1    MAYER BROWN LLP
     John Nadolenco (SBN 181128)
2    350 South Grand Avenue
     25th Floor
3    Los Angeles, CA 90071-1503
     Telephone: (213) 229-9500
4    jnadolenco@mayerbrown.com

5    Lauren R. Goldman (*pro hac vice*)
     1221 Avenue of the Americas
6    New York, NY 10020
     Telephone: (212) 506-2647
7    lrgoldman@mayerbrown.com

8    Archis A. Parasharami (*pro hac vice*)
     1999 K Street, N.W.
9    Washington, D.C. 20006-1101
     Telephone: (202) 263-3328
10   aparasharami@mayerbrown.com

11   *Counsel for Defendant Facebook, Inc.*

12

13                 **UNITED STATES DISTRICT COURT**

14                 **NORTHERN DISTRICT OF CALIFORNIA**

15                     **SAN FRANCISCO DIVISION**

16   IN RE FACEBOOK BIOMETRIC              Master Docket No.: 3:15-CV-03747-JD
     INFORMATION PRIVACY LITIGATION
17                                          **DEFENDANT FACEBOOK, INC.'S**
                                            **MOTION TO DISMISS;**
18   THIS DOCUMENT RELATES TO:             **MEMORANDUM OF POINTS AND**
                                            **AUTHORITIES IN SUPPORT**
19   ALL ACTIONS
                                            Date: December 16, 2015
20                                          Time: 10:00 a.m.
                                            Location: Courtroom 11
21
                                            Hon. James Donato
22
                                            [*Request for Judicial Notice and Proposed*
23                                          *Order filed concurrently herewith*]

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................. 1

STATEMENT OF ISSUES TO BE DECIDED .......................................................... 2

BACKGROUND ............................................................................................................ 2

    A.    Facebook's Terms of Service................................................................ 2

    B.    Facebook's Tag Suggestions Feature.................................................... 3

    C.    The Illinois Biometric Identification Privacy Act And Plaintiffs' Claims ........... 4

    D.    Procedural History ................................................................................ 6

I.    PLAINTIFFS CANNOT PURSUE A CLAIM UNDER THE ILLINOIS BIPA BECAUSE THEY AGREED THAT CALIFORNIA LAW GOVERNS THEIR DISPUTES WITH FACEBOOK ............................................................................ 6

    A.    California Has A Substantial Relationship To The Parties.................... 7

    B.    Applying California Law Would Not Offend Any Fundamental Policy of Illinois Law .................................................................................... 7

    C.    Illinois Does Not Have A Materially Greater Interest Than California In Resolving The Parties' Dispute ....................................................... 8

II.    THE ILLINOIS BIPA DOES NOT APPLY TO TAG SUGGESTIONS ...................... 10

    A.    The Plain Language Of The BIPA Expressly Excludes From The Statute's Reach Photographs And Any Information Derived From Photographs ............. 10

    B.    Collecting Information From Photographs Does Not Constitute A "Scan Of Hand Or Face Geometry" Within The Meaning Of The BIPA ..................... 11

        1.    Liability Under The BIPA Attaches Only To Biometric Identifiers And Information Derived From Them.................................... 11

        2.    The Phrase "Scan Of Hand Or Face Geography" Describes An In-Person, Physical Scan. ..................................................... 12

        3.    Plaintiffs' Argument Cannot Be Squared With The Legislative Findings And History.......................................................... 13

CONCLUSION................................................................................................................ 15

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Abat v. Chase Bank USA, N.A.*,
   738 F. Supp. 2d 1093 (C.D. Cal. 2010) ...............................................................................9

5

*ASW v. Oregon*,
6   424 F.3d 970 (9th Cir. 2005) ..............................................................................................3

7

*Brazil v. Dell Inc.*,
   585 F. Supp. 2d 1158 (N.D. Cal. 2008) ...............................................................................8

8

*C.M.D. v. Facebook, Inc.*,
9   2014 WL 1266291 (N.D. Cal. Mar. 26, 2014)......................................................................9

10

*Cannon v. Wells Fargo Bank, N.A.*,
   917 F. Supp. 2d 1025 (N.D. Cal. 2013) ...............................................................................9

11

*Commodity Futures Trading Comm'n v. Worth Bullion Grp.*,
12   717 F.3d 545 (7th Cir. 2013) ..............................................................................................12

13

*Davis v. Maryland Bank N.A.*,
   2002 WL 32713429 (N.D. Cal. June 19, 2002) ...................................................................9

14

*Gadda v. State Bar of Cal.*,
15   511 F.3d 933 (9th Cir. 2007) ..............................................................................................15

16

*Maksym v. Bd. of Election Comm'rs*,
   242 Ill. 2d 303 (2011) ........................................................................................................13

17

*Martin v. D-Wave Sys., Inc.*,
18   2009 WL 4572743 (N.D. Cal. 2009) ....................................................................................9

19

*McCann v. Foster Wheeler LLC*,
   48 Cal. 4th 68 (2010) ...........................................................................................................8

20

*McCoy v. Chase Manhattan Bank, USA, N.A.*,
21   654 F.3d 971 (9th Cir. 2011) ..............................................................................................10

22

*Medimatch, Inc. v. Lucent Tech. Inc.*,
   120 F. Supp. 2d 842 (N.D. Cal. 2000) ............................................................................8, 10

23

*Mell v. Goodbody & Co.*,
24   10 Ill. App. 3d 809 (1973) ...................................................................................................8

25

*Mich. Ave. Nat'l Bank v. Cnty. of Cook*,
   191 Ill. 2d 493 (2000) ...................................................................................................10, 13

26

*Midway Home Entertainment, Inc. v. Atwood Richards, Inc.*,
27   1998 WL 774123 (N.D. Ill. Oct. 29, 1998)..........................................................................7

28

*Nedlloyd Lines B.V. v. Super. Ct.*,
  3 Cal. 4th 459 (1992) ...........................................................................................6, 7, 8

*People v. Diggins*,
  235 Ill. 2d 48 (Ill. 2009).............................................................................................10

*People v. Qualls*,
  365 Ill. App. 3d 1015 (2006) ......................................................................................12

*People v. Trainor*,
  196 Ill. 2d 318 (2001) .................................................................................................12

*Potomac Leasing Co. v. Chuck's Pub, Inc.*,
  156 Ill. App. 3d 755 (1987) .......................................................................................7, 8

*S. Illinoisian v. Ill. Dep't of Pub. Health*,
  218 Ill. 2d 390 (2006) .................................................................................................10

*Skokie Castings, Inc. v. Ill. Ins. Guar. Fund*,
  2013 IL 113873 (Ill. Oct. 18, 2013)............................................................................14

*Song fi, Inc. v. Google, Inc.*,
  72 F. Supp. 3d 53, 64 (D.D.C.2014) .............................................................................9

*Telular Corp. v. Mentor Graphics Corp.*,
  282 F. Supp. 2d 869 (N.D. Ill. 2003) ............................................................................7

*WTM, Inc. v. Henneck*,
  125 F. Supp. 2d 864 (N.D. Ill. 2000) ............................................................................8

*Zinser v. Accufix Research Inst., Inc.*,
  253 F.3d 1180 (9th Cir. 2001) .......................................................................................6

**Statutes**

28 U.S.C. § 1404(a) ............................................................................................................6

740 ILCS 14/1 *et seq.*.........................................................................................................4

740 ILCS 14/5(a) ...........................................................................................................4, 14

740 ILCS 14/5(c) ................................................................................................................4

740 ILCS 14/10............................................................................................................. *passim*

740 ILCS 14/20(1) ..............................................................................................................6

740 ILCS 14/20(2) ..............................................................................................................6

**Rules**

Fed. R. Civ. P. 12(b)(6)......................................................................................................1

**Other Authorities**

2008 Reg. Sess. No. 167, at 60-61 (July 10, 2008)...........................................................................15

2008 Reg. Sess. No. 276, at 249 (May 30, 2008) ..............................................................................4

Illinois Senate Bill 2400, § 10 (Feb. 14, 2008)................................................................................14

Illinois Senate Bill 2400, § 10 (Apr. 11, 2008)................................................................................14

Illinois Senate Bill 2400, § 10 (May 28, 2008)................................................................................15

National Technology and Science Council, Committee on Technology,
    Committee on Homeland Security, Subcommittee on Biometrics, *Hand
    Geometry* (Aug. 7, 2006) ........................................................................................................13

Restatement (Second) of Conflict of Laws ..................................................................................... 6, 9

U.S. Customs and Border Protection, *Global Entry* ......................................................................13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>NOTICE OF MOTION & MOTION TO DISMISS</u>

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT, on December 16, 2015, at 10:00 a.m., before the Honorable James Donato, defendant Facebook, Inc. ("Facebook") will and hereby does move under Federal Rule of Civil Procedure 12(b)(6) for an order dismissing with prejudice the consolidated complaint (Dkt. No. 40) filed by plaintiffs Adam Pezen, Carlo Licata, and Nimesh Patel (collectively, "plaintiffs"). Facebook moves to dismiss the lawsuit on two grounds. First, plaintiffs' claims, which arise under an Illinois statute, are barred by the California choice-of-law provision in the contract that governs plaintiffs' relationship with Facebook. Second, even if Illinois law did apply, plaintiffs cannot state a claim under the Illinois Biometric Identification Privacy Act.

Facebook's motion is based on this notice of motion and motion, the accompanying memorandum of points and authorities, Facebook's Request for Judicial Notice ("RJN"), any reply memorandum that Facebook may file, the pleadings, papers and other documents on file in this action, and such other evidence and argument presented to the Court at or prior to the hearing in this matter.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

This suit challenges a product feature that enables people to more easily tag their friends in the photos that they upload to Facebook.  Plaintiffs assert that this feature, called "Tag Suggestions," violates an Illinois statute that regulates biometric data.  But Facebook's terms make clear that California law—not Illinois law—applies to all claims related to its service.  And, in any event, the Illinois statute expressly excludes both "photographs" and "information derived from photographs" from its reach.  Plaintiffs' claims should be dismissed.

Over a billion people worldwide use Facebook to connect with their friends and family and share a wide variety of interesting content, including photos, with them.  As described more fully below, Facebook has for many years enabled people to make sharing photos a more social and personal experience through a feature called "tagging."  A tag identifies a person by name and—if he or she also uses Facebook—links to that person's Facebook account.  For example, someone who uploads a photo of himself and six of his Facebook friends can tag not only himself in the photo, but also his six friends.  Those friends are notified about the photo and granted access to it.  The photo (and any tags) are visible only to the audience determined by the person who uploads it.

In 2010, Facebook started rolling out a feature called "Tag Suggestions" to make it easier for people to tag their friends in photos.  Facebook uses facial-recognition technology to analyze photos that are uploaded to its service, and then uses the information derived from the photos to make suggestions about which friends to tag.  Tag Suggestions is a completely optional feature and can be turned off at any time.  If a person turns Tag Suggestions off, Facebook will delete the information previously derived from photos of him.

Plaintiffs allege that the Tag Suggestions feature violates the Biometric Identification Privacy Act (the "BIPA"), an Illinois statute enacted in 2008 to regulate the use of biometric technologies (*e.g.*, retina, voice, and fingerprint scans) in connection with financial transactions and security screenings—not photo-tagging features offered by services like Facebook.

Plaintiffs' claims should be dismissed for two independently sufficient reasons.

*First*, plaintiffs' claims are barred by the terms that govern their relationship with Facebook.  As a condition of using Facebook, each plaintiff affirmatively agreed to Facebook's terms of service, which provide that California law applies to any dispute he might have with Facebook.  That contractual choice of California law is fully enforceable and precludes plaintiffs from bringing a claim under the law of another State.

*Second*, even if the Illinois statute applies, plaintiffs cannot state a claim under it.  The BIPA applies only to data that qualifies as a "biometric identifier" or "biometric information." 740 ILCS 14/10.  The statute expressly defines those terms to *exclude* both "photographs" and any "information derived from" photographs.  *Id.*  Because plaintiffs' claims rest entirely on information derived from photographs, their complaint should be dismissed with prejudice.

## STATEMENT OF THE ISSUES TO BE DECIDED

1.      Whether plaintiffs' claims under an Illinois statute are barred by the California choice-of-law provision in the terms that govern plaintiffs' relationship with Facebook.

2.      Whether plaintiffs have stated a claim under the BIPA.

## BACKGROUND

### A.      Facebook's Terms of Service

Each of the plaintiffs alleges that he currently has an active Facebook account.  *See* Compl. ¶¶ 32, 39, 46.  Mr. Pezen joined Facebook on August 22, 2005; Mr. Licata joined on November 13, 2009; and Mr. Patel joined no later than 2008.  *See id.*; RJN Ex. 1 (Decl. of Jeremy Jordan in Supp. of Def.'s Mot. to Transfer Venue) (Dkt. No. 20) ("Jordan Decl."), ¶ 3.

Each person who registers for and uses Facebook is required to affirmatively agree to its terms, which are called the "Statement of Rights and Responsibilities" (the "SRR").[1]  *See* Jordan Decl. Ex. A.  The SRR makes clear that adhering to Facebook's terms is a condition of using Facebook's service:  "By using or accessing the Facebook Services, you agree to this Statement, as updated from time to time . . . ."  *Id.*  The SRR is also hyperlinked on virtually every page of Facebook, including its homepage.  Jordan Decl. ¶ 6.

---

[1]      At various times, Facebook's terms of service have been called "Terms of Use" or "Terms of Service" rather than the "Statement of Rights and Responsibilities."  Jordan Decl. ¶ 7.

1  As relevant here, the SRR provides that "[t]he laws of the State of California will

2  govern . . . any claim that might arise" between each of the plaintiffs and Facebook, and that any

3  such claim will be litigated "exclusively in the U.S. District Court for the Northern District of

4  California or a state court located in San Mateo County." *Id*. Ex. A, § 15(1).[2]  As we discuss

5  below (at 6), plaintiffs all stipulated to transfer their lawsuits from Illinois to this Court.

6  **B.      Facebook's Tag Suggestions Feature**

7  People come to Facebook to share and view photos of themselves, their friends, and their

8  families.  For many years, Facebook has made sharing photos more personal and social by

9  allowing people to "tag" friends who appear in photos.  Compl. ¶ 2.  Tagging allows people to

10  organize their uploaded photos not just by the date when they were taken or uploaded, but also

11  by who is in them.  And this feature empowers the people tagged in a photo, by telling them that

12  they have been tagged and granting them access to the photo, which they can then view and

13  share with their other friends if they choose to do so.   "About Photo Tags,"

14  https://www.facebook.com/help/463455293673370.

15  One way in which a person can tag friends is by manually typing in their names.

16  Plaintiffs allege that Facebook launched a feature called "Tag Suggestions" in 2010 as an

17  alternative to manual tagging.  Compl. ¶¶ 3, 21.[3]  Plaintiffs' claim is entirely based upon

18  photographs and the information derived from them:  they allege  that Tag Suggestions uses

19

20  [2]      Facebook's terms have included a choice-of-law clause at all relevant times. The clause
21  has selected California law at nearly all times since at least 2005, including the dates when
   plaintiffs Pezen and Licata joined Facebook.  *See* Jordan Decl. ¶ 9; *id.* Ex. A § 15.1; Ex. B at p.
   9; Ex. C § 14.1; Ex. D § 15.1; Ex. E § 15.1; Ex. F § 15.1; Ex. G § 15.1; Ex. I at p.14; Ex. J at pp.
22  3-4.  For a brief period, the terms included a Delaware choice-of-law provision, but Facebook
   returned to the selection of California law in early 2009.  *Compare id.* Ex. H § 15.1 (version
23  dated September 23, 2008 containing Delaware choice-of-law clause) *with id.* Ex. I (version
   dated February 4, 2009 containing California choice-of-law clause).  Facebook has provided
24  notice of changes to its terms to people with Facebook accounts and informed them that
   "continued use" of the service constitutes "acceptance" of any new terms. *Id.* ¶ 11; Ex. A § 13.3.
25
26  [3]      Because the Court must "accept as true all well pleaded facts in the complaint" for
   purposes of this motion (*ASW v. Oregon*, 424 F.3d 970, 974 (9th Cir. 2005)), the description of
27  Facebook's Tag Suggestions feature is drawn largely from the consolidated complaint.
   Facebook reserves its right to contest the factual allegations in the complaint—including the
28  characterization of Tag Suggestions—should the case proceed beyond the pleadings stage.

"facial recognition technology" to scan "user-uploaded photographs" and to derive from those photographs various information "about the geometry of [a person's] face," such as "the distance between their eyes, nose, and ears." *Id.* ¶¶ 22–24. The information derived from previously-uploaded photographs of a person is then saved as a "template." *Id.* ¶ 24. The feature can be turned off at any time (*id.* ¶¶ 27, 29), in which case Facebook will delete the template ("Tag Suggestions," https://www.facebook.com/help/463455293673370). If the tagged person leaves the feature enabled, Facebook uses the template data to simplify the process in the future by suggesting that the person be tagged when other photos that look like him or her are uploaded. Compl. ¶¶ 3, 21.

### C.   The Illinois Biometric Identification Privacy Act And Plaintiffs' Claims

The Illinois Biometric Identification Privacy Act, 740 ILCS 14/1 *et seq.*, is a narrowly-written, state-specific statute; California has no such law. It was enacted in 2008 to address the "growing" use of biometric data "in the business and security screening sectors" in that State. 740 ILCS 14/5(a). The legislature found that "[m]ajor national corporations have selected the City of Chicago and other locations in this State as pilot testing sites for new applications of biometric-facilitated financial transactions, including finger-scan technologies at grocery stores, gas stations, and school cafeterias." *Id.* 14/5(b). It surmised that Illinois consumers were wary "of the use of biometrics when such information is tied to finances," and might be "deterred from partaking in biometric identifier-facilitated transactions" in the absence of additional "State law regulating the collection, use, safeguarding, and storage of biometrics." *Id.* 14/5(d)–(e). Of particular concern to the legislature, a company that stored fingerprint scans had filed for bankruptcy; it was unclear what would happen to the scans. RJN Ex. 2 (IL H.R. Tran. 2008 Reg. Sess. No. 276, at 249 (May 30, 2008) (Statement of Rep. Kathleen A. Ryg) ("Ryg Statement").

The BIPA addresses these concerns by regulating the collection and storage of "biometric identifiers" and "biometric information." The legislature gave these terms very specific definitions that reflect the statute's focus on "biometric-facilitated *transactions*." 740 ILCS 14/5(c) (emphasis added). "Biometric identifiers" are certain sources of data about a person. Section 10 of the BIPA provides a short, exclusive list: "'[b]iometric identifier' means a retina or

iris scan, fingerprint, voiceprint, or scan of hand or face geometry." *Id.* 14/10.  Other identifiers are then expressly *excluded* from that definition, including "writing samples, written signatures, *photographs*, human biological samples used for valid scientific testing or screening, demographic data, tattoo descriptions, or physical descriptions such as height, weight, hair color, or eye color." *Id.* (emphasis added).

"Biometric information," in turn, is data derived from analysis of a biometric identifier: the term is defined as information "based on an individual's biometric identifier" that is "used to identify an individual."  740 ILCS 14/10.  The statute expressly states that "[b]iometric information *does not include* information derived from items or procedures excluded under the definition of biometric identifiers"—such as photographs.  *Id.* (emphasis added).

The BIPA then imposes certain obligations on private entities that (1) obtain "biometric identifiers" from people and/or (2) analyze those biometric identifiers to produce "biometric information."  Such an entity may not "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifier or biometric information" (*id.* 14/15(b)) without first (1) informing the individual in writing that "a biometric identifier or biometric information is being collected or stored" (*id.* 14/15(b)(1)) and for what "specific purpose and length of term" (*id.* 14/15(b)(2)); and (2) obtaining a "written release" from the individual (*id.* 14/15(b)(3)).  In addition, a "private entity in possession of biometric identifiers or biometric information" is required to develop a publicly available written policy regarding the retention and destruction of biometric identifiers and biometric information.  *Id.* 14/15(a).

Plaintiffs allege that by "extract[ing] . . . from user-uploaded photographs" "information about the geometry" of individuals' faces, Facebook is collecting and retaining "biometric identifiers" within the meaning of the BIPA.  Compl. ¶¶ 23–24, 63.  Plaintiffs do not allege whether they have disabled the Tag Suggestions feature for their accounts.  Nevertheless, they allege that Facebook has violated the statute by failing to make the requisite disclosures to, and obtain adequate releases from, these individuals.  *Id.* ¶¶ 65–71.  They seek to represent a putative class that consists of "[a]ll persons who had their biometric identifiers, faceprints, or face templates collected, captured, received, or otherwise obtained by Facebook while residing in

Illinois."  Compl. ¶ 53.  And they request statutory damages of $5,000 per allegedly intentional and reckless violation (*see* 740 ILCS 14/20(2)) or (alternatively) statutory damages of $1,000 per allegedly negligent violation ((*see* 740 ILCS 14/20(1)); declaratory and injunctive relief; litigation expenses and attorneys' fees; and interest.  *See* Compl. at 15–16 (Prayer for Relief).

### D.   Procedural History

Each of the plaintiffs initially sued in Illinois.  Facebook moved to transfer the cases to this Court pursuant to 28 U.S.C. § 1404(a) and the SRR's forum-selection clause described above.   The parties ultimately stipulated to the transfer, and Judge Zagel transferred the consolidated cases to this Court.  Dkt. No. 29.

### ARGUMENT

### I.   PLAINTIFFS CANNOT PURSUE A CLAIM UNDER THE ILLINOIS BIPA BECAUSE THEY AGREED THAT CALIFORNIA LAW GOVERNS THEIR DISPUTES WITH FACEBOOK.

When they signed up for and used Facebook's services, plaintiffs entered into a contract that requires California law to govern "any claim that might arise" between each plaintiff and Facebook.   Jordan Decl. Ex. A, § 15(1).   Because this choice-of-law provision is valid and enforceable, plaintiffs may not bring a claim under Illinois law, and the Court should dismiss their claims under the Illinois BIPA.[4]

When assessing a choice-of-law clause, "[a] federal court sitting in diversity must look to the forum state's choice-of-law rules."  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1187 (9th Cir. 2001).  California has adopted Section 187(2)(b) of the Restatement (Second) of Conflict of Laws, which "reflect[s] a strong policy favoring enforcement of such provisions."  *Nedlloyd Lines B.V. v. Super. Ct.*, 3 Cal. 4th 459, 465 (1992).  "The law of the state chosen by

---

[4]      As noted, Facebook's terms included a California choice-of-law clause when both Mr. Pezen and Mr. Licata signed up for a Facebook account.  Mr. Patel does not disclose the precise date on which he signed up for Facebook; it is possible that he signed up during the brief period in which the terms selected Delaware law.  That possibility makes little difference, however, because (1) all of the plaintiffs are current Facebook users (Compl. ¶¶ 32, 39, 46) and are bound by the *current* Statement, which selects California law (Jordan Decl. ¶ 11; Ex. A § 13); and (2) the selection of either California or Delaware law (*id.* Exs. A-J) means that the parties never selected *Illinois* law to govern their disputes.

the parties . . . will be applied" unless one of two narrow exceptions is met:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice[;] or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Id.* (quoting Restatement (Second) of Conflict of Laws § 187(2)(a)–(b)).   Neither of those exceptions applies here.

### A.   California Has A Substantial Relationship To The Parties.

The first exception can be dispatched quickly.  Facebook is headquartered in California. *E.g.*, Compl. ¶ 10. "'If one of the parties resides in the chosen state, the parties have a reasonable basis for their choice,'" and the first exception is inapplicable.  *Nedlloyd*, 3 Cal. 4th at 467 (quoting *Consul Ltd. v. Solide Enters.*, 802 F.2d 1143, 1147 (9th Cir. 1986)).

### B.   Applying California Law Would Not Offend Any Fundamental Policy of Illinois Law.

Applying California law does not offend any fundamental policy of Illinois law—even though it means that plaintiffs cannot sue under an Illinois statute.  Illinois courts consistently enforce choice-of-law provisions even where the selection of another state's law precludes Illinois residents from pursuing an Illinois-specific claim or defense.   In *Midway Home Entertainment, Inc. v. Atwood Richards, Inc.*, 1998 WL 774123, at *2-3 (N.D. Ill. Oct. 29, 1998), for example, the court enforced the parties' contractual choice of New York law and dismissed the plaintiff's Illinois Consumer Fraud Act claim—even though New York's consumer protection statute was substantially narrower in scope than the Illinois Consumer Fraud Act; "left the Illinois residents no recourse" for the alleged wrong; and "deprive[d] Illinois citizens of protection guaranteed by their legislature."  Similarly, in *Potomac Leasing Co. v. Chuck's Pub, Inc.*, 156 Ill. App. 3d 755, 759 (1987), the Illinois Court of Appeals enforced a Michigan choice-of-law provision in the parties' lease agreement and precluded the defendant from asserting a defense under the Illinois consumer fraud statute.[5]

---

[5]    *See also*, *e.g.*, *Telular Corp. v. Mentor Graphics Corp.*, 282 F. Supp. 2d 869, 871 (N.D. Ill. 2003) (noting dismissal of Illinois Consumer Fraud Act claim in light of the "Oregon choice

1  These cases reflect the principle—accepted in both Illinois and California—that a court

2  should "apply the law of [the selected] State . . . unless it is contrary to pure morals and abstract

3  justice. . . . The public policy considerations must be strong and of a fundamental nature to

4  justify overriding the chosen law of the parties." *Potomac Leasing Co.*, 156 Ill.App.3d at 759

5  (alteration and quotation marks omitted). *See also*, *e.g.*, *Medimatch, Inc. v. Lucent Tech. Inc.*,

6  120 F. Supp. 2d 842, 862 (N.D. Cal. 2000) ("the mere fact that the chosen law provides a greater

7  or lesser protection . . ., or that in a particular application the chosen law would not provide

8  protection" does not render a choice-of-law clause unenforceable); *Brazil v. Dell Inc.*, 585 F.

9  Supp. 2d 1158, 1166 (N.D. Cal. 2008) (same).  Because Illinois law *supports* the enforcement of

10  contractual choice-of-law provisions even where a party will be deprived of a claim or defense,

11  the application of California law here violates no fundamental Illinois law or policy.

12  **C.      Illinois Does Not Have A Materially Greater Interest Than California In Resolving The Parties' Dispute.**

13  The absence of any conflict between the application of California law and a fundamental

14  policy of Illinois should end the inquiry.  *Nedlloyd*, 3 Cal. 4th at 466.  But even if it did not,

15  plaintiffs could not satisfy the second exception:  Illinois does not have a "materially greater

16  interest" than California in applying its laws in this case.  While Illinois does have an interest in

17  applying its laws to its residents, California has a countervailing interest in "being able to assure

18  individuals and commercial entities operating within its territory that *applicable limitations on*

19  *liability* set forth in the jurisdiction's law will be available to those individuals and businesses in

20  the event they are faced with litigation in the future." *McCann v. Foster Wheeler LLC*, 48 Cal.

21  4th 68, 98 (2010) (emphasis added).  That interest includes enforcing choice-of-law provisions

22  that provide certainty and predictability to technology companies like Facebook—many of which

23  call California home—that provide their services for free to people across the United States.  *Cf.*

24

25  of law provision in the contract"); *Mell v. Goodbody & Co.*, 10 Ill. App. 3d 809, 813 (1973) (holding that New York choice-of-law provision barred claim that loans were usurious under Illinois law and squarely rejecting argument "that giving effect to New York law . . ., which

26  permits an interest rate higher than that allowed in Illinois, would violate Illinois public policy");

27  *WTM, Inc. v. Henneck*, 125 F. Supp. 2d 864, 868 (N.D. Ill. 2000) ("[t]he fact that a different state may provide certain statutory rights for a plaintiff which are not available under the chosen

28  state's law does not invalidate a choice-of-law provision as contrary to public policy").

1   *Song fi, Inc. v. Google, Inc.*, 72 F. Supp. 3d 53, 64 (D.D.C.2014) (observing that the "provisions

2   and protections in [YouTube's] Terms of Service 'make it possible for YouTube to provide

3   video hosting services for free to hundreds of millions of users around the world'").

4          Overriding the parties' choice of law would impair California's interests by subjecting

5   such companies to a broad array of diverse and competing state-law standards—precisely the

6   result that contractual choice-of-law provisions are intended to avoid.  *See* Restatement (Second)

7   of Conflict of Laws § 187, cmt. e ("[T]he demands of certainty, predictability and convenience

8   dictate that" choice-of-law provisions be enforced, even if "the parties will be enabled to escape

9   prohibitions prevailing in the state which would otherwise be the state of the applicable law.").

10  Indeed, California federal courts have repeatedly recognized the "importance of enforcing choice

11  of law provisions for businesses with nationwide consumers to limit the risk and expenses of

12  litigation under different laws in every state."  *Abat v. Chase Bank USA, N.A.*, 738 F. Supp. 2d

13  1093, 1096 (C.D. Cal. 2010); *see also Davis v. Maryland Bank N.A.*, 2002 WL 32713429, at *10

14  (N.D. Cal. June 19, 2002).

15         In light of California's interest in enforcing choice-of-law provisions, it is unsurprising

16  that California courts—like Illinois courts—routinely invoke these principles to dismiss claims

17  brought under the laws of another state.  Enforcing the same California choice-of-law clause that

18  applies in this case, Judge Seeborg recently dismissed claims alleging violations of the Illinois

19  Right of Publicity Act.  *C.M.D. v. Facebook, Inc.*, 2014 WL 1266291, at *5 (N.D. Cal. Mar. 26,

20  2014).  Similarly, in *Song fi Inc. v. Google, Inc.*, --- F. Supp. 3d. ----, 2015 WL 3624335 (N.D.

21  Cal. June 10, 2015), the court granted the defendants' motion to dismiss the plaintiffs' claims

22  under the District of Columbia's consumer protection statute, because YouTube's online "Terms

23  of Service provide[] that California law governs the parties' dispute."  *Id.* at *8.[6]

24

25  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
    [6]    *See also, e.g.*, *Cannon v. Wells Fargo Bank, N.A.*, 917 F. Supp. 2d 1025, 1055 (N.D. Cal.
    2013) (dismissing California Unfair Competition Law (UCL) claim at the pleadings stage

26  because the parties' contract chose Florida law to govern their disputes); *Abat*, 738 F. Supp. 2d at
    1094–96 (Delaware choice-of-law clause "bars Plaintiff's California statutory claims as a matter

27  of law"); *Martin v. D-Wave Sys., Inc.*, 2009 WL 4572743, at *4–6 (N.D. Cal. 2009) (enforceable
    Canadian choice-of-law provision required dismissal of California cause of action); *Davis*, 2002

28  WL 32713429, at *10–11 (enforceable Delaware choice-of-law provision barred plaintiff's

1    In providing a free service to people across the United States, Facebook relied upon, and

2    is entitled to, the predictability resulting from the parties' selection of California law to govern

3    their disputes—a tradeoff that courts in both Illinois and California recognize and encourage.

4    Plaintiffs' effort to pursue claims under another state's laws should be rejected.

5    **II.     THE ILLINOIS BIPA DOES NOT APPLY TO TAG SUGGESTIONS.**

6    Even if plaintiffs were entitled to bring claims under the Illinois BIPA, those claims

7    would fail because they are barred by the plain language of the statute, which *expressly excludes*

8    from the definitions of "biometric identifier" and "biometric information" (i) photographs and

9    (ii) any information derived from those photographs.  The BIPA's express legislative findings

10   and history confirm that these broad exclusions were deliberate: the General Assembly sought to

11   regulate the use of biometric technology to facilitate financial and other secure transactions, and

12   wanted to make clear that other types and uses of technology were not prohibited.

13   **A.     The Plain Language Of The BIPA Expressly Excludes From The Statute's Reach Photographs And Any Information Derived From Photographs.**

14   Illinois' statutory-construction principles govern this Court's interpretation of an Illinois

15   statute like the BIPA.  *McCoy v. Chase Manhattan Bank, USA, N.A.*, 654 F.3d 971, 974–75 (9th

16   Cir. 2011).  The "primary objective" of statutory construction is to "ascertain and give effect to

17   the intent of the General Assembly."  *S. Illinoisian v. Ill. Dep't of Pub. Health*, 218 Ill. 2d 390,

18   415 (2006).  That inquiry "begins with the plain language of the statute, which is the most

19   reliable indication of the legislature's objectives."  *Id.*  Courts must "view all provisions of an

20   enactment as a whole," with each provision considered "in light of [the] other relevant provisions

21   of the statute" rather than "in isolation."  *Mich. Ave. Nat'l Bank v. Cnty. of Cook*, 191 Ill. 2d 493,

22   504 (2000) (citation omitted)).  "[N]o part [should be] rendered meaningless or superfluous."

23   *People v. Diggins*, 235 Ill. 2d 48, 54 (Ill. 2009).

24   Plaintiffs allege that the Tag Suggestions feature is based entirely on photos that people

25   voluntarily upload to Facebook.  *E.g.*, Compl. ¶¶ 2–4, 21–23, 26–27, 36, 43, 50.[7]  But the statute

26   California statutory causes of action under California's Song-Beverly Credit Card Act and
     Consumer Credit Reporting Act); *Medimatch*, 120 F. Supp. 2d at 861–62 (dismissing California

27   UCL claim because of enforceable New Jersey choice-of-law provision).

28   [7]    *See also, e.g.*, Compl. ¶ 3 ("Tag Suggestions functions by scanning photographs uploaded

10

specifically *excludes* from its coverage photographs and any information derived from photographs.  A "biometric identifier" is "a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry"; "*[b]iometric identifiers do not include . . . photographs*."  740 ILCS 14/10 (emphasis added).  "Biometric information" is limited to information "based on an individual's biometric identifier" and "*does not include information derived from items or procedures excluded under the definition of biometric identifiers*."  740 ILCS 14/10 (emphasis added).  Plaintiffs' claims thus fail as a matter of law.

**B.    Collecting Information From Photographs Does Not Constitute A "Scan Of Hand Or Face Geometry" Within The Meaning Of The BIPA.**

Ignoring the BIPA's clear exclusions of photographs and information derived from them, plaintiffs allege that "information about the geometry of their face"—no matter the source—constitutes a "scan of hand or face geometry" and thus falls within the definition of "biometric identifier."  Compl. ¶¶ 19, 23; *see also, e.g.*, *id.* ¶¶ 26, 36, 43, 50, 63.  That contention is wrong.

**1.    Liability Under The BIPA Attaches Only To Biometric Identifiers And Information Derived From Them.**

Plaintiffs' approach ignores the structure of the statute:  liability attaches under the BIPA only if the *source* of the information qualifies as a "biometric identifier."  740 ILCS 14/10.  As we have just shown, photographs do not qualify.

Nor can the application of facial-recognition technology transform a photograph into a biometric identifier.  The BIPA has a separate section that specifically addresses the application of technology to data that a party has collected:  the provision on "biometric information," which is defined as information "based on an individual's biometric identifier" that is "used to identify an individual."  740 ILCS 14/10.  If data "extracted" from the analysis of photographs (Compl. ¶¶ 23-24) were to be covered by the BIPA, it would be covered under the rubric of "biometric information."  But it is not: the statute explicitly excludes from the definition of "biometric

by the user"); *id.* ¶ 4 ("Tag Suggestions uses proprietary facial recognition software to extract from user-uploaded photographs" information about "facial geometry"); *id.* ¶ 22 ("Tag Suggestions relies on state-of-the-art facial recognition technology to extract biometric identifiers from user-uploaded photographs"); *id.* ¶ 36 ("when Pezen uploaded photographs to his account and made them his profile pictures, and also when he was tagged in photographs, . . . Facebook extracted from those photographs a unique faceprint or 'template' for him").

11

1  information" all "information derived from" the "items and procedures" that are excluded from

2  the meaning of "biometric identifier," including "photographs."  740 ILCS 14/10.

3       The across-the-board exclusion of photographs and information derived from them would

4  be rendered meaningless if the statute were interpreted to cover data derived from the scan of a

5  photograph.  *See People v. Trainor*, 196 Ill. 2d 318, 332 (2001) (the words of a statute "must be

6  read in conjunction with one another and their language so construed as to make them

7  harmonious and consistent," rather than "in a fashion that would render other words or phrases

8  meaningless, redundant, or superfluous").   It would make no sense for the legislature to

9  expressly exclude (1) photographs from the definition of biometric identifier and (2) information

10  derived from photographs from the definition of biometric information—only to turn around and

11  regulate information derived from photographs under a different label.

### 2. The Phrase "Scan Of Hand Or Face Geography" Describes An In-Person, Physical Scan.

13       Plaintiffs' theory cannot be squared with the very statutory phrase on which they rely:  a

14  "*scan* of hand or face geometry," 740 ILCS 14/10 (emphasis added).  That term plainly means an

15  *in-person* scan of a person's *actual* hand or face (which would typically occur for verification or

16  security purposes).  The reach of the word "scan" is "'narrowed by the commonsense canon of

17  *noscitur a sociis*—which counsels that a word is given more precise content by the neighboring

18  words with which it is associated.'"  *Commodity Futures Trading Comm'n v. Worth Bullion*

19  *Grp.*, 717 F.3d 545, 550 (7th Cir. 2013) (quoting *United States v. Williams*, 553 U.S. 285, 294

20  (2008)).  The purpose of this doctrine is "to avoid ascribing to one word a meaning so broad that

21  it is inconsistent with its accompanying words and to avoid the giving of unintended breadth to a

22  legislative act."  *People v. Qualls*, 365 Ill. App. 3d 1015, 1020 (2006) (quotation marks and

23  citations omitted).  That is precisely what plaintiffs seek to do here by claiming that a scan of a

24  photograph—as opposed to a hand or a face—is covered by the BIPA.

25       The "neighboring words" in the definition of biometric identifier—"retina or iris scan,

26  fingerprint, [or] voiceprint" (740 ILCS 14/10)—all describe the product of a common physical,

27  in-person process for obtaining information about an individual that can then be used for

28

1    authenticating a financial or other sensitive transaction or for accessing a secure area.  Retailers

2    and banks often authenticate financial transactions by scanning a person's finger or hand to

3    verify his or her identity.  In lieu of using identification cards, key fobs, or passcodes, businesses

4    often verify an individual's identity by scanning his or her finger, hand, eye, face, or voice.[8]

5         Just as a "retina or iris scan" requires putting one's eye up to a console for examination

6    and verification, so too must a "scan of hand or face geometry" require a person to present his or

7    her hand or face itself at a console or other type of scanner, such as the scanners now widely

8    used by government agencies at airports.  *See generally* U.S. Customs and Border Protection,

9    *Global Entry*, available at http://www.cbp.gov/travel/trusted-traveler-programs/global-entry (last

10   accessed Oct. 9, 2015) (qualifying travelers "may enter the United States by using automated

11   kiosks," a process which involves "plac[ing] their fingertips on the scanner for fingerprint

12   verification").  That is because the word "scan" must be construed consistently throughout the

13   statute.  When "the same . . . words or phrases appear in different parts of the same statute[,] they

14   will be given a generally accepted and consistent meaning."  *Maksym v. Bd. of Election

15   Comm'rs*, 242 Ill. 2d 303, 322 (2011) (citation omitted).  The BIPA does not apply to

16   photographs uploaded to Facebook's platform because the pictures did not result from in-person

17   scans of an individual's face itself.

18              **3.    Plaintiffs' Argument Cannot Be Squared With The Legislative
                        Findings And History.**

19        There is no reason for this Court to consider the legislative findings or history, because

20   the statutory language is utterly unambiguous.  *Mich. Ave. Nat'l Bank*, 191 Ill. 2d at 504 (citing

21   *Davis v. Toshiba Mach. Co.*, 186 Ill. 2d 181, 184–85 (1999)).  But these sources confirm that the

22   BIPA does not apply to Tag Suggestions.

23        The General Assembly's findings make clear that the statute regulates the use of

24   biometric identifiers to "streamline[] financial transactions and security screenings."  740 ILCS

25   _____

26   [8]     *See generally* National Technology and Science Council, Committee on Technology,
     Committee on Homeland Security, Subcommittee on Biometrics, *Hand Geometry* (Aug. 7,
27   2006), available at http://www.biometrics.gov/documents/handgeometry.pdf (last accessed Oct.
     9, 2015) ("Hand geometry recognition systems are widely used for applications in physical
28   access, attendance tracking, and personal verification.").

1    14/5(a).  The legislature was concerned with the substitution of biometric identifiers for "other

2    unique identifiers that are used to access finances or other sensitive information," such as "social

3    security numbers." *Id.* 14/5(c).  Thus, the legislature sought to regulate that substitution in order

4    to prevent Illinois residents from "withdraw[ing] from biometric-facilitated transactions" and to

5    ensure that they are not "deterred from partaking" in such transactions by a "heightened risk for

6    identity theft."  *Id.* 14/5(c), (e).  As an example, the General Assembly cited "finger-scan

7    technologies at grocery stores, gas stations, and school cafeterias."  *Id.* 14/5(b).  The notion that

8    the General Assembly intended the BIPA to apply to a very different set of circumstances—

9    scanning photos uploaded to online services to assist people in tagging their friends—finds no

10   support in the legislature's findings and statements of intent. *See, e.g.*, *Skokie Castings, Inc. v. Ill.*

11   *Ins. Guar. Fund*, 2013 IL 113873, ¶ 28 (Ill. Oct. 18, 2013) ("Legislative intent may . . . be

12   ascertained by considering the reason and necessity for the law, the evils to be remedied, and the

13   objects and purposes to be obtained.").

14        The legislative history further contradicts plaintiffs' reading of the BIPA.  The definitions

15   of "biometric identifier" and "biometric information" were sharply narrowed as the bill worked

16   its way towards passage.  The first version introduced in the Illinois Senate defined "biometric

17   identifier" and "biometric information" broadly (though even then, photographs were excluded):

18   > "Biometric identifier" means *any indelible personal physical characteristic* which
19   > can be used to uniquely identify an individual or pinpoint an individual at a
     > particular place at a particular time. Examples of biometric identifiers *include, but*
     > *are not limited to*, iris or retinal scans, fingerprints, voiceprints, and *records* of
20   > hand or facial geometry. Biometric identifiers do not include writing samples,
     > written signature[s], and photographs.

21   > "Biometric information" means any information, regardless of how it is captured,
     > converted, stored, or shared, based on an individual's biometric identifier used to
22   > identify an individual.

23   RJN Ex. 3 (Senate Bill 2400, § 10 (Feb. 14, 2008) (emphases added)).

24        A later version of the bill in the Senate changed the phrase "records of hand or facial

25   geometry" to the broader "records or scans of hand geometry, facial geometry, or *facial*

26   *recognition*."  RJN Ex. 4 (Amendment to Senate Bill 2400, § 10 (Apr. 11, 2008) (emphasis

27   added).  But that expansion was *rejected*.  The Illinois House of Representatives replaced the

28   Senate's definition of "biometric identifier" with the much narrower definition used in the statute

1    as enacted.  *See* RJN Ex. 5 (Amendment to Senate Bill 2400, § 10 (May 28, 2008).

2            The House thus (a) dropped any reference to "facial recognition"; (b) narrowed the

3    definition of "biometric identifier" from an open-ended set of "physical characteristic[s]" to a

4    narrowly-cabined list of enumerated sources; and (c) removed the broad term "records" and

5    replaced it with "scan."  The Senate unanimously concurred in these changes.  RJN Ex. 6 (Ill. S.

6    J., 2008 Reg. Sess. No. 167, at 60-61 (July 10, 2008)).  In other words, the Illinois General

7    Assembly consciously *declined* to regulate all possible forms of facial recognition technology.

8            A floor statement by the chief sponsor of the bill confirms the legislature's narrow focus

9    on how businesses collect and store information from biometric-facilitated financial transactions:

10           This Bill is especially important because one of the companies that has been
             piloted in Illinois, Pay By Touch, is the largest *fingerprint scan system* in Illinois
11           and they have recently filed for bankruptcy and wholly stopped providing
             verification services in March of 2008.  This pullout leaves thousands of
12           customers from Albertson's, Cub Foods, Farm Fresh, Jewel Osco, Shell, and
             Sunflower Market wondering what will become of their biometric and financial
13           data.  The California Bankruptcy Court recently approved the sale of their Pay By
             Touch database.  So, we are in very serious need of protections for the citizens of
14           Illinois when it comes to biometric information.

15   RJN Ex. 2 (Ryg Statement).

16           In sum, plaintiffs' complaint rests on an erroneous construction of the BIPA that is barred

17   by the plain language of the statute and cannot be squared with either the General Assembly's

18   express findings or the statute's legislative history.  Because plaintiffs cannot cure these defects,

19   the Court should dismiss these consolidated cases with prejudice.  *See, e.g.*, *Gadda v. State Bar*

20   *of Cal.*, 511 F.3d 933, 939 (9th Cir. 2007).

21                                   **CONCLUSION**

22           The consolidated amended complaint should be dismissed with prejudice.

23   Dated:  October 9, 2015                      MAYER BROWN LLP

24                                                By: */s/ John Nadolenco*
                                                     John Nadolenco
25                                                   Lauren R. Goldman
                                                     Archis A. Parasharami
26
27                                                *Counsel for Defendant Facebook, Inc.*

28

                                          15