Jay Edelson (Admitted *pro hac vice*)
jedelson@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Shawn A. Williams (213113)
shawnw@rgrdlaw.com
ROBBINS GELLER RUDMAN & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, California 94104
Tel: 415.288.4545
Fax: 415.288.4534

Paul J. Geller (Admitted *pro hac vice*)
pgeller@rgrdlaw.com
ROBBINS GELLER RUDMAN & DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, Florida 33432
Tel: 561.750.3000
Fax: 561.750.3364

Joel H. Bernstein (Admitted *pro hac vice*)
jbernstein@labaton.com
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
Tel: 212.907.0700
Fax: 212.818.0477

[Additional counsel appear on the signature page.]

*Counsel for Plaintiffs and the Putative Class*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

|  |  |
|---|---|
| *In re Facebook Biometric Information Privacy Litigation*<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Master Docket No. 3:15-cv-3747-JD<br><br>**PLAINTIFFS' OPPOSITION TO FACEBOOK'S MOTION TO DISMISS**<br><br>Date: December 16, 2015<br>Time: 10:00 a.m.<br>Location: Courtroom 11<br><br>Hon. James Donato |

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

FACTUAL BACKGROUND .............................................................................1

LEGAL ARGUMENT ......................................................................................3

    I.    Facebook's Illegal Collection Of Millions Of Illinois Residents'
        Biometric Identifiers Is Governed By Illinois Law .............................3

        A.    Facebook's choice-of-law clause cannot immunize it from
            liability for separate statutory violations against millions
            of Illinois residents .........................................................................3

            1.    Illinois has a fundamental public policy in protecting
                BIPA rights .......................................................................4

            2.    Illinois has a materially greater interest in this action than
                California or Delaware ......................................................6

        B.    Facebook fails to establish that Plaintiffs assented to its choice
            of law clause ...................................................................................8

        C.    Even if Facebook could show Plaintiffs' assent to its terms,
            Plaintiffs' claims fall outside the scope of the choice-of-law clause .......9

    II.    BIPA Regulates Facebook's Systematic Extraction Of
        Biometric Identifiers ......................................................................10

        A.    Scans of face geometry are explicitly regulated as biometric
            *Identifiers*, even where derived from photographs .............................11

        B.    Facebook's concocted "in-person" scan requirement also fails
            because BIPA regulates objects, not processes......................................13

        C.    BIPA's legislative history confirms its application to
            Facebook's conduct........................................................................14

CONCLUSION ................................................................................................15

# TABLE OF AUTHORITIES

**UNITED STATES SUPREME COURT CASES:**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................3

**UNITED STATES CIRCUIT COURT OF APPEALS CASES:**

*Fidelity Fed. Bank, FSB v. Durga Ma. Corp.*, 387 F.3d 1021 (9th Cir. 2004)..............10

*Johnson v. Lucent Tech. Inc.*, 653 F.3d 1000 (9th Cir. 2011) ..........................................3

*Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581 (9th Cir. 2012) ..............................7

*Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171 (9th Cir. 2014) ....................................8

*Pokorny v. Quixtar*, 601 F.3d 987 (9th Cir. 2009)...........................................................7

*Ruiz v. Affinity Logistics*, 667 F.3d 1318 (9th Cir. 2012) ...............................................7

*Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17 (2d Cir. 2002) ..................................8

*United States v. Corinthian Colleges*, 655 F.3d 984 (9th Cir. 2011)..............................8

*Ting v. AT&T*, 319 F.3d 1126 (9th Cir. 2003) .................................................................6

**UNITED STATES DISTRICT COURT CASES:**

*Am. Licorice Co. v. Total Sweeteners, Inc.,* No. C-13-1929, 2013 WL 4396778
      (N.D. Cal. Aug. 13, 2013)........................................................................................8

*Be In, Inc. v. Google Inc.*, No. 12-cv-3373, 2013 WL 5568706 (N.D. Cal. Oct. 9, 2013).............9

*Brazil v. Dell*, 585 F. Supp. 2d 1158 (N.D. Cal. 2008)....................................................5

*Brazil v. Dell Inc.*, No. 17-cv-1700, 2010 WL 8816312 (N.D. Cal. Mar. 29, 2010).......................5

*Gutierrez v. Wells Fargo Bank N.A.*, No. 12-cv-1135, 2012 WL 3257702
      (N.D. Cal. Aug. 8, 2012)........................................................................................8

*Harris v. comScore, Inc.*, 825 F. Supp. 2d 924 (N.D. Ill. 2011)......................................9

*Hood v. Hartford Life & Accident Ins. Co.*, 567 F. Supp. 2d 1221 (E.D. Cal. 2008).............14, 15

*In re Jiffy Lube Intern., Inc. Text Spam Litig.*, 847 F. Supp. 2d 1253 (S.D. Cal. 2012) ................10

*Lebowitz v. City of New York*, No. 12 CIV. 8982, 2014 WL 772349
    (S.D.N.Y. Feb. 25, 2014) ........................................................................................14

*Medimatch v. Lucent*, 120 F. Supp. 2d 842 (N.D. Cal. 2000) ........................................5, 6

*Ostreicher v. Alienware Corp.*, 502 F. Supp. 2d 1061 (N.D. Cal. 2007)................................7

*Rosell v. Wells Fargo Bank, N.A.*, No. 12-cv-6321, 2014 WL 4063050
    (N.D. Cal. Aug. 15, 2014)........................................................................................9

*Savetsky v. Pre-Paid Legal Servs., Inc.*, No. 14-cv-3514, 2015 WL 4593744
    (N.D. Cal. July 30, 2015)........................................................................................7

*Sgouros v. TransUnion Corp.*, No. 14-cv-1850, 2015 WL 507584
    (N.D. Ill. Feb. 5, 2015)........................................................................................9

*Tompkins v. 23andMe, Inc.*, No. 13-cv-05682, 2014 WL 2903752
    (N.D. Cal. June 25, 2014) ........................................................................................9

*WTM v. Henneck*, 125 F. Supp. 2d 864 (N.D. Ill. 2000) ........................................................10

*Zody v. Microsoft Corp.*, No. 12-cv-942, 2012 WL 4051197 (N.D. Cal. Sept. 13, 2012) .............9

**STATE COURT CASES:**

*Ashland Chem. Co. v. Provence*, 129 Cal. App. 3d 790 (1982) ........................................3

*Brown & Brown, Inc. v. Mudron*, 379 Ill. App. 3d 724 (3d Dist. 2008)................................5

*Healey v. Teachers Retirement System*, 200 Ill. App. 3d 240 (4th Dist. 1990) ..............................4

*Hernandez v. Burger*, 102 Cal. App. 3d 795 (1980)........................................................................4

*Maher & Assocs., Inc. v. Quality Cabinets*, 267 Ill. App. 3d 69 (2d Dist. 1994)............................5

*Mell v. Goodbody*, 10 Ill. App. 3d 809 (1973) ........................................................5, 10

*Midway Home Entm't, Inc. v. Atwood Richards, Inc.*, No. 98 C 2128,
    1998 WL 774123 (N.D. Ill. Oct. 29, 1998)........................................................................5

*Morris B. Chapman & Assocs., Ltd. v. Kitzman*, 193 Ill. 2d 560 (2000)........................................4

*Nedlloyd v. Sup. Ct.*, 3 Cal. 4th 459 (1992) ...............................................................6, 10

*Potomac Leasing Co. v. Chuck's Pub, Inc.,* 156 Ill. App. 3d 755 (1987) ...........................5, 6, 10

*Wheeler v. Caterpillar Tractor Co.*, 485 N.E.2d 372 (Ill. 1985) ......................................4

**STATUTES AND CONSTITUTIONS:**

Biometric Information Privacy Act, 740 ILCS 14/1, *et seq.* .................................................. *passim*

Illinois Constitution, Ill. Const. § 12 ........................................................................4

Illinois Freedom of Information Act, 5 ILCS 140/1, *et seq.* ..........................................4

**MISCELLANEOUS:**

Michael Cherry & Edward Imwinkelried, *A Cautionary Note About Fingerprint Analysis and Reliance on Digital Technology*, Champion, August 2006 .........................13

Restatement (Second) of Conflict of Laws ..................................................................3, 10

Stephen Hoffman, *Biometrics, Retinal Scanning, and the Right to Privacy in the 21st Century*, Syracuse Sci. & Tech. L. Rep., Spring 2010 ...................................................13

Wendy Davis, *Illinois Privacy Law Tested By 'Faceprint' Cases*, MEDIA POST, *MediaPrints* (Aug. 6, 2015), http://www.mediapost.com/publications/article/-255620/illinois-privacy-law-tested-by-faceprint-cases.html .............................................12

## INTRODUCTION

In 2008, a concerned Illinois legislature unanimously passed a law forbidding private corporations from hoarding scans of people's face geometry (their "faceprints") without first obtaining informed, written consent. Biometric Information Privacy Act, 740 ILCS 14/1, *et seq.* ("BIPA" or "the Statute"). Two years later—operating as if BIPA does not exist—Facebook did just that. It secretly and automatically enrolled millions of Illinoisans into "Tag Suggestions," a feature that scanned pictures to extract face geometry of both users and non-users to identify them in later photos. Plaintiffs Adam Pezen, Carlo Licata, and Nimesh Patel, three Illinois residents, now sue on behalf of millions of other Illinois residents whose unique facial biometric identifiers were covertly extracted and then stored, indexed, and catalogued by Facebook.

In moving to dismiss, Facebook, which has an office in Illinois, raises two fatally flawed excuses for not following BIPA. First, Facebook trots out its terms of service (without establishing their admissibility) to claim that a contractual choice-of-law clause waives the statutory privacy rights of millions of Illinois victims. That argument fails because fundamental Illinois public policy protecting its citizens' privacy rights trumps Facebook's choice-of-law clause here. Moreover, Facebook may not rely on, and the Court should not consider, outside-the-record materials—and unwarranted inferences from those materials—at this stage. And even were the Court inclined to admit those materials, Facebook ultimately fails to establish Plaintiffs' assent to the choice-of-law clause. Second, despite BIPA's plain text and broad scope, Facebook argues that the Statute does not regulate its amassing of the biometric data at issue here. Facebook is simply wrong: BIPA's text and intent confirm that biometric *identifiers* derived from photographs are fully protected. The Court should deny Facebook's motion so that the case can move forward and millions of Illinois citizens can vindicate their privacy rights.

## FACTUAL BACKGROUND

In passing BIPA, the Illinois legislature proclaimed that, "[t]he public welfare, security, and safety will be served by regulating the collection, use, safeguarding, handling, storage, retention, and destruction of biometric identifiers and information." 740 ILCS 14/5(g). Under

BIPA, a biometric *identifier* is a "retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry" (*i.e.*, a unique algorithmic or mathematical representation of physical features allowing for personal identification). Biometric *identifiers* cannot be qualitative items such as actual "photographs," writing samples, tattoo descriptions, or "physical descriptions such as height, weight, hair color, or eye color." *Id.* BIPA also protects biometric *information*, which is not at issue in this case. Biometric *information* is "based on an individual's biometric identifier" but excludes "information derived from items or procedures excluded under the definition of biometric identifiers," which would include photographs. *Id.*

BIPA requires companies that "collect, capture, purchase, receive through trade, or otherwise obtain" biometric data to obtain individualized, informed, and written consent, and achieves this by requiring companies to: post public written policies describing their biometric data practices; inform the subjects about the relevant collection, storage, and retention practices; obtain a written release before collecting; and get specific consent to any disclosure of biometric data. *See* 740 ILCS 14/15(a), (b)(1), (b)(3), (d)(1).

In 2010, Facebook, the world's largest social network, launched "Tag Suggestions," a program that scans photos uploaded to Facebook, recognizes faces in them, and isolates and extracts unique digital representations from those faces. (Plaintiffs' Consolidated Class Action Complaint, Dkt. 40, ¶¶ 3, 10, 21–27.) Facebook then cross-references those newly-extracted faceprints against its database of user faceprints. (*Id.*) If matched, Facebook suggests that the uploader "tag" the face with the name of the Facebook user identified. (*Id.*) But Facebook never obtained the informed written consent required by BIPA from affected Illinois residents before taking their biometric identifiers. (*Id.*, ¶¶ 28–31.)

Plaintiffs are Illinois Facebook users. (*Id.*, ¶¶ 7–9.) All were tagged in photographs on Facebook after Tag Suggestions launched. None received the notices required by BIPA, and none provided the informed, written consent BIPA requires. (*Id.*, ¶¶ 32–52.) Still, each time their photos were uploaded, Facebook isolated and extracted their unique faceprints or "templates" and identified them by those faceprints. (*Id.*) Facebook then compiled and stored the faceprints in

its databases—along with those of millions of other Illinois residents. (*Id.*) Each such faceprint is a "scan of . . . face geometry," and thus a biometric identifier under BIPA. Because Facebook never provided notice or obtained the consent BIPA requires, Tag Suggestions violates BIPA.

## LEGAL ARGUMENT

"On a motion to dismiss, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party," *Johnson v. Lucent Tech. Inc.*, 653 F.3d 1000, 1010 (9th Cir. 2011). Dismissal is improper when a court can "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Facebook claims here that: (1) Facebook is immune from violations of Illinois statutes because of a choice-of-law clause in its terms of service; and (2) even under Illinois law, amassing scans of face geometry falls outside BIPA's scope. Both arguments fail: Facebook fails to show that Plaintiffs ever assented to an applicable choice-of-law clause, and even if so, that clause would violate fundamental public policy. Next, because BIPA plainly covers *any* scan of face geometry, Facebook's collection of the same falls within BIPA's scope, even if derived from photos.

## I.   Facebook's Illegal Collection Of Millions Of Illinois Residents' Biometric Identifiers Is Governed By Illinois Law.

### A.   Facebook's choice-of-law clause cannot immunize it from liability for separate statutory violations against millions of Illinois residents.

First and foremost, fundamental Illinois public policy supports Plaintiffs' claims. *See* Restatement (Second) of Conflict of Laws § 187(2)(b) (If "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.").[1] Here, Illinois's fundamental public policy protects its citizens' biometric privacy

---

[1]    Absent an enforceable choice of law agreement, California courts use a "governmental interest approach" to choice of law determinations. *Ashland Chem. Co. v. Provence*, 129 Cal. App. 3d 790, 794 (1982). While a "state will have an interest in having its law applied if the policies underlying the law would be thereby advanced," *id.*, California has "no legitimate interest in applying the rule of decision embodied in its domestic law when California's sole connection with the case was that the defendants were California corporations and that California

rights; its interest in millions of Illinois citizens' claims is materially greater than California's; and its laws control regardless of whether Plaintiffs assented to Facebook's choice-of-law clause. As a result, Facebook's choice-of-law argument must be rejected.

### 1. Illinois has a fundamental public policy in protecting BIPA rights.

The public policy of Illinois is found in its "Constitution, legislative enactments, and judicial decisions." *Morris B. Chapman & Assocs., Ltd. v. Kitzman*, 193 Ill. 2d 560, 569 (2000). In unanimously passing BIPA, the legislature articulated a strong public policy protecting biometric data privacy, stating that "[t]he public welfare, security, and safety [would] be served by regulating the collection, use, safeguarding, handling, storage, retention, and destruction of biometric identifiers and information." 740 ILCS 14/5(g); *see also* 740 ILCS 14/5(d) (acknowledging that the "overwhelming majority" of the public was "weary"); 740 ILCS 14/15(e)(2) (requiring biometric data to be stored as or more securely than other information). Illinois courts regularly use similar legislative statements to confirm fundamental public policy. *See, e.g.*, *Wheeler v. Caterpillar Tractor Co.*, 485 N.E.2d 372, 374–75 (Ill. 1985) ("congressional findings . . . and declaration of policy . . . clearly enunciate a public policy").

Moreover, the Illinois Constitution enshrines Plaintiffs' privacy rights as fundamental and backed by the unqualified right to seek redress for any violations: "Every person shall find a certain remedy in the laws for all injuries and wrongs which he receives to his . . . privacy . . . He shall obtain justice by law, freely, completely, and promptly." Ill. Const. § 12. Other Illinois statutes similarly protect the privacy of biometric data. *See*, *e.g.*, 5 ILCS 140/2(c)(5), 140/7(1)(b) (Illinois Freedom of Information Act "exempt[s] from inspection and copying" biometric identifiers as protected "private information."); *Healey v. Teachers Retirement System*, 200 Ill. App. 3d 240 (4th Dist. 1990) (nondisclosure of items in 5 ILCS 140/7(1)(b) "comports with the

---

was the forum." *Hernandez v. Burger*, 102 Cal. App. 3d 795, 801 (1980). Given the same fact pattern here, California has no legitimate interest. And because, as described below, *see* Section I.A.2, *infra*, the class consists entirely of Illinois residents and Illinois has a fundamental public policy interest in having its laws applied to its residents, Illinois law controls in the absence of an enforceable choice-of-law provision.

1    public policy and legislative intent underlying the FOIA").

2           Facebook intimates that Illinois public policy endorses applying another state's law to

3    "preclude[] Illinois residents from pursuing an Illinois-specific claim or defense." (Dkt. 69, at 7.)

4    That Illinois would approve using a clause buried in an adhesion contract to strip millions of its

5    residents' constitutional and statutory privacy rights is difficult to imagine. In reality, Illinois

6    courts routinely reject choice-of-law clauses that would deprive a plaintiff of a remedy otherwise

7    available under Illinois law. *See Maher & Assocs., Inc. v. Quality Cabinets*, 267 Ill. App. 3d 69,

8    77 (2d Dist. 1994) (refusing to apply Texas law over Illinois law which allowed for treble

9    damages for failure to timely pay sales commissions); *Brown & Brown, Inc. v. Mudron*, 379 Ill.

10   App. 3d 724, 727-28 (3d Dist. 2008) (applying Illinois law on restrictive covenants over Florida

11   law where it was "contrary to Illinois's fundamental public policy").

12          Given the Illinois Constitution and the statutory regime governing biometric data, "public

13   policy considerations" in favor of applying Illinois law here are "strong and of [such] a

14   fundamental nature to justify overriding the chosen law of the parties." *Potomac Leasing Co. v.

15   Chuck's Pub, Inc.,* 156 Ill. App. 3d 755, 759 (1987). By contrast, Facebook's cited cases largely

16   presented the court with choosing between two states offering analogous (if somewhat different)

17   relief—not a situation where, as here, relief is completely absent in one forum. *See Midway

18   Home Entm't, Inc. v. Atwood Richards, Inc.,* No. 98 C 2128, 1998 WL 774123 (N.D. Ill. Oct. 29,

19   1998) (New York and Illinois consumer fraud laws); *Mell v. Goodbody*, 10 Ill. App. 3d 809

20   (1973) (Illinois and New York usury laws); *Medimatch v. Lucent*, 120 F. Supp. 2d 842 (N.D.

21   Cal. 2000) (California and New York consumer fraud laws). Facebook also cites *Brazil v. Dell* to

22   argue that no concern arises where a choice-of-law clause strips the plaintiff of a remedy. The

23   court held no such thing: It found no conflict between California and Texas law as related to the

24   deceptive practices at issue—and later rejected the clause altogether. 585 F. Supp. 2d 1158, 1163

25   (N.D. Cal. 2008); *see also Brazil v. Dell Inc.*, No. 17-cv-1700, 2010 WL 8816312, at *8 (N.D.

26   Cal. Mar. 29, 2010) (applying California law over Texas choice-of-law clause to avoid waiver of

27   class claims).

28

That Facebook's choice-of-law clause (if assented to at all) is hidden in a contract of adhesion further supports applying Illinois law here, because California's public policy rationale for enforcing a choice-of-law clause is lessened where the contract at issue is one-sided, as opposed to negotiated at arms-length between equals. *Ting v. AT&T*, 319 F.3d 1126, 1148 (9th Cir. 2003) (procedural unconscionability where contract is a "standardized contract, drafted by the party of superior bargaining strength… relegat[ing] to the subscribing party only the opportunity to adhere to the contract or reject it.").[2] And finally, Illinois's refusal to implicitly waive its citizens' substantive rights is particularly relevant here, given that BIPA is essentially an informed consent statute. That is, BIPA codifies specific public notice, *see* 740 ILCS 14/15(a); direct notice, *id.*, § 15(b)(1); written release, *id.*, § 15(b)(3); and specific consent requirements, *id.*, § 15(d)(1), unique to biometric data. Allowing Facebook to use adhesion contracts to sidestep BIPA's informed consent mandates would undercut Illinois's fundamental public policy protecting biometric data (which, unlike credit card numbers or other sensitive data, cannot be changed once compromised, *see* 740 ILCS 14/5(c)), and cause substantial injustice to millions of Illinois residents. Accordingly, because Illinois's fundamental public policy—as found in BIPA, the Constitution, and other statutes—strongly protects its citizens' biometric privacy rights—which include the right to seek relief for their infringement— Facebook's choice-of-law clause must fail to the extent it bars Plaintiffs' BIPA claims.

### 2. Illinois has a materially greater interest in this action than California or Delaware.

Because Plaintiffs and the entire putative class here consist of Illinois residents suing under an Illinois law for harm incurred in Illinois based on conduct in Illinois, Illinois has a materially greater interest in this action than California. Under these circumstances, courts in the Ninth Circuit apply Plaintiffs' chosen state law over the law in the contract. *Savetsky v. Pre-Paid*

---

[2]     Facebook's cited authorities underscore this point. *Nedlloyd*, 3 Cal. 4th 459 ("sophisticated, commercial entities" bargaining for the choice-of-law clause, not individual consumers facing a procedurally unconscionable adhesion contract); *Medimatch*, 120 F. Supp. 2d at 861–62 (same); *Potomac Leasing*, 156 Ill. App. 3d at 760 (contract result of "arms-length

*Legal Servs., Inc.*, No. 14-cv-3514, 2015 WL 4593744, at *7 (N.D. Cal. July 30, 2015) (citing *Pokorny v. Quixtar*, 601 F.3d 987 (9th Cir. 2009)); *Ruiz v. Affinity Logistics*, 667 F.3d 1318 (9th Cir. 2012) (California law applied despite Georgia choice-of-law clause and Georgia defendant); *Ostreicher v. Alienware Corp.*, 502 F. Supp. 2d 1061, 1069 (N.D. Cal. 2007) (California had "materially greater interest" where California residents were suing under California law for defective products shipped into California). Here, as in *Savetsky* and *Pokorny*, Plaintiffs and the other putative class members are Illinois residents seeking Illinois's statutory protections for injuries suffered in Illinois, with no relevant connection to California beyond interacting with a company headquartered there (but doing business everywhere, including Illinois where it has an office). Given the fundamental policy concerns raised by Plaintiffs' claims, Illinois "has a materially greater interest in applying its own laws." *Savetsky*, 2015 WL 4593744, at *7 ("Plaintiff is an associate bringing suit against an employer under an arbitration clause. He has never worked in Oklahoma and never visited Oklahoma. All his contact with the Defendant Oklahoma corporation has been in and through California.") (citing *Pokorny*, 601 F.3d at 995–96); *Ruiz*, 667 F.3d at 1324  (recognizing California's materially greater interest where plaintiffs lived in California, initiated their relationship with defendant in California, performed obligations in California, and only had a connection to foreign state through defendant's domicile).

Facebook proffers that California's interest in protecting its businesses trumps Illinois's interest in its citizens' privacy rights, but Illinois's interest is fundamental, specifically articulated by statute, and shielded by the state constitution. California defers under these circumstances; were that not so, California law would always apply in cases naming a California defendant. *See Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581 (9th Cir. 2012) ("California's interest in applying its law to residents of foreign states is attenuated" and refusing to apply California law to putative nationwide class where defendant's "corporate headquarters, the advertising agency that produced the allegedly fraudulent misrepresentations, and one fifth of the proposed class members [were] located in California."). Thus, Illinois law controls.

**B.      Facebook fails to establish that Plaintiffs assented to its choice-of-law clause.**

Facebook's choice-of-law argument is also flawed because it rests on the unsupported claim that "[w]hen they signed up for and used Facebook's services, plaintiffs entered into a contract that requires California law to govern 'any claim that might arise' between each Plaintiff and Facebook." (Dkt. 69, at 6.) The problem for Facebook is that it has the burden to establish that Plaintiffs agreed to be bound by its terms of service, including the choice-of-law clause, and that their claims fall within the scope of that agreement. *See Gustafson v. BAC Home Loans Servicing, LP*, 294 F.R.D. 529, 535–36 (C.D. Cal. 2013). Facebook fails to carry its burden.

"[M]utual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (quoting *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 29 (2d Cir. 2002) (applying California law)). "[M]utual assent is a question of fact" "for resolution by the jury" under both Illinois and California law. *Am. Licorice Co. v. Total Sweeteners, Inc.,* No. C-13-1929 EMC, 2013 WL 4396778, at *10 (N.D. Cal. Aug. 13, 2013). Even if the Court considers the terms of service at this stage, Facebook has not shown that Plaintiffs are bound by them.[3] Instead, Facebook announces upon the "information and belief" of its "lead litigation paralegal," that each user would have agreed to Facebook's terms by clicking on a "Sign Up" or "Register Now" button supposedly accompanied by text stating that clicking constituted acceptance of

---

[3]      Facebook submitted a declaration from a "Lead Litigation Paralegal," and appended various versions of Facebook's terms of service to add the choice-of-law provisions to the record. (Dkt. 70-1.) That is improper. Generally, a court "may not consider any material beyond the pleadings in a ruling on a Rule 12(b)(6) motion." *United States v. Corinthian Colleges*, 655 F.3d 984, 998 (9th Cir. 2011). But courts may consider "unattached evidence on which the complaint 'necessarily relies' if: (1) the Complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the document." *Id.* But Plaintiffs do not even refer to Facebook's terms of service, much less "necessarily rely on" them. Nor should they be expected to, as this case is not about a contractual breach, but rather independent statutory violations. Without Facebook's choice-of-law clauses before it, the Court should deny Facebook's motion. *Gutierrez v. Wells Fargo Bank N.A.*, No. 12-cv-1135, 2012 WL 3257702 (N.D. Cal. Aug. 8, 2012) (refusing to take judicial notice of a deed of trust on motion to dismiss, even if document could exculpate defendant). Plaintiffs incorporate their objections to Facebook's Request for Judicial Notice here.

Facebook's terms. (Dkt. 70-1, ¶ 10.)[4]

Nowhere does Facebook explain *how* (and therefore, *if*) Plaintiffs assented to the terms, including: (a) where "notice" of the terms was located, (b) how the notice was displayed (*i.e.*, font size and color relative to the surrounding text), and (c) whether the hyperlinks allegedly in the notice actually functioned. Without such detail, mutual assent cannot be shown. *See Be In, Inc. v. Google Inc.*, No. 12-cv-3373, 2013 WL 5568706, at *2 (N.D. Cal. Oct. 9, 2013); *Tompkins v. 23andMe, Inc.*, No. 13-cv-05682, 2014 WL 2903752, at *6 (N.D. Cal. June 25, 2014) (assent depends on the type of notice provided, and other factors); *Harris v. comScore, Inc.*, 825 F. Supp. 2d 924, 926–27 (N.D. Ill. 2011) ("[Defendant's] declaration does not provide sufficient detail about how the hyperlink to the agreement was presented to the user, however, to determine that the user could reasonably be expected to find the hyperlink to the agreement or manifest assent to it during the installation process."); *Sgouros v. TransUnion Corp.*, 2015 WL 507584, at *5 (N.D. Ill. Feb. 5, 2015) (for online terms to be binding on user, site must "provide[] reasonable notice or indication that users' click would constitute assent"). Without evidence of assent properly before it, the Court must reject Facebook's choice-of-law argument. *Rosell v. Wells Fargo Bank, N.A.*, No. 12-cv-6321, 2014 WL 4063050 (N.D. Cal. Aug. 15, 2014) (Donato, J.) (declining to infer additional facts and conclusions beyond judicially noticeable documents); *Zody v. Microsoft Corp.*, No. 12-cv-942, 2012 WL 4051197 (N.D. Cal. Sept. 13, 2012) (denying request for judicial notice along with motion to dismiss).

### C. Even if Facebook could show Plaintiffs' assent to its terms, Plaintiffs' claims fall outside the scope of the choice-of-law clause.

Even if fundamental Illinois public policy did not protect Plaintiffs' claims (it does), and even if Facebook showed that Plaintiffs assented to its terms of services (it has not), its motion to dismiss still fails because Plaintiffs' claims fall outside the scope of the choice-of-law clause. That is, the choice-of-law clause cannot govern purely *statutory* and unrelated violations of

---

[4]     Facebook is also unsure about other facts, including exactly what state law applied (California or Delaware) and when Plaintiff Patel joined. *Id.*

Illinois law. Tellingly, Facebook quotes the Restatement as providing that "[t]he law of the state chosen by the parties . . . will be applied," (Dkt. 69, at 12-13), but it intentionally omits the Restatement's crucial language that "[t]he law of the state chosen by the parties ***to govern their contractual rights and duties*** will be applied." Restatement (Second) of Conflict of Laws, § 187 (emphasis added). Because Plaintiffs' statutory claims do not relate to the contract itself, and the choice-of-law clause "makes no reference to" the subject-matter of the statute's protection, Facebook's choice-of-law clause cannot waive Plaintiffs' BIPA claims. *See Fidelity Fed. Bank, FSB v. Durga Ma. Corp.*, 387 F.3d 1021, 1023 (9th Cir. 2004).

Facebook's own cases confirm this point. For example, Facebook cites *Nedlloyd v. Sup. Ct.*, 3 Cal. 4th 459 (1992), to claim that California allows choice-of-law clauses to bar any recovery otherwise available. But a careful review of *Nedlloyd* shows the fiduciary duty and contract claims arose from the contract itself. *Id.* at 469. *See also Mell*, 10 Ill. App. 3d 809 (right to recovery arose from contract at issue); *WTM v. Henneck*, 125 F. Supp. 2d 864 (N.D. Ill. 2000) (claims rooted in securities contract); *Potomac Leasing Co.*, 509 N.E.2d 751 (suit to enforce lease agreement at issue). In the end, Facebook's contractual choice-of-law clause cannot fairly encompass totally unrelated statutory claims. *Cf. In re Jiffy Lube Intern., Inc. Text Spam Litig.*, 847 F. Supp. 2d 1253, 1262-63 (S.D. Cal. 2012) (holding that an "incredibly broad" arbitration clause's application to "a tort action arising from a completely separate incident . . . would clearly be unconscionable.").

## II.   BIPA Regulates Facebook's Systematic Extraction Of Biometric Identifiers.

Facebook argues that its scans of face geometry extracted from photographs escape BIPA's purview for two reasons: (1) data in or derived from a photograph is supposedly excluded from BIPA entirely, whether or not it otherwise qualifies as a biometric identifier; and (2) BIPA only regulates "scan[s] of . . . face geometry" obtained through *in-person* scans of physical objects, not scans of photographs. As shown below, neither the text of the Statute nor its legislative history supports this reading.

**A.    Scans of face geometry are explicitly regulated as biometric *identifiers*, even where derived from photographs.**

Facebook argues that BIPA broadly "excludes from its coverage photographs and any information derived from photographs." (Dkt. 69, at 10–11.) Its argument goes as follows: First, photographs are not biometric *identifiers*. That is true. *Id*. Second, information derived from photographs is not biometric *information*. That is also true. *Id*. But Facebook's conclusion that BIPA, *as a whole*, "excludes from its coverage photographs and any information derived from photographs" does not follow from these premises. (Dkt. 69, at 11.) In fact, BIPA states:

> "Biometric identifier" means a retina or iris scan, fingerprint, voiceprint, or ***scan of*** hand or ***face geometry***. Biometric identifiers do not include writing samples, written signatures, photographs, human biological samples used for valid scientific testing or screening, demographic data, tattoo descriptions, or physical descriptions such as height, weight, hair color, or eye color …

> "Biometric information" means any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual. Biometric information does not include information derived from items or procedures excluded under the definition of biometric identifiers.

740 ILCS 14/10 (emphasis added). So BIPA regulates (i) the collection and use of six specific biometric *identifiers*; and (ii) biometric *information – i.e.*, any derivative information based on any of the six *identifiers*. *Id*. Under the plain language of the statute, a biometric *identifier*— including a scan of face geometry—can be derived from *any* source (including a photograph). 740 ILCS 14/10. In fact, essentially all biometric identifiers are always derived from photographs. It is only biometric *information* that cannot be derived from a photograph. *Id*.

This statutory regime makes perfect sense. Photographs are not (themselves) regulated as biometric identifiers because, if they were, Facebook (and every other entity in Illinois) would violate the BIPA simply by collecting photographs that have people in them. That would be absurd. Likewise, it would make no sense to regulate as biometric *information* the collection of a derivative data point like someone's height simply because that data point was derived from a photograph. But Facebook does not just collect photographs, nor does it simply collect the height of the subjects of its photographs. Instead, Facebook uses algorithms to extract unique biometric

*identifiers* from the hundreds of millions of photographs uploaded to its servers each day. (*See, e.g.*, Compl., ¶ 23.) Facebook therefore violates the plain language of the BIPA.

Had the legislature intended to exclude certain kinds of scans of face geometry from the list of regulated biometric identifiers, it would have drafted the statute in such a way. It did not. While the definition of biometric identifiers excludes a long list of *items* (such as photographs) that are not, themselves, biometric identifiers, it leaves open all possible *sources* of Biometric Identifiers. *Id. Expressio unius est exclusio alterius*: the Court should give meaning to the legislature's (wholly logical) decision to exclude some sources of biometric *information* but leave open all sources of biometric *identifiers*. A scan of face geometry derived from a photograph is no less a biometric *identifier* than any other scan of face geometry.[5]

Moreover, adopting Facebook's "source" requirement would gut BIPA as virtually all biometric identifiers are based in the first instance on photographs. Scans of face geometry, including Facebook's, are always based on photographs. *See, e.g.*, Wendy Davis, *Illinois Privacy Law Tested By 'Faceprint' Cases*, MEDIA POST, *MediaPrints* (Aug. 6, 2015), http://www.mediapost.com/publications/article/-255620/illinois-privacy-law-tested-by-faceprint-cases.html ("I have literally never heard of any facial recognition system that works off of anything other than a photo or a video still") (quoting Professor Alvaro Bedoya, former chief counsel to the Senate Judiciary Subcommittee on Privacy, Technology and the Law) (attached as Exhibit 1-A to the Declaration of Alexander T.H. Nguyen ["Nguyen Decl."], which is attached to

---

[5]    Facebook also argues that Tag Suggestions does not extract scans of face geometry, but instead simply "collect[s] information from photographs" just as a photographer might snap a picture and later observe that the subject's hair is brown. (Dkt. 69, at 11.) That simply is not the case. Tag Suggestions relies on advanced algorithms to extract, store, and process unique biometric faceprints. (Dkt. 54., ¶ 23). Finally, Facebook falsely contends that Plaintiffs claim it "transforms" photographs into biometric *identifiers*. (Dkt. 69, at 11). Actually, Plaintiffs allege that Facebook *extracts* scans of face geometry from photographs. (Dkt. 54., ¶ 4). When a bad actor places a wiretap on a phone line and extracts from it a voiceprint, the concern under BIPA is not that the phone line was "transformed" into a biometric identifier. The concern is that a biometric identifier (a voiceprint) was *extracted* from the phone line. Likewise, the concern in this case is not that Facebook "transforms" photographs into biometric identifiers, but that it *extracts* biometric identifiers (scans of face geometry) from photographs. (Dkt. 54., ¶ 25 (faceprints are "separate and distinct" from the images from which they are created)).

this Motion as Exhibit 1). So too are retina and iris scans (including those extracted at the

Customs and Border Protection kiosks Facebook references). *See, e.g.*, *Lebowitz v. City of New*

*York*, No. 12 CIV. 8982 JSR, 2014 WL 772349, at *2 (S.D.N.Y. Feb. 25, 2014) ("Iris scans are

high resolution photographs of the pigmented portion of the eye, and are more accurate than

fingerprints in confirming identity.").[6] Modern fingerprint and hand-geometry scan technology

works the same way. *See, e.g.*, Michael Cherry & Edward Imwinkelried, *A Cautionary Note*

*About Fingerprint Analysis and Reliance on Digital Technology*, Champion, August 2006, at 27,

28 (attached as Exhibit 1-C to the Nguyen Decl.). Adopting Facebook's "source" rule—that

biometric *identifiers* may never be drawn from photographs—would gut BIPA almost entirely.

The legislature did not intend this, and the Court should reject Facebook's argument.[7]

### B. Facebook's concocted "in-person" scan requirement also fails because BIPA regulates objects, not processes.

Under BIPA, a scan of face geometry (or a "facial template") is an *object in existence* no

matter how obtained—whether in-person or by photo. That is because BIPA regulates (1)

companies "in possession" of scans of face geometry, and (2) companies who collect, capture,

purchase, receive, or obtain the same. 740 ICLS 14/10; 14/15(a)–(b). But Facebook attempts to

re-define a "scan of face geometry" as a *process*, declaring that it "plainly means an *in-person*

scan" of a person's "*actual*" face. (Dkt. 69, at 12.) As with Facebook's made-up "source" test,

this "in-person" test is found nowhere in the law. 740 ILCS 14/10.

Facebook's new definition—that a scan under BIPA is a *process* and not an *object*—

makes no sense: A company cannot "possess" a process, nor can it "collect, capture, purchase,

receive through trade, or otherwise obtain" such process. 740 ILCS 14/15(b). Nor would a

---

[6]    *See also* Stephen Hoffman, *Biometrics, Retinal Scanning, and the Right to Privacy in the 21st Century*, Syracuse Sci. & Tech. L. Rep., Spring 2010, at 38 (In retinal scanning technology, "the camera photographs the vasculature structure of your eyes and runs it against a database") (attached as Exhibit 1-B to the Nguyen Decl.).

[7]    Finally, Facebook argues that reading the BIPA by its plain text to apply to Tag Suggestions would render meaningless the exclusion of photographs themselves from that definition. That is simply not the case, however, as any photograph from which Facebook has not extracted a faceprint would still be excluded from the statute's scope.

1   customer have any interest in the disclosure of a process, or an established procedure for the

2   destruction of a company's process. *Id.*, §§ 15(a), (d). Thus BIPA must regulate scans of face

3   geometry as objects. Because scans of face geometry are *objects* under BIPA, it is incoherent to

4   suggest the statute regulates only "physical" or "in person" versions of them. Facebook's "in

5   person" requirement only finds meaning under the (false) assumption that a facial template is a

6   process. And surely Facebook does not suggest that BIPA regulates "physical" facial templates

7   (*e.g.*, made of clay) but does not regulate those made of bytes and pixels.

8       And Facebook's "physical" or "in person" requirement would produce absurd results—

9   especially because BIPA is an informed consent statute. As Facebook would have it, the Illinois

10  legislature set out to regulate biometric identifiers only when they are taken from volunteers who

11  physically "present" themselves and are already aware that their biometric identifiers are being

12  obtained (*e.g.*, at a kiosk, *see* Dkt. 69, at 13), but *not* when companies secretly acquire biometric

13  *identifiers* from unwitting victims from afar. That reading of BIPA leaves victims defenseless

14  when they most need its protection. For example, under Facebook's interpretation, a voiceprint

15  extracted from a wiretap would *not* be regulated by BIPA because it was not collected "in

16  person." Nor would be a retina scan extracted from a photograph shot by a hidden camera with a

17  high-powered zoom lens. But a retina scan or voiceprint extracted from a knowing subject who

18  presents himself or herself at a "console" or "kiosk" *would* be regulated. (Dkt. 69, at 12.)

19  Facebook's illogical re-interpretation of BIPA produces absurd results and should be rejected.

20      **C.    BIPA's legislative history confirms its application to Facebook's conduct.**

21      Facebook also misstates the legislative history and findings to improperly narrow BIPA's

22  scope. (Dkt. 69, at 13-15.) Facebook first suggests that BIPA was only meant to regulate

23  financial transactions. *Id.* But BIPA's statement of purpose is much broader, clarifying that the

24  "full ramifications of biometric technology are not fully known" and that BIPA is intended to

25  broadly protect the "public welfare, security, and safety" from "biometric identifiers and

26  information" generally. 740 ILCS 14/5(g). Financial transactions and security screenings are

27  mentioned only as *illustrations* of the broader problem warranting regulation. *Cf. Hood v.*

28

1   *Hartford Life & Accident Ins. Co.*, 567 F. Supp. 2d 1221, 1228 (E.D. Cal. 2008) (rejecting

2   narrow statutory interpretation, noting that "[n]othing in the statement of purpose expressly

3   limits" reach of statute). Facebook's argument also ignores BIPA's explicit exemption of many

4   financial institutions from its scope.[8]

5         Second, Facebook parses technical language variations between the original BIPA and

6   the House's final version to suggest that facial recognition technology is categorically exempted

7   from BIPA. (Dkt. 69, at 14-15.) But that assessment divines legislative intent where there simply

8   was none. Here is how Senator Ryg (BIPA's Senate sponsor) explained the House amendments

9   just before the Senate floor voted unanimously in concurrence: "Amendment 1 and 2 are just at

10   the request of the Bankers Association, City of Chicago and the Department of Corrections.

11   Answers some of their problems. I'll be more than happy to answer any questions on the final

12   bill." (Dkt. 70-1, RJN Ex. 6 (Ill. S. 6 J., 2008 Reg. Sess. No. 167, at 61 (July 10, 2008))). There

13   were no questions, nor any discussion. *Id.* BIPA passed the Senate unanimously, 42-0. *Id.*

14   Likewise, the House passed BIPA unanimously (113-0) after neither questions nor deliberation.

15   (RJN Ex. 2 (IL H.R. Tran. 2008 Reg. 23 Sess. No. 276, at 248 (May 30, 2008))).

16         Finally, Facebook misreads the significance of the Pay By Touch bankruptcy mentioned

17   by Senator Ryg. (Dkt. 69, at 15.) The point of highlighting that bankruptcy was that millions of

18   fingerprint records—which, like other biometric identifiers, can be permanently linked to

19   sensitive financial and personal data—were at risk of being sold, distributed, or otherwise shared

20   through bankruptcy proceedings without adequate protections. Those same concerns exist here

21   with even greater force: Facebook has covertly hoarded an even larger database. There is no

22   question that BIPA applies to Facebook's conduct, and the Court must deny its motion.

### CONCLUSION

24         For the reasons stated, Plaintiffs request that the Court deny the motion to dismiss.

25

26   [8]    *See* 740 ILCs 14/25(c) ("Nothing in this Act shall be deemed to apply in any manner to a
financial institution or an affiliate of a financial institution that is subject to Title V of the federal
27   Gramm-Leach-Bliley Act of 1999 and the rules promulgated thereunder.").

28

1

2                                            Respectfully submitted,

3                                            **ADAM PEZEN**, **CARLO LICATA**, and
                                             **NIMESH PATEL**, individually and on behalf of all
4                                            others similarly situated,

5    Dated: November 9, 2015                 By: /s/ Alexander T.H. Nguyen
                                                  One of Plaintiffs' Attorneys
6

7                                            Jay Edelson (Admitted *pro hac vice*)
                                             jedelson@edelson.com
8                                            Alexander T.H. Nguyen (Admitted *pro hac vice*)
                                             anguyen@edelson.com
9                                            J. Dominick Larry (Admitted *pro hac vice*)
                                             nlarry@edelson.com
10                                           EDELSON PC
                                             350 North LaSalle Street, Suite 1300
11                                           Chicago, Illinois 60654
                                             Tel: 312.589.6370
12                                           Fax: 312.589.6378

13

14                                           Shawn A. Williams (213113)
                                             shawnw@rgrdlaw.com
15                                           David W. Hall (213113)
                                             dhall@rgrdlaw.com
16                                           ROBBINS GELLER RUDMAN & DOWD LLP
                                             Post Montgomery Center
17                                           One Montgomery Street, Suite 1800
                                             San Francisco, California 94104
18                                           Tel: 415.288.4545
                                             Fax: 415.288.4534
19

20                                           Paul J. Geller (Admitted *pro hac vice*)
                                             pgeller@rgrdlaw.com
21                                           Stuart A. Davidson (Admitted *pro hac vice*)
                                             sdavidson@rgrdlaw.com
22                                           Mark Dearman (Admitted *pro hac vice*)
                                             mdearman@rgrdlaw.com
23                                           Christopher C. Martins (Admitted *pro hac vice*)
                                             cmartins@rgrdlaw.com
24                                           ROBBINS GELLER RUDMAN & DOWD LLP
                                             120 East Palmetto Park Road, Suite 500
25                                           Boca Raton, Florida 33432
                                             Tel: 561.750.3000
26                                           Fax: 561.750.3364

27

28   OPP. TO MTN. TO DISMISS                 16                    CASE NO. 3:15-cv-03747-JD

Travis E. Downs III (Admitted *pro hac vice*)
travisd@rgrdlaw.com
ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, California 92101
Tel: 619.231.1058
Fax: 619.231.7423

Joel H. Bernstein (Admitted *pro hac vice*)
jbernstein@labaton.com
Corban S. Rhodes (Admitted *pro hac vice*)
crhodes@labaton.com
Ross M. Kamhi (Admitted *pro hac vice*)
rkamhi@labaton.com
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
Tel: 212.907.0700
Fax: 212.818.0477

*Counsel for Plaintiffs and the Putative Class*

1

## CERTIFICATE OF SERVICE

2

I, Alexander T.H. Nguyen, hereby certify that on November 9, 2015, I served the above and foregoing *Plaintiffs' Opposition to Facebook's Motion to Dismiss* by causing true and accurate copies of such paper to be filed and transmitted to all counsel of record via the Court's CM/ECF electronic filing system.

3

4

5

6

_   /s/ Alexander T.H. Nguyen_____

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28