Pages 1 - 33

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JAMES DONATO, JUDGE

In re FACEBOOK BIOMETRIC          )
INFORMATION PRIVACY LITIGATION )   Master File No.
_____ )   15-cv-03747 JD

                                   San Francisco, California
                                   Wednesday, December 16, 2015

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

                        ROBBINS GELLER RUDMAN & DOWD LLP
                        One Montgomery Street, Suite 1800
                        San Francisco, California 94104
                   **BY:  SHAWN A. WILLIAMS, ATTORNEY AT LAW**

                        LABATON SUCHAROW LLP
                        140 Broadway
                        New York, New York 10005
                   **BY:  JOEL H. BERNSTEIN, ATTORNEY AT LAW**

                        EDELSON PC
                        350 North LaSalle Street, Suite 1300
                        Chicago, Illinois 60654
                   **BY:  ALEXANDER NGUYEN, ATTORNEY AT LAW**

(Appearances continued on next page)

**Reported By:**    *Katherine Powell Sullivan, CSR #5812, RPR, CRR*
                   *Official Reporter - U.S. District Court*

<u>**APPEARANCES (CONTINUED)**</u>:

For Defendant:

                MAYER BROWN LLP
                1221 Avenue of the Americas
                New York, New York 10020
      BY:  **LAUREN R. GOLDMAN, ATTORNEY AT LAW**

                MAYER BROWN LLP
                1999 K Street, N.W.
                Washington, D.C. 20006
      BY:  **ARCHIS A. PARASHARAMI, ATTORNEY AT LAW**

                MAYER BROWN LLP
                350 South Grand Avenue, 25th Floor
                Los Angeles, California 90071-1503
      BY:  **JOHN NADOLENCO, ATTORNEY AT LAW**

| | |
|---|---|
| 1 | **Wednesday - December 16, 2015**                          **10:25 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | **---0O0---** |
| 4 | **THE CLERK:**  Calling civil 15-3747, In Re Facebook |
| 5 | Biometric Information Privacy Litigation. |
| 6 | Counsel, please come forward and state your appearances |
| 7 | for the record. |
| 8 | **MR. WILLIAMS:**  Good morning, Your Honor.  Shawn |
| 9 | Williams on behalf of Nimesh Patel. |
| 10 | **MR. BERNSTEIN:**  Good morning, Your Honor.  Joel |
| 11 | Bernstein on behalf of plaintiffs. |
| 12 | **MR. NGUYEN:**  Good morning, Your Honor.  Alex Nguyen on |
| 13 | behalf of the plaintiffs. |
| 14 | **MS. GOLDMAN:**  Good morning, Your Honor.  Lauren |
| 15 | Goldman from Mayer Brown on behalf of defendant Facebook. |
| 16 | **MR. PARASHARAMI:**  Good morning, Your Honor.  Archis |
| 17 | Parasharami from Mayer Brown on behalf of defendant Facebook. |
| 18 | **MR. NADOLENCO:**  And good morning, Your Honor.  John |
| 19 | Nadolenco, also of Mayer Brown, on behalf of Facebook. |
| 20 | **THE COURT:**  Okay.  Who's going to take the lead for |
| 21 | the plaintiffs? |
| 22 | **MR. NGUYEN:**  That's me, Your Honor. |
| 23 | **THE COURT:**  All right.  Mr. Ngueyn, tell me -- I'm |
| 24 | having a little trouble following this -- what is your dispute |
| 25 | about the enforceability of the SRR? |

 1          **MR. NGUYEN:**  Your Honor, I'm sorry, I didn't hear.

 2          **THE COURT:**  Enforceability of the SRR that Facebook

 3  says it requires all of its users to accept.

 4          **MR. NGUYEN:**  Yes, Your Honor.

 5      Essentially, the terms -- Facebook's argument requires the

 6  Court to credit outside the records facts which Facebook isn't

 7  even sure about.

 8      They say "on information and belief" that whoever signed

 9  it for Facebook would have agreed to those terms.  And they

10  asked the Court to draw unwarranted legal inferences from --

11  from those outside-the-record materials.

12      And so, at this point in the case, Your Honor, it's a

13  burden of Facebook to show that the terms which the complaint

14  doesn't rely on, doesn't cite, and we also dispute, essentially

15  how those terms would have been presented to the user.

16      So in order --

17          **THE COURT:**  Are you arguing that there's some fact

18  dispute about whether every Facebook user agrees to these

19  terms?

20          **MR. NGUYEN:**  Your Honor, on the record before the

21  Court, the complaint says specifically that the plaintiffs did

22  not consent to have their biometric data taken.  And, also, we

23  don't know --

24          **THE COURT:**  By the way, why isn't that enough to

25  incorporate the SRRs by reference?

1    I mean, you say they didn't consent.  The consent document
2    is the SSR.

3    You all struggled mightily to avoid mentioning the SRR.  I
4    get that.  But when you say things like, "Well, we never told
5    Facebook," aren't you by implication referencing the SSR?  And
6    can't I now rely on it by incorporation?

7    **MR. NGUYEN:**  No, Your Honor.  This case is about the
8    statutory violations completely separate from the SSR which
9    essentially governs the plaintiffs -- it describes the use of
10   the Facebook.

11   **THE COURT:**  I know that.  But you do say the
12   plaintiffs did not consent.  You're preempting what might be a
13   defense under the BIPA.  Consent is a defense under the BIPA.
14   Or part of a defense.

15   So you're saying they didn't consent.  Well, the only way
16   to say they didn't consent is to look at their terms of
17   agreement in this case, the SRR with Facebook.

18   So why have you not at least implicitly incorporated those
19   into the complaint?

20   **MR. NGUYEN:**  Because the consent that we're talking
21   about in the complaint deals with the statute.  BIPA is an
22   informed consent statute.

23   So this is a statutory case, Your Honor.  The plaintiffs
24   did not consent to have their biometric information taken from
25   them.  So it's not --

1          **THE COURT:**  Listen.  We're going to get to BIPA later.

2    Right now I'm just looking at whether you made enough of a

3    reference to the SSR, covertly and inferentially, to bring it

4    in.

5          And I'm not hearing you tell me why you didn't.  You're

6    saying, "We didn't consent.  We didn't consent.  BIPA consent

7    is different."

8          That may all be true.  But isn't the starting point:  What

9    did you actually say as a user to Facebook what Facebook could

10   do?  So that's the SRR; right?

11         **MR. NGUYEN:**  In the cases that Facebook has cited, the

12   *C.M.D.* case and the *Song fi* case, for example, the contract or

13   the terms were made explicitly part of the complaint.  And they

14   were quoted as part of the complaint.  The causes of action

15   involved things like breach of contract or other causes of

16   action that emanate from that particular complaint.

17         This case is completely different.  The complaint does not

18   at all rely on the terms.  It does not cite the terms.  And we

19   dispute to the extent there is any authenticity.

20         So, in other words, Your Honor, in this case, which is a

21   purely statutory violation, we do not cite the complaint.  And

22   this is not a result of clever drafting, Your Honor.  This is

23   about a specific statutory violation.

24         And so that's distinguishable from other cases which

25   Facebook has cited, like the C.M.D. or the *Song fi* case, which

1  explicitly rely and quote from --

2  　　　　　THE COURT:  All right.  I appreciate that.

3  　　　Let me ask you this:  So you're contesting your clients

4  ever agreed to the SRR?

5  　　　　　MR. NGUYEN:  Yes, Your Honor.

6  　　　　　THE COURT:  All right.  Even that baseline

7  proposition, you contest that they ever agreed to the SRR?

8  　　　　　MR. NGUYEN:  Your Honor, the -- Facebook itself isn't

9  sure how the consent would have happened.  And consent --

10  　　　　　THE COURT:  I'm talking about you.  You on the

11  plaintiffs' side.  You contest your clients, all three of them,

12  all the lead clients here, you're saying that you all dispute

13  that they signed or agreed to the SRR?

14  　　　　　MR. NGUYEN:  Your Honor, what I can represent to the

15  Court is that the plaintiffs don't have a recollection of

16  having agreed to -- to the SRR at issue in this case.  So they

17  don't remember --

18  　　　　　THE COURT:  That's not helping.

19  　　　Look.  You've raised a contract formation defense to this

20  motion, okay.  You've said, Judge, you can't pull the trigger

21  on this because the contract was never formed binding us to

22  California choice of law.

23  　　　That's one of your arguments; right?

24  　　　　　MR. NGUYEN:  Correct.

25  　　　　　THE COURT:  All right.  So tell me what -- don't tell

1  me the clients don't remember.  Just tell me what the legal

2  claim is.  "Your Honor, here's an example."  Maybe this isn't

3  what you're saying.  Say whatever you want.  This is just an

4  example.  "Your Honor, we deny that the SRR is enforceable

5  because, one, our clients never signed it; two, it's

6  unconscionable."  Whatever it is.  Just lay it out for me

7  because I couldn't get it clearly in your briefs okay.

8          **MR. NGUYEN:**  All right.  Okay, Your Honor.  What

9  we're -- what we're arguing in our contract formation argument

10  is, number one, Facebook is not -- the contract at issue, and

11  they are multiple which they attached, is not properly before

12  this court at this stage in the proceedings.  That's the first

13  argument.

14          The second argument is that Facebook, based on information

15  and belief is -- cannot show that the plaintiffs assented to

16  the choice of law provision because that's a factually heavy --

17  that's a factually dependent dispute hinging on a number of

18  things:  How it was presented; where; whether it was clicked

19  on; whether hyperlinks worked; et cetera.

20          The third argument on the contract formation is that even

21  if Facebook is able to show assent, the choice of law provision

22  in this case is completely independent from the statutory claim

23  in this case.

24          So the restatement that they cite --

25          **THE COURT:**  Just look at the formation issue.  All

1    right.  So there's no assent.  And it's outside the complaint.

2    Focus on this issue.

3           **MR. NGUYEN:**  Right.

4           **THE COURT:**  What else on the formation issue?  Is it

5    unconscionable?  Did you argue that?  You had a couple of

6    passing references.  I wasn't clear whether you were really

7    saying it or not.

8           **MR. NGUYEN:**  Right.  It's unconscionable in the sense

9    that -- it's procedurally unconscionable in the sense that it's

10   a --

11          **THE COURT:**  Let me step back.  When you say

12   "unconscionable," what body of law are you invoking?

13   California law or Illinois law?

14          **MR. NGUYEN:**  California law, Your Honor.

15          **THE COURT:**  California law.

16    So you agree that the enforceability of the contract

17   should be tested under California law.  Plaintiffs agree with

18   that?

19          **MR. NGUYEN:**  Well, Your Honor --

20          **THE COURT:**  Counsel, just take a position.  It's yes

21   or no.  I'm just asking you to move this thing along.

22          **MR. NGUYEN:**  Yeah.

23          **THE COURT:**  What body of rules am I, at your proposal,

24   going to follow?  You propose that for all these contract

25   formation issues and whether the SRR is enforceable, California

1   law provides the rule of the day; right?

2           **MR. NGUYEN:**  Yes, Your Honor.

3           **THE COURT:**  California.  Yes?

4           **MR. NGUYEN:**  I believe so.

5           **THE COURT:**  You said yes.  So you're going to live

6   with that, okay.

7        All right.  So California law is going to provide the rule

8   of decision pursuant the plaintiffs.  I'll get to the

9   defendants in a minute.

10       Now, under California law are you arguing that the choice

11  of law provision is unenforceable because it's unconscionable?

12          **MR. NGUYEN:**  No, Your Honor.  That's part of our

13  fundamental public policy argument.

14          **THE COURT:**  Take it one step at a time.  Are you

15  attacking the SRR and specifically the choice of law provision

16  as being unconscionable?

17          **MR. NGUYEN:**  Not as being substantively

18  unconscionable.

19          **THE COURT:**  Well, you have to have both in California,

20  procedural and substantive.  If you're going to give up on one,

21  you're giving up on all, is my understanding, okay.

22          **MR. NGUYEN:**  Correct, Your Honor.

23          **THE COURT:**  So there's no unconscionability challenge

24  to the SRR or the choice of law term --

25          **MR. NGUYEN:**  Correct.

1      **THE COURT:** -- right?

2      Okay.  All right.  Let me hear from the defendants.

3      You can stay there, Mr. Nguyen.  You can stay there.

4      **THE COURT:**  All right.  Ms. Goldman.

5      **MS. GOLDMAN:**  Yes, Your Honor.

6      **THE COURT:**  You agree California law governs the

7  enforceability and formation questions?

8      **MS. GOLDMAN:**  Yes.

9      **THE COURT:**  Now, I have to say, I'm not uncomfortable

10  with taking judicial notice in the right circumstances.  But

11  this is a much more detailed factual attack on the SRR than I'm

12  comfortable resolving on judicial notice.  I can't see it.

13      Your counsel is right.  For whatever reason, it is not

14  clearly referenced in the complaint.  There may a little bit of

15  an inferential hook, but it's rather thin.

16      And there are just too many things here on assent and

17  enforceability, and all the other issues we touched on, to let

18  me comfortably say this is something easily verifiable by ready

19  turn to something outside the courtroom.

20      So why am I wrong?

21      **MS. GOLDMAN:**  Because, Your Honor, plaintiffs have

22  never disputed assent.  And they have never disputed

23  enforceability.

24      Counsel was just asked to say on what grounds plaintiff

25  disputes --

1        **THE COURT:**  It's in the opposition.  They said they

2   never agreed to this.

3        **MS. GOLDMAN:**  No.  They said they never agreed to have

4   their faceprints taken by Facebook.

5        He did not say, "We did not sign up for the contract."  He

6   did not say, "We are the only people who have managed to sign

7   up for and use Facebook without agreeing to its terms."  Terms

8   which have one --

9        **THE COURT:**  I don't think that's right.  The

10  midsection of their brief says, "We never agreed to the choice

11  of law.  We were never asked to agree.  It was hidden."  He has

12  given up on unconscionability, so you don't have to worry about

13  that.

14       I mean, there's a whole thing in here about, "We were

15  duped and misled into choosing California law, and we didn't do

16  that."  And that's clearly a formation issue.

17       **MS. GOLDMAN:**  It's really not, Your Honor, because

18  when we -- when plaintiffs filed these cases in Illinois, we

19  moved to transfer the cases to California under the foreign

20  selection clause in the SRR, which appears in the same

21  paragraph of the SRR as the choice of law clause that we are

22  now invoking.  Plaintiffs looked closely at our motion and then

23  they stipulated to transfer the cases to this court.

24       The cases came to this court.  They filed their amended

25  complaint.  The amended complaint says that each of the

1    plaintiffs has an active Facebook account, but doesn't respond

2    at all to our showing that everybody who has an active Facebook

3    account agreed to Facebook's terms both as a condition of

4    opening that account and as a condition of using the account.

5         Under Rule 201, under the incorporation by reference

6    doctrine, the Court can take judicial notice of facts that are

7    not reasonably subject to dispute.  This is really plain and

8    simple.

9         **THE COURT:**  I really don't see that here because

10   section B of their argument is Facebook fails to establish that

11   plaintiffs assented to its choice of law clause.

12        That is not resolvable by judicial notice.  What am I

13   taking judicial notice of?  That the plaintiffs assented?  They

14   say they didn't.  Now, whether they have a good argument or a

15   bad argument remains to be seen.  But in that context, judicial

16   notice just doesn't work.

17        Now, if you're saying that they made some kind of

18   admission in agreeing to venue the case here, you know, tell me

19   more about that because I don't see that in the papers.

20        **MS. GOLDMAN:**  The stipulation did not exceed the

21   enforceability of the contract.  But surely, Your Honor, if

22   they had facts to dispute, to suggest that they alone, among

23   Facebook's users, somehow signed up for and used the service

24   without agreeing to the terms, they presumably would not have

25   stipulated to transfer, which was pursuant to those terms.  And

1   they presumably would have put those facts in their complaint

2   or in their opposition to the judicial notice or in their

3   brief.

4        And they've never alleged any facts.  They never said,

5   "Well, the print was too small."

6             **THE COURT:**  I don't think they need to plead in an

7   anticipatory fashion, "And, oh, by the way, the SRR doesn't

8   apply."  They don't need to do that.  That's not their case.

9   The case is you broke the law in Illinois.

10       And, by the way, the weight of authority is against you on

11  this, rightly or wrongly.  But when people challenge the

12  Court's reliance on judicial notice proposals because there are

13  disputed issues of fact, most courts say, "I can't consider

14  it."

15       This is a 12(b)(6) motion, okay.  This is the start of the

16  case.  You're asking me to make a whole bunch of fact findings

17  about what these specific plaintiffs did; what they understood;

18  what they agreed to; what they didn't agree to.

19       The plaintiffs have said, "We dispute all that.  We think

20  Facebook is wrong.  There's no way they are going to be able to

21  show this."

22       So my inclination is to give you a choice.  And we can

23  talk about this.  I am not going to proceed under a 201

24  judicial notice approach or incorporation by reference.  There

25  just is not enough here for that to happen.

1        However, I will give defendants the initial opportunity to

2    make a choice.  You've got two arguments here attacking the

3    complaint.

4        Now, if you want to press the "California law prevails"

5    argument, I can get you to early summary judgment.  We can do

6    it in January.  All right.

7        So plaintiff is going to be put to the test.  They said

8    they've got a bunch of facts saying, "We never agreed."Now,

9    they will have the opportunity to show that at summary

10   judgment.

11       And we can put this issue to rest.  That is the only

12   vehicle I can see to get to the information that I would need

13   to resolve a fact dispute.

14       So what do you think about that?

15       **MS. GOLDMAN:**  Well, we think that the Court does not

16   need to even reach any of this because it is so clear that the

17   plaintiffs haven't stated a claim under the Illinois statute

18   that they've cited.

19       **THE COURT:**  In that case you can, you know, withdraw

20   the California argument.  Or I can deny it.  Do you want to

21   withdraw it?

22       **MS. GOLDMAN:**  I'd like to confer with my co-counsel.

23       **THE COURT:**  It's withdrawn without prejudice.  You can

24   renew it after the facts develop.  Under the 12(b)(6) stage I

25   can't grant it because there are too many fact issues.

1          **MS. GOLDMAN:**  We understand, Your Honor.

2      We'd like to have a sense of how the Court plans to rule

3  on the rest of the motion before we decide whether or not to

4  withdraw that argument.

5          **THE COURT:**  Well, initially, I have to say I thought

6  we can just reach the BIPA.  But I'm -- it's kind of wasteful,

7  from an efficiency perspective, to do that and then have you

8  all come back in two months and say on summary judgment, "Oh,

9  we never agreed to this, and California law, in fact,

10  prevails."  Or "We did agree to it, and California law

11  prevails."  In other words, some development that that actually

12  undercuts any Illinois state law ruling because, all the

13  sudden, it turns out California is, in fact, the order of the

14  day.

15          **MS. GOLDMAN:**  Understood, Your Honor.

16          **THE COURT:**  Do you understand what I'm saying?

17          **MS. GOLDMAN:**  Yes, I do.

18          **THE COURT:**  Go ahead, Mr. Nguyen.

19          **MR. NGUYEN:**  Thank you, Your Honor.

20      In our brief we lay out, really, regardless of whether or

21  not plaintiffs agreed to the choice of law provision in the

22  SRR, the Court should still apply Illinois law for fundamental

23  public policy reasons.  So --

24          **THE COURT:**  But that's not the point.

25      The point is if it turns out later that Facebook is right

```
1    and California law prevails, I don't want to go through a whole

2    thing on Illinois law when it turns out California law is the

3    trump card.  It's a waste of time and borders on being an

4    advisory opinion.  It's not worth your clients' money, the

5    defendant's money, or the Court's resources.

6         That's the issue.  Do you understand what I'm saying?

7              MR. NGUYEN:  I do, Your Honor.

8              THE COURT:  There is no doubt in my mind Facebook is

9    going to come back -- this is just me talking -- and say in two

10   months, "Here are the facts to show that California law

11   governs."

12        I don't want to spend all this time in a matter of first

13   impression in Illinois state law, a state 2,000 miles away from

14   here, that I'm not even in, opining about their privacy

15   statutes when I don't need to and maybe shouldn't have because

16   Illinois law doesn't apply.

17        So I'm trying to get you to tell me:  Why should we not

18   put this on hold and go to a contract formation early summary

19   judgment?  You say you have facts that are going to kick the

20   SRR to the curb.  You should be chomping at the bit to show

21   that to me.

22             MR. NGUYEN:  Yes, Your Honor.

23        What we're saying, Your Honor, is that under restatement,

24   which is the heart of the case, Illinois fundamental public

25   policy governs here because, as the Court can see and as we
```

1    cited --

2          **THE COURT:**  You're asking me to do a choice of law

3    provision analysis without having shown me that there's any

4    conflict in the laws yet, because nobody has committed to which

5    law applies.

6          I only do the choice of law when you say Illinois and the

7    defendant says California and there's a legitimate basis for

8    that.

9          Right now you say, "We can't say California because

10   there's a whole series of fact disputes that cannot be resolved

11   in a 12(b)(6) motion."  That is your argument.  And I'm saying,

12   okay, let's go forward on early summary judgment and get that

13   resolved.  Then we can see where we are.

14         It may be that California law applies.  In which case it

15   will be probably not so hard to get rid of the Illinois claim.

16   I don't know that, but that seems like the way it would turn

17   out.

18         Now -- or it may be that California law applies, but

19   Section 187 of the restatement and those tests say,

20   nevertheless, Illinois should still be the order of the day.

21   Or it may be California doesn't apply and goes forward.

22         But there is at least one scenario where California

23   applies and Illinois does not get a voice.  And in that

24   situation, I am concerned about burning a lot of time on

25   Illinois until we figure out whether California is in play or

1   not.  That's all that I'm saying.

2        Okay.  So why not just do summary judgment at the end of

3   January?  This is an easy issue.  Your clients are going to

4   say, "I did this, this and this when I signed up.  I never saw

5   X.  I never saw Y.  I never saw Z.  And Facebook never told me

6   anything about it."  And Facebook will say, "Here's what we do.

7   You can't use this service unless you click.  We have a record

8   of the click."  Whatever it is.

9        This is not hard.  It really isn't.  This comes up in

10  almost every Internet dispute where somebody says, "I'm not

11  bound by the terms of service."  Okay.  But this is early.

12  It's just 12(b)(6).  I can't just reach out and, you know, run

13  glibly through the facts.

14       I have to have the foundation either in the complaint --

15  which I don't because you all dispute it on the plaintiffs'

16  side, which is perfectly your right -- or I have to have a

17  basis in fact based on material from outside the record, which

18  I can only handle, unless you two tell me differently, under

19  Rule 56.  That's where we are.

20            **MS. GOLDMAN:**  May I have a moment to confer with my

21  colleagues, Your Honor?

22            **THE COURT:**  You're the lead counsel, Ms. Goldman.

23            **MS. GOLDMAN:**  I understand.

24            **THE COURT:**  Just tell me what you want to do.

25            **MS. GOLDMAN:**  Well, Your Honor, it's our position that

1   plaintiffs, like everybody else, clearly signed up for the --

2   for the terms when they signed up for Facebook accounts and

3   when they continued to use them.

4       The Court can take judicial notice of Facebook's rights

5   and responsibilities which is on the website.  The website is

6   massively invoked throughout plaintiffs' complaint.

7           **THE COURT:**  Okay.  But those are all dealing with fact

8   issues.  I'm not going to do it your way.  So just tell me what

9   you would like to do.

10          **MS. GOLDMAN:**  And the Court will not rule on the

11  statutory claim until --

12          **THE COURT:**  No, that part we're discussing.  So tell

13  me, I'm asking both of you -- look.  I'm just asking two

14  things, okay.  Do you want to go to summary judgment on the

15  formation issues?  I can do that in January.  It is an easy

16  thing to do.  And you all can be amply ready for it.  It's just

17  not that hard.  We can do it that way.

18      Step one can be:  Are plaintiffs subject to the SRR and

19  the choice of law clause?  Okay.  After that we can continue

20  this discussion about is California or Illinois going to govern

21  the outcome of the case.  Maybe California law does.  Maybe

22  Section 187 says no, Illinois has a fundamental policy, and we

23  go there.

24      All right.  What I do not want to -- this is the third

25  time I've said it.  Please, if you're not following it, tell

1    me.

2        What I do not want to do is have you and the Court spend a

3    lot of time on Illinois and then somebody comes back in April

4    and says you can't use Illinois law because of X, and that

5    turns out to be right.

6            **MS. GOLDMAN:**  Understood, Your Honor.  We --

7            **THE COURT:**  That's the point that I want to avoid.

8        Let's just talk here among friends.  This is nonbinding.

9    How would you two like to manage this case?

10       Let me start with Mr. Nguyen.

11           **MR. NGUYEN:**  Our position, Your Honor, is that the

12   Court should proceed on the entire case because the case is

13   fairly limited.  There are two arguments with respect to

14   whether or not BIPA applies.  And that is, number one, the

15   fundamental public policy which we have cited in our briefs and

16   which the defendant has opposed under the restatement would

17   mandate that Illinois law applies.

18       The second argument, which is -- an argument is that the

19   plaintiffs in this class that Facebook has failed to meet its

20   burden to show that plaintiffs have agreed to the terms of the

21   service.  But even if they did, our position is going to be

22   that fundamental Illinois public policy, which we have cited as

23   being in the Constitution in the legislation, and the statutory

24   structure in Illinois would still apply.

25       So our preference, Your Honor, would be for the Court

1    to -- rather than do it piecemeal on the question that will not

2    settle the case, to do it all at -- all at once.

3            **THE COURT:**  If California law applies exclusively, how

4    can you have an Illinois state law claim?

5            **MR. NGUYEN:**  Because, Your Honor, under the

6    restatement, as long as the plaintiff can show that fundamental

7    public policy --

8            **THE COURT:**  What if I reject that?  What if I find --

9    what I'm saying is, if I find California law governs and you do

10   not come within the exceptions of the restatement, that kills

11   your case.  You're finished.  That's my point.  There is a

12   potential dispositive outcome on choice of law.  You keep

13   telling me there isn't, but that's wrong.

14       You say, "You're going to see it my way on public policy."

15   That's not guaranteed.

16           **MR. NGUYEN:**  I understand that, Your Honor.

17           **THE COURT:**  Maybe I will.  I don't know.

18       So that is a cutoff.  It's a hard stop in the case.  And

19   that's what I'm concerned about.

20       Now, I don't know if it's a 5 percent possibility or a 95.

21   I just don't know.  But we're talking aloud here about how to

22   handle that eventuality.

23           **MR. NGUYEN:**  Right.

24           **THE COURT:**  Just to be crystal clear for the fourth

25   time, I do not want to go down this path and then have that

```
 1   5 percent or 95 percent opportunity manifest itself, and it
 2   turns out all of this work on Illinois was for nothing because
 3   public policy, or whatever, says Illinois law just doesn't
 4   apply.  Okay.  That's what I'm saying.
 5              MR. NGUYEN:  Yes, Your Honor.
 6              THE COURT:  I'm going to give the defendant one last
 7   chance.  What would you like to do?
 8              MS. GOLDMAN:  We agree with you, Your Honor.  We view
 9   this as a threshold issue.  We do not believe that plaintiffs
10   will be able to show that they did not assent to the terms.
11        We think it is an easy thing for us to show that they did
12   assent and those terms are enforceable; that there is no public
13   policy concern; and that California law should carry the day
14   under the restatement.  So we agree that the Court should
15   proceed with that as a threshold issue.
16              THE COURT:  Mr. Nguyen.
17              MR. NGUYEN:  Your Honor, again, I preference it's
18   going to be that the Court take it up all at once, also,
19   because the discovery that would be involved in showing the
20   fundamental public policy portion of it and for the Court to
21   reach the merits on that isn't going to be that --
22              THE COURT:  That's a legal issue.  Why would there be
23   any fact discovery on whether this is a fundamental public
24   policy?  What's that going to be?
25              MR. NGUYEN:  There isn't.  That's why I think, Your
```

1    Honor, that the Court can -- can decide both those issues right

2    now.

3           THE COURT:  All right.  Here's what we're going to do:

4    Plaintiffs have put formation of the contract, assent,

5    other essential issues into dispute.

6    Those are not disputes I can resolve within the confines

7    of the 12(b)(6) motion or on the face of the complaint.  And

8    request for judicial notice and incorporation by reference just

9    goes too far, in my view.

10   So we will set a half-day evidentiary hearing on the

11   formation and assent issues for January.

12   I don't think I have -- Lisa, what is the third Monday in

13   January?

14          THE CLERK:  It's a Holiday.

15          THE COURT:  How about Tuesday?  What is that?  The

16   19th?

17          THE CLERK:  Yes, the 19th.

18          THE COURT:  How about January 19th?

19          MS. GOLDMAN:  Your Honor, I have a trial beginning in

20   federal court in Massachusetts on January 25th.  And I believe

21   that we have some pretrial hearings scheduled for the week

22   before that.  Is there any way we could put this off until the

23   middle of February?

24          THE COURT:  That's a little far down the road.  You

25   have other colleagues.

1        **MS. GOLDMAN:**  Understood, Your Honor.

2        **THE COURT:**  Actually, you probably want to do a little

3 discovery before this; is that right?  Both of you?

4 Mr. Nguyen?

5        **MR. NGUYEN:**  Yes, Your Honor.

6        **MS. GOLDMAN:**  Yes.

7        **THE COURT:**  In that case, why don't we set it for --

8 is Monday the 30th -- what's the first Monday in February?

9        **THE CLERK:**  The 1st.

10        **THE COURT:**  We'll set it for February 1st, all right.

11    So you all tee up whether or not the SRR has been assented

12 to.  And if there are any specific issues for the choice of law

13 provision that for some reason have other unique factual

14 components, bring those up as well.  All right.

15    I will promptly decide after that.  And then we will go to

16 the issue of if California law applies, whether 187 public

17 policy exceptions suggest that I should, nevertheless,

18 disregard that choice of law term and apply Illinois.

19        **MS. GOLDMAN:**  Will that lateral legal issue, Your

20 Honor, be decided at this hearing on the 1st or --

21        **THE COURT:**  You should be prepared to argue that as

22 well, okay.  You have the briefing on that.  There's no more

23 briefing on that.  You can brief the summary judgment issue,

24 okay.  You should do that.  Just work out a schedule you're

25 comfortable with.

1    And then we'll have the hearing.  Because I'm assuming the

2   plaintiffs -- there is going to be some fact dispute.  Facebook

3   is going to say, "You all have to do it."  And plaintiffs are

4   going to say, "We never did."

5    So it seems to me a hearing is inevitable.  So we'll do

6   that.  Okay.  And then we'll resolve all of this within that

7   context.  All right.

8    Now, what else is happening?  Are you all doing anything

9   else right now?

10         **MS. GOLDMAN:**  No, Your Honor.  We've submitted the

11   case management statement according to the Court's order.

12         **THE COURT:**  What about disclosures?

13         **MS. GOLDMAN:**  The disclosures are due on January 8th,

14   Your Honor.

15    We would request that any additional discovery be held

16   until we resolve this threshold issue that the Court has

17   identified.

18         **THE COURT:**  Well, why don't we -- do you have any

19   problem, Mr. Nguyen, just, sort of, focusing on this for the

20   moment?

21         **MR. NGUYEN:**  Your Honor, we have provided -- we have

22   issued discovery in this case on December --

23         **THE COURT:**  Let me ask.  What is the fact discovery?

24   Let's assume you go forward under the BIPA.  What do you need

25   to know?  Isn't it just an up or down on whether it applies or

1  not?

2          **MR. NGUYEN:**  Yes, Your Honor.  But as we stated,

3  whether or not assent happened is a fact-specific inquiry.   So

4  we've issued some discovery going to that, essentially how the

5  user interface looked.

6          **THE COURT:**  Assent to the SRRs.

7          **MR. NGUYEN:**  Correct, Your Honor.

8          **THE COURT:**  We're going to do that in summary

9  judgment.  Let's say we get past this and it comes out your

10  way.  I was struggling to think what discovery you actually

11  need at that point.

12          **MR. NGUYEN:**  It's not going to be voluminous, Your

13  Honor.  In fact, our first discovery consisted of 7

14  interrogatories and 16 requests for production --

15          **THE COURT:**  It's really an issue of law whether you

16  come within the BIPA or not.  Right?

17          **MR. NGUYEN:**  Correct, Your Honor.  There may be some

18  residual issues about how the tag suggestion feature actually

19  works and things of this sort.  But it's not going to be

20  voluminous.

21          **THE COURT:**  So we could, if it goes forward, set this

22  for trial, if we need to, pretty soon.  Right?  We could do the

23  middle to the end of 2016.

24          **MR. NGUYEN:**  Correct, Your Honor.

25          **THE COURT:**  You have class cert.

1          **MR. NGUYEN:**  Yes.

2          **THE COURT:**  I'm not even sure there are any experts;

3    right?

4          **MR. NGUYEN:**  I don't know if any experts will be

5    necessary, Your Honor.  But I assume it's going to be pretty

6    much here's how the tag feature works and here's what the

7    statute is.  I think it's going to be fairly limited, Your

8    Honor.

9          **THE COURT:**  Do you agree, Ms. Goldman?

10         **MS. GOLDMAN:**  I think it's very hard to say.  We think

11   it's very clear that this case is going to be resolved on these

12   threshold legal issues.

13         **THE COURT:**  Assume it's not for a moment.  They've

14   raised a claim under BIPA.  And they say, "We're within the

15   BIPA."  What fact issues are going to go with that?  They live

16   in Illinois and they're Facebook users.  They've been tagged.

17   What's left?

18         **MS. GOLDMAN:**  Well, whether Facebook functionally

19   complied with the statute.  There could be any number of

20   factual issues.  We don't think any of these come into play

21   because we think it's so clear that the statute is -- it's just

22   inapplicable to tag suggestions.

23         **THE COURT:**  But those are all small issues.

24        Did Facebook more or less, or as you put it, functionally

25   comply?  This is not a case where -- I'm not hearing from

1    either one to tell me otherwise.  This is not a case where

2    there is going to be massive fact discovery on either side.

3    It's just not that kind of case.

4         **MR. NGUYEN:**  Right.  The issue is was there, you know,

5    informed written consent?  And was there a public policy about

6    the, you know, facial -- biometric information being posted.

7         So the universe of documents, Your Honor, and the universe

8    of the proof is going to be fairly limited.

9         **THE COURT:**  That seems right to me.

10   You two are getting along?  Everybody is working

11   cooperatively?

12        **MS. GOLDMAN:**  Yes, Your Honor.

13        **THE COURT:**  All right.  Work this out so we can get

14   lined up for the hearing.  Work out -- get the discovery done.

15   Don't stand on deadlines.  Just make it happen as much as you

16   can.

17        If you have a problem, I have very easy discovery dispute

18   resolution mechanisms.  Make sure you read my order.  All

19   right.  And you can call me up and we'll work it out over the

20   phone.

21        I would like to get this done promptly.  Work hard in

22   making that February 1st date work.

23        **MS. GOLDMAN:**  If I could just ask the Court --

24        **THE COURT:**  Yes.

25        **MS. GOLDMAN:**  I will be at trial that day.  And I

```
 1  really would like to be at the hearing.  I spent a lot of time
 2  focusing --
 3           THE COURT:  Are you the lead person?
 4           MS. GOLDMAN:  At the trial I am the only --
 5           THE COURT:  For everything.  Is this basically your
 6  thing?
 7           MS. GOLDMAN:  It's Mr. Nadolenco and me, Your Honor.
 8  But I am the person who has spent a great deal of time focusing
 9  on all the choice of law issues.
10           THE COURT:  I can't wait until March.  You have a
11  trial starting January what?
12           MS. GOLDMAN:  25th.
13           THE COURT:  In Massachusetts.
14           MS. GOLDMAN:  Yes.  But I expect it will be over by
15  February 14th, Your Honor.
16           THE COURT:  I know people always expect that.  But
17  trials are live shows.  They never go the way anybody thinks.
18           MS. GOLDMAN:  I understand, Your Honor.
19           THE COURT:  All right.  Mr. Nguyen, do you want to --
20  can you live with -- wait.
21      When does Eberhard start, Lisa?
22      When does Eberhard start, Jack?  Do you know?
23      Okay.  I think it starts the 22nd of February.
24           THE CLERK:  You have Johnson on the 22nd.
25           THE COURT:  I have Johnson on the 22nd?
```

1          **THE CLERK:**  Yes.

2          **THE COURT:**  Okay.  I have a long trial starting in

3 February.

4    Is Eberhard before that?

5          **THE CLERK:**  Let me check.

6    January 25th.

7          **THE COURT:**  I thought I moved that.

8    Didn't we move Eberhard?

9          **LAW CLERK:**  (Shakes head.)

10          **THE COURT:**  Is it set for the 25th?

11          **THE CLERK:**  Let me check the docket.

12          **THE COURT:**  These are cases that I know are going to

13 go.  So I've got to take a moment here.

14          **THE CLERK:**  Yeah, you must have.  The pretrial is set

15 for the 10th.

16          **THE COURT:**  I thought I did.  I think I scheduled them

17 for the 22nd with Mr. Johnson.

18    So can you bring up the 2016 calendar.

19          **THE CLERK:**  What date?

20          **THE COURT:**  Ms. Goldman, when are you done in

21 Massachusetts?

22          **MS. GOLDMAN:**  I am confident that we will finish

23 sometime by February 14th.  I think it should be by the 14th,

24 but I don't know for sure, Your Honor.

25    If necessary, I'm sure that one of my colleagues could

```
 1   cover the hearing.  I just would appreciate it if the Court
 2   could wait a few extra weeks.
 3           THE COURT:  How about March 2nd?
 4           MR. NGUYEN:  What's the date?
 5           MS. GOLDMAN:  March 2nd.
 6           MR. NGUYEN:  March 2nd.
 7           THE CLERK:  That's a Wednesday, Your Honor.
 8           THE COURT:  I know.  Wednesday is dark days during
 9   trial.  So I could accommodate you on the 2nd.
10           MR. NGUYEN:  March 2nd, Your Honor?
11           THE COURT:  Yeah.
12           MR. NGUYEN:  Yes.
13           THE COURT:  Probably will be after my law and motion.
14   I really don't see this as being more than half a day, unless
15   you disagree.  All right.
16           MS. GOLDMAN:  Understood, Your Honor.  And thank you
17   very much.  I appreciate it.
18           THE COURT:  You should thank Mr. Nguyen too.
19           MS. GOLDMAN:  Thank you.
20           THE COURT:  March 2nd.
21       In the meantime, why don't you focus on this.  And let's
22   not get too far afield before we get the choice of law issue
23   resolved, okay.
24       Anything else I can help you with?
25           MS. GOLDMAN:  Thank you, Your Honor.
```

 1          **MR. NGUYEN:**  Thank you, Your Honor.

 2          **MR. BERNSTEIN:**  Thank you, Your Honor.

 3          **MR. WILLIAMS:**  Thank you, Your Honor.

 4      (At 11:02 a.m. the proceedings were adjourned.)

 5                       -  -  -  -

 6

 7

 8

 9              **CERTIFICATE OF REPORTER**

10          I certify that the foregoing is a correct transcript

11  from the record of proceedings in the above-entitled matter.

12

13  DATE:   Friday, December 18, 2015

14

15

16              *Katherine Sullivan*

17  _____

18          Katherine Powell Sullivan, CSR #5812, RMR, CRR
                    U.S. Court Reporter

19

20

21

22

23

24

25