MAYER BROWN LLP
John Nadolenco (SBN 181128)
350 South Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
Telephone: (213) 229-9500
jnadolenco@mayerbrown.com

Lauren R. Goldman (*pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 506-2647
lrgoldman@mayerbrown.com

Archis A. Parasharami (*pro hac vice*)
1999 K Street, N.W.
Washington, D.C. 20006-1101
Telephone: (202) 263-3328
aparasharami@mayerbrown.com

*Counsel for Defendant Facebook, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE FACEBOOK BIOMETRIC INFORMATION PRIVACY LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Master Docket No.: 3:15-CV-03747-JD<br><br>**DEFENDANT FACEBOOK, INC.'S PRE-HEARING BRIEF**<br><br>Date: March 2, 2016<br>Time: 10:00 a.m.<br>Location: Courtroom 11<br><br>Hon. James Donato |

**REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................. 1
STATEMENT OF FACTS ................................................................................................... 2
    A.    Plaintiffs Sign Up For Facebook .............................................................................. 2
    B.    Facebook Provided Appropriate Notice Of Updates To Its Terms ......................... 5
    C.    Plaintiffs Continue To Use Facebook ..................................................................... 6
ARGUMENT ........................................................................................................................ 6
I.    PLAINTIFFS ASSENTED TO FACEBOOK'S TERMS ............................................ 6
    A.    Each Plaintiff Assented To Facebook's Terms When He Signed Up For His Facebook Account ............................................................................................ 6
        1.    Facebook's Signup Process Is An Established Method Of Online Contract Formation ................................................................................... 6
        2.    Plaintiffs Have Identified No Contrary Authority .................................... 8
    B.    Plaintiffs' Continued Use Of Facebook Likewise Constitutes Assent ................... 9
II.    PLAINTIFFS' EXPECTED OBJECTIONS TO CONTRACT FORMATION ARE MERITLESS ................................................................................................... 10
CONCLUSION ................................................................................................................... 12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al-Thani v. Wells Fargo & Co.*,
 2009 WL 55442 (N.D. Cal. Jan. 7, 2009) ..................................................................................10

*Be In, Inc. v. Google, Inc.*,
 2013 WL 5568706 (N.D. Cal. Oct. 9, 2013) ................................................................................9

*Binder v. Aetna Life Ins. Co.*,
 75 Cal. App. 4th 832 (1999) ........................................................................................................6

*Blau v. AT&T Mobility*,
 2012 WL 10546 (N.D. Cal. Jan. 3, 2012) ..................................................................................11

*C.M.D. ex rel. De Young v. Facebook, Inc.*,
 621 F. App'x 488 (9th Cir. 2015) ..............................................................................................10

*Carnival Cruise Lines, Inc. v. Shute*,
 499 U.S. 585 (1991) ....................................................................................................................8

*Castaldi v. Signature Retail Servs., Inc.*,
 2016 WL 74640 (N.D. Cal. Jan. 7, 2016) ..................................................................................12

*Chang Bee Yang v. Sun Trust Mortg., Inc.*,
 2011 WL 6749076 (E.D. Cal. Dec. 22, 2011) ...........................................................................12

*Circuit City Stores, Inc. v. Ahmed*,
 283 F.3d 1198 (9th Cir. 2002) ...................................................................................................11

*Crawford v. Beachbody, LLC*,
 2014 WL 6606563 (S.D. Cal. Nov. 5, 2014) ...............................................................................8

*Deering v. CenturyTel, Inc.*,
 2011 WL 1842859 (D. Mont. May 16, 2011) ...........................................................................10

*Defillipis v. Dell Fin. Servs.*,
 2016 WL 394003 (M.D. Pa. Jan. 29, 2016) .................................................................................8

*Douglas v. U.S. Dist. Ct.*,
 495 F.3d 1062 (9th Cir. 2007) ...................................................................................................10

*E.K.D. ex rel. Dawes v. Facebook, Inc.*,
 885 F. Supp. 2d 894 (S.D. Ill. 2012) .....................................................................................7, 10

*Facebook, Inc. v. Fisher*,
 2009 WL 5095269 (N.D. Cal. Dec. 21, 2009) .............................................................................7

*Facebook, Inc. v. Wallace*,
   2009 WL 840391 (N.D. Cal. Mar. 24, 2009) .............................................................................. 7

*Feldman v. Google, Inc.*,
   513 F. Supp. 2d 229 (E.D. Pa. 2007) ...................................................................................... 11

*Franklin v. Facebook, Inc.*,
   2015 WL 7755670 (N.D. Ga. Nov. 24, 2015) ........................................................................... 7

*Fteja v. Facebook, Inc.*,
   841 F. Supp. 2d 829 (S.D.N.Y. 2012) .............................................................................. *passim*

*Guadagno v. E*Trade Bank*,
   592 F. Supp. 2d 1263 (C.D. Cal. 2008) .................................................................................... 8

*Harris v. comScore, Inc.*,
   825 F. Supp. 2d 924 (N.D. Ill. 2011) ........................................................................................ 9

*Hill v. Gateway 2000, Inc.*,
   105 F.3d 1147 (7th Cir. 1997) ................................................................................................ 11

*Hubbert v. Dell Corp.*,
   835 N.E.2d 113 (Ill. App. Ct. 2005) ......................................................................................... 8

*Luafau v. Affiliated Computer Servs., Inc.*,
   2006 WL 1320472 (N.D. Cal. May 15, 2006) ........................................................................ 11

*Major v. McCallister*,
   302 S.W.3d 227 (Mo. Ct. App. 2009) ....................................................................................... 8

*Miller v. Facebook, Inc.*,
   2010 WL 9525523 (N.D. Ga. Jan. 15, 2010) ......................................................................... 7, 8

*Nguyen v. Barnes & Noble, Inc.*,
   763 F.3d 1171 (9th Cir. 2014) .......................................................................................... *passim*

*Rodman v. Safeway Inc.*,
   2015 WL 604985 (N.D. Cal. Feb. 12, 2015) ......................................................................... 9, 10

*Safadi v. Citibank, N.A.*,
   2012 WL 471875 (N.D. Cal. Oct. 2, 2012) ............................................................................. 11

*Savetsky v. Pre-Paid Legal Services, Inc.*,
    2015 WL 604767 (N.D. Cal. Feb. 12, 2015) ............................................................................ 8

*Sawyer v. Bill Me Later, Inc.*,
   2010 WL 5289537 (C.D. Cal. Oct. 4, 2010) ............................................................................. 9

*Snap-on Business Solutions Inc. v. O'Neil & Assocs., Inc.*,
  708 F. Supp. 2d 669 (N.D. Ohio 2010) .................................................................................. 8

*Soffin v. Echannel Network, Inc.*,
  2014 WL 2938347 (S.D. Fla. June 30, 2014) ........................................................................ 7

*Specht v. Netscape Commc'ns Corp.*,
  306 F.3d 17 (2d Cir. 2002) ..................................................................................................... 6

*Stewart v. Preston Pipeline Inc.*,
  134 Cal. App. 4th 1565 (2005) ............................................................................................. 11

*Swyft v. Zynga Corp.*,
  805 F. Supp. 2d 904 (N.D. Cal. 2011) ................................................................................... 8

*Tompkins v. 23andMe, Inc.*,
  2014 WL 2903752 (N.D. Cal. June 25, 2014) ................................................................. 8, 11

*Zaltz v. JDATE*,
  952 F. Supp. 2d 439 (E.D.N.Y. 2013) ................................................................................... 7

## INTRODUCTION

████████████████████████████████████████████████████████████████ The answer to the question before the Court at the March 2 hearing is just that simple: Mr. Patel and the two other plaintiffs agreed to be bound by Facebook's terms of use (the "Terms").[1] That agreement formed a contract between Facebook and the plaintiffs. And that contract requires that this case be dismissed with prejudice.

The facts are clear and undisputed: At the times when each of the plaintiffs registered for a Facebook account, the signup process required every potential subscriber to click a "sign up" or "register now" button that was accompanied by both (1) a clear statement that clicking the button constituted assent to the Terms and (2) a hyperlink to the Terms themselves. This approach is exactly how binding consumer contracts are created in the Internet age, which is why an unbroken line of cases has enforced Facebook's Terms. Most notably, in *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829 (S.D.N.Y. 2012), the court upheld the enforceability of the Terms over challenges to contract formation largely identical to those raised in plaintiffs' opposition to the motion to dismiss in this case. The Ninth Circuit subsequently endorsed *Fteja*'s reasoning in *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171 (9th Cir. 2014), its most significant decision on online contract formation. And numerous other California decisions have enforced online contract terms presented under similar circumstances.

Plaintiffs have failed to offer any evidence suggesting that they could have avoided Facebook's routine business practice of requiring all individuals who register for an account to agree to Facebook's Terms. And because plaintiffs accepted the Terms, this case is over. The choice-of-law provision in Facebook's Terms should be enforced, and plaintiffs' Illinois state-law claims should be dismissed with prejudice.

---

[1] At various times, Facebook's terms of service have been called "Terms of Use" or "Terms of Service" rather than the "Statement of Rights and Responsibilities" ("SRR"). For simplicity's sake, this brief will refer to all of the versions as the "Terms."

**STATEMENT OF FACTS**

**A.     Plaintiffs Sign Up For Facebook.**

Each plaintiff has an active Facebook account.  Chance Decl. ¶ 4; ███████████████████████████████████████████████████████████████████████████████████████████████████  To register for an account at any of these times, every prospective user of Facebook was required to complete a simple and straightforward signup process that required him or her to agree to the Terms.

*August 2005*.  On August 22, 2005, a person who wanted to register for a Facebook account was presented with the following screen:



*See* De Lombaert Decl. Ex. A.  The phrase "Terms of Use" was a hyperlink; clicking on it took the potential subscriber to a page displaying the complete set of Terms.  De Lombaert Dep. 74:21-75:18; De Lombaert Decl. ¶¶ 10-11.  To register, the person had to fill in the four identification fields; click the check box indicating assent to the Terms; and then click the "Register Now!" button.  *Id.* ¶ 9.

*February 2008*.  On February 11, 2008, there were two variations on the signup screen.  *Id.* ¶ 14.  ███████████████████████████████████████

De Lombaert Decl. Ex. C.  The phrase "Terms of Use" was a hyperlink.  *See id.* ¶¶ 17-18; De Lombaert Dep. 82:14-23.  To register, the user had to fill in the identification fields; click the check box indicating assent to the Terms; and then click the "Sign Up" button.  De Lombaert Decl. ¶ 15.[2]

*November 2009*.  The signup process in effect in November 2009 involved two forms.  First, the user was required to provide his or her name, email, password, gender, and birthday.  He or she would then move to the next screen by clicking the green "Sign Up" button.  *See* De Lombaert Decl. ¶¶ 21-23 & Ex. D.  The second screen looked like this:

---

[2] The other version was similar.  The user had to fill in the identification fields, click the check box indicating assent to the Terms, and then click a blue button that said "Sign Up" in white.  *See id.* ¶ 15 & Ex. B.

1  *See id.* Ex. E.  Again, the phrase "Terms of Use" was a hyperlink.  *Id.* ¶¶ 26-27.  The screen
2  required the completion of a "CAPTCHA" challenge designed to separate humans from
3  automated devices; it displayed a sequence of letters and/or numbers and required the person to
4  reproduce the correct sequence into a box.  *See id.* ¶ 24 & Ex. F.  After meeting that challenge,
5  the potential subscriber was required to click the "Sign Up" button to register.  *Id.* ¶ 25.

6  Joachim De Lombaert, a Facebook engineering manager, will testify that a person could
7  not register for a Facebook account at any of these times without filling in all of the fields on the
8  signup screen(s) and clicking the "Sign Up" or "Register Now" button(s).  *See also* De Lombaert
9  Decl. ¶¶ 9, 15, 25, 30.  In the versions that had a separate check box confirming assent to the
10 Terms, a person could not register without checking the box.  *Id.* ¶ 30.

[Redacted text spanning lines 10-19]

20 But the undisputed evidence demonstrates that at all relevant times, assent to Facebook's
21 Terms has been a condition of both registration and use of the service.  The text of the Terms in
22 effect at the time Mr. Licata registered for Facebook in November 2009 stated that "By using or
23 accessing Facebook, you agree to this Statement."  Pike Decl. Ex. C.  The other relevant versions
24 of Facebook's Terms contain similar language.[3]  And at all relevant times, the Terms have

---

[3] *See id.* Ex. A (June 28, 2005) ("By using Thefacebook web site . . . you signify that you have read, understand and agree to be bound by these Terms of Use"); *id.* Ex. B (Nov. 15, 2007) ("By accessing or using our website . . ., you (the 'User') signify that you have read, understand and agree to be bound by these Terms of Use"); *id.* Ex. D (Jan. 30, 2015) ("By using or accessing the Facebook Services, you agree to this Statement, as updated from time to time").

1  contained a California or Delaware choice-of-law provision. *See id.* Exs. A-D.[4]

**B.  Facebook Provided Appropriate Notice Of Updates To Its Terms.**

The Terms in effect when each plaintiff signed up for Facebook expressly stated that Facebook reserved the right to amend its Terms. *See* Pike Decl. Exs. A-C. Facebook provides notice of updates to its Terms to the people who use its service in a broad variety of ways.

One way in which Facebook has notified users of updates has been by sending an email to each user's registered email address. Pike Decl. ¶ 14. These notifications are clearly labeled as updates to the Terms, and have referred to the Terms both as "our terms" and as the "Statement of Rights and Responsibilities." For example, Facebook sent an email in November 2012 that disclosed the December 2012 update to the SRR; its subject line read "Updates to Data Use Policy and Statement of Rights and Responsibilities." *Id.* Ex. E. The first paragraph reminded the recipient that the SRR "explains the terms governing use of our services." *Id.* Similarly, the email sent in August 2013 informed the recipient that "We're writing to let you know that we are proposing updates to our Data Use Policy and our Statement of Rights and Responsibilities"—with each of the blue terms hyperlinked to the corresponding document. *Id.* Ex. G. The December 2014 email, titled "We're updating our terms and policies and introducing Privacy Basics," stated that Facebook was "updating our terms, data policy and cookies policy." *Id.* Ex. H.

Mark Pike, a Facebook privacy program manager, will testify that another way in which Facebook informed users of the most recent update to its Terms was by displaying prominent "jewel notifications" when the user accessed his or her Facebook account; *See* Pike Decl. ¶ 15; Pike Dep. 55:1-12; Patel Dep. 67:12-25. Facebook has also provided updates in other ways, including "roosters" (a different form of

---

[4]  As we have previously noted, for purposes of this case there is little difference between the selection of California or Delaware law; either way, the parties never selected *Illinois* law to govern their disputes. *See* Mot. to Dismiss (Dkt. No. 69) at 6 n.4.

notification that appears to users), banners, blog posts, and updates shared on the Facebook Site Governance Page.  Pike Decl. ¶ 16; *see also* Pike Dep. 167:20-168:4.

### C. Plaintiffs Continue To Use Facebook.

Each of the plaintiffs actively uses Facebook to this day.

## ARGUMENT

### I. PLAINTIFFS ASSENTED TO FACEBOOK'S TERMS.

Plaintiffs agreed to be bound by Facebook's Terms—including the choice-of-law clause—in each of two independently sufficient ways.  *First*, each plaintiff assented to the Terms when he signed up for Facebook.  *Second*, each plaintiff manifested assent to the current Terms by continuing to use Facebook's services after receiving notice of updates to that agreement.

#### A. Each Plaintiff Assented To Facebook's Terms When He Signed Up For His Facebook Account.

##### 1. Facebook's Signup Process Is An Established Method Of Online Contract Formation.

Both online and off, mutual assent is the "touchstone of contract" under California law. *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 29 (2d Cir. 2002) (citing *Binder v. Aetna Life Ins. Co.*, 75 Cal. App. 4th 832, 850 (1999)).  This requirement is generally satisfied when a website "user is required to affirmatively acknowledge the agreement *before* proceeding with use of the website." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014) (emphasis added) (citing *Fteja v. Facebook*, 841 F. Supp. 2d at 838-40).[5]  In *Nguyen*, the Ninth Circuit refused to enforce Barnes & Noble's online terms because they were presented in a so-called "pure-form browsewrap agreement," in which "the website will contain a notice that—by merely

---

[5]     Although the *Nguyen* court applied New York law, it relied mainly on federal cases and stated that "both California and New York law dictate the same outcome."  763 F.3d at 1175-76.

using the services of, obtaining information from, or initiating applications within the website—the user is agreeing to and is bound by the site's terms of service." *Id.* Such an agreement requires "no affirmative action . . . by the website user to agree to the terms of a contract other than his or her use of the website." *Id.* The court explained that if there "were . . . any evidence in the record that [the plaintiff] . . . was required to affirmatively acknowledge the Terms of Use before completing his online purchase, the outcome of this case might be different." *Id.*

*Nguyen*'s analysis is dispositive here. The Ninth Circuit expressly distinguished what it called the "pure-form browsewrap agreement" before it from Facebook's signup process. It relied upon the reasoning in *Fteja v. Facebook*, which upheld the enforceability of the *very terms and contract-formation process at issue here*. *Id.* at 1176-77 (citing *Fteja*, 841 F. Supp. 2d at 838-40).[6] As *Fteja* explained, a person is not bound to the Terms simply by the act of using Facebook's website without any other notice of Facebook's Terms; rather, he "must do something else—click 'Sign Up'—to assent to the hyperlinked terms." 841 F. Supp. 2d at 838. The *Fteja* court concluded that the plaintiff had assented to Facebook's terms because he—just like each plaintiff here—"was informed of the consequences of his assenting click and he was shown, immediately below, where to click to understand those consequences." *Id.* at 840.

It is thus unsurprising that *every court* to address Facebook's Terms, before and after *Nguyen*, has held that they are enforceable. *See Franklin v. Facebook, Inc.*, 2015 WL 7755670, at *2 (N.D. Ga. Nov. 24, 2015) (enforcing Facebook's Terms on motion to transfer venue and noting that "[t]he Court cannot identify a single instance where any federal court has struck down Defendant's SRR").[7] Facebook's signup process rests upon well-established principles of

---

[6] The Ninth Circuit also cited the similar reasoning in *Zaltz v. JDATE*, 952 F. Supp. 2d 439, 451-52 (E.D.N.Y. 2013), which enforced JDATE's terms because "prospective members had to check [a] box confirming that they both read and agreed to the website's Terms and Conditions of Service to obtain [an] account." *Nguyen*, 763 F.3d at 1176-77.

[7] *See also Soffin v. Echannel Network, Inc.*, 2014 WL 2938347, at *1-2 (S.D. Fla. June 30, 2014) (also enforcing Facebook's Terms on motion to transfer venue); *E.K.D. ex rel. Dawes v. Facebook, Inc.*, 885 F. Supp. 2d 894, 903 (S.D. Ill. 2012) (same); *Miller v. Facebook, Inc.*, 2010 WL 9525523, at *4 (N.D. Ga. Jan. 15, 2010); *Facebook, Inc. v. Fisher*, 2009 WL 5095269, at *1 (N.D. Cal. Dec. 21, 2009) (holding, on Facebook's motion for TRO based on defendant's violations of the Terms, that "Facebook users must register with the website and agree to Facebook's Terms of Use"); *Facebook, Inc. v. Wallace*, 2009 WL 840391, at *1 (N.D. Cal. Mar. 24, 2009) (same on motion for preliminary injunction).

contract formation. Its practice of presenting a hyperlink to its full terms next to the acknowledgement of assent to those terms is simply the "twenty-first century equivalent" of the practice, held enforceable in *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585 (1991), of placing terms on the back side of a cruise ship ticket. Such terms undoubtedly bind counterparties whether or not they choose to look at them. *Fteja*, 841 F. Supp. 2d at 839-40 (citing *Carnival Cruise Lines*, 499 U.S. at 587); *see also Miller*, 2010 WL 9525523, at *1. "[I]t is not too much to expect that an internet user" familiar with the "mechanics of the internet . . . would understand that the hyperlinked phrase 'Terms of Use' is really a sign that says 'Click Here for Terms of Use,'" which prompts the consumer "to examine terms of sale that are located somewhere else." *Fteja*, 841 F. Supp. 2d at 839.[8] Indeed, numerous California decisions have held that the combination of hyperlink and click-to-accept establishes mutual assent.[9]

### 2.  Plaintiffs Have Identified No Contrary Authority.

The decisions cited in plaintiffs' opposition to Facebook's motion to dismiss are entirely consistent with this rule. In *Savetsky v. Pre-Paid Legal Services, Inc.*, prospective customers were *not* required to check a box or otherwise manifest assent to the defendant website's terms; rather, they could simply click the "BUY NOW" button, which was *unaccompanied* by any acknowledgment that by clicking the button the customer was agreeing to the defendant's terms. 2015 WL 604767, at *4 (N.D. Cal. Feb. 12, 2015). That alone makes *Savetsky* distinguishable. But there is more: to locate the contract provision at issue in *Savetsky*, a customer would have had to stumble through multiple inconspicuous hyperlinks with vague labels like "More Plan Details." *Id.* Such circumstances stand in sharp contrast to the straightforward, prominent, and

---

[8] *See also id.* at 840-41 (citing *Hubbert v. Dell Corp.*, 835 N.E.2d 113 (Ill. App. Ct. 2005); *Major v. McCallister*, 302 S.W.3d 227 (Mo. Ct. App. 2009); *Guadagno v. E*Trade Bank*, 592 F. Supp. 2d 1263 (C.D. Cal. 2008); *Snap-on Business Solutions Inc. v. O'Neil & Assocs., Inc.*, 708 F. Supp. 2d 669 (N.D. Ohio 2010)); *Defillipis v. Dell Fin. Servs.*, 2016 WL 394003, at *10 (M.D. Pa. Jan. 29, 2016) (following *Fteja* and holding that plaintiff assented to her credit agreement by checking a box when she opened her online account, even though "the Credit Agreement was only accessible by hyperlink").

[9] *See, e.g.*, *Crawford v. Beachbody, LLC*, 2014 WL 6606563, at *3 (S.D. Cal. Nov. 5, 2014); *Tompkins v. 23andMe, Inc.*, 2014 WL 2903752, at *8 (N.D. Cal. June 25, 2014); *Swyft v. Zynga Corp.*, 805 F. Supp. 2d 904, 911-12 (N.D. Cal. 2011); *Guadagno*, 592 F. Supp. 2d at 1267, 1271.

direct hyperlink to Facebook's Terms.

*Be In, Inc. v. Google, Inc.* involved a pure browsewrap agreement like the one later found unenforceable in *Nguyen*. The complaint alleged only that the defendants had agreed to the "CamUp" software's terms of service because the CamUp website's home page included a hyperlink to those terms on the site. 2013 WL 5568706, at *8-9 (N.D. Cal. Oct. 9, 2013). Judge Koh held that the complaint had "provide[d] no grounds, beyond the mere existence of a link, for the Court to find that Defendants were put on notice that mere use of the website would be interpreted as agreement to the Terms of Service," and so the complaint's conclusory allegations were insufficient for the court to "infer valid contract formation." *Id.* at *9.[10] Both the sparse record and the absence of an affirmative act of assent render *Be In* inapposite; indeed, Judge Koh expressly distinguished *Fteja*. *Id.* at *7 (citing *Fteja*, 841 F. Supp. 2d at 835, 838-40).

### B. Plaintiffs' Continued Use Of Facebook Likewise Constitutes Assent.

The mutual assent requirement is satisfied for a second, independent reason. By continuing to use Facebook's services after receiving notice of updates to the Terms and reminders that the Terms govern their use of Facebook (*see* pp. 5-6, *supra*), each plaintiff assented to all of the Terms, including the choice-of-law clause, in effect at the time of the notice. Continued use after such notice, standing alone, has repeatedly been held sufficient to establish mutual assent. In *Sawyer v. Bill Me Later, Inc.*, 2010 WL 5289537, at *2-3 (C.D. Cal. Oct. 4, 2010), for example, the court enforced the defendant's contract terms because the defendant had sent its customers an "e-mail, announcing changes to the Original Agreement and the effective date of those changes." Likewise, in *Rodman v. Safeway Inc.*, 2015 WL 604985, at *11 (N.D. Cal. Feb. 12, 2015), Safeway could have informed customers adequately of changes to

---

[10] *Harris v. comScore, Inc.*, 825 F. Supp. 2d 924 (N.D. Ill. 2011) (cited at MTD Opp. 9) presented the same posture as *Be In*. The court in *Harris* found that the declaration submitted by the defendant while the case was at the pleading stage failed to "provide sufficient detail about how the hyperlink to the agreement was presented to the user." *Id.* at 927. The court acknowledged, however, that "further factual development may indicate that the plaintiff's allegations are incorrect, that the terms of the license agreement were reasonably available during the installation process, and that the plaintiffs therefore must have manifested assent to the contract." *Id.* The "further factual development" in this case has left no doubt that plaintiffs "must have manifested assent" to Facebook's Terms.

1 its Special Terms by "send[ing] all existing Safeway.com customers an email in order to ensure
2 that every customer is aware of a change in the Special Terms prior to making a purchase." *Id*.[11]
3 The facts here are even more stark: plaintiffs have continued to use Facebook's website
4 *after Facebook invoked the Terms and their choice-of-law clause in this case*. *See* p. 6, *supra*.
5 As the Ninth Circuit recently noted in a different context, "[b]y continuing to use facebook.com
6 after bringing their action, Plaintiffs manifested an intention not to disaffirm the [Terms]."
7 *C.M.D. ex rel. De Young v. Facebook, Inc.*, 621 F. App'x 488, 489 (9th Cir. 2015); *accord*
8 *E.K.D.*, 885 F. Supp. 2d at 900. The same rationale prohibits plaintiffs from continuing to use
9 Facebook while claiming not to be bound by the Terms.[12]

## II. PLAINTIFFS' EXPECTED OBJECTIONS TO CONTRACT FORMATION ARE MERITLESS.

At the December 16 hearing, plaintiffs' counsel responded to the Court's questions about the nature of plaintiffs' objections to the enforceability of Facebook's Terms by saying, "I can represent to the Court . . . that the plaintiffs don't have a recollection of having agreed to—to the SRR at issue in this case." Tr. 7:14-17. [REDACTED]

In any case, subjective lack of recall is wholly insufficient to overcome assent. "'Mutual assent to contract is based upon *objective and outward manifestations* of the parties; a party's

---

[11] *See also Deering v. CenturyTel, Inc.*, 2011 WL 1842859, at *2 (D. Mont. May 16, 2011) (holding that plaintiff had consented to his Internet service provider's updated privacy policy, because "an email to [the provider's] subscribers was sent informing them that the Privacy Policy had been updated and providing a link to the updated Privacy Policy"); *compare Douglas v. U.S. Dist. Ct.*, 495 F.3d 1062, 1065-66 (9th Cir. 2007) (assent based on continued use "can only be inferred after [the customer] receive[s] proper notice"); *Nguyen*, 763 F.3d at 1179 ("[T]he onus must be on website owners to put users on notice of the terms to which they wish to bind customers."). Facebook's clear, straightforward notices easily satisfy that onus.

[12] Because plaintiffs are all bound by Facebook's current Terms, which contain a California choice of law provision, the fact that plaintiff Patel initially assented to a Delaware choice of law provision when he signed up for Facebook is irrelevant. To be clear, though, the Delaware choice of law clause was just as enforceable as the California one when it was in effect, and likewise precludes Patel from relying on *Illinois* law for all of the reasons discussed by Facebook in its briefing on the motion to dismiss. *See* Mot. to Dismiss (Dkt. No. 69) at 6 n.4.

1 subjective intent, or subjective consent, therefore is irrelevant.'" *Al-Thani v. Wells Fargo & Co.*, 2009 WL 55442, at *6 (N.D. Cal. Jan. 7, 2009) (emphasis added) (quoting *Stewart v. Preston Pipeline Inc.*, 134 Cal. App. 4th 1565, 1587 (2005)). *See also Blau v. AT&T Mobility*, 2012 WL 10546, at *4 (N.D. Cal. Jan. 3, 2012) (enforcing terms of service: "if a party could get out of a contract by arguing that he did not recall making it, contracts would be meaningless"). Evidence of Facebook's signup process provides the requisite objective showing.

That evidence also dispels any argument that Facebook has not provided adequate proof of plaintiffs' individual registrations: Because "a putative Facebook user cannot become an actual Facebook user unless and until they have clicked through the registration page where they acknowledge they have read and agreed to Facebook's terms of use," a plaintiff's assertions that "[t]here is no proof that [he personally] agreed to" those terms fails "[a]s a matter of logic." *Fteja*, 841 F. Supp. 2d at 834 (quotation marks omitted); *Tompkins*, 2014 WL 2903752, at *7 ("user access to portions of websites that require indicating assent [is] sufficient evidence that the user clicked" the button acknowledging acceptance of terms) (citing *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 237 (E.D. Pa. 2007)). Facebook is aware of no case holding that a specific record of an individual's click is required to prove contract formation.

[REDACTED] "[O]ne who signs a contract is bound by its provisions and cannot complain of unfamiliarity with the language of the instrument." *Circuit City Stores, Inc. v. Ahmed*, 283 F.3d 1198, 1200 (9th Cir. 2002); *see also Nguyen*, 763 F.3d at 1179 (the "failure to read a contract before agreeing to its terms does not relieve a party of its obligations under the contract").[14]

---

[13] [REDACTED]

[14] *See also, e.g.*, *Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1149 (7th Cir. 1997) ("Competent adults are bound by [form contracts], read or unread."); *Fteja*, 841 F. Supp. 2d at 839; *Safadi v. Citibank, N.A.*, 2012 WL 471875, at *4 (N.D. Cal. Oct. 2, 2012); *Blau*, 2012 WL 10546, at *4; *Luafau v. Affiliated Computer Servs., Inc.*, 2006 WL 1320472, at *3 (N.D. Cal. May 15, 2006).

Finally, any argument by plaintiffs that either the signup screen or the Terms themselves were too hard to find or read, or that the Terms were too complex, would be wholly misplaced, as the perfectly legible and coherent documents Facebook has produced make clear.[15] ██████████ *see also id.* at 139:17-140:7 (authenticating the screenshots); De Lombaert Decl. ¶¶ 8, 14, 22. Plaintiffs have not suggested that they were unable to find or read Facebook's Terms. ██████████ Nor have any of the decisions enforcing Facebook's Terms suggested any inadequacy in the design elements of Facebook's signup flow or the Terms themselves.

**CONCLUSION**

For the foregoing reasons, plaintiffs are bound by the choice-of-law provisions contained in Facebook's terms. Their lawsuit should therefore be dismissed with prejudice.

Dated: February 24, 2016

MAYER BROWN LLP

By: */s/ John Nadolenco*
    John Nadolenco
    Lauren R. Goldman
    Archis A. Parasharami

*Counsel for Defendant Facebook, Inc.*

---

[15] Any such arguments would in any event be properly understood as an unconscionability challenge, not a challenge to contract formation. *See, e.g.*, *Castaldi v. Signature Retail Servs., Inc.*, 2016 WL 74640, at *9 (N.D. Cal. Jan. 7, 2016); *Chang Bee Yang v. Sun Trust Mortg., Inc.*, 2011 WL 6749076, at *9 (E.D. Cal. Dec. 22, 2011). At the December 16 hearing, plaintiffs acknowledged that they could not mount an unconscionability challenge to Facebook's Terms. Hearing Tr. 10:23-25.