UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JAMES DONATO, JUDGE

In re FACEBOOK BIOMETRIC          )
INFORMATION PRIVACY LITIGATION )     Master File No.
_____ )     15-cv-03747 JD

                                      San Francisco, California
                                      Wednesday, March 2, 2016

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

          ROBBINS GELLER RUDMAN & DOWD LLP
          One Montgomery Street, Suite 1800
          San Francisco, California 94104
     **BY: SHAWN A. WILLIAMS, ATTORNEY AT LAW**
          **DAVID W. HALL, ATTORNEY AT LAW**

          LABATON SUCHAROW LLP
          140 Broadway
          New York, New York 10005
     **BY: JOEL H. BERNSTEIN, ATTORNEY AT LAW**

          EDELSON PC
          350 North LaSalle Street, Suite 1300
          Chicago, Illinois 60654
     **BY: ALEXANDER NGUYEN, ATTORNEY AT LAW**

(Appearances continued on next page)

Reported By:     *Katherine Powell Sullivan, CSR #5812, RPR, CRR*
                 *Official Reporter - U.S. District Court*

**APPEARANCES (CONTINUED):**

For Defendant:

        MAYER BROWN LLP
        1221 Avenue of the Americas
        New York, New York 10020
    **BY: LAUREN R. GOLDMAN, ATTORNEY AT LAW**

        MAYER BROWN LLP
        1999 K Street, N.W.
        Washington, D.C. 20006
    **BY: ARCHIS A. PARASHARAMI, ATTORNEY AT LAW**

        MAYER BROWN LLP
        350 South Grand Avenue, 25th Floor
        Los Angeles, California 90071-1503
    **BY: JOHN NADOLENCO, ATTORNEY AT LAW**

For Frederick William Gullen:

        MILLIAN GONYA, LLP
        1395 Brickell Avenue, Suite 700
        Miami, Florida  33131
    **BY: FRANK S. HEDIN, ATTORNEY AT LAW**

# **I N D E X**

Wednesday, March 2, 2016

**DEFENDANT'S WITNESSES**                              **PAGE**

**DE LOMBAERT, JOACHIM**
(SWORN)                                                  6
Direct Examination by Mr. Nadolenco                      7
Cross Examination by Mr. Williams                       50
Redirect Examination by Mr. Nadolenco                   79

**PIKE, MARK**
(SWORN)                                                 85
Direct Examination by Mr. Nadolenco                     85
Cross Examination by Mr. Williams                       98

| | |
|---|---|
| 1 | **Wednesday - March 2, 2016**                    **10:28 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---000--- |
| 4 | **THE CLERK:**  Calling civil 15-3747, In re Facebook |
| 5 | Biometric Information Privacy Litigation. |
| 6 | Counsel, please come forward and state your appearances |
| 7 | for the record. |
| 8 | **MR. NADOLENCO:**  Good morning, Your Honor.  Shawn |
| 9 | Williams, Robbins Geller Rudman & Dowd, on behalf of |
| 10 | plaintiffs. |
| 11 | **THE COURT:**  Say that again. |
| 12 | **MR. WILLIAMS:**  Sorry.  Shawn Williams. |
| 13 | **THE COURT:**  Shawn Williams, okay. |
| 14 | **MR. NGUYEN:**  Good morning, Your Honor.  Alex Nguyen |
| 15 | for plaintiffs. |
| 16 | **MR. BERNSTEIN:**  Good morning, Your Honor.  Joel |
| 17 | Bernstein for plaintiffs. |
| 18 | **MR. RHODES:**  Good morning, Your Honor.  Corban Rhodes |
| 19 | from Labaton Sucharow for plaintiffs. |
| 20 | **MR. HEDIN:**  Good morning, Your Honor.  Frank Hedin on |
| 21 | behalf of Frederick William Gullen.  Mr. Gullen's case was |
| 22 | recently removed to this -- |
| 23 | **THE COURT:**  Oh, you're the other person.  Okay. |
| 24 | **MR. HEDIN:**  I'm here to answer any questions Your |
| 25 | Honor may have. |

1          **THE COURT:**  Okay.

2          **MS. GOLDMAN:**  Good morning, Your Honor.  Lauren

3  Goldman of Mayer Brown for defendant Facebook.

4          **MR. NADOLENCO:**  Good morning, Your Honor.  John

5  Nadolenco of Mayer Brown for defendant Facebook.

6          **MR. PARASHARAMI:**  Good morning, Your Honor.  Archis

7  Parasharami for Facebook, from Mayer Brown.

8          **MR. HALL:**  Good morning, Your Honor.  David Hall,

9  Robbins Geller, for plaintiff.

10          **THE COURT:**  Okay.  So do the assent to choice-of-law

11  provision first.  Then I'm going to take argument on legal

12  issues, okay.

13      So, Facebook, you're the proponent of the contract.  Tell

14  me why that should stick.

15          **MS. GOLDMAN:**  Excuse me, Your Honor?

16          **THE COURT:**  Tell me why that should stick.

17          **MS. GOLDMAN:**  Why that should stick.  It should stick

18  because when each of the plaintiffs signed up for Facebook he

19  agreed to Facebook's terms.

20      Each of the plaintiffs, at the time when he signed up --

21          **THE COURT:**  Do you have some witnesses or something to

22  put on?

23          **MS. GOLDMAN:**  I'm sorry, Your Honor?

24          **THE COURT:**  Are you able to hear me?

25          **MS. GOLDMAN:**  Yes.

1      THE COURT:  Can you turn me up a little bit, Lisa.

2      MS. GOLDMAN:  Perhaps it was just me, Your Honor.  I'm

3  sorry.

4      THE COURT:  Do you have witnesses you want to put on?

5      MS. GOLDMAN:  We do, Your Honor.  We have three

6  witnesses who are here in the courtroom.  We'd like to start

7  with Mr. Joachim De Lombaert.  He is a Facebook software

8  engineer.  And he will talk about the sign-up flow at the time

9  when each of the plaintiffs registered.

10     Mr. Nadolenco will be handling the witnesses, Your Honor.

11     THE COURT:  Okay.

12     MS. GOLDMAN:  Thank you.

13     MR. NADOLENCO:  Thank you, Your Honor.  At this time,

14  Facebook would like to call Mr. Joachim De Lombaert to the

15  stand.

16     THE COURT:  Okay.

17     THE CLERK:  Would you please raise your right hand.

18     **JOACHIM DE LOMBAERT, DEFENDANT'S WITNESS, SWORN**

19     THE WITNESS:  I do.

20     THE CLERK:  Please be seated.

21     Please state your full name for the Court and spell your

22  last name.

23     THE WITNESS:  Joachim De Lombaert.  My last name is

24  spelled D-e L-o-m-b-a-e-r-t.

25     THE CLERK:  Thank you.

1          **DIRECT EXAMINATION**

2   BY MR. NADOLENCO

3   **Q.**   Good morning, Mr. De Lombaert.  Can we start, please, by

4   having you tell the Court what, if any, educational degrees you

5   have.

6   **A.**   Sure.  After graduating from high school, I went to

7   Stanford University and got my bachelor's in symbolic systems.

8        Symbolic systems is a combination of computer science,

9   linguistics, interdisciplinary measures.

10  **Q.**   What year did you obtain your degree?

11  **A.**   2009.

12  **Q.**   And at some point did you start working at Facebook?

13  **A.**   Yes.  I started working at Facebook in 2011.

14  **Q.**   And what is your current job title?

15  **A.**   I'm a software engineering manager.

16  **Q.**   How long have you been in that role?

17  **A.**   I've been manager for about three years now.  A little

18  over three years.

19  **Q.**   Could you describe for the Court your job responsibilities

20  in that role, please.

21  **A.**   Sure.  So I'm involved in writing and reviewing source

22  code and software at Facebook.  That includes both due to my

23  own individual work and supporting other engineers that are on

24  the team that I work with, as well as dealing with career

25  growth and the team's projects and opportunities.

1    **Q.**    And the work you just described at Facebook, have you

2    worked on the sign-up flow at all?

3    **A.**    Yes.  That's actually one of the main things I work on the

4    last few years.

5    **Q.**    Could you explain to the Court, when we use the term or

6    you use the term "sign-up flow," what do you mean by that?

7    **A.**    Sign-up flow is the process that people have to go through

8    to successfully create an account on Facebook.  Sometimes I

9    call it registration.

10   **Q.**    Describe your experience specifically with your work on

11   the sign-up flow for Facebook.

12   **A.**    So, in my experience, I've been helping to develop the

13   sign-up flow.  And I've helped to make modifications to the

14   sign-up flow --

15        (Reporter interrupts.)

16        **THE COURT:**  Move up a little bit closer.  And, also,

17   our reporter is taking everything you say by hand, so slow it

18   down.  You have plenty of time.

19        So work on sign-up flow.  What do you do for it?

20        **THE WITNESS:**  So we talk about how to improve the

21   sign-up flow in different ways.  And I directly help modify

22   that sign-up and registration flow.

23        For example, we built a new sign-up flow on the native

24   mobile app in the past few years.

25        **THE COURT:**  Is sign-up flow different depending on if

1    you're using a phone versus an iPad or a tablet or a laptop?

2        **THE WITNESS:**  Yes, Your Honor.  It's different

3    depending on the device that you're using.  And we've had

4    different flows over the different years.

5        **THE COURT:**  In 2005, was that also true; different

6    flows?

7        **THE WITNESS:**  2005 there was only one flow.

8        **THE COURT:**  Regardless of the device?

9        **THE WITNESS:**  Regardless of the device.

10        **THE COURT:**  You get the same flow for a phone or

11    computer?

12        **THE WITNESS:**  Basically, you would not have been able

13    to successfully sign up using the phone.  You would have had to

14    use a desktop computer in 2005.

15        **THE COURT:**  In '05, you could not use a mobile device

16    to sign up for Facebook?

17        **THE WITNESS:**  Yes.

18        **THE COURT:**  When did that change?

19        **THE WITNESS:**  Early 2008.

20        **THE COURT:**  '8?

21        **THE WITNESS:**  '8.

22    **BY MR. NADOLENCO**

23    **Q.**    You mentioned your work with source code and your work

24    with sign-up flow.  Do the two ever overlap?

25    **A.**    Yes.  Actually, the sign-up flow needs to be modified by

1    modifying the source code.  And those are directly

2    interrelated.

3    **Q.**    So do you work on the source code that dictates the

4    sign-up flow for Facebook?

5    **A.**    That's correct, yes.

6    **Q.**    Is all of Facebook's source code stored in one place?

7    **A.**    Yes.  The source code is in, effectively, a central

8    repository.  And all the source code is located in that

9    repository.  And that includes all the current source code as

10   well as historical revisions of that source code.

11   **Q.**    Could you describe for the Court how the source code is

12   created.

13   **A.**    Sure.

14        So when someone in an engineering role is planning or

15   needs to make a change, they can then access the source code

16   that exists, the existing version of the source code, and

17   either make additional -- make -- add additional source code or

18   make modifications to the existing source code.

19        And that's -- once those changes are made, they then

20   publish it back.  They commit it, it's called, to the central

21   repository.  And from that point on, that source code is now

22   officially in -- in the repository.

23   **Q.**    And is it stored there?

24   **A.**    Yes, it's stored there permanently.

25   **Q.**    Have you ever personally written source code for the

1    sign-up flow?

2    **A.**    Yes, I have.

3    **Q.**    And is the source code in that central repository stored

4    and maintained accurately?

5    **A.**    Yes.  It's critical to Facebook's systems because the

6    source code directly is responsible for running the website and

7    all of our services.

8         And so it's critical that that is stored accurately, both

9    the current version and historic version, for day-to-day

10   business.  And we actually have a team dedicated to keeping

11   that source code -- keeping that system working correctly and

12   accurately.

13        **THE COURT:**  So you started in 2011 with Facebook?

14        **THE WITNESS:**  That's correct.

15        **THE COURT:**  All right.  So you did not have any

16   involvement in writing the source code for flow in '05, '08, or

17   '09; right?

18        **THE WITNESS:**  No.

19        **THE COURT:**  Go ahead.

20        **MR. NADOLENCO:**  Along those lines, Your Honor...

21   BY MR. NADOLENCO

22   **Q.**    Is just the most recent source code stored in that central

23   repository?

24   **A.**    No.  All versions of the source code is stored.  So I can

25   actually go access those versions of the source code.  And

1    given my understanding of Facebook systems and software

2    engineering, I can actually understand how the source code

3    would have worked in those previous years prior to me joining

4    Facebook.

5    **Q.**    And in the ordinary course of your duties at Facebook,

6    aside from this case, have you had occasion to pull historical

7    versions of source code?

8    **A.**    Yes.  It's a normal part of our business process.  It's

9    very frequent that we have to go look at older versions of the

10   source code in order to understand why certain changes were

11   made previously.  And it's just a normal thing that we do.

12             **THE COURT:**  Are you able to edit those older versions?

13             **THE WITNESS:**  No.  The -- once a version is committed

14   and submitted to the central repository, that particular

15   version cannot change.  You can only create an entirely newer

16   version on top of existing source code.

17   **BY MR. NADOLENCO**

18   **Q.**    Did you have occasion, sir, to look at prior versions of

19   the Facebook source code with regard to sign-up flow for this

20   case?

21   **A.**    Yes.  I specifically investigated the prior revisions of

22   the source code for the dates that the plaintiffs signed up.

23   **Q.**    And let's talk about that for a little bit.  Specifically,

24   what did you do?

25   **A.**    So I went into the system to understand not only which

1   versions of the source code would have been in place at the

2   dates that the plaintiffs signed up, but also I went through

3   and read the source code relevant to registration and took the

4   time to understand how source code would have run.  And then I

5   created reproductions of how that would have looked.

6        **THE COURT:**  How far back was the source code

7   repository launched?

8        **THE WITNESS:**  It predates 2005.

9        **THE COURT:**  It does?

10       **THE WITNESS:**  Yes.  It goes back before the date that

11  the plaintiff in 2005 signed up.

12       **THE COURT:**  All right.

13  **BY MR. NADOLENCO**

14  **Q.**   Okay.  So you've got the three dates the plaintiffs signed

15  up.  Tell us, did you follow the same general process with

16  regard to the source code for all three dates?

17  **A.**   Yes, I followed a similar process for all three dates.

18  **Q.**   Okay.  So let's go ahead and walk the Court through the

19  precise process you followed, if you would.

20  **A.**   Okay.  So in order to find the right source code, I needed

21  to account for, effectively, a lag between when the source code

22  is created and when it's actually accessible to users on

23  Facebook.com.  Because there is some amount of time between

24  when an engineer makes a change and that change becomes

25  available on -- on the live website.

1    And so what I've done is I've looked at -- I've accounted

2  for that lag by looking at all the possibilities during the

3  time period that the plaintiffs signed up, both immediately

4  after the plaintiffs signed up as one goalpost and --

5         THE COURT:  When you say "immediately," plus or minus

6  what?  One month?  Five weeks?

7         THE WITNESS:  So one day after the plaintiffs signed

8  up, in addition to two to four weeks before the plaintiffs

9  signed up.

10        THE COURT:  Okay.

11        THE WITNESS:  That lag is typically a few days.

12        THE COURT:  All right.

13  BY MR. NADOLENCO

14  Q.   And when you -- so at that point, did you compare, in your

15  terms, the first goalpost to the last goalpost?

16  A.   Yes.  I wanted to make sure there were no changes to the

17  sign-up flow that would have caused the sign-up flow to be

18  different during that time period for this plaintiff's claim.

19  Q.   And what did you determine?

20  A.   That there were no differences, and that the version I

21  identified accurately represents what the flow would have been

22  like at the time.

23  Q.   And did you review anything else in the process that you

24  just described?

25  A.   Let's see.  So -- yes.  In addition to the source code, I

1    also looked at -- well, I'll just mention that the central

2    repository, in addition to containing the source code itself,

3    also contains metadata.  So that's engineering comments and

4    descriptions about the changes that were being made.  And so I

5    also reviewed those to get a better understanding as to what

6    changes might have been made during those time periods.

7    **Q.**   What did you do next, Mr. De Lombaert?

8    **A.**   So in order to understand better how that sign-up flow

9    would have worked, I took the source code, copied it

10   effectively to my computer, and reconstructed it in a way that

11   I could actually get it to run and output the same -- like,

12   basically, the same thing that someone would have seen when

13   they signed up.

14        **THE COURT:**  So Facebook can't just go back and get a

15   screenshot from '05 about what the flow for the user would look

16   like?  You didn't do that?  You have to actually re-create it?

17        **THE WITNESS:**  That's right.  We don't have arbitrary

18   screenshots of all the different dates.

19        **THE COURT:**  So all those screenshots I have from '05,

20   '08, and '09, are your re-creations from the source code?

21        **THE WITNESS:**  I think several of the exhibits are,

22   yes, the re-creations that I created, and the screenshots.

23        **THE COURT:**  Nobody has screenshots from those sign-up

24   sheets from those years; right?

25        **THE WITNESS:**  So I actually tried to look and find

1    those screenshots in our own records.  I think there is one

2    screenshot that I found that is included as one of the

3    exhibits.  But there's no screenshot for the exact date that

4    the plaintiffs signed up.  But I found the closest

5    representation.  And then the screenshots I produced are of the

6    exact dates that the plaintiffs signed up.

7    BY MR. NADOLENCO

8    Q.    Okay.  So tell us how you went about, then, reconstructing

9    the source code into the screenshots that you ultimately

10   produced.

11   A.    Sure.

12        So in order to reconstruct that, the process I went

13   through -- like I said, I copied the code.  That includes the

14   PHP code, the Java Script code, and the style sheets.  Those

15   are the key pieces needed to display the content and the visual

16   styles of the registration flows that would have existed.

17        And then I was able to load that and run that in my Web

18   browser.  And in my own Web browser I took the screenshots

19   using the screenshot tools --

20        THE COURT:  How do you know what a user saw in '05 is

21   what you reproduced?  How do you know that?

22        THE WITNESS:  It's directly based on the source code,

23   because I found the source code in that particular-- I found

24   the source code for that particular date.

25        And so the output of the source code would not have

1  differed today versus the date that I signed up -- that the

2  plaintiffs signed up.  The output of the source code is a

3  constant.

4       And what I've done is I've taken that constant output and

5  just rendered it and displayed it, myself, on my browser.

6  That's how I know that they are the same.

7  **BY MR. NADOLENCO**

8  **Q.**  Before we talk about the screenshots you rendered, did you

9  produce the code, itself, that you just described?

10 **A.**  Yes.  I produced the code itself.  And just as a note, I

11 did --

12      **THE COURT:**  I don't understand what that means.

13      What do you mean "produced"?  Give it to the opponents

14 or --

15      **MR. NADOLENCO:**  Well, we did give it to the opponents.

16 But I'm just talking about whether he saved it and produced it

17 and made it available so that we could produce it to the

18 opponents.

19      **THE COURT:**  All right.  Go ahead.

20      **THE WITNESS:**  Yeah.  So not only did I produce the

21 screenshot which basically summarizes all of the code, but I

22 also produced the key pieces of the registration-related code.

23 I redacted the pieces that weren't relevant, because there's a

24 ton of code in there.

25      **THE COURT:**  Would you like some water?

1          THE WITNESS:  I'm okay.

2          THE COURT:  Are you sure?

3          THE WITNESS:  Yeah.

4     BY MR. NADOLENCO

5     Q.   We'll get you a water.

6     A.   Thank you.

7     Q.   Roughly how many lines or pages of code are we talking

8     about that you produced?

9     A.   I think there's around 150 pages of code.  Something like

10    that.

11    Q.   So if a layperson was to take a look at that code, could

12    they -- could they decipher it in any meaningful way?

13         MR. WILLIAMS:  Objection.

14         THE COURT:  Did you say something?  Stand up and boom

15    it out.  I can't hear you.

16         MR. WILLIAMS:  I'm sorry, Your Honor.  Objection.

17         THE COURT:  What's the grounds?

18         MR. WILLIAMS:  It's a vague question.  I didn't

19    understand the question.

20         THE COURT:  I didn't either.  Go ahead.

21    BY MR. NADOLENCO

22    Q.   So the question is, do you need any type of specialized

23    training to be able to understand or decipher the source code

24    that you produced in any meaningful way?

25    A.   Yes.  I think you would need an engineering background and

1    knowledge --

2            THE COURT:  You have to be a programmer; right?

3            THE WITNESS:  Yeah.

4            THE COURT:  A software engineer?

5            THE WITNESS:  Yeah.

6            THE COURT:  All right.

7            THE WITNESS:  And, also, knowledge of Facebook's

8    systems.  Because there's a lot of Facebook-specific pieces in

9    there too.

10   BY MR. NADOLENCO

11   Q.   Okay.  So once you identified the source code, tell me,

12   what did you do next -- what did you do next?

13           THE COURT:  Let's put some specifics.  You got the '05

14   source code.  What did you do next?  Just for '05.  That's

15   emblematic for what you did for everything else; right?

16           THE WITNESS:  Yes.

17           THE COURT:  You located the '05 code.  It's just a

18   bunch of code.  What did you do with that code?

19           THE WITNESS:  Then I took all the files related to

20   registration -- and that includes PHP and the Java Script and

21   the style sheets -- and then I ran that code in the same way

22   that it would have been run in 2005.  And that spits out HTML.

23   And that HTML that it spits out is the same HTML it would have

24   spit out in 2005.

25           THE COURT:  So it looks the same?

1          THE WITNESS:  Yes.  I load it up in the Web browser.

2    It looks the same.  Again, I took a screenshot.  And I just

3    repeated that for each of the different years and then produced

4    the screenshots.

5          THE COURT:  Are we going to see that?  Is that coming

6    up?  I have some questions about the screenshots.

7          MR. NADOLENCO:  I actually don't have a screen,

8    ironically.

9          THE COURT:  What's the tech fellow doing?  Isn't he

10   going to show us --

11         MR. NADOLENCO:  Oh, yeah, for sure.  One more

12   question.

13         THE COURT:  Go ahead.

14   BY MR. NADOLENCO

15   Q.   Did you follow the same process for all three dates, sir?

16   A.   Yes, I did.

17         MR. NADOLENCO:  Okay.  Let's put up Exhibit 28.

18   BY MR. NADOLENCO

19   Q.   And, Mr. De Lombaert, you should have both -- you can see

20   it on your screen, but you should also have -- or perhaps you

21   should have notebooks in front of you that if you turn to

22   Exhibit 28 -- no notebooks?  Let's just look at the screen.

23         Mr. De Lombaert, does this look familiar?  What we've

24   marked as Exhibit 28, does that look familiar to you?

25   A.   Yes.  This is the screenshot I produced of the

1  registration flow as it would have existed in 2005.

2          THE COURT:  Do you have a hard copy for me?

3          MR. NADOLENCO:  The hard copy of the exhibit, Your

4  Honor?

5          THE COURT:  Whatever you are going to use, yeah.

6          MR. NADOLENCO:  Absolutely.  I thought we lodged those

7  earlier, but I can get you one.

8          THE COURT:  Actually, I have it.  Thank you.

9      All right.  Go ahead.

10  BY MR. NADOLENCO

11  Q.  Does this look familiar, Mr. De Lombaert?

12  A.  Yeah.  Like I said, this is the screenshot I produced of

13  the registration flow as it would have existed in 2005, on

14  August 22nd.

15  Q.  And is this an accurate depiction of the sign-up screen on

16  that date?

17  A.  Yes.

18          MR. WILLIAMS:  Objection.  Which date?  August 2005,

19  or the day he created it?

20          MR. NADOLENCO:  Yes.  Sorry.

21  BY MR. NADOLENCO

22  Q.  As of August 22nd, 2005?

23  A.  Yeah.  This is an accurate representation of what this

24  would have -- of what this would have looked like in -- on that

25  date in 2005.

1    **THE COURT:** All right. So this entire screen is

2    populated by the source code; right?

3    **THE WITNESS:** Yes. It's generated by the source code.

4    **THE COURT:** So "Terms of Use" was highlighted like

5    that as a click-through?

6    **THE WITNESS:** Yes, it was.

7    **THE COURT:** If you clicked on the "Terms of Use" what

8    would you get?

9    **THE WITNESS:** You would be redirected to the Terms of

10   Use page. And you would see the terms of use as they were

11   current on that date.

12   **THE COURT:** Okay.

13   **BY MR. NADOLENCO**

14   **Q.** And did you also check that -- by the way, is there

15   separate source code for the Terms of Use link right there?

16   **A.** Yes. There's source code, separate source code for the

17   Terms of Use and for the registration piece that's displayed

18   here.

19   **Q.** And did you check the, for lack of a better word, Terms of

20   Use source code as well?

21   **A.** Yes. I checked the Terms of Use source code. And, again,

22   it was functional. The Terms of Use would have displayed and

23   would have been the Terms of Use that were current at that

24   time.

25   **Q.** And did you check that? Did you actually check to see if

1  the link took you to the then current Terms of Use?

2  **A.**    Yes.

3  **Q.**    What did you determine?

4  **A.**    That they did take you to the -- the current Terms of Use.

5         **THE COURT:**  So let me ask you a question.  Internally,

6  would you call this -- have you ever heard terms like

7  browsewrap, clickwrap, scrollwrap?

8         **THE WITNESS:**  Uhm, I think I've heard the term

9  mentioned, but I don't know exactly.

10        **THE COURT:**  Do you use those terms --

11        **THE WITNESS:**  No.

12        **THE COURT:**  -- in regards to sign-up flow sheets?

13        **THE WITNESS:**  We don't use those terms internally.

14        **THE COURT:**  All right.  Go ahead.

15 **BY MR. NADOLENCO**

16 **Q.**    For a user to register on this date, being August 22nd,

17 2005, would he or she have had to click on the check box

18 indicating assent to the Terms of Use?

19 **A.**    Yes.  In order to register on that date in 2005, you would

20 have had to click the check box and make a check, and then

21 click the form submission button.

22 **Q.**    And how do you know that?

23 **A.**    That's based on the source code again.

24        The way that the source code works is that it checks to

25 make sure that the check box was checked.

1  **Q.**  If a user did not complete all these steps, could he

2  register an account for Facebook back on August 22nd, 2005?

3  **A.**  No.  This is the only registration flow.  And you would

4  have had to go through all those steps in order to create an

5  account.

6       **MR. NADOLENCO:**  Your Honor, at this point, we move the

7  admission of Exhibit 28.

8       **MR. WILLIAMS:**  Object to it, Your Honor.  We don't

9  think that it can be authenticated based on his testimony.  The

10  document clearly is not a document that existed at the time.

11  He created it based on --

12       **THE COURT:**  I tell you what.  You will have a chance

13  to cross.  So I will hold the objection pending the cross.  I'm

14  inclined to admit it, but you can convince me otherwise, okay.

15     Go ahead.

16       **MR. NADOLENCO:**  Can you please put up in a split

17  screen Exhibit 16 and 17.

18     They should be in the same notebook, Your Honor.

19     And they should be coming up for you, Mr. De Lombaert, in

20  a second.

21       **THE COURT:**  All right.  So in 2005, if you did not

22  click that box that says "I have read and agreed" you could not

23  register for Facebook?

24       **THE WITNESS:**  That's correct.

25       **THE COURT:**  And if you can't register for Facebook,

1  you can't use the service; is that right?

2         **THE WITNESS:**  That's correct.

3         **THE COURT:**  All right.  Go ahead.

4         **MR. NADOLENCO:**  Thank you, Your Honor.

5  **BY MR. NADOLENCO**

6  **Q.**  Do Exhibit 16 on the left and Exhibit 17 on the right look

7  familiar to you, sir?

8  **A.**  Yes.  Similarly, these are the screenshots I produced for

9  the 2008 case.  And then the date, I guess, was February 22nd,

10 I believe -- February 11th.  My apology.

11 **Q.**  Why are there two exhibits that we're looking at; do you

12 know?

13        **MR. WILLIAMS:**  Objection.  Does he have two in front

14 of him?

15        **MR. NADOLENCO:**  16.

16        **MR. WILLIAMS:**  And 17?

17        **MR. NADOLENCO:**   Yes.

18        **THE COURT:**  Do you see those?

19        **THE WITNESS:**  I see those.

20 **BY MR. NADOLENCO**

21 **Q.**  Can you describe for the Court why there are two sign-up

22 flows there?

23 **A.**  Yes.  As part of my investigation, I discovered there were

24 two possible sign-up flows on that date in 2008.  And it was

25 actually just an experiment that was running at the time that

1  would have shown people signing up, one of those two options,

2  one of those two versions of the sign-up flow.

3  **Q.**   So who would have seen the flow depicted in Exhibit 16?

4  **A.**   The majority of people signing up would have seen the one

5  from Exhibit 16.

6  **Q.**   And so I take it the remainder would have seen the flow

7  depicted in Exhibit 17?

8  **A.**   That's right.

9          **THE COURT:**  Was it random?

10         **THE WITNESS:**  It was random.

11         **THE COURT:**  Okay.

12  **BY MR. NADOLENCO**

13  **Q.**   Is the relative size of the font used in the different

14  parts of the sign-up screen on these two exhibits accurately

15  depicted?

16  **A.**   Yes.  The -- that's what I did in -- by including the

17  style sheets and the other information.  The relative size of

18  the fonts are correct.

19  **Q.**   I should have asked you this.  I apologize.

20      Was that also true with regard to the sign-up flow we saw

21  in Exhibit 28?

22  **A.**   Yes.  It's the same process.  So, yes, same answer.

23         **THE COURT:**  This is the actual size of the font the

24  user would have seen in 2008?

25         **THE WITNESS:**  So, yes.  The -- the one thing I'll say

1   is, the images might just be displayed slightly differently.

2   But all the font sizes are relevant to each other, the correct

3   font sizes.

4   **BY MR. NADOLENCO**

5   **Q.**   For a user to register on this date, which is February 11,

6   2008, would he have had to fill in all of the identifying

7   information as shown on the sign-up flow?

8   **A.**   Yes.  Someone would have had to fill out all the fields,

9   all the identifying fields.  And then they would have had to

10  click that check box.  And they would have had to also click

11  the sign-up button in both cases, both Exhibit 16 and Exhibit

12  17.

13  **Q.**   So they would have had to click the check box next to the

14  words "I have read and agreed to the Terms of Use and Privacy

15  Policy"?

16  **A.**   Yes, that's right.

17  **Q.**   And that's true as to both variants shown on Exhibit 16

18  and Exhibit 17?

19  **A.**   Yes.

20          **THE COURT:**  Now, is this what you would see on a phone

21  or what you would see on a computer?

22          **THE WITNESS:**  This is what you would see on a

23  computer.

24          **THE COURT:**  What about for a phone?

25          **THE WITNESS:**  So the phone is different.  I can

1    describe it to you.

2        Basically, it's very similar.  It would have had these

3    identifying fields as well.  And then it would have had a

4    sentence saying that, "By submitting this information, I

5    acknowledge that I have read and agreed to the Terms of Use and

6    Privacy Policy," followed by a form submission button.

7            THE COURT:  So on a mobile -- let's call it mobile

8    device version.  Is that fair?

9            THE WITNESS:  Yeah.

10           THE COURT:  So on the mobile device version there is

11   no check box for "I have read and agreed"?

12           THE WITNESS:  That's correct, there's no check box on

13   the mobile device version.

14           THE COURT:  That's true for all of 2008?

15           THE WITNESS:  Yes.

16           THE COURT:  And is that true for 2009, as well?

17           THE WITNESS:  Yes.

18           THE COURT:  So if you registered on a mobile device in

19   '08 or '09, you did not have to check a box saying "I have read

20   and agreed"; is that right?

21           THE WITNESS:  Correct.  You did not have the check

22   box, but the sentence was still present about the terms of use.

23           THE COURT:  Are you able to tell -- when you look at a

24   specific user, are you able to tell what kind of device they

25   used?

1    THE WITNESS:  So, I did not investigate that piece,

2 and so I don't know that.

3    THE COURT:  I'm sorry, just a couple more.

4    So on Exhibit 16, is "Terms of Use" a link, so if you

5 click on that you would get to the terms?

6    THE WITNESS:  Yes.  It's a link.  And you would have

7 gotten to the terms by clicking on it.

8    THE COURT:  And for Exhibit 17, is that also true;

9 "Terms of Use" is a link?

10    THE WITNESS:  Yes, it is.

11    THE COURT:  So before you checked the box, you could

12 actually read "Terms of Use" and "Privacy Policy" in 16 and 17

13 by clicking those phrases; right?

14    THE WITNESS:  That's right.

15    THE COURT:  All right.  Go ahead.

16 BY MR. NADOLENCO

17 Q.    And, in fact, as part of your investigation, did you check

18 to make sure that that was, in fact, the case?

19 A.    Yeah.  I checked to make sure, again in my reproduction,

20 that those links were functional.

21 Q.    And what did you determine?

22 A.    That they were functional.

23    MR. NADOLENCO:  Your Honor, I would also move the

24 admission of Exhibit 16 and 17.  I assume we will follow the

25 same protocol.

1      THE COURT:  Yeah.

2      MR. WILLIAMS:  Same objection.

3      THE COURT:  Just remind me at the end if I forget.

4      MR. NADOLENCO:  I'll remember.  If not, someone else

5  will remind me.

6      Let's put up Exhibits 23 and 24, if you would, please.

7      THE COURT:  Before you do that, can you just tell me,

8  to the best of your recollection, what did the mobile device

9  sentence say?

10     THE WITNESS:  I think I remember it said, "By

11 submitting this information, you acknowledge that you have read

12 and agreed to the Terms of Use and Privacy Policy."

13     THE COURT:  Okay.  And they did not -- the person

14 signing up did not have to click anything to do that, other

15 than "Sign Up" or "Submit" right?

16     THE WITNESS:  That's right.  You would have had to

17 click "Sign Up," but no check box.

18 BY MR. NADOLENCO

19 Q.  And where is the "Sign Up" button in relation to the words

20 you just read -- or that you just recited, "By submitting this

21 information," et cetera?

22 A.  It was directly underneath that sentence on the mobile

23 flow.

24 Q.  So we now have up on the screen, Mr. De Lombaert, Exhibits

25 23 and 24.  Do these look familiar to you, sir?

1  A.  Yes, they do.

2  Q.  Okay.  And what are they?

3  A.  So just like the other exhibits we've seen, these are my

4  reproductions of the sign-up flow as it would have existed in

5  2009.  And in this case it would have been November 13th.

6  Q.  What year?

7  A.  2009.

8  Q.  Why are there two pages -- first of all, are these two

9  pages related to the same sign-up flow?

10  A.  Yes, they are.

11  Q.  And I notice there are two pages.  Do you know why that

12  is?

13  A.  Yeah.  As part of my investigation, again, I determined

14  that this registration flow in 2009 had a two-step process.

15  The one in Exhibit 23 is step one of the process.  And Exhibit

16  24 is step two of the process.

17       THE COURT:  How did that work?  You filled out one,

18  and then what happened?  So you filled out Exhibit 23.  That's

19  the separate page on its own; right?

20       THE WITNESS:  That's right.

21       THE COURT:  And Exhibit 24 is not attached to that?

22       THE WITNESS:  So they were -- the way this would work

23  is, you would visit the Facebook home page where the

24  registration form was displayed.  You would fill out all the

25  identifying fields and click "Sign Up" on the first step.

1  Immediately, the second step would be displayed.  And the

2  second step would be displayed in the same location and same

3  place as the first step.

4      And you would have to again click "Sign Up" and complete

5  the security check in order to actually create the account.  It

6  was not sufficient to just do the first step.  You had to go

7  through both.

8          **THE COURT:**  And this is the nonmobile flow?

9          **THE WITNESS:**  This is the nonmobile or desktop flow.

10         **THE COURT:**  Or desktop flow.

11     Okay.  Go ahead.

12 **BY MR. NADOLENCO**

13 **Q.**  So just focusing for a moment on Exhibit 23, for a user to

14 register on this date would he have had to fill in all the

15 identifying information shown on Exhibit 23?

16 **A.**  Yes.

17 **Q.**  And then would they have had to click "Sign Up"?

18 **A.**  Yes.

19 **Q.**  Then what would happen?

20 **A.**  Then the second step would be displayed.  And they would

21 have to complete the second step and click "Sign Up."

22 **Q.**  Describe for us, what is this second step?

23 **A.**  So the second step is a security check for -- it's -- I

24 guess it's also referred to as a CAPTCHA.  And the purpose of

25 this is to prevent automated or fake registration attempts.

1    At the time there were, you know, malicious actors

2 attempting to create Facebook accounts that were fake.  And as

3 a result this checklist put in place to make sure that everyone

4 signing up would complete this.

5    The way this typically works is an image is displayed, and

6 someone has to type in the words corresponding to that image.

7        **THE COURT:**  All right.  So the security check in 24 is

8 just a CAPTCHA?

9        **THE WITNESS:**  Yes.

10 **BY MR. NADOLENCO**

11 **Q.**   And on Exhibit 24, for a user to register on this date of

12 November 13, 2009, would he have had to click the "Sign Up"

13 button?

14 **A.**   Right.  He would have had to click the "Sign Up" button on

15 the second step, obviously in addition to clicking the "Sign

16 Up" button on the first step.

17 **Q.**   What does it say directly beneath the "Sign Up" button?

18 **A.**   It says, "By clicking Sign Up you are indicating that you

19 have read and agreed to the Terms of Use and Privacy Policy."

20        **MR. NADOLENCO:**  I would like to -- can we do a split

21 screen, please, of Exhibits 24 and 25.  Next to each other,

22 please.

23 **BY MR. NADOLENCO**

24 **Q.**   I believe you were alluding to Exhibit 25 earlier in your

25 testimony; is that right?

**A.**   Yes.

    **MR. WILLIAMS:**  Objection.  Form.  Was he alluding to
it?  Did you ask him about it?

    **THE COURT:**  There's no jury here.  Go ahead.

    **MR. NADOLENCO:**  I'll connect the dots.

**BY MR. NADOLENCO**

**Q.**   What is Exhibit 25?

**A.**   Exhibit 25 is the screenshot I found in -- as part of my
investigation.  It's the screenshot I found that was taken in
2009, that displays what someone saw as the second step of
registration.

**Q.**   So when you say you found it, can you describe for the
Court where you found it?

**A.**   Sure.  I found it by looking through, again, many of these
different business records.  The one I was looking at in this
case was something called our "tasks tool."  And our tasks tool
keeps track of just things that need to be done.  It's our
task-tracking tool.

    And one of the tasks that someone had created involves
them taking a screenshot of the flow and mentioning that there
was something weird they were seeing on this flow related to
the caption, even though they had typed it in correctly, was
not being accepted.

    And as part of this record, I was able to find the
screenshot of the flow that was taken at the time.

1    **Q.**   And so when you compare it to the sign-up screenshot that

2    you created pursuant to the process that you described, do you

3    draw any particular conclusion from that?

4    **A.**   So this, I think, helps to demonstrate that my

5    reproduction is accurate.  You can see that the text appears in

6    the same style and that in my reproduction we have the content

7    of the Terms of Use sentence, et cetera, as present, and just

8    helps to authenticate that.

9    **Q.**   Is this task system you described, is that an internal

10   business system for Facebook?

11   **A.**   Yes, it is.

12   **Q.**   And do you and others rely on that system?

13   **A.**   Yeah.  We use it daily.

14   **Q.**   And you use it daily in the ordinary course of your

15   duties?

16   **A.**   That's right.

17          **MR. NADOLENCO:**  Your Honor, we would also move the

18   admission of Exhibits 23, 24, and 25.  But we can leave that

19   until after the cross.

20   **BY MR. NADOLENCO**

21   **Q.**   We touched a bit on this, but I just want to make sure we

22   have it correct.

23        We noticed that and the judge pointed out that in a number

24   of screenshots --

25          **MR. NADOLENCO:**  We can leave those up.

1  BY MR. NADOLENCO

2  Q.   In a number of the screenshots we can see that the words

3  "Terms of Use" are in a different color.  And describe just one

4  more time why that is.

5  A.   That's because they are hyperlinks.  That's the standard

6  web way of displaying a hyperlink.

7  Q.   And as part of the investigation in this case, did you

8  check to determine that for each of the screenshots that we

9  looked at here today that that hyperlink was, in fact,

10 functioning?

11 A.   Yes, I did.

12 Q.   Describe what you did.

13 A.   So, again, I started with my reproduction, and just made

14 sure that in my reproduction these were functional links.

15     I also reviewed the source code.  And simply from the

16 source code I could tell that these links were functional and

17 would have displayed the content that they were intended to

18 display.

19 Q.   What was that content they were intended to display?  If

20 you clicked on any of those links, where would they have led

21 you?

22 A.   So all of the Terms of Use links that have led you to the

23 Terms of Use page, which described the Terms of Use as it was

24 current on the various dates that I had investigated.

25     THE COURT:   So 25 is an actual captured-in-time

1    screenshot from 2009; right?

2            THE WITNESS:  That's right.

3            THE COURT:  So that literally that's what someone saw,

4    a user saw in 2009?

5            THE WITNESS:  That's right.

6            THE COURT:  Okay.  So why does that look different

7    from 24?

8            THE WITNESS:  So as part of my reproduction, there are

9    a lot of different services that are required for running

10   Facebook.  And one of those services was retrieving the CAPTCHA

11   check.  So in this case -- that service is no longer

12   functioning.  And so in my reproduction I had to simulate that

13   service.  What I mean by that is I had to basically -- that

14   service is a third-party service.  What I had to do is

15   reconstruct what that third-party service would have done.

16        In this case, I wasn't able to get an actual image.  And

17   that's why you see the little question mark instead of the, you

18   know, "searching" text that's displayed in Exhibit 25.

19           THE COURT:  Well, I mean, 25 looks a lot different

20   from 24.  Right?

21           MR. NADOLENCO:  I believe the judge is referring to

22   some of the color differences.

23           THE COURT:  Well, there's an arrow next to "Back" in

24   25.  There is no arrow next to "Back" in 24.  There's a

25   highlighted box on 25.  There's no similarly situated

1    highlighted box on 24.  The alignment of the box is different.

2    "Sign Up" is at the bottom on 24; it's on the top in 25.  Blue

3    background.

4         It just looks really different.  What's the deal?

5              THE WITNESS:  I can explain that.

6              THE COURT:  Yes.

7              THE WITNESS:  So basically this step -- I had limited

8    time to reproduce this, and I reproduced it as accurately as I

9    could.

10        In the case of the CAPTCHA check, that was --

11             THE COURT:  What do you mean you had limited time?

12   What does that mean?

13             THE WITNESS:  Basically, I wanted to, like -- it's --

14             THE COURT:  Did you rush through these things?

15             THE WITNESS:  No, no, no.

16             THE COURT:  Did you feel like you had enough time to

17   do an accurate job?

18             THE WITNESS:  Yeah.

19             THE COURT:  So what does "limited time" mean?

20             THE WITNESS:  I mean I spent something like 40 hours

21   on reproducing these.

22             THE COURT:  All right.  Did you feel like you didn't

23   have enough time to do all this?

24        Do you have any question in your mind you did not have an

25   adequate amount of time to reproduce these flow things?

1          **THE WITNESS:**  No.  I think I had an adequate amount of

2  time.

3          **THE COURT:**  All right.  Go ahead.

4  **BY MR. NADOLENCO**

5  **Q.**  Why don't you explain to the Judge --

6          **THE COURT:**  No.  Let's answer the judge's question.

7  Why are these different?  Just tell me in plain and simple

8  language, why do these things look so different?

9          **THE WITNESS:**  Sure.

10  So, again, it's all about these external services.

11  Facebook relies on a lot of different external services and

12  services that exist within the company.  Those services

13  basically can't be run today.

14  And so, for example, just the way that this -- the entire

15  CAPTCHA is displayed, the service to retrieve this CAPTCHA

16  piece no longer exists.  So that is not -- I think what I was

17  alluding to about limited time is I can't reconstruct this

18  entire service.  That is months of engineering work.

19  So what I did is I retrieved the next -- like, the best

20  thing that I could, which is in this case just showing a blank

21  image where the CAPTCHA image would have appeared.

22  Now, regarding some of your other questions --

23          **THE COURT:**  So 25 is the actual page.  24 is your best

24  guess.  And how does that affect 23?  Is 23 subject to that

25  same sort of best-guess idea, or is this more accurate in your

1    view?

2         **THE WITNESS:**  So the other ones are more accurate

3    simply because it was -- 2009 is the most complicated one.  It

4    relied on the most external services.

5         In the 2005 and 2008 cases I did not have to reconstruct

6    those external services.  In 2009, I did for the CAPTCHA.  It's

7    ultimately the CAPTCHA piece that is the biggest difference

8    between these screenshots.

9         **THE COURT:**  You couldn't find a previous page in '09,

10   like that was in front of 25?  You only had the CAPTCHA

11   screenshot, but you didn't have the previous page screenshot?

12   The initial sign-up screen, you didn't have that?

13        **THE WITNESS:**  I think I found some screenshots that

14   were similar.  And I actually used those to help just

15   double-check that the representation I was creating actually

16   corresponded to the screenshots that were created at the time.

17        **THE COURT:**  Do I have those?

18        **THE WITNESS:**  Uhm, I think we only produced --

19        **THE COURT:**  Do I have those?

20        **MR. NADOLENCO:**  Yes, Your Honor.  We certainly can

21   make those available to Your Honor.

22   **BY MR. NADOLENCO**

23   **Q.**   But, Mr. De Lombaert --

24        **THE COURT:**  So they're not in this binder?

25        **MR. NADOLENCO:**  No, I don't believe we have those.

1    But there's a reason.

2             THE COURT:  All right.

3    BY MR. NADOLENCO

4    Q.   Is this from the -- the flow that's shown in Exhibit 25,

5    is that from the same date on which the plaintiff signed up?

6    A.   No.  That's from -- I think this one is from June 1st,

7    2009.

8         Again, we don't have screenshots of every single date.

9    And so what we did is -- specifically what I did in this case

10   is to reconstruct the exact dates and then find screenshots

11   from dates that were reasonably close in time -- but

12   "reasonably close" meaning within months, within a few

13   months -- just to help understand that the version that I was

14   creating was actually accurate in time or accurate

15   representation of the sign-up flow.

16   Q.   But when you look at Exhibit 24, that's derived from the

17   source code that was, in your terms, live and active on the

18   date that the plaintiff signed up in this case?

19   A.   Yes, that's true.

20   Q.   There's also some difference --

21            THE COURT:  So I want to see the underlying

22   screenshots.  Can you give them to me now?  Do you have them

23   there?

24            MR. NADOLENCO:  I don't believe we have.

25            THE COURT:  All right.  You submit those by the end of

1    the day, okay.

2        Do you have any actual screenshots from any other time?

3            THE WITNESS:  Uhm, I -- I can basically try to find

4    some.

5            THE COURT:  You make sure -- Mr. Nadolenco?

6            MR. NADOLENCO:  It is Mr. Nadolenco.

7            THE COURT:  -- has those so he can give them to me by

8    the close of business today.  All right.  Okay.  Thank you.

9    BY MR. NADOLENCO

10   Q.   Let me show you what we have in Exhibit 31.

11           THE COURT:  I don't have a 31.

12           MR. NADOLENCO:  It's on the screen, Your Honor.  It's

13   a video.

14           THE COURT:  Okay.

15       (Video played.)

16           MR. NADOLENCO:  Can we start it over again real quick?

17   Very short video.

18       (Video played.)

19   BY MR. NADOLENCO

20   Q.   Do you know what the video in Exhibit 31 is?

21   A.   Yeah.  So this is a video I produced based, again, on my

22   reproduction of the 2009 case, that just tries to better

23   display the behavior of the sign-up flow at that point.

24   Q.   And how did you go about creating this?

25   A.   I used the same process as the screenshots.  Just instead

1   of taking a screenshot, I took a full video and just, you know,

2   went through the actual reproduction myself, just to

3   demonstrate that it's functional and how the flow works.

4   **Q.**   So let's just talk a bit about a subject you already

5   covered some of, which is cell phone registration.  The judge

6   had some questions about that.

7        First of all, when did it first become possible to

8   register for Facebook on a cell phone?

9   **A.**   That was early 2008.

10  **Q.**   And did that entail registering through the Facebook app

11  itself?

12  **A.**   No.  There's a distinction between the Facebook app and

13  the mobile version of the website.  It would have been on the

14  mobile version of the website and not on the app.

15  **Q.**   And what do you mean by "the mobile version of the

16  website"?

17  **A.**   When a mobile phone or mobile device accesses Facebook,

18  it's actually redirected to a mobile-specific version of

19  Facebook's site, which is a distinct flow and distinct version

20  from the desktop and typical Web registration process.  By that

21  I mean the desktop Web registration.

22  **Q.**   Did you look, also, at the source code that dictated the

23  cell phone registration process?

24  **A.**   Yes.  I went through the same process to investigate that

25  source code for the mobile phone.

1    **Q.**    And what did you determine?

2    **A.**    I described how the flow would have looked earlier with

3    the identification fields, the sentence referring to the Terms

4    of Use and the hyperlink being present, functional, and then a

5    submission button for the form itself.

6          **THE COURT:**  Do you have those in here, Counsel, the

7    mobile flow instructions?

8          **MR. NADOLENCO:**  No, Your Honor, because we -- we don't

9    know that any of the named plaintiffs registered on a mobile

10   phone.

11         **THE COURT:**  Well, you don't know they didn't either;

12   right?

13         **MR. NADOLENCO:**  Well, they're pretty sure they didn't.

14   The only one --

15         **THE COURT:**  You aren't able to tell, are you, for any

16   specific person what device they used to register?

17         **THE WITNESS:**  So I didn't investigate that, and I

18   don't know.

19         **THE COURT:**  You don't know.  All right.

20         **THE WITNESS:**  Yeah.

21         **MR. NADOLENCO:**  They all did say they registered with

22   a computer.  We'll see that --

23         **THE COURT:**  All right.

24         **MR. NADOLENCO:**  We'll see that.

25         **MR. WILLIAMS:**  I was being careful.  I thought he was

1  responding to your question as opposed to the witness.

2          THE COURT:  He is.

3      Is that right?  Do they all say they did a desktop --

4          MR. WILLIAMS:  Your Honor, there is one witness who

5  very specifically said, when asked during a deposition, how --

6  I apologize.  "How did you sign up?"  And his answer was, "I

7  signed up on a mobile phone."

8          THE COURT:  Who was that?

9          MR. NADOLENCO:  No.

10         THE COURT:  Who was that?

11         MR. WILLIAMS:  That was Mr. Nimesh Patel.

12         THE COURT:  Mr. Patel said "I signed up on a mobile

13  phone"?

14         MR. WILLIAMS:  Signed up on a mobile phone.

15     There was additional testimony, questions --

16         THE COURT:  What year was he?  '08?

17         MR. WILLIAMS:  2008.

18         THE COURT:  Okay.  All right.  Go ahead.

19         MR. WILLIAMS:  There's additional testimony that was

20  taken from Mr. Nadolenco, wherein he then says he thinks he

21  signed up on a desktop or a laptop computer.

22         THE COURT:  So he retreated?

23         MR. NADOLENCO:  That is not what Mr. --

24         THE COURT:  Hold on.

25     He retreated?  Or what did he do?  He said, "Absolutely, I

1    did mobile phone" --

2           MR. WILLIAMS:  Right.  I think it was a long time ago,

3    and he just wasn't sure.

4        The testimony is in the record.  Your Honor can view it.

5    He was asked the question.  He said he believes he signed up on

6    a mobile phone.  Then after another question he said, well,

7    maybe it was desktop because I don't know if you could sign up

8    on mobile at the time.

9        I'm not quoting exactly.  But, clearly, we now know --

10          THE COURT:  Let's just take a look at it.

11          MR. WILLIAMS:  Sure.

12          THE COURT:  Okay.  So Mr. Patel's deposition?

13          MR. NADOLENCO:  Look at page 56, Your Honor, of

14   Mr. Patel's deposition.

15          THE COURT:  All right.  56.  Okay.

16          MR. NADOLENCO:  Line 8.

17          THE COURT:  Where is the initial answer?

18          MR. WILLIAMS:  Let me find it for Your Honor.

19          MR. NADOLENCO:  Your Honor, can I just clarify?

20          THE COURT:  No, no.

21          MR. NADOLENCO:  There is no initial answer.

22          THE COURT:  Let Mr. Williams give me a page and line.

23   Is it Mr. Williams?

24          MR. WILLIAMS:  Yes, it is.

25          THE COURT:  Where is it?

1        MR. WILLIAMS:  Give me one quick second.  Page 54.

2        THE COURT:  54.  Okay.

3        MR. WILLIAMS:  Beginning on line 4.

4    I'll allow you to read it.  You don't need me to read it

5    to you or into the record.

6        THE COURT:  Okay.  So he says a Motorola smartphone;

7    right?

8        MR. WILLIAMS:  Right.

9        THE COURT:  So what happened two pages later?

10        MR. WILLIAMS:  A couple of pages later, on additional

11    questioning, Your Honor, he then said that -- the question was:

12        "Where back in 2008 do you recall whether you were

13        able to register through Facebook.com on a phone?"

14        And he said:

15        "No, you would actually have to do it on a computer

16        and register your Facebook on a computer and then

17        associate it with your phone with the credentials you

18        have."

19        Then he cites his Gmail address.

20        Now, clearly, we know, based on the witness's testimony,

21    that you could do it on a phone in early 2008.  The witness is

22    either accurate or inaccurate.  He's stating his recollection

23    and then stating, well, maybe you couldn't do it in early 2008.

24        If we accept Mr. De Lombaert's testimony as true, we know

25    that you could do it in early 2008.

1    With respect to Mr. Licata, who signed up in 2009, he was

2  not sure whether he signed up through a mobile device.

3        **THE COURT:**  All right.

4        **MR. NADOLENCO:**  So I would -- on Mr. Patel's

5  deposition, page 56, I asked the following question:

6        "So but your best recollection, sitting here today, is

7        that you registered on a computer?

8    **"A.**  Yes."

9        **THE COURT:**  Go ahead.

10       **MR. NADOLENCO:**  Mr. Licata, to the extent we're

11  talking about him, page 35, line 2:

12       "Do you believe you used a computer of some sort to

13       sign up for Facebook?

14   **"A.**  Yes."

15       **MR. WILLIAMS:**  And then --

16       **MR. NADOLENCO:**  Question --

17       **THE COURT:**  Hold on.  35, line 2?

18       **MR. NADOLENCO:**  Yes.

19       **THE COURT:**  All right.

20       **MR. WILLIAMS:**  And then --

21       **MR. NADOLENCO:**  Hold on.

22       **MR. WILLIAMS:**  I'm sorry.  Go ahead.

23       **THE COURT:**  Okay.  Mr. Williams?

24       **MR. NADOLENCO:**  Just one more.

25       "Do you recall if it was a desktop or a laptop?

1    "I do not recall."

2         THE COURT:  Mr. Williams.

3         MR. WILLIAMS:  There is additional testimony from

4    Mr. Licata as well.  That's on page 81, and begins on line 15.

5    The question is:

6         "Mr. Licata, you said earlier that around the time

7         that you signed up for Facebook you had access to a bunch

8         of computers?

9    "A.  That's correct.

10        "Did you also have access to a bunch of smartphones?

11        "Yes, I did.

12        "Okay.  Do you remember, as you sit here today, if you

13        used a phone or a computer to sign up?"

14   There was an objection.  And then the answer is:

15        "I do not recall what phone or computer that I used."

16        THE COURT:  All right.  Okay.  Any more questions,

17   Mr. Nadolenco?

18        MR. NADOLENCO:  Just one more.

19   BY MR. NADOLENCO

20   Q.   Mr. De Lombaert, when we left off you were talking about

21   the hyperlink for the mobile flow for the Terms of Use.  Did

22   you check to determine whether that was, in fact, functional at

23   the time in '09?

24   A.   Yes, I checked that too.

25        THE COURT:  Okay.  Pass the witness?

1    MR. NADOLENCO:  Pass the witness, Your Honor.

2    MR. WILLIAMS:  May I?

3    THE COURT:  Yes.

4                    **CROSS-EXAMINATION**

5  BY MR. WILLIAMS

6  Q.   How are you, Mr. De Lombaert?  Is that the right

7  pronunciation?

8  A.   Yes.

9  Q.   My name is Shawn Williams.

10    MR. WILLIAMS:  Your Honor, I'll be careful not to

11  cover too much of the area you did.

12    THE COURT:  Sure.

13  BY MR. WILLIAMS

14  Q.   So, Mr. De Lombaert, you -- you weren't at Facebook in

15  2005, were you?

16  A.   No.

17  Q.   And you don't have any idea what -- how source code was

18  stored or kept at that time, do you?

19    MR. NADOLENCO:  Objection.  Misstates the testimony.

20  Asked and answered.

21    THE COURT:  Okay.  You're here with the judge only.

22  So, please, unless it's inadmissible, I don't need any

23  objections.

24    Go ahead.

25

BY MR. WILLIAMS

Q.   You weren't at the company at the time; right?

A.   I was not at the company.

Q.   2005 where were you?  High school?

A.   Uhm, let's see.  I graduated high school in 2005.

Q.   Here in California?

A.   No.

Q.   Where is that?

A.   Connecticut.

Q.   Connecticut.

     And -- and you went to Stanford, and you got your engineering -- you got an engineering degree?

A.   I have a bachelor's degree in symbolic systems, which is an engineering degree.

Q.   And thereafter you -- after you graduated, you started working for Facebook?

A.   Uhm, there was a period of time where I was working at a different company before Facebook.

Q.   You worked for who?  I'm sorry.

A.   I worked for a different company, named Friend.ly.

Q.   Doing what?

A.   That was also a social networking company.

          THE COURT:  What was the name of the company?

          THE WITNESS:  Friend.ly.

          THE COURT:  Friend.ly?

1      THE WITNESS:  Yes.

2      THE COURT:  Okay.  Go ahead.

3  BY MR. WILLIAMS

4  Q.   Was that your company?

5  A.   Yes.

6  Q.   And Facebook bought that company?

7  A.   Yes.

8  Q.   What year was that?

9  A.   2011.

10  Q.   And you started working for Facebook after that; right?

11  A.   That's right.

12  Q.   And you were a software engineer at Facebook?

13  A.   Yes.  I started as a software engineer before I switched

14  over to the management track.

15  Q.   Did they work you on Friend.ly-related material or

16  Facebook-related material?

17  A.   No, I did not work on any Friendly-related material while

18  on Facebook.  We stopped the Friend.ly product and started

19  working directly on Facebook itself.

20  Q.   You indicated earlier that you -- as a Facebook employee,

21  you were involved in writing and reviewing software; correct?

22  A.   Yes.

23  Q.   You didn't write or review any of the software code

24  related to the sign-up sheets in 2005, 2008, or 2009, did you?

25  A.   No.  That was before I joined.

1  Q.    And did you write any software code for sign-up sheets

2  since you were a Facebook employee?

3  A.    Yes, quite a bit.

4  Q.    What years?

5  A.    Through basically since I joined.  So I started doing

6  this -- so I joined in late 2011.  And I think I joined the

7  growth team that I work on, that is related to the sign-up

8  flow, in very early 2012.  So since 2012, I've been working on

9  various parts of the sign-up flow and process.

10 Q.    The source code?

11 A.    Yes, the source code.

12 Q.    Doing it by yourself or with a team of people?

13 A.    Uhm, both.

14 Q.    Okay.  And did you produce any of the flows that you

15 actually worked on in this case?

16 A.    No.  All the flows were the ones prior to me joining.

17 Q.    So but you know how to find -- you know how to find

18 historical flows if you need to find them; right?

19 A.    Yes.

20 Q.    And you said you did that in this case?

21 A.    Yes.

22 Q.    And you went back to 2005, as early as 2005?

23 A.    Yes.

24 Q.    And did you -- you said you went to a central repository?

25 A.    Yes.

1  **Q.**   What's the name of that?

2  **A.**   It's our revision control system.

3  **Q.**   Is that what it's called internally?

4  **A.**   Yeah.

5         **THE COURT:**  You say revision control --

6         **MR. NADOLENCO:**  Your Honor, I don't know if the answer

7  to this is proprietary or not.  But does the name really

8  matter?

9         **THE COURT:**  It's just a name.  It doesn't matter.

10      So what did you call it?  Revision control center?

11        **THE WITNESS:**  Revision control system or subversion

12  revision.  I'm sorry, subversion repository.

13        **THE COURT:**  Go ahead, Mr. Williams.

14 **BY MR. WILLIAMS**

15 **Q.**   And a number of people have access to it?

16 **A.**   Yes.

17 **Q.**   How did you go about getting access to the 2005 material

18 related to the sign-up flows?

19 **A.**   As an engineer, I have access to the source system.  That

20 has all the different versions.  And so I can actually just go

21 look at the code at any specific date in time as it existed.

22 **Q.**   Is there a log --

23        **MR. WILLIAMS:**  Pardon me, Your Honor.

24 **BY MR. WILLIAMS**

25 **Q.**   Is there a log for when you went to look at the source

1    code to develop or look for the 2005 source code related to the

2    sign-up pages in this case?

3    **A.**    Are you asking about the log of my own activities?

4    **Q.**    Yes.

5    **A.**    I don't know if there is.

6    **Q.**    So you couldn't tell the Court, with any accuracy, when

7    you went to look at that source code for purposes of this case?

8    **A.**    On which date I retrieved it?

9    **Q.**    Sure.

10   **A.**    I mean, I have just from the modification and creation

11   dates of the files where I've -- I mean, so I copied the files

12   to my computer.  And so I know that those -- that that would be

13   the date that I would have retrieved it.

14   **Q.**    Right.  But there's no record of your entry into the

15   source code repository?

16   **A.**    I don't know.

17   **Q.**    You talked about -- I just wanted to go through some of

18   the documents that you testified about.

19          **MR. WILLIAMS:**  Is it okay if we pull up number 28?

20          **THE COURT:**  28.

21          **MR. NADOLENCO:**  That one I showed to him?

22          **MR. WILLIAMS:**  Yeah.  It's one that you showed him.

23          **MR. NADOLENCO:**  Fine.

24   BY MR. WILLIAMS:

25   **Q.**    Do you see number 28 in front of you?

1    **A.**    I do.

2    **Q.**    And this is something that you created for purposes of

3    this case; right?

4    **A.**    That's right.

5    **Q.**    And you hadn't created something like this for any reason

6    other than this case; is that correct?

7    **A.**    I reproduced this for the investigation of this case.

8    **Q.**    Right.  And when did you learn about the case?

9    **A.**    Let's see.  I think it was sometime last year maybe.

10   **Q.**    And do you know when you produced this document?

11   **A.**    Uhm --

12   **Q.**    I'm sorry, withdrawn.

13         When you created this document?

14   **A.**    I mean, I don't remember the exact off the top of my head.

15   Sometime in the past few months, I think.

16   **Q.**    So not when you learned about the case?

17   **A.**    No, not on the date I learned about the case.

18   **Q.**    And number 28, you indicated that you looked at some

19   source code; you know, pulled that together and launched it on

20   your browser?

21   **A.**    That's correct.  That's right.

22   **Q.**    And you indicated that you were using a Safari browser?

23   **A.**    That's correct.

24   **Q.**    So Safari wasn't available in 2005; is that right?

25   **A.**    Uhm, I'm not entirely sure.  I don't know exactly when

1  Safari was first released.  It might have been.  I'm not sure.

2  **Q.**   Isn't it true that the appearance of what you created

3  would differ depending on what browser any user was using?

4  **A.**   I don't think it would differ significantly.

5  **Q.**   Is it true that it would differ depending on the browser

6  that one was using?

7  **A.**   Uhm, let's see.  So the exact way that, say, a button

8  would be displayed might differ slightly.

9  **Q.**   I'm sorry?

10 **A.**   The exact way that, say, a button like the registering app

11 button might be displayed might differ very slightly between

12 browsers.

13 **Q.**   It may be smaller; right?

14 **A.**   I don't think so.

15 **Q.**   May be bigger?

16 **A.**   I think, like, the way that HTML browsers work means that

17 there's a standard size for buttons.  It's typically in this

18 case -- so, actually, in this case, in this particular

19 screenshot, this was using a custom Facebook button.  It was

20 not using the standard browser button.  So it should have

21 looked more or less exactly the same across browsers.

22 **Q.**   So what -- you say this is a custom button?

23 **A.**   It has custom style sheets associated with the button.

24 **Q.**   And style sheets were one of the things you looked at as

25 part of your source code review?

1    **A.**    Yes.

2    **Q.**    All right.  You didn't produce any of the style sheets to

3    the defense counsel or to plaintiff's counsel for review, did

4    you?

5    **A.**    No.  I only produced the critical piece of the source code

6    or the PHP and HTML generation pieces.

7    **Q.**    Aren't the style sheets critical to the appearance of the

8    page to a user?

9    **A.**    The style sheets do control the visual style.  That is

10    summarized by these screenshots that display how the visual

11    style would have been -- would have existed.

12    **Q.**    Right.

13        So you had the style sheets.  You didn't give them to

14    defense counsel or to plaintiffs' counsel; right?

15    **A.**    I only produced the source code that were directly related

16    to displaying the actual content of the Terms of Use, a

17    sentence.  And that piece of the registration --

18        **THE COURT:**  So what do the style sheets do?  They tell

19    you how it would look?  What do they do?

20        **THE WITNESS:**  They modify the overall appearance of

21    the page.

22        **THE COURT:**  So what style sheet did you use for

23    Exhibit 28?

24        **THE WITNESS:**  In my reproduction, I used the one from

25    that date.  I used it directly from the source code as it

1    existed.

2         **THE COURT:**  Is there only one style sheet for any

3    particular date?

4         **THE WITNESS:**  No -- well, yes, there's only one style

5    sheet for any particular day.

6         Let me explain that better.  There's many different style

7    sheets that are used simultaneously.  They're all combined

8    together on one particular day.

9         **THE COURT:**  Mr. Williams.

10   **BY MR. WILLIAMS**

11   **Q.**   As you sit here today, you don't know that Exhibit 28

12   is -- appeared in the same way that Mr. Pezen might have seen

13   it if he had signed up on a desktop?

14   **A.**   So this is my own reproduction as I saw it.

15   **Q.**   Right.

16   **A.**   And it reproduces, again, all the structure and all the

17   visual styles for registration and sign-up.  I don't know the

18   exact pixels that the plaintiff would have seen.

19   **Q.**   You don't know the pixels.  You don't know the colors

20   either, do you?

21   **A.**   The colors here are accurate.

22   **Q.**   And you don't know the size of the overall picture?

23   **A.**   The size here, all the relative sizes are displayed on the

24   screenshot.

25   **Q.**   You testified that one would have to click on the box that

1  said "I have read and understood the Terms of Use, and I agree

2  to them"; right?

3  **A.**    Yes.

4  **Q.**    And you said you determined that by doing what?

5  **A.**    By checking the source code.

6  **Q.**    And how did you determine which source code -- well,

7  withdrawn.

8       Did you produce all of the source code that you used to

9  create number 28?

10 **A.**    No, I didn't produce all of it.  There was a ton of it.

11 And some of it is just not directly related to the registration

12 flow.

13      In my case, during the reproduction -- so let me describe

14 this better.  Each of the -- the code is -- there's a lot of

15 different pieces to this code.  There is just hundreds if

16 not -- yeah, in this case I think hundreds of files.  Actual

17 files themselves.

18      And the files contain multiple things.  They contain code

19 directly related to registration and then code that's not

20 directly related to registration but might be used by another

21 piece of the site.

22      So I used that entire code when I was reproducing it

23 myself.  But I didn't produce all of that code because a lot of

24 it is just not relevant to how registration works.

25 **Q.**    And how did you determine that?

1  A.   Based on my engineering knowledge and how I understand the

2  source code.

3  Q.   And that was after you knew what the case was about?

4  A.   Yes.

5  Q.   I'm going to ask you to --

6        MR. WILLIAMS:   Can we pull up 16, please.

7  BY MR. WILLIAMS

8  Q.   Let me direct your attention to Exhibit 16.

9  A.   I see it.

10  Q.   This is another one that you have created?

11  A.   Yes, it is.

12  Q.   And you didn't -- you didn't turn over the style sheets

13  for this one either, did you?

14  A.   No.  It's the same.

15  Q.   The style sheets control what this would look like to a

16  user; correct?

17  A.   So I don't think it's entirely correct.  The style

18  sheets -- the core piece of how the page is rendered and how

19  the page is displayed is contained in the PHP and HTML.  And

20  the style sheets make small additional visual adjustments.

21  Q.   And they control what the user would see?

22  A.   Right.

23       So the core piece of what the user would see is

24  contained -- like, all the content, the structure, and the

25  placement pieces are the core pieces in the PHP and HTML.  And

1    then the style sheets make, slightly, visual modifications to

2    what the user would see, yeah.

3    **Q.**   So what's missing from Exhibit 16, that a user might see?

4    **A.**   Uhm, well, so one of the things is the line that's labeled

5    "High School" -- in this case I talked about all these

6    different services required to run Facebook.

7           One of those services is the list of all the high schools

8    available in the country.  And in order to display a selection

9    box with all the different high schools that are available in

10   the country, I would have had to be able to reconstruct the

11   system that generated that list.

12          So that is one of the pieces that I don't think is

13   particularly relevant in this case but I omitted simply because

14   I wasn't able to reproduce that entire list of high schools.

15   **Q.**   How about logos, any logos missing from 16?

16   **A.**   Uhm, so this is the piece of the page that displays the

17   registration flow.  It's -- this is what would appear on the

18   rest of the -- on the rest of the index page or registration

19   page.  So there might be a logo that says "Facebook" in the top

20   left corner if you were to expand the screenshot beyond just

21   the piece that you see here.

22   **Q.**   16 is not necessarily what a user would see?

23   **A.**   It's not the entire page.  But it's the piece of the

24   registration that the user would see.

25   **Q.**   And that piece that he wouldn't see is part of the

1  registration flow, isn't it?

2  **A.**    This maybe just is terminology.  I think the registration

3  flow is the actual registration form itself and all the

4  behavior that is related to that form.  And the rest of the

5  page is part of the form.

6  **Q.**    So did you decide what the registration flow was going to

7  be when you were creating these screenshots?

8  **A.**    Uhm, no.  The registration flow is the registration form.

9  And in this case I included the registration form in every

10 case.

11 **Q.**    Except for the things you didn't think were relevant?

12 **A.**    Uhm, no, I included everything that I could reproduce.

13 **Q.**    Well, looking at 16 again, would it appear with a white

14 background to a user?

15 **A.**    Yes, I believe so.

16 **Q.**    No shading whatsoever?  The only color that would be on

17 this page is "Sign Up" button, "Terms of Use," and "Check out

18 our help pages"?

19 **A.**    I think so.

20      So when I actually had done this reproduction, I compared

21 it to these other screenshots that I alluded to that were from

22 other dates in time, just to double-check.  And I -- if I

23 remember correctly from the screenshot, I don't think there was

24 a different shading.

25 **Q.**    And that would have been driven by what?  The style

1  sheets?

2  A.   Uhm, no.  In this case it would have been most likely

3  driven by the PHP and HTML piece of the source codes.

4  Q.   And those have been produced as well?

5  A.   Let's see.  I'm just trying to remember exactly which

6  piece I produced.

7      I think if -- if that was part of -- so in this case we've

8  got the entire page itself, including the headers and logos and

9  so on.  But -- you know, just I wasn't able to reproduce in

10 this case.

11     This piece is the registration piece.  And I think that

12 any kind of styling and shading on the background would have

13 been part of this registration form here.

14 Q.   You think or you know?

15 A.   Uhm, let's see.  I'm just trying to recall based on the

16 source code, because it was a while ago.

17     Let's see.  Yeah, in this case it would have been part of

18 the -- it would have been part of what I reproduced in the

19 screenshot.

20         MR. WILLIAMS:  Can we pull up 23, please.

21     I'm sorry, 17, please.

22 BY MR. WILLIAMS:

23 Q.   Did you produce the Java Script part of the code?

24 A.   I think I produced the Java Script portions of the code.

25 Q.   Do you think or do you know?

1    A.    Uhm, let's see.  So I know I did it for 2009.

2          In 2008 I -- I'm not sure I did it in 2008 because I don't

3    think there was any Java Script involved in the registration

4    process at that time.  I'm trying to recall again from -- from

5    the few weeks back.

6    Q.    Take a look at Exhibit 17.

7          This is another reconstruction of yours; right?

8    A.    Right.

9    Q.    Right.  Not exactly what a user would have seen in 2008?

10   A.    Uhm, yeah.  I think we talked about this in the sense that

11   it's -- it represents, again, the position of the font sizes,

12   the colors and so on.  But the exact pixels may have been

13   slightly different.

14   Q.    And you pulled this up on your browser?

15   A.    Yes.

16   Q.    And you testified that you made certain that the "Terms of

17   Use" and "Privacy Policy" were functional --

18   A.    Yes.

19   Q.    -- right?

20         And "functional" meaning that they would send you to the

21   Privacy Policy or Terms of Use that were in place at the time?

22   A.    They would send you to the Terms of Use.

23   Q.    Did you actually click on them?

24   A.    Yes.

25   Q.    So you could actually sign up live?  When you created this

1  style sheet, did you actually sign up for Facebook?

2  **A.**    No.  I didn't reproduce -- so, again, this is like one of

3  the many external systems, is the storage of user accounts and

4  so on.  I didn't reproduce that piece.  So I was not able to,

5  like, actually create an account using my reproduction.

6  **Q.**    Right.  So you couldn't -- so when you clicked on it, when

7  you clicked on "Terms of Use" nothing would happen in your

8  reproduction; correct?

9  **A.**    No, actually, it would direct me to the Terms of Use page

10  in my reproduction.

11  **Q.**    For that time?

12  **A.**    Right.  I -- I also reproduced the Terms of Service page

13  for that time.

14  **Q.**    And so if you clicked on "Sign Up," what happened?  What

15  would have happened?

16  **A.**    So in that case it directed me to the -- so the way this

17  works is when you submit a form on the website, it also directs

18  you to a page that processes that form.

19      So when I clicked "Sign Up," it directs me to the page

20  that processes that form.  But since I didn't reproduce the

21  processing of that form, nothing would have happened.

22  Basically, the browser would show a blank page.

23  **Q.**    Right.  And so when you said "functionality," you just

24  meant that something would happen if you clicked on any of

25  those buttons?

1   **A.**   Yes.

2   **Q.**   And you don't know if Mr. Patel clicked on any of these

3   buttons, do you?

4   **A.**   Well, I know he clicked on "Sign Up" if he has an account.

5   **Q.**   Right.  That's it.  That's all you know?

6   **A.**   Correct.

7   **Q.**   And --

8   **A.**   And the check box of course.  We count that as a button.

9   **Q.**   And was there ever any time when you could sign up without

10  clicking on the check box?

11  **A.**   No.  If the check box was present, it required clicking on

12  the check box in order to sign up.

13  **Q.**   And what if there was no check box?

14  **A.**   So, again, for this particular -- are you talking about

15  this particular date in time?

16  **Q.**   Generally.

17  **A.**   In general?

18          **MR. NADOLENCO:**  Objection, Your Honor.  Vague.

19          **THE COURT:**  I'm not sure what -- you mean a mobile

20  device?

21  **BY MR. WILLIAMS**

22  **Q.**   No.  I'm talking about during this period between 2005 and

23  2009, when these plaintiffs signed up, was there any period

24  where you could -- if there was no check box at all could you

25  just sign up without having to agree to anything?

1    A.    Yes.  On a different date there was a version of the

2    sign-up flow that did not have a check box but that said, "By

3    clicking Sign Up, you acknowledge that you have read and agreed

4    to the terms of service."

5         We talked about this with the mobile flow too.

6    Q.    And those were the only two?

7    A.    The only two registration flows in 2008?

8    Q.    Well, between 2005 and 2009.  2005 and 2009.

9    A.    So I investigated these specific dates and, you know, the

10   time directly around those dates.  But I haven't looked at

11   2006, 2007, 2008.  I haven't -- sorry, 2006 and 2007 is what I

12   mean.

13        I haven't gone through and looked at every possible

14   version of registration on the dates that aren't relevant to

15   the plaintiffs' claim.

16   Q.    So is it fair to say there are a number of different

17   registration flows that may not look like the ones you created

18   because you only looked at those three dates?

19   A.    Uhm, let's see.  So not during that time period.  During

20   that time period it was the desktop flow and the mobile flow.

21   And I've looked at versions of those as they existed at

22   particular dates in time.  I don't know of any other

23   registration flow that would have existed during that time

24   period.

25   Q.    You indicated in 2008, at least on the day that Mr. Patel

1   signed up, there was an experiment between two different flows

2   on that day; right?

3   **A.**   Right.   Those are the exhibits that we talked about.

4   **Q.**   Right.   I'm asking on dates other than the dates that the

5   plaintiffs signed up, were there other flows that did not look

6   like these?

7           **MR. NADOLENCO:**  Objection, Your Honor.  Relevance.

8           **THE COURT:**  Overruled.

9       Go ahead.

10          **THE WITNESS:**  Yes, I think -- yes.

11  **BY MR. WILLIAMS**

12  **Q.**   And how often did they change?

13  **A.**   Let's see.  So these changed from time to time.  Sometimes

14  they changed -- I'd say my guess would be major changes might

15  happen once every year or two years.  Something like that.

16  **Q.**   And there are other, like, experiments during those

17  periods as well; right?

18  **A.**   Yes.

19          **MR. NADOLENCO:**  Objection.  Vague and relevance.

20          **THE COURT:**  Overruled.

21      Go ahead.  Did you say "yes"?

22          **THE WITNESS:**  Yes.

23  **BY MR. WILLIAMS**

24  **Q.**   You didn't produce any of the flows for any period other

25  than these three dates; right?

1   A.   That's right.

2        MR. WILLIAMS:  Can you pull up number 24, please.

3   BY MR. WILLIAMS:

4   Q.   So number 24, you testified, is the second part of a

5   two-step process between, I guess -- was it 23 and 24?

6   A.   24 is the second part of the two-step process.

7   Q.   And the security check is not -- the way it's depicted in

8   4 is not what a user would have seen?

9   A.   So, again, the user would have seen an image and some

10  slightly different text in front of the box giving them more

11  instructions as to what to do.

12  Q.   Right.  But isn't it your testimony that this is an

13  accurate depiction of what the user would have seen on that

14  day?

15  A.   Oh, I think it's an accurate representation of the sign-up

16  flow.  It's not a pixel-perfect representation of what the user

17  would have seen.

18  Q.   A user would not have seen a question mark in that page --

19  in that box?

20  A.   Right.  They would not have seen a question mark.

21  Q.   And that's because the source code that you retrieved and

22  put together to create this would not generate what someone

23  actually would have seen; correct?

24  A.   Let's see.  So basically the source code output would be

25  the same.  There's just the piece related to this CAPTCHA that

1  could not successfully be output, right.  Does that make sense?

2  **Q.**    Sure.  My only point is, what's depicted in 24 is not what

3  anyone signing up on that day would have seen?

4  **A.**    Again, the exact thing, no.  It's a reproduction.  It

5  shows the overall structure in the sense as to what would have

6  existed.  But I think it accurately represents the terms of

7  service.

8  **Q.**    There's no check box on this one; correct?

9  **A.**    Right.

10  **Q.**    Do you know why or if -- withdrawn.

11      Do you know why there is no check box here?

12  **A.**    No.

13  **Q.**    All right.  Is one of those one of the changes that

14  occurred between 2008 and 2009?

15  **A.**    That's right.

16  **Q.**    All right.  And did you look at why those changes were

17  made?

18  **A.**    Yeah.  I looked into why these changes were made.  I

19  didn't see any specific reasoning behind why the check box was

20  removed.

21  **Q.**    Is it to make the flow a little bit faster?

22  **A.**    So there were comments about -- there was actually an

23  entire redesign of the flow.  And not specifically just the

24  check box, by the way.  But the entire redesign for the flow

25  was about, kind of, streamlining the flow to make it more

1    modern, more appealing.

2    **Q.**    And that includes removing the check box?

3    **A.**    I -- I assume so.  I'm not sure.

4    **Q.**    What are the differences -- withdrawn.

5         Looking at 24 again, you generated this on a Safari

6    browser?

7    **A.**    Yes.

8    **Q.**    And it would have been different on a Firefox browser if

9    the user was looking at it from a Firefox browser?

10   **A.**    Yeah.  The other exhibit actually gives you a sense as to

11   what some of the differences might be.  Is it Exhibit 25?

12   **Q.**    My question, is the answer to the question yes --

13   **A.**    Yes.

14   **Q.**    -- it would be different?

15        And what about Internet Explorer, look different?

16   **A.**    Yes.

17   **Q.**    And you didn't generate these on Firefox or Internet

18   Explorer?

19   **A.**    No.  I mean, this -- you know, the user browser, that I

20   think is pretty representative of what someone would have seen,

21   the standard compliant browser.  And there's a set of standards

22   for how browsers render HTML.

23   **Q.**    But those might have been accurate too; correct?

24   **A.**    I'm sorry, I don't understand.

25   **Q.**    Withdrawn.

1      If you had generated the same page on Internet Explorer or

2  Firefox, those may have been an accurate depiction of what a

3  user might see as well?

4  **A.**   Did you say inaccurate or accurate?

5  **Q.**   "An accurate."  A-n accurate.

6  **A.**   Yeah, I think that reproducing them on one of the other

7  browsers would have also given, like, an accurate

8  representation.

9  **Q.**   But they would be different from Safari?

10  **A.**   Yeah, they might be slightly different.

11      **THE COURT:**  We're going to take a five-minute break.

12  Let's focus on wrapping this up.  Five minutes.

13      (Recess taken from 11:57 a.m. to 12:08 p.m.)

14      **THE COURT:**  Okay.  Do you want to wrap this up?

15      **MR. WILLIAMS:**  Just a couple minutes, Your Honor.

16      **THE COURT:**  Yes.

17      **MR. WILLIAMS:**  John, can we pull up number 25.

18      **MR. NADOLENCO:**  Yeah.

19  BY MR. WILLIAMS

20  **Q.**   Do you have 25 in front of you?

21  **A.**   Yes.

22  **Q.**   This is one of the sign-up flows that is a real one;

23  right?

24  **A.**   It's a screenshot --

25  **Q.**   It's a real screenshot of a flow that you found?

1  A.   Yes, it is.

2  Q.   Right.

3       And as the Court had indicated or questioned you, it's a

4  little different than the ones you created; right?

5  A.   Yes.

6  Q.   Here, just direct your attention to the bottom of this

7  shaded box where it says, "By clicking Sign Up you're

8  indicating that you've read and agree to the Terms of Use."

9       Do you see that?

10 A.   I do.

11 Q.   And the "Terms of Use" is in the same -- almost the same

12 color as the background; right?

13 A.   You mean --

14 Q.   They're both blue?

15 A.   They look like different colors to me.  I mean, the

16 background is light blue and the "Terms" is darker blue.

17 Q.   Okay.  And above that the -- there's a box that's in red;

18 right?

19 A.   Yes, there is.

20 Q.   Kind of see that first?

21 A.   Yes.

22 Q.   Pops out at you?

23 A.   Uhm, so just to be clear, this box only appears after

24 you've clicked "Sign Up" on step two the previous time, saying,

25 like, you know, you've decided to register and -- first time.

1   So that --

2   **Q.**   My only question was, it's red; right?

3   **A.**   It's red.

4   **Q.**   It kind of pops out at you?

5   **A.**   Yeah.  It's an error message.

6   **Q.**   Sure.  And the "Searching nawsco" is also in big black

7   letters?

8   **A.**   Yes, it is.

9   **Q.**   Not blue that sort of blend into the background; right?

10  **A.**   Uhm, the actual CAPTCHA image can differ in terms of

11  colors that's represented.

12  **Q.**   And when you compared that to 24, that we were just

13  looking at, they are obviously very different?

14  **A.**   Uhm, they are different.  Yeah, I agree with you.

15  **Q.**   I want to just ask you one more series of questions about

16  2008.

17      You recall submitting a declaration in support of

18  Facebook's prehearing motion; right?

19  **A.**   Yes.

20  **Q.**   And in that declaration you talked a little bit about the

21  availability of mobile flow; right?

22  **A.**   Yes, I did.

23  **Q.**   And one of the things you said was that beginning in 2008,

24  continuing through 2009, it became possible to register for a

25  new Facebook account with certain mobile devices; right?

1  **A.**    That's right.  Any mobile device that was capable of

2  rendering a web page.

3  **Q.**    Android?

4  **A.**    That includes Android.

5  **Q.**    IOS?

6  **A.**    Yes.

7  **Q.**    And you don't know whether or not any of the plaintiffs

8  signed up through a mobile phone?

9  **A.**    Again, I didn't look at that.

10  **Q.**    Why didn't you look at it?

11  **A.**    It wasn't part of -- I mean, I didn't have all the

12  information about the plaintiffs' accounts and so on.

13  **Q.**    So why did you include this mobile flow piece in your

14  declaration?

15  **A.**    Just to be complete about all the possible cases.

16  **Q.**    Okay.  So there's nothing possible, in terms of flows,

17  that's not in your declaration?

18  **A.**    Not that I know of.

19  **Q.**    Okay.  And you added:

20        "Based on my review of the underlying source code that

21        dictated Facebook's mobile sign-up flow and associated

22        style sheets, and based on my knowledge and experience as

23        an engineer, I determined that users who register for

24        Facebook via their mobile devices during this period of

25        time were shown a screen requiring them to click a Submit

1          or Sign Up button to create a functioning Facebook

2          account."

3          Is that fair?

4     A.   That sounds right.

5               MR. NADOLENCO:  Shawn, what paragraph are you reading

6     from?

7               MR. WILLIAMS:  29.

8     BY MR. WILLIAMS

9     Q.   And the mobile sign-up flows that you reviewed, you didn't

10    provide them to defense counsel or us; correct?

11    A.   Let's see.  No, I didn't produce -- I didn't reproduce

12    those.

13    Q.   Right.  And you didn't produce the style sheets you

14    reviewed, either, for those; right?

15    A.   For the mobile flows?

16    Q.   Right.

17    A.   No.

18    Q.   And you didn't create a screenshot of those either; right?

19    A.   No, I didn't.

20    Q.   Why not?

21    A.   My understanding was that the -- the desktop was the

22    relevant one while I was creating the screenshots.

23    Q.   But you could have if you wanted to?

24    A.   Sure.  Yes, could have reproduced the mobile ones.

25    Q.   Because you looked at --

1    A.    Well, the thing is -- yeah, yeah, I think so.

2    Q.    Because you looked at them; right?

3    A.    Yes.

4    Q.    And you determined that they were functioning; right?

5    A.    Yes.

6    Q.    So did you actually create -- did you load it up on your

7    browser and do all the same things that you did for the desktop

8    versions?

9    A.    Uhm, let's see.  So this is after the point where I had

10    produced the desktop screenshots.  And I started to look into

11    that, but I didn't go through at the same full process of

12    actually creating all the screenshots and so on.

13    Q.    So when exactly was it that you looked at the -- the

14    mobile flow?

15    A.    You know, I don't remember exactly.  Past few weeks.

16    Q.    Was it last week?

17    A.    No, I don't think so, no.

18    Q.    Was it -- was it after the depositions of the plaintiffs

19    in this case?

20         MR. NADOLENCO:  Objection.  Foundation.

21         THE COURT:  Overruled.

22    Go ahead.  Do you have the dates?

23         THE WITNESS:  I don't remember the exact dates.

24    BY MR. WILLIAMS

25    Q.    Sometime in the past few weeks?

1  **A.**    Yeah.

2         **MR. WILLIAMS:**  I have Nothing further, Your Honor.

3         **THE COURT:**  Okay.  Very, very brief redirect.

4                    <u>**REDIRECT EXAMINATION**</u>

5  **BY MR. NADOLENCO**

6  **Q.**    Mr. De Lombaert, you were asked some questions about

7  joining Facebook after the plaintiffs had registered.

8      Do you recall that testimony?

9  **A.**    Yes.

10 **Q.**    In your view, do you need to write the code to be able to

11 know what it did at the relevant time?

12 **A.**    No.

13 **Q.**    And did the process you followed show you the registration

14 flow that the plaintiffs would have seen?

15 **A.**    Yes.

16 **Q.**    And did you produce the source code that directly related

17 to that registration flow?

18 **A.**    Yes.

19        **MR. NADOLENCO:**  Can we put up Exhibit 28, please.

20 **BY MR. NADOLENCO**

21 **Q.**    Mr. De Lombaert, you were asked a number of questions

22 about things that may have been different, may have not have

23 been the same.

24     Is there any doubt in your mind that Exhibit 28 accurately

25 depicts the registration flow that the plaintiffs would have

1  seen, one of the named plaintiffs would have seen when he

2  registered?

3  **A.**    No, I think this is the representation of the flow they

4  would have seen.

5  **Q.**    And you were similarly asked the number of differences

6  between the different flows.  But is there a conflict there?

7  Is there always some indication that someone registering for

8  Facebook has read and understood the Terms of Use and agrees to

9  that?

10  **A.**    Yes.  In all these cases, there's some sentence, a

11  hyperlink, and information about the Terms of Use that would

12  have been present and visible and accessible, that someone

13  would have had to click "Sign Up," or, you know, the form

14  submission button across all these flow zones.

15  **Q.**    At any -- at any of the three points where you looked at

16  the registration flow, was it possible to create a Facebook

17  account without indicating assent to Terms of Use?

18  **A.**    No.

19  **Q.**    Let's look at Exhibit 16, please.

20        Similarly, despite any differences that may or may not

21  have existed, did a user have to indicate assent to the Terms

22  of Use if they signed up with this registration flow?

23  **A.**    Yes.

24  **Q.**    They would have had to click that box?

25  **A.**    Right.  They would have had to click the box to check it,

1    and then click "Sign Up" to submit the form.

2    Q.    And when you reviewed the source code, you were asked some

3    questions about in the rendition you did you clicked "Sign Up"

4    and nothing would happen.

5         Did the source code itself, that you reviewed, tell you

6    what would happen if you correctly filled out these fields?

7    A.    Yeah.  The source code itself I can read.  And I can see

8    exactly what would have happened.

9    Q.    And what would have happened?

10   A.    It would have validated these fields.  That means it would

11   have verified that the check box was checked.  And if that was

12   not the case, this would have sent back an error saying, you

13   know, you will need to do something different -- I forget

14   exactly the error message -- in order to proceed.

15   Q.    Is there any doubt in your mind that the screenshot shown

16   here on Exhibit 16 accurately shows the sign-up flow that the

17   named plaintiffs would have seen registering for Facebook?

18   A.    Well, it would have been either this exhibit or Exhibit

19   17, but one of those two.

20        MR. NADOLENCO:  Let's show Exhibit 17.

21   BY MR. NADOLENCO

22   Q.    Is there any doubt in your mind that if one of the named

23   plaintiffs registered on the date when this was the active and

24   live sign-up flow that they would have had to indicate assent

25   to the Terms of Use?

1  A.   Yes, they would have had to assent to the Terms of Use to

2  sign up.

3  Q.   And how would they have done that?

4  A.   They would have had to check the box and then click the

5  "Sign Up" button.

6  Q.   At this time was it possible to register for a Facebook

7  account without indicating assent to the Terms of Use?

8       MR. WILLIAMS:  Your Honor, pardon me.  Objection.  I

9  would only add he's only talking about desktop?

10      Is that fair?  Your question --

11      THE COURT:  Yes, I understand you're talking about

12  desktop.

13      Also, let's wrap it up.  I got it.

14      Anything else you want to cover?

15      MR. NADOLENCO:  Couple more things, Your Honor, very

16  quickly.

17      Exhibit 24, please.

18  BY MR. NADOLENCO

19  Q.   You were asked some questions here that the click box is

20  not there.  Nonetheless, did the user still have to assent to

21  the Terms of Use to register for Facebook?

22  A.   Yes.

23  Q.   How would they do that?

24  A.   By clicking "Sign Up" and seeing the sentence that was

25  present there referring to the Terms of Use.

1    **Q.**    Last one, Exhibit 25, please.

2        Mr. Williams drew your attention to the red box.  Do you

3    see that?

4    **A.**    Yes.

5    **Q.**    Does that only pop up if you incorrectly fill in the field

6    with the CAPTCHA challenge?

7    **A.**    That's right.

8            **MR. NADOLENCO:**  No further questions, Your Honor.

9            **THE COURT:**  All right.  You can step down.

10    (Witness excused.)

11            **THE COURT:**  I want to move this along a little bit.

12        Facebook, you're relying on the current terms of service

13    for choice of law and the other issues; right?

14            **MR. NADOLENCO:**  Yes, Your Honor.  We're also relying

15    on the current terms of service.

16            **THE COURT:**  So what would help me most is hearing from

17    someone about how we know, if we know, that the three

18    plaintiffs, the named plaintiffs, have consented to the current

19    Terms of Use, okay.  Just to help you focus your exam.

20        We don't need to go through every iteration between '05

21    and 2016.  Just how do we know today they assented to that.

22        You know, when I'm talking to you and your colleague says

23    come over, you don't turn your back and walk away.  You pay

24    attention to me first.

25            **MR. NADOLENCO:**  I apologize.

1    **THE COURT:** You must know that, Mr. Nadolenco.

2    **MR. NADOLENCO:** I do. I apologize.

3    **THE COURT:** Call your next witness.

4    **MR. NADOLENCO:** What we would like to do, Your Honor,

5    is show a short video of the three named plaintiffs who do talk

6    about assenting to the Terms of Use.

7    **THE COURT:** All right.

8    **MR. NADOLENCO:** Your Honor, the first clip is from

9    plaintiff Nimesh Patel.

10   (Video played.)

11   **MR. NADOLENCO:** Your Honor, the next one is plaintiff

12   Carlo Licata.

13   (Video played.)

14   **MR. NADOLENCO:** And the last one is plaintiff Adam

15   Pezen.

16   (Video played.)

17   **MR. NADOLENCO:** Just one thing, Your Honor. We

18   accidentally omitted one relevant part of Mr. Patel's

19   testimony. So we're going to go back to Mr. Patel.

20   (Video played.)

21   **MR. NADOLENCO:** Your Honor, at this point Facebook

22   would call Mark Pike.

23   **THE COURT:** Let's just stay focused on current use.

24   **MR. NADOLENCO:** Absolutely.

25   **THE CLERK:** Please raise your right hand.

1      **MARK PIKE, DEFENDANT'S WITNESS, SWORN**

2          **THE WITNESS:**  Yes, I do.

3          **THE CLERK:**  Please be seated.

4      Please state your full name for the Court and spell your

5  last name.

6          **THE WITNESS:**  Mark Pike.  P-i-k-e.

7          **THE CLERK:**  Thank you.

8          **MR. NADOLENCO:**  Your Honor, before I inadvertently

9  waste the Court's time, I understood Your Honor to want to hear

10  about the current Terms of Use.  And you just said "current

11  use."  Do you mean --

12          **THE COURT:**  Current Terms of Use.  Show me why these

13  three named plaintiffs assented to the current terms.

14          **MR. NADOLENCO:**  Okay.

15                  **DIRECT EXAMINATION**

16  **BY MR. NADOLENCO:**

17  **Q.**  Mr. Pike, what degrees do you have?

18  **A.**  Graduated from Duke University.  And also attended law

19  school at William and Mary.  Have a J.D.

20  **Q.**  When did you start at Facebook?

21  **A.**  I started working at Facebook in 2010.

22  **Q.**  What is your current job title?

23  **A.**  Currently, a privacy program manager.

24  **Q.**  And how long have you been in that role?

25  **A.**  Been in that role for about three years.

1  **Q.**   And what are your job responsibilities?

2  **A.**   I manage a team that reviews all new consumer products, to

3  help make sure we're upholding our privacy commitments.

4  **Q.**   Is there a document that Facebook believes governs user

5  relationship with Facebook?

6  **A.**   Yes.  Terms of Use or Statement of Rights and

7  Responsibilities.

8  **Q.**   And have those terms been updated over time?

9  **A.**   Yes.

10 **Q.**   Have you had a role in updating those terms?

11 **A.**   Yes.  I played an active role in the past two updates to

12 our terms.

13       **MR. NADOLENCO:**   Can we please put up Exhibit 11.

14 **BY MR. NADOLENCO**

15 **Q.**   Mr. Pike, do you recognize the document that's been marked

16 as Exhibit 11?

17 **A.**   Yes.  These are the active terms right now.  They have

18 been populated since January 30, 2015.

19 **Q.**   Did you have a role in updating these terms?

20 **A.**   I did, yes.

21 **Q.**   Describe that role, please.

22 **A.**   Sure.

23       As you can imagine, anytime we update our Terms, there are

24 a large number of constituents at the company who are very

25 interested in making sure it goes well.

1    So I help facilitate meetings, work with our legal team,

2    our policy team and other stakeholders, to make sure that we're

3    upholding our privacy commitments.  And part of that is making

4    sure we provide adequate notice, provide education to the

5    people who use Facebook, our services.

6    **Q.**    And you may have said this.  I apologize.  But these are

7    the most recent Terms of Use?

8    **A.**    Oh, yes.  These are definitely the most recent ones.

9    **Q.**    And you mentioned email -- you mentioned providing notice

10   to users of the updates.

11       Can you describe to the Court what steps Facebook took to

12   provide that notice?

13   **A.**    Sure.

14       For the most recent one, we emailed all users with

15   registered email addresses.

16       We also provided notice with a jewel notification on the

17   site, which is an on-site notification.

18       We also published updates from the Facebook's governance

19   page so that people who are logged into Facebook could see

20   updates on the page, with relevant information about the

21   update.

22       We launched something called a Privacy Basis Center, which

23   explained in a little bit more detail some of the updates in

24   the terms.

25       We also utilized something called the Facebook News Room,

1    which publishes short news items about updates, including

2    things like the terms.

3         And if you were viewing the terms page, we also displayed

4    something that's called a rooster or a banner that was

5    displayed at the top.

6         So during the period prior to the change of the Terms, if

7    you were visiting it you would see that there were proposed new

8    terms.  And so you could click through and see what the

9    proposed new terms were as well.

10   **Q.**   And Facebook did all those things with regard to the most

11   recent update?

12   **A.**   Yes.  Very robust notice.

13   **Q.**   You mentioned emails.  Who got those emails?

14   **A.**   Everybody with a registered email address would have

15   received an email.

16        **THE COURT:**  Did you check the emails for the named

17   plaintiffs in this case?

18        **THE WITNESS:**  I'm not sure I understand the question.

19        **THE COURT:**  Do you have a record of the emails that

20   went out?  Does Facebook have records of who they emailed the

21   notice to?

22        **THE WITNESS:**  We don't have specific records for

23   individuals.  But we do have records that we did send emails

24   out to everybody with a registered email address.

25        **THE COURT:**  You can't tell whether a specific address

1   got the email?

2        THE WITNESS:  There's not an individual copy of the

3   email that goes out.

4        THE COURT:  What is a jewel notice?

5        THE WITNESS:  Sure.

6   Jewel notification, on Facebook there's a notification

7   tray at the top of the site.  And when a significant on-site

8   action occurs, a friend sends you a message or a page that you

9   like has published an update, the jewel notification turns red

10  and maybe show you a number to show you how many notifications

11  you have.

12  So for the most recent update to our terms, we -- we

13  changed that badge to indicate that you had a new message.  And

14  if you clicked on it, it would let you know that the terms

15  were -- there was new Terms proposed and getting updated.

16       THE COURT:  What about the rooster banner, where is

17  that?

18       THE WITNESS:  Sure.

19  The rooster appeared, I believe, in two places.  I know

20  for sure it was displayed on the -- where we had the Terms

21  prior to January 30th.

22  So if on January 28th you visited and were reading the

23  Terms, there would be a banner, a rooster that appeared --

24       THE COURT:  Is it on your personal page or is it

25  somewhere else?  Where do you see the rooster?

1        THE WITNESS:  You would only see the rooster if you

2   were visiting the Terms page.

3        THE COURT:  So if you look at your own page, you will

4   see a jewel notice, and that's it?

5        THE WITNESS:  Uhm, I wouldn't say that's it.  You

6   would also have received an email.

7        THE COURT:  No, no.  When you're looking at your own

8   page, all you see is the jewel notice?

9        THE WITNESS:  So if you log-in to Facebook.com, you

10  are on your news feed, you would see the jewel notification.

11  And that persisted a number of times in case you didn't visit.

12  And then --

13        THE COURT:  And separately you might get an email at

14  whatever address you have for Facebook?

15        THE WITNESS:  You would.  You said "you might."  You

16  would receive --

17        THE COURT:  If the email is current.  It might be a

18  noncurrent email; right?

19        THE WITNESS:  It would be the email that you had

20  provided Facebook with to receive important notifications from

21  Facebook.

22        THE COURT:  All right.  But if you didn't update that

23  email after your email changed, Facebook would use the email it

24  had; it wouldn't necessarily use your current one.

25        THE WITNESS:  It would use the email that you had

1    currently.

2         THE COURT:  All right.  And the rooster banner you see

3    only if you go to Facebook's -- what did you call it,

4    governance page?

5         THE WITNESS:  To the Terms page.

6         THE COURT:  Terms page, okay.

7         THE WITNESS:  The site governance page is a page that

8    a lot of people like to get updates.  And I believe in previous

9    Terms updates we encouraged people to follow the Site

10   Governance page to stay up-to-date.

11        THE COURT:  Now, do users have -- were they required

12   to click anything to affirm that they had received and

13   consented to the new Terms of Use?

14        THE WITNESS:  For the new Terms, they would not have

15   to -- their continued use would be assenting to the terms.

16   They had a choice to not continue to use it.

17        THE COURT:  They didn't have to take any affirmative

18   step, from Facebook's point of view, to be subjected to the

19   current Terms of Use?

20        THE WITNESS:  Correct.

21        THE COURT:  All right.  Go ahead.

22        MR. NADOLENCO:  Thank you, Your Honor.

23   BY MR. NADOLENCO

24   Q.   You mentioned the email notification.  Then the judge

25   asked you if Facebook retained individual copies of the emails

1    that went out to its users.  How many users did Facebook have

2    at the time of the most recent update?

3    **A.**   Over a billion.

4    **Q.**   Is that part of the reason why the emails aren't kept?

5    **A.**   I would definitely say that's part of it.

6        Sending an email of that scale and retaining copies would

7    be significant space and storage and site performance issues,

8    yes.

9        **MR. NADOLENCO:**  Your Honor, just in the interests of

10   time, at this point I would just show him the email updates

11   that went out.

12       **THE COURT:**  Sure.

13       **MR. NADOLENCO:**  Okay.  Can we take a look at Exhibit

14   18.

15   **BY MR. NADOLENCO**

16   **Q.**   Mr. Pike, do you recognize the document that's up there as

17   Trial Exhibit 18?

18   **A.**   Yes, I do.  This is -- yes, I recognize it.

19   **Q.**   What is this document?

20   **A.**   This is an email to my personal Gmail account from 2012,

21   describing the updates to our Data Use Policy and our SRR terms

22   back in 2012.

23   **Q.**   What is the re line?  If you got this in your inbox, what

24   is the re line?

25   **A.**   I'm sorry?

1    Q.    What is the re line of this email?

2    A.    Of the subject line?

3    Q.    Yes.

4    A.    It's the updates to Data Use Policy and Statement of

5    Rights and Responsibilities.

6    Q.    And is Statement of Rights and Responsibilities the name

7    for the terms of use in November of 2012?

8    A.    Yes.  This is what we referred to as the "Terms."

9          MR. NADOLENCO:  Let me ask you to put up Exhibit 19.

10   BY MR. NADOLENCO:

11   Q.    Mr. Pike, do you recognize this document?

12   A.    Yes, I do.

13   Q.    What is it?

14   A.    This is an email I received to my personal Gmail account.

15   Q.    Also relating to a new update to the Terms of Use?

16   A.    Yes.  Related to that same proposed update.

17         MR. NADOLENCO:  Also, let's put up Exhibit 20, please.

18   BY MR. NADOLENCO:

19   Q.    Mr. Pike, do you recognize Exhibit 20?

20   A.    I do.

21   Q.    What is Exhibit 20?

22   A.    This is another email I received from Facebook to my

23   personal account.

24   Q.    And what's it relating to?

25   A.    This is another proposed update to our Data Use Policy and

1    our Statement of Rights and Responsibilities.

2    **Q.**   And what is the date of this email?

3    **A.**   This one is from August 20th -- sorry, August 30th, 2013.

4    **Q.**   And, lastly, Exhibit 21.  Do you recognize this document?

5    **A.**   I do.  This is another email to my Gmail account.

6    **Q.**   And what's this email about?

7    **A.**   The subject line says it all:  "We're updating our terms

8    and policies and introducing Privacy Basics."

9    **Q.**   Are you the only Facebook user who received the emails

10   that I just showed you, Exhibits 18, 19, 20, and 21?

11   **A.**   No.

12   **Q.**   How do you know that?

13   **A.**   I worked very closely on the past two updates and was

14   familiar with the team working on it for the one previous.

15           **THE COURT:**  So Exhibit 21 is a standardized email that

16   all Facebook users -- well, let me put it this way:  Exhibit 21

17   is a standardized email that Facebook sent to all the email

18   addresses it had, introducing Exhibit 11, the terms of service?

19           **THE WITNESS:**  Yes.  I'm sorry, I can't see the number.

20   Is this 21?

21           **MR. NADOLENCO:**  This is 21.

22           **THE WITNESS:**  Yes, that's correct.

23           **THE COURT:**  Everyone got exactly the same email; there

24   is no difference?

25           **THE WITNESS:**  There is no difference.

1          THE COURT:  And did the email call -- does it tell you

2     what the changes are to the Terms of Use?

3          THE WITNESS:  I believe it's a description.  But it

4     doesn't contain the full text.  But there are ample hyperlinks

5     throughout telling you where you can go to get the full text.

6          THE COURT:  So if you wanted to see Exhibit 11 and you

7     were looking at Exhibit 21, what would you click on to get to

8     Exhibit 11?

9          THE WITNESS:  Sure.  I believe there's a number of

10    hyperlinks there.  So where it says "Terms" you would be able

11    to click through.

12         THE COURT:  Where do you see that?  "Terms" in the

13    first sentence?

14         MR. NADOLENCO:  Can you help the witness please.

15         THE COURT:  Is that it?

16         THE WITNESS:  Yes, I believe so.

17         THE COURT:  There's a hyperlink?

18         THE WITNESS:  I believe so.

19         THE COURT:  Well, do you know or not?

20         THE WITNESS:  So this is -- this is a reproduction of

21    my Gmail account.  Viewing this on a computer would make it

22    clear.

23         THE COURT:  Okay.  But do you know where Facebook

24    would put the link through?  So if you got this email, how --

25    do you just click through this email to get to the current

1   Terms that you're receiving?

2          **THE WITNESS:**  Sure.  This isn't the full email -- is

3   there any way we could show the full thing?

4          **MR. NADOLENCO:**  Yeah.  Just give me one second,

5   please.

6       What he's saying is he's just seeing the first page on the

7   screen.

8          **THE COURT:**  Do you have a binder --

9          **MR. NADOLENCO:**  I'd like to get him a hard copy of the

10  exhibit.

11         **THE COURT:**  That's fine.

12         **MR. NADOLENCO:**  May I approach the witness, Your

13  Honor?

14         **THE COURT:**  Yes.

15      Where do you click through to get the terms of use?

16         **THE WITNESS:**  Yes, I believe this is a hyperlink

17  within the document itself.

18         **THE COURT:**  Where?

19         **THE WITNESS:**  Where -- I think it's where it says

20  "Terms and Policies."

21         **THE COURT:**  In the first sentence?

22         **THE WITNESS:**  I believe so.

23         **THE COURT:**  Okay.  Why aren't you sure?

24         **THE WITNESS:**  Uhm, I think because of the way the page

25  is rendered I can't tell.  That said, clicking "Facebook" at

1   the top would take you directly to your account, and you would

2   be able to log-in and see this information.

3         **THE COURT:** All right.  Go ahead.

4   **BY MR. NADOLENCO**

5   **Q.** Mr. Pike, you were part of the team that oversaw the

6   rollout of the updates for the terms of use; correct?

7   **A.** Yes.

8   **Q.** So whether you can see them on the exhibits that are in

9   black-and-white copies or not, do you know one way or another

10   whether the email that went out did, in fact, contain

11   hyperlinks to the terms of use?

12   **A.** Yes.

13   **Q.** And did they?

14   **A.** Yes.

15   **Q.** And is that something that was important to Facebook to

16   make sure that the emails contained?

17   **A.** Yes, important to provide it.

18   **Q.** And why is that?

19   **A.** We wanted to make sure everybody had the opportunity to

20   read the updates; wanted to make sure everybody was educated

21   about them and they had the opportunity to read through.

22   **Q.** To your knowledge, did substantively identical email

23   notifications go out to all registered emails for Facebook?

24   **A.** Yes.

25         **MR. NADOLENCO:** I don't have any further questions,

1  Your Honor.

2          **THE COURT:**  Mr. Pike.

3          **THE WITNESS:**  Yes.

4          **THE COURT:**  If a user doesn't like the changes, what

5  does Facebook tell them?

6          **THE WITNESS:**  Well, if somebody doesn't like the

7  changes, they -- they could provide a comment on the Facebook

8  Site Governance page.  Another choice they have is not to

9  continue to use our site or our services.

10          **THE COURT:**  Does Exhibit 21 lay that out somewhere?

11          **THE WITNESS:**  Uhm, at the bottom of the email we let

12  people know updates will be taking effect on a certain date.

13  And then I believe it says, "As always, we welcome your

14  feedback about our policies."

15          **THE COURT:**  Okay.  What about the jewel notification,

16  what does that tell people -- does it say anything at all if

17  you're unhappy about these changes in the jewel notification?

18          **THE WITNESS:**  I don't think -- the jewel notification

19  was a much shorter message.

20          **THE COURT:**  Okay.  Recross.

21                    **CROSS-EXAMINATION**

22  **BY MR. WILLIAMS**

23  **Q.**   Hi, Mr. Pike.  How are you?

24       You're a lawyer?

25  **A.**   I am a licensed attorney.  I'm not a lawyer for Facebook.

1    Q.    You work in their privacy department/division?

2    A.    Uhm, I'm a member of the Privacy Program team, yes.

3    Q.    Privacy Program team.  And part of that responsibility is

4    generating or updating the Statement of Rights and

5    Responsibilities?

6    A.    Yes, we work on that project.

7    Q.    Does that also include sending out notifications by email

8    that you were just talking about -- you were discussing with

9    Mr. Nadolenco?

10   A.    My team is involved in that process.  We're not personally

11   responsible for generating emails.  We rely on other teams to

12   do that.

13           MR. WILLIAMS:  Can we pull up 11, John?

14           MR. NADOLENCO:  Is that also one I showed him?  Yeah.

15   BY MR. WILLIAMS

16   Q.    Mr. Nadolenco just asked you a little bit about

17   Exhibit Number 11; correct?

18   A.    Yes.

19   Q.    And you said that that's the most recent Statement of

20   Rights and Responsibilities, Facebook's most recent Statement

21   of Rights and Responsibilities?

22   A.    Yes.

23   Q.    And one of the things that it says quarter of the way down

24   the page is "Privacy."  Do you see that?

25   A.    Yes.

1  **Q.**  "Privacy is very important to us"; right?

2  **A.**  I see that, yeah.

3  **Q.**  Had you reviewed prior versions of the statement of rights

4  or terms of use?

5  **A.**  Had I reviewed previous drafts --

6  **Q.**  Just prior updates?

7  **A.**  Oh, yes.

8  **Q.**  Yes.  And there were representations -- withdrawn.

9      Were there representations in any of those that privacy

10  was important to Facebook?

11  **A.**  I believe so.

12  **Q.**  You expect -- Facebook expects their users to read these

13  terms; correct?

14  **A.**  Yes.

15  **Q.**  They expect people to believe them?

16  **A.**  Yes.

17  **Q.**  Particularly the representations within that Facebook is

18  making; right?

19  **A.**  Yes.

20  **Q.**  And just direct your attention to paragraph 15, which I

21  think is on Bates 23 of the same document.

22      If you need to, you can use the binder there.  Or we can

23  move the screen.

24          **MR. NADOLENCO:**  What page?  I'm sorry, Counsel.

25          **MR. WILLIAMS:**  It's Bates ending 23.  And it's

1    paragraph 15, "Disputes."

2    **BY MR. WILLIAMS**

3    **Q.**    Do you see that?

4    **A.**    Yes.

5    **Q.**    And do you recognize that paragraph generally?

6    **A.**    You're referring to 15.3?

7    **Q.**    Paragraph 15.1.  I'm sorry.

8    **A.**    15.1?

9    **Q.**    Uh-huh.

10   **A.**    Yes.

11   **Q.**    How would you describe that?  Is there a description of

12   that paragraph that Facebook uses or you understand it to be?

13   **A.**    I'm generally aware that this has to do with our choice of

14   venue.

15   **Q.**    What do you mean by "choice of venue"?

16   **A.**    The jurisdiction in which laws will govern this statement.

17   **Q.**    And do you understand that paragraph as you sit there?

18   **A.**    Yes.

19   **Q.**    So what do you understand it to mean?

20   **A.**    That any claim, cause of action or dispute resulting from

21   peoples' use is going to be heard exclusively in this district.

22   **Q.**    And do you see on the last sentence where it says, "The

23   laws of the State of California will govern this statement as

24   well as any claim that might rise between you and us without

25   regard to conflict-of-law provisions"?

1   **A.**   Yes.

2   **Q.**   Did you have a role in updating this section of the terms

3   of use?

4   **A.**   Uhm, I played a role in making sure the rollout of these

5   terms went well.

6   **Q.**   Do you know what that last sentence means?

7   **A.**   I can't, with any certainty, discuss the legal

8   implications.

9   **Q.**   Sure.

10  **A.**   I would defer to my in-house counsel on that.

11  **Q.**   Understand.

12         **THE COURT:**  You're a Facebook user; right?

13         **THE WITNESS:**  Yes.

14         **THE COURT:**  What does it mean to you as a Facebook

15  user?

16         **THE WITNESS:**  The laws of the State of California

17  would be governing this statement.  The California law applies

18  here.

19  **BY MR. WILLIAMS**

20  **Q.**   Anything in that statement indicate to you that -- that

21  you as a user would be waiving your privacy rights?

22  **A.**   As a consumer, I would think that the State of California

23  would protect me.

24  **Q.**   Uh-huh.

25  **A.**   And I wouldn't be waiving any privacy rights that I had.

1  **Q.** Right. Because Facebook cares about -- withdrawn.

2  Privacy is very important to Facebook; right?

3  **A.** Yes.

4  **Q.** So you wouldn't read that as removing any of your privacy

5  rights as a user, would you?

6  **A.** Not for sure I understand the question.

7  **Q.** Okay. That's fine.

8  Look at the same page, Bates ending 23, paragraph 15.3,

9  that we just were -- you thought that I was looking at before.

10 Do you see that?

11 **A.** Sure.

12 **Q.** Big letters, caps; right?

13 **A.** Yes.

14 **Q.** Do you know why?

15 **A.** No.

16 **Q.** Facebook expects people to see that or read it?

17 **A.** Facebook expects people to see all of the terms.

18 **Q.** So what's the difference between the big terms and the

19 small terms?

20 **MR. NADOLENCO:** Objection. Vague.

21 **THE COURT:** Overruled.

22 **THE WITNESS:** I'm not sure.

23 **MR. WILLIAMS:** Can we pull up 18, please.

24 BY MR. WILLIAMS

25 **Q.** So you were asked some questions about Exhibit Number 18.

1    Do you recall that?

2    **A.**    Yes.

3    **Q.**    It's an email that you describe as a document that

4    Facebook would send to its users to inform of data policy

5    updates; right?

6    **A.**    Yes.

7    **Q.**    And you -- again, you're in -- as a Facebook employee and

8    in your role you have a minor -- have minor participation in

9    these emails going out to users; is that fair?

10   **A.**    I do generally.  For this particular one, I was not on the

11   privacy team at the time.

12   **Q.**    But Facebook keeps a lot of records, doesn't it?

13   **A.**    Uhm, yes.

14   **Q.**    Generally?

15   **A.**    Facebook keeps records.

16   **Q.**    And a lot of data; right?

17   **A.**    Yes.

18   **Q.**    The best you could do is go into your personal email

19   account to find an example of what Facebook sends out to its

20   users?

21   **A.**    This was the easiest method I -- so as a personal user,

22   the registered account information that I have provided

23   Facebook with, because I enjoy using Facebook as a person, is

24   my Gmail account.

25        And so I knew that since that was the email that I use,

1  that the quickest way I could find this email would be to find

2  my copy of the email.

3  **Q.**  And you say that these -- withdrawn.

4      **MR. WILLIAMS:**  Can we pull up 19.

5  **BY MR. WILLIAMS**

6  **Q.**  It's another one of the emails that Mr. Nadolenco asked

7  you about; right?

8  **A.**  Yes.

9  **Q.**  It looks like it's dated December 5th, 2012; right?

10  **A.**  Yes.

11  **Q.**  What is the subject line here?  I don't see the subject

12  line.

13  **A.**  "Our Global Site Governance Vote."

14  **Q.**  I see that.

15      And this is another one of those emails that goes out to

16  Facebook users --

17  **A.**  Yes.

18  **Q.**  -- right?

19      But you had to go into your archive, your personal

20  archive, to produce this; correct?

21  **A.**  I did do that, yes.

22  **Q.**  Did you ask anybody at Facebook to find an example for

23  you?

24  **A.**  Uhm, this was the example that I decided to provide.

25  **Q.**  Could you have done it if -- withdrawn.

1    Is there someone that could have asked for some evidence

2  of a batch email that went out to Facebook users?

3  **A.**   Yes, I believe I could have spoken to a team to -- to

4  provide evidence that emails were sent out.

5  **Q.**   Why did you do it this way?

6  **A.**   So as a privacy program manager, I thought that this would

7  be a great example of a person receiving a copy of an email

8  from Facebook.  And so I was thinking of it -- just with my

9  expertise, I thought that would be a good way to audit that

10  this occurred.

11    **MR. WILLIAMS:**   Can we pull up number 20, please.

12  **BY MR. WILLIAMS**

13  **Q.**   Do you have 20 in front of you?

14  **A.**   I do.

15  **Q.**   Another email that Mr. Nadolenco talked with you about;

16  right?

17  **A.**   Yes.

18  **Q.**   The subject line is just "News from Facebook"?

19  **A.**   Yes.

20  **Q.**   If you looked at the subject line, you wouldn't know that

21  it had anything to do with updating Terms of Use, would you?

22  **A.**   I would know that it was some type of important

23  notification from Facebook.

24  **Q.**   Just "News"?

25  **A.**   I would -- I would probably click through.  And I did,

1    yeah.

2    **Q.**    No, I'm just asking you, from the subject line, there's

3    nothing in the subject line of the email that would suggest

4    that you may have an update to the Terms of Use?

5    **A.**    Nothing about the terms.  But Facebook infrequently sends

6    these types of emails.

7    **Q.**    Frequently or infrequently?

8    **A.**    Infrequently sends an email with this type of subject

9    line.

10   **Q.**    One of the things you testified to -- withdrawn.

11       Now, is it your testimony that the January 30th, 2015

12   update is the latest revision, the one that's depicted in

13   Exhibit 11?

14   **A.**    January 30th, 2015 would be the version that day.  It's

15   not displayed right now, but yes.

16   **Q.**    January 30th?

17   **A.**    Yes.

18   **Q.**    You didn't produce one of the email updates after

19   January 30th, 2015, did you?

20   **A.**    I believe we provided the December 20th, 2014, which lets

21   people know we're updating our Terms and Policies and

22   introducing Privacy Basics.

23   **Q.**    Does the email you described go out before the update

24   occurs or after the update occurs?

25   **A.**    The email goes out to propose the update.

Q.   I'm sorry, to propose the update?

A.   Yes.

Q.   And once it's implemented, is there an email that says these are the terms of use that are in place now?

A.   I'm not sure if we sent an email, the most recent one, to let people know of the date when -- on the date that it did go active.  But we did tell people in the December email that these updates take effect on January 1st.

It didn't end up taking effect until January 30th.  We took some time to make sure we had a chance to listen to feedback.

Q.   So you told them something that didn't happen, but the expectation is that people would know anyway?

A.   We let people know that the updates would take effect on January 1st.  There was some reason why they didn't go into effect until January 30th.  But gave people extra time to decide if they wanted to continue to use the site, I guess.

MR. WILLIAMS:  I have nothing further.

THE COURT:  Okay.  Anything else?

MR. NADOLENCO:  No further questions for Mr. Pike.

THE COURT:  Step down.

I'll let you both make very short -- I have what I need. Just a few last comments.  I want to get the choice of law --

MR. NADOLENCO:  I will defer to my colleague Ms. Goldman on the arguments.

1   On housekeeping matters, we would like to move in the

2   exhibits we discussed with the witnesses.  Happy to do that

3   however the Court would like.

4        **THE COURT:**  Mr. Williams?

5        **MR. NADOLENCO:**  In addition, we would call Ms. Chance.

6   But Ms. Chance would be --

7        **THE COURT:**  Let's do the evidence.

8   Mr. Williams, any objection?

9        **MR. WILLIAMS:**  Your Honor, yes.

10   As we indicated earlier, we have objections to all of the

11   documents that have been submitted, particularly the

12   screenshots.

13        **THE COURT:**  Foundation?  Authentication?

14        **MR. WILLIAMS:**  Foundation and authentication.

15        **THE COURT:**  What's the foundation objection?

16        **MR. WILLIAMS:**  Because Mr. Chance [sic] has not fully

17   established where those documents are kept, how the systems are

18   maintained, or what he did to determine how he would choose

19   which source code was going to generate what would be relevant

20   for the case.

21   I understand that he did a lot of work to provide

22   something responsive.  But I don't -- I don't know if he laid

23   the proper foundation for anyone to accurately represent that

24   his process resulted in what he claims to be an accurate

25   depiction of what the website looked like at the time he says

1    that they did.

2          **THE COURT:**  Okay.  That's overruled.

3      Is there anything else?

4         **MR. WILLIAMS:**  Well --

5          **THE COURT:**  I'm going to admit the exhibits.  What I

6    do with them remains to be seen, but I will admit them.  I

7    think they are amply authenticated and have foundation.

8      Okay.  Let's have very brief last remarks on choice-of-law

9    assent, and then I want to talk about legal issues.

10         **MR. WILLIAMS:**  A question.

11         **THE COURT:**  Yes.

12         **MR. WILLIAMS:**  Mr. Nguyen is going to handle the

13    argument on the choice-of-law issues.

14         **THE COURT:**  Okay.

15         **MR. WILLIAMS:**  With respect to the assent, Your Honor,

16    I think that because defendants have the burden I think the

17    evidence that has been elicited today establishes that they

18    can't meet that burden --

19         **THE COURT:**  Just tell me why though.  Give me your top

20    three reasons why.

21         **MR. WILLIAMS:**  Well, the first was that I don't think

22    that the evidence that they submitted is -- is actually

23    admissible and reliable.

24      Second, the testimony is not reliable with respect to

25    whether or not these witness -- these plaintiffs actually

1 | assented to the terms, and certainly not the choice-of-law

2 | provision --

3 |     **THE COURT:** What's the standard of proof?

4 |     **MR. WILLIAMS:** For defendants?

5 |     **THE COURT:** It's a preponderance. More likely than

6 | not. So tell me how --

7 |     **MR. WILLIAMS:** I read your order the other day, Your

8 | Honor, and I --

9 |     **THE COURT:** How is it less likely rather than more

10 | likely that the plaintiffs, you know, signed up for these

11 | terms?

12 |     **MR. WILLIAMS:** I don't think that they've demonstrated

13 | that it is more likely, because what they've submitted simply

14 | doesn't establish that.

15 |     I would just make one comment.

16 |     **THE COURT:** Well, let's stop there. So let's assume,

17 | for the sake of discussion -- I'm not making any finding right

18 | now, but let's assume for the sake of discussion the following

19 | principles are true:

20 |     You can't use Facebook unless you sign up. You can't sign

21 | up unless you, in '05 and '08, checked the box saying "I

22 | agree." And every time the Terms of Use changed, there is a

23 | push from Facebook with some kind of notification.

24 |     So I agree with you they cannot show and have not tried to

25 | show that your specific clients did anything in particular

1   other than use the service, okay.

2       Why is that -- with those other conditions, why is that

3   not enough to find --

4       **MR. WILLIAMS:**  Your Honor, I think that the cases are

5   truly all over the map.

6       **THE COURT:**  Are they?

7       **MR. WILLIAMS:**  Well, I think so.

8       **THE COURT:**  How are they all over the map?

9       **MR. WILLIAMS:**  I think so, because there aren't any

10  that I've seen that go -- that are not, sort of, the

11  arbitration type.

12      **THE COURT:**  I agree.  Skip arbitration.  That's a

13  separate issue.

14      **MR. WILLIAMS:**  And the others that really look at, you

15  know, the clickwrap, browsewrap, sign-in-wrap types go more to

16  whether or not there was a contract, but don't go to that next

17  level like you did in the *Samsung* case.  Well, even if I find

18  that you assented to this contract, the terms within it,

19  particularly in a case like this one where there is a privacy

20  right, a statutory privacy right that Facebook is saying was

21  waived by simply assenting to the contract, I don't think there

22  are cases that address that.  I think that, from my review, you

23  came closest to doing it.

24      And I think that they failed altogether to demonstrate

25  that any of these plaintiffs, if you assume that they assented

1    to a contract, assented to those specific terms.

2        We heard Mr. Pike.  Mr. Pike couldn't even understand

3    those terms.  He works for Facebook and he's a lawyer.  And the

4    terms say, hey, you know, we -- privacy is very, very important

5    to us.

6        There's absolutely nothing about those terms, even if you

7    clicked on it, read it, scrolled through it, that suggests that

8    those terms were an agreement that my rights that are statutory

9    in some other place are no longer mine.

10        And so I think that these facts of this case, they are

11    somewhat unique.

12        **THE COURT:**  What case, though, says a company has a

13    duty -- by specifying choice of law, what case says the company

14    then has a duty to explain to each and every user in each and

15    every jurisdiction what that might means?

16        **MR. WILLIAMS:**  I don't know that there's a case that

17    actually says that.  I wouldn't suggest that there was.  But I

18    think that these issues are -- they truly are, sort of, case

19    specific.

20        Obviously, the -- you know, the Internet has changed the

21    way people interact with companies.  And I expect that this

22    issue will come up more and more with different nuance.

23        But I think we've got the facts before us.  And they have

24    a burden.  I know you're -- you've indicated that it's

25    preponderance.  I don't think that they've met that.  And I

1  don't think they even tried.

2      THE COURT:  It's what the law says.  It is

3  preponderance.

4      MR. WILLIAMS:  Okay.  And they haven't even tried to

5  establish the second level that I'm describing.

6      THE COURT:  What case has said that Facebook's terms

7  are not enforceable?

8      MR. WILLIAMS:  That the terms are not enforceable?

9      THE COURT:  This is not the first time a plaintiff has

10  challenged enforceability of the terms of the use for Facebook.

11      Now, I haven't seen a case yet -- I'm not saying this

12  drives the outcome.  I'm not saying that.  A case decided on

13  some facts, all right.

14      But do you know of a case where a court said Facebook's

15  terms are not enforceable?

16      MR. WILLIAMS:  Not Facebook's terms, Your Honor.  I

17  are don't know of a case.

18      THE COURT:  Let me ask you another question.

19      MR. WILLIAMS:  Okay.

20      THE COURT:  You're not going to do the choice of law?

21      MR. WILLIAMS:  I'm not, Your Honor.

22      THE COURT:  Okay.  Any comments, defendant?

23      MS. GOLDMAN:  Just a brief response to that, Your

24  Honor.

25      The cases are not all over the map.  They all line up one

1  way except for the outlier *Berkson* decision from Eastern

2  District of New York.

3      The Ninth Circuit made very clear in *Nguyen* that the

4  Internet has not changed contract law, okay.  So mutual assent

5  is the foundation of contract.  And the long line of cases

6  cited in our brief holds that click to accept plus hyperlink

7  constitutes a binding contract in the Internet age.

8      The Court has correctly said that no case has required a

9  defendant to show an individual's click.  What a defendant has

10  to show is that in order --

11      **THE COURT:**  What about 2009, I mean, why -- why did

12  Facebook retreat to the browsewrap-style license?  If you read

13  this and you go forward, you're deemed to have consented.

14      **MS. GOLDMAN:**  It didn't retreat to a browsewrap, Your

15  Honor.

16      In 2009, you still had to click a sign-up button that was

17  accompanied by the clear phrase that --

18      **THE COURT:**  All right.  So it wasn't an undistilled

19  pure browsewrap, but it's a lot closer to a browsewrap than a

20  clickwrap.

21      **MS. GOLDMAN:**  It's not, Your Honor.

22      The Court in *Fteja*, out of the Southern District of

23  New York, which evaluated this exact same sign-up flow, said

24  that it's a modified clickwrap because you have to do something

25  more than just use or look at the website in order to

1   communicate your assent.  *Fteja* cited the approval --

2         THE COURT:  That judge called it a modified clickwrap.

3   He could equally call it a modified browsewrap.

4         MS. GOLDMAN:  But the point is, it's not a pure

5   browsewrap.  The distinction that the Ninth Circuit in *Nguyen*

6   cited *Fteja* is between a situation where the user just uses the

7   website with no particular action undertaken by the user.

8         THE COURT:  We have a court reporter.  You have to

9   slow down.

10        MS. GOLDMAN:  Sorry.

11        In order to indicate assent in *Fteja*, the Court said the

12  user must do something more, click "Sign Up," in order to

13  indicate assent to the terms.  And there's a long line of cases

14  cited in our brief that say that that's not.  And the cases

15  don't distinguish between whether you have to click a blank box

16  or whether it says "I'm agreeing to the terms" or whether you

17  just have to click a sign-up box that the company --

18        THE COURT:  Why did Facebook do that?

19        MS. GOLDMAN:  I don't know why it did it.

20        THE COURT:  Do you have idea?

21        MS. GOLDMAN:  I have no idea why, Your Honor.  And it

22  doesn't matter.  Because what matters is the outward

23  manifestation of contract.  That's what the Court said in the

24  *Norcia* case.  And the Ninth Circuit has said it over and over.

25  What matters is the objective outward manifestation of assent.

1   And that was present --

2       **THE COURT:** In *Norcia* there was no manifestation of

3   assent.

4       **MS. GOLDMAN:** Right, because in that case the contract

5   term was buried in page 70 of a booklet that was entitled

6   "Warranty," that didn't put the plaintiff on notice that he was

7   entering into a contract.

8      Here, by contrast, every version of the terms -- and we've

9   attached them all to the exhibits that the Court has -- makes

10   very clear that this is a contract between the Facebook user

11   and Facebook. This is the agreement that governs your

12   relationship with Facebook. And using Facebook means you agree

13   to this contract. It says that in every version. These are

14   short, plain documents.

15      And when Your Honor asked Mr. Pike, in his capacity as --

16       **THE COURT:** I know these cases say the Internet has

17   not changed contract law, but that's just not right. I mean,

18   there's no other form of contract, no other form of contract

19   where you can sign a deal in one year and then three years

20   later another party can unilaterally change the terms and say

21   if you continue looking at this deal you're bound by it.

22       **MS. GOLDMAN:** But those aren't the facts in this case,

23   Your Honor. We are relying --

24       **THE COURT:** You made the point earlier that it's all

25   basic contract law. I don't think that's right. I think the

1  Internet has changed the application of contract law.

2      **MS. GOLDMAN:**  Well, I would point the Court to the

3  Ninth Circuit law --

4      **THE COURT:**  I bought a car in 2009.  I signed a

5  contract that was forevermore carved in stone unless there was

6  mutual written assent, in most contracts.  Internet doesn't

7  require that.  Facebook doesn't require that.

8      **MS. GOLDMAN:**  Well, Facebook does require it, Your

9  Honor.  We have established it here.

10      Plaintiffs showed their assent in two ways.  We are not

11  relying solely on the current terms.  At all relevant times the

12  Terms of Use had a choice-of-law provision that selected a

13  state that was not Illinois.  It was California at all relevant

14  times, except for when Mr. Patel signed up, when it was briefly

15  Delaware, which also does not have this statute.

16      Okay.  So we are not relying solely on a change.  We're

17  relying on two sets of facts which work together.  It's not

18  either/or.  We've satisfied both.  We've satisfied that they

19  clicked to assent when they signed up.  And that was

20  sufficient.

21      I just want to point the Court to several cases in which

22  Courts in this district have held that the clicking a sign-up

23  button or a purchase-now button plus a hyperlink, that's enough

24  without the separate blank box.  That would be the *Swift* case

25  and the *Crawford* case.  Both of those, in addition to *Fteja*,

1    involved that click to assent, okay.

2         The blank box is a nice feature.  It's a belt and

3    suspenders.  It's not necessary.

4         The point is that in all of these cases -- and the Ninth

5    Circuit didn't distinguish between the cases with the blank box

6    and the cases with the click to, click on, sign up, purchase

7    now -- the plaintiff has to do something, the user has to do

8    something to indicate assent.

9         The second way that each of the plaintiffs agreed to

10   Facebook's terms was they continued to use Facebook after being

11   repeatedly notified that continued use constituted agreement to

12   the terms.  Plaintiffs barely touched on this in their trial

13   brief.

14        We showed in our trial brief that they used Facebook after

15   they received the email notices of the most recent terms, after

16   we filed this lawsuit, after we invoked the forum selection

17   clause, and after we invoked the choice-of-law clause.  They

18   kept using Facebook.

19        And one of the things that has not changed about contract

20   law is that if you want to continue using the defendant's

21   product, you're still bound by its terms.

22        They were bound by those terms when they signed up.  They

23   were bound to those terms by continued use.  They can't say, "I

24   love Facebook; I want to use Facebook; but I don't want to be

25   bound by its terms."

1       Facebook made very clear, at all relevant times, in many,

2  many ways, that continuing to use Facebook constituted

3  agreement to the terms.

4       **THE COURT:** Anything else?  I want to move on.

5       **MR. NGUYEN:**  Well, if I may, Your Honor, on the email

6  issue --

7       **THE COURT:** Do you want to do it, or Mr. Williams?

8       **MR. WILLIAMS:** No, I'll submit.

9       **MR. NGUYEN:**  On the email issue, Your Honor, the

10  record has shown that in Exhibits 19 and 20 the emails that

11  were received, the subject line were "Our Global Site

12  Governance Vote" and "News from Facebook."

13       So an average user, or any user for that matter, seeing

14  those emails would not understand that they're actually

15  agreeing to a contract, including choice-of-law provisions

16  within that, that waive completely separate statutory rights.

17       So to the extent those emails, along with these rooster

18  notifications which were on the Site Governance Vote, a user

19  would have to wade through various terms, click on various

20  hyperlinks, as the evidence has shown.  And the witness didn't

21  even know where exactly the hyperlinks was located.  It's

22  simply not reasonable to assume that users would have agreed to

23  a contract under these circumstances, Your Honor.

24       **THE COURT:** Okay.  All right.  Let's go to the

25  conflicts issue.

1     Let's assume -- I will make a decision.  Let's just assume

2  for a moment that, just for today, the California choice-of-law

3  provision is applicable.  All right.  Let's just assume that.

4     On the defendant's side, I just -- why wouldn't

5  restatement section say I should go to Illinois?  This is a

6  group of Illinois citizens.  It's an Illinois statute.  Why

7  would California law displace that?

8     **MS. GOLDMAN:**  In order to answer that question, what

9  the Court needs to do is look to the way Illinois courts act

10  when they are faced with a choice-of-law clause.  It's clear on

11  the restatement that that's the analysis.

12     The Illinois courts, over and over again, apply

13  choice-of-law clauses and enforce them unless they find that

14  the other state's law is contrary to pure morals and abstract

15  justice, or unless the enforcement would be of evil example and

16  harmful to its people.

17     So we cited a number of cases in our motion --

18     **THE COURT:**  My question more was how -- isn't it

19  patently obvious that the State of Illinois has a much greater

20  interest in the outcome of this case than California does?

21     **MS. GOLDMAN:**  Absolutely not, Your Honor.  The key

22  thing to --

23     **THE COURT:**  How is that true?

24     **MS. GOLDMAN:**  The key thing to focus on in the

25  threshold is that when you have a valid choice-of-law clause,

1  as you do here, the plaintiff has to prove two things.  This is

2  not a situation like in the *Ting* case or the *Pokorny* case where

3  you're just looking at it in the abstract.

4      **THE COURT:**  I understand.

5      **MS. GOLDMAN:**  Okay.

6      **THE COURT:**  I understand baseline is the choice of law

7  is entitled to a presumption, okay.  But it's a rebuttable

8  presumption.

9      One of the points of rebuttal is, which state has a

10  materially more significant interest in the outcome of the

11  case?

12      How could that possibly not be Illinois?  It's an Illinois

13  group of citizens only, construing an Illinois statute in a

14  case of first impression, okay.  So why wouldn't Illinois

15  govern these?

16      **MS. GOLDMAN:**  Those are not the correct factors to

17  look at, Your Honor, in deciding whether to enforce a

18  choice-of-law clause.  Okay.  It's not a question of whether

19  Illinois would want to be the state to construe a statute.

20  It's not --

21      **THE COURT:**  I didn't say it wants to be.  I said they

22  have a materially greater interest in it.  And that is out of

23  the restatement, Counsel.

24      So tell me why Illinois does not have a materially greater

25  interest in application of this law to this case.

1          **MS. GOLDMAN:**  Well, that's one of the two things that

2    plaintiffs have to show.

3          The reason why they can't show that item of the

4    conjunctive two-part test is that California has an equally

5    strong if not stronger interest in ensuring that the companies

6    that do business here, that enter into valid choice-of-law

7    contracts with their consumers, get the benefits of

8    predictability, certainty, and diminished litigation costs that

9    are associated with that choice-of-law clause.

10         That's why companies in California have those clauses.

11   And where it's enforceable, as it is here, the company is

12   entitled to the benefit.

13         **THE COURT:**  Under that approach, you would never have

14   a 187 analysis.  So that can't be the right answer.

15         **MS. GOLDMAN:**  But the other piece of the analysis --

16         **THE COURT:**  That can't be the right answer because,

17   otherwise, 187 just gets written out of the books.

18         **MS. GOLDMAN:**  I'm sorry, Your Honor.  I don't

19   understand the question.

20         **THE COURT:**  If the answer is California necessarily

21   always has a greater interest because the company that is

22   insisting on the clause resides in California, Section 187

23   wouldn't even apply.

24         **MS. GOLDMAN:**  But Section 187 has a two-part --

25         **THE COURT:**  Tell me an example of when Section 187

1   would choose another state's law for a California corporation

2   that has asserted California choice-of-law.

3       **MS. GOLDMAN:**  When -- that's not the question.  The

4   question is when an Illinois court would apply choice-of-law.

5       Because, Your Honor --

6       **THE COURT:**  You know what?  You need to answer my

7   questions or I'm going to move on, okay.

8       **MS. GOLDMAN:**  Sorry, Your Honor.

9       **THE COURT:**  Answer my question.  Tell me when a

10  California corporation that has asserted a California

11  choice-of-law would defer to the choice of another state.  What

12  circumstances?

13      What you have said so far eviscerates Section 187.  It's

14  an extreme, untenable position, in my view.  I'm asking you to

15  tell me what circumstance do you see where that would not be

16  true.

17      **MS. GOLDMAN:**  Where the first prong of the test is

18  satisfied, Your Honor, where application of the choice-of-law

19  clause would violate a fundamental policy of the other state.

20      **THE COURT:**  Why can't they sue in California under the

21  UCL?  Why can't they bring a BIPA-based claim under the unfair

22  competition laws?  You insist on California law.  Why can't

23  they do that?

24      **MS. GOLDMAN:**  I think there are a variety of reasons

25  why they couldn't do that, but we haven't briefed that here

1  because that's not the question before the Court.

2      **THE COURT:**  What are they?  Just tell me.  Why can't

3  they do that?

4      **MS. GOLDMAN:**  Your Honor, standing here, I haven't

5  researched why they couldn't bring a BIPA claim under the UCL.

6  I know that there are many reasons why they cannot, but that's

7  not the issue that's been briefed here.

8      **THE COURT:**  What about applying California law?  Let's

9  say California law sticks.  Why couldn't you bring a UCL claim

10  based on the unlawful prong based on violation of the Illinois

11  BIPA?

12      **MR. NGUYEN:**  Your Honor, millions of Illinois citizens

13  would be out of luck.  Basically, they wouldn't --

14      **THE COURT:**  No.  You could vindicate their rights

15  under California law using the unfair competition law.  The law

16  has three prongs: unlawful, unfair, and deceptive.  The

17  unlawful prong would be you put on a case that Facebook has

18  violated the BIPA, but it would be within the context of a

19  California legal claim.

20      **MR. NGUYEN:**  It wouldn't be the same statute, Your

21  Honor.  The Biometric Privacy Information Statute is a very

22  specific statute going to the biometrics.  And this is where

23  the fundamental --

24      **THE COURT:**  No, no.  You may not be following me.

25  That would be the predicate.  You would put on the case, the

 1  predicate that the BIPA has been violated.  It's the same case.

 2  It's just that it would be within the shell of California law.

 3  Why can't we -- and, you know, the UCL is famously broad and

 4  expansive.  So plaintiffs generally like it.

 5      What's the problem with that?

 6      **MR. NGUYEN:**  I haven't looked specifically into

 7  whether or not it's possible, Your Honor.  But I don't think

 8  the Court necessarily needs to reach that question because the

 9  fundamental public policy here is crystal clear.

10      **THE COURT:**  Okay.  Let me ask you that.  That actually

11  is my main question for you.

12      So Article I of Section 1 of the California Constitution

13  mentions privacy.  Illinois Constitution mentions privacy.

14  California is widely regarded as the most aggressive state on

15  privacy legislation and protection.

16      I'm having trouble seeing what the fundamental policy gap

17  is.  So in the cases that have found a fundamental policy gap,

18  there really has been a gap.

19      Georgia, in one case decided by this court, doesn't

20  protect workers; California does.  Okay.  In the Ninth Circuit

21  case, you know, class actions are allowed in one place and

22  they're basically banned in another place.

23      Here you have two states who agree, as a constitutional

24  matter, that privacy is a right.  And you have two states that

25  appear to be engaged in protecting citizens' privacy rights.

1    So what is the fundamental conflict?  How does California law

2    contravene Illinois fundamental policy?

3         MR. NGUYEN:  Right.  On biometric information, Your

4    Honor, the Biometric Information Privacy Act was enacted in

5    2008.  And here's what happened:  A California bankruptcy court

6    was going to sell the fingerprint database of this company

7    called Pay By Touch.  That was happening in --

8         THE COURT:  Called what?

9         MR. NGUYEN:  The fingerprint database, Your Honor.

10   When the law was enacted in 2008, it was because a California

11   bankruptcy court was about to sell a database through

12   liquidation.  A fingerprint database.  In reaction, the

13   Illinois Legislature got together immediately and passed

14   unanimously a law to stop that from happening.

15        And so the -- the legislative history makes it clear, the

16   Illinois Legislature, realizing what was going to happen in

17   California, immediately got together, passed a law saying that,

18   "We are in very serious need of protections for the citizens of

19   Illinois when it comes to biometric information.  I know of no

20   opposition to the legislation."

21        So there you already see a contrast.

22        THE COURT:  Why is that a fundamental policy?  That's

23   just a law.

24        MR. NGUYEN:  Yes, Your Honor.  But, a fundamental

25   public policy, when courts consider whether or not something is

 1  fundamental public policy, they look at the legislative text,

 2  they look at the Constitution as well as other acts.

 3      And we have those here.  For example, the statute in this

 4  case went out of its way to explain that it is a public

 5  interest.  It says "Public, welfare, security, and safety will

 6  be served by regulating the collection, use, safeguarding,

 7  handling, storage of biometric identifiers and information."

 8      **THE COURT:**  I mean, how does the application of

 9  California law fundamentally contravene that?

10      You may not be able to bring a BIPA claim, but how does

11  that fundamental -- how does that contravene a fundamental

12  policy of the state of Illinois?

13      **MR. NGUYEN:**  Your Honor, under the provision that we

14  have now, under the legislative, sort of, structure that we

15  have now, Illinois citizens may be out of -- out of any sort of

16  redress, at all, for their violations.

17      **THE COURT:**  Well, you could bring a UCL claim.

18  Apparently, I'm the only one who thinks this is a good idea.

19  But you could bring a UCL claim.

20      I'm just thinking off the top of my head.  My days of

21  giving legal advice are over.

22      (Laughter)

23      **THE COURT:**  So let me ask you a question, though.  I

24  mean, you know, the cases where a choice-of-law provision has

25  been trumped have had some very starkly contrasting rights and

1   policies between the two states that the judge was picking,

2   okay.  I mean, it was really kind of binary.  State A allowed

3   something; State B fundamentally opposed it.  It wasn't just

4   the loss of the claim.  It was a policy conflict, a fundamental

5   policy conflict.  At least that's how the cases are worded.

6       So give me your best explanation about why California law

7   is fundamentally at odds with Illinois law.

8       **MR. NGUYEN:**  Your Honor, I'm not sure that the

9   contrast is necessarily that stark.

10      There are cases where, for example, there may be

11  variations in, you know, what elements to consider; whether one

12  element of a specific claim is considered in one state versus

13  another.

14      And so the contrast, Your Honor, isn't that stark.  So

15  what -- from our case, as we've seen, is that the Court will

16  look at the Constitution, the legislative act, and judicial

17  decisions in finding whether or not there is a public policy

18  reason here.

19      And that's clearly the case here.  The statute is very

20  specific to Illinois.  It's very specific to protecting

21  Illinois citizens.

22      **THE COURT:**  There's no California analog; right?

23      **MR. NGUYEN:**  That's correct, Your Honor, there is no

24  California analog.  And the Constitution in Illinois

25  specifically protects privacy.  And the long, sort of, preamble

1  to the statute specifically talks about the public welfare,

2  security, and safety for protecting biometric identifiers which

3  are different qualitatively.

4      These are identifiers where if they're compromised can

5  never -- you can't change your face.  Can't change your

6  fingerprint.  So the Illinois Legislature, when faced with a

7  threat of a fingerprint database being sold in California,

8  jumped in, passed a unanimous law to protect these identifiers

9  on behalf of Illinois citizens.

10     So Illinois clearly has a materially greater interest in

11  this case.  Everything that's relevant to this case, Your

12  Honor, happened in Illinois.  The plaintiffs are from Illinois.

13  The millions of class members are from Illinois.  Equally

14  important, the class members are nowhere else.  They are all

15  just in Illinois.

16     The photos were supposed to be uploaded in Illinois.  The

17  disclosure under BIPA was supposed to be in Illinois.  The

18  impact is felt in Illinois.  And so they're looking for a law

19  passed by the Illinois Legislature to give them redress.  And

20  even Facebook has a presence in Illinois.

21     So Your Honor under the restatement here, Illinois has a

22  materially fundamental interest in protecting its citizens'

23  privacy rights.  And so essentially, Your Honor, to find that

24  Illinois law wouldn't govern here would leave all those

25  millions of class members out in the cold, giving up their

1  privacy biometric identifiers.

2      **THE COURT:**  I can look this up.

3      Just help me for a minute.  What's the relief available

4  under the BIPA?

5      **MR. NGUYEN:**  Under the BIPA, Your Honor, we're asking

6  for a variety of relief.  But it --

7      **THE COURT:**  What does the statute provide for?

8      **MR. NGUYEN:**  Okay.  The statute provides for

9  injunctive relief, declaratory relief, as well as monetary

10  relief for violations, depending on whether or not the

11  violation was intentional or reckless.

12      **THE COURT:**  So are there penalties in the statute?

13      **MR. NGUYEN:**  Yes, Your Honor.

14      **THE COURT:**  All right.  So you can clearly get an

15  injunction or declaratory relief under California law.  Maybe

16  penalties aren't --

17      **MR. NGUYEN:**  Correct, Your Honor.

18      **THE COURT:**  All right.  Defendant.

19      **MS. GOLDMAN:**  That argument rested on any number of

20  miscitations of the record and/or law.

21      First of all, the Illinois Constitution, plaintiffs are

22  misquoting the relevant provision, which actually states,

23  "Every person shall find a certain remedy in the laws for all

24  injuries and wrongs which he received to his person, privacy,

25  property, or reputation."

1    That is virtually any kind of right that somebody may say

2 is violated.  The Illinois Constitution did not enshrine

3 privacy higher than rights to person, property, or reputation.

4 That's virtually any kind of a claim.

5    Plaintiff is also misrepresenting the legislative findings

6 in support of the BIPA statute.  The General Assembly

7 explicitly said that it was concerned about financial

8 transactions and security screenings, which is exactly why it

9 was concerned about the Pay By Touch bankruptcy where the

10 biometric identifiers and the biometric information were tied

11 to the plaintiffs' finances -- excuse me, the consumers'

12 finances.

13    The very first part of the legislative findings says, "The

14 use of biometrics is growing in the business and security

15 screening sectors and appears to promise streamlined financial

16 transactions and security screenings."

17    Section D says, "An overwhelming majority of members of

18 the public are wary of the use of biometrics when such

19 information is tied to finances and other personal

20 information."

21    Of course, that's part of our other argument that that is

22 why the legislature excluded photographs and information

23 derived from them from the scope of the statute.  It was not

24 concerned about social media websites.  It was concerned about

25 security screenings and financial information.

1    Just moving back to the law and choice of law for a

2  moment.  What plaintiffs need to show is that in the Court's

3  shoes an Illinois court would say Illinois has a fundamental

4  interest in ensuring that its law applies here.

5    But the Illinois courts do not hesitate to enforce

6  choice-of-law clauses even when it deprives Illinois citizens

7  of statutory rights under Illinois law, okay.

8    So we cited several cases like that in our brief.  In *Mell*

9  the Court refused to apply the Illinois usury statute even

10  though the plaintiff had no claim under the New York statute,

11  which was different.

12    In *Midway* the Court refused to apply the Illinois consumer

13  products statute, finding that the choice-of-law clause was

14  enforceable.

15    In --

16    **THE COURT:**  Facebook's position is if Illinois law

17  doesn't apply, the plaintiffs have no claim they can bring

18  under California law; is that right?

19    **MS. GOLDMAN:**  They have no claim under the BIPA,

20  whether broad under the BIPA directly or under some other

21  statute.  They have no claim under the BIPA because this claim

22  arises from photographs.  Even apart from that, any claim would

23  be barred by the California choice-of-law clause and use of

24  those terms.

25    **THE COURT:**  It's impossible for them to bring a

**PROCEEDINGS**

1  biometrics claim in California?

2      **MS. GOLDMAN:**  They can't bring a claim under the

3  statute that we are talking about, the Biometric Information

4  Privacy Act.

5      **THE COURT:**  Is there any California law they could sue

6  under for biometrics?

7      **MS. GOLDMAN:**  I am not aware of any law that they

8  can -- I don't know what the Court means by biometrics.

9      **THE COURT:**  Assuming the misappropriation of biometric

10  information, are you aware of any California law that they

11  might invoke to bring a claim under California law?

12      **MS. GOLDMAN:**  No, Your Honor.

13      **THE COURT:**  Okay.  That's all I need.

14    What's going on now?  Where are you?

15      **MR. NGUYEN:**  I'm sorry, Your Honor?

16      **THE COURT:**  What's happening?  Discovery?

17      **MR. NGUYEN:**  Right.  So we have -- Your Honor, we

18  served discovery to Facebook in December.  This was a broader

19  set of discovery.

20      **THE COURT:**  Okay.

21      **MR. NGUYEN:**  And so when we had this hearing, we

22  focused on very narrow discovery --

23      **THE COURT:**  All right.

24      **MR. NGUYEN:**  -- on just the assent issue.  So there

25  are those discovery requests that are still outstanding.

1        THE COURT:  Okay.

2        MR. NGUYEN:  So we were hoping for the Court's

3  guidance on what we should do.

4        THE COURT:  Let me ask.  What about the case that came

5  up; they were never Facebook users?

6        MR. NGUYEN:  Right.

7        THE COURT:  Should that be related to this case?

8        MR. NGUYEN:  I assume, Your Honor, that were they

9  related --

10        THE COURT:  What do you think?

11        MR. NGUYEN:  What do I think?

12     I think to the extent that the cases should be

13  coordinated, you know, as far as the discovery --

14        THE COURT:  I'm not going to consolidate them.  But

15  should they be related, in other words?

16        MR. NGUYEN:  Yes, Your Honor.  They raised the same

17  BIPA cause of action.  So under the State of Illinois statute,

18  the nonuser in that case is also an Illinois resident, Your

19  Honor.

20        THE COURT:  So it's also just Illinois citizens for

21  Illinois law?

22        MR. NGUYEN:  That's my understanding, Your Honor.

23        THE COURT:  Okay.  So what do you want to do?  Do you

24  want to just wait until I get my decision out?  Or do you want

25  to start doing discovery?  What do you want to do?

**PROCEEDINGS**

1    **MR. NGUYEN:**  Your Honor, it would be our preference to

2    continue with the discovery, Your Honor.

3        **THE COURT:**  Okay.  Defendants.

4        **MS. GOLDMAN:**  Your Honor, we still have a pending

5    motion to dismiss on our statutory argument.  So it's our

6    position that --

7        **THE COURT:**  Well, I'm just trying to do an efficient,

8    pragmatic thing here.  Motions to dismiss don't toll discovery.

9      What would you like to do?

10       **MS. GOLDMAN:**  We would like to wait until we get the

11   Court's ruling on this motion and also on our pending motion to

12   dismiss on the statutory issue, Your Honor, which is also a

13   special issue that does not require discovery.

14       **THE COURT:**  What discovery do you have outstanding?

15   What have you asked for?

16       **MR. NGUYEN:**  Your Honor, essentially, some of it had

17   to do with, you know, how the feature at issue actually worked;

18   any kind of correspondence that was sent; sort of, how

19   faceprints are stored and things of this sort.

20     It was a fairly narrow set of discovery.  And as stated

21   before, I think once we get past this stage, the discovery will

22   be fairly limited.  But we did request certain information to

23   find out more details how the feature exactly worked and its

24   process.

25       **THE COURT:**  Okay.  All right.  Why don't we -- let me

1  reflect on what the next step will be, okay.  But I'll probably

2  have this out in a couple of weeks, all right.

3       Okay.  Thank you.

4       **MR. NADOLENCO:**  Your Honor, can I raise one

5  housekeeping issue?  I apologize.

6       **THE COURT:**  Okay.

7       **MR. NADOLENCO:**  You asked Mr. De Lombaert to produce

8  the screenshots.

9       **THE COURT:**  Yes.

10      **MR. NADOLENCO:**  I don't know if he has time to get

11  back to Palo Alto --

12      **THE COURT:**  Tomorrow is fine.  Do it tomorrow.

13      **MR. NADOLENCO:**  That's fine.  I was going to ask you.

14      **THE COURT:**  Yep.

15      (The proceedings were adjourned at 1:38 p.m.)

16                      - - - - -

17            <u>**CERTIFICATE OF REPORTER**</u>

18       I certify that the foregoing is a correct transcript

19  from the record of proceedings in the above-entitled matter.

20  DATE: Friday, March 4, 2016

21

22                          *Katherine Sullivan*

23  _____

24       Katherine Powell Sullivan, CSR #5812, RMR, CRR
                  U.S. Court Reporter

25