UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

| | | |
|---|---|---|
| In re:  FACEBOOK BIOMETRIC | ) | |
| INFORMATION PRIVACY LITIGATION,) | | **NO. C 15-03747 JD** |
| _____ | ) | |
| FREDERICK WILLIAM GULLEN, on | ) | |
| behalf of himself and all | ) | |
| others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| VS. | ) | **NO. C 16-00937 JD** |
| | ) | |
| FACEBOOK, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

San Francisco, California
Thursday, October 27, 2016

**<u>TRANSCRIPT OF PROCEEDINGS</u>**

**<u>APPEARANCES</u>:**

**For Plaintiff Nimesh Patel:**

                    Robbins Geller Rudman & Dowd LLP
                    Post Montgomery Center
                    One Montgomery Street, Suite 1800
                    San Francisco, CA  94104
                    (415) 288-4545
                    (415) 288-4534 (fax)
          **BY:  DAVID WILLIAM HALL**
               **SHAWN A. WILLIAMS**

Reported By:  Lydia Zinn, CSR No. 9223, FCRR, Official Reporter

**APPEARANCES**:

**For Plaintiff Nimesh Patel:**
                         Edelson P.C.
                         350 North LaSalle Street, 13th Floor
                         Chicago, IL  60654
                         (312) 589-6370
                         (312) 589-6378 (fax)
          BY:  **ALEXANDER GLENN TIEVSKY**

**For Plaintiff Nimesh Patel:**
                         Edelson P.C.
                         123 Townsend Street, Suite 100
                         San Francisco, CA  94107
                         (415) 212-9300
                         (415) 373-9435 (fax)
          BY:  **RAFEY S. BALABANIAN**

**For Plaintiff Adam Pezen:**
                         Labaton Sucharow LLP
                         140 Broadway
                         New York, NY  10005
                         (212) 907-0700
                         (212) 818-0477 (fax)
          BY:  **JOEL H. BERNSTEIN**

**For Interested Party Frederick William Gullen:**
                         Carey Rodriguez, LLP
                         1395 Brickell Avenue, Suite 700
                         Miami, FL  33130
                         (305) 372-7474
          BY:  **DAVID P. MILIAN**

**For Defendant Facebook, Inc.:**
                         Mayer Brown LLP
                         1221 Avenue of the Americas
                         New York, NY  10020
                         (212) 506-2647
          BY:  **LAUREN R. GOLDMAN**

**For Defendant Facebook, Inc.:**
                         Mayer Brown LLP
                         350 South Grand Avenue, 25th Floor
                         Los Angeles, CA 90071-1503
                         (213) 229-9500
                         (213) 625-0248 (fax)
          BY:  **JOHN NADOLENCO**

**ALSO PRESENT:  NIKKI SOKOL**

| | |
|---|---|

**Thursday - October 27, 2016**               **10:12 a.m.**

**P R O C E E D I N G S**

**---000---**

    **THE CLERK:** Calling Civil 15-3747, In Re: Facebook Biometric Information Privacy Litigation. Counsel.

    **MR. BALABANIAN:** Good morning, Your Honor. Rafey Balabanian, on behalf of plaintiffs.

    **MR. TIEVSKY:** Good morning, Your Honor. Alexander Tievsky on behalf of plaintiffs.

    **MR. MILIAN:** Good morning, Your Honor. David Milian, for Frederick Gullen, in the *Gullen versus Facebook* matter.

    **MR. WILLIAMS:** Good morning, Your Honor. Shawn Williams, Robbins Geller Rudman & Dowd, on behalf of plaintiffs.

    **MR. HALL:** Good morning, Your Honor. David Hall, Robbins Geller, on behalf of plaintiffs.

    **MS. GOLDMAN:** Good morning, Your Honor, Lauren Goldman, on behalf of Facebook. I'm here with Mr. Nadolenco, and also with Nikki Sokol from Facebook, who is back in the courtroom.

    **THE COURT:** Okay. All right.

  Who's going to take the lead for the plaintiffs?

    **MR. BALABANIAN:** I'm sorry, Your Honor.

    **THE COURT:** Are you taking the lead for the plaintiffs?

1    **MR. BALABANIAN:**  Yes.  Excuse me, Your Honor.  Yes.

2    **THE COURT:**  Okay.  All right.  Go ahead.

3    **MS. GOLDMAN:**  Good morning, Your Honor.

4    Plaintiffs' claim that, by applying facial-recognition

5    software to their photos, Facebook violated BIPA's notice and

6    consent provisions; but what they pointedly do not allege is

7    that they suffered any real-world harm as a result of those

8    alleged violations that they're worse off in any concrete,

9    real-world way.

10    And under the Supreme Court's Decision in *Spokeo*, a

11    plaintiff must allege concrete harm; harm that is real and

12    *de facto*, and not abstract, to establish Article III standing,

13    the Court held.

14    **THE COURT:**  Let me just jump in on that.

15    So what is particularly new about *Spokeo*?

16    **MS. GOLDMAN:**  Well, prior to *Spokeo*, the rule in the

17    Ninth Circuit was that a plaintiff could satisfy Article III

18    standing by alleging a statutory violation.  He said, *I have*

19    *these statutory rights.  They were violated.  Therefore, I have*

20    *standing*.

21    And what *Spokeo* holds is that a plaintiff can't just do

22    that.  He has to come in and show real-world harm.

23    So in the months since *Spokeo* was decided, District Courts

24    and Courts of Appeal all around the country have been saying,

25    *Okay, plaintiff.  You've said that the defendant violated your*

*statutory rights, but that's not enough.  You have to show how*
*you were injured.*

So did you lose money?  Did the defendant embarrass you in a way that can support a lawsuit in federal court?  Did you -- was your personal information exposed to the public in a way that humiliated you?  What is your actual harm?

**THE COURT:**  What I'm struggling with -- I mean, I'm not sure I'm prepared to say that the Ninth Circuit categorically said as to any, statutory injury was enough.  I think that goes too far.

But leaving that aside, I mean, *Spokeo* impresses me for its utter lack of novelty.  I mean, these are all well-established Article III standing tests.  I mean, just look at the cases that *Spokeo* cites.  I mean, there's just nothing sort of -- it's old law just sort of restated.  There's nothing particularly novel about it.

**MS. GOLDMAN:**  Well, no, Your Honor.  In the wake of *Spokeo*, Courts all around the country have been dismissing claims, holding that a bare statutory violation is no longer enough.

It's true that *Spokeo* was enunciating and building upon principles that were already there in the law for many years; but the lower courts, especially the Ninth Circuit and the Seventh Circuit, had been misapplying them by saying, *Okay.*
*It's enough for you to allege a particularized statutory*

1  *violation; that the defendant violated a statute; and that you*

2  *were in the zone of interests*.

3      Well, what they weren't doing is requiring a concrete,

4  real-world injury.

5      They require you now to show how you were harmed in the

6  real world.

7      It's not enough to say, *The defendant scanned a photo of*

8  *me, and has a template in its database*.  You have to show that

9  as a result of that, you were identified in some embarrassing

10 situation and lost your job, or that you tried to sell your

11 biometric information, and you were unable to do so because

12 Facebook cornered the market on it, and it had value that it no

13 longer has.  You have to show a real-world injury.

14      **THE COURT:**  Well, I'm just -- it's kind of a side

15 point, to be honest.  I'm just somewhat skeptical that *Spokeo's*

16 a big change in the law.  It's all well-established Article III

17 injury-in-fact jurisprudence.

18      But in any event, let me ask you this.  So I denied

19 summary judgment, and applied Illinois law because I found that

20 there was a fundamental right of privacy in Illinois, and that

21 the BIPA was attempting to protect that.  So, I mean, the one

22 thing the *Spokeo* cases all have in common, which isn't much,

23 because they're all very specific to the facts, you know,

24 they're addressing -- but the one thing they all have in common

25 is that when they do try to come up with an illustration of an

injury that passes under *Spokeo*, they all say invasion of
privacy. And that's kind of what I've found in the summary
judgment order; that BIPA was addressing invasions of privacy.
So why is that not enough?

     **MS. GOLDMAN:** Well, we would not say that the cases
all hold that invasions of privacy are sufficient, after
*Spokeo*.

     And, in fact, Judge Coleman in the Northern District of
Illinois just held in the *McCullough versus Smarte Carte* case
that a bare BIPA violation does not satisfy Article III. So
she said, *I understand that you have these statutory rights,
but there is a difference between a statutory right and an
injury flowing from a violation of that right. And it's not
enough to say it's just an invasion of privacy, in the air.
You have to show how your privacy was violated, and how you
were harmed*.

     Every statute protects some sort of public interest. We
recognize that the Court held that the BIPA embodies a
fundamental privacy public interest in Illinois. We understand
that, but the federal -- the Fair Credit Reporting Act also
embodies incredibly important public policies about making sure
that people's credit is reported accurately. And the
Supreme Court said that a violation of the FCRA notice and
consent provisions is not necessarily enough to support
standing. You have to show how that violation harmed you.

1  **THE COURT:**  Well, but my finding on summary judgment

2  was based on the Illinois Legislature's statements that

3  biometrics are unlike other unique identifiers.  They're

4  totally special.  And once they're harvested and violated or

5  compromised, the individual has no recourse, and suffers from

6  risk of identity theft and other public-welfare, security, and

7  safety violations or risks; threats of those violations.  It's

8  on page 18 of my Order.

9  So it seems to me the only way has been -- Illinois

10  Legislature has been very specific about saying, *Your*

11  *biometrics are yours, and yours alone; and if they're going to*

12  *be harvested, you have the right to make sure they're harvested*

13  *with your consent.  And if that doesn't happen, you have been*

14  *concretely injured.*  That's all.

15  **MS. GOLDMAN:**  It's that last part, Your Honor, that

16  we would disagree with.

17  So you're absolutely right that the Legislature identified

18  a number of risks that can be associated with the use of

19  biometric technology.  Right?  It talked about the risk of

20  identity theft.  It talked about these other risks.

21  Plaintiffs have not alleged that any of those things have

22  happened here.

23  That's exactly why Judge Coleman, in the *Smarte Carte*

24  case, said that there was no injury.  She said in the absence

25  of disclosure of the biometric information or the concrete risk

1  of such disclosure, there's no injury here.  The mere retention

2  and gathering of the biometric data isn't a concrete injury.

3  So that's -- I mean, this is a Federal Judge in Chicago

4  determining on the basis of the exact same arguments as the

5  plaintiffs are making here.  We went and we looked at the

6  plaintiffs' brief in that case.  They made the exact same

7  arguments.  They cited the same cases.  And Judge Coleman said,

8  *This is not an injury*.

9          **THE COURT:**  Well, a Federal Judge right on this floor

10  to my immediate right, Judge Henderson, said just three months

11  ago, *If anything constitutes a concrete injury in fact, it's*

12  *invasion of privacy*, and rejected a *Spokeo* challenge in a case

13  that he had, which conceptually is not that different than this

14  one.  And that was under the TCPA, one of the world's

15  least-interesting federal statutes -- Telephone Consumer

16  Protection Act -- which basically says, *You cannot get a phone*

17  *call or a text that you didn't solicit*.

18      So if that passes, it's hard for me to see how the ringing

19  endorsement by the Illinois State Legislature on the value and

20  the need to protect unique biometric identifiers is any weaker.

21          **MS. GOLDMAN:**  But Your Honor, there's a difference

22  between --

23      First of all, not every privacy violation is the same.

24      The robocall cases -- and there are many of them -- have

25  held that that is a specific kind of invasion of privacy; that

it is an intrusion on your home; that it creates privacy
problems because you lose your minutes on your cell-phone plan,
and you lose your battery.

**THE COURT:** Let me just jump in.  I mean, getting an
unwanted text on your cell phone seems to me to be several
steps away from, in terms of being much more mild, than having
your biometrics harvested and used without your permission.  I
mean, isn't that more invasive than just getting a text you
didn't want?

**MS. GOLDMAN:**  It's very different in terms of what
the concrete harm is deemed to be.

And I would also point the Court to the *Ewing versus SQM*
case from the Southern District of California, which holds that
a robocall is not a concrete violation, because the plaintiff
couldn't show that she was worse off than she would have been
had the defendant manually dialed her phone number.  So the
robocall cases are under a different statute, and they're all
over the map.  It's not enough to just say, *My privacy was
violated*.

I mean, this goes back to common law standing cases like
the *Low* case, in which Judge Koh said, *You can't just say, you
know, that LinkedIn harvested your information from your
account, shared it with third parties, and your privacy was
violated.  You have to say how it was violated.  What
information about you was shared with the outside world, and*

*how were you harmed by that?*

There is a difference between a right and a concrete injury. That's what the Supreme Court held in *Spokeo*. And that's what the Lower Courts have been holding in the cases that is we've cited in our brief. Magistrate Judge Spero, just a few weeks ago, rejected all of the same arguments.

**THE COURT:** But that was a completely different -- I mean, that case -- the allegation was: You didn't give me a manual.

I mean, that was totally trivial, and easily dispatched lack of harm of any sort. I mean, that one, I'm not troubled by.

But let me pause for a moment, and hear from your opponent.

**MR. BALABANIAN:** Thank you, Your Honor.

I'd like to note I don't think *Spokeo* changed anything. And I'll refer the Court to Judge Kennelly's opinion in the *Aranda versus Caribbean Cruise* case that was recently decided in August, deciding this issue of standing under the TCPA. And Judge Kennelly pointed out that *Spokeo* was not the first case to set forth that both -- that injury must be both concrete and particular as to suffice as injury in fact for constitutional purposes; and frankly, that concreteness and particularity have been the twin pillars of justiciable injury in fact for at least the last 40 years. So it's true that *Spokeo* changed

1   nothing.

2      In particular, *Spokeo* did not create some rule that a

3   statutory violation had to result in some type of a

4   "real-world" -- I'm using quotes -- injury, in order to entitle

5   a plaintiff to Article III standing to sue in federal court.

6      That is exactly -- that is precisely the argument that the

7   defense pushed, and that the Supreme Court rejected, which was,

8   *No, No, no.  If you have a statutory violation, it's not*

9   *enough.  You have to show also that you were harmed*

10  *economically in some way*.

11     And the Supreme Court said, *Absolutely not.  That is not*

12  *the case*.  The Supreme Court --

13         **THE COURT:**  No.  I'm with you on that.  You can have

14  an intangible injury.

15     Just give me your plain and simple articulation of how the

16  plaintiffs in this case were hurt.

17         **MR. BALABANIAN:**  Thank you, Your Honor.

18     Three ways.

19     Well, two theories of injury, so to speak.

20     One, that our clients have a property right in their

21  biometric identifiers, and that that property right was

22  infringed upon.  And that's a tangible injury.  And there is

23  zero dispute across any of the case law that --

24         **THE COURT:**  What does that mean, though?

25         **MR. BALABANIAN:**  What does it mean by having a

1  tangible --

2  **THE COURT:** A property right in your biometric

3  data -- what does that mean?

4  **MR. BALABANIAN:** Well, you have to look at a couple

5  of things. We make the argument that the Illinois Legislature,

6  in passing a separate statute, the Right of Publicity Act, has

7  determined that individuals -- Illinois citizens -- have a

8  right -- a property right -- in their identities; to control

9  their identities.

10  And they have determined -- they have passed legislation

11  that says that that, in and of itself -- a person's identity --

12  is a property right, just like someone's land is a property

13  right. And so when a trespasser comes by and each day puts his

14  finger on a blade of grass on that land, that finger on that

15  blade of grass certainly doesn't effect an economic harm in any

16  way, but that landowner certainly has a right to sue, to eject

17  that person from doing that. And there's no requirement that

18  that person show actual damage, or that that person necessarily

19  shows some kind of embarrassment or whatnot. Common law has

20  recognized those types of actions.

21  And here, if the Court accepts that what we have here is a

22  property right, which the Illinois Legislature says this is --

23  This does constitute a property right.

24  -- by Facebook infringing on that, that's a tangible harm

25  that would allow for Article III injury.

1    But let's put that aside.  Let's put the property right

2  aside.  You also have an informational injury here.  And you

3  can --

4        **THE COURT:**  Well, I just -- I mean, what are you

5  saying?

6    If you are at a social gathering, and a third party that

7  you don't know takes your picture, and then puts it up on her

8  Facebook page, are you saying that you can sue that Facebook

9  user?

10        **MR. BALABANIAN:**  No.

11        **THE COURT:**  How is that different from Facebook doing

12  it?

13        **MR. BALABANIAN:**  Well, Facebook's taking your

14  biometric identifier, which I would say is something much more

15  personal -- and imparts someone's likeness -- than a photograph

16  is.  And someone is not able to extract that information by

17  just taking your picture; but Facebook is.

18        **THE COURT:**  Well, but you just told me that Illinois

19  had passed a statute saying your likeness, meaning your

20  picture, you have a property right in.  So if that's true, then

21  anybody who took your picture without permission, and posted

22  it, would be liable to suit.  I can't buy that.  That cannot be

23  right.

24        **MR. BALABANIAN:**  Well, I --

25        **THE COURT:**  That simply cannot be right.

1     **MR. BALABANIAN:**  I misspoke a little.  They wouldn't

2  be able to use your --

3          **THE COURT:**  Misspoke a little?  What does that mean?

4          **MR. BALABANIAN:**  I left that out.

5          **THE COURT:**  On which part did you misspeak?

6          **MR. BALABANIAN:**  I did not finish what I should have

7  said, which is -- which was they're not allowed to use it for

8  commercial purposes.  And I think that that person would be

9  subject to suit, under the Illinois right.

10         **THE COURT:**  How is Facebook using it for commercial

11  purposes?  It's a free service.  They don't charge anybody for

12  it.

13         **MR. BALABANIAN:**  Well, Facebook derives financial

14  benefit from their collection of that type of information.  I

15  think that will be borne out in discovery.

16         **THE COURT:**  Where is that in the Complaint?

17         **MR. BALABANIAN:**  Ah, I'm not -- I don't know the

18  exact paragraph it is, Your Honor.  Your Honor, I'm not -- I

19  mean I'm having trouble locating the allegation.  I'm not

20  representing necessarily that it's in there, but -- but.

21         **THE COURT:**  Well, just tell me where it is.  Take a

22  moment and find it.  I don't see it.

23      Now, you need to tell me whether it's there or not.

24         **MR. BALABANIAN:**  Yes, Your Honor.

25  (Pause in proceedings.)

(Discussion off the record.)

          **MR. BALABANIAN:**  Well, we don't specifically allege
that they're profiting from it in the -- in the sense of
selling off the information.  We don't -- we don't think that's
what's happening; at least, we don't have any information that
that's happening.

          **THE COURT:**  That argument's not going to help you.

     So what argument is actually going to help you that's
based on the Complaint?

     Here's what I see.  Let me throw you a bone here.  All I
see is allegations, for example, in paragraphs 37 and 38, that
Facebook's unauthorized collection and use of Pezen's biometric
identifiers deprived him of control over that valuable
information.  That's it.

          **MR. BALABANIAN:**  Yes, Your Honor.  I can speak to
that.  The --

          **THE COURT:**  So what does that mean?

          **MR. BALABANIAN:**  Let's put aside the property right.

     You have absolutely an informational injury, and you have
an injury when it comes to the collecting of the biometric
information without consent.

     And the Court touched upon it earlier, when -- when
questioning my opponent, which is that the Illinois Legislature
identified a specific harm that they sought to address in
passing BIPA, which was the protection of privacy, but also the

1 provision of information to Illinois citizens.

2       **THE COURT:** All right. Let me just jump in. So

3 that's my reading of the statute, as I said in my motion; but

4 your Complaint keeps talking about -- your Complaint doesn't

5 really say invasion of privacy. If it does, you need to show

6 me. Now, it has a little bit on the back end, but when you

7 talk of about each of these individual plaintiffs, you go to

8 this thing about they've suffered the loss of valuable

9 information or a diminution in the value of their biometrics.

10 Okay? It's all about value.

11     Now, I'm willing to roll with invasion of privacy, because

12 I think that's right under the case law; but you're not

13 alleging that.

14     And I'm having a real problem understanding what -- I

15 don't even know what that means, for one thing. I don't

16 personally believe that my biometrics are in any way

17 monetizable or valuable. Now, that's fine. That's just me.

18 It doesn't matter. You need to tell me as a matter of law why

19 that's true. Why does it matter? I mean, what case or law

20 says your biometric portrait is valuable to you, and Facebook

21 has deprived you of that? Because that's -- I mean, I'm asking

22 you to tell me. And I didn't hear anything. That's the only

23 concrete injury I see you all alleging, so you're going to have

24 to live or die by that.

25       **MR. BALABANIAN:** We're not simply alleging that it's

1   a property right, Your Honor.  We allege that --

2          **THE COURT:**  Well, then show me.  That's what I'm

3   telling you.

4          **MR. BALABANIAN:**  Sure.  Okay.

5          **THE COURT:**  Tell me where else in the Complaint you

6   allege a different concrete injury.  That's the only one I saw.

7   Now you have your chance here to tell me what I missed.

8          **MR. BALABANIAN:**  Page 10 of 20 in the Complaint,

9   speaking of Pezen's experience, Your Honor, it points out at

10   paragraph 33 that Pezen never gave consent, agreed, or

11   permission --

12          **THE COURT:**  What page are you talking about?

13          **MR. BALABANIAN:**  10 of 20, as far as the docket.

14          **THE COURT:**  Give me the paragraph number.

15          **MR. BALABANIAN:**  33, Your Honor.  Excuse me.

16          **THE COURT:**  All right.  Okay.

17          **MR. BALABANIAN:**  So Pezen alleges that he never

18   consented or agreed or gave permission in any way for Facebook

19   to collect its biometric information, but that it did so

20   regardless.  So we don't use the legal conclusion, saying

21   Facebook invaded Pezen's privacy; but the conclusion that can

22   be drawn from those factual allegations is that certainly an

23   invasion of privacy took place.

24      And that was the other side of my argument, which is --

25   put aside the property-right issue -- you certainly have an

invasion of privacy which the Supreme Court has elevated to a cognizable cause of action; something that can be sued on under Article III.  Here --

    **THE COURT:**  All right.  Well, let me -- okay.  I mean, I thought you were going to point to paragraph 66, which I think is a lot better for you, because in paragraph 66 you do allege that the violation is to the class' rights to privacy in their biometric identifiers, as set forth in the statute.  And that, to me, which you did not point to, but I found, makes sense.  So tell me more about that.  Why is that a specific concrete injury?

    **MR. BALABANIAN:**  Well, it -- you look to -- based on *Spokeo*, you look to a couple of things.  You look to the point of the statute; what harm the Legislature was seeking to address.

    And, as I was saying and the Court pointed out earlier, one, it's the invasion of privacy; but two, it's really informing consumers about this new type of information that's being gathered about them, and the fear that consumers would be giving out this information without full knowledge of what the implications are.

    It wasn't necessarily focused solely on, you know, misuse or disclosure or whatnot.

    The point is and the situation that arose in that instance before the statute was passed was where a company had collected

1  the information, and everyone thought it was a reputable

2  source.  It turned out not to be.  The company that had the

3  information went bankrupt, and nobody knew what was happening

4  with the information.

5      The fear wasn't entirely that the information was going to

6  be disclosed without consent, or used for nefarious purposes;

7  but that consumers -- there was an absolute dearth of

8  information when it came to this type of new technology.

9      And beyond that, Illinois was concerned -- was interested

10  in actually utilizing this type of technology.

11          THE COURT:  Well, let me just jump in.  Isn't it true

12  that Illinois has a constitutional right to privacy?

13          MR. BALABANIAN:  Yes.

14          THE COURT:  All right.  And isn't it true, in your

15  view, that the BIPA is the Legislature's attempt to protect

16  that constitutionally enshrined right of privacy, in the face

17  of new biometric-collection technology?

18          MR. BALABANIAN:  I believe that it's the

19  Legislature's attempt to codify rights of privacy that both

20  exist in the Illinois Constitution and at common law.

21          THE COURT:  All right.  Why isn't that enough,

22  Ms. Goldman?

23          MS. GOLDMAN:  Because plaintiffs have to show more

24  than that they have a statutory right.  They have to show an

25  actual injury.  And case after case from this Court, both

1  before and after --

2          **THE COURT:**  Constitutional right.  Right to privacy.

3          **MS. GOLDMAN:**  It's still a constitutional right, but

4  they have to show an injury.  And the Court held in *Spokeo* that

5  a right is not enough; that Article III requires a concrete

6  injury, even in the face of a statutory -- of a violation of a

7  statutory right.

8          And while legislatures have some --

9          There are several problems with plaintiffs' privacy

10  argument.  First is that they don't allege any harm.  They

11  allege that there was an analysis sitting in a service -- in a

12  server somewhere.  They're not saying that was ever disclosed

13  to the public, or that they were harmed as a result.  And those

14  are the two requirements.

15          **THE COURT:**  Isn't the tagging -- the whole point of

16  tagging is you just -- I mean, you're talking about the actual

17  biometric data?  Because certainly their pictures are shown to

18  people.  You're talking about the biometric data.  All right.

19          **MS. GOLDMAN:**  Well, but in the Complaint the only

20  privacy violation --

21          First of all, the Complaint just says *Facebook violated my*

22  *statutory rights, so it violated my privacy rights*.  There's no

23  allegation of how those privacy rights were infringed.  So

24  that's one problem.

25          Another problem is that the Complaint is not couched in

1  terms of --

2      **THE COURT:**  Well, let's just pause on that for a

3  moment.  So just see it my way for a moment, because I have

4  found that Illinois has said biometric data is protected; you

5  have a privacy stake in it.

6      Why is the mere harvesting not enough; the unconsented-to

7  harvesting?  Why is that not enough to be invasion?

8      **MS. GOLDMAN:**  Because Courts in this Circuit have

9  held, both before and after *Spokeo* --

10     This is *In Re: Facebook Internet*.  This is *Low*.  This is

11  *Zappos*.

12     -- that the harvesting of personal information, even

13  information to which you have a right to privacy, does not

14  constitute a concrete injury unless you can show either a

15  concrete intangible harm, like that this was disclosed to third

16  parties and it embarrassed you, or harmed your credit, or you

17  were fired.  You have to show that something happened to you in

18  the real world.

19     So that was true under the common law, and it's true under

20  a statute.  Those are now the same two analyses under *Spokeo*.

21     Second --

22     **THE COURT:**  Let's pause on that just a moment.

23     So what's your response to that?

24     **MR. BALABANIAN:**  This goes back to their argument

25  that unless the statutory violation tracks specifically a

common law claim, that it doesn't -- it can't be elevated to

allow for suit in federal court.  And that's just not the case.

So what *Spokeo* said was that -- that what's instructive is

that a statutory right close --

**THE COURT:**  Let me fine-tune this for you.

Your opponent is saying -- I'll put it in my terms -- *It has to be harvesting plus.*  Okay?  And there is some case-law basis for that.  What is the plus in your case?  They've harvested it.  You've alleged that.  We'll assume for the sake of today that's true.  What's the plus?

**MR. BALABANIAN:**  My opponent is incorrect.  It's not harvesting plus.

**THE COURT:**  What is the plus?  You have no -- I mean, do you have a plus?

**MR. BALABANIAN:**  Well, you could say the plus is the informational injury:  The fact that they're not allowed to take it, first of all, without consent; but also they have to provide certain disclosures.

And when you are deprived of those disclosures, just like the many cases that we cited recently, post *Spokeo*, where Judge -- where informational injury has been found, both by the Eleventh Circuit in the *Church* case, in the Eastern District of Virginia by Judge Chen, in the Northern District of Illinois in the -- excuse me -- the *Bayshore* case, which we did not cite, but it came out recently, Your Honor.  That's the *Lane versus*

1  *Bayview* case.  Excuse me -- that informational injury is

2  sufficient.

3      And the Supreme Court said in the -- pointing to the

4  *Akins* case and the *Public Citizen* case, that when you're

5  deprived -- that Congress is allowed to pass a statute that

6  elevates a claim to an injury, that allows for article -- that

7  allows for suit in federal court, where you have been deprived

8  of information.  And it doesn't matter that -- that the

9  government deprived you of the information.

10      That was sort of the argument that they tried to make in

11  the FOIA context, and in the context of *Akins* and *Public*

12  *Citizen*; that a legislature can pass a statute that requires

13  private entities to -- to provide disclosures to their

14  consumers; and when those disclosures weren't provided, that

15  that is an intangible injury that is sufficient for Article III

16  purposes.

17      So when you look at the *Church* case, in that case I

18  believe it was an FDCPA disclosure.  The plaintiff was deprived

19  of an FDCPA disclosure.  And the Eleventh Circuit said, *Well,*

20  *looking to Spokeo, Spokeo says if you're deprived of*

21  *informational injury* [sic]*, then* -- *if you're deprived of*

22  *information* -- excuse me -- *you suffer an informational injury.*

23  And that is enough for Article III.  *Akin* says that*, Public*

24  *Citizen* says that, and *Spokeo* says that.

25      And here that's exactly what you have.  You have a taking

1    of the information without consent.  And you have no provision

2    of the information that's required to be provided, that the

3    Illinois Legislature says has to be provided.

4         **THE COURT:**  I'm not sure you're reading that -- I

5    mean, those cases all -- the foundation for those cases was the

6    plaintiff had a right to get certain information, and was

7    deprived of that.  For example, a FOIA request may have been

8    unfairly -- this is a concept illustration -- unfairly denied.

9         That is different from saying somebody collected

10   information about you without your consent.

11        **MR. BALABANIAN:**  But --

12        **THE COURT:**  I'm saying concepts.

13        **MR. BALABANIAN:**  But the Illinois Legislature says

14   you have that right.  You have the right to those disclosures.

15   So no different than a FOIA request.  The fact that --

16        **THE COURT:**  Yeah, but you're running -- this is

17   Article III.  Okay?

18        **MR. BALABANIAN:**  Yes.

19        **THE COURT:**  State legislators do not grant or define

20   the parameters of this Court's jurisdiction.  That is defined

21   by Article III.  There are plenty of examples where there is a

22   state right that someone may have been deprived of.  That does

23   not amount to an Article III case, because the plaintiff does

24   not have Article III standing.

25        State legislators do not grant the jurisdiction of this

Court.

So the fact that the state legislature said *X* does not answer the question.

The question is:  Is there a particularized and concrete harm within the long line of cases, of which *Spokeo* is only the most recent iteration, in my view -- there is nothing terribly novel about it, at all -- that shows that you cross those tests?

So the mere fact that the legislators said *X* in Illinois doesn't answer the Article III question.

**MR. BALABANIAN:**  Well, it -- the question is:  Did the Legislature identify a harm that the statute seeks to address?  And does the statute address that harm?

And if so, then you can -- then it can be said that there was a substantive right created.

**THE COURT:**  No.  That's a bridge too far.  It cannot just be said.  That is the whole point of the inquiry.  It cannot just be said that if a state law was broken, you have Article III standing; otherwise these cases would not exist. You cannot do that.

**MR. BALABANIAN:**  I'm not saying that, Your Honor.

**THE COURT:**  You just said it can be said.

You cannot say that.  You have to prove it.  You've got to show it up.

**MR. BALABANIAN:**  Right.

**THE COURT:** And that means you have to plead -- not prove, but plead an injury in fact, concrete and particularized.

Let me -- we've got to close it, because I've got some other things to do.

**MS. GOLDMAN:** Can I just make a couple more --

**THE COURT:** Yes. Go ahead.

**MS. GOLDMAN:** Your Honor is exactly correct that neither Congress nor the Illinois General Assembly can alter the hard floor of Article III jurisdiction. That's the whole point of *Spokeo*. It's whole point of all of these other cases.

Plaintiffs have to show that they have alleged a concrete real-world injury that is analogous to -- not identical to, but analogous to not just a right that existed at the time of the founding of common law, but a harm that's supported a lout.

**THE COURT:** That's another problem that I have. You know, there are a couple of Justices -- we keep focusing on what happened 200 --

What is George Washington's position on the harvesting of biometric data? Okay. Are you able to tell me that?

(Laughter in the courtroom.)

**MS. GOLDMAN:** Your Honor, I am not suggesting --

**THE COURT:** Alexander Hamilton? Anybody?

Who from that generation had a position that is in any way helpful to the Federal Court in 2016?

1          **MS. GOLDMAN:**  Your Honor --

2          **THE COURT:**  So, you know, the Court says these

3    things.  It comes in the jury-trial rights, too.  Oh, let's

4    look back at what happened, you know, 200 years ago, before

5    there was electricity.  I mean, how is this possibly useful for

6    the Court?

7          **MS. GOLDMAN:**  Your Honor.

8          **THE COURT:**  You don't have to answer that.  It's

9    just --

10         **MS. GOLDMAN:**  It take your point, Your Honor.

11         **THE COURT:**  That is my burden; not yours.

12         **MS. GOLDMAN:**  The plaintiffs have not alleged any

13   harm that is in any way analogous to anything that has

14   supported a claim at common law at the time of the founding, in

15   the 19th Century when privacy rights --

16         **THE COURT:**  My last trivial point is:  They can't,

17   because there are historical realities that simply don't

18   overlap.  So the fact that this cannot be traced to something

19   in the 18th Century is not, in my view, even relevant.

20      But let me ask you this.  Now, two of these cases were

21   removed.  Right?  I have four of these things.  Two were

22   removed, and two were original federal jurisdiction.  Is that

23   right?

24         **MR. BALABANIAN:**  Ah.

25         **THE COURT:**  Two were original filed in federal court.

And one came from California state court, and one came from
Illinois state court.

    **MR. BALABANIAN:** Correct, Your Honor.

    **THE COURT:** Okay. Now, don't read anything into
this, but I'm just gaming out paths.

    Now, if I find -- you know, if I deny the motion, then
we're fine.

    But if I grant it, isn't it right outcome for those two
cases to be remanded to state court?

    **MR. BALABANIAN:** Yes. I think that our case would
have to be severed from the other two that were consolidated --
or actually not consolidated, but related to.

    Ours would have to be remanded to state court.

    **THE COURT:** The two removed cases would have to be
remanded?

    **MR. BALABANIAN:** I believe so. Yes, Your Honor.

    **THE COURT:** Would you agree with that, Ms. Goldman?

    **MS. GOLDMAN:** Yes, Your Honor.

    **THE COURT:** Okay. All right. That proved less
controversial than I thought. Okay. That's good.

    **MR. MILIAN:** I was just here to say the *Gullen* case
was removed. And so I fully agree, if Your Honor were to go
that route.

    **THE COURT:** Now, while you're here -- so look. We're
going to keep everything rolling until I decide. All right?

1   Nothing is stayed.  We're not stopping anything.

2       Let me do a couple housekeeping things.

3       You all filed a proposed protective order in *Gullen*, I

4   think?

5               MR. MILIAN:  Yes, Your Honor.

6           THE COURT:  Okay.  Is that identical to the one I

7   entered in the *In Re:  Facebook*?

8               MR. MILIAN:  Completely identical.  Yes, sir.

9           THE COURT:  Okay.  So consider that entered.

10              MR. MILIAN:  Thank you.

11          THE COURT:  Facebook you want to amend your answer.

12  Is that right?

13              MS. GOLDMAN:  Yes, Your Honor.  I --

14          THE COURT:  Okay.  That seems fine.  So is there any

15  problem with that?

16              MR. MILIAN:  Yes.  We have opposed it.

17          THE COURT:  I know you opposed it, but what -- it's a

18  Rule 15 -- there really -- what is the reason for saying no?

19  Why do we have to go through all of this?  They're just

20  adding -- you're adding an affirmative --

21      Hold on.

22      You're adding an Affirmative Defense, basically?

23          MS. GOLDMAN:  Correct, Your Honor, within the

24  deadline that the Court imposed for adding such things.

25          MR. MILIAN:  Judge, the defense is it's vague and

frankly, it's futile.  It's an Affirmative Defense that says the statute is unconstitutional, for unspecified reasons; among them is a vague reference to a Dormant Commerce Clause.

**THE COURT:**  Well, maybe I misunderstood.  I thought you were just adding a Dormant Commerce Clause --

**MS. GOLDMAN:**  We are just adding a Dormant Commerce Clause argument, Your Honor, on which plaintiffs have already sought discovery and taken discovery.

**THE COURT:**  It's just a dormant -- there's no mystery.  It's the Dormant Commerce Clause.

**MS. GOLDMAN:**  Correct.

**MR. MILIAN:**  Well, it wasn't quite worded that way, Judge.  It was quite broad.

**THE COURT:**  That's why we're talking.  So that is your commitment.  It's just Dormant Commerce Clause?

**MS. GOLDMAN:**  Correct, Your Honor.

**THE COURT:**  I can't imagine there's any reason not to do that, so I'll grant the motion.  Just file a timely amendment.

And let's see.  Oh, I hate to ask.  Mr. Williams, can you come up?

All right.  You indicated that you were making progress on discovery?

**MR. WILLIAMS:**  Indeed, we were, Your Honor.  And I think we submitted a letter on October 11th that actually

outlined where we ended up with that.  We reached agreement on several things.

   **THE COURT:**  Two weeks ago.  So --

   **MR. WILLIAMS:**  That's right.  We took a deposition on October 18th.  I think there are some issues that may arise from that that defendants want to move for a protective order on.

  There are some outstanding issues that you'll see in the letter that we weren't able to reach agreement on; and I don't think that it was due to a lack of trying.  I think that the positions that the defendants --

   **THE COURT:**  Now, you two met in person?  Quality time together?

   **MR. NADOLENCO:**  Quality time.  I flew up here.

   **THE COURT:**  Coffee?

   **MR. WILLIAMS:**  Coffee?  Breakfast.  I treated.

   **MR. NADOLENCO:**  I owe him.

   **THE COURT:**  Yeah.

   **MR. WILLIAMS:**  So with the outstanding issues, Your Honor, we talked about them.

   **THE COURT:**  Wait a second now.  So you're going to send me some briefing on the protective order you want?

   **MR. NADOLENCO:**  Correct, Your Honor.

   **THE COURT:**  What can I help you with today?

   **MR. WILLIAMS:**  I'm not sure we --

1       THE COURT:  Nothing?  Okay.

2       MR. WILLIAMS:  I don't think you can help us.  I

3  think they have taken a really clear position that what we've

4  asked for that we haven't been able to agree to is simply not

5  something they're willing to produce or look for.  And they

6  want to file a protective order on it.  We don't think that

7  it's --

8       THE COURT:  I thought that was just for the

9  deposition.  Is it more than that?

10      MR. WILLIAMS:  No.  There are a number of other

11 issues.

12      MR. NADOLENCO:  There are three issues where -- I was

13 speaking with Mr. Rhodes prior to the hearing.  I think the

14 next steps on those are to submit a proposed briefing schedule

15 to Your Honor.  We'll file our motion for protective order.  We

16 can include the issues that arose at the depo.

17      THE COURT:  Now, let me just -- why do you have to

18 file an order?  Can't you just send me the discovery letters?

19 Why do you have to make it a motion for protective order?

20      MR. NADOLENCO:  We can proceed however --

21      THE COURT:  Just do it as discovery.  I mean, do you

22 need extra?  Do you need extra pages?

23      MR. NADOLENCO:  We needed more than the pages that we

24 were seeking.

25      THE COURT:  Can you do it in seven pages each?  There

1  are multiple issues.

2        **MR. NADOLENCO:**  There are.  And there are about four

3  issues.  So if we could have --

4        **THE COURT:**  How about ten pages each?

5        **MR. NADOLENCO:**  Very well, Your Honor.

6        **THE COURT:**  And you just do that in the next week or

7  two.

8        **MR. NADOLENCO:**  Two weeks would be terrific.

9        **THE COURT:**  You can respond.  Two weeks' response?

10       **MR. WILLIAMS:**  That's fine.

11       **THE COURT:**  Probably just have a phone call.

12     Anything else I can help you with today?

13       **MR. NADOLENCO:**  No, thank you, Your Honor.

14     (At 10:49 a.m. the proceedings were adjourned.)

15  I certify that the foregoing is a correct transcript from the

16  record of proceedings in the above-entitled matter.

17

18  *Lydia Zinn*

19  _____        October 28, 2016

    Signature of Court Reporter/Transcriber    Date

20  Lydia Zinn

21

22

23

24

25