**ROBBINS GELLER RUDMAN & DOWD LLP**

| Atlanta | Chicago | Melville | Philadelphia | San Francisco |
| Boca Raton | Manhattan | Nashville | San Diego | Washington, DC |

<u>**UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**</u>

November 28, 2016

<u>VIA ECF</u>

Honorable James Donato
United States District Court
450 Golden Gate Avenue
San Francisco, California 94102

      Re: *In re Facebook Biometric Info. Privacy Litig.*, No. 3:15-cv-03747-JD (N.D. Cal.);
            *Gullen v. Facebook, Inc.*, No. 3:16-cv-00937-JD (N.D. Cal.)

Dear Judge Donato:

      Pursuant to the Court's Minute Order filed October 28, 2016 (Dkt. No. 162), and in response to Facebook Inc.'s ("Facebook" or the "Company") November 10, 2016 letter (Dkt. No. 168), plaintiffs in the above-referenced actions submit this letter brief on outstanding discovery disputes. For months, Facebook has refused to produce – and now belatedly seeks a protective order for – documents relating to: (1) lobbying activity with respect to Illinois' Biometric Information Privacy Act, 740 ILCS 14/1 *et seq.* ("BIPA"); (2) European authorities' investigation into the same Facial Recognition Technology at issue here; (3) Facebook's acquisition of Face.com; and (4) Facebook's patents related to its Facial Recognition Technology. The parties also dispute Facebook's unilateral redaction of documents for relevance and deficient responses to interrogatories and requests for admission.

      **A.**    **Documents Related to Facebook's BIPA Lobbying**

      Immediately after the Court denied Facebook's motions to dismiss, Facebook and others in the technology industry began lobbying the Illinois legislature to amend BIPA retroactively to carve out and exempt their current practices. Information relating to these lobbying efforts is plainly relevant to, *inter alia*, Facebook's knowing violations of BIPA and damages. *See* BIPA, 740 ILCS 14/20(2); *see, e.g.*, *Stalling v. Union Pac. R.R. Co.*, 2003 U.S. Dist. LEXIS 9550, at *20 (N.D. Ill. June 6, 2003) (lobbying efforts relevant to establish that "Defendants knew they had a common law duty which they lobbied to change").

      Facebook's reliance on the *Noerr-Pennington* doctrine is misplaced. "*Noerr-Pennington* is by definition an exemption from . . . liability, and ***not a bar to discovery of evidence***." *N.C. Elec. Membership Corp. v. Carolina Power & Light Co.*, 666 F.2d 50, 53 (4th Cir. 1981)[1]; *Barnes Found. v. Twp. of Lower Merion*, 1996 U.S. Dist. LEXIS 19472, at *14-*15 (E.D. Pa. Dec. 19, 1996)

---

[1] All emphasis is added and citations and footnotes are omitted unless otherwise noted.

Honorable James Donato
November 28, 2016
Page 2

(same). Accordingly, courts routinely allow discovery of documents and communications related to lobbying activities. *See, e.g.*, *Stalling*, 2003 U.S. Dist. LEXIS 9550, at *19-*20 (overruling *Noerr-Pennington* objections and permitting discovery into lobbying efforts); *Gen. Motors Corp. v. Johnson Matthey, Inc.*, 887 F. Supp. 1240, 1246 (E.D. Wis. 1995) (same).

The cases cited by Facebook applying *Noerr-Pennington* are inapposite. Each concerns not discovery, but rather whether the party had produced sufficient evidence to establish antitrust liability. In this case, Facebook's lobbying efforts themselves do not constitute a basis for liability under BIPA; the *Noerr-Pennington* doctrine is therefore inapplicable. *See United States ex rel. Maranto v. Maxxam, Inc.*, 2009 U.S. Dist. LEXIS 14375, at *18 (N.D. Cal. Feb. 9, 2009) ("*Noerr-Pennington* doctrine does not apply because it merely precludes liability from being imposed for the ***act of petitioning*** the government. Plaintiffs do not assert that Facebook violated the False Claims Act by 'petitioning' the government . . . .") (emphasis in original).

Though Facebook raises a purported Illinois state-law privilege, it has failed to provide a log as required by the Federal Rules of Civil Procedure and the Court's Standing Order for Discovery in Civil Cases Before Judge Donato ("Standing Order for Discovery").[2] An objecting party must produce a privilege log that "describe[s] the nature of the documents" withheld to "enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A)(ii); Standing Order for Discovery, ¶7 ("Privilege logs shall promptly be provided and must be sufficiently detailed and informative to justify the privilege."); *Perry v. Schwarzenegger*, 591 F.3d 1126, 1133 n.1 (9th Cir. 2009).[3]

Facebook has failed to establish that its communications with lobbyists are privileged under Illinois law.[4] Facebook cites to no Illinois decision finding lobbying communications privileged. To the contrary, Facebook acknowledges case law holding the opposite. *See* Dkt. No. 168 at 7 n.3 (citing *Dukes v. Pneumo Abex Corp.*, 900 N.E.2d 1128, 1145 (Ill. App. Ct. 2008)). And in the absence of a privilege log, Facebook cannot establish that communications were made in

---

[2] Facebook also failed, at the time of production, to provide "the specific custodian, source and location for each produced item." *See* Standing Order for Discovery, ¶4.

[3] *See also Johnson v. Runnels*, 2009 U.S. Dist. LEXIS 34086, at *17-*18 (E.D. Cal. Mar. 31, 2009) ("Refusal to produce discovery based on a blanket assertion of privilege and without a proper privilege log is clearly not an appropriate response to the discovery request."); *Stalling v. Union Pac. R.R. Co.*, 2003 U.S. Dist. LEXIS 12419, at *7 ("Even if there are outstanding privilege disputes, as defendants seem to contend, they have made it impossible for us to decide them. Defendants, who have admitted that only some of their lobbying documents are privileged, have not submitted a privilege log or made any attempt to describe which documents are subject to which privilege.").

[4] Moreover, to the extent any state-law privileges apply under Federal Rule of Evidence 501, it is likely the law of California that governs. *See Fid. Nat'l Fin., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburg, PA*, 2014 U.S. Dist. LEXIS 49854, at *15 n.4 (S.D. Cal. Apr. 9, 2014) (when applying state privileges under Rule 501, generally "[f]ederal courts apply the law of the forum state").

Honorable James Donato
November 28, 2016
Page 3

"confidence," and that such confidentiality was "'essential'" to the to the parties' relationship. *Ill. Educ. Labor Relations Bd. v. Homer Cnty. Consol. Sch. Dist.*, 547 N.E. 2d 182, 185 (Ill. 1989). Finally, Facebook's argument that discovery into its lobbying communications would unnecessarily "chill" protected speech is a non-starter – if that argument were correct, non-public communications protected by the First Amendment would never be discoverable in Illinois. It is clear that is not the state of the law.

> **B.** **Documents Related to the European Union's Investigation into the Scope and Privacy Implications of Facebook's Facial Recognition Technology**

The European Union ("EU"), specifically the Irish Data Protection Commissioner ("IDPC"), banned Facebook's use of its Facial Recognition Technology. The EU issued the ban following a comprehensive study of the scope of information collected and the very privacy and security concerns articulated by the Illinois legislature. *See* BIPA, 740 ILCS 14/15(g). Facebook confirmed that it "does not currently offer . . . the ability to have [face] templates created and stored" from photographs uploaded by users located in the EU, and that all previously collected "biometric profiles of EU users have been deleted." *See* Submission by "Facebook Ireland Ltd" to the Office of the Irish Data Protection Commissioner at 1, 10.[5] This demonstrates that Facebook can disable its Facial Recognition Technology geographically, including by analyzing the IP addresses of devices uploading photographs.[6] Moreover, Facebook submitted documents to the IDPC authorities describing how its Facial Recognition Technology performs, specifically stating that it does in fact "scan" photos:

> *We are able to suggest that your friend tag you in a picture by scanning and comparing your friend's pictures to information* we've put together from the other photos you have been tagged in.

> \*   \*   \*

> We currently use facial recognition software that uses an algorithm to calculate a unique number ("template") based on someone's facial features like the

---

[5] Available at http://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&ved=0ahUKEwilt3bkdTPAhXowlQKHSJwBhgQFgggMAA&url=http%3A%2F%2Fwww.europe-v-facebook.org%2FFINAL_-_Complaint_9_-_Facial_Recognition.pdf&usg=AFQjCNF_-FVals8F-42j8gpHvrQ2T_o0Gw&sig2=oYficzZT0G9PNM6qP-kKgA&bvm=bv.135475266,d.cGw (last visited Nov. 28, 2016).

[6] In Facebook's most recent Quarterly Report on Form 10-Q, submitted on November 3, 2016, the Company stated that "our data regarding the geographic location of our users is estimated based on a number of factors, *such as the user's IP address* and self-disclosed location." *See* Facebook, Inc., Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, 4, 51 (Nov. 3, 2016), http://d1lge852tjjqow.cloudfront.net/CIK-0001326801/67314d37-e2d2-4855-a8bd-2959c6e53acf.pdf.

1208448_1

> distance between the eyes, nose and ears. This template is based on photos you've been tagged in . . . .

*See* Submission by "Facebook Ireland Ltd" to the Office of the Irish Data Protection Commissioner, at 2.[7] And at deposition, Yaniv Taigman, Facebook's designated 30(b)(6) witness, confirmed that the sentence emphasized above correctly describes how the Facial Recognition Technology performs in the United States. *See* Transcript of Deposition of Yaniv Taigman, dated October 18, 2016 at 249:16-252:3. Documents compiled by Facebook regarding the EU proceedings are thus plainly relevant. Facebook makes four arguments to justify its refusal to produce. Each argument fails.

*First*, a relevant matter for discovery is "'any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case.'" *Baptiste v. Lids*, 2013 U.S. Dist. LEXIS 150413, at *3 (N.D. Cal. Oct. 18, 2013) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)). Documents related to the EU investigation concern the very technology and privacy implications at the heart of this case. Not only does this information relate to Facebook's knowledge of its collection of biometric identifiers of all individuals who appear in user-uploaded photos, it is also plainly relevant to Facebook's technical ability to disable its Facial Recognition Technology geographically, to identifying the overall geographic scope of the alleged unlawful conduct, and to Facebook's proposed Dormant Commerce Clause defense.[8] Yet Facebook categorically refuses to produce any of it, erroneously claiming that the Court already ruled on its relevance.

Facebook's argument that information related to the EU inquiry is irrelevant because the class definition is limited to the state of Illinois is also misplaced. Courts are "'not bound by the class definition proposed in the complaint.'" *Bueche v. Fid. Nat'l Mgmt. Servs., LLC*, 2014 U.S. Dist. LEXIS 77660, at *5 (E.D. Cal. May 30, 2014). Class definitions do not control the scope of discovery; rather, "'the shape and form of a class action evolves only through the process of discovery.'" *In re Wal-Mart Stores, Inc.*, 505 F. Supp. 2d 609, 615 (N.D. Cal. 2007).[9]

---

[7] *See also* Order re Motion to Dismiss and Summary Judgment (Dkt. No. 120) at 22 ("As the facts develop, it may be that 'scan' and 'photograph' with respect to Facebook's practices take on technical dimensions that might affect the BIPA claims.").

[8] In fact, this information when combined with Facebook's public admissions that it can locate photographs by city (*see infra* at 10), entirely undercut Facebook's Dormant Commerce Clause argument.

[9] *See also Sandoval v. Cty. of Sonoma*, 2015 U.S. Dist. LEXIS 55571, at *4-*5 (N.D. Cal. Apr. 27, 2015) ("In class action litigation, the class is defined by the order granting certification. . . . There is no rule that the definition of a certified class must exactly match the definition contained in a complaint . . . . 'to assume that the definition of the Plaintiff class alleged in the complaint is ultimately binding on the Court . . . is an inaccurate assumption.'").

*Second*, the requested documents are not cumulative. The requested documents directly contradict Facebook's continued denial that its Facial Recognition Technology scans photographs and collects biometric data. That Facebook believes it will ultimately produce other relevant documents does not make the requested documents cumulative. In fact, production of the EU-related documents could actually limit the need for additional productions. Plaintiffs' requests for admission, for example, ask whether Facebook's Facial Recognition Technology scans photographs and collects biometric data. Despite what it has already told the IDPC and stated at deposition, Facebook continues to deny these facts. *See* Dkt. No. 146-1 at 24.

*Third*, international comity does not excuse Facebook from producing relevant documents. As discussed above, plaintiffs' request is not limited to documents actually submitted to the EU. It would, of course, include Facebook's own internal documents related to the EU inquiry. International comity is thus no concern. And here, "[t]he Supreme Court and the Ninth Circuit agree that comity and foreign law alone are not dispositive when a discovery dispute arises regarding a foreign law's protection of documents sought in a United States court." *Fenerjian v. Nong Shim Co.*, 2016 U.S. Dist. LEXIS 7311, at *11 (N.D. Cal. Jan. 21, 2016). Moreover, Facebook ignores that "'[t]he party relying on foreign law has the burden of showing that such law bars production [of documents].'" *Id*. at *13 (quoting *United States v. Vetco, Inc*., 691 F.2d 1281, 1289 (9th Cir. 1981)). But Facebook cites to nothing more than an "Annual Report" by the IDPC, wherein the IDPC, before outlining general examples of its work with multinational technology companies, noted "it is not possible to publicly disclose details of our engagement with these organisations." Annual Report of the Data Protection Commissioner of Ireland, at 12 (2014), https://www.dataprotection.ie/docimages/documents/Annual%20Report%202014.pdf. This vague statement is not "law" or even regulation; Facebook has thus failed to meet its burden. *Cf. BrightEdge Techs., Inc. v. Searchmetrics, GmbH*, 2014 U.S. Dist. LEXIS 112377, at *5 n.2 (N.D. Cal. Aug. 13, 2014) (compelling disclosure even where "[Defendant] identifie[d] three laws that . . . prevent it from disclosing personal data in this litigation").

Likewise, *Campbell v. Facebook Inc.*, 2015 U.S. Dist. LEXIS 95702 (N.D. Cal. July 21, 2015), is inapposite. There, plaintiffs alleged that Facebook was improperly scanning users' private email messages and sought documents related to the IDPC's audit reports of Facebook. Yet the IDPC expressly stated that Facebook's private messaging system was beyond the scope of its audit. *Id*. at *10. *Campbell,* unlike this case, had nothing to do with Facebook's Facial Recognition Technology, let alone anything suggesting that Facebook's submissions to the IDPC directly contradicted its statements concerning the Facial Recognition Technology, whether it scans photographs and collects biometric data, or the like. Furthermore, plaintiffs here seek Facebook's *own* documents submitted to the IDPC, not production by the IDPC or documents that body itself created. *Campbell* expressly recognized that, like here, the "situation may be different from circumstances where a party is simply asked to produce its own documents." *Id*. at *14 n.4.

***Fourth***, Facebook's assertion of "undue burden" is entirely unfounded. Although Facebook asserts that it "will need to seek permission from the IDPC" before producing its own documents to plaintiffs, Facebook has provided no legal authority that would preclude it from disclosing the requested material. Facebook should be ordered to produce all documents related to investigations by the EU and the IDPC related to its Facial Recognition Technology.

### C. Information Related to Facebook's Acquisition of Face.com

Facebook agrees that documents related to its acquisition of Face.com are relevant and in a prior submission to this Court on October 11, 2016, agreed to produce them. *See* Dkt. No. at 158 at 2. During the deposition of Mr. Taigman on October 18, 2016, however, Facebook changed its position, improperly instructing Mr. Taigman not to answer any questions about the acquisition.[10]

Information related to Facebook's acquisition of Face.com is relevant to the value and monetization of the biometrics Facebook misappropriated from plaintiffs, and thus directly relevant to the complaint's allegations that "Facebook misappropriated the value of [plaintiffs'] biometric identifiers" (*see* Dkt. No. 40, ¶¶37, 44, 51) and whether "Facebook has sold, leased, traded, or otherwise profited from Plaintiffs' and the Class's biometrics identifiers." *See id*. ¶55(d); *see also* BIPA, 740 ILCS 14/15(c). It also relates to how Facebook's Technology actually works and Facebook's knowledge and intent. *See* BIPA, 740 ILCS 14/20.

Yet Facebook says that "plaintiffs have no need for discovery on this issue" because "the complaints do not even allege that Facebook has benefitted commercially from Tag Suggestions" and "plaintiffs have never asserted an unjust enrichment claim in this case." Dkt. No. 168 at 4-5. Facebook ignores that plaintiffs are entitled to pursue ***any*** and ***all*** legal theories entitling them to relief under the facts alleged. *See Alvarez v. Hill*, 518 F.3d 1152, 1157 (9th Cir. 2008) ("A complaint need not identify the statutory or constitutional source of the claim raised . . . ."). Moreover, information regarding the value of Plaintiffs' misappropriated biometrics may bear on the existence of an injury-in-fact. *See, e.g.*, *Boelter v. Hearst Commc'ns, Inc*., 2016 U.S. Dist. LEXIS 85025, at *10 (S.D.N.Y. June 17, 2016) (plaintiffs had Article III standing based on allegations that the defendant, after collecting plaintiffs' personal reading information without authorization, "unjustly retained the economic benefit the value of that information conferred"); *see also* BIPA, 740 ILCS 14/15(b).

### D. Information Concerning Facebook's Patents

Information regarding Facebook's patents governing its Facial Recognition Technology is relevant to, *inter alia*, how Facebook's Facial Recognition Technology works, Facebook's

---

[10] *See* Standing Order for Discovery, ¶13.

1208448_1

knowledge of its violations of BIPA, and the value and monetization of the biometrics misappropriated from plaintiffs.

Again, Facebook asserts a purported attorney-client privilege, yet refuses to substantiate it in a privilege log. Nor is this information cumulative. How Facebook describes the Facial Recognition Technology in its patents offers unique insight into how this technology actually works and how the Company believes that it works. That the patents are "publicly available" (Dkt. No. 168 at 5) is inconsequential for several reasons. First, no "publicly available" exception exists in the Federal Rules. Plaintiffs are entitled to all responsive documents to determine which of the many patents concern the Facial Recognition Technology. Second, the requested documents are relevant to whether Facebook has licensed its Facial Recognition Technology and facial database to others in violation of BIPA. *See* BIPA, 740 ILCS 14/15(c). Third, the requested information is not limited to the patents themselves, but includes documents and information relating to those patents, including Facebook's internal communications, which will offer further non-public insight into how the Company describes and views its own Facial Recognition Technology, all directly relevant to knowledge and damages.

### E. Facebook's Unilateral Redactions for Relevance

Facebook's has produced heavily redacted versions of responsive documents based on its unilateral determination that certain portions of those documents are irrelevant. Facebook ignores the overwhelming jurisprudence in this District and around the country disfavoring such redactions, especially where, as here, there is a protective order in place.[11] The Court should order Facebook to cease redacting for relevance, and to produce unredacted versions of documents already produced. *Cf. In re Akebia Therapeutics, Inc.*, 2015 U.S. Dist. LEXIS 179042, at *4 (N.D. Cal. Mar. 9, 2015) (ordering producing party to "'make the 510 notebooks available for [requesting party's] inspection, whereupon it will be [requesting party's] burden to review the notebooks for relevant information'").

To date, 99 of the 967 documents produced by Facebook have been redacted. With respect to 34 of those redactions, plaintiffs have repeatedly requested a redaction log, but still have not received one. Of those redactions for which a log has been provided, 50 out of 65 were redacted for

---

[11] *See Live Nation Merch., Inc. v. Miller*, 2014 U.S. Dist. LEXIS 65174, at *8 (N.D. Cal. May 9, 2014) ("[R]edactions of otherwise discoverable documents here are unwarranted because [the] concern about protecting privacy interests and confidential/proprietary information could be addressed through a protective order. As courts have recognized, this type of unilateral redaction is disfavored, and a protective order could ensure the confidentiality of sensitive information."); *Evon v. Law Offices of Sidney Mickell*, 2010 U.S. Dist. LEXIS 20666, at *5 n.1 (E.D. Cal. Feb. 3, 2010) ("[A] party should not take it upon him, her or itself to decide unilaterally what context is necessary for the non-redacted part disclosed, and what might be useless to the case.").

supposedly "Nonresponsive Information."[12] The vague explanations provided by Facebook, however, largely *confirm* the relevance of the redacted information. For example, one of the most frequently cited reasons is that redacted information concerns "potential future uses of facial recognition technology that were not implemented." *Id*. But there are myriad ways in which such information could be relevant or lead to the discovery of relevant evidence. Potential applications of the Facial Recognition Technology is likely to shed light on the kind of information gathered, the manner in which it is stored, the Facial Recognition Technology's capabilities, and discussions about future not-yet-implemented applications of the technology that bear on Facebook's application of it during the relevant time period.[13]

Facebook's explanations make no sense given other information available in the documents. For instance, Facebook claims to have redacted information supposedly "unrelated to facial recognition and tag suggestions." Redaction Log. Yet these broad characterizations do not square with titles such as "Face Recognition" and "Web-Scale Training for Face Identification," that appear on their face to pertain *entirely* to the subject matter of this litigation. At the very least, plaintiffs and their experts are entitled to review these critical documents in the same, unredacted form that Facebook employees would have in the regular course of business. *See* Fed. R. Civ. P. 34(b)(2)(E)(i) (requiring documents be produced "as they are kept in the usual course of business"); *see also HR Tech., Inc. v. Imura Int'l U.S.A., Inc.*, 2010 U.S. Dist. LEXIS 121921, at *17-*18 (D. Kan. Nov. 17, 2010) ("'[T]he duty to "produce documents as they are kept in the usual course of business" includes the substantive contents of those documents. . . . ***There is no express or implied support for the insertion of another step*** in the process (with its attendant expense and delay) ***in which a party would scrub responsive documents of non-responsive information***.'").

Ironically, Facebook, through its redactions for relevance, is attempting to shield the most relevant information from production. By redacting hundreds of pages as "unrelated to facial recognition and tag suggestions" (Redaction Log), Facebook appears to be withholding information pertaining to its collection of scans of face geometry from photographs in the first instance, because the process of collecting face scans (of users and non-users alike) necessarily precedes Facebook's application of "facial recognition or tag suggestions." Yet it is the collection of a scan of face geometry – not Facebook's application of tag suggestions technology to a harvested face scan – that is the critical conduct giving rise to any violation of BIPA. *See* BIPA, 740 ILCS 14/15(b) ("No private entity may collect, capture, purchase, receive through trade, or otherwise obtain a person's

---

[12] Facebook Inc. Document Redaction Log, dated September 8, 2016 ("Redaction Log").

[13] Another explanation that confirms relevance is where documents contained "information specific to non-United States Facebook users." *Id*. For all the reasons discussed above, *supra* at 4-5, this information is relevant and should not be redacted.

or a customer's biometric identifier or biometric information, unless it first . . . ."); BIPA, 740 ILCS 14/15(c)-(e) ("[n]o private entity *in possession of* a biometric identifier or biometric information").

The baselessness of Facebook's relevancy objections is further confirmed by certain identifiable deficiencies in Facebook's redaction process. Counsel for plaintiffs have located a public version of FBBIPA_0001203, a highly relevant document produced by Facebook with redactions. The fact that the document was redacted at all even though it is available on the Internet is troubling in and of itself, but the information redacted is far more concerning. The unredacted version reveals highly relevant information about the total number of photos uploaded to Facebook and the rates at which photos are uploaded to Facebook: "->200 Billion Photos ->300M Photos Uploaded/Day ->3500 Photos Every Sec" *See* Yaniv Taigman, Web-Scale Training for Face Identification, http://www.cs.tau.ac.il/~wolf/deeplearningmeeting/pdfs/deepface_masterclass.pdf (last visited Nov. 28, 2016). Had plaintiffs' counsel not stumbled upon this information on the Internet, we would never have known that Facebook was redacting information that bears directly on the scope and number of violations at issue in this case. Without production of unredacted versions of the rest of Facebook's production, we may never know how many other supposedly irrelevant portions of these documents in fact contain highly relevant material. Moreover, defense counsel has admittedly redacted source code as irrelevant without review by anyone who can actually decipher source code.

### F. Responses to Plaintiffs' Interrogatories and Requests for Admission

Facebook's deficient responses remain in dispute.

Plaintiffs' Request For Admission No. 3 asks whether Facebook's Facial Recognition Technology "converts the measurements of facial features . . . from faces uploaded in photographs . . . into mathematical codes." And Request for Admission No. 6 concerns "Facebook's ability to suggest tags of photos involved the scanning of photos." As discussed above, Facebook has admitted publicly that its Facial Recognition Technology converts biometric information into an algorithm, and that it is able to suggest tags of photos based on the information it collects from photographs. *See supra* at 4. Yet Facebook continues to deny the very facts it has otherwise admitted.

Interrogatory No. 14 seeks the number of photos of faces uploaded to Facebook from Illinois IP addresses – highly relevant information no doubt within Facebook's possession, custody, and control. In a letter dated September 16, 2016, Facebook agreed to "provide an amended response to plaintiffs' Interrogatory No. 14 that identifies the number of photographs uploaded to Facebook since January 1, 2010 which (a) have been tagged with Facebook users, and (b) were uploaded from "'Illinois IP addresses.'" In a letter dated September 23, 2016, plaintiffs explained that Facebook's amended response should not be limited to photos "tagged" with Facebook users – particularly because the *Gullen* action specifically alleges claims for violation of BIPA on behalf of Illinois **non-users of Facebook** who appear in photographs uploaded to Facebook. On October 11,

Honorable James Donato
November 28, 2016
Page 10

2016, Facebook said it "is engaged in ongoing discussion with the Company's engineers to determine whether this can be done and will continue meeting and conferring with plaintiffs about these issues." Dkt. No. 158 at 4. Documents produced by Facebook, however, confirm that this can be done and that Facebook knows the state from which every photo is uploaded. For example, FBBIPA_00001103 shows that Facer detection requests are sent to servers in particular regions of the country for processing based on the state of upload: "so for example we direct Oregon detect requests, 50% to East and 50% to Carolina by changing the site var as follows." Similarly, in FBBIPA_00000756 Facebook admits that by focusing on the city in which a photograph is uploaded, Facebook is able to determine the country of upload.

It has been over two months since Facebook agreed to provide an amended response to Interrogatory No. 14. To date, Facebook has failed to amend any of its responses and has provided no reason for its delay. The Court should compel Facebook to amend its responses to all of plaintiffs' interrogatories, including Interrogatory No. 14.

## CONCLUSION

In light of this Court's July 27, 2016 Scheduling Order providing a December 1, 2016 deadline for the substantial completion of document productions and a fact discovery cut-off of February 3, 2017 (*see* Dkt. No. 137), plaintiffs are particularly concerned with Facebook's delay and refusal to produce. Indeed, plaintiffs have yet to receive the bulk of Facebook's production even though the substantial completion deadline is three days away. Accordingly, the Court should compel Facebook to respond and produce as outlined above.

Respectfully submitted,

SHAWN A. WILLIAMS

SAW:rb

1208448_1

**Robbins Geller Rudman & Dowd LLP**

| Atlanta | Chicago | Melville | Philadelphia | San Francisco |
| Boca Raton | Manhattan | Nashville | San Diego | Washington, DC |

## CERTIFICATE OF SERVICE

I hereby certify that on November 28, 2016, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 28, 2016.

s/ Shawn A. Williams
SHAWN A. WILLIAMS

ROBBINS GELLER RUDMAN
  & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
E-mail: shawnw@rgrdlaw.com