# Exhibit 1 to

# Nadolenco Declaration

## (*Facebook Biometric* Motion for Summary Judgment)

Pages 1 - 40

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JAMES DONATO

```
IN RE FACEBOOK BIOMETRIC        )
INFORMATION PRIVACY LITIGATION  )
                                )
                                ) No. C 15-3747 JD
--------------------------------  )
                                )
FREDERICK WILLIAM GULLEN, on behalf)
of himself and all others similarly)
situated,                       )
                                ) No. C 16-0937 JD
           Plaintiff,           )
      vs.                       )
                                ) San Francisco, California
FACEBOOK, INC.,                 ) November 30, 2017
                                ) 10:00 a.m.
           Defendant.           )
_____)
```

### TRANSCRIPT OF PROCEEDINGS

**APPEARANCES**:

**For User Plaintiffs:**      EDELSON PC
                              350 North LaSalle Street
                              13th Floor
                              Chicago, Illinois 60654
                        BY:   **ALEXANDER GLENN TIEVSKY, ESQ.**


                              ROBBINS GELLER RUDMAN & DOWD, LLP
                              One Montgomery Street
                              Suite 1800
                              San Francisco, California 94104
                        BY:   **DAVID WILLIAM HALL, ESQ.**


               **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
            Official Reporter - US District Court
            Computerized Transcription By Eclipse

1   **APPEARANCES:   (CONTINUED)**

2

3   **For Plaintiff**              CAREY RODRIGUEZ MILIAN GONYA, LLP
    **Gullen:**                    1395 Brickell Avenue
                                   Suite 700
4                                  Miami, Florida 33131
                              BY:  **DAVID PHILIP MILIAN**
5

6

7   **For Defendant:**             MAYER BROWN, LLP
                                   1221 Avenue of the Americas
                                   New York, New York 10020
8                             BY:  **LAUREN R. GOLDMAN, ESQ.**

9                                      —  —  —

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **Thursday - November 30, 2017**                    **10:06 a.m.** |
| 2 | <u>P R O C E E D I N G S</u> |
| 3 | ---oOo--- |
| 4 | **THE CLERK:**  Calling related actions Civil 15-3747, In |
| 5 | Re Facebook Biometric Privacy Litigation, and Civil 16-937, |
| 6 | Gullen versus Facebook. |
| 7 | Counsel, please state your appearances for the record. |
| 8 | **MR. TIEVSKY:**  Good morning, your Honor.  Alexander |
| 9 | Tievsky for the In Re Facebook Biometric plaintiffs. |
| 10 | **MR. MILIAN:**  Good morning, your Honor.  David Milian |
| 11 | for Frederick Gullen. |
| 12 | **MS. GOLDMAN:**  Good morning, your Honor.  Lauren |
| 13 | Goldman for Defendant Facebook.  I'm here with my client Nikki |
| 14 | Sokol of Facebook. |
| 15 | **THE COURT:**  Tievsky? |
| 16 | **MR. TIEVSKY:**  Tievsky. |
| 17 | **THE COURT:**  Are you driving on the plaintiff's side |
| 18 | today? |
| 19 | **MR. TIEVSKY:**  Yes, your Honor. |
| 20 | **THE COURT:**  Okay, good.  All right. |
| 21 | All right.  Well, Facebook has brought the motion.  You do |
| 22 | have the burden under jurisdictional issues. |
| 23 | **MR. TIEVSKY:**  Would you like me to begin, your Honor? |
| 24 | **THE COURT:**  Yes, please. |
| 25 | **MR. TIEVSKY:**  So I think that -- |

1           **THE COURT:**  Just to jump in, there are two things I'm

2    most interested in, but I'll share that with you as we go

3    along.

4           **MR. TIEVSKY:**  Okay.  So I guess I would like to start

5    with the -- I think the landscape became on these issues much

6    clearer yesterday.

7           **THE COURT:**  Yesterday?

8           **MR. TIEVSKY:**  Yesterday, your Honor.  We filed --

9           **THE COURT:**  What happened yesterday?  Oh, that thing

10   you filed?  Okay.

11          **MR. TIEVSKY:**  Yes.  The Ninth Circuit issued an

12   opinion --

13          **THE COURT:**  I don't mean it to be deflationary, but

14   go ahead.

15          **MR. TIEVSKY:**  No, it's fine.

16   The Ninth Circuit issued an opinion in *Eichenberger v*

17   *ESPN*, which was a Video Privacy Protection Act case.  It was

18   quite clear that this is a statute that generally protects

19   privacy interests; that it is a context specific extension of

20   the right to privacy by statute and that any invasion of that

21   right is a concrete injury in fact that's sufficient for

22   standing.

23       And that lines up with the rest of the Ninth Circuit

24   authority on this issue.  In *Van Patten,* the *TCPA* case, as this

25   Court pointed out about a year ago when we had the last hearing

1   here, you know, if anything, this is more invasive than a text

2   message or phone call.  And Facebook's response to that last

3   time was:  Well, there are other District Court case that's

4   found a TCPA violation is not good enough for standing.  And

5   that argument is now foreclosed by the Ninth Circuit in

6   *Van Patten*.

7          So I think, I think that pretty much answers the question,

8   you know, the only other things that came up where Facebook

9   argued:  Well, it's the harassment, or in *Spokeo* the loss of a

10  job opportunity that created the standing.  And, you know, the

11  Ninth Circuit has been very clear since then that that's not

12  the case.

13         In *Spokeo* the Ninth Circuit said it's not the fact that he

14  lost a specific job opportunity.

15         In *Eichenberger* the other day the Ninth Circuit says it's

16  not -- you know, the statute doesn't protect against

17  harassment.  The statute protects against violations of

18  privacy.  That's what we've got here.  That's really the main

19  point.

20         There is an unpublished Second Circuit case, *Take-Two* that

21  does involve this statute that came out the other week.  That's

22  a very different factual scenario.

23              **THE COURT:**  That's *Vigil*, right?

24              **MR. TIEVSKY:**  That's the one, yes, your Honor.

25              **THE COURT:**  That was last week?

1          MR. TIEVSKY:  A few weeks ago, I guess.

2          THE COURT:  Okay.  Well, let me ask you this.  What

3     do you think the concrete injury is alleged in the Complaint?

4          MR. TIEVSKY:  The concrete injury is the invasion of

5     privacy caused by the collection of the biometric identifier,

6     the face print, right?  So that invasion of plaintiff's and

7     putative class members' privacy is a concrete injury in fact

8     because, as the Ninth Circuit explained in *Eichenberger*, the

9     Illinois legislature made a context specific extension of the

10    right to privacy.  That's well grounded in common law, as your

11    Honor pointed out last time, in the Illinois Constitution, too.

12    And that's an interesting thought.

13         THE COURT:  Less pass on that for a moment.  What

14    exactly was the invasion in this case?  How was your client's

15    privacy invaded?

16         MR. TIEVSKY:  It's the unauthorized collection of the

17    biometric identifier of the face print.  So a picture gets

18    uploaded, maybe by them, maybe by somebody else, and without

19    telling them what they are doing -- I understand Facebook has

20    some ideas about consent and what their data policy says, but

21    it is not obvious that this is what they are doing and, yet,

22    they are taking these pictures.  They are scraping the

23    biometric identifiers off of it.

24         It's like if you put your hand up to this like a picture

25    and they took your fingerprint off it.  You're not expecting

```
 1    them to do it.  And they have not gotten consent to do it.
 2    And, yet, they are taking this very private information that
 3    the Illinois legislature tried to protect.
 4         THE COURT:  So we have been churning along here for a
 5    good long time and is it the plaintiff's position that there is
 6    no evidence that Facebook did a notice and consent for tagging
 7    people under the BIPA; is that right?
 8         MR. TIEVSKY:  There is no evidence that there is --
 9    that there is sufficient consent that a person could reasonably
10    understand that this is what they are doing.
11         You know, maybe if you sat in a deposition with Facebook's
12    lawyer for two hours and they walked you through everything and
13    explained what they thought it meant, you might understand it.
14         But -- but, no.  Looking at it on its face, it's not
15    obvious.  They don't get consent and they don't disclose what
16    they are doing.
17         THE COURT:  What do you understand -- this is the
18    issue, one of the issues I want to raise because I'm quite
19    interested in it.  What do you understand the function of
20    consent to be under the BIPA?
21         MR. TIEVSKY:  The function of subsequent -- I mean,
22    this is a consent-based statute, right?  It doesn't -- the
23    whole idea is to facilitate biometric transactions, right?
24         So the function of consent is to -- so that the consumer
25    or whoever's biometric information is being collected has
```

1  control over their own biometrics, right?  These things that

2  are very personal to their body.

3          THE COURT:  And under your reading of the BIPA, when

4  is consent supposed to be obtained from the consumer?

5          MR. TIEVSKY:  Before the information is collected.

6          THE COURT:  Okay.

7          MR. TIEVSKY:  If you collect the information without

8  consent and you haven't gotten it and you collect it, then

9  you've violated the statute.

10         THE COURT:  All right.  Now, I think that's going to

11 be the heart of the issue on whether that's concrete and

12 particularized enough, but to round this out, I did not see --

13 this is your chance to tell me if I missed it.  I did not see

14 any substantive allegations in the Complaint or anywhere else

15 that Facebook has monetized the biometric data, sold it,

16 misused it in any way; is that right?  You're not contending

17 that?

18         MR. TIEVSKY:  We're not contending that.  I don't

19 think that's required by the statute.

20         THE COURT:  Well, I understand, but you're not --

21 you're not contending that the -- your clients have been harmed

22 in any way by misuse of the biometric data?

23         MR. TIEVSKY:  We are in the sense that it is -- it is

24 misuse to have it at all.

25         THE COURT:  Leaving that aside, you're not -- just

| | |
|---|---|
| 1 | talking practically here, okay?  You're not contending that |
| 2 | Facebook sold to it a third party, used it for advertising |
| 3 | purposes or did anything else downstream from the actual |
| 4 | collection that has harmed your client; is that right? |
| 5 | **MR. TIEVSKY:**  No.  We don't believe that any |
| 6 | consequential harm -- we don't know if any consequential harm |
| 7 | resulted.  We haven't found that it happened.  We don't |
| 8 | think -- |
| 9 | **THE COURT:**  You're not planting your flag on |
| 10 | downstream harm. |
| 11 | **MR. TIEVSKY:**  That's correct. |
| 12 | **THE COURT:**  Okay, good. |
| 13 | All right.  Let me hear from Facebook.  So what is your |
| 14 | understanding of the consent function under the BIPA? |
| 15 | **MS. GOLDMAN:**  The consent function in the BIPA |
| 16 | requires a defendant to obtain informed consent from people |
| 17 | from whom it collects biometric data.  That's the purpose of |
| 18 | the statute. |
| 19 | But what the plaintiffs haven't alleged is that to the |
| 20 | extent Facebook failed to comply with the letter of BIPA, it |
| 21 | harmed them.  They don't say in the Complaint and they didn't |
| 22 | say in their deposition that they suffered any form of harm as |
| 23 | a result of Facebook's alleged failure to comply with the |
| 24 | letter of BIPA.  And Facebook -- |
| 25 | **THE COURT:**  Let me just jump in on that. |

1      They were denied the right to say no.  Why isn't that a

2  cognizable harm?

3      The way I read BIPA it says:  Before you do this, before

4  you collect what the Illinois state legislature has declared to

5  be the unique biometric identifiers of you, as a person, you

6  need to have -- you need to give the person whose data you're

7  collecting the right to say no.  And Facebook didn't do that.

8      That seems to me to be a highly concrete and

9  particularized harm.  I mean, taking away the right to say no

10 is a deprivation.

11          **MS. GOLDMAN:**  Your Honor, putting to one side the

12 fact that Facebook did disclose what it was doing, that it said

13 so in its data policy --

14          **THE COURT:**  I do want to get to that.

15          **MS. GOLDMAN:**  Putting that to one side, what the

16 Court has identified is the alleged violation of the statute.

17     But under the Ninth Circuit's remand decision in *Spokeo*

18 *II*, under the Supreme Court's decision in *Spokeo I*, plaintiffs

19 can't just say:  You denied me the right to say no.  They have

20 to say that they were harmed as a result.  And they have

21 steadfastly refused to identify any harm that has come to them

22 as a result of that violation.  They have not said, for

23 example, that they would have said no.

24          **THE COURT:**  Well, let me jump in.  I have a different

25 reading of Ninth Circuit law.

1          So in *Syed vs M-1*, 853 F.3d 492 at 499, this is, gosh;

2     eight months ago, March 2017.  The Circuit held that a portion

3     of the FCRA, quote:

4               "Creates a right to privacy by enabling

5          applicants to withhold permission to obtain the report

6          from the perspective employer and a concrete injury

7          when applicants are deprived of their ability to

8          meaningfully authorize the credit check."

9          In other words, I happen to agree with this.  The right to

10    say no is a valuable commodity, particularly when it comes to

11    decisions about controlling the absolutely most personal

12    aspects of your life:  Your face, your fingerprints, who you

13    are to the world.

14         So I don't see how saying no is just a procedural

15    violation.  That's a big deal.

16         **MS. GOLDMAN:**  Here is why, your Honor.  I would point

17    the Court to Page 499 of that same opinion.

18         **THE COURT:**  I just read from 499.

19         **MS. GOLDMAN:**  But I want to point you to different

20    language on that page.

21         The Court in *Syed* withdrew its opinion and reissued it to

22    make clear that you have to look at what Syed's allegations of

23    harm were.

24         And the Court says:

25               "We can fairly infer that Syed was confused by

1          the inclusion of the liability waiver with the

2          disclosure and would not have signed it had it

3          contained a sufficiently clear disclosure, as required

4          in the statute."

5      The plaintiff made allegations from which the Court

6  inferred that he would have done something differently had the

7  Defendant complied with the statute.

8      And that is what these plaintiffs have steadfastly refused

9  to do.  They have not said -- they have not even said:  I'm

10  upset that Facebook took this information from me.  We have now

11  deposed three out of the four named plaintiffs.  Each one of

12  them said that they were not harmed by this.

13      The whole point of these *Spokeo* cases, and all of the

14  other cases that have addressed standing after *Spokeo*, is that

15  you can't have a case where the plaintiff says:  I'm not harmed

16  and you have these lawyer-driven, no injury class actions.

17      These people under oath were asked if they could identify

18  any harm that had come to them as a result of Facebook's use of

19  facial recognition, as a result of Facebook's analysis of

20  photos that they and their friends had voluntarily uploaded.

21          **THE COURT:**  Let me just jump in.

22      I think you all agree on that, as I understand it, and the

23  plaintiffs are not saying Facebook in any way misused it.  So

24  you're all on the same page with that.

25          **MS. GOLDMAN:**  And --

1        **THE COURT:**  But -- but the point is the one I raised

2   earlier, which is Illinois gave its citizens the right to say

3   no and Facebook -- the allegation is Facebook usurped that

4   right.  And that is not a mere technicality, in my view.

5        **MS. GOLDMAN:**  And that is --

6        **THE COURT:**  Let me just jump to, so what do you

7   think -- so we agree there is no formal BIPA notice that

8   Facebook sent out, right?

9        **MS. GOLDMAN:**  I'm not conceding that, but we can --

10       **THE COURT:**  If you're not conceding it, tell me where

11  it is.

12       **MS. GOLDMAN:**  Facebook informed users that it was

13  analyzing their photos and that it was going to -- what

14  Facebook said was that -- in the data policy, which the Court

15  found that the plaintiffs agreed to, it said:

16       "We are able to suggest that your friend tag you

17       in a picture by comparing your friend's pictures to

18       information we put together from your profile pictures

19       and the other photos in which you have been tagged.

20       If this feature is enabled for you, you can control

21       whether we suggest that another user tag you in the

22       photo using the timeline and tagging settings.  We

23       store data for as long as it's necessary to provide

24       products and services to you and others."

25  So in plain English it's was saying we're analyzing the

```
 1   photos your friends upload.  We're analyzing the photos in
 2   which you have been tagged.  We are comparing the two and we
 3   use that in order to suggest that your friends tag you in a
 4   photo, and here is how you can turn it off.
 5              THE COURT:  But did Facebook anywhere say -- I didn't
 6   see it, so you can tell me if I missed it.
 7         Where, if anywhere, did Facebook say expressly that a
 8   biometric identifier is being collected or stored?
 9              MS. GOLDMAN:  It did not use those words.  But, first
10   of all, I mean, as the Second Circuit observed last week in the
11   Vigil case, plaintiffs don't allege that had Facebook used
12   magic words like "biometric identifier" or "face print," they
13   would have done anything differently.
14         Facebook was telling them what it was doing with this
15   information.  They chose to interact with Facebook.  They chose
16   to agree to Facebook's terms.  And Facebook informed them what
17   it was doing with their information.  That's enough.
18         And I -- I just want to go back to the Court's earlier
19   point.  What the court is focusing on is the statutory
20   violation, but that's only half the question.  The other half
21   of the question is what harm did that cause?
22         And if the Court looks at the remand decision in Spokeo,
23   it's clear that this is an integral part of the analysis.  It's
24   what does the plaintiff allege in terms of concrete real-world
25   consequences of the Defendant's statutory violation.
```

1    So the Ninth Circuit in the *Robins* case said that the

2    plaintiff had specifically alleged -- and I'm -- here I'm

3    quoting:

4         "He's out of work and looking for a job, but that

5         *Spokeo's* inaccurate reports have caused actual harm to

6         his employment prospects by misrepresenting facts that

7         would be relevant to employers and that he suffers

8         from anxiety and stress and concern and/or worry about

9         his diminished prospects as a result."

10   If all that Mr. Robins had to show was that *Spokeo* had

11   violated FCRA, that would have been the end of the discussion.

12   The Court would have no need to analyze these personalized

13   allegations of what happened to him as a result.

14   What the Court said is that the plaintiff has to allege

15   that the violation caused him to suffer some harm that actually

16   exists in the world.  That's real-world harm.  That's what the

17   plaintiffs here are saying they don't have to show.  Not only

18   have they not alleged it, they have testified that they haven't

19   suffered it.

20   So, I mean, Mr. Pezen was asked at his deposition whether

21   he could identify any harm, any harm that has occurred to you

22   because of tag suggestions, and he said, "No.  Personally, no."

23   So you can't have -- I mean, the point of this is to see

24   whether there is a case or controversy.  How can there be a

25   case or controversy when their clients say:  I haven't been

1   harmed.

2       I mean, it's even more remote -- I want to talk for a

3   minute about the Gullen case, which is the non-users.

4   Mr. Gullen at his deposition said:  What I'm really upset about

5   is there is a template of my face associated with my identity

6   sitting on Facebook's server.

7       There's not.  We have shown there is not.  He's a

8   non-user.  Facebook doesn't know who Mr. Gullen is, what he

9   looks like, what his face looks like, how to find him, anything

10  about him.  Facebook knows nothing about him.  He doesn't use

11  Facebook.

12          THE COURT:  Well, what's troubling me is that

13  Illinois granted its citizens the right to say no, to control

14  their data, and that was -- they were deprived of that.

15      It's hard for me to see how that's not enough.  You can't

16  grant a statute that says your biometric data is unique and

17  special and valuable and you have the right to control whether

18  somebody can harvest it and what they can do with it.  And the

19  threshold of that is you have to be told a company is going to

20  use your biometric data or collect it.  You have to be given

21  the opportunity to say:  Please, do not do that.  That did not

22  happen here.

23          MS. GOLDMAN:  They were given the opportunity --

24          THE COURT:  Well, I don't -- you're reading a lot

25  into high level waiver now or terms of use agreement.

1          I'm still reflecting on that, but I do think this is not a

2     mere misuse of a zip code or some other technical violation

3     under a statute.  This is who you are and Illinois saying you

4     have the right to have some hand in how that's collected and

5     used.

6               MS. GOLDMAN:  That's the statutory --

7               THE COURT:  And depriving people of that is a

8     problem.

9               MS. GOLDMAN:  But it's not -- that's the statutory

10    right.  That's only half the analysis, your Honor.  You still

11    have to look at what the harm was that flowed from that.

12         Plaintiffs are relying on this *Eichenberger* case that came

13    down yesterday from the Ninth Circuit.  And that's actually

14    very instructive because what *Eichenberger* was about was the

15    misuse of the plaintiff's data and the sharing of it with third

16    parties.

17         So what ESPN did was it gathered information about the

18    plaintiff's video watching habits and it shared that

19    information with an analytics company.  And what the court said

20    was that this was a substantive violation and not a procedural

21    one because they shared it with third parties.

22         And we've always said in all of our briefing on this and

23    the Courts have always said that when you share information

24    with third parties against the will of the person from whom you

25    conflicted it, that can be a per se violation.  That was the

```
 1    Third Circuit's decision in Nickelodeon.   Eichenberger is
 2    totally consistent with that.
 3       But that's not what happened here.  What plaintiffs are
 4    saying, the user plaintiffs are saying is that they chose to
 5    join Facebook.  They chose to have their photographs on
 6    Facebook and that Facebook gathered information about them and
 7    it's sitting there securely on Facebook's servers.  They are
 8    not alleging that it could --
 9          THE COURT:  I really don't think -- you're -- you're
10    barking up a plus tree that I don't think actually exists.  And
11    the reason I don't think -- I mean, the Supreme Court has held
12    long before Spokeo, harkening back to Ward v Selden, that:
13             "Illegally protected interests may exist solely
14          by virtue of statutes creating legal rights, the
15          invasion of which creates standing."
16       You don't have to show that you were granted a statutory
17    right and then you lost your arm or your bank account was
18    seized or your house was burned down or you lost a job.  The
19    statutory right alone can create the -- the image of a
20    statutory right alone is enough.
21          MS. GOLDMAN:  Your Honor, that's exactly what the
22    Supreme Court said in Spokeo was not enough.  Some statutes --
23          THE COURT:  I was just reading from Vigil.  It's a
24    post-Spokeo case.
25          MS. GOLDMAN:  Yes, some statutes street rights that
```

1    standing alone are enough.  A notice and consent statute does

2    not.

3         So I would point the Court, for example, to the Ninth

4    Circuit's remand opinion in *Spokeo II*, to the footnote where

5    the Court says:  We're focusing on the particular provisions of

6    FCRA that Mr. Robins is invoking here which govern the

7    dissemination of inaccurate information about him to third

8    parties.

9         The Court specifically says he was originally proceeding

10   under other sections of the statute, which did not involve the

11   dissemination of information about him.  And those would have

12   caused great difficulty for his standing argument.  This is

13   footnote two of the opinion.

14       He's now said that he's no longer proceeding under those

15   provisions.  So we're just looking at the particular provisions

16   of the statute that govern the unauthorized dissemination of

17   information.  The Court said --

18           **THE COURT:**  Let me just jump in.

19       You keep saying something I just don't think is right.

20   The Supreme Court expressly said in *Spokeo*:

21           "The violation of a procedural right granted by

22       statute can be sufficient to constitute injury in

23       fact."

24       136 Supreme Court at 1549.

25       You keep saying that they didn't say that or they

1  retracted it.  It's just not true.  *Spokeo* says plain as day a

2  procedural right in and of itself can, when deprived, be enough

3  for standing.

4           MS. GOLDMAN:  The Court was talking about a narrow

5  category of statutes, like statutes that say the government

6  can't restrict your right to freedom of speech or freedom of

7  religion or the situation in *Havens* where the person was, you

8  know, harmed by the fact that the Defendant was engaging in

9  racially discriminatory housing practices.

10     The Court was not saying a violation of any old statute

11  standing alone were enough.  That was the whole point of the

12  decision.

13           THE COURT:  No one here is saying any old statute is

14  enough.  We're saying here that the BIPA granted a substantive

15  right to say no.  That's what we're talking about.

16     It's not any old statute, counsel.  We're talking about

17  the case in front of us.

18           MS. GOLDMAN:  The --

19           THE COURT:  Anyway, let's hear from Mr. Tievsky.

20  Anything in response?

21           MR. TIEVSKY:  I do.  I have a couple things, your

22  Honor.

23           THE COURT:  Yes.

24           MR. TIEVSKY:  The first is that the *Spokeo* itself,

25  were represented by the same counsel, is extremely unhappy with

1    the decision from the Ninth Circuit and is petitioning for

2    *certiorari* again --

3              THE COURT:  Well, let's not characterize, counsel.

4    Just talk about the law.

5              MR. TIEVSKY:  Sure.

6         With regard to *Eichenberger*, and counsel's reading of it

7    is pretty aggressive.  The Court concluded that the VPPA

8    codified, I'm quoting here:

9              "...a context specific extension of the

10             substantive," in italics, "right to privacy."

11        And then:

12             "Accordingly every," again in italics,

13             "disclosure of an individual's personally identifiable

14             information and video viewing history offends the

15             interest the statute protects."

16        In other words, when a statute protects a substantive

17   right, which this Court has already found that BIPA does, then

18   that's -- that's enough for standing.

19        And I'd add that it's not about embarrassment or

20   harassment or any kind of consequence or harm flowing from

21   that.  It's not even limited to disclosure.  So the

22   reasoning --

23             THE COURT:  I mean, don't you agree the Illinois

24   statute was saying you have the right to say:  No, don't do

25   this unless I give you my permission.  Right?  I mean, isn't

1    that sort of the core of your case?

2              MR. TIEVSKY:  Yes, your Honor.  It is absolutely the

3    core.  The core is -- I'm quoting from *Eichenberger* again:

4              "Ensuring that consumers retain control over

5         their personal information."

6    I think that's another way of saying the right to say no.

7    I don't -- I agree with the Court.  I don't think that

8    there is any need to demonstrate any more than that.

9              With regard to the depositions of our clients, harm -- we

10   have been standing here arguing about it for an after hour now.

11   It's --

12             THE COURT:  What's that?

13             MR. TIEVSKY:  We have been standing here talking

14   about it for some time now.  Eight Justices of the Supreme

15   Court had to write three opinions to decide what harm meant.

16   If you ask a layperson, "Have you been harmed?" that is not a

17   meaningful question and their answers are not meaningful in

18   terms of have they been injured in fact.

19             In any event, the question gets at the downstream harm

20   that, as the Ninth Circuit has held and as the Court pointed

21   out, just isn't required by the law.  Never has been.

22             THE COURT:  Well, but it doesn't really matter

23   because you're not arguing it anyway, right?

24             MR. TIEVSKY:  And we're not arguing it anyway.

25             THE COURT:  Okay.

```
 1              MR. TIEVSKY:  The last very small thing is the user
 2    agreement --
 3              THE COURT:  Can I ask you one other question?  Sorry.
 4    We'll get to that.
 5              MR. TIEVSKY:  Sure.
 6              THE COURT:  In some ways this is really just a fight
 7    about which court you're going to be in, right?  If for some
 8    reason -- this is a hypothetical.  No one should read anything
 9    into this.  But if for some reason it turns out maybe it's not
10    enough to have Article III standing, you just go back to
11    Illinois.
12              MR. TIEVSKY:  For one of the cases.
13              THE COURT:  For Illinois state court.
14              MR. TIEVSKY:  For Mr. Licata's case.
15         For the other two plaintiffs, they filed initially in
16    federal court, so their cases would be dismissed without
17    prejudice.
18              THE COURT:  They could refile.
19              MR. TIEVSKY:  They could refile, yes.
20              THE COURT:  Isn't there some attraction to letting an
21    Illinois Court interpret an Illinois state statute?
22              MR. TIEVSKY:  There could be.
23              THE COURT:  Rather than a little old District judge
24    out here in San Francisco.  Isn't there some charm in letting
25    the home team handle it?
```

1          **MR. TIEVSKY:**  Certainly.  I'm an Illinois attorney.

2    I don't mind handling it --

3          **THE COURT:**  Are you?  You're from Chicago?

4          **MR. TIEVSKY:**  I am.  I'm admitted pro hac vice to

5    this court.  I certainly don't mind litigating in Chicago.

6          I would say that it could create an unnecessary personal

7    jurisdiction fight.  Facebook is down the street.  And, you

8    know, Facebook is the one who asked to transfer out here.  You

9    know, it frankly -- you know, we're certainly happy to be in

10   this courtroom.  We're happy to be in Chicago, too.

11         **THE COURT:**  I see, okay.

12         Did you want to add something?

13         **MR. TIEVSKY:**  Yes, just one more.  One more thing on

14   the data policy.  I'm looking at Exhibit A On docket 236, which

15   is the complete data policy unobscured by a dialogue box.

16         Counsel talked about the information at issue.

17   Information is actually -- it's not a defined term, but it's

18   explained and it says:

19             "This can include information in or about the

20         contents you provide, such as the location of a

21         photo" --

22         **THE COURT:**  Where are you in this?

23         **MR. TIEVSKY:**  Excuse me.  So if you've got Exhibit A

24   in Docket 236, it's that first bullet point under Section 1.

25         **THE COURT:**  Yes, I have it.

1          **MR. TIEVSKY:**  "Things you do and information you

2     provide."

3          **THE COURT:**  Okay.

4          **MR. TIEVSKY:**  So that's where it explains what the

5     information is.  The portion that counsel quoted from is later

6     on, what they do with the information.

7          So such as the location of a photo or the date a file was

8     created.  Now, that's very different from scraping a face

9     print, right?  These are metadata.  They are saying, yeah, we

10    can look at the file itself, locations.  That's not even close

11    to what they are actually doing.  And it's -- you know, to the

12    degree that this could -- that the later section would be read

13    sort of vaguely to say what they are doing, this is highly

14    misleading.

15         **THE COURT:**  Did this -- I'm just curious.  Maybe

16    Facebook might know better, but did this language on the

17    "Things you do and information you provide," did that language

18    precede the use of tagging?  The creation of tagging?

19         **MS. GOLDMAN:**  The disclosures about tagging have

20    changed over time.  Facebook rolled out user notifications

21    starting in the middle of 2010, six months before it started

22    using facial recognition.  The disclosures have changed over

23    time.  Substantively that language has been in place since, I

24    believe, about 2013.

25         But the point is --

1            **THE COURT:**  Is that pre-tagging?

2            **MS. GOLDMAN:**  No.  It is mid-tagging.

3            **THE COURT:**  Mid-tagging, okay.

4            **MS. GOLDMAN:**  The point, your Honor, is, first of

5    all, the language that counsel was just reading to you said

6    "information can include."  It was giving examples of the types

7    of information that Facebook might obtain.

8        The language that I read to you is the more specific

9    language about what it's doing with facial recognition.  It's

10   gathering information from photos your friends upload and

11   comparing that to information that we've gathered from your

12   photos.  So that's much more specific in terms of the facial

13   recognition.

14       But more broadly, plaintiffs have conceded that they are

15   not alleging any misuse of this information.  And they are

16   relying on Eichenwald for the -- sorry, *Eichenberger* for the

17   proposition that this is a substantive right.

18       What *Eichenberger* says about this is that:

19           "Although the FCRA outlines procedural

20       obligations that sometimes protect individual

21       interests, the VPPA identifies a substantive right to

22       privacy that suffers any time a video service provider

23       discloses otherwise private information to third

24       parties."

25       That's the point.  The point is that the VPPA says you

```
 1   can't gather information about people and then disclose it to
 2   third parties.  They have conceded that that's not what they
 3   are alleging Facebook did here.
 4       Facebook analyzed photos that were uploaded to Facebook
 5   about people who chose to interact with Facebook?
 6            THE COURT:  Well, but the BIPA starts by saying you
 7   have to advise people you're doing it and get their consent.
 8   There are arguably two lawyers to BIPA.
 9            MS. GOLDMAN:  Exactly, your Honor.
10            THE COURT:  First, you have to get notice and
11   consent.  And after that, even if you do notice and consent,
12   you still can't misuse the data.  I don't see those as
13   mutually -- they are not in conflict.
14            MS. GOLDMAN:  They are not in conflict at all, but
15   they are very different provisions of the statute.
16            THE COURT:  And I think you properly say the
17   plaintiffs are not -- the second part, they are not on.  They
18   are not worried about misappropriation --
19            MS. GOLDMAN:  Correct.
20            THE COURT:  -- or misuse.
21            MS. GOLDMAN:  And those are the substantive portions
22   of the statute.
23            THE COURT:  That's the question.
24            MS. GOLDMAN:  It is the question.  And that's the
25   argument that I'm making, your Honor.
```

1          **THE COURT:**  Yes, I know.  I understand.

2          **MS. GOLDMAN:**  And that's what the Ninth Circuit said

3     in *Spokeo* on remand.  It said *Robins* -- what this case stands

4     for is the proposition that the Court has to do two things.  It

5     has to look at each particular provisions of the statute that

6     the plaintiff is invoking and say:  Does this protect concrete

7     rights?  Is this substantive or procedural?

8          Then it has to say:  Okay, and what harm flowed from that?

9     If plaintiffs didn't have to allege what harm flowed from the

10    violation, then there was no need for the Ninth Circuit to

11    spend so much time talking about the fact that Mr. Robins was

12    out of work; that these mis- -- that these misstatements in the

13    report had harmed his prospects --

14         **THE COURT:**  Well, you know, there is a long -- I just

15    happened to look at this in the context of another

16    constitutional case.  There is a long and distinguished line of

17    Supreme Court cases talking about the right to be left alone.

18    In other words, the right to say no, you can't do this to me.

19    I don't want to hear this.  I don't want to see this.  I don't

20    want you to collect this.

21         **MS. GOLDMAN:**  They haven't alleged that.

22         **THE COURT:**  That is not just the check the box on a

23    procedural point.  That is a time honored constitutional right,

24    the right to be left alone.  And BIPA I think, you know,

25    arguably is giving Illinois citizens the right to have their

```
 1   biometric data left alone unless they say in advance:  I
 2   consent to you using it.
 3           MS. GOLDMAN:  But they still have to under -- under
 4   this whole line of decisions, they still have to allege that
 5   they wanted to be left alone and that they didn't want this
 6   information to be gathered about them without their consent.
 7   They have to allege that and they have refused to do that.
 8        We said in our reply brief on this motion, you know, we --
 9           THE COURT:  They refused to do it.
10           MS. GOLDMAN:  They refused to allege that they didn't
11   want Facebook to take this information.
12           THE COURT:  Is that right, Mr. Tievsky?
13           MR. TIEVSKY:  If we wanted Facebook to take this
14   information, I don't think we would have sued Facebook.  Being
15   upset is not enough for a lawsuit.  You can't sue because
16   you're angry.
17           THE COURT:  You might be surprised.  But go ahead.
18           MR. TIEVSKY:  Being angry has never been enough.  You
19   have to allege that they violated the law, right, and that the
20   law is -- and I should an add in *Spokeo* the Ninth Circuit said:
21           "It is of no consequence how likely Robins is to
22        suffer additional concrete harm as well," additional
23        in italics," such as the loss of a specific job
24        opportunity."
25        What's -- what was enough in *Spokeo* was the creation of an
```

1    inaccurate consumer report.

2        What's enough here is, as your Honor pointed out,

3    deprivation of the right to say no to collection of this --

4    this highly personal information.  That's all.  That's enough.

5            **MS. GOLDMAN:**  That's just not what the Court said.

6    They are ignoring what the Court said.  The Court said it's not

7    enough that it just said inaccurate things in a report

8    somewhere.

9        What the Court said was, yes, you don't have to allege

10   additional harm beyond the fact that you were out of work; that

11   these misrepresentations about you harmed your job prospect and

12   that as a result of that, you -- you suffered from anxiety,

13   stress and concern.

14       In fact, the Court said at footnote three:

15           "We don't consider whether a plaintiff would

16       allege a concrete harm if he alleged only that a

17       materially inaccurate report about him was prepared by

18       never published."

19       You have to show real-world harm.  This is not something

20   that the lawyers can cook up.  The plaintiff -- it's not that

21   being angry alone is not enough, but the statutory violation

22   alone is also not enough.  You need both.  You need to show

23   that the statute was violated and that that harmed you; that

24   you would have done something differently had the statute been

25   complied with; that it harmed your privacy in some specific

1    way.

2        You can't just say privacy rights were violated.  Rights

3    and harm were two different things.  And that's what they are

4    just refusing to do.

5            THE COURT:  All right.  Thank you.  It's all very

6    interesting.  I'll get this out when I can.

7        Before you leave, what else is happening generally?

8            MR. MILIAN:  Judge?  If I may, just for the Gullen

9    plaintiff.

10           THE COURT:  Yes.

11           MR. MILIAN:  Two quick points that distinguishes

12   Gullen a little bit.

13           THE COURT:  All right.

14           MR. MILIAN:  We're completely consistent with the

15   user plaintiffs on this argument.

16       Gullen, though, is a non-user.  He was never shown any

17   data policy or privacy use form as a result of his status.  He

18   was never on Facebook.  So he specifically never consented, in

19   no way could have ever wanted in to happen to him.

20       So that's -- that's clear as to Gullen.

21           THE COURT:  I understand that.  I just -- I'm

22   hesitant even to ask, but just out of curiosity, how is

23   Facebook supposed to reach somebody like that?

24       Maybe there is an argument that they could contact their

25   own users, but, I mean, how do you -- Facebook can't alert

1   310 million Americans:  You're at risk of being tagged.

2       I just -- I have no problem with that side of -- your

3   side.  I just don't get it.  What are they supposed to do?

4   Just tell me.

5           MR. MILIAN:  Well, BIPA is a negligence statute, so

6   it's not a strict liability statute.  If a -- someone who wants

7   to take biometric information can do it as long as they act

8   reasonably, okay?  And so one way they might be able to --

9   Facebook and others might be able to comply with the statute is

10  as, you know, photos are -- before a photo, biometric face

11  tagging or face scanning technology is applied, once a photo is

12  uploaded from an Illinois IP address, it -- it's definable as

13  something coming from Illinois.  Before any facial recognition

14  technology is applied to that photo, you can second a box to

15  say:  Hey, we see this is coming from Illinois.  Do you

16  consent?  And a long list of things that you consent to, check

17  the box:  Yes, I do.  And that's that.

18          THE COURT:  Well, suppose you're an Illinois family

19  at the Grand Canyon and you take the rim crater shot and you do

20  what everybody in my family does, you immediately upload it on

21  site.  How are they supposed to know?

22          MR. MILIAN:  That may not be a violation.

23          THE COURT:  Where are you going to draw the line?

24          MR. MILIAN:  I think you draw the line with photos

25  uploaded from the State of Illinois, that the person taking the

```
 1    biometric information --

 2              THE COURT:  Based on an IP address?

 3              MR. MILIAN:  IP address, other geo location

 4    information associated with the photo.  All those things can

 5    inform the business that wants to take that information where

 6    this is coming from.

 7              THE COURT:  What you're saying is Facebook is

 8    supposed to have -- it gets millions of photographs a day,

 9    probably an hour.  They are supposed to screen every

10    photograph --

11              MR. MILIAN:  They already do for Texas, Judge.  Texas

12    has a similar statute to BIPA.  It doesn't have a private right

13    of action --

14              THE COURT:  Do they had do this for non-users in

15    Texas?

16              MR. MILIAN:  As to users.  As to non-users --

17              THE COURT:  They don't do that in Texas.

18              MR. MILIAN:  We're getting kind of far afield, but

19    you asked the question.

20              THE COURT:  It's nagging at me and the case has been

21    around now for two years.  That's not the issue for today,

22    but --

23              MR. MILIAN:  As to non-users --

24              THE COURT:  If I were in your position, I would begin

25    thinking about how you're going to explain to me how this is
```

1    supposed to work out.

2          **MR. MILIAN:**  And, again, Judge --

3          **THE COURT:**  I mean, you know, if I drive through

4    Chicago and somebody a takes a picture of me and it gets tagged

5    on Facebook, I don't think that's what the BIPA was supposed to

6    address.  That just seems more than -- I'm not a Facebook user.

7    So it just seems more than Illinois contemplated.

8          I don't think they were saying anybody who is for a minute

9    at O'Hare or, you know, somehow gets uploaded through a server

10   based in Chicago -- which can happen without you being

11   geographically in Illinois, by the way.  I could be in

12   Wisconsin and it could be routed through a Chicago server.  I'm

13   having a lot of conceptual -- for another day, okay?  For

14   another day.  Start thinking.

15         **MR. MILIAN:**  And, Judge, we could address all of

16   those in ways that are -- one can comply with the statute,

17   because it's a negligence standard.  It's a negligent or

18   intentional standard.  It's not strict liability.  And there

19   are reasonable things that create reasonable care that a user

20   could do and implement in order to ensure even non-users, who

21   are anonymously having their biometrics taken and they don't

22   know about it, you can still comply.

23         **THE COURT:**  All right.  We will save that for another

24   day.  Okay.

25         **MR. MILIAN:**  Thank you, your Honor.

```
 1              THE COURT:  Now, where are things generally?  What's

 2     happening?

 3              MS. GOLDMAN:  Your Honor, fact discovery closed on

 4     November 17th.  The parties had a meet-and-confer for the first

 5     time that day on some discovery issues that the plaintiffs have

 6     now identified and written the Court about.  I think the

 7     parties --

 8              THE COURT:  Discovery already closed.

 9              MS. GOLDMAN:  Discovery had closed.  I think the

10     close of discovery was the Court's deadline for raising any

11     disputes.

12          The plaintiffs waited until then.  We had our first

13     meet-and-confer that day.  A week later, on the Friday after

14     Thanksgiving, they filed a letter --

15              THE COURT REPORTER:  Counsel, your name, please?

16              MR. HALL:  Sure.  David Hall, Robbins Geller, on

17     behalf of plaintiffs.

18          We were dealing with several productions even that last

19     week up to the deadline.  We were going by the local rule that

20     sets the deadline for such motions as a week after the

21     discovery cut-off.  So we were complying with this Court's

22     local rulings.

23          The only extension, though, that -- the only discovery

24     that has gone beyond the original cut-off is one deposition.

25              THE COURT:  You all agreed to that.
```

```
 1              MR. HALL:  Right, and that's been ordered.
 2   Everything else is complete.
 3              THE COURT:  Okay.  All right.  I haven't seen -- did
 4   I ask for a response?
 5              MS. GOLDMAN:  You did, and it's due next week, and
 6   we'll be filing that.
 7        Can I make one quick point just in one to counsel's point,
 8   Mr. Millian's point?
 9              THE COURT:  Yes.
10              MS. GOLDMAN:  The Gullen plaintiffs.  A lot of what
11   he said was inaccurate.  I don't think it's correct that --
12   first of all, the class is not defined that terms of IP
13   addresses.  The class is defined in terms of Illinois
14   residents.
15        Second of all, we're not taking non-user biometrics.  I
16   mean, we've said and we attached evidence to our standing
17   motion saying we don't collect or store or save any information
18   about non-users.  So I just want to make that very clear.
19        Third of all --
20              THE COURT:  So I don't -- I'm merely curious.  I'm
21   not tying anybody's hands, but when you say that -- so if you
22   have a non-user show up in a photo and it gets tagged, what do
23   you do where that non-user?
24              MS. GOLDMAN:  The tag -- okay.  So it is actually
25   relevant to their claim of standing.  They have never
```

1   identified any injury and the reason why not, they claim that a

2   photo of Mr. Gullen was uploaded and then some months later it

3   was tagged "Frederick W. Gullen."  Discovery shown that it was

4   tagged that by his son a couple days before the Complaint was

5   filed.

6        That tag is not -- has nothing to do with Mr. Gullen's

7   face.  It has nothing to do with any analysis of his face.  All

8   that tag is is a tag that's associated with a particular

9   location on a particular photograph.  It's -- there is no

10  biometric analysis associated with that tag at all.

11            THE COURT:  That's what I was wondering.

12            MS. GOLDMAN:  That is what discovery has shown.

13            THE COURT:  This is a group photo or a photo of two

14  or three people, a non-user is in it.

15            MS. GOLDMAN:  Correct.

16            THE COURT:  And you don't harvest any of the --

17            MS. GOLDMAN:  We harvest nothing.  We know nothing

18  about him.  We don't know who Mr. Gullen is.  He has no account

19  on Facebook.  We have no information about it.  We don't know

20  how to reach him.  We couldn't possibly give him notice or

21  obtain his consent.

22        Your example, you're in the Grand Canyon and take a

23  picture of your kids.  Let's say they are from California.  And

24  a guy in the background who is from Chicago is also visiting

25  the Grand Canyon with his family and he's in your photo.  On

```
 1   their theory you would have to give that guy notice and obtain

 2   his consent.  It's literally impossible.

 3            MR. MILIAN:  Judge, let me just interject.

 4        The testimony is that Facebook creates a face print as to

 5   everybody, because how does it know whether you're a user or

 6   not to give you have an opportunity to tag your friend?  It has

 7   to analyze every photo.  And it does.  It creates a face print

 8   of everybody.

 9        What they claim they don't do is save non-user's

10   information in the long term.  They certainly collect it, which

11   is a violation.  They certainly use it to compare it to users

12   to see who is a user and who's not.

13            THE COURT:  I don't know why I keep asking.  I

14   shouldn't, but I'm just -- you're compelling me.  It's a

15   riveting issue.

16        You say they collect it, but that's not what I'm hearing.

17   What I'm hearing is somebody uploads it.  It is literally

18   resident on a Facebook server because it's been uploaded by a

19   user, but how is that collection by Facebook?

20            MR. MILIAN:  They perform the same biometric scanning

21   of the non-user that they do to the user to determine who that

22   person is.

23            THE COURT:  Your colleague just said that didn't

24   happen.

25            MS. GOLDMAN:  We do, your Honor.  The photo is
```

1   analyzed to see if it matches anything.

2           **THE COURT:**  It is, okay.  I misunderstood.

3           **MS. GOLDMAN:**  The photo is analyzed because it's like

4   any other system where you have to see whether people are users

5   or non-users.  But what we don't do is save any information

6   about them.

7           **THE COURT:**  You analyze it.  You just don't store it.

8           **MS. GOLDMAN:**  Correct.  We don't save it.  We don't

9   store it.  It's an ephemeral thing.

10          **THE COURT:**  How is this going to come up again?

11  Summary judgment?  When am I going to get through all this.

12          **MS. GOLDMAN:**  It's probably going to come up a few

13  times.  Certainly, at summary judgment.

14          **THE COURT:**  A few times.

15          **MS. GOLDMAN:**  Summary judgment and class

16  certification.

17          **THE COURT:**  Class cert, okay.

18      All right.  So discovery is closed.  You had some

19  lingering disputes, which I will take care of.

20      Anything else happening?

21          **MR. MILIAN:**  Not from the plaintiff's perspective.

22          **THE COURT:**  Talking about settlement, for example?

23          **MR. HALL:**  David Hall again for the plaintiffs.

24      We do have a class cert motion that will be filed in early

25  December, and I believe we have an early spring trial date, but

```
 1  there hasn't been any movement on settlement efforts since our

 2  failed mediation earlier this year.

 3          THE COURT:  Who was that with?

 4          MR. HALL:  That was with Judge Phillips, Layn

 5  Phillips.

 6          THE COURT:  You did it privately?

 7          MR. HALL:  Right.

 8          THE COURT:  Would you like to use someone here, a

 9  magistrate judge?

10          MS. GOLDMAN:  Not at this time, your Honor.

11          THE COURT:  No?  Are you sure?

12          MS. GOLDMAN:  Not at this time, your Honor.

13          THE COURT:  Plaintiffs?

14          MR. HALL:  We're open to pursuing it if Defendants

15  are when they are ready, but it sounds like they aren't.

16          THE COURT:  Okay.  All right.  Thank you very much.

17  I'll get this out as soon as I can.

18          THE CLERK:  All rise.  Court is in recess.

19      (Proceedings adjourned.)

20

21

22

23

24

25
```

## CERTIFICATE OF OFFICIAL REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Tuesday, December 5, 2017