Pages 1 - 33

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JAMES DONATO, JUDGE

| | | |
|---|---|---|
| IN RE FACEBOOK BIOMETRIC | ) | |
| INFORMATION PRIVACY LITIGATION | ) | **No. 15-cv-03747-JD** |
| ——————————————————————— | ) | |
| | ) | |
| FREDERICK WILLIAM GULLEN, | ) | |
| individually and on behalf of | ) | |
| all others similarly situated, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | **No. 16-cv-00937-JD** |
| | ) | |
| FACEBOOK, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| ——————————————————————— | ) | San Francisco, California |
| | | Thursday, March 29, 2018 |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

Counsel for In re Facebook Biometric Info. Plaintiffs and the
Putative Class:

> ROBBINS GELLER RUDMAN
>  & DOWD LLP
> One Montgomery Street, Suite 1800
> San Francisco, California 94104
> **BY: SHAWN A. WILLIAMS, ESQUIRE**
> **JOHN H. GEORGE, ESQUIRE**
>
> EDELSON PC
> 350 North LaSalle Street, 14th Floor
> Chicago, Illinois 60654
> **BY: ALEXANDER GLENN TIEVSKY, ESQUIRE**

(Appearances continued on next page)

Reported By:   Katherine Powell Sullivan, CSR #5812, RPR, CRR
               Official Reporter - U.S. District Court

**<u>APPEARANCES (CONTINUED):</u>**

Counsel for In re Facebook Biometric Info. Plaintiffs and the
Putative Class

                                        LABATON SUCHAROW LLP
                                        140 Broadway
                                        New York, New York 10005
                              **BY: CORBAN S. RHODES, ESQUIRE**

For Plaintiff Gullen and the Putative Class:
                                        MILIAN GONYA, LLP
                                        1395 Brickell Avenue, Suite 700
                                      Miami, Florida 33131
                          **BY: DAVID P. MILIAN, ESQUIRE**

For Defendant:              MAYER BROWN LLP
                                      1221 Avenue of the Americas
                                      New York, New York 10020
                          **BY: LAUREN R. GOLDMAN, ESQUIRE**
                                    **MICHAEL E RAYFIELD, ESQUIRE**

                                      MAYER BROWN LLP
                                      350 South Grand Avenue, 25th Floor
                                      Los Angeles, California 90071-1503
                        **BY: JOHN NADOLENCO, ESQUIRE**

                                      MAYER BROWN LLP
                                      71 S. Wacker Drive
                                      Chicago, Illinois 60606
                        **BY: VINCENT J. CONNELLY, ESQUIRE**

**Thursday - March 29, 2018**                                    **10:10 a.m.**

                        P R O C E E D I N G S

                             ---oOo---

         **THE CLERK:**  Calling related action Civil 15-3747,

In re Facebook Biometric Information Privacy Litigation, and

Civil 16-937, Gullen versus Facebook.

         Counsel, please state your appearances for the record.

         **MR. TIEVSKY:**  Good morning, Your Honor.  Alexander

Tievsky for the user plaintiffs.

         **MR. MILIAN:**  Good morning, Your Honor.  David Milian

for the Gullen nonuser plaintiffs.

         **MR. WILLIAMS:**  Good morning, Your Honor.  Shawn

Williams, Robbins Geller Rudman & Dowd, on behalf of

plaintiffs.  I'll be addressing the summary judgment issues for

plaintiffs, and the scheduling.

         **THE COURT:**  Scheduling, good.  Okay.

         **MR. RHODES:**  Good morning, Your Honor.  Corban Rhodes,

from Labaton Sucharow, on behalf of user plaintiffs.

         **MR. GEORGE:**  Good morning, Your Honor.  John George,

Robbins Geller Rudman & Dowd, on behalf of user plaintiffs.

         **MS. GOLDMAN:**  Good morning, Your Honor.  Lauren

Goldman, of Mayer Brown, representing Facebook.

      I just wanted to let the Court know that Nikki Sokol, from

Facebook, is also here with us today as well.

         **THE COURT:**  Who?

4

1           **MS. GOLDMAN:**  Nikki Sokol from Facebook.

2           **THE COURT:**  Okay.  Yes.

3           **MR. RAYFIELD:**  Good morning, Your Honor.  Michael

4  Rayfield, from Mayer Brown, on behalf of Facebook.  I'll be

5  addressing the summary judgment motion.

6           **THE COURT:**  Okay.

7           **MR. NADALENCO:**  Good morning, Your Honor.  John

8  Nadalenco, of Mayer Brown, also on behalf of Facebook.

9           **MR. CONNELLY:**  Finally, Judge, good morning.  Vincent

10  Connelly, with Mayer Brown, on behalf of Facebook.

11           **THE COURT:**  All right.  Let's start with Gullen.

12    Is it Mr. Milian?

13           **MR. MILIAN:**  Yes.

14           **THE COURT:**  Come on up.  And one person from

15  defendant, please.

16           **MS. GOLDMAN:**  Your Honor, is this on the

17  classification motion?

18           **THE COURT:**  Summary judgment.

19    I'm having doubts, Mr. Milian.

20           **MR. MILIAN:**  Let me allay your doubts.

21           **THE COURT:**  And you are too, because you filed

22  something this morning with a new action.

23           **MR. MILIAN:**  We did, Your Honor.

24           **THE COURT:**  Yes.  So here's the issue.  Appears to be

25  undisputed that your client was on the business side of

 1   Facebook.  What do you call that side?

 2          **MR. RAYFIELD:**  Business organization page.

 3          **THE COURT:**  Business organization page, where they

 4   don't -- they don't do the biometric data collection; is that

 5   right?

 6          **MR. RAYFIELD:**  Correct.

 7          **THE COURT:**  Okay.

 8          **MR. MILIAN:**  It's that latter part that's in dispute,

 9   Your Honor.

10          **THE COURT:**  I didn't see -- I know you say that.  But

11   what's the evidence that shows that Facebook has lied to me,

12   basically, by saying they don't do it?

13          **MR. MILIAN:**  We took the deposition of Facebook's

14   30(b)(6) representative back in October 18th of 2016.  The

15   transcript's on file.  Mr. Yaniv Taigman.  He was asked

16   specifically:

17      "Q.  Does Facebook apply its facial recognition technology

18          to all photos uploaded to Facebook within the

19          United States?

20      "A.  Like I mentioned before, photos are being processed

21          on Facebook with several -- with several functions.  There

22          is a pipeline that photos go through.  Like I mentioned,

23          detection alignment and face signature creation.  Which

24          one of those are you referring to?

25      "Q.  All of them.

1       "A.  All right.  So, yes, I said that uploaded photos go

2       through that specific pipeline.

3       "Q.  Every photo?

4       "A.  Every -- I mean, like, photo -- like I mentioned, we

5       talked previously about JPEGs, uploaded photos, yeah.  I

6       mean, like, uploaded photos by Facebook users naturally go

7       through that pipeline."

8       That was the 30(b)(6) deposition testimony.  An errata

9   sheet was filed thereafter.

10          THE COURT:  Is that Mr. Yadan?

11          MR. MILIAN:  That's Yaniv Taigman.

12      Mr. Yadan, subsequently, after the close of discovery,

13  filed an affidavit that seems to contradict their 30(b)(6)

14  deposition testimony.  And he does so in a way that --

15          THE COURT:  Let me ask you a question.  What was the

16  30(b)(6) -- for what topic was he designated?  What was the

17  precise request?

18          MR. MILIAN:  I don't have that with me, Judge, but it

19  was broad.  He was the inventor of the facer technology that is

20  the subject matter of the case.  So it was, how does your

21  technology work?

22      And -- and later we asked him:

23      "Q.  Would you say that you know more about this

24      technology than -- this facial recognition technology that

25      Facebook operates than anyone else?

1      "A.   Yes.   When you say 'this,' I mean in general, like,

2      the face recognition technology that Facebook has, yes,

3      I'm the one that knows the best."

4    That was the testimony of Facebook in October of 2016.

5        THE COURT:  All right.  Mr. Rayfield, is that right?

6      MR. RAYFIELD:  There's no dispute that -- well,

7  putting aside the issue of whether facial recognition is run on

8  pages, there's no dispute that facial recognition was not run

9  on the one photo of Mr. Gullen that was uploaded from Illinois.

10    There were no --

11      THE COURT:  And that was because he was on the

12  business organization page.

13      MR. RAYFIELD:  At the time Facebook was not running

14  facial recognition on business organization pages, at the time

15  that the photo of Mr. Gullen was uploaded to Facebook.

16      THE COURT:  Tell me why that's undisputed.  Tell me

17  why you think that's an ironclad fact.

18      MR. RAYFIELD:  Because the evidence shows we've --

19      THE COURT:  That's Mr. Yadan's declaration.

20      MR. RAYFIELD:  Mr. Yadan's declaration and the

21  documents attached to the declaration show that facial

22  recognition -- there was no --

23      THE COURT:  How do you get around this long snippet

24  that Mr. Milian just read?

25      MR. RAYFIELD:  The snippet that Mr. Milian just read

1  was not purporting to be an exhaustive -- exhaustive testimony

2  about all the situations in which Facebook runs facial

3  recognition.

4      There are -- there are extensive documents in the record

5  that we've -- that we've provided in -- as an attachment to the

6  Provance declaration, which we attached to our reply, which

7  showed that -- which say, in several occasions, recognition is

8  turned off on pages.  Recognition wasn't necessary for page

9  photos, and so it was left out of the upload flow.

10      We've cited at least 30 documents in the Provance

11  declaration that say the exact same thing.

12      THE COURT:  Well, it seemed to me, effectively, what

13  you're saying is the witness that your colleague is relying on

14  was just overstating his understanding of the facts.  Is that

15  right?

16      MR. RAYFIELD:  I wouldn't say he was overstating it.

17  I think he was saying that --

18      THE COURT:  He said all pictures are uploaded.  And

19  you're telling me that, in fact, was not the case.

20      MR. RAYFIELD:  He was not purporting -- he was not

21  saying that facial recognition is performed on all photos

22  uploaded to the service.

23      He was testifying -- he was giving testimony about --

24  about how the technology works -- works generally, without

25  purporting to explain the exceptions that are applied in

1  situations like pages and comment posts and things like that.

2      **THE COURT:**  What did you -- what did you provide to

3  the plaintiffs in terms of discovery on the business

4  organization page and scanning?

5      In other words, why is it fair to say they should have

6  known, before you filed summary judgment, that the photograph

7  for Mr. Gullen would not have been uploaded -- the biometric

8  data would not have been collected from his photo?

9      **MR. RAYFIELD:**  So we provided the documents in the

10  Provance declaration, which say that recognition is turned off

11  on pages.  And this is -- the citations are in paragraphs 4

12  through -- through 5 of that -- of that declaration.

13      **THE COURT:**  All right.  And those documents were

14  produced to Mr. Milian well before summary judgment?

15      **MR. RAYFIELD:**  Yes.

16      **THE COURT:**  Is that right, Mr. Milian?

17      **MR. MILIAN:**  Judge, that declaration, if it's the

18  declaration I'm thinking of, was in December of 2017, after the

19  cutoff of discovery.

20      **THE COURT:**  Well, but the declaration attached what

21  Facebook says was the documents that would have tipped you off.

22      **MR. MILIAN:**  Right.  And the documents refer to pages.

23  And, you know, here's one of the documents.  And I've

24  highlighted the part that references pages.  A lot of it is

25  redacted.

1    And we're supposed to be clairvoyant and read this and say

2    "pages" means business and organizational accounts.  And

3    it's -- even though redacted, it's still unclear because it

4    says facial recognition, clustering and recognition wasn't

5    necessary for page photos.

6        The way the pipeline works -- and I could read this --

7    recognition is the last step performed.  Clustering is the

8    grouping, and then recognition is the final step.  Before that,

9    you have detection.  After that, you have alignment.  Then you

10   have a next step, which is classification.

11       Our experts --

12       **THE COURT:**  Well, let me just jump in.  All I'm

13   concerned about is, did you have fair notice?

14       You're asking for more discovery.  I'm finding that to be

15   unpalatable at this stage of the case.  And so what I'm trying

16   to figure out is, whether you read it or got it or not, if it

17   was in your hands, it was enough for me.  And it sounds like it

18   was in your hands.

19       **MR. MILIAN:**  Judge, here's the thing.  Yadan wasn't

20   their 30(b)(6) representative.  Mr. Taigman was.  Yadan makes

21   this statement without referring to any source code.

22       The experts in this case, both sides, have gone through

23   millions of lines of source code.  Neither of them -- our

24   expert, the source code review didn't reveal any of this.  And

25   when we deposed their expert, we asked him, Did you review the

1   source code related to this page/nonpage turning on and off?

2   He said no.  Why not?  Didn't bother.

3       Okay.  So the source code would be -- and it's probably

4   about ten lines of source code.  If they could point us to or

5   replicate the source code that turned off -- or turned off the

6   application of facial recognition technology, as they say, to

7   business and organizational pages, we could have our expert

8   review it.  That would not be burdensome.

9           **THE COURT:**  The point is, Mr. Milian, you had the

10  statements about, quote, pages, unquote, in hand and you didn't

11  ask.

12          **MR. MILIAN:**  But "pages" doesn't tell me --

13          **THE COURT:**  You have to ask.  You're not just a

14  passive vessel.  You need to say, hey, I don't understand what

15  this means, I think I'll ask a witness, or I'll serve an

16  interrogatory, or I'll call up the lawyer on the other side and

17  say can we do this informally.

18      They don't need to feed you.  You need to be proactive in

19  figuring out your case.

20          **MR. MILIAN:**  Understood, Judge.

21          **THE COURT:**  You had the raw materials.  That's all I'm

22  interested in.  What you did when them, that's up to you.  My

23  only concern is if you didn't have the raw materials, I would

24  be concerned.  But if you had the raw materials and they didn't

25  get digested, I'm less concerned.

1        Let me ask you this.

2               **MR. MILIAN:**  Sure.

3               **THE COURT:**  Philadelphia.  So the other photo of your

4     client was taken in Philadelphia and uploaded in Michigan; is

5     that right?

6               **MR. MILIAN:**  Correct.

7               **THE COURT:**  Okay.  All right.  So that's clearly not

8     going to be enough to go forward on.

9               **MR. MILIAN:**  I would concede that, Judge.  That's not

10    part of our class.

11              **THE COURT:**  So you're going to live or die on the

12    business organization page issue?

13              **MR. MILIAN:**  That's correct, Your Honor.

14              **THE COURT:**  Okay.  That's all I need for that.  Thank

15    you.

16         I do want to talk about class cert on the other case.

17              **MR. RAYFIELD:**  Your Honor, may I make one more point

18    on that case?

19              **THE COURT:**  Sure.

20              **MR. RAYFIELD:**  There's another document which is

21    addressed in -- on paragraph 29 of Mr. Yadan's declaration,

22    which is attached to our motion for summary judgment --

23              **THE COURT:**  Okay.

24              **MR. RAYFIELD:**  -- which cites a -- which cites a

25    document FBBIPA_00044567, which is not about pages generally.

1   That's about the analysis that was performed on Mr. Gullen's

2   own photo.  And it shows that no face box was created from the

3   photo.

4       So it's not just that we provided information about pages

5   generally.  We've also provided information about Mr. Gullen's

6   specific photos.

7           **MR. MILIAN:**  That latter provision was after the close

8   of discovery, Your Honor.

9           **THE COURT:**  All right.  I will look through that.

10  Thank you.

11      Okay.  Class cert for the other case, In re Facebook.

12          **MR. TIEVSKY:**  Good morning again, Your Honor.

13          **THE COURT:**  Mr. Tievsky.

14          **MR. TIEVSKY:**  That's correct.

15          **THE COURT:**  Okay.  All right.  Let me ask you a

16  question -- actually, Ms. Goldman.

17      So *Rosenbach*, Illinois Court of Appeal, Intermediate Court

18  of Appeals.  *Rosenbach* was a fingerprint case, wasn't it, like

19  *SmartCart*?

20          **MS. GOLDMAN:**  It was, Your Honor.

21          **THE COURT:**  Okay.  So I'm having trouble seeing how

22  that's particularly applicable here for the reasons that I

23  distinguished the fingerprint cases in my *Spokeo* decision.  How

24  is it that they are applicable in this context?

25          **MS. GOLDMAN:**  For several reasons, Your Honor.

1          One is that the question in *Rosenbach* was a certified

2     question.  It wasn't limited to fingerprints.  It was -- it

3     extended to all kinds of biometric identifiers.

4          So the certified question in *Rosenbach* was whether an

5     individual is an aggrieved person when the only injury he or

6     she alleges is a violation of BIPA by a private entity that

7     collected his or her biometric identifiers without providing

8     the disclosures and obtaining the written consent required by

9     the statute.

10         And the court answered that question unanimously in the

11    negative.  So the opinion was -- this was a court that was

12    taking an interlocutory appeal to provide guidance to all the

13    trial courts in Illinois and elsewhere that are applying this

14    statute.  And the Court took this broad certified question and

15    answered it in the negative.

16              **THE COURT:**  Well --

17              **MS. GOLDMAN:**  The second -- I'm sorry.

18              **THE COURT:**  -- no judge here or in Illinois answers a

19    question in the abstract.  The case is quite clear that it was

20    a thumbprint taken and that the plaintiff knew the thumbprint

21    was being taken because he put his thumb on the device.

22         There is no ambiguity about the fact that he and his mom,

23    I guess, were giving up their thumbprints.  And, you know,

24    that's front and center in the description of the facts for the

25    case.

1    So I don't think it's just a free-floating riff on injury

2 under BIPA.  It's tied to the facts of the *Six Flags* case,

3 which is entirely different from this one, as I explained in my

4 *Spokeo* decision.

5    **MS. GOLDMAN:**  No, Your Honor, respectfully, we don't

6 agree with that.  And here's why.  The facts of this case were

7 not exactly what the Court just said.

8    The facts of this case were that Alexander went to the

9 park without his mother.  Without his mother.  He's a minor

10 child.  He went to the park without his mother.  He bought a

11 season pass.  He was fingerprinted.  He came home, and his

12 mother said, Where's your pamphlet?  Where's the information?

13    And he said, What are you talking about?  I didn't get any

14 pamphlet, I didn't get any information.

15    So the facts of *Rosenbach* were that the biometric

16 identifiers of a minor child were taken without notice, without

17 consent, without getting permission from his mother as the

18 legally authorized representative.

19    A child can't give knowing and -- knowing written consent.

20 So the facts of that case did not turn on the fact that

21 Alexander was aware that his fingerprint was taken or that his

22 mother was aware that his fingerprint was taken.

23    What his mother said in the complaint was that had she

24 known he was going to be fingerprinted she wouldn't have

25 authorized him to go by himself and get a season pass.

 1          So it's not distinguishable on the basis of fingerprints,

 2     and it's not distinguishable on the basis that people knew that

 3     their biometric identifiers were being taken.

 4          In addition, even if it were, that still would not remove

 5     the predominance problem on class certification because, as

 6     we've shown in the summary judgment motion that is not yet

 7     ripe, Facebook had a data policy where it told people what it

 8     was doing with its information, with the photographs.  So even

 9     if --

10          THE COURT:  It's the same one I looked at for *Spokeo*,

11     isn't it?

12          MS. GOLDMAN:  No, Your Honor.  In your order on *the*

13     *Spokeo* motion, the Court said that it wasn't --

14          THE COURT:  I haven't looked at the other one.

15          MS. GOLDMAN:  -- considering any of that.  It was

16     12(b)(1).

17          THE COURT:  That's the same policy you attached

18     though; right?

19          MS. GOLDMAN:  It is, but the Court said it didn't look

20     at it.

21          THE COURT:  Well, I read it.  I didn't rely on it.  I

22     didn't say I didn't look at it, I didn't rely on it for my

23     decision.  It's a very different thing.  I did read that.

24          MS. GOLDMAN:  Many people understood exactly what --

25          THE COURT:  I don't recall the phrase "collected

biometric data" being anywhere in that disclosure.

**MS. GOLDMAN:**  When we showed that data policy, which the Court has already held everybody in the class is bound to, and we showed it to one of the plaintiffs at his deposition, we said to him, what is it that you want Facebook to do?

And he said, I want them to make it evident what they're doing with the photos.

And we said, Well, look at this policy; doesn't this make it evident?

And he said, They do make it evident, yeah, they do.

So each class member is going to have to come in and, under *Rosenbach*, they're going to have to show that they are aggrieved.

Many people will have read the policies that the court found were binding and will understand that those policies mean that we're analyzing their photos and comparing them to the newly uploaded photos from their friends.  And those people aren't aggrieved.

Other people may say, you know, I didn't know, but I actually don't care, and that's fine.  And those people are not aggrieved.

This is not about standing.  There are many, many cases in which courts find that there's Article III standing, and then they go on to say there's a statutory injury requirement, and it is individualized and can't be demonstrated with common

 1    proof and, therefore, you can't certify a class.  That's the

 2    *Ticketmaster* case from the Ninth Circuit.

 3             **THE COURT:**  All right.  Mr. Tievsky, *Rosenbach*, your

 4    opponent says, controls the day.  You've heard my doubts.  What

 5    do you think?

 6             **MR. TIEVSKY:**  Whether or not *Rosenbach* says what they

 7    say it does -- and I don't think that it does, and I agree with

 8    Your Honor that the facts of it are so different from the

 9    fingerprint case, the putting your thumb on the scanner, that

10    it doesn't reasonably apply here.

11         But, either way, it's a common question.  There's no --

12    there's no individual inquiry necessary.  Everyone got the

13    same -- there's no dispute about, well, some people saw the

14    data policy and some people didn't.  It's the same data policy.

15         Whatever questions there are about *Rosenbach* or about the

16    data policy can be -- can be answered classwide.  And that's

17    why we need class certification.

18             **THE COURT:**  So in *Rosenbach*, where the court said no

19    privacy injury was alleged, what do you think that meant?

20             **MR. TIEVSKY:**  It's a little cryptic, but I think it

21    meant what it says.  They chose, for reasons that I cannot

22    explain to you, not to proceed on a theory that there was an

23    injury to their client's privacy.  They chose to proceed on a

24    theory that a technical bare statutory violation was --

25             **THE COURT:**  Isn't that enough to distinguish

1  *Rosenbach*?  I've already found that an invasion of privacy has

2  been alleged.

3           **MR. TIEVSKY:**  That's correct, it absolutely is.

4       **THE COURT:**  That alone kind of kicks *Rosenbach* to the

5  curb, doesn't it?

6           **MR. TIEVSKY:**  It does, Your Honor.

7      When Your Honor asked me last time what the concrete

8  injury was, I said it is the invasion of privacy caused by the

9  violation of the statute.  My answer to that question has not

10  change, and *Rosenbach* doesn't change it.

11          **THE COURT:**  Ms. Goldman.

12      **MS. GOLDMAN:**  Your Honor, what plaintiff said is just

13  not true, because in paragraph 20, in *Rosenbach*, the Court

14  says:

15          "Plaintiff asserts that Alexander's right to privacy

16      is a personal right or a legal right that has been

17      adversely affected."

18      That's paragraph 20.  The Court then drops a footnote

19  saying that those allegations aren't in the complaint.

20      The clear import of what the Court is saying there is that

21  she's making an argument on appeal; it's not in her complaint.

22  The Court is assuming that she could amend.  So it's addressing

23  that allegation that Alexander had a personal right or a legal

24  right to privacy that has been adversely affected by the taking

25  of his fingerprints in his mother's absence without notice and

1  consent.  And the Court says that's not enough.  You would have

2  to prove consequential harm.

3       And when we're talking about standing, Mr. Tievsky said,

4  We're not alleging downstream harm.  We're alleging that they

5  violated the notice and consent provisions and that that is

6  enough.

7       They were very careful to do that because they didn't want

8  to create an individualized issue.

9       And what *Rosenbach* squarely holds is that it's not enough.

10 That when you take biometric identifiers and do that without

11 notice and consent, there still is no satisfaction of the

12 aggrieved requirement unless you can allege and prove

13 downstream harm.

14      The other reason that standing is different -- standing --

15 the Court made a ruling --

16           **THE COURT:**  Yes.  There's no confusion about standing

17 in class cert.  You don't have to worry about that.

18      Let me ask you a question.  What about *Jones*?  The

19 Illinois Supreme Court held, in 1943, that "aggrieved" had a

20 specific meaning.  *Rosenbach* didn't even mention it.  I find

21 that troubling.

22           **MS. GOLDMAN:**  *Jones* is a --

23           **THE COURT:**  Part of what I do --

24           **MS. GOLDMAN:**  *Jones* --

25           **THE COURT:**  -- is to decide whether an intermediate

1    court has correctly predicted, in the absence of a state

2    Supreme Court decision, has correctly predicted how the state

3    Supreme Court would hold the issue.

4        I have doubts that *Rosenbach* can be squared with *Jones*.

5    Tell me what you think about that.

6            **MS. GOLDMAN:**  Sure, happy to, Your Honor.

7        So, a couple things.  One is, under *Emery*, of course, the

8    standard is whether there's convincing evidence that *Rosenbach*

9    would be reversed.

10       There's been four cases that have addressed the aggrieved

11   requirement under this statute.  All four of them have held

12   that it requires downstream harm, which the plaintiffs here are

13   not alleging.

14       So it's *Rosenbach*, it's also *Vigil vs. Take-Two*, it's also

15   the *McCollough* case, and it's also the trial court decision in

16   *Rottner*, which we submitted.

17       But putting that to one side, *Jones* has nothing to do with

18   this.  *Jones* was about a venue statute.  And the statute

19   addressed the right of an insurance company to come in and

20   claim that some privileges given to a different insurance

21   company were permissible under a certain regulation.  And it

22   says that the suit could be brought in any place where the

23   aggrieved party has a principal place of business.

24       That's a totally different kind of statute.  They were

25   figuring out, you know, whether this third party could come in

1   and sue.

2        What *Rosenbach* is saying is that, in the context of the

3   BIPA statute, "aggrieved" means that you need downstream harm.

4   And what it's saying is, otherwise, the word "aggrieved" would

5   be superfluous.

6        And the Court is well aware that Illinois has a standing

7   requirement that's coextensive with federal law.  Not every

8   statute says -- so anytime somebody comes into Illinois court,

9   they have to allege a concrete injury in order to bring their

10  suit.

11       Many statutes, though, don't say "aggrieved."  So the

12  court is saying when the Legislature used the word "aggrieved,"

13  it meant something more.

14       And in this case we think the something more is something

15  more than the taking of biometric identifiers without notice

16  and consent.  The opinion is completely unqualified on that

17  ground.  It's not qualified at all.

18       So we would submit that a venue statute --

19       **THE COURT:**  It's not qualified, but it may be wrong.

20  That's the point I'm getting to.

21       **MS. GOLDMAN:**  We respectfully submit that the Court

22  does not have a basis to say that there is convincing evidence

23  that *Rosenbach* will be reversed by the Illinois Supreme Court.

24       There certainly is not convincing evidence that that is

25  wrong given that four courts have construed the BIPA statute,

and have construed this word in the BIPA statute, and they've

all come out the same way.

    **THE COURT:**  Well, they've all come out against me on

*Spokeo* as well.  A few headwinds from the Second Circuit are of

really no moment right now.

   Mr. Tievsky, what do you think about the case *Jones*?

    **MR. TIEVSKY:**  I think that the *Jones* case is quite

clear about what it says.  It's a --

    **THE COURT:**  Well, how do you square them?

    **MR. TIEVSKY:**  How do I square *Rosenbach* and *Jones*?  I

can't.  I think *Rosenbach* is wrongly decided.

    **THE COURT:**  Tell me why.

    **MR. TIEVSKY:**  Because *Jones* is -- the Illinois Supreme

Court case it quite clear as to -- I mean, the quote we have in

our brief is "a person who is immediately aggrieved by the act

done and not one who is only consequently aggrieved."  I think

that's right on point.

   There's numerous Illinois appellate court decisions after

that, explaining that aggrieved means that in context.  And, in

fact, the U.S. Supreme Court, when it analyzes that word

"aggrieved" -- it did so in *Doe v. Chao* -- it says coextensive

with Article III standing.

   You know, I think that --

    **THE COURT:**  Coextensive?

    **MR. TIEVSKY:**  Yes, yes.  Aggrieved means --

1        **THE COURT:**  I actually think *Rosenbach* is, in some

2   ways, an implicit standing opinion more than anything else.

3        If you look at what *Rosenbach* says, they talk about

4   basically injury in fact, concreteness of the harm.  I mean,

5   language that is highly reminiscent of the *Spokeo* inquiry.

6        **MR. TIEVSKY:**  I think that's right.  And the reason

7   it's done in the context it's done in is because Illinois'

8   standing requirement is not actually the same as the federal

9   requirement.  It's different.

10       Standing is an affirmative defense in Illinois, that

11  defendant has to raise and then prove a lack of standing.

12       **THE COURT:**  Well, it's also different because I'm a

13  court of limited jurisdiction.  Illinois is a court of general

14  jurisdiction.

15       **MR. TIEVSKY:**  That's correct.  And in some states,

16  standing is still jurisdictional.  In Illinois, that is not the

17  case.  It is not jurisdictional.

18       **THE COURT:**  So what do you think is the best reason

19  why *Rosenbach* is inconsistent with *Jones*?

20       **MR. TIEVSKY:**  *Rosenbach* -- *Rosenbach* -- to the extent

21  that *Rosenbach* purports to hold that some -- some

22  consequential -- it says nonpecuniary is okay, but I don't

23  really know what that means.  To the extent that it holds that,

24  you can only consider a consequential downstream harm, as Your

25  Honor put it, to satisfy the aggrieved requirement.

1          To the extent it reads that much into that word,

2      "aggrieved," it conflicts with the plain meaning of that word

3      as --

4              **THE COURT:**  There was no statutory analysis of

5      aggrieved --

6              **MR. TIEVSKY:**  Not that --

7              **THE COURT:**  -- in *Rosenbach*.

8              **MR. TIEVSKY:**  Very little.  And certainly none that

9      relied on Illinois Supreme Court opinions.  And I don't --

10             **THE COURT:**  In fact, *Rosenbach* didn't even mention

11     *Jones*, did it?

12             **MR. TIEVSKY:**  No.  It did not.  It relied, instead, on

13     federal cases, for reasons that, again, I --

14             **THE COURT:**  Do you have any reason to believe that

15     *Jones* is no longer good law in Illinois?

16             **MR. TIEVSKY:**  I have no reason to believe that, no.

17             **THE COURT:**  Why is that?  What do you think is the

18     latest iteration of *Jones* in Illinois?  Do you have a case for

19     that?

20             **MR. TIEVSKY:**  We've got a few Illinois Appellate Court

21     cases.

22         *In re Appointment of Special Prosecutor*, 2009, says a

23     person is aggrieved in the legal sense when a legal right has

24     been invaded.

25         Relaying also, aggrieved means to suffer from an

1    infringement or denial of legal rights.

2          The Illinois appellate court has been relatively

3    consistent on that front with the exception of *Rosenbach*.   It

4    sort of came out of nowhere.

5          And I should add, also, that Illinois Appellate Court

6    districts are not bound by each other's opinion.   And this

7    matter is up on appeal --

8          **THE COURT:**  Well, it's just like California.

9          **MR. TIEVSKY:**  -- in a different district.

10   Yes.   There is less deference --

11         **THE COURT:**  Sorry I interrupted you.

12   What's on appeal?

13         **MR. TIEVSKY:**  This same -- well, so not on a certified

14   question but, in fact, on a direct appeal.

15         **THE COURT:**  The Illinois Supreme Court?

16         **MR. TIEVSKY:**  The Illinois Appellate Court, First

17   District, will be hearing this case -- will be hearing it in

18   another case.

19         **THE COURT:**  Well, as far as you know, none of these

20   issues have been presented to the Illinois Supreme Court?

21         **MR. TIEVSKY:**  There's been a petition for a leave to

22   appeal filed in *Rosenbach*.

23         **THE COURT:**  Do you know the timeline for that?

24   Are you from Illinois?

25         **MR. TIEVSKY:**  I am from Illinois, yes.

1          **THE COURT:**  You're the Illinois court expert.   What's

2     the timeline for that?

3          **MR. TIEVSKY:**  So the petition has been filed.   The

4     defendant -- it was filed last week, so the defendant has

5     another two weeks to decide if they want to respond.

6          And then the amount of time the Supreme Court takes to

7     decide on it is highly variable, so do I not know when that

8     will be.

9          **THE COURT:**  All right.   Anything else, Ms. Goldman?

10          **MS. GOLDMAN:**  Yes, Your Honor.

11          Looking at what *Jones* actually said, the statute in that

12     case refers to -- it explains that the suit can be brought in a

13     county in which the principal office in the state of the

14     company aggrieved by such order or decision is located or where

15     the person so aggrieved resides.

16          It's a very -- in addition to being a venue statute, it's

17     not even the same language that we're talking about here.   Here

18     the statutory language is, aggrieved by a violation of the act.

19          The notion that an 80-year-old case that is construing a

20     different phrase in a different kind of statute renders --

21     constitutes convincing evidence that the Illinois Appellate

22     Court got it wrong in *Rosenbach* in a way that is meaningful

23     here, it's just not enough.

24          **THE COURT:**  All right.

25          **MS. GOLDMAN:**  It's just not enough.

1          **THE COURT:**  Okay.  I will have --

2          **MR. TIEVSKY:**  I'm sorry.  Your Honor, let me correct

3     myself on one point.  I misstated that timeline.  Actually, the

4     defendant's time to respond has already expired.

5          **THE COURT:**  And they didn't respond?

6          **MR. TIEVSKY:**  They did -- I do not know.  It's not

7     posted online, and I haven't called Springfield, yet, to find

8     out.

9          **THE COURT:**  All right.  Thank you.

10         Let's talk about scheduling.

11         Mr. Williams, do you want to join us?

12         **MS. GOLDMAN:**  Your Honor, one housekeeping note,

13     actually, on class cert.

14         **THE COURT:**  Yes.

15         **MS. GOLDMAN:**  We didn't have the Court's order on

16     standing when we filed our opposition to class certification.

17         I just want to make clear that we preserve our objections

18     to that order, and also that we think federal standing is an

19     individualized issue that, in addition to the ones identified

20     in our brief, would preclude certification here.

21         **THE COURT:**  Well, that's between you and the circuit,

22     so.

23         **MS. GOLDMAN:**  Thank you.

24         **THE COURT:**  Okay.  Let's talk about scheduling.

25         I haven't looked at all, as I indicated, at the summary

```
 1   judgment motion.  But let's just assume trial is going to go
 2   forward.  Okay.  I don't know, but let's just assume.
 3          MR. WILLIAMS:  I'm sorry.  I didn't hear what you
 4   said.
 5          THE COURT:  I haven't looked at the other summary
 6   judgment motion, but let's just assume trial is going to go
 7   forward.  I have, the rest of the year, a very carefully
 8   crafted architecture for trial dates, and I can't move it very
 9   much.  Okay?
10       So here's what I'd like to do.  Why don't we come in
11   earlier on summary judgment, the next summary judgment.
12       Are those Daubert motions?
13          MR. NADALENCO:  There are Daubert motions as well,
14   Your Honor.
15          THE COURT:  All right.  So we'll do all of that on --
16   let me see my notes here.  Oh, yes.  Why don't we do all that
17   on May 3rd.  Okay?  So it's currently set for, I think, May --
18          MR. WILLIAMS:  16th, is it?
19          THE COURT:  -- 17th, maybe?
20          MR. WILLIAMS:  17th, yes.
21          THE COURT:  Yes.  Let's move that up two weeks, to
22   May 3rd.  And then we'll do the pretrial conference on
23   June 14th.  And I'll have you in for trial on July 9th.  So
24   it's about a six-week slip.  That's the best I can do.
25          MR. WILLIAMS:  Your Honor, that looks fine for us
```

1    here.  The only thing that I would ask is that some of the --

2    some of the dates in your standing order --

3              **THE COURT:**  Yes.

4         **MR. WILLIAMS:**  -- for civil trials, they stagger a

5    number of things that would have to be exchanged between the

6    parties and submitted to the Court.

7         And I just wanted to know if there's any flexibility on

8    the timing within those periods.  I think that might make it

9    easier.

10        Some require an exchange of motions in limine, for

11   example, as opposed to just filing of them and then submitting

12   them to the Court ten days later or something like that.  I

13   don't have the exact timeline in my head.

14             **THE COURT:**  I tell you what.  You all can work that

15   out, all right, within the parameters of those dates, okay.  So

16   if you want to give yourselves some little extra room

17   internally, that's fine.

18        I just want to stick with those dates, and I need the

19   things in advance so I can review them with enough time on my

20   end to get through it.  Okay?

21             **MR. NADALENCO:**  Your Honor --

22             **THE COURT:**  Yes.

23             **MR. NADALENCO:**  -- I apologize, may I have the dates

24   one more time?  I have the May 3rd day.

25             **THE COURT:**  May 3rd.  Pretrial conference on June 14.

1   And then trial on July 9.

2           MR. NADALENCO:  I'm not aware of conflicts at this

3   point.

4           THE COURT:  Are we good?

5           MR. NADALENCO:  I believe we're okay, Your Honor.  If

6   not, we will alert the Court as soon as we can.

7           THE COURT:  Well, if there's any problem, I -- I'm

8   trying to accommodate everybody here, including me.  So it

9   would have to be a rather sizable problem.  Let's just count on

10  those dates.

11          MR. NADALENCO:  Okay.

12          MR. WILLIAMS:  Very good, your Honor.

13          THE COURT:  All right.  Now, we're getting close to

14  the end here, at least for the Facebook side.

15      Where are you all in trying to work this out informally?

16      Mr. Williams?

17          MR. WILLIAMS:  As you know, we had a full-day

18  mediation with Retired Judge Layn Phillips about a year ago.

19          THE COURT:  Oh, you did?

20          MR. WILLIAMS:  A little less than a year ago.

21          THE COURT:  All right.

22          MR. WILLIAMS:  We haven't had any meaningful

23  discussions about possible resolution since then.  We're -- at

24  least from our perspective, we think -- and I think we've

25  indicated this to you, and I've said it to Mr. Nadalenco --

1  that we think that those discussions are important to have even

2  if you don't reach a resolution.  So we're willing to do that.

3       You know, time is getting tight, and there's probably

4  limited opportunities to do so, but we're open to having those

5  discussions.

6            **THE COURT:**  Mr. Nadalenco.

7            **MR. NADALENCO:**  We agree that the discussions were not

8  fruitful.  We have not had discussions since.  I'm not sure it

9  will be fruitful.  And we believe the best way to resolve the

10 case is through the motions that we've filed.

11           **THE COURT:**  Well, with everything else going on in the

12 world, maybe this is a good time for Facebook to look at all of

13 its privacy practices, not just the ones in the news.

14      Isn't the time ripe for sitting down with Mr. Williams and

15 his colleagues and seeing what can be done?

16           **MR. NADALENCO:**  We're happy to confer with our client

17 and report back to Mr. Williams.

18           **THE COURT:**  All right.  That's not enough.  So here's

19 what we're going to do.  I'm going to send you to Magistrate

20 Judge Ryu.  She can see you in the next 30 to 60 days.

21      She's very busy, but I think she's going to be able to fit

22 you in.  Ultimately, it will be up to her schedule.  But I am

23 going to refer you to her.  She will set the dates.

24      Each side is required to have a client representative

25 attend the settlement discussions with Judge Ryu in person,

1   with full settlement authority.  That is my order.  Regardless

2   of what happens elsewhere.

3        I will be highly troubled if I get a report that a client

4   representative is not present or that client representative was

5   not authorized with full authority to settle on the spot for

6   both sides.

7        Is that clear, Mr. Williams?

8             **MR. WILLIAMS:**  Very good.

9             **THE COURT:**  Mr. Nadalenco?

10            **MR. NADALENCO:**  Absolutely, Your Honor.

11            **THE COURT:**  All right.  She'll have you in.  I'll make

12   that referral today.  And, otherwise, I will see you on

13   May 3rd.  Okay?

14        (Counsel thank the Court.)

15            **MR. MILIAN:**  Your Honor.

16            **THE COURT:**  Oh, yes.

17            **MR. MILIAN:**  Just to be clear, the cases have been

18   consolidated.  Does that include the Gullen case, as well, for

19   the mediation and the dates?

20            **THE COURT:**  Yes.

21            **MR. MILIAN:**  Thank you, Your Honor.

22        (At 10:45 a.m. the proceedings were adjourned.)

23                        -   -   -   -

## **CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:   Tuesday, April 3, 2018



_____

Katherine Powell Sullivan, CSR #5812, RMR, CRR
U.S. Court Reporter