Pages 1 - 60

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JAMES DONATO

```
                              )
IN RE FACEBOOK BIOMETRIC      ) No. C 15-3747 JD
INFORMATION PRIVACY LITIGATION)
                              )  San Francisco, California
                              )  May 21 2018
_____)  10:00 a.m.
```

## TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:              ROBBINS GELLER RUDMAN & DOWD, LLP
                            One Montgomery Street
                            Suite 1800
                            San Francisco, California 94104
                     BY:    SHAWN WILLIAMS, ESQ.
                            JOHN GEORGE, ESQ.


                            ROBBINS GELLER RUDMAN & DOWD, LLP
                            655 West Broadway
                            Suite 1900
                            San Diego, California 92101
                     BY:    PATRICK J. COUGHLIN, ESQ.



                            LABATON AND SUCHAROW, LLP
                            140 Broadway
                            34th Floor
                            New York, New York 10005
                     BY:    LAWRENCE A. SUCHAROW, ESQ.


            (APPEARANCES CONTINUED ON FOLLOWING PAGE)


Reported By:   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
               *Official Reporter - US District Court*
               *Computerized Transcription By Eclipse*
```

*Debra L. Pas, CSR, RPR, RMR, CRR*
*Official Reporter - U.S. District Court - San Francisco*
*(415) 431-1477*

2

**APPEARANCES:   (CONTINUED)**

For Defendant:          MAYER BROWN, LLP
                        1221 Avenue of the Americas
                        New York, New York 10020
                   BY:  **LAUREN R. GOLDMAN, ESQ.**


                        MAYER BROWN, LLP
                        1909 K Street, NW
                        Washington, DC 20006
                   BY:  **ARCHIS PARASHARAMI, ESQ.**


                        MAYER BROWN, LLP
                        71 South Wacker Drive
                        Chicago, Illinois 60606
                   BY:  **VINCENT J. CONNELLY, ESQ.**


Also Present:           **Nikki Stitt Sokol**
                        Associate General Counsel - Facebook


                          -  -  -

<u>**Monday - May 21, 2018**</u>                                    <u>**10:02 a.m.**</u>

P R O C E E D I N G S

---oOo---


    **THE CLERK:**  Calling Case No. 15-3747, In Re Facebook

Biometric Information Privacy Litigation.

    Counsel?

    **MR. WILLIAMS:**  Good morning, your Honor.  Shawn

Williams, Robbins Geller Rudman and Dowd.

    I'm also here with my colleagues Patrick Coughlin and John

George from my firm, and Corban Rhodes from the Labaton firm,

on behalf of plaintiff.

    **THE COURT:**  Okay.

    **MS. GOLDMAN:**  Good morning, your Honor.  Lauren

Goldman of Mayer Brown on behalf of Facebook.

    I'm here today with Archis Parasharami, who I think you

met before, who will be covering the class action notice

issues; with my partner Vincent Connelly, who is one of the

people who will be trying the case; and with Nikki Sokol from

Facebook.

    **THE COURT:**  All right.  Okay.  We're going to power

through the notice issue.  Why don't you both -- both come on

up.

    All right.  Now, let's talk about a couple of things

first.  Who is going to do what?

```
 1          My sense is, after reviewing everybody's papers, I think
 2     the class administrator should send the email, okay?  So they
 3     can send the email notice.  We're going to work out the back
 4     office part of this in a moment.
 5          And then, Facebook, I want you to do one of those jewel
 6     notifications that I learned about earlier in the case, and,
 7     also, a news feed insert.  Okay?
 8               MR. PARASHARAMI:  Your Honor, may I be heard on those
 9     issues?
10               THE COURT:  Yes.
11               MR. PARASHARAMI:  So in light of the fact that your
12     Honor is ordering email notice, which we think is appropriate,
13     the jewel notifications and news feed notices --
14          THE COURT:  I think you need to get a little bit
15     closer to the mic.
16               MR. PARASHARAMI:  I'm sorry.
17          THE COURT:  Just slide it towards you.  Slide the
18     thing -- yeah, okay.
19          All right.  Go ahead.
20               MR. PARASHARAMI:  So the news feed notifications and
21     the jewel notifications would be duplicative, unnecessarily
22     duplicative.
23          THE COURT:  They may be duplicative, but our goal
24     here is to give notice.  And it's reasonable, in my view, for
25     you anow to do that.
```

5

1       So we will do a jewel notice, or whatever you call it, the

2  jewel thing with the little red light that flashes and the news

3  feed insert.

4       I'm going to decline Messenger.  I don't think that --

5  that's necessary.  I think that seems to be the least likely to

6  get everybody, so Messenger will be declined.

7            **MR. PARASHARAMI:**  Your Honor, may I be heard on the

8  -- just a little further on the jewel notification?

9            **THE COURT:**  Yes.

10            **MR. PARASHARAMI:**  So the Manual for Complex

11  Litigation says using essentially communications processes of a

12  business should be essentially the last resort, only if there

13  are no other feasible alternatives because of the way that it

14  interferes with --

15            **THE COURT:**  I don't agree with that.  We're trying to

16  give the best reasonable notice.

17       In my view, given your business and your platform, email

18  is just not going to cut it.  You need to get the jewel

19  notifications and the news feed.  So those will happen.

20       Now, tell me a little bit about what you did with

21  Cambridge Analytica.  So that looks to me -- now maybe I'm

22  wrong because I do not use Facebook.  I never have, because I'm

23  a federal judge.  I don't use any social media.  It's not just

24  Facebook.  I don't Tweet.  I don't do anything.  Now,

25  nevertheless, I understand what you do because people around me

1    use it.

2         So my understanding is your postings about Cambridge

3    Analytica were not in news feed and not in jewel.  You did

4    something special for that; is that right?

5              MR. PARASHARAMI:  Your Honor, I don't know the

6    details of it, but let me try and address that question.

7    Cambridge Analytica is a totally different situation, your

8    Honor, because it is a communication between the company and

9    its customers.  It is not a Court ordered class notice.  It's

10   just a different fit.

11        I mean, I think to the extent that your Honor is raising

12   the possibility of a jewel notification and -- you know, and a

13   news feed, that probably is enough to describe what we would

14   have to do here.

15             THE COURT:  Well, that may be, but what did you all

16   do with -- I'm looking at screenshots and they're not -- they

17   don't look like news feed or jewel.

18        Is there something else you did?  Was there something else

19   Facebook did for Cambridge?

20             MR. WILLIAMS:  Your Honor, I can talk about the news

21   feed piece, at least briefly, because they did do that --

22             THE COURT:  They did do a news feed for Cambridge?

23             MR. WILLIAMS:  -- with Cambridge Analytica.  And in

24   our view it's something that is sufficient.  It seems cheaper

25   than some other forms of notice.

```
 1              It is a -- a notice that goes directly to a user's news

 2      feed so when they open Facebook, it's the first thing that

 3      they see.

 4              THE COURT:  No, I understand that and it's ordered.

 5      We're -- what I want to know is do you know, maybe -- if you

 6      don't know, that's fine.

 7              But, Mr. Williams, for example, do you know, did they do

 8      something special for Cambridge?

 9              MR. WILLIAMS:  When you say "special" in terms of the

10      news feed?

11              THE COURT:  Was it -- outside of the news feed and

12      outside of jewel, did they have a separate push that they used?

13              MR. WILLIAMS:  I don't know that.  I don't know the

14      answer to that.  I do know that it was through news feed at

15      least.

16              THE COURT:  At least through news feed.  Okay.

17              And, Mr. Parasharami -- did I get that right?

18              MR. PARASHARAMI:  Yes.  Thank you.

19              THE COURT:  You don't know whether they did

20      something?

21              MR. PARASHARAMI:  My understanding is that it's not

22      something special or different outside of its normal channels

23      for communicating with its own users.

24              THE COURT:  Okay.  Well, I just happened to see one

25      this morning that is on a mobile phone.  It says Facebook, and
```

1   it's from Facebook, and it says "Sarah," personalized to the

2   user, and then it goes on from there.

3        But you don't know whether there was a news feed or

4   something else.

5        **MR. PARASHARAMI:**  No, I don't.  This is something not

6   in the record, your Honor.

7        **THE COURT:**  All right.  Well, it will be news feed,

8   jewel and the emails.

9        Now, the emails you all are going to do, Mr. Williams.

10  Okay?

11       Now, my next question is when can we get all of this done?

12  It looked to me like -- can we get it out by May 30th?  That's

13  40 days before trial.

14       **MR. WILLIAMS:**  I think that's right, your Honor.  The

15  papers -- defendant's papers made clear that they could get at

16  least all of the email in a form that could be communicated to

17  the administrator by next Friday, which is May 25th.

18       **THE COURT:**  Is that right?

19       **MR. WILLIAMS:**  Assume it goes over to Monday, you're

20  at the 28th, which is at least two days before that.

21       **THE COURT:**  Maybe you can have them work on the

22  weekend.

23       **MR. WILLIAMS:**  Oh, that's Facebook.

24       **THE COURT:**  Okay.

25       **MR. WILLIAMS:**  They are compiling all the email to

```
 1   send and will have it all compiled by the end of next week.  At
 2   least that's what's in their papers.
 3            THE COURT:  All right.  So May 25th, unless something
 4   dramatic happens, will be a bankable date.
 5        Yes.
 6            MR. PARASHARAMI:  Your Honor, just to be clear --
 7            THE COURT:  I really need you to move the microphone.
 8   Just put it right in front of you.  Don't bend down.  Just move
 9   it towards you, so you can stay upright and still speak.
10            MR. PARASHARAMI:  Is this better?
11            THE COURT:  No.  Move it closer.
12            MR. PARASHARAMI:  All right.  Thanks.  Thank you,
13   your Honor.
14        I just wanted to --
15            THE COURT:  That's better.  Go ahead.
16            MR. PARASHARAMI:  Okay.  Just on the question of
17   timing.  You know, our declarant testified to what we could do
18   under essentially the proposal that we had made, and so I just
19   want to make clear that if -- you know, if it is some different
20   set of people that we're supposed to identify, then this Friday
21   date could never hold.
22            THE COURT:  All right.  Well, we can talk with that.
23        So it looked to me that, Facebook, you can go back -- so
24   you have the IP address and some kind of advertising placement
25   technology to find people, right?
```

1       **MR. PARASHARAMI:**  Essentially we have something that

2  we use to predict the home location of users, and that's what

3  we use in our advertising processes.

4       **THE COURT:**  All right.  So you can use both

5  techniques back to January of 2012 and then IP addresses only

6  for 2011 and 2012.

7       **MR. PARASHARAMI:**  That's essentially right, your

8  Honor.

9       **THE COURT:**  Seems fine.

10     Any problem with that, Mr. Williams?

11      **MR. WILLIAMS:**  Not for locating the email address,

12  no.

13      **THE COURT:**  Okay.

14      **MR. WILLIAMS:**  And if --

15      **MR. PARASHARAMI:**  And -- oh, I'm sorry, Sean.

16      **MR. WILLIAMS:**  Go ahead.

17      **MR. PARASHARAMI:**  Just to be clear, your Honor, the

18  idea would be to try to identify individuals who are -- who are

19  users that are residents of Illinois for purposes of

20  identifying and are an over-inclusive, but appropriately

21  tailored group of notice recipients.

22      **THE COURT:**  Yes.  Now, let's talk about what I'm

23  going to call the O'Hare problem.  Okay?

24     So you're living in Colorado.  You are a Facebook user.

25  You're connecting through O'Hare.  You're there for two hours.

1    As users often do, you check your Facebook to see what's

2    happening in the 90 minutes that you are, you know, unavailable

3    and then you leave.

4         Now, that will show an IP address for Illinois, but they

5    are not going to be members of the class.  They are residents

6    of Colorado.  So how are we going to deal with that?

7              **MR. WILLIAMS:**  Well, two points there.  On the

8    residency issue, I do want to discuss that a little bit.  It

9    was one of the things that me and my colleagues and Facebook

10   talked about over the weekend with respect to the content of

11   the notice.

12             **THE COURT:**  Okay.

13             **MR. WILLIAMS:**  I think that is a difficult problem.

14   I don't think it's a difficult -- well, let me back up.

15        I think that if that person who landed in Illinois for an

16   hour, checks their Facebook page, maybe even opened up, took a

17   selfie and uploaded it onto Facebook, that person is going to

18   have a scan of their face geometry done and possibly a template

19   created.

20        I think your Honor was very, very clear in its class

21   certification order about the class definition being limited to

22   people who had a template created and stored in Illinois.  What

23   the Court did not do was -- what the Court did not do was limit

24   it to -- to residents.

25             **THE COURT:**  It doesn't have to be stored in Illinois.

1        **MR. WILLIAMS:**  Correct.

2        **THE COURT:**  It just has to be people who had

3   templates harvested from data.

4        **MR. WILLIAMS:**  I misspoke.

5        **THE COURT:**  Yes.

6        **MR. WILLIAMS:**  I think that the Court did not limit

7   it to people who were, quote/unquote, residents.

8       We don't really have a -- an issue with the term

9   "resident" unless it becomes a requirement later that -- you

10  know, in a proof of claim that a person must show that they

11  were a legal resident in Illinois at the time that this

12  violation occurred.  So we just need to work through that.

13       **THE COURT:**  I don't think we need to sort through

14  that now.  Let's be common-sensical about this.  This is an

15  Illinois state law for Illinois people.  Okay?

16      So if you're passing through O'Hare or driving through

17  Peoria, you're not an Illinois person subject to BIPA.  That's

18  all we're talking about.  So how are you going to sort that

19  out?

20      Facebook, can you do something?

21       **MR. PARASHARAMI:**  Yes.  Our proposal is to -- in

22  coming up with this list of potential notice recipients, which

23  we believe is over-inclusive, but appropriately tailored for

24  purposes of notice, but our proposal is to look for people who

25  have a predicted home location in the State of Illinois for a

1    substantial portion of a year.  And to us that was a good way

2    to come close to assessing residents.  I mean --

3             **THE COURT:**  Well, just let me jump in.

4        I don't want to have any game playing with "substantial

5    portion."  If they are there, they are there.

6        Now, I'm only talking about the O'Hare problem.  I've

7    intentionally called -- that's my term.  I've intentionally

8    called it that so you get the gist of what I'm trying to

9    communicate.

10       If you are just passing through, you're not in the class.

11   If you have lived there for a month, if you have lived there

12   for two months, if you've lived there for any period of time

13   and you're not just passing through, although you're not a

14   lifetime resident, you are potentially part of the class.

15   Okay?

16       So I don't want to find out that, you know, you all built

17   in some eight-month limit, so that -- Facebook, you know, if

18   you ran your parameters and if you aren't there for eight

19   months, you're kicked out of the list.  That I don't want to

20   have happen.

21       So how are you going to define that substantial -- can

22   you -- like a -- a week or less.  How about that, Mr. Williams?

23            **MR. WILLIAMS:**  That's fine.  And that was the problem

24   I was worried about.

25            **THE COURT:**  We have to have some -- you need some

```
 1   gatekeeping time; right?
 2           MR. PARASHARAMI:  Yeah.  I wonder if that is,
 3   unfortunately, way too small just because of the --
 4           THE COURT:  Let's talk about that.
 5       How about -- you know, it's possible you could be on a
 6   business trip or maybe a trial in the Northern District for two
 7   months.  How about --
 8           MR. WILLIAMS:  I think it's fair to say just a month.
 9   If you're in Illinois for a month, that means that you have at
10   least some business or social issue that requires you to be
11   there, use the services of, you know, the state or city that
12   are available to you.  And even if you don't have a plan to
13   stay forever or a year, that a month, I think, puts you in a
14   position where you're actually -- you're there and it's a
15   meaningful period of time.
16           MR. PARASHARAMI:  There is sort of an indeterminacy
17   to that that I think is problematic.
18       And I guess the other point I would make is that this a
19   predicted home location.  It's not as though we know for sure;
20   right?
21       So I guess my take is that if it's a relatively short
22   time, it's really not enough to know if they are there.
23       You know, I'm not trying to play games or anything like
24   that.  I think it makes sense to have something that is, you
25   know, tied to other standards in the law.
```

```
 1          So one example might be residency for tax purposes, which
 2     is --
 3               THE COURT:  That's a year, though.  That's too long.
 4               MR. PARASHARAMI:  Well, often they say 100- -- you
 5     know, let's say over six months.  183 days is the IRS
 6     requirement, just as an example.
 7          I mean, I think, to me, that might be better than the
 8     alternative of, like, one week or one month.  There is --
 9               THE COURT:  Let's just think this through.  Now, this
10     is notice.  Okay?  This is not writing checks.  There is -- a
11     lot of things have to happen before that ever happens.
12          Now, it's okay to be -- throw a wider net, cast a wider
13     net for notice.  It may be that we use a shorter time period
14     for notice, but should the day come -- and who knows, maybe it
15     won't, but should the day come that claim forms get submitted,
16     we tighten it up.  And, you know, you -- if it's less than
17     three months, we'll just presume you were a transient and
18     you're not going to be eligible to get any of the damages that
19     might be awarded.
20               MR. WILLIAMS:  I think that makes sense.
21               THE COURT:  We could do it that way.
22               MR. WILLIAMS:  I think it makes sense.  Wider in the
23     beginning and narrow it later.
24               THE COURT:  Okay.  So -- yes.
25               MR. PARASHARAMI:  I guess the other thing I would say
```

```
 1   is that if we change the parameters, we just do need to have
 2   more time in order to effectuate that.  I mean, you know, we --
 3            THE COURT:  You just push a different date in.  I
 4   mean --
 5            MR. PARASHARAMI:  It's not just like pressing
 6   buttons.  I think it would take a lot.
 7            THE COURT:  It's not just like pressing buttons?
 8            MR. PARASHARAMI:  Well, it might be like pressing a
 9   lot and lot and lot of buttons.
10            THE COURT:  What else could it be but pressing
11   buttons?  You're Facebook.
12            MR. PARASHARAMI:  Your Honor, I appreciate that.  I
13   guess maybe I should have been more -- more apt.  It's not like
14   pressing one button.
15            THE COURT:  Fine.  You have to change the algorithm
16   or whatever.
17            MR. PARASHARAMI:  So then I would, your Honor, ask
18   for enough time to effectuate that.  You know, I obviously will
19   warrant that we will work with alacrity, but this is being
20   developed for the first time --
21            THE COURT:  We'll come back to timing at the end.
22   Let's work out all these little things first.
23        So I'll tell you what.  We'll reserve the claimant
24   eligibility issue on location until we get to the claim stage,
25   should that happen.  Who knows?  It may not.
```

1    And for notice purposes, let's just -- I think two months

2    or less is not -- is presumptively transient.  So, you know,

3    more than 60 days will be the notice cut-off.

4         **MR. PARASHARAMI:**  And, your Honor, so my take would

5    be that that should be 60 continuous days, because otherwise if

6    it's --

7         **THE COURT:**  That's fine.  I don't have a problem with

8    that.

9         **MR. WILLIAMS:**  Well, I guess one thing that we need

10   to know is what -- what are the manners in which they are

11   actually putting parameters around the search now.

12        **THE COURT:**  You anticipated my next question.

13   So, Mr. Parasharami, just tell me, just generally, how is

14   all this going to happen?  How is that list going to get

15   populated?

16        **MR. PARASHARAMI:**  Well, so we attempt to look for

17   what's called predicted home location, which is essentially

18   this method that we use for advertising to try and predict, you

19   know, for advertisers where somebody will be.  What their home

20   location is on a specific day.  Right?  And so I guess we would

21   look for the number of hits, you know, for a number of days per

22   person.

23   So it requires a complicated search.  I'm no engineer, so

24   I can't, you know, begin to understand what they do to get

25   there, but I do understand --

```
 1              THE COURT:  Somehow I'm confident Facebook can do it.
 2         But let me just ask this.  This is all the existing
 3    technology.  There is nothing different.  For example, you'll
 4    just take what Facebook normally uses and just adapt it for
 5    this purpose.
 6              MR. PARASHARAMI:  Right.  I guess the -- the
 7    predicted home location technology is existing technology.  The
 8    process of searching for this, obviously, is not something it
 9    ordinarily has to do --
10              THE COURT:  I understand.  You're just tailoring
11    existing search protocols for this project.  Just like if I
12    were Procter and Gamble, you would be tailoring it for Procter
13    and Gamble.
14         You're just using pre-existing -- I want your assurance
15    this is not a new, different or unusual software.  This is what
16    Facebook does in the ordinary course of business to get this
17    information.
18              MR. PARASHARAMI:  I understand your question, your
19    Honor.  I think it is accurate to say that the underlying
20    information of predicted home location is part of our course of
21    business.
22         The searching of it.  The substantial engineering time
23    needed to actually get this information pulled, the pulling of
24    an email list, is not part of our ordinary course of business.
25              THE COURT:  I understand.  Of course not.  This is
```

```
 1   litigation.  This isn't -- class action trials don't happen

 2   every day, even for Facebook.

 3        Now, for the IP addresses, how are you going to harvest

 4   those?

 5             MR. PARASHARAMI:  That specific of how to do it is

 6   beyond my knowledge, but my understanding --

 7             THE COURT:  Just generally.  What do you understand

 8   is going to happen?

 9             MR. PARASHARAMI:  I think we have data and we are

10   going to look at that data.  I mean, at that level -- the

11   engineers understand it and, as I say, I think we can do it

12   with reasonable speed.

13             THE COURT:  All right.  Okay.  So we're going to set

14   a target date of May 25th for this.  All right?

15        Now, if there is any extraordinary problem, you can let me

16   know, like, the day before and we'll see what we can do.

17             MR. PARASHARAMI:  Your Honor, just to try and -- I

18   think that given this time frame of the two months, I -- that

19   has been -- you know, we're going to have to start on it.  I

20   just do not know that starting today, we can get it done by the

21   25th.

22        I would ask, rather than us coming back to you on the 24th

23   or 25th -- the 24th is three days from now, and saying --

24             THE COURT:  Well, your declarant says they -- we're

25   talking about what was in the declaration.  He said he could do
```

```
 1    it by the 25th.  What's the problem?
 2              MR. WILLIAMS:  I think they said they already
 3    started.
 4              MR. PARASHARAMI:  Yeah.  Started on, I think, a
 5    different time frame.  So I just don't know.  I think, your
 6    Honor, if we --
 7              THE COURT:  It's a mildly longer one.  I mean, if you
 8    were doing six months, this is just now three months shorter.
 9              MR. PARASHARAMI:  Yeah.  If we have to restart our
10    work in order to do it, then that might expand the time.
11              THE COURT:  I will be surprised, but you ask and
12    figure that out.  But all we're doing is the -- literally the
13    only thing we're doing is, apparently, starting a little bit
14    earlier than you might have.  That's all.  Maybe they did start
15    earlier.  Who knows?
16              MR. PARASHARAMI:  Right.  So I'm saying we would have
17    to start the search now, as opposed to having already tried to
18    start work on this.
19              THE COURT:  All right.  May 25th is going to be the
20    target date.  You let me know if there is any problem with
21    that.  We're going to shoot to get everything out by May 30th.
22    Okay?  That will give us 40 days before trial.
23         All right.  Now, I do want to -- then you all can raise
24    any other issues you want to, but let's just go over the long
25    form notice as amended in the, what is it, reply filing,
```

```
 1    Mr. Williams?

 2              MR. WILLIAMS:  We filed a declaration on Friday

 3    afternoon.

 4              THE COURT:  Yes, that one.  I want to use that one.

 5    Okay.

 6              MR. WILLIAMS:  I think it's docket -- the red line is

 7    381-2, if that's helpful.

 8              THE COURT:  Let's actually take the original un-red

 9    lined one, 381-1, which is plaintiff's revised long form

10    notice.  Let's just go through it.

11         There are a couple of changes I'm going to make and then

12    we can discuss whether other changes need to be made as well.

13    So on Page 1, that all looked fine to me.

14         Mr. Parasharami, any problems with that?

15              MR. PARASHARAMI:  I'm sorry.  You're looking at

16    380 --

17              THE COURT:  381-1, the long form notice, called

18    Exhibit A.

19              MR. WILLIAMS:  381-1 was filed on May 18.

20              THE COURT:  May 18.

21         Maybe you two can share?

22              MR. WILLIAMS:  That's fine.  I don't have my winning

23    case notes here.

24              THE COURT:  Exhibit A.

25              MR. WILLIAMS:  381-1 is the clean version.  381-2 is
```

```
1    the red line.

2         (Whereupon document was tendered to counsel.)

3              MR. PARASHARAMI:  Oh, thanks.  Appreciate it.

4              THE COURT:  Okay.  Page 1 seems fine.

5         Any problem with that, Mr. Parasharami?

6              MR. PARASHARAMI:  Your Honor, we -- we do, you know,

7    for -- you know, I guess -- I think an appropriate --

8    especially since we have some time, but what I would propose is

9    that we submit --

10             THE COURT:  No, we're just going to do it now.  Let's

11   get this thing done.

12        Look, this is one of my oldest cases.  Okay?  We can't

13   keep pushing things down the road.  The time for trial has

14   come.  You're here.  I'm here.  I've got a million other things

15   to do.  Trust me, I have a lot more than you do.  Let's just

16   finish this now.  Okay?

17             MR. PARASHARAMI:  I appreciate, your Honor --

18             THE COURT:  So any problems that are not in your

19   brief?  Any objections to Page 1?

20             MR. PARASHARAMI:  Yeah.  Our concern is that the use

21   of the phrase "biometric data" is inaccurate because it doesn't

22   appear in the statute.  It's not what the claims are --

23             THE COURT:  What do you want, "biometric

24   information"?

25             MR. PARASHARAMI:  "Identifiers," your Honor.  That's
```

```
 1   the phrase in the statute and that's the -- that's the phrase
 2   that they are -- that the plaintiffs are actually litigating.
 3         THE COURT:  This has no legal interpretive effect.
 4   You understand that?  So this is just telling people in the
 5   world in a practical and reasonable way what the case is about.
 6         I think that idea of identifiers, it's not going to tie
 7   your hands.  It's not going to tie anybody's hands.  It's
 8   certainly not going to tie my hands.  We just want to
 9   communicate to people in a way that they understand.
10         I'm going to overrule that.  "Data" is fine.  That is not
11   an interpretation of BIPA.  It is not meant to be a statement
12   of law.  You know that.  This is just telling folks in the
13   world:  Hey, maybe I should do something.  Okay?
14         MR. PARASHARAMI:  I think that the problem is it
15   misstates the claims, and Rule 23(c)(2) requires an accurate
16   statement of --
17         THE COURT:  It is accurate, Mr. Parasharami.  Trust
18   me.  I have been writing Facebook order after Facebook order
19   for the last two months.  All right?  This thing is going to
20   get done.
21         So if you want to say "information" because you don't like
22   the word "data," that's fine.  It does not have to slavishly
23   follow the statute to be accurate and informative.
24         Now, what do you want to say if you don't like the word
25   "data"?  Would you prefer to say "information"?
```

```
1              MR. PARASHARAMI:  Umm --

2              THE COURT:  "Materials"?

3      I don't know why the word "data" is objectionable, but if

4  you don't like it, I will entertain a substitute.

5              MR. PARASHARAMI:  Yeah.  I --

6              THE COURT:  "Stuff."

7              MR. PARASHARAMI:  Oh, no.  I --

8              THE COURT:  "Your face," how about that?  "Stored

9  your face."

10             MR. PARASHARAMI:  Yeah, I don't think that's quite

11  right.  I think -- do we prefer "information"?

12             MS. GOLDMAN:  Yes.

13             MR. PARASHARAMI:  "Information."

14             THE COURT:  "Information," okay.

15      Mr. Williams, do you have any problem with that?

16             MR. WILLIAMS:  No.

17             THE COURT:  That will be changed to "information."

18      Okay.  Anything else on Page 1, Mr. Parasharami?

19             MR. PARASHARAMI:  Yeah.  I think -- I think

20  throughout where there are references to "in Illinois," and

21  this is a global problem with the notice, it should refer to

22  "residents."

23      I think that, you know, the Court has said in its class

24  certification order, the order granting class certification,

25  that the class consists of Illinois residents; that it is not a
```

```
 1    class of Illinois non-residents.

 2              MR. WILLIAMS:  That's inaccurate.

 3              MR. PARASHARAMI:  Well, on Page 13 it says -- the

 4    order says that this is not a class of Illinois non-residents.

 5              MR. WILLIAMS:  Your Honor, what he's referring to on

 6    Page 13 of the order -- first, the class definition is:

 7              "Facebook users located in Illinois for whom

 8         Facebook created and stored a face template after

 9         June 7, 2011."

10         That's on Page 15.

11         Page 13, that Mr. Parasharami is referring to, is a page

12    where your Honor was discussing the extraterritoriality issue

13    and actually -- and the Avery case, which -- in which case the

14    issue was plaintiffs who brought suit under an Illinois

15    statute, but lived outside of Illinois.  And you are

16    distinguishing that set of circumstances --

17              THE COURT:  I remember that all quite clearly.

18         Why don't we do this?  I did say "located."  Why don't we

19    say, "If you are a Facebook user located in Illinois"?

20              MR. WILLIAMS:  That's fine.

21              THE COURT:  Okay?  Make that change throughout.

22    Okay?  So, for example, starting in that bold language at the

23    top and then elsewhere.  Okay?

24              MR. PARASHARAMI:  Your Honor, just on that point.  It

25    does seem like based -- the order said none of the class
```

```
 1   members are non-residents, and I just think that it could be

 2   misleading to people, to the extent that if they believe

 3   that -- that there is some sort of broader criteria, you know,

 4   located in what captured your O'Hare example.  And I think that

 5   would be very confusing to potential recipients of this.

 6          THE COURT:  I think that's -- I'm not worried that

 7   that's going to be confusing.

 8       So we'll -- we'll meet you halfway there, Mr. Parasharami.

 9   We will say "located in."  Mainly to stay consistent with the

10   definition that's in the next paragraph.

11       Okay.  Any other concerns about Page 1?

12       Mr. Williams, you need to just take notes or have somebody

13   on your team take notes so we can make all this good.  Okay?

14       All right.  Anything else?

15       (No response.)

16          THE COURT:  Page 2 is just the Table of Contents.

17   Anything there?

18          MR. PARASHARAMI:  So, no, we don't have a problem

19   with that.

20          THE COURT:  Okay.  Page 3.  I am changing Section 1

21   to -- we're going to delete entirely the sentence, "The trial

22   will decide."  Okay?

23       So it should go from bracket date to my name.  Take that

24   middle sentence out.

25       And then in the second line "You have legal rights," say
```

1   "Before the Court holds a jury trial."  All right?  So add

2   "jury" there and take out "the trial will decide" line.

3        Mr. Parasharami, any concerns about Page 3?

4        **MR. PARASHARAMI:**  So I guess globally we've covered

5   the change from "data" to "information"?

6        **THE COURT:**  All right, yes.  That will be made

7   throughout, along with the "located."

8        Okay.  Anything else?

9        **MR. PARASHARAMI:**  Yeah.  I think in the last sentence

10  of 2, we think it's --

11       **THE COURT:**  2?  Okay.

12       **MR. WILLIAMS:**  Section 2.

13       **THE COURT:**  Yes.

14       **MR. PARASHARAMI:**  Section 2.

15       **THE COURT:**  Yes.

16       **MR. PARASHARAMI:**  We think it's important to instead

17  of repeating the phrase about the "stored biometric data

18  without prior consent," to identify the statutory requirement,

19  which I'll agree is part of the requirement of being aggrieved

20  by a violation of the statute.

21       **THE COURT:**  All right.  So what are you asking?

22       **MR. PARASHARAMI:**  To delete -- where it says "any

23  person in Illinois," and then delete "from" through "consent to

24  aggrieved by a violation of the statute."

25       **MR. WILLIAMS:**  I'm not sure I understand.

 1              THE COURT:  I don't see the word "from."  Where is

 2    that?  This is Paragraph 2, "What is this lawsuit about?"

 3              MR. PARASHARAMI:  So we would change after "BIPA

 4    allows any person in Illinois from."

 5              THE COURT:  The last sentence, I see.  "BIPA allows

 6    any person in Illinois."

 7              MR. PARASHARAMI:  "Aggrieved by a violation of the

 8    statute," is what we would say in place of "from" through

 9    "without prior consent."

10              THE COURT:  Can we just drop that last sentence

11    entirely?  Do we really need it?  It seems a little duplicative

12    of anything else.

13              MR. WILLIAMS:  The reason we had it in there is

14    because we felt we needed to actually explain the damages, the

15    potential.  But if that's out, we're comfortable with it.

16              MR. PARASHARAMI:  We're fine with deleting the

17    sentence.

18              THE COURT:  All right.  That last sentence will be

19    deleted.  Let's take that whole thing out and make it shorter

20    anyway.

21         Okay.  Anything else on Page 3?

22              MR. PARASHARAMI:  I think -- I think in the first

23    bullet on the response to -- the response No. 4, where it says,

24    "who have been tagged in photographs and, thus, had face

25    templates created."

```
 1        I'm not sure that's entirely clear that that's right.  And
 2   I would just cut "who have been tagged" --
 3            THE COURT:  How about if we drop all those bullet
 4   points?  For notice purposes, do they really need --
 5            MR. PARASHARAMI:  That's fine.
 6            MR. WILLIAMS:  Don't need them.
 7            THE COURT:  All right.  All the bullet points are
 8   out.  All the little dot things will be out.  Okay.  That's
 9   good.  All right.  So that takes care of that.
10        Page 4.  Any concerns, Mr. Parasharami?
11            MR. PARASHARAMI:  So, again, the -- I think we're
12   replacing "biometric data" with --
13            THE COURT:  That's going to happen universally.  So
14   don't worry about that.
15        (Brief pause.)
16            THE COURT:  All right.  Nothing this?
17            MR. PARASHARAMI:  Yeah.  I -- we would like to
18   supplement, and I just don't have language here, but six
19   with -- you know, because I think if I understand right --
20            THE COURT:  Six, okay.  Yes.
21            MR. PARASHARAMI:  Mr. Williams and I are probably
22   going to submit after this a joint document that contains
23   our -- our views of what this should look like for the Court's
24   approval.  So just -- you know, I think that might be a good
25   way to proceed.
```

```
 1          But with that, we want to provide a --

 2          THE COURT:  Can I tell you what I used to do when I

 3   was on your side of the case?  I would just say:  We disagree

 4   entirely and consider ourselves to be as innocent as the new

 5   lambs.  I mean, how much more do you need to say?

 6          MR. PARASHARAMI:  I think with respect, I appreciate

 7   that, but we would like to communicate our point of view.

 8          Can I -- I guess I can read into the record what our view

 9   would be for -- for six and --

10          THE COURT:  I'll tell you what.  Just work it out

11   today.

12          MR. PARASHARAMI:  Is that all right, your Honor --

13          THE COURT:  Any reasonable statement.  They can say

14   whatever they want.

15          MR. WILLIAMS:  One point I'd like to make there.

16          THE COURT:  Yes.

17          MR. WILLIAMS:  It's their position they want to say

18   whatever they want, that's fine.

19          What they do want to add, though, which we talked about

20   yesterday, which was that they have a current petition with the

21   Ninth Circuit pending under 23(f).  And I explained that, look,

22   it's not in the Ninth Circuit.  It's a petition and it's not --

23   have relevance to any person that is going to be reading this

24   for notice purposes.

25          And so we didn't think that that had any role in --
```

```
 1              THE COURT:  Well, I agree with that.  You can just
 2     say -- we're talking about the merits here, okay, not
 3     procedural things.  So just whatever you want to say on the
 4     merits.
 5              MR. WILLIAMS:  They can say whatever they want to
 6     say.
 7              THE COURT:  They can do whatever they like.  If you
 8     have any objections, let me know.  Okay?
 9         Let's get that done by tomorrow -- I would like to have
10     this back first thing tomorrow morning.
11              MR. PARASHARAMI:  Your Honor, with that in mind, I
12     think -- and we have been negotiating over the weekend.  I
13     think there might be some value in -- and I think we agreed on
14     a lot of things, Sean, I think it's fair to say.
15              MR. WILLIAMS:  Except last night wasn't quite an
16     agreement.
17              THE COURT:  Just talk to the Court not to each other.
18     Talk to me.
19         What's the issue?
20              MR. PARASHARAMI:  Your Honor, I think it might be
21     appropriate for us to -- you know, if we can agree on certain
22     other changes to this, we would put in it a red line for your
23     Honor --
24              THE COURT:  You can do whatever you want, but this is
25     the baseline.  Okay?
```

1          **MR. PARASHARAMI:**  Sure.

2          **THE COURT:**  If you want to riff on it some more,

3    that's fine, as long as everybody agrees.

4          **MR. WILLIAMS:**  And the changes that your Honor has

5    suggested right now, we're fine with those.

6          **THE COURT:**  Those are all mandatory.  Okay?  They're

7    not to be negotiated.

8       Now, I do not want to see 15 other topics of this

9    agreement.  This is your time.  So don't go home and think:

10   I'm going to add 20 more points.  We're getting this done now.

11      Now, I will let you negotiate your insert.  That's fine.

12   Okay?  Now, if there is anything else you both agree on, that's

13   fine, too.

14         **MR. PARASHARAMI:**  And is that true throughout the

15   document?

16         **THE COURT:**  That's through for the entire notice.

17   Okay?  This is it.  This is your show time.

18         **MR. PARASHARAMI:**  Appreciate it, your Honor.

19         **THE COURT:**  Okay.  Anything else on Page 4?

20      (No response.)

21         **THE COURT:**  All right.  Page 5?

22      (Brief pause.)

23         **THE COURT:**  Now, I have to say for number ten, I

24   understand there is not going to be a website that

25   automatically tells you.  That's fine.

1    But I think the wording of this properly captures the fact

2    that they will be notified later after all of the checking

3    mechanisms are put into place and it's determined.  So I don't

4    have a problem with that.

5         MR. PARASHARAMI:  Your Honor, on this we feel very --

6    there is not going to be some process by which -- that can

7    inform potential class members accurately whether they are

8    class members or not.  So that's a pretty important point.

9         THE COURT:  I agree with that.  But I think this

10   notification just says go to this website, type your name in

11   and we'll get back to you.

12        It doesn't say we're going to instantaneously determine

13   whether you're a class member or not.

14        MR. PARASHARAMI:  I think that -- at least if I were

15   a class member reading that, I would think that by putting my

16   information in, I would get some return at some point on

17   whether I'm a class member or not.  And that is typically --

18        THE COURT:  It says you will be notified.

19        MR. PARASHARAMI:  So that -- that essentially almost

20   never happens in class actions.  To my mind -- and I do a lot

21   of class actions and class action notices.  To me, this is both

22   unheard of and, frankly, totally impractical.  I don't think

23   it's necessary to -- for purposes of understanding whether

24   somebody should opt in or opt out.

25        I think the other problem with that is that if somebody is

1  choosing whether to exercise their due process right to opt out

2  of the class, they might believe they could go to a website and

3  actually provide that information.

4      This is -- at the end of the day if there is a trial in

5  the case and, you know, a final resolution, there would always

6  need to be a claims process in order to determine who is in the

7  class.  So I think this is wholly misleading.

8      I think striking it is -- would be useful.  And, you know,

9  I think we have --

10         THE COURT:  Well, all right.  I don't agree with any

11  of that, but in the interests of expediency, can we just drop

12  it?

13         MR. WILLIAMS:  I don't think that it's misleading at

14  all.  I think it's helpful.

15         THE COURT:  Why do we need it?  Why do we need it?

16         MR. WILLIAMS:  The only reason that we need it is so

17  that class members or potential class members can go to the

18  website and find out more about the case and whether or not

19  they may be part of the class.  It's more informative than

20  anything else.

21         MR. PARASHARAMI:  But I think throughout this

22  document you're going to have places where you say:  For more

23  information about the class action, you know, look at this web

24  page.  This is specific about class membership.

25         MR. WILLIAMS:  Your Honor, if you think -- if you

1   think it's --

2          THE COURT:  Hold on, everybody.  We've got plenty of

3   time here.

4       Now, let me ask you this.  Are you looking to harvest

5   something from this cite that you need?

6          MR. WILLIAMS:  No.

7          THE COURT:  Any data or anything like that?

8          MR. WILLIAMS:  No.

9          THE COURT:  Okay.  I thought maybe this was an effort

10  to get extra clarity on who might be -- but it's not.

11         MR. WILLIAMS:  Well, the -- the website and people

12  logging in or putting their name and information in there and

13  getting info about whether or not they may be in the class,

14  that it's more helpful to the notice recipient than to us.

15         MR. PARASHARAMI:  This is a website that can never

16  really exist because there won't be a process for checking them

17  against -- there is no class membership list to check against.

18  And that's why I say I think it was -- and 11 is kind of the

19  same way.  They say "you will be notified" --

20         THE COURT:  Slow down here.  We are going to

21  determine who has a face template.  There is just no question.

22  That is going to happen.  It may not happen now for the notice

23  period, but it is going to happen when we get to the claim

24  stage should that day ever arise.

25         MR. PARASHARAMI:  So I think that's a totally

1   different process and that including language about some -- you

2   know, about some website now would be misleading because it

3   would imply that you could find out before the claim is

4   processed.

5        I agree that, you know, at the end of the day there will

6   be a claims process.  That should be delineated later, not in

7   this notice.

8        It would be misleading to tell people -- I assume that the

9   blank is a -- so if I may?  That the blank is going to be the

10  class notice website.  That's typically what the blank refers

11  to.

12       But that notice website, as -- you know, when somebody

13  gets an email, if they click on this link, there is not going

14  to be anything on that website that allows them to actually get

15  information about whether they are in the class or not during

16  the opt-out period.

17       And the whole purpose of notice is for people to be able

18  to decide whether or not to opt out.  That's sort of the

19  touchstone of due process.  So this is not just kind of a side

20  issue.  This is actually pretty important.

21       And, you know, I -- I think if we're going to, you know,

22  take this seriously, we have to got to not include misleading

23  information like this.

24       **MR. WILLIAMS:**  I think I understand the issue now,

25  your Honor.  I had not heard this before.

```
 1        I think that what Mr. Parasharami is suggesting is that --
 2   that this -- this suggests that you can go to a website now and
 3   determine if your name is going to be among those.
 4        And I agree, that that's not -- I don't think that that's
 5   necessary.  There won't be any information populated in there,
 6   in that website now about whether or not your name is --
 7            THE COURT:  I started off by saying yes.  It says,
 8   we'll let you know later.  But I thought it was to help define
 9   specifically people who might get missed otherwise, but you
10   said no.  So if you want to put in a general, "for more
11   information, see..."
12            MR. WILLIAMS:  "For more information."  We can do
13   that.
14            THE COURT:  How about that?
15            MR. WILLIAMS:  Yes.
16            MR. PARASHARAMI:  I think that's the kind of thing
17   that we could readily negotiate.
18            THE COURT:  All right.  So why don't you just redo 10
19   and 11 and just make it:  For more information, please see your
20   cite.  Okay?
21            MR. PARASHARAMI:  Your Honor, I do think in 11 there
22   is the potential to mislead people.  And 10 as well, for that
23   matter.  But certainly in 11, in talking about whether you're
24   in the class or not.
25        Just uploading one photograph might not be enough to put
```

```
 1   you in the class.  I think there should be some -- some
 2   qualifier, like, enough photographs just to make it clear.
 3             THE COURT:  You two try to work something out.  I
 4   mean, I think 10 and 11 could probably just be one item.
 5             MR. WILLIAMS:  Can I be heard on this point, because
 6   it's one that we discussed yesterday.
 7             THE COURT:  Sure.  Okay.
 8             MR. WILLIAMS:  Whether or not a person uploads enough
 9   photographs for a template to be created is an issue that a
10   notice recipient is not going to understand.  Frankly, it is --
11   I don't even know that it's accurate.
12        So what defendants are suggesting is that in some
13   instances you may have to upload more than one photograph or
14   there needs to be more than one photograph of you in order for
15   a template to be created.
16        That issue is going to come out at trial in one way or
17   another.  It's not necessary here at all.
18             THE COURT:  I agree.  Look.  The way to approach
19   notice is you have to have had at least one photo uploaded.
20   That may not be enough.  We'll see.  Have to dispute this at
21   trial maybe.
22             MR. WILLIAMS:  Right.
23             THE COURT:  But let's not -- we're not going to get
24   into that now.  Okay.
25        I think all of this can probably just be for more
```

```
1   information and to help you think about your rights, you know,

2   something along those lines, and whether you want to stay in or

3   stay out, you can go to this website or call you.

4            MR. WILLIAMS:  That's right.

5            THE COURT:  Not me.  Call you.  Okay?  I'm not sure

6   we say that enough actually.  I know it's at the end, but think

7   about maybe in the beginning when you mention my name, "Please

8   do not call the Court."  Ms. Clark and I would be very happy.

9   Okay.

10           MR. WILLIAMS:  Will do, your Honor.

11           THE COURT:  All right.

12           MR. PARASHARAMI:  This is something we can probably

13  work out with Mr. Williams, but for -- if we're on number 12, I

14  think that would be a good place to say "Do not contact

15  Facebook or the Court."

16           THE COURT:  That's fine.  You can put that in, too.

17  That's perfectly fine.

18       In fact, that probably is not a bad idea.  Why don't you

19  say, "Please do not email or do anything to Facebook because it

20  will not be seen.  You need to go through this process."

21       All right?

22           MR. PARASHARAMI:  Right.

23           THE COURT:  All right.  Page 6.  Oh, I do have -- the

24  exclusion process, I think, is not adequate.  We'll get to that

25  in a moment.
```

1    Anything up to -- in the first paragraph or Paragraph 14

2    on Page 6?

3         MR. PARASHARAMI:  I don't believe so, in the first

4    paragraph.

5         THE COURT:  Nothing, okay.  Paragraph 14.

6         MR. PARASHARAMI:  Are we on the second paragraph?

7         THE COURT:  Yeah, the one that's numbered 14.

8         MR. PARASHARAMI:  Yeah.  So we didn't have an issue

9    in the first paragraph.

10        I guess on the second paragraph, I think that the last

11   sentence of that paragraph is a little bit confusing.

12        THE COURT:  "If you exclude."

13        MR. PARASHARAMI:  It sort of presumes why somebody

14   might exclude themselves, and it seems to give them, you know,

15   legal advice, which I think is probably not the function of a

16   class notice.

17        THE COURT:  Why don't we just do this, "If you

18   exclude yourself, you should talk to your own lawyer soon."

19   How about that?

20        MR. WILLIAMS:  That's fine with us, your Honor.

21        THE COURT:  Let's just do that.

22        MR. PARASHARAMI:  I think that's fine.

23        THE COURT:  Okay?  All right.  So, "If you exclude

24   yourself, you should talk..."

25        Now, 15, Mr. Williams, you went from the 21st century to

```
 1    the 19th when you want to opt.  I think U.S. mail is just

 2    not -- not the right technique.  You need to have a click "opt

 3    me out," a -- you know, something easy.  Do not go to a

 4    different website.  Just something that can say, "Please

 5    exclude."

 6              MR. WILLIAMS:  We talked about that with the claims

 7    administrator over the weekend and this morning and that can be

 8    electronic.

 9              THE COURT:  All right.  I think U.S. mail should be a

10    last resort, if there at all.  Okay?  Because it's just -- in

11    this day and age, and particularly for this case, it's not that

12    suited.  All right?

13              MR. WILLIAMS:  Yes.

14              THE COURT:  All right.  You work that out.

15         Okay.  Page 7?  Anything on Page 7, Mr. Parasharami?

16              MR. PARASHARAMI:  Yeah.  My understanding is that

17    plaintiff's counsel had some changes on their communications

18    issues on Page -- on 16.

19              THE COURT:  On which one?

20              MR. PARASHARAMI:  On number 16, but I suspect we can

21    work that all out.

22              MR. WILLIAMS:  Oh, on 16 we're just going to change

23    the telephone numbers.  We have an 800 number that we would

24    like to --

25              THE COURT:  Oh, okay.  Good.  1-800 number.
```

```
1              MR. WILLIAMS:  Each firm has an 800 number that is --
2     has people trained to answer questions related to the notice or
3     questions from potential class members.
4              THE COURT:  All right.  Okay.
5          All right.  Anything on Page 7?  I do -- I'm going to
6     change the trial section, but we'll -- anything before that,
7     Mr. Parasharami?
8              MR. PARASHARAMI:  No, not -- no.
9              THE COURT:  On the trial, just -- let's have that
10    entry sentence read, "The Court has scheduled a jury trial to
11    begin on July 9, 2018."
12         Just take out the rest.  End after 2018.
13         Okay.  Anything else on Page 7, Mr. Parasharami?
14             MR. PARASHARAMI:  No, not on  -- not on the -- one
15    second.
16             THE COURT:  Anything on Page 8?
17             MR. PARASHARAMI:  Sorry.  I'm just comparing.
18             THE COURT:  Yes, that's fine.
19             MR. PARASHARAMI:  No.
20             THE COURT:  Okay.  Now, you two finish those little
21    things you're going to work out.  Get it to me by tomorrow
22    morning and then tailor the short form to correspond to all the
23    changes we made to this one.  Okay?
24             MR. WILLIAMS:  Will do.
25             THE COURT:  All right.  Anything else I can help you
```

1   with on notice?

2          **MR. PARASHARAMI:**  I think we do want to talk about

3   timing again, your Honor.

4          You know, we made -- I mean, first of all, obviously, we

5   will do our best and we will keep the Court informed about

6   creating the list of notice recipients.  Obviously, as your

7   Honor said, we will target the 25th.

8          We make clear in the declarations that we filed that a --

9   that the news feed would take a week longer than that after the

10  list is completed and that the jewel notifications would take

11  two weeks longer than that.  Just so your Honor is aware of

12  that.

13         **THE COURT:**  Why is that?

14         **MR. PARASHARAMI:**  That was -- that was for the

15  computing time and resources, engineering resources that would

16  take to do it.  We asked how long would that take, and that's

17  what we were told.

18         **THE COURT:**  Two weeks to post something on a jewel?

19         **MR. PARASHARAMI:**  Yeah, because this isn't -- it's

20  not something that we have just set up.  It's not -- again,

21  it's not like you press one button.

22         I appreciate that buttons are pressed, but lots and lots

23  of buttons are pressed here.

24         **THE COURT:**  How can it take two weeks to do that?  I

25  mean...

1          **MR. PARASHARAMI:**  I mean, that is --

2          **THE COURT:**  I didn't get that.  I find it little

3   counter-intuitive, to be honest.

4      But why does it take -- the jewel mechanism is set up.

5   You've just got to populate the text box.  Why does that take

6   two weeks?

7          **MR. PARASHARAMI:**  I just don't think that's how it

8   works.  And we can talk to the engineers and get you more

9   detail.  In the -- we had, as you know, almost no time to deal

10  with these issues.

11         **THE COURT:**  I really disagree with that

12  characterization.  It's just not right.  You had plenty of

13  time.  We can take it down to 30 days and you still have plenty

14  of time.  So this is not -- and particularly for an online

15  company that moves with alacrity when it chooses to in other

16  circumstances, I find the time protestations to be a bit

17  hollow.

18      Now, what I would like to do is understand why it takes

19  two weeks to populate a jewel content.  I don't get that.  Do

20  you know?

21         **MR. PARASHARAMI:**  No.  We talked to our engineers and

22  asked them what would it take and that is what we were told.

23         **THE COURT:**  I need more detail on that.  I am

24  skeptical, quite skeptical that Facebook cannot turn on less

25  than two week's notice to post a jewel.  That's what you're

```
 1   telling me.

 2        I'm going to hold you to that.  And I'm finding it very,

 3   very hard to believe that there is an iron-clad algorithmic

 4   online law that Facebook cannot do a notice on less than two

 5   week's prep time.  I'm very skeptical.

 6        Now, maybe that's right, but I'm going to need to see some

 7   proof.  I am going to remember that you told me that,

 8   Mr. Parasharami.

 9             MR. PARASHARAMI:  I appreciate that, your Honor.  I

10   wouldn't tell you that if I did not think --

11             THE COURT:  You're not able to tell me the details

12   why, which makes me concerned.

13             MR. PARASHARAMI:  Yeah.  Again, in sort of the time

14   frame for trying to brief these issues in the last two to three

15   days, or whatever it's been, we tried to get quick answers to

16   how to accomplish this task.

17             THE COURT:  All right.  I want to see a detailed

18   declaration from the engineer who does this explaining to me

19   that it is literally impossible for Facebook under any

20   circumstances to post a jewel notification on less than 14 days

21   notice.  That's what I expect to see.  You get that to me by

22   tomorrow at 5:00 p.m.

23        Now, what about the -- you said it took a week for what?

24             MR. PARASHARAMI:  For the news feed.

25             THE COURT:  I want the same declaration for the news
```

1    feed.  I do not want generalities.  I want specific

2    understandings.  And I want that person to say that they have

3    never been able to do this before and it's literally impossible

4    for Facebook to post anything in a jewel notice on less than

5    two week's notice no matter what.  And it is impossible for

6    Facebook to post anything in the news feed on, what is it, less

7    than seven days.  That's what I expect to see.

8         **MR. PARASHARAMI:**  I think that that's a -- I'll just

9    be direct.  I think that's a bit unfair.  We asked for the best

10   estimate of the time it would take and --

11        **THE COURT:**  We're not talking about that.  I'm

12   talking about your representations to the Court,

13   Mr. Parasharami, that Facebook could not do this on less than

14   two week's time.  I want to see the evidence for that.

15        That's what we're talking about, not the overall time in

16   the case.  I want to see the data behind that representation.

17        **MR. PARASHARAMI:**  I just want to be clear --

18        **THE COURT:**  I want to have an engineer tell me, under

19   penalty of perjury, that it is literally impossible for

20   Facebook to do that on less than two week's notice, because I

21   am deeply skeptical.

22        **MR. PARASHARAMI:**  So I want to be clear.  I don't

23   think I'm representing the words "literally impossible."  What

24   I was representing is what I understood is the time that they

25   forecast it will take.

1        Do they -- I think it's not like it's been -- I just don't
2    know the answer to that.  I think that --
3            THE COURT:  You told me two weeks.  Now --
4            MR. PARASHARAMI:  That's our best estimate.  I think
5    it's a legitimate --
6            THE COURT:  I'm not going to accept a best estimate.
7    When you tell me, as you did, that you cannot do it, no way, no
8    how, on less than two week's notice, I want to see the evidence
9    for that.  I don't believe that's true.  Now, it may be, and I
10   may learn something, but I'm skeptical that that's true.
11       You get that to me tomorrow at 5:00, and you get the news
12   feed one at the same time.
13       Anything else I can help you with?
14           MR. PARASHARAMI:  On that issue, your Honor, i would
15   just ask if I turns out -- and I'm not trying to be difficult
16   here.  If it turns out we can do it quicker, we will try, but I
17   -- and then -- and we'll learn that.
18       But we gave the Court the best information we had at the
19   time we filed these declarations, you know, at the Friday
20   5:00 p.m. deadline.
21           THE COURT:  We shall see, Mr. Parasharami.
22       Anything else I can help you with, Mr. Williams?
23           MR. WILLIAMS:  Just one point, your Honor.
24           THE COURT:  Yes.
25           MR. WILLIAMS:  Actually two.

1       To the extent that you're satisfied with whatever you get

2   from Facebook on those issues, it shouldn't stop whatever they

3   can do quickly should get out.  We can stagger some of those

4   issues, to the extent the Court is willing to do that.

5           THE COURT:  I will take a keen eye to the timeline.

6           MR. WILLIAMS:  And the next issue is just one I'm

7   anticipating due to correspondence I have had with defendants

8   over the last few days.

9       So when we were here last a few weeks ago, we asked you

10  about your standing order on civil trials and the timing of the

11  obligations of the parties in exchanging information so that

12  you had the information that you needed within, I think it's 14

13  days of the pretrial conference.

14          THE COURT:  Let me -- remind me when that is?

15          MR. WILLIAMS:  It's June 14th.  Pretrial conference

16  is June 14th.

17          THE COURT:  Oh, okay.  Yes.

18          MR. WILLIAMS:  So that requires you to have the

19  documents that you need by May 31st.

20          THE COURT:  Yes.

21          MR. WILLIAMS:  We met-and-conferred on May 2nd or 3rd

22  regarding, you know, Exhibit Lists, Witness Lists, things that

23  are going to require us to really talk about to get the

24  documents before you in the form that you need them.

25      Last week we -- we agreed to exchange that information on

 1    May 17th or 18th at the latest and plaintiffs have served their

 2    Motions in Limine, the Exhibit List, the Witness List and other

 3    materials to invite correspondence and discussion on those

 4    matters so that we can get them, you know, together.

 5        We got a response from Facebook saying that they needed

 6    another five or six business days to do their exchange.  So we

 7    haven't received anything other than Motions in Limine from

 8    them yet and so there is no work that can get done.

 9        Last night I got an email from Facebook saying that they

10    may raise this issue with you to get more time to do the

11    exchanges, but they would like to do it in a way that doesn't

12    affect the trial date, but it might affect the date on which

13    you get the materials in order to make decisions about

14    admissibility and things of that nature.

15             THE COURT:  How many do you have?  For example, how

16    many Motions in Limine do you have?

17             MR. WILLIAMS:  Well, your limit was eight.  We

18    served --

19             THE COURT:  You hit the limit?

20             MR. WILLIAMS:  Yeah.  We served --

21             THE COURT:  You hit the limit.

22             MR. WILLIAMS:  We hit the limit.  They served six.  I

23    think there are probably three of those that we'll work out.

24             THE COURT:  I know you know, because you're an

25    experienced trial lawyer, you both are, it's just evidentiary

1   objections.  Okay?  It's not -- they are not mini summary

2   judgments.  We are not covert *Daubert* motions.  It's just:

3   This category of documents or this type of testimony should be

4   excluded because --

5          MR. WILLIAMS:  We're true to that.

6          THE COURT:  -- it's character evidence, or something

7   like that.  You had eight of those.

8          MR. WILLIAMS:  We were true to that.  I think that

9   once --

10          THE COURT:  Can you give me a sample?  Just a high

11   level -- what are some of the issues that's your evidentiary

12   problems?

13          MR. WILLIAMS:  One of the issues is, for example, the

14   admissibility of documents related to the Irish Data Protection

15   Commission, which had audited Facebook in 2011 and 2012,

16   particularly about the privacy issues and the way they were

17   collecting biometric data.

18          THE COURT:  All right.

19          MR. WILLIAMS:  That's one thing we expect to be an

20   issue.

21          THE COURT:  Okay.

22          MR. WILLIAMS:  The next issue is the acquisition of

23   face.com, and issues around that.  They have taken the position

24   in pleadings that the facial recognition data --

25          THE COURT:  I just wanted a flavor.  That's good.

1   Okay.  Sounds like you did the right thing on the motions.

2   You'll have plenty of time to argue that.

3           MR. WILLIAMS:  But I think -- we did hit the limit of

4   eight, but I do think that we will be able to work out some of

5   them so that it comes down to maybe five --

6           THE COURT:  All right.

7           MR. WILLIAMS:  -- or six.

8           THE COURT:  Okay.

9           MR. WILLIAMS:  But the Motions in Limine are not the

10  issue.  It's the other things that have to be done.  The Jury

11  Instructions, the -- the proposed Jury Instructions, you know,

12  the Exhibit Lists on negotiating admissibility and what that's

13  going to look like.

14      If we're not getting the exchanges from Facebook, we're,

15  you know, negotiating with ourselves and the time frame for us

16  to reach those agreements is going to get much shorter.

17          THE COURT:  Well, let me just jump in.  I have been

18  thinking about Jury Instructions.  Now, I'm presuming Illinois

19  does not have a model instruction for BIPA.

20          MR. WILLIAMS:  No.

21          THE COURT:  So this will be one of those rare

22  circumstances where we're going to craft one.  I don't think

23  that will be terribly hard.  I think that can be done in a page

24  or two, maybe, and maybe some terms defined, as we do in the

25  Jury Instructions.  I'm not sure that's necessary, but I think

```
 1   we could do that.
 2        And then there will be an issue on damages.  Zero damages,
 3   1,000 or 5,000.  And I presume no one is attempting to prove
 4   actual damages.
 5             MR. WILLIAMS:  That's right.
 6             THE COURT:  Okay.  So it's going to be statutory
 7   damages.
 8             MR. WILLIAMS:  That's right.
 9             THE COURT:  Okay.  All right.  So that's not an
10   insurmountable task between now and June 14th.
11             MR. WILLIAMS:  Between now and May 31st, because
12   that's the date that we have to submit all the pretrial
13   materials --
14             THE COURT:  Ten days from today.
15             MR. WILLIAMS:  -- including the trial brief.
16        There is a lot to be done.  And unless it's a two-way
17   street, it's not going to get done.  And we don't want to be
18   jammed in making those decisions, as they now have all of our
19   materials to just sit on and sort of evaluate and provide us
20   with their responses or their positions whenever they get
21   comfortable with it.
22             THE COURT:  All right.  Let's hear from Facebook.
23        Mr. Connelly.
24             MR. CONNELLY:  Judge, I'm going to accentuate the
25   positives.  We're getting closer to trial, as you might expect.
```

 1    You know, that's --

 2              **THE COURT:**  These things happen.

 3              **MR. CONNELLY:**  You have to search a little bit for

 4    the positive, but there have been good faith communications

 5    between the parties trying to narrow the issues.

 6         The -- and the deadline for both parties is May 31st to be

 7    done with it.  That would then let you have all of the

 8    materials two weeks in advance of June 14th.

 9              **THE COURT:**  Yes.

10              **MR. CONNELLY:**  What Facebook has been suggesting is,

11    look, let's keep talking, but we're getting crunched.  We'll

12    all do a better job if rather than -- rather than submitting

13    everything to the Court on May 31st, give us three extra

14    business days, which would push it out til June 5th.

15         Now, full disclosure, Judge --

16              **THE COURT:**  Three actual business days.

17              **MR. CONNELLY:**  Yeah.  We would like to have the

18    filing on June 5th.  Full disclosure that the Court can easily

19    back into itself.  That tightens it up a little bit in terms of

20    when the Court gets everything filed on June 5th for the

21    June 14th hearing, but that's our suggestion.

22         Again, not for purposes of delay, but really, frankly, so

23    that we can -- as you can understand, a case of this magnitude,

24    there are certain layers of review and getting client approval,

25    so that we can continue to talk with the Plaintiffs -- I'm

```
 1   sorry, with the other side in total, as far as let's see how
 2   much we can hit common ground on.
 3              THE COURT:  And this would be to make my life easier.
 4              MR. CONNELLY:  Yours and ours both.
 5              THE COURT:  All right.  June 5th?
 6              MR. CONNELLY:  That's our suggestion.
 7              THE COURT:  All right.  I can accept that, 5:00 p.m.
 8   California time June 5th.  Just have it all in by 5:00 p.m.
 9   California time on June 5th.  And this is with an eye towards
10   streamlining the issues, the extra time.
11              MR. CONNELLY:  One last point, Judge, unrelated to
12   this issue, but as long as I'm up here.
13              THE COURT:  Yes.
14              MR. CONNELLY:  And I think it's pretty clear that the
15   Court has denied or plans to deny Facebook's request to stay
16   the proceedings while we have the petition before the Ninth
17   Circuit.  I just --
18              THE COURT:  I haven't even gotten the opposition to
19   that yet.
20              MR. WILLIAMS:  The opposition is due today.
21              THE COURT:  I have not taken a look at it.
22              MR. CONNELLY:  I'm sorry.
23              THE COURT:  I have so much to do.  Until things are
24   submitted, I really don't -- I just -- I wish I had time to
25   kind of read the things as they come in.  I don't.  It's just
```

```
 1    not practical for a district judge.

 2            MR. WILLIAMS:  Can I make one more point, your Honor,

 3    because there is one expectation.

 4            THE COURT:  Yes.

 5            MR. WILLIAMS:  You know, your class certification

 6    order, obviously, focuses on the face templates.  And the --

 7    the number of face templates that Facebook has either created

 8    in Illinois is obviously going to be at issue in the case, one

 9    of the primary issues, a number of them.

10        We asked for that number in discovery many times.  We

11    actually came to the Court at one point to -- on a Motion to

12    Compel and the Court ordered to us meet-and-confer, and the

13    promise was they would get something to us in the form of a

14    stipulation what the number of face templates are.  They have

15    the number.  We think it's somewhere around 7 million, maybe

16    slightly less than that.

17        But I don't see how we can go forward until they produce

18    that number.  And it doesn't have to be today, but your Honor

19    is going to need it.  We're going to need it.

20        We've asked for it.  We're entitled to it.  They have it.

21    It may come up in papers before you, but I don't see any reason

22    why it's not something that hasn't been provided, you know,

23    forthwith.

24            THE COURT:  So it's not subject to some fact disputes

25    at trial?
```

```
 1            MR. WILLIAMS:  How many face templates they have?
 2            THE COURT:  Yes.
 3            MR. WILLIAMS:  I don't think so.  I don't think
 4   it's -- the number is really going to be a fact dispute, but
 5   because we asked for the number, they have it.  It's kind of a
 6   discovery issue that never got resolved.
 7            THE COURT:  I take it you want to say in opening
 8   statement -- you want to use the number in opening statement?
 9   Is that the issue?
10            MR. WILLIAMS:  I may.
11            THE COURT:  Okay.  I thought it was disputed, the
12   number of templates.
13       Is that right, Mr. Connelly?
14            MR. CONNELLY:  Well, yes.  I think -- that's a fair
15   statement.
16            THE COURT:  All right.  Well --
17            MR. CONNELLY:  Although I appreciate what counsel is
18   saying.
19       Again, I haven't been personally engaged in this process.
20   I will take a deep dive into it to find out whether or not that
21   number can be made available and if not, why it can't be made
22   available.
23            THE COURT:  To be honest, it actually -- as you have
24   suggested with an eye towards streamlining pretrial prep, if
25   that's something you can just stipulate to, you can just make
```

1    it a stipulation of fact.  Okay?  That would -- if it's not

2    controversial and you all are happy with it, let's just do

3    that.

4              MR. WILLIAMS:  It will be controversial because the

5    number will have some impact on the damages issue, which is why

6    they haven't -- in my view, why they haven't produced the

7    number even though we've asked for it a number of times.

8         Ultimately what you'll hear from us, your Honor, is that

9    to the extent that they are unwilling to provide the number of

10   face templates, then our position will be that they should not

11   be able to present evidence to the Court or to a jury that it's

12   anything less than the number of users in Illinois.

13             THE COURT:  Well, I think that's going a little far

14   now.  Why don't you two see what you can work out?

15        I was under the impression that the -- populating the

16   exact count of templates was something that may turn on the

17   evidence at trial.  If that's wrong, you can tell me.  If it's

18   right, you can certainly say "we believe it's millions" in the

19   opening and go from there.  Whatever you want.

20        You can make your argument.  There may be a consequence if

21   you overstate, but that's up to you.

22             MR. WILLIAMS:  Which is why we asked for the number

23   in discovery and they haven't produced it.

24             THE COURT:  Okay.  Well, you two will -- why don't

25   you address that?  If you can't resolve it in the next couple

```
 1   days, just let me know.
 2              MR. CONNELLY:  Two other, hopefully, quick items from
 3   Facebook, one from me and one from Archis.
 4              THE COURT:  Yes.
 5              MR. CONNELLY:  I think that the hearing on the
 6   request for a stay is set for June 21st.  And I would suggest
 7   in order for everybody to keep that July 9th date, if it's
 8   possible, if it's convenient for everyone, to try to move that
 9   hearing a little up, have it sooner than June 21st, if that's
10   possible.
11        I appreciate that the Court hasn't had a chance to take a
12   look at all the papers, so I'm just -- I'm raising that as a
13   possibility.
14              THE COURT:  I haven't looked at them all.  I
15   certainly haven't gotten an opposition.
16        If you two want to propose an earlier date, I will
17   consider it.  I have another trial coming up -- actually, I
18   have two other trials coming up.
19              THE CLERK:  June 14th.
20              MR. WILLIAMS:  I thought it with as June 14 as well,
21   which is --
22              THE CLERK:  It is.
23              THE COURT:  Oh, June 14th.
24              MR. WILLIAMS:  Which is when --
25              THE COURT:  I really doubt -- well, I mean, if you
```

1    want to work it out, I will see if I can do it.  June 14th is,

2    what, two weeks away now, three weeks away?

3         If you want to do it, see what you can work out.  Okay?

4              MR. CONNELLY:  Very good.

5              THE COURT:  Now, one other thing.  I -- I have

6    forgotten.  Okay.  Anything else?

7              MR. WILLIAMS:  Nothing, your Honor.

8              THE COURT:  Mr. Connelly?

9              MR. CONNELLY:  I think the last question on notice.

10             THE COURT:  Yes.

11             MR. PARASHARAMI:  Just one last point.  We had

12   addressed it in the briefs, but had not gotten to it here,

13   which is that the rules are basically that the plaintiff has to

14   pay for the cost of class notice.  That's under *Eisen* and

15   *Oppenheimer*.

16        So we would like the Court to clarify that the cost of

17   notice that we experience in putting together this information

18   has to --

19             THE COURT:  Generally, the plaintiff pays the class

20   notice.  If the cost is insubstantial and it's not worth the

21   time and effort, then you typically don't.  I will have to see

22   some firm documentation on what the extra expenses will be and

23   then we'll talk about it.

24             MR. PARASHARAMI:  Okay.  Thank you, your Honor.

25             THE COURT:  Okay?  You get those declarations to me

1    by 5:00 p.m. tomorrow.

2         Okay.  Thank you.

3              **MR. WILLIAMS:**  Thank you, your Honor.

4              **THE CLERK:**  All rise.  Court is in recess.

5         (Proceedings adjourned.)

## CERTIFICATE OF OFFICIAL REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Tuesday, May 22, 2018