Pages 1 - 39

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JAMES DONATO

IN RE FACEBOOK BIOMETRIC          )
INFORMATION PRIVACY LITIGATION    ) No. C 15-3747 JD
                                  )
                                  )  San Francisco, California
                                  )  Thursday
                                  )  June 4, 2020
_____)  3:00 p.m.


**TRANSCRIPT OF REMOTE ZOOM VIDEO CONFERENCE**

**APPEARANCES**:

**For Plaintiffs:**        EDELSON PC
                          123 Townsend Street
                          Suite 100
                          San Francisco, California 94107
                     BY:  **RAFEY SARKIS BALABANIAN, ESQ.**



**For Defendant:**         COOLEY LLP
                          101 California Street
                          5th Floor
                          San Francisco, California 94111
                     BY:  **MICHAEL GRAHAM RHODES, ESQ.**








*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                 Official Reporter - US District Court
                 Computerized Transcription By Eclipse

1  **THURSDAY - JUNE 4, 2020**                    **3:02 P.M.**

2                    **P R O C E E D I N G S**

3                     ---oOo---

4       **THE CLERK:**  Calling Civil 15-3747, In Re Facebook

5  Biometric Information Privacy Litigation.

6       Counsel, can you please state your appearances for the

7  record starting with counsel for the plaintiff.

8       **MR. BALABANIAN:**  Good afternoon, Your Honor.  It's a

9  pleasure to make my appearance today.  I'm Rafey Balabanian of

10 Edelson on behalf of plaintiffs Nimesh Patel, Adam Pezen, Carlo

11 Licata, and the class.

12      Your Honor, for the record I'm joined on the public line

13 by my co-counsel.  If the Court would like me to make their

14 appearances, I can as well.

15      **THE COURT:**  Oh, well, let's see.  Are they on the

16 attendee side?  Who would you like to include?

17      **MR. BALABANIAN:**  They are, Your Honor.  Thank you,

18 Your Honor.

19      From Robbins Geller, Paul Geller and Shawn Williams.

20      From Labaton Sucharow, Michael Canty and Corban Rhodes.

21      And my partner, Jay Edelson.

22      **THE COURT:**  Okay.  Now, you're just -- you're saying

23 hello.  You're not asking that they be panelists, are you?

24      **MR. BALABANIAN:**  That's correct.

25      **THE COURT:**  All right.  Okay, good.

1        All right.  Defendant Facebook.

2            **MR. RHODES:**  Good afternoon, Your Honor.  Michael

3    Rhodes of Cooly on behalf of defendant Facebook.

4        And I will not recite the names of my colleagues who are

5    listening in, but there are various people from my law firm and

6    from Facebook that will be listening in today's proceedings.

7    Thank you.

8            **THE COURT:**  Okay, good.

9        All right.  Well, the courthouse is closed for issues

10   related to the police situation.  So I am even more remote than

11   usual, but let's dive in.

12       Mr. Balabanian, I have all the papers.  I've spent a lot

13   of time reviewing them and thinking about the issues.  I'm

14   happy to hear anything you would like to add.  I have

15   questions, but if there is something you want to do first, I'm

16   happy to hear it.

17           **MR. BALABANIAN:**  I appreciate it.  Thank you, your

18   Honor.

19       I just wanted to make a couple just opening remarks, if I

20   could, to -- really just to give a little context as to how we

21   got here, Your Honor, outside of the briefs.

22       So to be clear, Your Honor, this was in our view an

23   incredibly difficult case to settle.  Settlement was certainly

24   not a foregone conclusion in this case.

25       As the Court is well aware, this case has lasted for five

1   years.  We had two failed mediation attempts.  And we were

2   truly, from the plaintiff's perspective, on the brink of trial

3   before the case went up to the Ninth Circuit.

4        And it's our -- looking back on the case truly our view is

5   that it was incredibly hard to settle because it was truly a

6   case of first impression in so many different ways.  Obviously,

7   the -- the challenged conduct, Facebook's facial recognition

8   technology, raised new and complicated issues.

9        But beyond that, Your Honor, I think more fundamentally

10  with respect to why the parties just had such a hard time

11  coming together to settle the case, this case was always out in

12  the front of all the others.  This was the first ever class

13  action filed under BIPA.  It was the first ever, to our

14  knowledge, civil lawsuit filed under BIPA.  And there was a

15  tort of lawsuits filed in its wake.

16       But at the end of the day, with each ruling that this

17  Court made, it was this case that was establishing the law

18  surrounding BIPA.  And, frankly, it took, in our view, the

19  Supreme Court of Illinois -- it took the Supreme Court of

20  Illinois basically adopting verbatim this Court's reasoning

21  with regard to, among other things, what it means to be

22  aggrieved under the statute --

23       And then, of course, it took the Ninth Circuit's opinion

24  affirming Your Honor's class certification order to really

25  create an environment to be able to sit down and truly try to

1    settle the case.  The reality was once it came back down from

2    the Ninth, there were no more detours.  It was settlement or

3    trial.

4         -- and even when we settled the case on principle at the

5    mediation, Your Honor, it was incredibly difficult to close the

6    deal.  There were -- I can't tell you how many times the

7    parties dug in and claimed that they wouldn't move, and it

8    required the involvement of Ambassador Bleich.  We had

9    appointed him as the arbitrator to preside over any, you know,

10   papering dispute, so to speak, that we couldn't figure out.

11        And Ambassador Bleich literally spent if not every day on

12   the phone with one of the lawyers from each side, it was every

13   other day for basically two months after the mediation and

14   leading up to the signing of the Settlement Agreement.

15        Very privileged to be before the Court presenting the

16   settlement today, Your Honor.  We believe as class counsel that

17   it is a historic settlement in the privacy context.

18        And with that, Your Honor, I'm happy to delve into the

19   details of the settlement, why we think it's fair, adequate and

20   reasonable and within the range of approval, or proceed in any

21   other fashion as the Court deems appropriate.

22            THE COURT:  All right.  Well, we can start off with

23   just taking opening statements.  Let me hear from Mr. Rhodes.

24   You're not the moving party, but anything you would like to

25   say, this would be the time.

1      **MR. RHODES:**  No, Your Honor.  I think we should just

2    get to the heart of the Court's concerns and questions.

3      **THE COURT:**  Okay.  All right.  Well, so let me do

4    this.  We're not going to get through approval today.  I have a

5    number of things that I would like to have clarified.  They may

6    not be problems, I don't know, but I would like some additional

7    thinking from you and commentary about a couple of issues.

8    Actually, about a number of issues.  And I think we're going to

9    have to have at least one follow-up hearing and possibly more.

10   So let me -- let me just dive.

11      So the first issue, and I flagged this at the last time we

12   got together, the proposed recovery is, in toto, 550 million.

13   That's a lot of money.  No one is ever going to say, you know,

14   the old sob about the portions -- the food was bad and the

15   portions were small.  That's not an issue here.  It's

16   550 million.  That's a lot.

17      But the question is, is it really a lot.  The individual

18   payments are going to end up being $150, expected to be $150

19   per claimant, which is another way of saying per aggrieved

20   individual under the Illinois BIPA.  Possibly topping out at

21   300, depending on how things go with the claim rate.  That is a

22   significant reduction from the thousand dollars that the

23   Illinois legislature set as the baseline.

24      So I'd like to hear more about why that is a reasonable

25   settlement amount.

1          Let me just tell you, the Illinois legislature has said

2     loud and clear this is meant to be an expensive violation.  The

3     Illinois legislature set this privacy expectation and privacy

4     right as a serious one, and they put a high price tag on it for

5     that reason.

6          So the fact that it might cost a lot of money is not

7     something that I'm going to gainsay.  That was the Illinois

8     legislature's policy decision to do, and I'm going to enforce

9     that.

10         So I want to understand why the members of this class, the

11    aggrieved individuals, are being asked to take what is at least

12    an $850 reduction from the thousand dollars that they are

13    entitled to by law.

14         And I'd also like to understand why there was no

15    discussion whatsoever on why this is not a case where the

16    enhanced damages of $5,000 per person are on the table.

17         Now, in connection with that, I want to raise one issue

18    that is of great concern to me.  I am aware of the recent FTC

19    settlement with Facebook -- that was for $5 billion, billion

20    with a "B" -- in the District Court of the District of

21    Columbia.  Now, I've looked at that settlement, and I have some

22    concerns about how this case interacts with that settlement.

23         Now, for whatever reason -- and I'm not casting blame.

24    For whatever reason, you did not mention that in your papers,

25    Mr. Balabanian, and I bring it up now and I'm going to return

1    to it on a couple of more occasions.

2         But I'm bringing it up now because it looks to me like

3    what Facebook did to violate the BIPA may have also been a

4    violation of that prior FTC Consent Decree of 2012, in which

5    case you would have a pretty good argument that this is an

6    example of an intentional or reckless violation under the BIPA

7    that would warrant $5,000.

8         So I'd like to know why those numbers came out the way

9    they did.

10        **MR. BALABANIAN:**  Thank you for the opportunity to

11   explain, Your Honor.

12        So maybe I could start with the 5,000 marker, because I

13   think that actually captures the main risk -- well, one of the

14   30 main risks that we face in this case and the reason why we

15   think the discount that we took -- and we understand that we

16   absolutely need to justify it for the this Court -- is a

17   reasonable discount.

18        So in terms of the $5,000 and why we don't think that that

19   was the level that Facebook was likely going to be liable for

20   in terms of willful violations.  The reality is that there was

21   somewhat of a derth of evidence from our perspective refuting

22   that Facebook acted intentionally.

23        And the FTC settlement, I appreciate the Court's concern

24   about that, but it's sort of -- their lack of intentionality

25   here coincides with why I don't think that they violated the --

1  well, I'm not going to say I don't think they did, but that was

2  not a relevant point from our perspective.

3       We think that Facebook, at the end of the day, probably

4  proffered enough evidence to show that they did not construe

5  BIPA unreasonably in terms of the photographic section.

6       And I would point to one piece of evidence in particular

7  that was showcased in Facebook's reply in support of their

8  Motion for Summary Judgment, Your Honor.  And that piece of

9  evidence is that Facebook argued, frankly, to the Australian

10 Government, I believe it was in 2014, that -- that -- they

11 argued for the adoption of BIPA's definition of what it means,

12 what biometric information means.  They did that, you know, not

13 by accident, but they did that because the evidence from our

14 perspective showed that they genuinely at some level believed

15 that photographs, whether digital or in paper form, were

16 exempted from application of the statute.

17      And the fact that they were so outward in -- in asking the

18 Australian Government to adopt BIPA's definition of biometric

19 information suggests that -- I mean, they would have, of

20 course, been crazy to suggest that if they really thought that

21 they would have been on the hook for the $5,000 willful

22 violation level.

23      And so -- but more fundamentally with regard to that

24 point, Your Honor, the $5,000 statutory damage award, when

25 aggregated, created more problems for the plaintiff than it

```
1    solved.  Because at the end of the day, and as the Court
2    pointed out in its order granting our motion for class
3    certification, was the last line of the Court's order at Docket
4    333, it pointed out how the Court absolutely has discretion, if
5    the time should come, to reduce a statutory damage award based
6    on due process.
7         And so if you're talking about the maximum possible
8    recovery in this case, and we lay it out in our papers, of
9    potentially $47 billion, there is, in our view, almost -- it is
10   almost a certainty that the Court would cut that damage award
11   down.  And regardless of what the Court cuts that damage award
12   to -- and it's certainly unpredictable at the end of the day --
13   you look at the Golan case that we cited that just recently
14   came out of the Eighth Circuit and the Dish Network case that
15   was admittedly vacated by the Seventh Circuit, but vacated
16   because the Seventh Circuit felt as though the District Court
17   the didn't conduct the proper analysis as to why statutory
18   damages should be reduced.  In that case it was based upon the
19   defendant's ability to pay and the Seventh Circuit --
20            THE COURT:  Let me just jump in.
21            MR. BALABANIAN:  Yes.
22            THE COURT:  I don't find that a particularly
23   persuasive argument.  The Illinois legislature has set the
24   benchmarks.  It's not for me to second guess it.  All right?
25   The Illinois legislature put a price tag on these violations.
```

 1          I don't know what would ever happen if you ever got close
 2   to $47 billion.  That's not happening here, because right now
 3   you've told me that the home run amount is about $47 billion,
 4   and you're proposing that this class compromise its claims for
 5   about one and a quarter percent of that.  That's what I want
 6   you to explain.
 7          I was willing to give you a smaller range.  I mean, I was
 8   asking 150 -- you know, why the delta between 5,000 or a
 9   thousand and 150.  But if you want to do it your way, they are
10   taking what is effectively a 98.75 percent discount off of the
11   amount that the Illinois legislature said might be due in this
12   case if you proved up your case.
13          So, you know, I -- I just -- the idea that you're helping
14   me out by doing an early calculation on how I might reduce
15   damages is not selling me.  All right?  I need more
16   information.
17          And by the way, the comment you just made about the
18   $5,000, I mean, I'd like to hear more about that.  I'd like to
19   see that evidence.  None of that was in the papers.  So that's
20   one thing you're going to have to put in, because I need --
21   look, our mission here is straightforward.  I am in charge of
22   making sure that this is a reasonable, fair and adequate
23   settlement for this class.  And that's all we're doing here.
24   And that's an important mission given the amount of money
25   involved and the fact that this is a new type of claim.

1      So we're going to have to go back and make a better stab.

2  You're going to have to go back and make a better stab at

3  explaining these things.  So that's one issue.

4      Now, before I leave the FTC -- and I do want a clearer

5  explanation.  I think we're going to have to do this at a

6  hearing, but I want a clearer explanation about how this case

7  intersects, if it does.  It looks like it does.  Maybe I'm

8  wrong.  I want a clearer explanation of how these -- this case

9  intersects with the Consent Decree that was just entered in the

10 District Court for the District of Columbia.

11     Now, Section 6 of that Consent Decree is specifically

12 about facial recognition templates.  That's exactly what we're

13 dealing with in this case.

14     And I'm going to jump here ahead a little bit, but this

15 gives me some doubts about the value of the conduct remedies

16 you all have proposed.  As I'm moving from the money part now

17 to the conduct part, you say that, you know, Facebook is going

18 to delete these records if they don't get consent and so on,

19 but they are already obligated to do that under the FTC decree.

20     So, I mean, the language is exactly the same.  I'm not

21 going to read Section 6 to you, but I'm having a hard time

22 seeing how the Consent Decree you proposed in this case is in

23 any way, shape or form different from what they are already

24 obligated to do under the FTC Consent Decree, not to mention

25 what they are already obligated to do under Illinois statutory

```
 1   law.  So that's another thing that we're going to have to spend
 2   some time on.
 3       Now, what I would like to do, in order to keep this record
 4   developed and give me the benefit of all your best thoughts --
 5   I don't want to do this on the fly, but we are going to set
 6   another hearing where I want to have a clearer explanation
 7   about that issue, why the Consent Decree is anything but a
 8   plain vanilla obligation -- a plain vanilla statement that we
 9   are going to follow along on the FTC Consent Decree, but right
10   now that looks to me like the only thing that Facebook is
11   agreeing to do.
12       So any thoughts on that?  Yes.
13           MR. BALABANIAN:  Thank you.
14       As I understand it, that is Facebook's obligations going
15   forward, Your Honor, but they weren't required to go back and
16   delete the face templates of our class members.  And that, to
17   our -- our understanding is that that is the main thrust of the
18   injunctive relief.
19       So on a going-forward basis, certainly the flow with
20   respect to the notice and consent procedures as it relates to
21   the facial recognition technology has changed.  They are all
22   new users going forward.  But that didn't change the actual
23   circumstances of our class that we represent.
24       So we could have insisted.  We could have just required
25   that injunctive relief do the same thing that the FTC Consent
```

1   Decree did, but we didn't.

2       What we asked them to do is we specifically required them

3   to take everyone through an in-flow, everyone in our class.

4   And that isn't required by the FTC, Your Honor.  And so they

5   would have to be run through -- everyone is getting their

6   facial recognition settings turned off.

7       This class is having this -- this entire class of people

8   is going to be running through the facial recognition interface

9   again.  And to the extent they don't affirmatively opt in, then

10  their face templates will be deleted.

11      But that is a backward looking manner of injunctive relief

12  that isn't accounted for, I don't believe, by the FTC's Consent

13  Decree.  And that is truly --

14          **THE COURT:**  Let me just jump in.

15      I'm just puzzled by that, Mr. Balabanian, because I'm

16  reading the FTC language and it says, expressly says:

17          "Facebook will not create any new templates and

18      it will delete any existing templates."

19      I just -- I don't see how what you're saying is different

20  from what the FTC has ordered.

21      But in any event, let's not -- I want a clearer

22  explanation.  This is an opportunity.  It's not closing the

23  door.  It's opening a door.  I want to hear more about why this

24  is different, better, newer, and something that's actually a

25  contribution that is in the benefit of this class and not just

1    a copycat, you know, slapping on of obligations that Facebook

2    is already required to do.

3        Now, on that note, also, I do not understand, because I

4    didn't get enough information, what the actual technical steps

5    will be to implement this process of turning off consent,

6    getting new consent, deleting old files.

7        So when we meet again, in addition to all the other issues

8    that we are going to follow up on, I would like -- and I'm

9    ordering a presentation by Facebook.  Not by plaintiff's

10   counsel.  I want to hear directly from Facebook engineers, or

11   somebody at Facebook who has their hands on the switches, so to

12   speak, how all this is going to work.  I want a clearer

13   indication of what the past practices were, and then I want an

14   indication of how, if this goes forward, they will be changed.

15   All right?

16       Now, as part of that, I also want a clearer explanation

17   about those notices.  I think they are attached somewhere.  I

18   think they might be Exhibit D and E, the statements about here

19   are your rights and here is the company's rights with respect

20   to your templates and your biometrics.  I want to know where

21   those are going to be.  I want to know how they are going to be

22   shown.  I want to know long they are going to be up.

23       So consider it kind of a technology tutorial on how all

24   that is going to work.  And I really want to hear from business

25   side people or engineers at Facebook.  That would be a great

```
 1   help to me.
 2        And then the other thing -- let me just jump ahead to a
 3   couple of other issues.  I'm happy to cover anything you want
 4   to cover, but this is just sort of the list I have.
 5        I don't understand what's happening with the class
 6   definition.  So I certified a class of all Facebook users from
 7   June 2011.  Now you're proposing an age cutoff, which never
 8   discussed before, and now it's only people 18 years and older.
 9   I don't -- I don't know where that came from.  It doesn't make
10   sense to me.  I don't know why anybody under the age of 18
11   would be cut out from the recovery.
12            MR. RHODES:  Your Honor, if I may --
13            THE COURT:  Let me just finish.
14        I also don't understand why you're telling me now that
15   September of 2019 is a cutoff date.  Nobody ever told me that
16   before.
17        So the class now excludes anybody under the age of 18 and
18   anybody after September 2019.  So --
19            MR. RHODES:  Your Honor, no.  Actually, anybody under
20   the age of 18 is not eligible to have a template created.
21   That's the reason for that.
22        And our understanding was that the class ran to the
23   current period.  Indeed, we were going to -- we ran the notice
24   period numbers.  Anticipating a remand before Your Honor in the
25   September time period, our data was through August of last
```

1    year.  We were anticipating we would have to run it all the way

2    through the date of your preliminary approval order.  So we're

3    not taking that position.

4            **THE COURT:**  I don't understand.  The --

5            **MR. RHODES:**  Our understanding, Your Honor, was your

6    order was very clear.  It's June of 2011 to the present, and

7    it's people that are residents of Illinois who had a template

8    created.

9            **THE COURT:**  I'm not arguing with you, Mr. Rhodes, but

10   Mr. Balabanian says that the class cuts off on September 3rd,

11   2019 because Facebook made changes.

12           **MR. RHODES:**  No.  I think the point there, Your

13   Honor, was that with respect to -- and there is a lot here I

14   would love to comment on, but I'm mindful that you may have a

15   different plan of how you want this information.

16           **THE COURT:**  No, no, no.  Everybody will have a turn,

17   but go ahead right now.

18           **MR. RHODES:**  Thank you.

19       So let me just make a couple observations.  Let's take the

20   5,000 benchmark first.  We're mindful of the comments you made

21   in your order.  I think it's Docket 372.  I don't need to

22   repeat it to you, but you recall on the summary judgment where

23   you landed with respect to those issues around negligence.

24       The parties used the negligence benchmark.  And the

25   reasons issues were, as Mr. Balabanian said.  But there's some

```
 1   other facts you should consider.  And I'm happy, more than
 2   happy to give you a much more fuller proffer, testimony.
 3   However you would like it, we'll give it to you.
 4        In December of 2010 Facebook announced that this product
 5   feature was coming.  All right?  So that's an important thing
 6   here.  We didn't launch this without telling people.  And you
 7   can quarrel about whether we did this -- you know, the
 8   disclosure adequate or not.  But that's a quarrel we can have.
 9   But they did announce it.
10        They then for the next four or five months, up until
11   June 7th, I believe, of 2011 told the users what it was.  They
12   used the phrase "facial recognition."  Identified it as "tag
13   suggestions."  And they gave instructions as to how you could
14   prevent it from going live.
15        So one of the things the parties considered was it would
16   be tough to argue that the company was acting recklessly or
17   willfully in the context of it attempting to tell its users
18   about the feature.  Describing it, describing it in terms of
19   facial recognition technology and giving advice on how to turn
20   it off.
21        You could tell me:  Well, Mr. Rhodes, they didn't do it
22   the correct way under BIPA.  And I would have that quarrel with
23   you and debate, and I would accept that.  But I think that
24   naturally takes you to the negligence threshold.
25        The price tag of the settlement -- which is absolutely
```

1   extraordinary.  As you know, I have been doing these kinds of
2   cases for a very long time, and a lot of the law in this area
3   are cases that I've personally handled.

4        This is an extraordinary amount of recovery, and I think
5   that we're being too conservative on what we think the per
6   claim eligible form will end up producing.

7        So let's just take the thousand dollar benchmark as the
8   starting point, and the correct one.  The more likely result
9   than not.  Not the only outcome, but the more likely.  If we
10  start at a thousand dollars, we then say:  What would happen at
11  trial?  What were the open issues that Your Honor was going to
12  have to preside over?

13       Whether there was a scan of face geometry.  That's at
14  docket 372.

15       Whether there was consent.

16       The appropriate intent level.

17       You made a comment that if something new came up, maybe
18  you would reopen the photo exclusion for more evidence.  You
19  didn't say "yes" or "no."  You said "maybe."

20       And then, of course, the Ninth Circuit said:  Where is
21  the -- where are the material events that compromise the
22  violation taking place?

23       So I would argue that you are -- it's not a generic
24  litigation of risk deduction.  And I read your -- a couple of
25  your recent rulings in this area, and I remember you said to

1    us, I think it was in February of this year about this point,

2    about don't tell me about just generic litigation risk

3    deduction.  I accept that.

4         Well, here there were some very meaningful open factual

5    issues yet to be resolved.  Okay?  And so I think those were

6    taken into consideration.

7         Now, if you look at comparators, if we look at cases in

8    the Northern District -- and we cite these, I think, in our

9    brief.  But if you look at the *Harris*, *Aranda*, *Fraley*, *Perkins*

10   and *McCabe* cases together, and you compare the sizes of those

11   classes, they are all statutory damages cases, the size of the

12   potential recovery which also ran into the billions.  And

13   the -- both the apples to apples comparisons and the orange to

14   orange, which is the -- just taking the total class number

15   divided by the total consideration available, or the

16   anticipated estimate of what the actual claims would be based

17   on anticipated claims rate, which is a bit of a -- you know,

18   you can make those numbers look however you want, I would

19   concede to the Court, because we really don't know what the

20   tank rate is going to be here.  This settlement would fall at

21   the high end, if not the highest end of all the comparator

22   cases where the Court said, yes, this will satisfy muster.

23        So I think it's the combination of things that says $1,000

24   is the right benchmark to begin with.  There is a lot of

25   evidence to suggest that Facebook thought photos apply or not

 1   and in the course has spoken about the standards that apply to

 2   that position, and I'm not going to repeat that.

 3        There were a lot of open issues of fact at trial,

 4   including the quintessential factual issue of whether there is

 5   facial geometry at issue here.

 6        Now, I will tell the Court that when I got involved in

 7   this case in August, we ran a lot of experiments on this

 8   system.  A lot.  A lot that I did personally with my team of

 9   experts.  And what's interesting about this system is that when

10   you put a face through it and you do not change the geometry at

11   all, you just change the brightness or intensity or the color

12   variation of it, the system will start not recognizing the

13   photograph.

14        And other times if you change the geometry dramatically,

15   move the eyes, position of the nose, but keep -- the pixel

16   intensity is the same.  If you run it through the system, it

17   won't recognize it.  The outputs are clearly being driven by

18   something other than geometry.

19        The jury could disagree with me, but there is a very

20   credible issue here of fact that we would have put on at trial

21   to show that this is not face geometry.  And I -- and as the

22   Court pointed out in your order, this is a battle of experts,

23   all of those things.

24        So if we try to take into consideration the totality of

25   all of that, this is not just, you know, what number out of

1   thin air and how do we get to a generic litigation.  This is a

2   very customizable settlement.

3       On the FTC I'll make a couple of points, Your Honor.  And,

4   again, we'll come back to you and give you a much more solid

5   evidentiary framework for you to consider, to digest.

6       One thing I would point out is in September 3 of last year

7   Facebook changed its practices with respect to all

8   going-forward users.  This is the adjunct of the FTC.  And five

9   billion dollars there, by the way, is all U.S. users for a

10  variety of privacy issues.

11      This is a specific privacy issue, biometrics, under only

12  one state for a much smaller group of people.  Actually, if you

13  do the rateable analysis we're actually overpaying by

14  comparison in many respects.  But we understand where the case

15  was at the time of settlement.

16      And if you think about it this the way, the one thing

17  that, for example -- an example of what something FTC doesn't

18  cover is, we took the class period and said:  If you have been

19  inactive in that period for three years -- so any time starting

20  the date of effectiveness, going back three years for an

21  Illinois resident.  If you're inactive, your injunction here

22  would say within 90 days you have to delete all those

23  templates.  Those were not picked up by the FTC that.  That's

24  an example where there isn't an overlap, and that is something

25  different and unique.

          The other thing is we guarantee that all of the class
members here are going to be -- their settings are going to be
turned off.  And if they don't turn it manually back on, then
those templates are deleted and that solves -- that is the
conduct remedy that the plaintiffs wanted here.  It turns
everybody back into the Court's perspective of what a BIPA
compliance system would be.  And that was a big ask for us and
we did give that.

          We'll be happy to come back to you and explain why that is
not the same as what's in the FTC, and it is different here.
But that one historical piece is important to remember that
there is a whole group of people whose templates will be
automatically be deleted because they were inactive users.

          You know, I think that's probably the gist of what I would
have to say.  I'm happy to come back and bring you whatever you
want in whatever form you want.  But this really is a -- a
remarkable settlement achievement we've presented to the Court,
and we want to make sure the Court feels very comfortable about
approving it because we think it's an approvable deal.

          **THE COURT:**  Maybe.  As of today, it's not.  So we're
going to have to do some more work on that.  I have an open
mind, and we'll see where we end up.  But right now I have more
questions than I have answers.

          You know, it's also important to remember that the FTC
order that was entered by the District Court in the District of

1   Columbia was, in fact, a contempt order because the prior order

2   had been -- I can't remember the exact language the district

3   judge used, but either "flagrantly ignored," unapologetically

4   breached."  It was a dramatic statement.

5        So before we take comfort in anything, I want to get a

6   very clear explanation about the intersection between those

7   two -- the settlement, proposed settlement, and the FTC.

8        Also, I'm still not understanding the age 18.  I know that

9   you're not supposed to do things with kids under COPPA and

10  other statutes, but how do we know that children weren't tagged

11  that were in this class?

12       **MR. RHODES:**  The system -- and if the Court -- it

13  sounds like the Court will want evidence on this point, and we

14  would be happy to bring it to you.

15       The system doesn't allow anybody under the age of 18.  So

16  if the system thinks you're under 18, you will not be -- you

17  will not have a template created.  Just as if you live in

18  Canada or Europe, it will not create a template for you.  It's

19  a filter of the system.  That's why it's not included in the

20  class, Your Honor.

21       **THE COURT:**  I would like to hear more about that in

22  the technology portion when we get back together.

23       Now, I'm also -- this is a little bit more technical, but

24  let's go through it while we're on the phone.

25       The scope of the release is giving me some pause.  I only

1    certified a class of Facebook users.  There are other cases

2    where there are non-users who are suing, and I have those

3    cases.  This maybe has just been a drafting error.  I don't

4    know what it is, but for some reason the release uses the word,

5    quote, people, close quote, rather than "Facebook users" in the

6    scope of the release.  That's too broad, so...

7              MR. RHODES:  That's not intentional, Your Honor.

8              MR. BALABANIAN:  Not intentional, Your Honor.

9              THE COURT:  All right.  That needs to be fixed.

10       I'm also concerned about the release is much broader than

11   the BIPA claim.  Now, that was the claim in this case.  But the

12   release goes on to say everything that is in any way possibly

13   tied to the appropriation of biometric information is settled

14   and released, and you have a whole sentence there saying we

15   mean this -- we mean everything.  That's basically the --

16   reducing the legal language there in that last sentence and the

17   release paragraph, release claims paragraph, we need

18   everything.  That's too much.

19       I don't know whether Illinois has invasion of privacy

20   torts or other common law torts or statutory claims that might

21   relate to privacy, but I'm unwilling to let this case have a

22   release that goes beyond the BIPA claims.  Particularly,

23   particularly if they end up -- if the aggrieved class members

24   end up getting just $150.  I mean, that is -- if we get to that

25   point, and I don't know.  Maybe we will, maybe we won't.  They

are releasing a lot for $150, and I don't think that's

appropriate.  So I want you to take another look at that.

Yes, Mr. Balabanian?

**MR. BALABANIAN:**  No.  It's Mr. Rhodes, Your Honor.

**THE COURT:**  Mr. Rhodes, yes.

**MR. RHODES:**  I think what the intent there was, just

so the Court is not thinking we're trying to overreach here.

For example, in California we have 17200.  I think the fear was

that somebody would try to do an end run around of BIPA by

saying if it can port through some other statute.  We're just

trying to release that body of claim.  We're not trying to find

some other claim out there.  It's just to the extent someone is

basing a claim on whatever is covered by BIPA by a different

name, that's what we're trying to pick up, in addition to BIPA

per se.

So that's all the intent there.  I didn't want the Court

to think --

**THE COURT:**  Well, that's fine.  You're going to have

to try again.  But I'm not going to -- you know, if Illinois

has invasion of privacy and other torts, it's hard for me to

see how that would be released for the diminimus payment that

they may end up getting in this case.  And it wasn't litigated.

And then, also, it's not fair.  It wasn't litigated here.

The other thing I'm concerned about is the scope of the

released parties.  It includes all of -- I think the language

```
 1    is "Facebook's sister and affiliated companies."  I mean, you
 2    know, that's Instagram.  That's Oculus.  That's WhatsApp.  None
 3    of those people, none of those entities were defendants in this
 4    case.  And I could see the possibility of BIPA claims with, for
 5    example, Instagram or maybe Oculus.
 6        I am not willing to let those companies off the hook in
 7    this case, where they weren't defendants, claims against them
 8    were not articulated, and the amount that the aggrieved people
 9    are going to get is $150.  That just doesn't seem right to me.
10    So you're going to have to take another look at that as well.
11    That's just too broad for the number of entities that might be
12    potentially subject to a BIPA claim in the Facebook family.
13        Now -- oh, yes.  On the notices to the class, it's --
14    first of all, I want a 60-day opt-out.  I can't remember what
15    the period was, I think you were close.
16            MR. BALABANIAN:  56.
17            MR. RHODES:  It's 56, Your Honor.
18            THE COURT:  Okay, that's fine.  So let's do 60.
19    That's sort of the bare minimum that I think is reasonable in
20    any case, particularly this one.
21        I don't understand what the class notice list is.  There
22    is a reference to it in one of the claim forms.
23        What is that, Mr. Balabanian?
24            MR. BALABANIAN:  Well, the class notice list is the
25    list that we put together, if the Court recalls, back in May of
```

1    2018.  We did the same type of exercise when we did a data pool

2    over a 60-day period and tried to determine how many people

3    would be getting direct notice.

4        So the class list is the same mechanism that we used back

5    in 2018.  We have tested it to, in our view, ensure that it

6    actually captures and doesn't -- you know, beyond over capture

7    the class back in 2016.  When we laid out the criteria, it

8    yielded a notice list, a direct notice list of 30 million

9    individuals.  That's clearly far too overbroad when you talk

10   about the population of Illinois being about 12 and a half

11   million people and nine and a half or so million adults.

12       So the notices now, Your Honor, it's been cut down quite a

13   bit, but it's still overbroad, which we think is appropriate.

14   We want to make sure that we notice each and every potential

15   class member with direct notice.

16       It's now $15.4 million people.  We used the same

17   methodology that we had used in the context of adversarial

18   notice, Your Honor.  We do think that the list has been

19   sufficiently tightened up and is much more representative of

20   the potential class members.

21           **MR. RHODES:**  Your Honor, may I give you some more

22   insight on that?

23           **THE COURT:**  Yes, please.

24           **MR. RHODES:**  So when the Court ordered the -- I'm

25   going to call this class notice versus claim notice, if you

 1   will, and I'm going to pick up on the Court's observation in

 2   document 445-3, Page 6.

 3       You'll recall, Your Honor, before I got involved in the

 4   case, there was a colloquy with counsel about setting a time

 5   parameter for establishing a class notice.  I think the Court

 6   settled on something over 60 days, 60 or over days.  And in

 7   that same regard you said something to the effect of 90 days or

 8   less we can sort of assume is transiency, not residency.

 9       When we got the case back from the Ninth Circuit, we ran

10   that group of people, pursuant to the Court's prior orders, on

11   the assumption we were going to have to send that notice out

12   promptly upon getting back in front of you.  When you do that,

13   you get a fairly big group of people.  It's 29 million people

14   or something.

15       In the settlement negotiations we said, okay, we have to

16   treat the settlement fund essentially like that's the amount of

17   money to be distributed to people.  Therefore, what are the

18   criteria by which eligibility will be established.  And we look

19   at a variety of metrics on time.

20       We started with the principle that you had articulated in

21   your transcript hearing that if it's, quote -- if it's less

22   than three months, we'll just presume you're a transient.  We

23   started there.

24       We looked at Illinois law, which I think has this one-year

25   benchmark.  We said that's too long.

1          We ultimately settled on what's called the 183-day rule

2     that the IRS establishes for tax situs, if you have been

3     someplace for 183 days.

4          Then to get the data pulled together we looked at

5     Facebook's predictive home location tool.  Now, this thing is

6     inaccurate because it's trying to essentially interpolate where

7     you might be.  But there is a million different reasons why it

8     will be inaccurate.

9          And we also then provided -- in the context of developing

10    the settlement, we looked at a variety of different parameters

11    to try to benchmark, to try and get to what that logical class

12    size is.

13         So where we landed was, we used this 183-day rule that the

14    IRS establishes and six activity signals within a six-month

15    period, which is generally consistent with the metric by which

16    companies like this report this monthly average user indicator.

17    And when you do that, you get to about 15.4.

18         But that's -- just to be clear, that's through August of

19    last year.  We will have to bring that number forward,

20    obviously.  And that's who will get direct notice in the manner

21    that we proposed in the stipulation of settlement.

22         I should point out for the Court's benefit that if you go

23    to the notices that are attached to the stipulation of

24    settlement, Exhibit D and Exhibit E -- and I -- I will be

25    candid with you, that I struggled with this when I read this

1    the other day preparing for today's hearing.  Exhibit D, the

2    whole thing is a link.  It's not clear from the example I

3    provided in the document, but the Juul notice there, the whole

4    text there will be a link that if you click on, it takes you

5    immediately to the settlement web page.

6         In designing the notice campaign we tried to be literally

7    following your prior orders before the case went up on 23(f) in

8    the way and manner of the notice, and we tried to match to

9    that.  Just so you understand the architecture.

10        **THE COURT:**  Yes.  I -- yes.  We went out of our way

11   last time.

12        You know, Facebook is online and it was the keys to the

13   online empire in terms of reaching people.  So we're going to

14   take full advantages of that.  So I appreciate that.

15        I don't have a problem with 183 days.  That seems like a

16   reasonable compromise.  That's perfectly fine.

17        Where I'm a little more concerned is those -- the

18   exhibits, the Juul notice, and the other online things, you

19   know, they had all the charm and excitement of a utility bill.

20   They need to pop.  They need to catch people's eyes.  Okay?

21   They are not sending a message that says:  I should apply here

22   and get the money that I'm owed under the settlement.

23        So I really want to see a better form, a much more

24   inviting -- to use, in light of a better word, inviting and

25   engaging notice that catches the eye and motivates claimants.

1    Okay?  There is no reason, there is no reason why we ought to

2    be settling for anything less than a 90 percent claim rate.

3    Okay?

4        I mean, Facebook users stick.  They are around.  I'll get

5    to the point in a moment of whether people have closed the book

6    and moved onto do something else.

7        But as I understand it, and you can two tell me if I'm

8    wrong, these people -- people use Facebook forever, and we need

9    to reach them and catch their eye and get this money into their

10   hands.  So I want to see better notices.

11       Exhibit C is also -- you know, it's just a long legalese

12   form with a lot of stuff in it that even I wasn't able to

13   understand.  And I think it deeds to be clean, crisp and

14   something that people who don't get legal documents every day,

15   like you and me, are going to be able to understand and see

16   this is value for them.  All right?  We need to communicate the

17   message.  You are getting your rights enforced, and this is the

18   value that you're getting for that.  Both to see if they want

19   to opt out, and to make sure that they submit a -- they get

20   compensated.

21       I do not understand the need for a claim form.  I just --

22   I mean, there may be a small portion of people who have signed

23   off Facebook, and we should talk about that.  But having

24   anybody who is a current user and within the class sign a claim

25   form just seems like a non-starter to me.

1          **MR. RHODES:**  We don't have any data on economics,

2   Your Honor.  We may have some, but we can't push money to these

3   people.  We needs to get information from them to be able to

4   pay them.

5          **THE COURT:**  If that's the case, there just -- there

6   shouldn't be anything about, you know, affirmations and

7   attestations and all this other stuff.  It should be:  We have

8   a check waiting for you, and please tell us where to send it.

9   That's the kind of notice that ought to be.

10          **MR. RHODES:**  Well, there is a couple of exceptions,

11   and I'd like --

12          **THE COURT:**  I don't want people jumping through hoops

13   for this.  This is what kills realization rates on class

14   settlement, even for $150 for more.  You know, people just

15   throw up their hands and say:  I don't understand this form.

16   I'm not going to do it.  We don't need to do that in this case.

17          All right.  Go ahead, Mr. Rhodes.

18          **MR. RHODES:**  I appreciate that, Your Honor.  There

19   are some people that will be hard to reach.  There are just

20   some -- there are some gaps in the data.

21          So what we were trying to do is if people that were beyond

22   the direct notice regime got to the website, we were trying to

23   give those people opportunities to claim form -- in the form

24   itself to make a claim in a way that we can verify that would

25   still include them somehow.

1    We're not trying to make this complicated.  And I will

2  take the Court's comment that lawyers drafting these kinds of

3  things, they may be somewhat turgid in the prose that's used

4  and we'll try a lot harder to make them less so.

5        **THE COURT:**  Get someone from -- one of you --

6  Facebook marketing team, or plaintiff's marketing.  Get a

7  marketing person to write these things.  All right?  Because

8  they know how to sell.  And I want this to be -- the consumers

9  deserve to hear about this, and they should be sold that this

10  is something they should pursue.

11    I really would prefer -- now, you can discuss this with me

12  next time.  Maybe there is a good reason not to, and I'm open

13  to hearing it.  If you need an address for an account, that's

14  fine.  But no claim form for current users that you can have on

15  your list.

16    And for capturing people who may have dropped out, I don't

17  mind a claim form, if you want to do something along those

18  lines, but I want it to be just for them.

19    And I also think you need a better outreach.  I think you

20  need to be doing banner ads on other sites.  You need to be,

21  you know, finding people who are no longer on Facebook.  You're

22  going to have to use channels by definition outside of Facebook

23  that are online.  Maybe it was there and I missed it, but I

24  didn't see that.

25    So I'd like to see a plan for, you know, running at a

1    minimum, a bare minimum -- I hope you do more -- banner ads in

2    other sites that are going to get people to your website,

3    Mr. Balabanian, or the claims administrator's website.  Okay?

4         **MR. BALABANIAN:**  Yes, Your Honor.

5         But to that point, Your Honor, just -- I'll make it very

6    quick.  We definitely thought about banner ads.  We proposed

7    that a couple years ago, and it didn't make sense in the

8    context of the adversarial notice program.

9         Maybe we were a little too dogmatic in terms of wanting to

10   absolutely follow the Court's prior directions in that regard,

11   but certainly that is something that is on our radar.

12        **THE COURT:**  We're all living and learning, so don't

13   tie yourself to the past.  Okay?  Be creative.  Let's get the

14   money out.

15        **MR. BALABANIAN:**  Yes, sir.

16        **THE COURT:**  Okay.  And really, redo those forms.

17   They were not exciting, and they are not clear.

18        Let me just check my notes here.

19        (Brief pause.)

20        **THE COURT:**  Okay.  I think that's really all I had.

21        Now, remember, I'm going to summarize all this in the

22   minute order so you'll have some guidance.

23        Here is what I would like you to do.  You two

24   meet-and-confer about a date.  And I'll have you in maybe in a

25   couple of weeks.  Give yourself some time.

1      I do want to hear from the Facebook engineers or business

2  people, whoever, on the nuts and bolts of what's going to be

3  different from the past and switches being turned off and on

4  and how records are being cleaned.

5      I would on that same time, Mr. Rhodes, also like a little

6  more information about the predicted home location protocols.

7  I don't -- look, I'm not a software engineer.  So scale it

8  appropriately, but I want a better understanding about why

9  that's reasonable in terms of finding the class.

10      And then I do want a much better explanation about why the

11  Consent Decree is anything other than just a retread of BIPA

12  and the FTC order.

13         **MR. RHODES:**  I think this is a key point.  As I

14  heard, you want to make sure you understand whether it's a

15  concentric circle, a Venn diagram, or how they intersect with

16  each other.

17         **THE COURT:**  Right now if you Venn diagrammed, it

18  looks to me like the Consent Decree is coterminous with the FTC

19  decree and BIPA.  In other words, it doesn't mean anything.

20         **MR. RHODES:**  Yeah.  It's not -- I don't think that's

21  the case, and we will be prepared to address that.

22         **THE COURT:**  You're going to have to show me that's

23  the case.

24      So that's for the lawyers.

25      And then the other side is for the business people or

1    engineers.

2         And then you can just submit -- you know, do it as a new

3    set of papers, but I'd like, you know, the explanation about

4    why $5,000 is off the table.

5         I don't understand the 18 issue.  That seems to me over --

6    it's going to be over -- it's going to over exclude.  It's

7    going to exclude too many people who may have been captured.

8         Maybe I'm wrong, but I'm doubtful that a machine can tell

9    whether someone who is 16 is within the class or without the

10   class.  It might be fine for a kid, younger kid, but it's going

11   to be hard otherwise.  And I don't want people who are tagged

12   and eligible not getting a check because somebody thinks they

13   are under the age of 18.

14        Then also, Mr. Balabanian, redo the forms and file them

15   whenever you're ready.

16        I would suggest -- it's up to you, but I would suggest

17   giving yourselves a good couple of weeks.  Unfortunately, for

18   me, not for you, I was all set to have a groundbreaking civil

19   trial, but it's now off the table.  And I was so supposed to

20   start June 15th, so I do have time to have you in in the next

21   couple weeks.  But I want -- you're comfortable with your prep

22   and you've got everything lined up, so you just tell me the

23   time you want to come in.  All right?

24        **MR. RHODES:**  I was going to ask the Court.  Would it

25   be acceptable to, Your Honor, if we meet-and-confer and then

1    propose a schedule to you?

2              THE COURT:  That would be fine.

3              MR. RHODES:  Okay.

4              THE COURT:  And when we do the presentations, it will

5    all be on Zoom.  So no one will be in.  So we'll all be

6    remoting in, just like we are now.  And I've done that in other

7    contexts in criminal cases.  It works.  But just be aware of

8    that.  Set it up with the understanding that it's going to be

9    not in front of me personally, but remotely.  Okay?

10             MR. RHODES:  I have a housekeeping question, Your

11   Honor.

12             THE COURT:  Please.

13             MR. RHODES:  We technically have a pretrial

14   conference scheduled on June 25.  A bunch of things are due a

15   week from today.  May I ask the Court to --

16             THE COURT:  All right.  Yes, I'll vacate it for now.

17   You know, trial is not out of the question yet.  Nothing has

18   been approved, but I will vacate all that now.  I want you to

19   focus on responding to my inquiries today and then we'll see

20   what happens after that.

21       Okay.

22             MR. RHODES:  Your Honor, I apologize for sitting.

23   I've never been before you sitting before.  I find it weird,

24   but I couldn't find a standing configuration that would work.

25             MR. BALABANIAN:  I'm standing, Your Honor, just to be

1   clear.

2           **THE COURT:**  Your opponent stood up, Mr. Rhodes.

3           **MR. RHODES:**  I know.  I feel bad about it.

4           **MR. BALABANIAN:**  I'm actually on a step, too, so I

5   can look a little taller.

6           **THE COURT:**  The key thing is you're both dressed for

7   court.

8        All right.  I will see you soon.  Thanks very much.

9           **MR. BALABANIAN:**  Thank you for the time, Your Honor.

10           **THE COURT:**  Okay.  Have a good day.

11        (Proceedings adjourned.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## <u>CERTIFICATE OF OFFICIAL REPORTER</u>

     I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Sunday, June 7, 2020