**Pages 1 - 18**

             UNITED STATES DISTRICT COURT

           NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

                                        )
                                        )
                                        )
In re Facebook Biometric                )
Information Privacy Litigation )   CV 15-03747-JD
                                        )
                                        )
                                        )

                           San Francisco, California
                           Tuesday, September 22, 2020

             **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    EDELSON PC
                    350 North LaSalle Street - 14th Floor
                    Chicago, IL 60654
              BY:   **JAY EDELSON, ESQUIRE**

For Defendant Facebook, Inc.:
                    COOLEY LLP
                    101 California Street - 5th Floor
                    San Francisco, CA 94111
              BY:   **MICHAEL G. RHODES, ESQUIRE**

For Respondent Levi & Korsinsky, LLP:
                    LEVI & KORSINSKY, LLP
                    55 Broadway
                    New York, NY 10006
              BY:   **GREGORY M. NESPOLE, ESQUIRE**

Reported By:        Pamela Batalo Hebel, CSR No. 3593, RMR,
                    FCRR, Official Reporter

```
 1    Tuesday - September 22, 2020                           11:02 a.m.
 2                         P R O C E E D I N G S
 3                              ---oOo---
 4        THE CLERK:  Calling Civil Case 15-3747, In re Facebook
 5    Biometric Information Privacy Litigation.
 6        Counsel, please state your appearances for the record.
 7        MR. EDELSON:  Good morning, Your Honor.  Jay Edelson
 8    for the class.
 9        MR. RHODES:  Good morning, Your Honor.  Michael Rhodes
10    on behalf of Defendant Facebook.  Good to see you.
11        MR. NESPOLE:  Good morning, Your Honor.  Greg Nespole
12    from Levi & Korinsky on behalf of Levi & Korinsky.  Good
13    morning.
14        THE COURT:  Okay.  Well, I am concerned.
15        Mr. Edelson, my understanding was that the official
16    notice, the notice that you and -- well, your clients and the
17    defendant, Facebook, worked on long and hard to advise the
18    class members of their settlement and opt-out rights hasn't
19    even gone out yet; is that right?
20        MR. EDELSON:  Your Honor, it's in the process of going
21    out.  It started, I believe, on Friday and is continuing this
22    week.
23        The -- what we alerted the Court to were ads that started,
24    we believe, a week before the notice, so the first engagement
25    that the class had with the settlement for many of the class
```

1  members was what we believe was misleading advertising.
2      **THE COURT:** All right.  So, in other words, it's your
3  understanding that the first thing anybody saw after all the
4  publicity about the $650 million and how Illinois residents
5  could get up to several hundred dollars each -- the first thing
6  they saw was that ad that -- let's see -- the Levi & Korinsky
7  firm posted; is that right?
8      **MR. EDELSON:** There was -- yeah.  The class notice had
9  not gone out, so at least for, we think, thousands, if not tens
10 of thousands, of people saw an ad saying to "fill out a claim"
11 or "to submit a claim that's going to take under two minutes,
12 click here," and as Your Honor knows from our court papers,
13 there was confusion from class members.  Some people went
14 through the process, and in the comments on the Facebook page,
15 certain class members said, "I'm very confused."  At the end of
16 this, it said, "I'm somehow excluded from the class action."
17     So we have a situation where we literally have a large
18 class that was waiting to get notice so they could claim their
19 money, and it's kind of the worst thing that can happen in
20 notice where now we have class members who are not sure what
21 the legitimate process is.
22     **THE COURT:** All right.  So --
23     **MR. RHODES:** Your Honor, this is Mike Rhodes, for the
24 record.
25     Just for your benefit, the website went live, I believe,

1  sort of midafternoon on Friday, the settlement administration
2  website, so that's when that kind of kicked into gear, if the
3  Court was interested in that.
4      **THE COURT:**  All right.  Well -- okay.  I am interested
5  in that.
6      Now, we also had a very elaborate structure of jewel
7  notifications on Facebook, emails to class or putative class
8  members, people you think are class members, news feed --
9  Facebook news feed channel.  So the only thing that happened on
10  Friday was the settlement website went up.  And when are the
11  jewel and the news feed and everything else going to go out?
12  Is that still September 23rd?
13      **MR. RHODES:**  Yes, Your Honor.  That's the target date.
14      The other thing I would note for you then -- we provided
15  the Court with notice of this in the last status report -- was
16  we actually did meet and confer with Professor Ariely and
17  changed some of those forms specifically to address the Court's
18  comments around trying to make the process more -- more
19  engaging, so it was disappointing, obviously, to have this
20  development take place after we had gone even further to try to
21  make sure that the people that were going to get the notice
22  actually took action, you know, and -- after we consulted with
23  him and made some changes to the forms.
24      **MR. EDELSON:**  Your Honor, may I just add one small
25  clarification?

      **THE COURT:** Yes.

      **MR. EDELSON:** Emails have started going out in batches, so we've already been contacted by certain class members, and I believe that started over the weekend, perhaps. That's when I started hearing from class members, but it's not complete yet.

      **THE COURT:** So is the opt-out function operational right now?

      **MR. NESPOLE:** Your Honor, may I? Greg Nespole, Levi & Korinsky.

   Thank you for hearing us on such short notice.

      **THE COURT:** I'm sorry, Mr. Nespole. I didn't ask you a question. Just one second.

   Mr. Edelson, is the opt-out function operational now?

      **MR. EDELSON:** Yes, Your Honor.

      **THE COURT:** It is. Has anybody opted out?

      **MR. EDELSON:** I'm not aware of that.

      **MR. RHODES:** We haven't gotten a report from the administrator yet, Your Honor.

      **THE COURT:** I'm sorry. What?

      **MR. RHODES:** We have not received our first report from the class administrator. We'll get them every Friday, and as you know, we are going to report back to you every two weeks in that regard. We just haven't gotten the first one yet. This just all started in the last few days.

1       **THE COURT:** All right.

2    And, Mr. Edelson, how did this come to your attention?

3       **MR. EDELSON:** Blind luck, Your Honor. Some -- some

4 members of my firm ended up being alerted to it I think from

5 family who asked whether this was legitimate, was it part of

6 our class notice. So we found out and then filed a couple

7 hours later.

8    We actually don't know the full extent of it. We know

9 that these were certain ads that they were running. We don't

10 know whether there are other ads that had been going on or are

11 currently going on.

12      **THE COURT:** Let me ask you about that. My

13 understanding was they took them down promptly after you filed

14 your motion; is that right?

15      **MR. EDELSON:** Opposing counsel can -- can say that. I

16 read their response carefully, and what it said was that they

17 took down the ads in question and wouldn't put back these ads

18 in question without speaking to us. It's unclear to us whether

19 there are other ads or whether they are going to change a few

20 words and throw them back up there.

21      **MR. RHODES:** Your Honor, we were -- Facebook was asked

22 by class counsel to jump on this on Friday. We did. And we

23 were in the process of identifying both the ads and sort of --

24 let's just call it for simplicity sort of the home page for the

25 ads going out, and we were in the process of looking at those

1   and whether we could take those down ourselves.  When we went
2   there, the product people went there, that had been taken down,
3   so my understanding is it was taken down sort of early
4   afternoonish, perhaps earlier in the day on Friday.
5       I don't know what triggered that, of course, but we were
6   trying to look independently at suspending the ads until this
7   matter could be resolved.
8           **THE COURT:**  All right.
9       And where were they -- I will just start with you,
10  Mr. Rhodes.  Where were they on Facebook?
11          **MR. RHODES:**  I couldn't tell you honestly, Your Honor.
12  I couldn't tell you.
13          **THE COURT:**  Do you know, Mr. Edelson?  Where do they
14  show up on Facebook?
15          **MR. EDELSON:**  My understanding is that they were
16  sponsored ads that were showing up in the -- in the feeds.
17      And just to be clear, we only know what was happening with
18  Facebook.  Often when people run ad campaigns, they're running
19  them on multiple platforms, so one question -- and Greg and I
20  were supposed to speak today, and we missed each other.  One
21  question we had for them is whether they have been running
22  these on different platforms like Google AdWords.
23          **MR. RHODES:**  Your Honor, I apologize.  I thought you
24  meant literally where did they run, like whose feed and so
25  forth.  But, yeah, that's fair.  They were -- these are ads

1  that are running in the user's feed.
2          **THE COURT:**  That's what I meant.  So they were just
3  sort of scrolling at the top of people's pages?
4          **MR. RHODES:**  Yes.  Or in the feed itself as you scroll
5  through the content that comprises, you know, your access to
6  Facebook.
7          **THE COURT:**  All right.
8      Mr. Nespole, let's start with that question.  Where else
9  have these ads been running other than Facebook?
10         **MR. NESPOLE:**  Nowhere else.  Nowhere else, Your Honor.
11 Just on Facebook.
12         **THE COURT:**  All right.  And you have them down?  They
13 are over now?  You took them down as you --
14         **MR. NESPOLE:**  Your Honor, we took them down Friday
15 after receiving a phone call from class counsel expressing
16 their concerns, and we thought it was appropriate to bring them
17 down so we could have a series of meet-and-confers with them
18 during the course of the weekend, which was a holiday for many
19 people in my firm, to address their concerns, understand what
20 it was that they were worried about or they found to be
21 misleading, which we contend they were not.
22     Those meet-and-confers are really one-way conversations
23 where they just wanted us to take it down permanently, and come
24 Monday morning, we received the subsequent papers seeking
25 additional relief.

1           I would like to address some of the issues you raised with
2    Mr. Edelson and Mr. Rhodes about these ads, these materials.
3    They are --
4           **THE COURT:**  That's fine, but before we get to that, so
5    nothing right now is running anywhere on Facebook --
6           **MR. NESPOLE:**  No.
7           **THE COURT:**  -- or anywhere else; is that right?
8           **MR. NESPOLE:**  No.  No.  Nothing is up now at all,
9    Your Honor.
10          **THE COURT:**  All right.
11       So how did you decide on this timing?  How did you decide
12   that September -- whatever Friday was -- was the day for you to
13   launch this thing?
14          **MR. NESPOLE:**  Your Honor, I think it was launched
15   actually prior to that, and it was launched in response to an
16   understanding that we thought that they were going to get their
17   notice out sooner than obviously they did.  We thought it was
18   appropriate to let class members know sooner than later that
19   they had an opt-out right, and, indeed, the materials are very
20   explicit that this concerns an opt-out right.
21          **THE COURT:**  Let me just jump in.
22       I don't quite understand your sense of timing because my
23   preliminary approval order said notice would go up
24   September 23rd, so presumably you read that.
25          **MR. NESPOLE:**  I did.

1    **THE COURT:** Why did you think that it was going to be
2 earlier than the 23rd? I don't see any grounds for that.
3    **MR. NESPOLE:** I think the answer to that is we didn't
4 think it truly, Your Honor, mattered if we sent it out before
5 or after preliminary approval because the notice was quite
6 clear --
7    **THE COURT:** No, no. It's not -- I'm not talking about
8 the preliminary approval date. I said in my preliminary
9 approval order that the official court-approved notice to the
10 class would go out September 23rd.
11    Now, you just told me that you thought it had gone out
12 earlier. I'm trying to figure out --
13    **MR. NESPOLE:** I mis --
14    **THE COURT:** -- how you could possibly --
15    **MR. NESPOLE:** I mis --
16    **THE COURT:** Mr. Nespole, don't speak over me. This is
17 hard enough on Zoom without people interrupting the Court.
18 Please don't do it.
19    How did you conclude that Friday was the day to launch
20 your counter-ad?
21    **MR. NESPOLE:** I think we actually launched it before
22 Friday.
23    **THE COURT:** When did you start it then?
24    **MR. NESPOLE:** I believe earlier in the week, if not a
25 week before.

1       **THE COURT:** You need to give me a date. I --
2       **MR. NESPOLE:** I don't know offhand, Your Honor. I
3   don't know. I'm sorry. I will look it up. I don't know.
4   Sorry.
5       **THE COURT:** It's been out at least a week before
6   Friday?
7       **MR. NESPOLE:** I think it's been out for several days.
8       **THE COURT:** And how many responses did you get?
9       **MR. NESPOLE:** Three thousand.
10      **THE COURT:** All right. And what are you doing with
11  those responses?
12      **MR. NESPOLE:** We have -- those people have agreed,
13  premised upon clicking and signing and going through the
14  opt-out pages, to opt out of litigation.
15      **THE COURT:** Let me ask you a question. As I'm looking
16  at the screenshot for your ad, it says, "Sign up for a Facebook
17  illegal facial recognition claim."
18          Now, what were you trying to communicate when you put that
19  ad up?
20      **MR. NESPOLE:** That, admittedly, probably,
21  Your Honor -- the word "claim" there was probably not as artful
22  as it should have been, but once you go further into the
23  materials, it's quite explicit from our brief that it lays out
24  the opportunity to opt out, not to file a substantive claim in
25  a class action.

1    I admit that looking back on it now, there probably should
2    have been a more artful term used than just "claim" by itself,
3    but --
4         **THE COURT:** Listen, I appreciate that, but, you know,
5    it looks to me that it was artful in the sense that it was
6    meant to mislead and deceive people into thinking that this is
7    how you filed a claim under the settlement.
8         **MR. NESPOLE:** Well --
9         **THE COURT:** I can't think of any other reason why you
10   would have said "file a claim" knowing, as you know, as
11   experts -- you know, you profess -- you hold yourselves out as
12   experts in class actions -- you know what that means.  That is
13   a term of art.  And you know that an average person who is not
14   a lawyer, who has got a good head on his or her shoulders that
15   doesn't know the first thing about what you and I do every day
16   all day is going to see that as the way that they file their
17   claim to get their check for the widely-publicized
18   record-breaking $650 million settlement that everybody in
19   Illinois has probably heard about.  So I appreciate your
20   candor, and it was wrong, and I think you recognize that.
21       Now, what are you going to do to correct that?
22        **MR. NESPOLE:** Well, I would just like to say,
23   Your Honor, that with respect to "claim," yes, of course it's
24   "claim" because when you file an opt-out, it's also a claim.
25   But when you look further through our materials, Your Honor,

1    there was no effort to deceive.  The materials are clear that
2    this concerns an opt-out.  It contains at least three instances
3    where you must --
4            **THE COURT:**  Mr. Nespole, that's not the point.  You
5    baited a hook.  Once the hook was swallowed, you are trying to
6    tell me that the worm was as honest as the day is long.  It
7    doesn't matter.
8            **MR. NESPOLE:**  Okay.
9            **THE COURT:**  You get that hook into somebody's gullet
10   by a trick or by fraud or by being misleading -- "fraud" is
11   probably too much of a word -- but by being misleading or
12   confusing, it's just wrong.  Now, you can't do that.
13       Now, I don't have any problem, as is a well-established
14   principle, that if you want to do something about opt-outs, you
15   can do that, but it has to be forthright, candid, and honest,
16   and it cannot be disruptive.
17       Putting this thing out before -- and you knew this --
18   before the official class -- court-approved class notices have
19   been posted was deceptive and misleading, and that cover page
20   saying "file your claim here" in effect could not be more
21   misleading and deceptive to an average consumer.  So you are
22   0 and 2 on persuading me that this was the right thing to do.
23       Now, I want to know what you plan to do to correct this.
24   You've got 3,000 names or emails addresses or something.  What
25   are you going to do to fix this?

1       **MR. NESPOLE:**  Once you're in a hole, I guess you stop
2    digging.  So what we'll do is we'll send --
3       **THE COURT:**  You need a shovel so you can dig your way
4    out and get back on course here.  Now, how do you want to do
5    that --
6       **MR. NESPOLE:**  I think I might need a ladder.
7       But what we'll do here is we will send an email to these
8    3,000 people explaining that they opted out, that there is
9    still a claims process.  We will work with Mr. Edelson with
10   respect to the communication.
11      Once the -- once the -- once the entire claims process
12   goes live through the administrator, if we so elect, we will
13   then go about our business again and solicit potentially
14   opt-out plaintiffs.
15      **THE COURT:**  Mr. Edelson, what do you think about that?
16   Mr. Nespole is pledging to work with you on a joint
17   communication for those 3,000 people.  You will have a hand in
18   crafting that.  Does that sound like enough?  What do you
19   think?
20      **MR. EDELSON:**  If the idea is they're not going to run
21   any ads in the meantime -- and we hear what Your Honor says and
22   we agree with the law, if they want to opt out, they can do
23   that.  We just want to make sure everything is straightforward.
24      But if they're saying status quo right now and then
25   they'll show us their suggested -- the language that they want

1  to send to these people, that would be something we would
2  appreciate.
3          **THE COURT:** Okay.
4      Mr. Rhodes, your thoughts?
5          **MR. RHODES:** Yes, Your Honor.  Thank you.
6      Well, let's take the starting premise of Your Honor's
7  remarks that if this -- if these 3,000 people have been
8  identified and responded to these ads and if we further assume
9  those ads were, in fact, misleading, we need curative
10 disclosure to those people; right?
11     The whole purpose of this exercise over the last many
12 months with Your Honor's supervision was to make sure that we
13 got effective notice to people and encouraged them to take the
14 money, not to be misled into opting out and not getting the
15 money.
16     So I think the Court needs to supervise, obviously, any
17 further communication.  There needs to be remediation through a
18 curative disclosure, and I think all three parties need to meet
19 and confer about that forthwith and come up with a plan by
20 which these people will be re-noticed, if you will, and be
21 driven to the proper website.
22     If he wants to go out and try to disrupt the settlement by
23 doing the opt-out process in a legitimate, fair way, obviously
24 the law, I think, allows him to do that to some degree.  But
25 what we have here is not only do we have deception and

1  misleading ads, we have them before the notice went out, so
2  it's not even a situation where people got competing notices,
3  if you will, and maybe were misled.  Here some group of people
4  got only this misleading notice, so I would argue that a
5  strenuous court-approved remediation notice needs to go out.
6       **THE COURT:**  Well, that -- I am not ruling that out.
7       And here is what I'm going to suggest.  I think in the
8  first instance, you three -- and I'll advise Mr. Rhodes to
9  participate as well -- you three craft a proposed notice to the
10 3,000 or so people that Mr. Nespole's law firm has gotten
11 responses from.  I'm going to leave the drafting to you, but I
12 would imagine that it will be very clear in saying that this is
13 not how you file a claim for the settlement.  That if you elect
14 to opt out, you will not participate in or receive a check from
15 the settlement and all the things that you, as an average
16 consumer, would want to know in order to make an informed
17 decision.
18      Now, if you all can sign off and agree on that, then I
19 think that's probably the best thing to do.  If you can't, I
20 will take up the matter of a court-approved communication to
21 class members that will advise, in probably stronger terms, the
22 response to what happened with this law firm.
23      So why don't you three take a crack at that.
24      In the meantime, Mr. Nespole, there aren't going to be any
25 ads running; is that right?

| | |
|---|---|
| 1 | **MR. NESPOLE:** Yes, Your Honor. |
| 2 | **THE COURT:** Okay.  So why don't you get started on |
| 3 | that today.  And if you hit an impasse, you just send me a |
| 4 | letter, all right, and I will take it up at that point.  But my |
| 5 | main interest now is making sure that that very thorough and |
| 6 | complicated and heavily-discussed notice -- series of notices |
| 7 | that we arranged through the jewel and the news feed and |
| 8 | everything else are going to go ahead as scheduled.  I think |
| 9 | that's already started, but I don't want this to interrupt |
| 10 | that.  That needs to go and happen. |
| 11 | **MR. RHODES:** Your Honor, just for your -- |
| 12 | **THE COURT:** Yes.  Go ahead. |
| 13 | **MR. RHODES:** Just for your clarification, I'm apprised |
| 14 | through a text just now that the jewel notification -- those |
| 15 | online notifications are scheduled to go out tomorrow -- |
| 16 | **THE COURT:** All right.  Okay. |
| 17 | **MR. RHODES:** -- as ordered by the Court. |
| 18 | **THE COURT:** All right.  Thank you. |
| 19 | And then the two of you -- three of you work on something, |
| 20 | and I'm happy to review it if you'd like, or if you want to do |
| 21 | it independently, that's fine as well.  All right? |
| 22 | Mr. Edelson, I think that takes care of everything today. |
| 23 | Is there anything else? |
| 24 | **MR. EDELSON:** No.  Thank you, Your Honor, for your |
| 25 | time. |

1  **THE COURT:** Mr. Nespole?

2  **MR. NESPOLE:** No, Your Honor. Thank you.

3  **THE COURT:** Mr. Rhodes?

4  **MR. RHODES:** I have one last thing, which is I would

5  assume there's not going to be any effort by the opt-out --

6  I'll call it the opt-out plaintiffs' firm -- to communicate

7  further with those 3,000 identified individuals in advance of

8  this other notice.

9  **THE COURT:** Mr. Nespole, I would assume that would be

10 true.

11 **MR. NESPOLE:** Of course, Your Honor. We will not do

12 that.

13 **MR. RHODES:** Thank you, Your Honor.

14 **MR. NESPOLE:** We'll work --

15 **THE COURT:** Okay. I will issue a short minute order

16 just recording our highlights so that we are crystal clear on

17 what we've come up with today. All right?

18 Okay. Thanks very much, everyone.

19 (Proceedings adjourned at 11:21 a.m.)

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Wednesday, September 23, 2020

*Pamela Batalo Hebel*
_____
Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
U.S. Court Reporter