EDELSON PC
Jay Edelson (*pro hac vice*)
Benjamin H. Richman (*pro hac vice*)
Alexander G. Tievsky (*pro hac vice*)
350 North LaSalle Street, 14th Floor
Chicago, IL 60654
Telephone: (312) 589-6370
Fax: (312) 589-6379
jedelson@edelson.com

ROBBINS GELLER RUDMAN & DOWD LLP
Paul J. Geller (*pro hac vice*)
Stuart A. Davidson (*pro hac vice*)
Christopher C. Gold (*pro hac vice*)
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
pgeller@rgrdlaw.com

LABATON SUCHAROW LLP
Michael P. Canty (*pro hac vice*)
Corban S. Rhodes (*pro hac vice*)
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Fax: (212) 818-0477
mcanty@labaton.com

Counsel for plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| In re FACEBOOK BIOMETRIC INFORMATION PRIVACY LITIGATION | ) ) ) |
| | ) |
| This Document Relates To: | ) ) |
| ALL ACTIONS. | ) ) ) ) |

Master File No. 3:15-cv-03747-JD

CLASS ACTION

PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARDS

Hearing date: Jan. 7, 2021 at 10:00 a.m.

1

<u>**TABLE OF CONTENTS**</u>

**NOTICE OF MOTION AND MOTION** ................................................................1

**INTRODUCTION** ..................................................................................................1

**BACKGROUND** .....................................................................................................2

**I.**      Litigation Before this Court.............................................................2

**II.**     Interlocutory Appeal to the Ninth Circuit .....................................6

**III.**    Mediations and Settlement ..............................................................6

**ARGUMENT** ..........................................................................................................8

**I.**      The Court Should Award 20% of the First $550 Million ...............8

      **A.**     **Class Counsel Obtained an Unprecedented Result for the Class** ....................10

      **B.**     **Class Counsel's Efforts Generated Non-Monetary Benefits**............................14

      **C.**     **Pursuing this Litigation on a Contingent Basis Was Extremely Risky for Class Counsel**............................................................................................15

      **D.**     **The Market Supports the Requested Fee** ..................................................18

      **E.**     **No "Windfall" Will Result from the Fee Awarded** .....................................20

          **1.**     **Excluding the Last $100 Million from the Fee Request Supports the Reasonableness of the Fee** ...............................................................20

          **2.**     **Conducting a Lodestar Cross Check Here Would Not Advance the Goal of Preventing a Windfall** ...................................................................21

          **3.**     **Even if the Court Decides to Perform a Lodestar Cross-Check, the Fee Request Is Reasonable** ...............................................................23

**II.**     Plaintiffs' Expenses Are Reasonable............................................26

**III.**    The Requested Incentive Awards Are Reasonable Given the Length of the Case and the Significant Efforts of the Class Representatives.........................................27

**CONCLUSION** ......................................................................................................29

1

2

## <u>TABLE OF AUTHORITIES</u>

3

**Cases:**

4

*Acosta v. Frito-Lay, Inc.*,
No. 15-CV-02128-JSC, 2018 WL 646691 (N.D. Cal. Jan. 31, 2018)...............................26

5

*Aranda v. Caribbean Cruise Line, Inc.*,
6  No. 12 C 4069, 2017 WL 1369741 (N.D. Ill. Apr. 10, 2017) ...........................................12

7

*Beckman v. KeyBank, N.A.*,
8  293 F.R.D. 467 (S.D.N.Y. 2013)......................................................................................25

9  *Bellinghausen v. Tractor Supply Co.*,
306 F.R.D. 245 (N.D. Cal. 2015) .....................................................................................24

10

11  *Birchmeier v. Caribbean Cruise Line, Inc.*,
896 F.3d 792 (7th Cir. 2018).............................................................................12, 13, 21

12

*Brundidge v. Glendale Fed. Bank, F.S.B.*,
13  168 Ill. 2d 235 (1995) ........................................................................................................9

14  *Campbell v. Facebook, Inc.*,
951 F.3d 1106 (9th Cir. 2020) .........................................................................................21

15

16  *Chen v. Chase Bank USA, N.A.*,
No. 19-CV-01082-JSC, 2020 WL 3432644 (N.D. Cal. June 23, 2020).........................28

17

18  *Cheng Jiangchen v. Rentech, Inc.*,
No. CV 17-1490-GW(FFMX), 2019 WL 5173771 (C.D. Cal. Oct. 10, 2019) ...............24

19

*Craft v. Cty. of San Bernardino*,
20  624 F. Supp. 2d 1113 (C.D. Cal. 2008) ...........................................................................25

21  *Dickey v. Advanced Micro Devices, Inc.*,
No. 15-CV-04922-HSG, 2020 WL 870928 (N.D. Cal. Feb. 21, 2020)............................24

22

23  *Edenborough v. ADT, LLC*,
No. 16-CV-02233-JST, 2019 WL 4164731 (N.D. Cal. July 22, 2019)..............................8

24

*Farrell v. Bank of Am, N.A.*,
25  No. 18-56272, 2020 WL 5230456 (9th Cir. Sept. 2, 2020).........................................8, 21

26  *Ford v. CEC Ent. Inc.*,
No. 14CV677 JLS (JLB), 2015 WL 11439033 (S.D. Cal. Dec. 14, 2015) .......................9

27

28

*Fowler v. Wells Fargo Bank, N.A.*,
No. 17-CV-02092-HSG, 2019 WL 330910 (N.D. Cal. Jan. 25, 2019) ............................29

*Frank v. Gaos*,
139 S. Ct. 1041 (2019)...................................................................................................11

*In re Anthem, Inc. Data Breach Litig.*,
327 F.R.D. 299 (N.D. Cal. 2018) ..................................................................................12

*In re Bluetooth Headset Prods. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011) ...........................................................................8, 10, 20

*In re Capacitors Antitrust Litig.*,
No. 3:14-CV-03264-JD, 2017 WL 9613950 (N.D. Cal. June 27, 2017)...........................9

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
No. 1:17-MD-2800-TWT, 2020 WL 256132 (N.D. Ga. Mar. 17, 2020) .............11, 12, 13

*In re Facebook Biometric Info. Privacy Litig.*,
326 F.R.D. 535 (N.D. Cal. 2018) ....................................................................................2

*In re Facebook Biometric Info. Privacy Litig.*,
932 F.3d 1264 (9th Cir. 2019) ........................................................................................2

*In re Facebook Biometric Info. Privacy Litig.*,
No. 3:15-CV-03747-JD, 2018 WL 2197546 (N.D. Cal. May 14, 2018)...........................4

*In re Facebook Biometric Info. Privacy Litig.*,
No. 15-CV-03747-JD, 2020 WL 4818608 (N.D. Cal. Aug. 19, 2020) ..............................1

*In re Genworth Fin. Sec. Litig.*,
No. 1:14-cv-02392 (AKH) (S.D.N.Y.) ...........................................................................25

*In re Google Referrer Header Privacy Litig.*,
869 F.3d 737 (9th Cir. 2017) .........................................................................................11

*In re High-Tech Employee Antitrust Litig.*,
No. 11-CV-02509-LHK, 2015 WL 5158730 (N.D. Cal. Sept. 2, 2015) ..........................27

*In re HP Inkjet Printer Litig.*,
716 F.3d 1173 (9th Cir. 2013) ........................................................................10, 13, 19

*In re Immune Response Sec. Litig.*,
497 F. Supp. 2d 1166 (S.D. Cal. 2007) .....................................................................26, 27

*In re Korean Air Lines Co., Ltd. Antitrust Litig.*,
No. CV 07-05107 SJO AGRX, 2013 WL 7985367 (C.D. Cal. Dec. 23, 2013)..................9

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
    No. 4:14-MD-2541-CW, 2017 WL 6040065 (N.D. Cal. Dec. 6, 2017)....................10, 25

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
    768 F. App'x 651 (9th Cir. 2019) ....................................................................................10

*In re Online DVD-Rental Antitrust Litig.*,
    779 F.3d 934 (9th Cir. 2015) ..........................................................................................27

*In re Optical Disk Drive Prod. Antitrust Litig.*,
    959 F.3d 922 (9th Cir. 2020) ..................................................................................8, 9, 18

*In re Pacific Enters. Sec. Litig.*,
    47 F.3d 373 (9th Cir. 1994) ..............................................................................................9

*In re Synthroid Mktg. Litig.*,
    264 F.3d 712 (7th Cir. 2001) ....................................................................................20, 21

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
    No. MDL C-07-1841 EMC, 2011 WL 3352460 (N.D. Cal. Aug. 2, 2011) ....................22

*In re Wells Fargo Loan Processor Overtime Pay Litig.*,
    No. 2672 CRB (JSC), 2017 WL 1047834 (N.D. Cal. Mar. 17, 2017) .............................29

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
    No. 16-MD-02752-LHK, 2020 WL 4212811 (N.D. Cal. July 22, 2020)...................12, 13

*Jacobs v. California State Auto. Ass'n Inter-Ins. Bureau*,
    No. C 07-00362 MHP, 2009 WL 3562871 (N.D. Cal. Oct. 27, 2009)............................28

*Kaess v. Deutsche Bank AG*,
    No. 09-cv-01714 (GHW) (RWL) (S.D.N.Y.)...................................................................24

*McDonald, v. Kiloo A/S*,
    No. 17-CV-04344-JD, 2020 WL 5702113 (N.D. Cal. Sept. 24, 2020) .............................6

*Monterrubio v. Best Buy Stores, L.P.*,
    291 F.R.D. 443 (E.D. Cal. 2013) ....................................................................................28

*Paul, Johnson, Alston & Hunt v. Graulty*,
    886 F.2d 268 (9th Cir. 1989) ..........................................................................................24

*Perlin v. Time Inc.*,
    237 F. Supp. 3d 623 (E.D. Mich. 2017) ..........................................................................18

*Radcliffe v. Experian Info. Sols. Inc.*,
    715 F.3d 1157 (9th Cir. 2013) .........................................................................................28

*Rael v. Children's Place, Inc.*,
　　No. 3:16-CV-00370-GPC-LL, 2020 WL 434482 (S.D. Cal. Jan. 28, 2020)...............12, 13

*Rodriguez v. W. Publ'g Corp.*,
　　563 F.3d 948 (9th Cir. 2009) ........................................................................................27

*Roes, 1-2 v. SFBSC Mgmt., LLC*,
　　944 F.3d 1035 (9th Cir. 2019) ......................................................................................28

*Rosenbach v. Six Flags Entm't Corp.*,
　　2019 IL 123186 ...................................................................................................*passim*

*Santana v. Take-Two Interactive Software, Inc.*,
　　717 F. App'x 12 (2d Cir. 2017) .................................................................................4, 5

*Spokeo, Inc. v. Robins*,
　　136 S. Ct. 1540 (2016)...........................................................................................4, 5, 17

*Steiner v. Am. Broad. Co.*,
　　248 F. App'x 780 (9th Cir. 2007) ...........................................................................*passim*

*Sullivan v. Dolgen Cal., LLC*,
　　No. 3:15-CV-01617-JD, 2017 WL 3232540 (N.D. Cal. July 31, 2017) ..........................27

*Theodore Broomfield v. Craft Brew All., Inc.*,
　　No. 17-CV-01027-BLF, 2020 WL 1972505 (N.D. Cal. Feb. 5, 2020) ............................13

*Vincent v. Hughes Air W., Inc.*,
　　557 F.2d 759 (9th Cir. 1977) ........................................................................................26

*Vizcaino v. Microsoft Corp.*,
　　142 F. Supp. 2d 1299 (W.D. Wash. 2001) ....................................................................16

*Vizcaino v. Microsoft Corp.*,
　　290 F.3d 1043 (9th Cir. 2002) ..............................................................................*passim*

*Wininger v. SI Mgmt. L.P.*,
　　301 F.3d 1115 (9th Cir. 2002) ......................................................................................26

**Other Authorities:**

*Peter Eavis & Steve Lohr, Big Tech's Domination of Business Reaches New Heights*,
　　N.Y. Times (Aug. 19, 2020), https://nyti.ms/3l6FImh .................................................17

U.S. Bureau of Labor & Statistics, CPI Inflation Calculator,
　　https://www.bls.gov/data/inflation_calculator.htm .......................................................28

### NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on January 7, 2021, or as soon thereafter as they may be heard, Plaintiffs will move the Court for an order awarding attorneys' fees and expenses to Class Counsel and incentive awards to the Class Representatives. This motion is based upon the following memorandum of points and authorities and the contemporaneously-filed declarations.[1]

### INTRODUCTION

After five years of "fierce[]" litigation in the very first case ever brought under the Illinois Biometric Information Privacy Act ("BIPA"), and "with no legal pebble left unturned[,]" *In re Facebook Biometric Info. Privacy Litig.*, No. 15-CV-03747-JD, 2020 WL 4818608, at *1 (N.D. Cal. Aug. 19, 2020), and Class Counsel[2] successfully negotiated a $650 million non-reversionary settlement that provides substantial cash relief to the Class. In terms of total dollars recovered, dollars per Class Member, and prospective relief achieved this settlement provides stronger relief than almost any other privacy settlement. Plaintiffs now move for an award of attorneys' fees and expenses to Class Counsel, who litigated this case on a fully contingent basis, and incentive awards to the Class Representatives.

The benchmark attorneys' fee award in the Ninth Circuit is 25% of a common fund, but Class Counsel's request is substantially lower than the benchmark. Class Counsel are not seeking fees on the last $100 million of the fund, which was added as a result of additional negotiations after the first preliminary approval hearing. Out of the original $550 million, Class Counsel are seeking an award of 20% (five percentage points lower than the benchmark and lower than the fee cap in the original settlement) plus their reasonable expenses advanced over the five years of this litigation. That amounts to $110 million, which is 16.9% of the total Settlement Fund. For the Class Representatives, they request a modest award of $7,500 each. As explained in detail

---

[1]   When Plaintiffs submit their Motion for Final Approval or before December 3, 2020, they intend to submit a proposed order addressing both that motion and this one.

[2]   All capitalized terms herein are defined in the Amended Stipulation of Class Action Settlement (ECF No. 468), unless otherwise noted.

1  below, and in the attached declarations of Professors William B. Rubenstein and Brian

2  Fitzpatrick, the requested award would fairly compensate Class Counsel for the exceptional

3  result they achieved for the Class without providing a windfall.

4  **BACKGROUND**

5  As the Ninth Circuit stated, "[t]he material facts of this case are reported in a number of

6  prior orders" and do not need to be reproduced in great detail here. *In re Facebook Biometric*

7  *Info. Privacy Litig.*, 326 F.R.D. 535, 540–41 (N.D. Cal. 2018), *aff'd* 932 F.3d 1264 (9th Cir.

8  2019). "Briefly summarized, plaintiffs are Facebook users who challenge its 'Tag Suggestions'

9  program, which scans for and identifies people in uploaded photographs to promote user tagging.

10  Plaintiffs allege that Facebook collects and stores their biometric data without prior notice or

11  consent in violation of their privacy rights and Sections 15(a) and 15(b) of the Illinois Biometric

12  Information Privacy Act[.]" *Id.*

13  Allegations such as these have become a familiar part of the class action landscape in the

14  last five years, but on April 1, 2015, when Plaintiff Carlo Licata sued Facebook in the Circuit

15  Court of Cook County, Illinois, they were a first. (Declaration of Class Counsel ("CC Decl."),

16  attached hereto as Exhibit 1, ¶ 8.) Although BIPA had been on the books in Illinois since 2008,

17  not a single lawsuit—class action or otherwise—had been filed under the statute. As a case

18  raising so many novel issues and issues of first impression, it is significantly more complex than

19  many BIPA actions filed today. Without providing unnecessary detail about the 19 depositions,

20  17 hearings, and five rounds of dispositive motion practice, a brief discussion of its procedural

21  background helps to illustrate the significant efforts by Plaintiffs and Class Counsel that resulted

22  in the settlement that forms the basis for the present fee request.

23  **I.     Litigation Before this Court.**

24  After Licata filed suit, Facebook removed the case to federal court in Illinois and moved

25  to transfer it, as well as the two similar cases filed by Plaintiffs Adam Pezen and Nimesh Patel,

26  to this District. (*Id.* ¶¶ 9, 10.) Rather than expend time and resources on drawn-out litigation on

27  transfer or a prolonged dispute as to who would lead the cases, Plaintiffs agreed to transfer the

28  cases to this Court, to consolidate them into a single action, and to work together to reach the

1   best result for the Class. (*Id.* ¶ 12.) They filed a consolidated complaint in this Court on August

2   28, 2015, and Facebook's motion to dismiss was on file by early October of that year. (*Id.* ¶ 14.)

3        Facebook's principal arguments in support of its motion to dismiss were that: (1)

4   Facebook users could not assert Illinois claims because Facebook's user agreement contained a

5   California choice-of-law clause; and (2) BIPA did not apply to Tag Suggestions because of the

6   statutory exception for photographs. (*Id.* ¶ 16.) The Court converted Facebook's motion to a

7   summary judgment motion, and the parties engaged in an expedited discovery period, which

8   included depositions of the three plaintiffs and two Facebook witnesses as well as the exchange

9   of thousands of pages of documents. (*Id.* ¶¶ 18-23.) After further briefing, the Court held a three-

10   hour evidentiary hearing, followed by oral argument, on the question of whether Plaintiffs had

11   assented to Facebook's user agreement. (*Id.* ¶¶ 24-26.) The Court determined that Plaintiffs had

12   assented to Facebook's user agreement but agreed with Plaintiffs that enforcing the California

13   choice-of-law clause would be contrary to the fundamental public policy of Illinois. The Court

14   also determined that the photograph exception did not apply to Plaintiffs' allegations. (*Id.* ¶¶ 27-

15   30.)

16        Just a few weeks after the Court's order, Class Counsel learned of an industry-sponsored

17   effort in the Illinois Legislature to surreptitiously amend BIPA. (*Id.* ¶ 32.) The bill would have

18   retroactively changed BIPA specifically to undermine the Court's order by preventing it from

19   applying to digital images. If it had passed, this lawsuit would have been over immediately. (*Id.* ¶

20   33.) The bill was introduced not through the normal process, but via a parliamentary mechanism

21   known as "gut and replace," by which an unrelated piece of legislation (the "Uniform

22   Disposition of Unclaimed Property Act") was emptied out and replaced with the proposed

23   changes to BIPA. Using this procedure allowed the bill to skip many normal stages of legislation

24   just days before the end of the Illinois legislative session, and even those well-versed in Illinois

25   parliamentary procedure could easily have missed it. (*Id.* ¶¶ 33-34.) Class Counsel, working on

26   the ground and around-the-clock in Springfield, alerted advocacy groups, government officials,

27   legislators, and media to the attempt to dismantle BIPA without so much as a committee hearing.

28   In the face of this public scrutiny, the sponsor of the amendment tabled it. (*Id.* ¶ 35.)

1    Nevertheless, efforts to gut BIPA's protections continued throughout the pendency of this case,

2    with the introduction of at least nine more separate pieces of legislation throughout multiple

3    sessions. Each year, Class Counsel ensured that Class's interests were represented, and their

4    efforts helped ensure that no new legislation gained momentum. (*Id.* ¶¶ 36-41.)

5        The highly technical nature of this case also required significant work by experts, whose

6    fees Class Counsel advanced. (*Id.* ¶ 52.) Due to the sensitive nature of Facebook's source code,

7    Class Counsel and their affirmative expert, Dr. Atif Hashmi, spent seven weeks on-site

8    reviewing Facebook's voluminous source code to allow Plaintiffs to "tender[] evidence that

9    Facebook's algorithm collects information about face geometry." *In re Facebook Biometric Info.*

10   *Privacy Litig.*, No. 3:15-CV-03747-JD, 2018 WL 2197546, at *3 (N.D. Cal. May 14, 2018); *see*

11   *also* ECF No. 87 § 8. Understanding and distilling this information proved crucial to Plaintiffs'

12   case because the Court determined that the parties' "strongly conflicting interpretations of how

13   the software processes human faces" was "a quintessential dispute of fact for the jury to decide."

14   *Facebook Biometric*, 2018 WL 2197546, at *2-3. (CC Decl. ¶ 53.) Indeed, as part of Facebook's

15   effort to "contest the claim that its technology scans face geometry," its expert opined that

16   Facebook's technology "does not explicitly detect human-notable facial features" *Facebook*

17   *Biometric*, 2018 WL 2197546, at *3. (CC Decl. ¶ 54.) Accordingly, Class Counsel quickly

18   located and retained a rebuttal expert, Jeffrey Dunn, the former Technical Director for

19   Biometrics at the National Security Agency ("NSA") Laboratory for Physical Science,

20   "specifically to rebut Dr. Turk's testimony." (ECF No. 343 at 8.) (CC Decl. ¶ 55.) All three

21   experts produced written reports (Facebook's expert produced two), and all three sat for

22   depositions. (CC Decl. ¶¶ 53-57.)

23       While discovery was ongoing, Facebook was also seeking dismissal for lack of subject-

24   matter jurisdiction. (*Id.* ¶ 58.) About a year after the case was filed, the Supreme Court issued its

25   opinion in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016), which many in the defense bar

26   (including Facebook's counsel, who also represented Spokeo) believed would end this type of

27   statutory class action. (*Id.* ¶¶ 59-60.) Indeed, other would-be BIPA plaintiffs saw their cases

28   dismissed for lack of subject-matter jurisdiction under *Spokeo. See, e.g., Santana v. Take-Two*

1   *Interactive Software, Inc.*, 717 F. App'x 12, 17 (2d Cir. 2017). Here, Facebook was not the only

2   party who benefited from counsel experienced in complex Article III standing issues, as counsel

3   from Edelson PC represented Mr. Robins before the Supreme Court in *Spokeo*. Class Counsel

4   briefed and argued Facebook's two separate sets of motions to dismiss for lack of subject matter

5   jurisdiction, which the Court ultimately denied. (*Id.* ¶¶ 61-67.)

6       As discovery closed, more high-stakes motion practice ensued. Plaintiffs moved for class

7   certification, and on the same day, Facebook moved for summary judgment on the basis that

8   BIPA could not apply extraterritorially and that the Dormant Commerce Clause precluded

9   liability. (*Id.* ¶¶ 68, 74.) Shortly thereafter, and before either of those motions had been decided,

10  Facebook filed another motion for summary judgment, setting out four additional arguments it

11  believed precluded a trial. (*Id.* ¶ 77.) Plaintiffs opposed both of Facebook's motions and filed

12  their own motion for partial summary judgment. (*Id.* ¶¶ 76, 79.) On top of that, the parties each

13  moved to exclude portions of the others' expert witness testimony. After hearing oral argument,

14  the Court substantially granted the class certification motion in April 2018 and denied all of the

15  summary judgment motions a month later. (*Id.* ¶¶ 80-81.)

16      After ruling on class certification and the summary judgment motions, the Court set a

17  firm trial date, and Class Counsel began intense preparation for the first BIPA trial. (*Id.* ¶ 82.)

18  Those many weeks of preparations included putting together a comprehensive notice plan (many

19  portions of which were repurposed for the settlement notice) and a five-day intensive session

20  with trial consultant Rodney Jew. (*Id.* ¶¶ 86.) That session, which included dedicated work with

21  a trial graphics expert to create demonstratives, proved immensely valuable to Class Counsel,

22  both in terms of how to effectively communicate a complex, highly technical set of facts to a

23  layperson, and how best to structure their presentation. (*Id.*) The parties exchanged 526 trial

24  exhibits and eight motions *in limine*, and they identified 17 trial witnesses. Plaintiffs issued trial

25  subpoenas to key Facebook personnel, including Mark Zuckerberg (whose subpoena Facebook

26  subsequently moved to quash). (*Id.* ¶¶ 83-85.)

27

28

## II.     Interlocutory Appeal to the Ninth Circuit

While trial preparation was underway, Facebook was also seeking interlocutory review of the class certification order. (*Id.* ¶87.) Class Counsel opposed both Facebook's petition for interlocutory review and its request that this Court delay the trial pending its resolution, the latter of which this Court denied. (*Id.* ¶¶ 88-89.) However, the Ninth Circuit granted both requests, agreeing to review the class certification order and staying the trial until after the interlocutory appeal was resolved. (*Id.* ¶ 91.) Meanwhile, on a parallel track, Class Counsel submitted an *amicus* brief to the Illinois Supreme Court in the now-landmark BIPA case, *Rosenbach v. Six Flags Entertainment Corp.*, 2019 IL 123186, on behalf of the Class Representatives to protect the interests of the now-certified Class. The motion for leave to file the *amicus* brief was ultimately denied, but the *Rosenbach* court was aware of this case and cited this Court's reasoning extensively. (*Id.* ¶ 94.)

Although Facebook's petition had largely been about class certification issues, its merits briefing pivoted swiftly to the issues of Article III standing and statutory standing, effectively guaranteeing appellate resolution of a key disputed issue before trial. (*Id.* ¶ 96.) Class Counsel continued their vigorous representation of the Class on appeal, filing not only a standard appellate brief, but also a motion to dismiss the appeal after the Illinois Supreme Court in *Rosenbach* ruled on the statutory standing argument in the Class's favor. (*Id.* ¶¶ 97-99.) After oral argument, the Ninth Circuit affirmed this Court's rulings on both class certification and Article III standing in full—a decisive and unambiguous victory for the Class. (*Id.* ¶ 100-101.) Facebook hired a new lawyer—a former Acting U.S. Solicitor General—to seek *en banc* rehearing, and, when that was denied, *certiorari* (also denied). In early 2020, the case was remanded for trial. (*Id.* ¶¶ 102-108.)

## III.     Mediations and Settlement

Consistent with the "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned," *McDonald, v. Kiloo A/S*, No. 17-CV-04344-JD, 2020 WL 5702113, at *4 (N.D. Cal. Sept. 24, 2020) (Donato, J.), Class Counsel engaged Facebook in three separate mediated attempts to reach a settlement in this case. (*Id.* ¶ 109.)

The first attempt was in May 2017, before the Hon. Layn Phillips (Ret.). The parties exchanged detailed mediation statements and attended an in-person mediation session with Judge Phillips. However, they were unable to make substantial progress toward resolving the case, and litigation continued. (*Id.* ¶ 110.)

About a year later, the Court directed the parties to participate in a settlement conference before the Hon. Donna M. Ryu of this District. (*Id.* ¶ 111.) The parties again exchanged mediation statements and attended an in-person mediation with Judge Ryu in Oakland. Although discussions advanced slightly further than they had in the previous mediation attempt, it became apparent that settlement would not be forthcoming, and litigation proceeded. (*Id.* ¶ 112.)

Finally, after the Ninth Circuit denied *en banc* rehearing and while the mandate was stayed pending the Supreme Court's consideration of Facebook's *certiorari* petition, the parties agreed to participate in a third mediation with Ambassador Jeffrey Bleich in San Francisco. (*Id.* ¶ 113.) After exchanging updated statements and participating in lengthy negotiations, the parties reached an agreement in principle. (*Id.* ¶ 114.) The parties then continued negotiations for the next several months on the details of the settlement, including the nature and mechanics of conduct relief. (*Id.* ¶ 116.) Plaintiffs moved for preliminary approval of the original $550 million settlement, which the Court denied without prejudice after citing a number of concerns. (*Id.* ¶¶ 119-123.) The parties thereafter returned with a revised settlement, which addressed all of the Court's non-monetary concerns, added an additional $100 million to the Settlement Fund, and reduced the attorneys' fee request. (*Id.* ¶¶ 124-131.) The Court granted preliminary approval of the revised settlement. (*Id.* ¶ 132.)

Since the Court granted preliminary approval, Class Counsel have worked diligently to send notice and ensure that as many Class Members as possible are able to claim. (*Id.* ¶ 133.) To that end, they have carefully monitored the email notice, taking action where necessary to achieve maximum visibility (such as re-sending notice to millions of Gmail users whose original notice was automatically directed to spam folders). (*Id.* ¶¶ 134-135.) With the Court's assistance, Class Counsel have also acted swiftly to protect the Class from inappropriate and confusing opt-

1   out solicitations. The Class is now on track to achieve an unprecedented claims rate for an

2   unprecedented settlement. (*Id.* ¶¶ 136-138.)

3                                   **ARGUMENT**

4          Plaintiffs now seek attorneys' fees for Class Counsel in the amount of 20% of the first

5   $550 million of the Settlement, payment of the expenses Class Counsel advanced or incurred in

6   prosecuting this action, and modest incentive awards of $7,500 for the three named Class

7   Representatives. In evaluating these requests, the Court "assume[s] a fiduciary role that requires

8   close scrutiny of class counsel's requests for fees and expenses from the common fund." *In re*

9   *Optical Disk Drive Prod. Antitrust Litig.*, 959 F.3d 922, 930 (9th Cir. 2020). Plaintiffs and Class

10  Counsel welcome the Court's scrutiny here. A close look at the fee request, particularly in the

11  context of empirical analysis by two leading class actions scholars, demonstrates that the

12  requested fee is reasonable given the outstanding result, the high degree of risk faced by counsel,

13  and Class Counsel's efficient staffing. Similarly, Class Counsel's expenses were necessary to

14  prosecute this action, and the incentive awards properly compensate the Class Representatives

15  for their role in reaching this Settlement.

16

17

18  **I.      The Court Should Award 20% of the First $550 Million.**

19         It is entirely within this Court's "discretion to choose how [to] calculate[] fees," *Farrell*

20  *v. Bank of Am, N.A.*, No. 18-56272, 2020 WL 5230456, at *1 (9th Cir. Sept. 2, 2020) (quoting *In*

21  *re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 944 (9th Cir. 2011)). "'Where a

22  settlement produces a common fund for the benefit of the entire class, courts have discretion to

23  employ either the lodestar method or the percentage-of-recovery method' to determine the

24  reasonableness of attorney's fees." *Edenborough v. ADT, LLC*, No. 16-CV-02233-JST, 2019 WL

25  4164731, at *3 (N.D. Cal. July 22, 2019) (Tigar, J.) (quoting *Bluetooth*, 654 F.3d at 942).[3] "The

26

27  [3]    Because Illinois substantive law controlled the claims here, "it also governs the award of
28  fees." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002). There is no meaningful
    difference between Illinois law and Ninth Circuit law on the question of awarding fees in a

1   Ninth Circuit has routinely applied the percentage-of-the-fund approach, treating twenty-five

2   percent as the 'benchmark.'" *Ford v. CEC Ent. Inc.*, No. 14CV677 JLS (JLB), 2015 WL

3   11439033, at *5 (S.D. Cal. Dec. 14, 2015) (quoting *In re Pacific Enters. Sec. Litig.*, 47 F.3d 373,

4   378-79 (9th Cir. 1994)); *accord Vizcaino*, 290 F.3d at 1048.

5          The percentage method is preferred in cases where there is a cash-based common fund,

6   and the Court should therefore use that method here. *See In re Capacitors Antitrust Litig.*, No.

7   3:14-CV-03264-JD, 2017 WL 9613950, at *2 (N.D. Cal. June 27, 2017) (Donato, J.); *In re*

8   *Korean Air Lines Co., Ltd. Antitrust Litig.*, No. CV 07-05107 SJO AGRX, 2013 WL 7985367, at

9   *1 (C.D. Cal. Dec. 23, 2013) ("The use of the percentage-of-the-fund method in common-fund

10  cases is the prevailing practice in the Ninth Circuit for awarding attorneys' fees and permits the

11  Court to focus on a showing that a fund conferring benefits on a class was created through the

12  efforts of plaintiffs' counsel."). When courts consider a request for attorneys' fees based on the

13  percentage method, they consider "(1) the extent to which class counsel achieved exceptional

14  results for the class; (2) whether the case was risky for class counsel; (3) whether counsel's

15  performance generated benefits beyond the cash settlement fund; (4) the market rate for the

16  particular field of law; (5) the burdens class counsel experienced while litigating the case; (6)

17  and whether the case was handled on a contingency basis." *Optical Disk Drive*, 959 F.3d at 930.

18  The Ninth Circuit has also noted that in cases where the fund is very large, like this one, (a so-

19  called "megafund") the Court should ensure that the fee awarded is based on the results achieved

20  by class counsel, so as to prevent a windfall in a case where economies of scale happen to create

21  a very large recovery. *See id.* However, the Ninth Circuit does not require district courts to use

22  any particular approach (such as a "sliding scale" or a lodestar calculation) in "megafund" cases.

23  *See id.* at 933.

24         Here, Class Counsel are requesting a fee award of $110 million, or 20% of the first $550

25  million of the Settlement Fund. This percentage properly compensates Class Counsel for

26

27  common fund settlement. *See Brundidge v. Glendale Fed. Bank, F.S.B.*, 168 Ill. 2d 235, 245

28  (1995) (permitting courts to choose between the percentage method and the lodestar method).

1    achieving an outstanding result in extraordinarily risky litigation. Further, it is in line with the

2    market rate for a settlement of this size at this stage of the case. And while the fund is large, to be

3    sure, a $110 million award appropriately compensates Class Counsel without creating a windfall

4    and without improperly distorting the incentive to work efficiently.

5                    **A.    Class Counsel Obtained an Unprecedented Result for the Class.**

6            When considering the amount of attorneys' fees in a class action, "[t]he most important

7    factor is the results achieved for the class." *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-*

8    *in-Aid Cap Antitrust Litig.*, No. 4:14-MD-2541-CW, 2017 WL 6040065, at *3 (N.D. Cal. Dec. 6,

9    2017), *aff'd,* 768 F. App'x 651 (9th Cir. 2019). "Typically, courts try to ensure faithful

10   representation by tying together the interests of class members and class counsel. That is, courts

11   aim to tether the value of an attorneys' fees award to the value of the class recovery." *In re HP*

12   *Inkjet Printer Litig.*, 716 F.3d 1173, 1178 (9th Cir. 2013).

13           Where both the class and its attorneys are paid in cash, this task is fairly effortless.
             The district court can assess the relative value of the attorneys' fees and the class
14           relief simply by comparing the amount of cash paid to the attorneys with the amount
             of cash paid to the class. The more valuable the class recovery, the greater the fees
15           award.

16   *Id.*

17           Here, the result is unprecedented, both on its own and in comparison to other consumer

18   privacy settlements. The main relief provided to Class Members is a non-reversionary, cash fund

19   of $650 million, not coupons or in-kind relief. The settlement class is the same class that the

20   Court already certified, and whose certification was affirmed by the Ninth Circuit. *See Bluetooth*,

21   654 F.3d at 946-47 (pointing out that post-certification settlements do not have some of the

22   problems that can be seen in pre-certification settlements). At the top end of Class Counsel's

23   target claims rate—a nearly unprecedented 30%—checks will be over $200. In addition, Class

24   Counsel fiercely negotiated with Facebook for reform measures that it agreed to put into place to

25   ensure that it, specifically, will not violate its Illinois customers' biometric privacy rights again.

26   After this litigation is over, Facebook will delete the face template of every single Class Member

27   who does not affirmatively say otherwise after viewing a clear, detailed, and accurate

28   explanation of Facebook's face-scanning practices. In other words, this Settlement does for

PLAINTIFFS' MOTION FOR FEES - 3:15-cv-03747-JD                                              - 10 -

1   Illinois consumers precisely what BIPA was intended to do: incentivize compliance with BIPA

2   by leveling massive damages on a company that violated consumers' privacy, and it puts control

3   of consumers' biometric data back in their own hands.

4         To be clear, the relief obtained here *is* massive, particularly as it compares to other cases

5   in this realm. Consumer privacy settlements are notorious for failing to provide consumers with

6   real-world relief for the damages they have suffered. In *In re Google Referrer Header Privacy*

7   *Litig.*, 869 F.3d 737, 740 (9th Cir. 2017), *vacated on other grounds by Frank v. Gaos*, 139 S. Ct.

8   1041 (2019), the Ninth Circuit affirmed a 25% award of attorneys' fees in a case where

9   consumers did not see a single penny. All of the money was to go to *cy pres*, with no cash relief

10   for the class at all. *Gaos*, 139 S. Ct. at 1045.

11         Though such *cy pres* settlements are common, even in consumer privacy settlements that

12   do provide monetary relief and have been adjudged to be fair and reasonable by district courts,

13   the relief is often far less than what has been made available here. Illustrating that point,

14   Professor Rubenstein, author of the leading national treatise on class action practice *Newberg on*

15   *Class Actions*, conducted a rigorous empirical analysis of class action privacy settlements since

16   2015. In terms of total dollar amount, this Settlement is the largest one that Professor

17   Rubenstein's analysis has identified—almost $150 million more than the next closest case.

18   (Declaration of William B. Rubenstein, attached hereto as Exhibit 3, ¶ 15.) That case, the

19   *Equifax* data breach case, is not an unrestricted cash fund made available to all class members,

20   like the Settlement here. (*Id.* ¶ 16.) Rather, the centerpiece of the *Equifax* settlement is credit

21   monitoring (which only a small portion of class members ultimately opted for), with

22   substantially lower caps on the amount of cash available to class members (such as $31 million

23   for class members without proof of loss). (*Id.*) Here, by contrast, the entire cash Settlement Fund

24   is unrestricted and will be used to pay money to Class Members in equal shares.

25         Accounting for class size, the difference between this Settlement and the other

26   settlements in Professor Rubenstein's analysis becomes even more remarkable. Compared to the

27   next closest settlement, the Settlement is *thirty percent larger*, and even that second-largest

28   settlement is an outlier. When compared to *Equifax* on numbers alone, this Settlement provides

1  over 27 times more value per Class Member—$94.20 in cash compared to $3.44 of restricted

2  benefits. In order to be comparable in terms of dollars available per class member, the *Equifax*

3  settlement would have had to have created $13 billion all-cash, non-reversionary fund. The same

4  is true for other large privacy settlements. *See, e.g.*, *In re Anthem, Inc. Data Breach Litig.*, 327

5  F.R.D. 299, 324 (N.D. Cal. 2018) (explaining that only $13 million of the $115 million fund was

6  available for cash payments, with the rest being reserved to purchase credit monitoring services);

7  *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-MD-02752-LHK, 2020 WL

8  4212811, at *22 (N.D. Cal. July 22, 2020) (cash relief made available to class members with

9  existing credit monitoring, out-of-pocket losses, and who paid Yahoo! for premium services).

10      A better comparison in terms of actual results achieved is the next closest large privacy

11  class settlement, *Birchmeier v. Caribbean Cruise Line, Inc.*—a $76 million non-reversionary

12  common fund settlement valued at about $73 per class member. (Rubenstein Decl. ¶ 17.) In that

13  case, the court determined that class counsel "provided exceptional representation for the class

14  and produced high-value output, securing the largest and strongest TCPA settlement in history."

15  *Aranda v. Caribbean Cruise Line, Inc.*, No. 12 C 4069, 2017 WL 1369741, at *9 (N.D. Ill. Apr.

16  10, 2017), *aff'd* 896 F.3d 792 (7th Cir. 2018) (internal quotation marks omitted). The relief here,

17  on a per-class member basis, is nearly thirty percent higher than *Birchmeier*. And *Birchmeier* is

18  an outlier. Of the top twenty large privacy class action settlements since 2015, all but the top four

19  made less than $15 in value available per class member. (Rubenstein Decl. ¶ 18.)

20      Value obtained per class member can be a misleading number, however, given that in

21  almost all settlements, not every class member will file a claim. *Claiming* class members in the

22  settlements analyzed by Professor Rubenstein generally received substantially more money than

23  the per-member relief. For example, in *In re Yahoo! Inc. Data Breach Litigation*, a $117.5

24  million fund was made available for a class of 194,000,000 people, but only 1.3 million class

25  members submitted claims, and the settlement administrator estimated that payments for class

26  members with existing credit monitoring "will be approximately $40 to $50 per claimant." 2020

27  WL 4212811, at *6, *20 (internal quotations omitted). That type of claims rate is typical in a

28  consumer class action. *See, e.g.*, *Rael v. Children's Place, Inc.*, No. 3:16-CV-00370-GPC-LL,

1   2020 WL 434482, at *9 (S.D. Cal. Jan. 28, 2020) ("[C]onsumer class actions tend to result in

2   claims rates in the low single digits"); *Theodore Broomfield v. Craft Brew All., Inc.*, No. 17-CV-

3   01027-BLF, 2020 WL 1972505, at *7 (N.D. Cal. Feb. 5, 2020) (approving a 2% claims rate).

4          When claims rate is taken into consideration, the Settlement distinguishes itself yet again.

5   Nearly 1.2 million people have *already* filed claims, and there is still more than a month left in

6   the claims period. Even if the claims rate doubles, there is enough money in the Settlement Fund

7   that claiming Class Members will be paid well over $200 each. Further, this overwhelmingly

8   positive response not only demonstrates how successful the notice plan has been, but also is

9   evidence that the Class believes the Settlement to be a strong one.

10         Given that the benefits of the Settlement far outshine those in the other, similar privacy

11  class action settlements discussed in Professor Rubenstein's report, Plaintiffs respectfully submit

12  that it is reasonable—even adjusting for the larger total size of the Settlement Fund—to award a

13  similar percentage of the recovery. *Cf. HP*, 716 F.3d at 1178 (discussing the benefits of tying

14  counsel's compensation to class members' recovery). In *In re Yahoo! Inc. Data Breach*

15  *Litigation*, the fee award was about 20% of the fund. 2020 WL 4212811, at *39. In *Equifax*, the

16  fee was also about 20.36% of the fund, even though much of the fund would provide only credit

17  monitoring, and the remainder includes many internal caps on cash compensation. *In re Equifax*

18  *Inc. Customer Data Sec. Breach Litig.*, No. 1:17-MD-2800-TWT, 2020 WL 256132, at *36

19  (N.D. Ga. Mar. 17, 2020). In *Birchmeier*, the court used a declining fee scale that resulted in a

20  25% fee.

21         All of these cases are "megafunds" in Ninth Circuit parlance, and all of the judicially

22  approved fee awards are similar, on a percentage basis, to the 20% of the first $550 million that

23  Plaintiffs request for Class Counsel here (and substantially higher than the bottom line figure of

24  16.9% of the total). The application of the megafund rule is discussed in greater detail below, but

25  even in comparison to *other megafunds*, the results achieved here are extraordinary, and the

26  requested fee is in line with what courts regularly award in the Ninth Circuit and nationwide.

27  (*See* Rubenstein Decl. ¶¶ 22-23.) Plaintiffs respectfully submit that awarding 20% of the first

28

1    $550 million of the common fund is appropriate, and that there is no reason for a downward

2    departure from similar awards.[4]

3    **B.**     **Class Counsel's Efforts Generated Non-Monetary Benefits.**

4           The monetary component of this Settlement is the chief relief made available to the

5    Class, and it is the only component of the Settlement that Class Counsel ask to be compensated

6    for directly. That said, the non-monetary benefits that Class Counsel achieved for the Class in

7    this groundbreaking litigation are significant, and they further justify the appropriateness of the

8    fee award here.

9           First, and most obviously, there is the prospective relief that Facebook agreed to. For

10   nearly every Class member, Facebook will turn *off* the face recognition feature. Facebook will

11   then disclose—in a clear and separate form—exactly how it uses face templates and make clear

12   that Facebook will not create a face template without the Class Member's affirmative consent. If

13   the Class Member takes no action after reviewing the disclosure, her face template will be

14   deleted, and face recognition will remain off. If the Class Member does not log into Facebook

15   and review the document within 180 days of the Effective Date of the Settlement, her face

16   template will be deleted, and face recognition will remain turned off. In fact, any action other

17   than reviewing the disclosure and affirmatively consenting to collection of biometric data will

18   result in the Class Member's face template being deleted and face recognition remaining off.

19   While BIPA authorizes injunctive relief as part of a judgment, it is difficult to imagine how more

20   complete injunctive relief could be obtained after a trial.

21          On top of the benefits set out in the settlement, Class Counsel's efforts in this litigation

22   have resulted in the Class being protected more generally. This litigation is unique in that, on

23   numbers alone, it is beyond doubt that the Class includes most of the adults in Illinois. BIPA

24

25   _____

     [4]    Plaintiffs note that this Court has on occasion observed that administration and notice
26   expenses should not be considered when using the percentage method. Here, administration costs
     are estimated to be $1.6 million, so excluding them would reduce the fee request by $320,000.
27   Class Counsel do not believe this reduction is necessary, given the significant benefit that Class
     Members have obtained from the strong notice plan here.
28

1   protects Illinois residents not only in their dealings with Facebook, but also in their interactions

2   with nearly every other company that wants to use biometrics in the state. This litigation created

3   strong precedent that will protect the Class in the future. For example, the effectiveness of BIPA

4   as an incentive for companies to respect consumers' privacy rights was severely threatened by

5   the Illinois Appellate Court's decision in *Rosenbach*. When the Illinois Supreme Court reversed

6   that decision, it relied heavily on this Court's decisions finding in Plaintiffs' favor. The

7   *Rosenbach* court expressly stated that this Court had "correctly" rejected the position advanced

8   by the defendants, and it cited this Court's reasoning five times—more citations than any other

9   authority referenced in the opinion. *Rosenbach v. Six Flags Ent. Corp.*, 2019 IL 123186, ¶ 23.

10  There is no question, then, that Class Counsel's efforts here influenced the Illinois Supreme

11  Court and protected the Class in more than just this litigation. Furthermore, the size and breadth

12  of the prospective and monetary relief obtained here will serve as a deterrent to similarly situated

13  companies that wish to collect biometric data in Illinois.

14          This litigation also spawned legislative efforts, backed by well-funded industry groups, to

15  repeal or defang BIPA. Had Class Counsel ignored these efforts, a change to the statute could

16  have caused consumers to lose any opportunity to recover in this litigation as well as leaving

17  them unprotected more generally. Instead, Class Counsel deployed significant resources in

18  Springfield in order to educate legislators on the importance of this statute, coordinate efforts by

19  like-minded non-profit organizations, and generally ensure that Class Members' voices were

20  heard. Absent these efforts, the loudest voices in Springfield would have been the lobbyists paid

21  for by Facebook and the trade organizations that it bankrolls. Simply put, a legislative strategy is

22  now an integral part of prosecuting a large class action based on a statutory claim, and Class

23  Counsel's success in this area created enormous benefits for the Class.

24          **C.      Pursuing this Litigation on a Contingent Basis Was Extremely Risky
                       for Class Counsel.**

25

26          In determining the appropriateness of a fee award, the next step is to consider the flip side

27  of the results—risk. That is, the amount of the fee depends in part on whether, and to what

28  degree, "class counsel ran the risk of not being paid at all." *Steiner v. Am. Broad. Co.*, 248 F.

1   App'x 780, 782 & n.2 (9th Cir. 2007). Here, Class Counsel worked entirely on contingency,

2   advancing both their time and the required cash expenses, which were substantial. (*See generally*

3   Declaration of Shawn Williams, attached hereto as Exhibit 4; Declaration of Michael Canty,

4   attached hereto as Exhibit 5; Declaration of Rafey S. Balabanian, attached hereto as Exhibit 6.)

5   As described in more detail below, the risks here went far beyond the inherent risk in any

6   litigation, given the lack of precedent and the extra-judicial attacks on the statute. If Facebook

7   had won this case, Class Counsel would not have been compensated at all.

8       While that risk exists in all contingency litigation, it was substantially more acute here

9   than in other cases. *Vizcaino*, 290 F.3d at 1048, illustrates that point well. In *Vizcaino*, one of the

10  leading Ninth Circuit cases on awarding attorneys' fees in common fund class action settlements,

11  the Ninth Circuit approved the district court's characterization of the case as "extremely risky[.]"

12  The district court arrived at that conclusion because:

13          there were no controlling precedents concerning their claims, only analogies
            involving various areas of law. In addition, Class Counsel's risk was even greater,
14          and their work made more difficult, because Microsoft is one of the nation's largest
            and most formidable companies and it, and several law firms, defended the case
15          vigorously for several years.

16  *Vizcaino v. Microsoft Corp.*, 142 F. Supp. 2d 1299, 1303 (W.D. Wash. 2001).

17      Here, Class Counsel found themselves in much the same situation. Unlike other statutes

18  that commonly form the basis for class actions (*e.g.*, the Telephone Consumer Protection Act;

19  the Fair Credit Reporting Act; the Fair Debt Collections Practices Act; etc.), BIPA had not been

20  heavily litigated when this case was filed in 2015. In fact, to Class Counsel's knowledge, there

21  was no litigation at all involving BIPA until this case was filed. That means that all the elements

22  of Plaintiffs' claims—indeed, even the question of what the elements of Plaintiffs' claims *are*—

23  were matters of first impression. (*See* Rubenstein Decl. at 3.) The factual landscape was similarly

24  undeveloped. While some class actions follow on the heels of a government enforcement action

25  in which a public agency has already identified and investigated a problem, this one did not. That

26  is largely because, unlike in many other consumer protection contexts "[o]ther than the private

27  right of action … no other enforcement mechanism is available" for BIPA violations.

28  *Rosenbach*, 2019 IL 123186, ¶ 37.

And like in *Vizcaino*, the defendant in this first BIPA case was not an ordinary company, but Facebook, now nearly always mentioned in the same breath as Microsoft when discussing the nation's largest companies. *See, e.g.*, Peter Eavis & Steve Lohr, *Big Tech's Domination of Business Reaches New Heights*, N.Y. TIMES (Aug. 19, 2020), https://nyti.ms/3l6FImh; (Rubenstein Decl. at 42.) Having effectively unlimited resources, Facebook was defended by two of the country's largest law firms (with a third firm added at the appellate *en banc* and *certiorari* stage), which like Microsoft's counsel in *Vizcaino*, defended this case extremely vigorously for years.

Subsequent developments in the case confirmed the extraordinary risk that Class Counsel took on by prosecuting this action. The Ninth Circuit has agreed that a case involved a "good deal of risk" where "class counsel faced two reasonably possible scenarios in which they would effectively 'lose' and not recover any attorneys' fees." *Steiner*, 248 F. App'x at 782 & n.2. Here, Class Counsel faced at least *six* separate reasonably likely occasions where they easily could have lost the case in court:

- Facebook's motion to dismiss/motion for summary judgment on the basis of the choice-of-law clause and the subsequent evidentiary hearing;
- Facebook's motion to dismiss for lack of subject-matter jurisdiction after the Supreme Court's decision in *Spokeo*;
- The Illinois Supreme Court's grant of the petition for leave to appeal in *Rosenbach*;
- Facebook's motion for summary judgment on the merits;
- Facebook's opposition to the motion for class certification; and
- The Ninth Circuit's review of class certification and subject-matter jurisdiction.

And these are only the ones with a better-than-average chance of succeeding. For example, Professor Rubenstein concludes that the chance of losing on subject-matter jurisdiction grounds—a concern until the Supreme Court denied Facebook's *certiorari* petition in January of this year—was an astronomical 40%. Although Plaintiffs still would have been able to continue their case in a state court, the relatively late stage at which Article III standing was decided made the risk very serious. If the Court lacked jurisdiction, all of the favorable orders that Plaintiffs achieved over the years would have been vacated, and Plaintiffs may even have had to destroy much of the material they obtained in discovery. (ECF No. 87 § 15.) Facebook could also have

1    won on any number of other issues of first impression raised in their three separate summary

2    judgment motions.

3          On top of the risks inherent in a case of first impression and the risks of losing the

4    litigation, Class Counsel faced substantial out-of-court risks not contemplated by *Vizcaino*.

5    Because *Vizcaino* involved common-law contact claims, Microsoft's powerful lobbying presence

6    in Washington would not legitimately have been able to affect its liability to the class. Here, on

7    the other hand, industry groups used their lobbying influence in Springfield to attempt to gut

8    BIPA and end this case almost before it got off the ground. Class Counsel's quick organizing

9    efforts and personal visits to Springfield avoided that outcome, but it was—and remains—an

10   extremely serious risk. Indeed, on at least one occasion during the pendency of this litigation,

11   industry groups successfully pressured state legislators to amend a consumer privacy statute

12   while class action litigation was pending. *See Perlin v. Time Inc.*, 237 F. Supp. 3d 623, 629-30

13   (E.D. Mich. 2017).

14         In sum, this case involved bringing claims under an untested statute against one of the

15   largest companies in the country, who then proceeded to challenge nearly every issue in nearly

16   every forum available to it. The risk of nonpayment here was extreme, and that should factor

17   heavily in the Court's determination of a reasonable fee.

18              **D.    The Market Supports the Requested Fee.**

19         Although the Ninth Circuit has not adopted the full market-mimicking approach of other

20   circuits, "the market rate for the particular field of law" is still an important consideration.

21   *Optical Disk Drive*, 959 F.3d at 930. Here, a market-based analysis supports both the

22   reasonableness of using the percentage method to calculate the fee in this case and the specific

23   percentage Class Counsel request.

24         As Professor Brian Fitzpatrick explains, the market for high-stakes, high-value,

25   plaintiff's-side litigators is entirely driven by a percentage-of-the-recovery model. (Declaration

26   of Brian T. Fitzpatrick, attached hereto as Exhibit 2, ¶ 13-14.) That is true across the board,

27   whether in agreements with individuals who do not have much experience hiring counsel (such

28   as in personal injury cases) or in agreements with sophisticated corporate counsel. (*Id.* ¶ 14.)

Professor Fitzpatrick compares class actions to the most common scenario where sophisticated clients enter into contingent fee arrangements—patent litigation. (*Id.*) Empirical studies of fee arrangements in patent cases demonstrate that sophisticated clients always pick the same two types of fee arrangements: fixed percentages or increasing percentages as the litigation matured (so that a case that required a trial or appeal would result in a larger percentage). (*Id.* ¶¶ 15, 19.) The relevant market comparison for the fee in this case, therefore, is the percentage of recovery.

In terms of the specific amount requested here, the market would likely support a fee higher than the 20% of the first $550 million that Class Counsel request. The Ninth Circuit has questioned the market-based approach where the sole point of comparison is other judicially approved fees. *See Vizcaino*, 290 F.3d at 1049. Accordingly, a good starting point for the market comparison is "commercial litigation where the fee is determined by application of the negotiated contingency percentage to the amount of the recovery." *Id.*

Although no such market truly exists for class actions, *see id.*, there are meaningful comparisons to be had in other areas of law. One study looked at fee arrangements with ordinary clients who do not regularly interact with the legal system like the Class Members here. In those cases (mostly personal injury cases), the most common fee arrangement was a flat one-third. (Fitzpatrick Decl. ¶ 19.) In cases involving sophisticated clients, the average fixed percentage was 38.6% of the total recovery, and the average escalating percentage fee for a case involving an appeal was 40.2%. (*Id.*) Not a single client in any of these cases agreed to a fee arrangement by which the client paid their lawyers a smaller percentage for a larger recovery. (*Id.*)

The reason for that is straightforward. As the Ninth Circuit has explained, the goal of setting a fee award is to "ensure faithful representation by tying together the interests of class members and class counsel." *HP*, 716 F.3d at 1178. A system where class counsel is paid *less* for recovering more money has exactly the opposite effect, and application of the "megafund" principle without careful, case-specific analysis can create very poor incentives. (Fitzpatrick Decl. ¶ 20.)

Comparison to judicially approved fees can also be useful, and that comparison supports Class Counsel's request here as well. Unsurprisingly, given the Ninth Circuit's benchmark, the

1    mean percentage award of attorneys' fees in class actions in the Ninth Circuit is 26% of the fund.

2    (Rubenstein Decl. ¶ 23.) Considering the market by subject matter as opposed to strictly

3    geographically, the mean percentage award in recent large privacy class actions was 25.3% and

4    the median 23.97%. Even for megafund cases, the mean percentage awarded in the same range

5    as the percentage Class Counsel is seeking here. *See id.* (reviewing various empirical studies of

6    large settlements showing that mean awards in large cases range from 12% to 22.3%). And in

7    terms of the geographic reasonableness of the rates, it bears mention that a disproportionate

8    number of these privacy settlements came from Illinois, where all of the class members live or

9    lived. Class Counsel's request for 20% of the original $550 million therefore falls several

10   percentage points below the relevant market rate. A market analysis therefore supports the

11   requested award here.

12                  **E.      No "Windfall" Will Result from the Fee Awarded.**

13          The overall goal in of ensuring the reasonableness of a requested fee is the same no

14   matter the size of the fund. However, the Ninth Circuit has recognized that sometimes, when a

15   fund is very large, there is a danger that class counsel could obtain a windfall simply by virtue of

16   the size of the fund. *See Bluetooth*, 654 F.3d at 942. Accordingly, courts take additional steps in

17   megafund cases to ensure that the attorneys' fee award does not overcompensate class counsel.

18   Here, Class Counsel excluded the last $100 million of the settlement amount from the basis for

19   their fee request. They also respectfully submit that consideration of lodestar in this case would

20   not accurately account for the results Class Counsel achieved, nor would it help prevent a

21   windfall, and that it would create perverse incentives for future class actions with regard to

22   efficiency.

23                  **1.      Excluding the Last $100 Million from the Fee Request**
24                          **Supports the Reasonableness of the Fee**

25          The clearest and most obvious step to take to avoid providing a windfall to class counsel

26   is to identify if there are portions of a settlement that are less attributable to the efforts of class

27   counsel and to reduce the compensation for that portion. That is the logic behind the so-called

28   "sliding scale" used in some circuits, *see In re Synthroid Mktg. Litig.*, 264 F.3d 712, 721 (7th Cir.

2001), although it is not always applied that way. (Fitzpatrick Decl. ¶ 22.) Here, the last $100 million of the Settlement Fund is certainly partially attributable to the enormous effort Class Counsel have expended for the Class at every stage of this litigation. But it is also a product of the concerns presented by the Court at the initial preliminary approval hearing and Facebook's response to those concerns. Accordingly, awarding fees to Class Counsel on that portion of the recovery could be construed as a windfall. To eliminate this issue, Class Counsel are not seeking fees on that portion of the recovery, and it will all go to the Class.

That said, Class Counsel are cognizant of Judge Easterbrook's observation that "percentages can be juggled, but, unless the bottom line changes, what's the point?" *Birchmeier v. Caribbean Cruise Line, Inc.*, 896 F.3d 792, 797 (7th Cir. 2018). That is why Class Counsel have changed the bottom line too, asking not for the benchmark of 25%, but for 20% of the first $550 million. That amounts to 16.9% of the total Settlement Fund. When compared to Professor Rubenstein's dataset of similar settlements, the requested award—whether it is viewed as 20% of the first $550 million or 16.9% of the total Settlement Fund—falls well within the normal range. (*See* Rubenstein Decl. ¶ 1 & n.2; ¶¶ 22-24.)

### 2. Conducting a Lodestar Cross Check Here Would Not Advance the Goal of Preventing a Windfall.

One of the ways that the Ninth Circuit has suggested—although it has expressly declined to require—assessing fees in a megafund case is to conduct a lodestar crosscheck. That is, to consider the hours that class counsel spent on the litigation and compare them to the percentage fee award to determine its reasonableness. It is "settled" law in the Ninth Circuit that lodestar crosscheck is not required. *Farrell*, 2020 WL 5230456, at *2 (citing *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1126 (9th Cir. 2020)). Rather, a district court can determine that the circumstances of a given case warrant a certain percentage of a fund—particularly if that percentage is under the 25% benchmark—without considering class counsel's lodestar. *See id.*

That said, Professor Fitzpatrick opines that a "lodestar crosscheck reintroduces the same bad incentives of the lodestar method that the percentage method was designed to avoid." (Fitzpatrick Decl. ¶ 16.) As explained above, sophisticated private clients who engage attorneys

1    for plaintiff's-side patent work *never* pick lodestar arrangements, and there is no evidence of any

2    of these clients insisting on—or even considering—a lodestar crosscheck when negotiating a fee.

3    (*Id.* ¶ 14.) The reason is simple: clients want to incentivize their attorneys maximizing the

4    clients' recovery, not the number of hours spent on litigation. (*Id.* ¶ 15.) This is even more

5    important in consumer litigation, where the clients and the court are not able to monitor the

6    attorneys' time as it is being spent in the same way as a sophisticated corporate client. (*Id.* ¶ 17.)

7            Consider, for example, *In re Volkswagen "Clean Diesel" Marketing Sales Practices, &*

8    *Products Liability Litigation*, No. 2672 CRB (JSC), 2017 WL 1047834 (N.D. Cal. Mar. 17,

9    2017), which was filed nearly nine months after this case. In *Volkswagen*, almost no adversarial

10   litigation took place. The court expressly noted, "Volkswagen's liability [was] not contested"

11   and commented on "the short time frame it took the parties to settle the … class action claims."

12   *Id.* at *2. Settlement was reached by July 2016 (around the time of the first discovery scheduling

13   order in this case) and was approved by Judge Breyer in March 2017 (while the parties here were

14   deep in discovery). Nevertheless, class counsel in *Volkswagen* managed to expend approximately

15   98,000 hours litigating and settling the case, arriving at a lodestar of $63.5 million. The court

16   found the hours reasonable and determined that "there is no indication that Class Counsel sought

17   to artificially inflate their hours to justify the lodestar amount." *Id.* at *5.

18           In this case—where nearly *everything* was contested—Class Counsel were well aware

19   that they could have justified at least 50,000 hours, if not more. Yet, despite the many

20   opportunities that having three firms work on a case could have provided to engage in

21   duplicative work, Class Counsel staffed the case leanly and worked efficiently. Depositions were

22   not conventions, and care was taken to avoid unnecessary duplication of document review.

23   Briefs were not drafted by committee, but instead assigned to a single attorney who took charge

24   of drafting the arguments, soliciting feedback, and revising accordingly. Where possible, and in

25   keeping with the directives in the Court's standing order, primary responsibility for tasks was

26   frequently assigned to less-experienced attorneys (with lower hourly rates), with partners acting

27   in a supervisory capacity. (*See* Rubenstein Decl. ¶ 32) (noting that tasks were delegated

28   appropriately). The renewed motion to dismiss for lack of subject matter jurisdiction, motion for

1  class certification, and interlocutory appeal in the Ninth Circuit were *all* successfully briefed and

2  argued primarily by associate-level attorneys, not senior partners. So too was the petition for *en*

3  *banc* rehearing, in which Facebook was represented by a prominent attorney who served as

4  Acting Solicitor General (not a single Ninth Circuit judge even asked for a vote on whether the

5  case should be reheard).

6          That is not to say having fewer lawyers on the case slowed down Class Counsel. Other

7  than specifically for the purpose of engaging in settlement discussions, Class Counsel repeatedly

8  opposed Facebook's efforts to stay or otherwise slow down this litigation. That is also not to say

9  that the Class did not benefit from the highly experienced partners working on this case. Given

10 the relative infrequency of class action trials, for example, the trial team was led primarily by

11 more experienced trial attorneys simply because they were the ones who had the requisite skill to

12 navigate a trial on unprecedented issues.

13         Simply put, Class Counsel have been well aware at all times of the Court's preference for

14 litigating cases efficiently and avoiding wasted time. Class Counsel has worked diligently on this

15 case, has not overstaffed, and has not performed unnecessary tasks to pad their lodestar. Simply

16 relying on a lodestar crosscheck here would effectively penalize such choices and incentivize

17 attorneys in similar situations in the future to delay cases for the purpose of manufacturing

18 thousands of unnecessary additional hours in order to inflate lodestar, rather than accept a

19 settlement that is in the best interests of the Class.

20                    **3.      Even if the Court Decides to Perform a Lodestar Cross-Check,
                               the Fee Request Is Reasonable.**

21

22         Nevertheless, as required by the Northern District's Procedural Guidance on Class Action

23 Settlements, Class Counsel have submitted their lodestar information and supporting documents.

24 In total, they spent 30,194.3 hours for a lodestar of $20,701,829.25. If the Court decides that

25 lodestar crosscheck is necessary, Class Counsel respectfully submit that their hours and rates are

26 reasonable, and that the effective multiplier is consistent with the extraordinary results achieved

27 in this case.

28

1        When a court decides to conduct a lodestar crosscheck, the "calculation need entail

2    neither mathematical precision nor bean counting." *Bellinghausen v. Tractor Supply Co.*, 306

3    F.R.D. 245, 264 (N.D. Cal. 2015). "Under the lodestar method, courts 'calculate the fee award by

4    multiplying the number of hours reasonably spent by a reasonable hourly rate and then

5    enhancing that figure, if necessary, to account for the risks associated with the representation.'"

6    *Cheng Jiangchen v. Rentech, Inc.*, No. CV 17-1490-GW(FFMX), 2019 WL 5173771, at *10

7    (C.D. Cal. Oct. 10, 2019) (quoting *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272

8    (9th Cir. 1989)).

9        Here, the hours worked to obtain the result are, as discussed above, more than reasonable.

10   Class Counsel were able to procure a record-breaking settlement while dedicating about a quarter

11   of the time other attorneys spent in similar cases, while still pushing the case to the brink of trial,

12   with a trip to the appeals court and three separate mediations along the way. (Rubenstein Decl.

13   ¶ 38.) The total number of hours is equivalent to about 2.5 attorneys working full time for five

14   years—quite a low figure given the amount of work done. (*Id.*) There can be no real question

15   that the hours expended here were necessary.

16       Class Counsel's hourly rates, too, are reasonable. For attorneys with 12 years of

17   experience or less (who did the bulk of the work on this case), Class Counsel's average rate is

18   lower than the average approved in settlements in this District. (*Id.* ¶ 30.) For the senior attorneys

19   who took supervisory roles, the rate is slightly higher than average. (*Id.*) That is unsurprising

20   here, considering that Class Counsel have been recognized as among the top in their profession.

21   (*Id.*) Further, many of Class Counsel's rates have recent judicial approval. *See Dickey v.*

22   *Advanced Micro Devices, Inc.*, No. 15-CV-04922-HSG, 2020 WL 870928, at *8 (N.D. Cal. Feb.

23   21, 2020) ("The Court finds that the billing rates used by [Edelson PC] to calculate the lodestar

24   are reasonable and in line with prevailing rates in this district for personnel of comparable

25   experience, skill, and reputation."); June 11, 2020 Hr'g Tr. at 25:12-16, *Kaess v. Deutsche Bank*

26   *AG*, No. 09-cv-01714 (GHW) (RWL) (S.D.N.Y.) ("I find that these billable rates [for Robbins

27   Geller] based on the timekeeper's title, specific years of experience, and market rates for similar

28   professionals in their fields … to be reasonable in this context."); Nov. 15, 2017 Hr'g Tr. at

16:13-19, *In re Genworth Fin. Sec. Litig.*, No. 1:14-cv-02392 (AKH) (S.D.N.Y.), ECF No. 181

("I don't find the rates [for Robbins Geller and Labaton] – they're high, but I don't find them

unreasonable, given what's going on in the market," and "agree[d]" the firm's rates were

"actually below market.").

The last piece of the crosscheck analysis is the risk multiplier. "Courts regularly award

lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers."

*Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 481 (S.D.N.Y. 2013) (citing *Vizcaino*, 290 F.3d at

1052-54); *Craft v. Cty. of San Bernardino*, 624 F. Supp. 2d 1113, 1125 (C.D. Cal. 2008) (noting

"ample authority" for a multiplier of 5.2 and collecting cases with substantially higher

multipliers); *see also In re Nat'l Collegiate Athletic Ass'n*, 2017 WL 6030065, at \*9 & n.57

(collecting cases). The Ninth Circuit, for its part, has determined in the context of a crosscheck

that a multiplier of 6.85 was "well within the range of multipliers that courts have allowed."

*Steiner*, 248 F. App'x at 783. That lines up with Professor Rubenstein's research, which

concludes that the *average* multiplier in large cases is 3.20.

As explained in detail above, this is not the average case in terms of either the risk taken

on by Class Counsel or the results achieved for the Class. Accordingly, if the lodestar crosscheck

returns a multiplier above the average—but well within the range deemed allowable by the Ninth

Circuit—it would serve to confirm the appropriateness of the fee award here. That is precisely

the result. The crosscheck calculation, without accounting for the substantial amount of work

that remains to be done to complete this Settlement, results in a risk multiplier of 5.31.

(Rubenstein Decl. ¶ 41 n.53.) That is lower than the 6.8 multiplier allowed by the Ninth Circuit

in *Steiner*, but higher than what courts have awarded in cases with more mundane risk.

The results obtained by staffing this case smartly and litigating efficiently are, as

discussed above, difficult to quarrel with. At every turn in this case—whether it involved

complex legal arguments, intensely technical fact discovery, presentation of evidence to the

Court, or heading off legislative disaster—Class Counsel have prevailed for the Class. No benefit

would be gained, and no windfall prevented, by engaging in an intensive review of Class

Counsel's hours and attempting to divine the appropriate multiplier. However, if the Court is

1   inclined to consider a rough lodestar crosscheck, the multiplier is reasonable and in line with

2   awards that have been affirmed by the Ninth Circuit.

3   **II.    Plaintiffs' Expenses Are Reasonable.**

4          In common-fund cases, the Ninth Circuit has stated that the reasonable expenses of

5   acquiring the fund can be reimbursed to counsel who has incurred the expense. *See Vincent v.*

6   *Hughes Air W., Inc.*, 557 F.2d 759, 769 (9th Cir. 1977); *Acosta v. Frito-Lay, Inc.*, No. 15-CV-

7   02128-JSC, 2018 WL 646691, at *11 (N.D. Cal. Jan. 31, 2018) ("There is no doubt that an

8   attorney who has created a common fund for the benefit of the class is entitled to reimbursement

9

10  of reasonable litigation expenses from that fund.") (citation omitted). Such expense awards

11  comport with the notion that the district court may "spread the costs of the litigation among the

12  recipients of the common benefit." *Wininger v. SI Mgmt. L.P.*, 301 F.3d 1115, 1121 (9th Cir.

13  2002).

14         Here, Class Counsel request $915,454.37 in litigation expenses and charges reasonably

15  incurred. (Williams Decl. ¶ 6; Canty Decl. ¶ 6; Balabanian Decl. ¶ 7.) The main expense here

16  relates to work performed by Plaintiffs' experts and consultants ($251,884.89 or approximately

17  28% of total expenses). (Williams Decl. ¶ 7; Canty Decl. ¶ 7; Balabanian Decl. ¶ 8.) Class

18  Counsel retained experts and consultants in the areas of, *inter alia*, facial recognition technology,

19  software analysis, personally identifiable information, and trial strategy. Class Counsel received

20

21  crucial advice and assistance from these experts and consultants in connection with class

22  certification, summary judgment, and trial preparation.

23

24         Class Counsel were also required to travel in connection with court appearances,

25  discovery, and settlement efforts, and to work long hours. Work-related transportation, lodging,

26  and meal costs totaled $218,177.81 or approximately 24% of aggregate expenses. (Williams

27  Decl. ¶ 7; Canty Decl. ¶ 7; Balabanian Decl. ¶ 8.) *See also In re Immune Response Sec. Litig*,

28

497 F. Supp. 2d 1166, 1177 (S.D. Cal. 2007) ("reimbursement for travel expenses ... is within the broad discretion of the Court") (citation omitted).

The expenses also include the costs of mediation efforts ($30,750 or approximately 3% of total expenses) and e-discovery ($26,152.88 or approximately 3% of total expenses). (Williams Decl. ¶ 7; Canty Decl. ¶ 7; Balabanian Decl. ¶ 8.) Class Counsel also seek the costs of factual and legal research ($33,741.12 or approximately 3% of total expenses). *Id.* These are the costs of computerized factual and legal research services such as Lexis/Nexis, Westlaw, and PACER. It is standard practice for attorneys to use such databases to assist them in researching legal and factual issues and reimbursement is proper. *See Immune Response*, 497 F. Supp. 2d at 1177.

The other expenses for which Class Counsel seek payment are the types of expenses that are necessarily incurred in litigation. These expenses include, among others, copying costs, teleconferencing, and court filing fees. (Williams Decl. ¶ 7; Canty Decl. ¶ 7; Balabanian Decl. ¶ 8.) The expenses are in line with those routinely approved in this District. *See, e.g.*, *Sullivan v. Dolgen Cal., LLC*, No. 3:15-CV-01617-JD, 2017 WL 3232540, at *2 (N.D. Cal. July 31, 2017) (Donato, J.); *In re High-Tech Employee Antitrust Litig.*, No. 11-CV-02509-LHK, 2015 WL 5158730, at *16 (N.D. Cal. Sept. 2, 2015).

**III.     The Requested Incentive Awards Are Reasonable Given the Length of the Case and the Significant Efforts of the Class Representatives.**

Finally, Plaintiffs request incentive awards of $7,500 for each of the three Class Representatives. "[I]ncentive awards that are intended to compensate class representatives for work undertaken on behalf of a class are fairly typical in class action cases." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 943 (9th Cir. 2015) (internal quotation omitted). Such awards "are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009). Courts' main concern in approving incentive awards is to

1    make sure that "they do not undermine the adequacy of the class representatives." *Radcliffe v.*

2    *Experian Info. Sols. Inc.*, 715 F.3d 1157, 1163 (9th Cir. 2013). "Courts have generally found that

3    $7,500 incentive payments are reasonable" where that figure constitutes only a small percentage

4    of the total recovery. *Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D. 443, 462 (E.D. Cal.

5    2013). Conversely, serious concerns arise when incentive awards are pre-conditioned on the

6    class representatives' approval of the settlement, *Radcliffe*, 715 F.3d at 1167, or when they are

7    extremely high, *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1058 (9th Cir. 2019) (raising

8    concerns about $20,000 incentive payments).[5]

9        Here, incentive awards of $7,500 are warranted and do not pose a danger to the adequacy

10   of the Class Representatives in this adversarially certified class action. All three of the requested

11   awards together total $22,500, or 0.00004% of the total settlement fund (or less than 2.2 cents

12   per claimant). Class Counsel and the Class Representatives did not enter into any kind of

13   agreement by which the Class Representatives' incentive payments are contingent on their

14   support for the Settlement.

15       In addition, the Class Representatives here each did substantial work on behalf of the

16   Class, including sitting for two depositions each, gathering documents, reviewing and

17   understanding correspondence from Class Counsel, and participating in the settlement process.

18   Over five years of litigation, Mr. Licata spent over 55 hours participating in this case, including

19   being available for the Court-ordered mediation in the middle of the night during his honeymoon

20   abroad. (Declaration of Carlo Licata, attached hereto as Exhibit 7.) Mr. Patel spent at least 55

21   hours on this case, including flying to San Francisco to attend mediation with Judge Ryu.

22   (Declaration of Nimesh Patel, attached hereto as Exhibit 8.) Mr. Pezen similarly devoted an

23

24   [5]    While courts in this district have often used $5,000 as the "presumptively reasonable" figure,
25   they have done so since 2009 with no adjustment at all. *See Jacobs v. California State Auto. Ass'n
     Inter-Ins. Bureau*, No. C 07-00362 MHP, 2009 WL 3562871, at *5 (N.D. Cal. Oct. 27, 2009)
26   (calling $5,000 "presumptively reasonable"); *Chen v. Chase Bank USA, N.A.*, No. 19-CV-01082-
     JSC, 2020 WL 3432644, at *12 (N.D. Cal. June 23, 2020) (same). But accounting for inflation
27   alone, $5,000 in 2009 dollars is more than $6,100 in 2020 dollars. U.S. Bureau of Labor &
     Statistics, CPI Inflation Calculator, https://www.bls.gov/data/inflation_calculator.htm
28

1  estimated 60 hours or more on the case, including flying from Chicago to San Francisco to

2  participate in the mediation. (Declaration of Adam Pezen, attached hereto as Exhibit 9.)

3       A $7,500 incentive award is in line with awards given to class representatives who have

4  done similar or smaller amounts of work for the class. *See, e.g.*, *Fowler v. Wells Fargo Bank,*

5  *N.A.*, No. 17-CV-02092-HSG, 2019 WL 330910, at *8 (N.D. Cal. Jan. 25, 2019) (awarding

6  $7,500 to named plaintiff who assisted with settlement and written discovery but did not sit for

7  deposition); *In re Wells Fargo Loan Processor Overtime Pay Litig.*, No. MDL C-07-1841 EMC,

8  2011 WL 3352460, at *11 (N.D. Cal. Aug. 2, 2011) (approving $7,500 incentive award to class

9  representatives who were involved in the case for five years "including appearing for

10  depositions, assisting with written discovery, and working with Class Counsel to manage the

11  settlement process"). It is appropriate to award that amount here.

12  **CONCLUSION**

13       Plaintiffs respectfully request that the Court approve Class Counsel's fee request of 20%

14  of the first $550 million of the Settlement Fund, or $110 million, award Class Counsel costs and

15  expenses in the amount of $915,454.37 and grant incentive awards of $7,500 to each of the Class

16  Representatives.

1   DATED: October 15, 2020                    /s/Jay Edelson
2                                              Class Counsel

3                                              EDELSON PC
                                               JAY EDELSON*
4                                              BENJAMIN RICHMAN*
                                               ALEXANDER G. TIEVSKY*
5                                              350 North LaSalle Street, 14th Floor
                                               Chicago, IL 60654
6                                              Telephone: 312/589-6370
                                               312/589-6378 (fax)

7                                              EDELSON PC
                                               RAFEY BALABANIAN*
8                                              LILY HOUGH*
                                               123 Townsend Street, Suite 100
9                                              San Francisco, CA 94107
                                               Telephone: 415/212-9300
10                                             415/373-9435 (fax)

11                                             ROBBINS GELLER RUDMAN
                                                 & DOWD LLP
12                                             PAUL J. GELLER*
                                               STUART A. DAVIDSON*
13                                             CHRISTOPHER C. GOLD*
                                               120 East Palmetto Park Road, Suite 500
14                                             Boca Raton, FL 33432
                                               Telephone: 561/750-3000
15                                             561/750-3364 (fax)

16                                             ROBBINS GELLER RUDMAN
                                                 & DOWD LLP
17                                             PATRICK J. COUGHLIN
                                               ELLEN GUSIKOFF STEWART
18                                             LUCAS F. OLTS
                                               RANDI D. BANDMAN
19                                             655 West Broadway, Suite 1900
                                               San Diego, CA 92101
20                                             Telephone: 619/231-1058
                                               619/231-7423 (fax)
21
                                               ROBBINS GELLER RUDMAN
22                                                 & DOWD LLP
                                               SHAWN A. WILLIAMS (213113)
23                                             JOHN H. GEORGE (292332)
                                               Post Montgomery Center
24                                             One Montgomery Street, Suite 1800
                                               San Francisco, CA 94104
25                                             Telephone: 415/288-4545
                                               415/288-4534 (fax)
26
27
28

PLAINTIFFS' MOTION FOR FEES - 3:15-cv-03747-JD                              - 30 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LABATON SUCHAROW LLP
MICHAEL P. CANTY*
CORBAN S. RHODES*
140 Broadway
New York, NY 10005
Telephone: 212/907-0700
212/818-0477 (fax)

Attorneys for Plaintiffs and Class Counsel