# Exhibit 2

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

*In re Facebook Biometric Information Privacy Litigation*

*Case No. 3:15-CV-03747-JD*

<u>**DECLARATION OF BRIAN T. FITZPATRICK**</u>

**I.      BACKGROUND AND QUALIFICATIONS**

1.      I am a Professor of Law at Vanderbilt University in Nashville, Tennessee.  I joined the Vanderbilt law faculty in 2007, after serving as the John M. Olin Fellow at New York University School of Law in 2005 and 2006.  I graduated from the University of Notre Dame in 1997 and Harvard Law School in 2000.  After law school, I served as a law clerk to The Honorable Diarmuid O'Scannlain on the United States Court of Appeals for the Ninth Circuit and to The Honorable Antonin Scalia on the United States Supreme Court.  I also practiced law for several years in Washington, D.C., at Sidley Austin LLP.  My C.V. is attached as Exhibit 1.

2.      My teaching and research at Vanderbilt have focused on class action litigation.  I teach the Civil Procedure, Federal Courts, and Complex Litigation courses.  In addition, I have published a number of articles on class action litigation in such journals as the University of Pennsylvania Law Review, the Journal of Empirical Legal Studies, the Vanderbilt Law Review, the NYU Journal of Law & Business, and the University of Arizona Law Review.  My work has been cited by numerous courts, scholars, and media outlets such as the New York Times, USA Today, and Wall Street Journal.  I have also been invited to speak at symposia and other events about class action litigation, such as the ABA National Institutes on Class Actions in 2011, 2015, 2016, 2017, and 2019; and the ABA Annual Meeting in 2012.  Since 2010, I have also served on

the Executive Committee of the Litigation Practice Group of the Federalist Society for Law & Public Policy Studies.  In 2015, I was elected to the membership of the American Law Institute.

    3.     In December 2010, I published an article in the Journal of Empirical Legal Studies entitled *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL L. STUD. 811 (2010) (hereinafter "Empirical Study").  This article is what I believe to be the most comprehensive examination of federal class action settlements and attorneys' fees that has ever been published.  Unlike other studies of class actions, which have been confined to one subject matter or have been based on samples of cases that were not intended to be representative of the whole (such as settlements approved in published opinions), my study attempted to examine *every* class action settlement approved by a federal court over a two-year period (2006-2007).  *See id*. at 812-13.  As such, not only is my study an unbiased sample of settlements, but the number of settlements included in my study is also several times the number of settlements per year that has been identified in any other empirical study of class action settlements: over this two-year period, I found 688 settlements, including 111 from the Ninth Circuit.  *See id*. at 817.  I presented the findings of my study at the Conference on Empirical Legal Studies at the University of Southern California School of Law in 2009, the Meeting of the Midwestern Law and Economics Association at the University of Notre Dame in 2009, and before the faculties of many law schools in 2009 and 2010.  Since then, this study has been relied upon regularly by a number of courts, scholars, and testifying experts.[1]

---

[1] *See, e.g., Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 958 (7th Cir. 2013) (relying on article to assess fees); *In re Wells Fargo & Co. S'holder Derivative Litig.*, 2020 WL 1786159 at *11 (N.D. Cal. Apr. 7, 2020) (same); *Arkansas Teacher Ret. Sys. v. State St. Bank & Trust Co.*, 2020 WL 949885 at *52 (D. Mass. Feb. 27, 2020) (same); *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 2020 WL 256132, at *34 (N.D. Ga. Jan. 13, 2020) (same); *In re Transpacific Passenger Air Transp. Antitrust Litig.*, 2019 WL 6327363, at *4-5 (N.D. Cal. Nov. 26, 2019)

4.     In addition to my empirical works, I have also published many papers on how law-and-economics theory affects the incentives of attorneys and others in class action litigation.  *See, e.g.*, Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 V AND. L. R EV. 1623 (2009); Brian

---

(same); *Espinal v. Victor's Cafe 52nd St., Inc.*, 2019 WL 5425475, at *2 (S.D.N.Y. Oct. 23, 2019) (same); *James v. China Grill Mgmt., Inc.*, 2019 WL 1915298, at *2 (S.D.N.Y. Apr. 30, 2019) (same); *Grice v. Pepsi Beverages Co.*, 363 F. Supp. 3d 401, 407 (S.D.N.Y. 2019) (same); *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 2018 WL 6250657, at *2 (S.D.N.Y. Nov. 29, 2018) (same); *Rodman v. Safeway Inc.*, 2018 WL 4030558, at *5 (N.D. Cal. Aug. 23, 2018) (same); *Little v. Washington Metro. Area Transit Auth.*, 313 F. Supp. 3d 27, 38 (D.D.C. 2018) (same); *Hillson v. Kelly Servs. Inc.*, 2017 WL 3446596, at *4 (E.D. Mich. Aug. 11, 2017) (same); *Good v. W. Virginia-Am. Water Co.*, 2017 WL 2884535, at *23, *27 (S.D.W. Va. July 6, 2017) (same); *McGreevy v. Life Alert Emergency Response, Inc.*, 258 F. Supp. 3d 380, 385 (S.D.N.Y. 2017) (same); *Brown v. Rita's Water Ice Franchise Co. LLC*, 2017 WL 1021025, at *9 (E.D. Pa. Mar. 16, 2017) (same); *In re Credit Default Swaps Antitrust Litig.*, 2016 WL 1629349, at *17 (S.D.N.Y. Apr. 24, 2016) (same); *Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 236 (N.D. Ill. 2016); *Ramah Navajo Chapter v. Jewell*, 167 F. Supp 3d 1217, 1246 (D.N.M. 2016); *In re: Cathode Ray Tube (Crt) Antitrust Litig.*, 2016 WL 721680, at *42 (N.D. Cal. Jan. 28, 2016) (same); *In re Pool Products Distribution Mkt. Antitrust Litig.*, 2015 WL 4528880, at *19-20 (E.D. La. July 27, 2015) (same); *Craftwood Lumber Co. v. Interline Brands, Inc.*, 2015 WL 2147679, at *2-4 (N.D. Ill. May 6, 2015) (same); *Craftwood Lumber Co. v. Interline Brands, Inc.*, 2015 WL 1399367, at *3-5 (N.D. Ill. Mar. 23, 2015) (same); *In re Capital One Tel. Consumer Prot. Act Litig.*, 2015 WL 605203, at *12 (N.D. Ill. Feb. 12, 2015) (same); *In re Neurontin Marketing and Sales Practices Litig.*, 2014 WL 5810625, at *3 (D. Mass. Nov. 10, 2014) (same); *Tennille v. W. Union Co.*, 2014 WL 5394624, at *4 (D. Colo. Oct. 15, 2014) (same); *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 349-51 (S.D.N.Y. 2014) (same); *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 991 F. Supp. 2d 437, 444-46 & n.8 (E.D.N.Y. 2014) (same); *In re Fed. Nat'l Mortg. Association Sec., Derivative, and "ERISA" Litig.*, 4 F. Supp. 3d 94, 111-12 (D.D.C. 2013) (same); *In re Vioxx Prod. Liab. Litig.*, 2013 WL 5295707, at *3-4 (E.D. La. Sep. 18, 2013) (same); *In re Black Farmers Discrimination Litig.*, 953 F. Supp. 2d 82, 98-99 (D.D.C. 2013) (same); *In re Se. Milk Antitrust Litig.*, 2013 WL 2155387, at *2 (E.D. Tenn., May 17, 2013) (same); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1081 (S.D. Tex. 2012) (same); *Pavlik v. FDIC*, 2011 WL 5184445, at *4 (N.D. Ill. Nov. 1, 2011) (same); *In re Black Farmers Discrimination Litig.*, 856 F. Supp. 2d 1, 40 (D.D.C. 2011) (same); *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1033 (N.D. Ill. 2011) (same); *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 359 (E.D.N.Y. 2010) (same).

T. Fitzpatrick, *Do Class Action Lawyers Make Too Little*, 158 U. PA. L. REV. 2043 (2010) (hereinafter "Class Action Lawyers").  The culmination of these papers is a book published last year by the University of Chicago Press entitled THE CONSERVATIVE CASE FOR CLASS ACTIONS. The thesis of the book is that the so-called "private attorney general" is superior to the public attorney general in the enforcement of the rules that free markets need in order to operate effectively, and that courts should provide consistent and proper incentives to encourage such private attorney general behavior.  I will draw upon this work in this declaration.

5.      I have been asked by class counsel to opine on fee practices in the market for legal representation insofar as they may be relevant to a court's task to set fees in class actions.  The documents I reviewed from this litigation are listed in Exhibit 2.  My opinions are as follows:

- Clients in the legal market overwhelmingly use the percentage method to pay lawyers they hire on contingency.  There is no evidence that clients in the legal market—even very sophisticated ones like large corporations—use the lodestar crosscheck to limit this percentage.  The reason for this is that the lodestar crosscheck causes the incentives of the lawyer and the interests of the client to diverge.  If judges are interested in doing what class members themselves would want, then, to the extent the law allows for it, they should not use the lodestar crosscheck.

- Clients in the legal market overwhelmingly pay their lawyers fixed percentages of one-third or percentages that escalate with the litigation's maturity that go even higher.  This is true even among very sophisticated clients like large corporations and it is true even in the largest cases like patent infringement litigation.  There is no evidence that clients in the legal market pay smaller percentages if their lawyers

recover more for them.  The reason is the same: paying smaller percentages for bigger recoveries causes the incentives of the lawyer and interests of the client to diverge.  If judges are interested in doing what class members themselves would want, then, to the extent the law allows for it, they should not choose smaller percentages when class counsel recovers more for the class.

- In my opinion, the fee percentage requested in this case is even lower than class members themselves would have chosen if they had hired attorneys to represent them in a case of this magnitude, risk, and complexity.

## II.    CASE BACKGROUND

6.     This settlement arises out of litigation between Facebook and its Illinois users, who alleged that Facebook violated Illinois' Biometric Information Privacy Act (BIPA) by collecting and storing their biometric data (i.e., face scans) without their prior informed, written consent. Since this litigation began in April 2015, class counsel have litigated two motions to dismiss, three motions for summary judgement, a motion for class certification, *Daubert* motions, an appeal to the Ninth Circuit and a petition for writ of certiorari to the U.S. Supreme Court.  *See* ECF Nos. 69, 73, 76, 85, 96, 97-3, 120, 129, 138, 140, 167, 227, 236, 239, 255, 257, 262, 266, 272, 278, 285, 292, 294, 299, 301, 303, 305, 307,  333, 337, 341-343, 350, 352, 354, 357, 359, 372, 416. 418. 426.  Counsel have also engaged in extensive discovery, twice unsuccessfully attempted to reach settlement through mediation (*see* ECF Nos. 78, 325), and began preparing for trial in earnest.  The parties have now reached a settlement, which this court preliminarily approved on August 19, 2020.  ECF No. 474.  The parties have now moved the court for final approval.

7.     The class includes Facebook users located in Illinois for whom Facebook created and stored a face template between June 7, 2011, and the date of the Preliminary Approval Order.

*See* Settlement Agreement ¶ 1.7.  Under the settlement, the class will receive $650 million in cash and Facebook will disable the face recognition setting for class members until it obtains an individual class member's express, informed consent.  *See id.* at ¶¶ 2.1, 2.9.  The cash will be distributed pro rata to those who file claims and any uncashed checks will be redistributed to the those who cashed their checks; none of it will revert to Facebook.  *See id.* at ¶¶ 2.6, 2.7.  In exchange for these benefits, the class will release Facebook and its affiliates from all claims that, among other things, are "related to plaintiffs' allegations regarding the alleged collection, storage, or dissemination of biometric data related to facial recognition technology from Facebook users located in Illinois."  *Id.* at ¶¶ 1.25, 1.26.

8.     Class counsel have now moved the court for an award of $110 million in fees, or approximately 16.9% of the total settlement amount.

## III.    WHY THE LEGAL MARKET IS RELEVANT TO CLASS ACTIONS

9.     It is well known that judges must act as "fiduciaries" for class members when overseeing class actions.  *See, e.g.*, William B. Rubenstein, NEWBERG ON CLASS ACTIONS § 13.40 (5th ed. 2020) ("[T]he law requires the judge to act as a fiduciary . . . .").  The reason is that class members are often not in a good position to protect their own interests.  Sometimes they are stuck in the class action whether they like it or not because they are not allowed to opt-out, as in a Rule 23(b)(2) "injunctive relief" class.  Even when they can opt out, sometimes they do not receive notice that they are even part of the class action.  Even when they can opt out and do receive notice, there may be no point to opting out because they have so little at stake they would never sue on their own.

10.     What does it mean to be a fiduciary?  It means that the judges are acting as agents for absent class members.  When awarding fees, this means that judges should choose the same

fee arrangements that rational class members would have employed had they been able to bargain with class counsel directly at the start of litigation. *See* Restatement (Third) of Agency § 8.01 (Am. Law Inst. 2006) ("An agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship."); *id*. at § 8.10 ("An agent has a duty, within the scope of the agency relationship, to act reasonably and to refrain from conduct that is likely to damage the principal's enterprise."); *id*. at § 2.02, cmt. f ("The agent's fiduciary duty to the principal obliges the agent to interpret the principal's manifestations so as to infer, in a reasonable manner, what the principal desires to be done in light of facts of which the agent has notice at the time of acting.").

11.    In my opinion, the best way to ascertain what rational clients like class members would do when hiring a lawyer, is to ask what rational clients *actually* do when they hire a lawyer. That is, to examine how clients actually hire lawyers who work on contingency like class counsel do. As I explain below, this examination shows the following. First, clients overwhelming choose the percentage method and they always choose it without the lodestar crosscheck. Second, clients overwhelmingly choose to pay fixed percentages or escalating percentages of one-third or more; they do not pay their lawyers smaller percentages if they recover more for them.

## III.    THE LEGAL MARKET IS DOMINATED BY THE PERCENTAGE METHOD AND THERE IS NO EVIDENCE ANYONE USES THE LODESTAR CROSSCHECK

12.    In the market for legal services, lawyers who work on contingency are almost always paid a percentage of their clients' recoveries. The most famous studies are from Professor Herbert Kritzer of the University of Minnesota School of Law. *See, e.g.*, HERBERT M. KRITZER, RISKS, REPUTATIONS, AND REWARDS (2004). Ninety-five percent of the clients in his studies chose the percentage method. *Id.* at 39. Most of the time, the agreements employed fixed percentages,

but some of the time the agreements employed percentages that escalated as the litigation matured. The other five percent were split among a variety of methods with a contingent component. *Id.* at 40.  No one used a lodestar crosscheck.  *Id.*

13.    The Kritzer studies are largely based on fee agreements with unsophisticated clients.  *Id.* at 35 (noting that "personal injury was the dominant type of case").  But studies from sophisticated clients like large corporations largely confirm Kritzer's findings.  Although the data on sophisticated clients is limited—these clients usually pay lawyers by the hour instead of on contingency—we do have some data.  The best of it comes from cases where corporations hire lawyers on contingency to represent them in patent litigation.

14.    The best study of contingent fee arrangements in patent litigation is from David Schwartz.  *See* David L. Schwartz, *The Rise of Contingent Fee Representation in Patent Litigation*, 64 ALA. L. REV. 335, 360 (2012).  Professor Schwarz interviewed lawyers and businesspeople associated with contingent litigation in patent law during 2010 and 2011 and obtained copies of their contingent fee agreements.  *See id.* at 356-57.  Many of these cases presented enormous potential damages.  *Id.* at 363 ("They . . . select cases that they perceive to . . . have extremely high potential damages.").  Nonetheless, he found that corporations who hire patent litigators on contingency use the same two types of fee agreements that unsophisticated clients do: fixed percentages or escalating percentages as the litigation matured.  *Id.* at 360.  No one used a lodestar crosscheck.

15.    It is easy to understand why even sophisticated clients choose the percentage method without the lodestar crosscheck.  The percentage method incentivizes lawyers to maximize the value of the client's recovery; the more the client recovers, the more the lawyer is paid.  The lodestar method creates different and much inferior incentives.  Because it ties lawyers'

compensation to the time they expend, it motivates counsel to focus on building their hours.  But clients care about hours only when additional work increases their recoveries.  They have no interest in paying lawyers to expend time for time's sake.   Time-based compensation also encourages delay, which lawyers use to amass the number of hours that, they hope, will maximize their compensation.  *See Kirchoff v. Flynn*, 786 F.2d 320, 325–26 (7th Cir. 1986) (Easterbrook, J.) ("The contingent fee uses private incentives rather than careful monitoring to align the interests of lawyer and client.  The lawyer gains only to the extent his client gains . . . . The unscrupulous lawyer paid by the hour may be willing to settle for a lower recovery coupled with a payment for more hours.  Contingent fees eliminate this incentive and also ensure a reasonable proportion between the recovery and the fees assessed to defendants . . . . At the same time as it automatically aligns interests of lawyer and client, rewards exceptional success, and penalizes failure, the contingent fee automatically handles compensation for the uncertainty of litigation.").

16.   The lodestar crosscheck reintroduces the same bad incentives of the lodestar method that the percentage method was designed to avoid.  *See Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011) ("The . . . argument . . . that any percentage fee award exceeding a certain lodestar multiplier is excessive . . . echoes the 'megafund' cap we rejected in *Synthroid*.").  Consider the following examples.  Suppose a lawyer had worked on a case for one year and accrued a lodestar of $1 million.  If the lawyer believed that a court would award it a fee of 33⅓%, or 1.5 times his lodestar, whichever was lesser, then he would be completely indifferent as between recommending that his or her client accept a settlement offer at this point of $4.5 million or $45 million.  Either way he would get only $1.5 million.  Needless to say, the incentive to be indifferent as to the size of the settlement is not good for clients.  Or suppose the lawyer had been offered a settlement offer of $9 million after one year of work.  If the lawyer again believed

the court would not award a fee of 33⅓% unless it was no more than 1.5 times his lodestar, the lawyer would have the incentive to delay recommending acceptance of the settlement until he could generate another $1 million in lodestar and thereby reap the maximum fee.  Again, dragging cases along for nothing is not good for clients or courts.

17.     Indeed, it is even *more* imperative that we avoid the lodestar crosscheck in class actions than in conventional lawsuits because it is doubtful that class members and the judges acting as their fiduciaries can monitor class action lawyers as effectively as sophisticated corporate clients can.  Rather, we must rely even more than sophisticated clients do on the invisible hand of incentives to harmonize class counsel's incentives and class members' interests as closely as possible.  *See* Nancy Morawetz, *Bargaining, Class Representation, and Fairness*, 54 OHIO ST. L. J. 1, 5 (1993) (noting that "[t]he law and economics literature has suggested that clients are unable to monitor their attorneys' behavior in the class setting and that fee structures should be altered to better align attorney incentives with the interests of the client class").  As Professor John Coffee puts it: "[E]ven uninformed clients can align their attorney's interests with their own by compensating them through a percentage-of-recovery fee formula."   John C. Coffee, Jr., *The Regulation of Entrepreneurial Litigation: Balancing Fairness and Efficiency in the Large Class Action*, 54 U. CHI. L. REV. 877, 887 (1987).  Percentages do not perfectly align the lawyer's incentives with the client's interests, *see* Steven Shavell, FOUNDATIONS OF ECONOMIC ANALYSIS OF LAW 435 (2009) ("the lawyer . . . press[es] for settlement more often . . . because the lawyer bears all the litigation costs but obtains only a percentage of the settlement"), but they are *far* superior to the lodestar method and its cousin the lodestar crosscheck.

18.     The good news is that, according to my empirical study and those by other scholars, the vast majority of courts choose the percentage method.  *See* Brian Fitzpatrick, *Empirical Study*,

*supra*, at 832 (finding the percentage method used in 69% of fee awards); Theodore Eisenberg, et al., *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. REV. 937, 945 (2017) (hereinafter "Eisenberg-Miller 2017") (finding the percentage method used 91.8% of the time from 2009-2013 and 79.4% from 1993-2008).  But the bad news is that a significant minority of these courts also use the lodestar crosscheck.  *See* Fitzpatrick, *Empirical Study*, *supra*, at 833 (finding that 49% of courts consider lodestar when awarding fees with the percentage method); Eisenberg-Miller 2017, *supra*, at 945 (finding percent method with lodestar crosscheck used 38% of the time versus 54% for percentage method without lodestar crosscheck).  In my opinion, the majority has it right: class members on their own would not hire contingency lawyers using the lodestar crosscheck; therefore, judges acting as good fiduciaries for them should not force that arrangement upon them in class actions.  Thankfully, the lodestar crosscheck is not required in the Ninth Circuit.  *See Farrell v. Bank of Am. Corp., N.A.*, 2020 WL 5230456, *1 (9th Cir. 2020) ("This Court has consistently refused to adopt a crosscheck requirement, and we do so once more.").

## IV.    THE LEGAL MARKET IS DOMINATED BY FIXED OR ESCALATING PERCENTAGES OF AT LEAST ONE-THIRD; THERE IS NO EVIDENCE ANYONE PAYS SMALLER PERCENTAGES FOR BIGGER RECOVERIES

19.    In the market for legal services, clients who choose the percentage method usually pay their lawyers a fixed percentage of one-third or an escalating percentage as the case matures that can go even higher.  In the Kritzer studies, 60% of clients chose a fixed one-third percentage, 31% chose escalating percentages, and the other 9% chose different fixed percentages or, as I noted above, other arrangements altogether.  *See* KRITZER, RISKS, REPUTATIONS, AND REWARDS, *supra*, at 39-40.  The same is true of the study of patent litigation by Professor Schwartz.  *See* Schwartz, *The Rise of Contingent Fee Representation in Patent Litigation*, *supra*.  Of the plaintiffs who used

fixed percentages, the mean percentage was 38.6%. Of those who used escalating percentages, the mean upon filing was 28% and the mean through appeal was 40.2%. *Id.* at 360. No one in any of these studies ever paid their lawyers a smaller percentage if the lawyers recovered more money rather than less.

20.     The reason why no clients choose to pay smaller percentages for bigger recoveries is the same reason why no one chooses the lodestar crosscheck: it causes the lawyer's incentives to diverge from the client's. *See, e.g.*, *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) ("*Synthroid I*") (Easterbrook, J.) ("This means that counsel for the consumer class could have received $22 million in fees had they settled for $74 million but were limited to $8.2 million in fees because they obtained an extra $14 million for their clients . . . . Why there should be such a notch is a mystery. Markets would not tolerate that effect . . . ."). Indeed, the incentives here are particularly perverse. Consider the following example: if courts award class action attorneys 33⅓% of settlements when they are under $100 million but only 20% of settlements when they are over $100 million, then rational class action attorneys will prefer to recommend settlements for $90 million (*i.e.*, a $30 million fee award) than for $125 million (*i.e.*, a $25 million fee award)! No client would want that. No client chooses that. And, in my opinion, judges acting as good fiduciaries for them should not force them to live with it in class actions.

21.     Unfortunately, as with the lodestar crosscheck, I and others have found that some judges nonetheless award class counsel a smaller percentage if they recover more than if they recover less. *See Fitzpatrick*, *Empirical Study*, *supra*, at 828 (noting a statistically significant effect, largely in settlements above $100 million); Eisenberg-Miller 2017, *supra*, at 947 (same). But not all judges do this. *See, e.g.*, *In re Cendant Corp. Litig.*, 264 F.3d 201, 284 n.55 (3d Cir. 2001) ("Th[e] position [that the percentage of a recovery devoted to attorneys' fees should decrease

as the size of the overall settlement or recovery increases] . . . has been criticized by respected courts and commentators, who contend that such a fee scale often gives counsel an incentive to settle cases too early and too cheaply.") (alteration in original); *Allapattah Servs. Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1213 (S.D. Fla. 2006) ("By not rewarding Class Counsel for the additional work necessary to achieve a better outcome for the class, [this] approach creates the perverse incentive for Class Counsel to settle too early for too little."); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1367 (S.D. Fla. 2011) (quoting *Allapattah*); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 8:10ML-02151-JVS, 2013 WL 12327929, at *17 n.16 (C.D. Cal. June 17, 2013) ("The Court also agrees with … other courts, e.g., *Allapattah Servs.*, 454 F. Supp. 2d at 1213, which have found that decreasing a fee percentage based only on the size of the fund would provide a perverse disincentive to counsel to maximize recovery for the class."). And, importantly, the Ninth Circuit does not require it. *See In re Optical Disk Drive Prod. Antitrust Litig.*, 959 F.3d 922, 933 (9th Cir. 2020) ("[W]e have already declined to adopt a bright-line rule requiring the use of sliding-scale fee awards for class counsel in megafund cases….").

22.     It is true that sometimes sophisticated clients *taper* fee percentages downward on a *marginal basis* as the recovery becomes larger. That is, pay the lawyer, say, one-third of the first $100 million recovered and 25% of any recovery above that. Although these practices were not found in the studies I cited above, they are not unheard of. *See In re Synthroid I*, 264 F.3d at 721. But it is also true that sophisticated clients sometimes taper fee percentages *upward* as recoveries become large. *See, e.g.*, *In re AT & T Corp.*, 455 F.3d 160, 163 (3d Cir. 2006) (describing fee agreement between class counsel and "the lead plaintiff New Hampshire Retirement Systems": "The formula provided attorneys' fees would equal 15% of any settlement amount up to $25

million, 20% of any settlement amount between $25 million and $50 million, and 25% of any settlement amount over $50 million."). With limited data from sophisticated clients, it is impossible to know which practice is more prevalent. But it should be noted that downward tapering undermines the percentage method's alignment of the lawyer's incentives and the client's interests. *See In re Synthroid I*, 264 F.3d at 721 ("[D]eclining marginal percentages . . . create declining marginal returns to legal work . . . . This feature exacerbates the agency costs inherent in any percentage-of-recovery system . . . ."). In class actions, where it is doubtful that class members and even judges can monitor lawyers as well as sophisticated clients can, in my opinion it is a usually a mistake to run this risk of misaligned incentives. If fee percentages are to be tapered at all in this context, they should probably be tapered upward. *See* John C. Coffee, Jr., *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions*, 86 COLUM. L. REV. 669, 697 (1986) ("[T]he most logical answer to this problem of premature settlement would be to base fees on a graduated, increasing percentage of the recovery formula—one that operates, much like the Internal Revenue Code, to award the plaintiff's attorney a marginally greater percentage of each defined increment of the recovery."); Jill E. Fisch, *Lawyers on the Auction Block: Evaluating the Selection of Class Counsel by Auction*, 102 COLUM. L. REV. 650, 678 (2002) (same because the "last dollars of recovery are generally the most costly to produce").

## V.  CONCLUSIONS

23.    The Ninth Circuit has explained that a district court has "discretion to choose how [to] calculate[] fees" and that a lodestar crosscheck is not required.  *Farrell*, 2020 WL 5230456, at *1 (quoting *In re Bluetooth Headset Prods. Liab. Litig*., 654 F.3d 935, 944 (9th Cir. 2011)).  In my opinion, the Court should exercise its discretion to decline to use a lodestar crosscheck to determine the reasonableness of Class Counsel's fee award.

24.    Class Counsel in this case have applied for an attorneys' fee award of 16.9% of the Settlement Fund.  Based on my academic research, this percentage is even lower than the contingency fee class members would have agreed to pay in a case of this magnitude, complexity, and risk had they hired Class Counsel on their own.

Nashville, TN

October 14, 2020

Brian T. Fitzpatrick

# EXHIBIT 1

# BRIAN T. FITZPATRICK

Vanderbilt University Law School
131 21st Avenue South
Nashville, TN 37203
(615) 322-4032
brian.fitzpatrick@law.vanderbilt.edu

## ACADEMIC APPOINTMENTS

**VANDERBILT UNIVERSITY LAW SCHOOL**, *Milton R. Underwood Chair in Free Enterprise*, 2020 to present
- *Professor of Law*, 2012 to present
- *FedEx Research Professor*, 2014-2015; *Associate Professor*, 2010-2012; *Assistant Professor*, 2007-2010
- Classes: Civil Procedure, Complex Litigation, Federal Courts, Comparative Class Actions
- Hall-Hartman Outstanding Professor Award, 2008-2009
- Vanderbilt's Association of American Law Schools Teacher of the Year, 2009

**HARVARD LAW SCHOOL**, *Visiting Professor*, Fall 2018
- Classes: Civil Procedure, Litigation Finance

**FORDHAM LAW SCHOOL**, *Visiting Professor*, Fall 2010
- Classes: Civil Procedure

## EDUCATION

**HARVARD LAW SCHOOL**, J.D., *magna cum laude*, 2000
- Fay Diploma (for graduating first in the class)
- Sears Prize, 1999 (for highest grades in the second year)
- *Harvard Law Review*, Articles Committee, 1999-2000; Editor, 1998-1999
- *Harvard Journal of Law & Public Policy*, Senior Editor, 1999-2000; Editor, 1998-1999
- Research Assistant, David Shapiro, 1999; Steven Shavell, 1999

**UNIVERSITY OF NOTRE DAME**, B.S., Chemical Engineering, *summa cum laude*, 1997
- First runner-up to Valedictorian (GPA: 3.97/4.0)
- Steiner Prize, 1997 (for overall achievement in the College of Engineering)

## CLERKSHIPS

**HON. ANTONIN SCALIA**, Supreme Court of the United States, 2001-2002

**HON. DIARMUID O'SCANNLAIN**, U.S. Court of Appeals for the Ninth Circuit, 2000-2001

## EXPERIENCE

**NEW YORK UNIVERSITY SCHOOL OF LAW**, Feb. 2006 to June 2007
*John M. Olin Fellow*

**HON. JOHN CORNYN**, United States Senate, July 2005 to Jan. 2006
*Special Counsel for Supreme Court Nominations*

**SIDLEY AUSTIN LLP**, Washington, DC, 2002 to 2005
*Litigation Associate*

## BOOKS

THE CAMBRIDGE INTERNATIONAL HANDBOOK OF CLASS ACTIONS (Cambridge University Press, forthcoming 2021) (ed., with Randall Thomas)

THE CONSERVATIVE CASE FOR CLASS ACTIONS (University of Chicago Press 2019)

## ACADEMIC ARTICLES

*Why Class Actions are Something* both *Liberals* and *Conservatives Can Love*, 73 VAND. L. REV. 1147 (2020)

*Deregulation and Private Enforcement*, 24 LEWIS & CLARK L. REV. 685 (2020)

*The Indian Securities Fraud Class Action: Is Class Arbitration the Answer?*, 40 NW. J. INT'L L. & BUS. 203 (2020) (with Randall Thomas)

*Can the Class Action be Made Business Friendly?*, 24 N.Z. BUS. L. & Q. 169 (2018)

*Can and Should the New Third-Party Litigation Financing Come to Class Actions?*, 19 THEORETICAL INQUIRIES IN LAW 109 (2018)

*Scalia in the Casebooks*, 84 U. CHI. L. REV. 2231 (2017)

*The Ideological Consequences of Judicial Selection*, 70 VAND. L. REV. 1729 (2017)

*Judicial Selection and Ideology*, 42 OKLAHOMA CITY UNIV. L. REV. 53 (2017)

*Justice Scalia and Class Actions: A Loving Critique,* 92 NOTRE DAME L. REV. 1977 (2017)

*A Tribute to Justice Scalia: Why Bad Cases Make Bad Methodology,* 69 VAND. L. REV. 991 (2016)

*The Hidden Question in* Fisher, 10 NYU J. L. & LIBERTY 168 (2016)

*An Empirical Look at Compensation in Consumer Class Actions,* 11 NYU J. L. & BUS. 767 (2015) (with Robert Gilbert)

*The End of Class Actions?*, 57 ARIZ. L. REV. 161 (2015)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, 98 VA. L. REV. 839 (2012)

Twombly *and* Iqbal *Reconsidered*, 87 NOTRE DAME L. REV. 1621 (2012)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 7 J. EMPIRICAL L. STUD. 811 (2010) (selected for the 2009 Conference on Empirical Legal Studies)

*Do Class Action Lawyers Make Too Little?*, 158 U. PA. L. REV. 2043 (2010)

*Originalism and Summary Judgment*, 71 OHIO ST. L.J. 919 (2010)

*The End of Objector Blackmail?*, 62 VAND. L. REV. 1623 (2009) (selected for the 2009 Stanford-Yale Junior Faculty Forum)

*The Politics of Merit Selection*, 74 MISSOURI L. REV. 675 (2009)

*Errors, Omissions, and the Tennessee Plan*, 39 U. MEMPHIS L. REV. 85 (2008)

*Election by Appointment: The Tennessee Plan Reconsidered*, 75 TENN. L. REV. 473 (2008)

*Can Michigan Universities Use Proxies for Race After the Ban on Racial Preferences?*, 13 MICH. J. RACE & LAW 277 (2007)


## BOOK CHAPTERS

*The Indian Securities Fraud Class Action: Is Class Arbitration the Answer?*, in THE CAMBRIDGE INTERNATIONAL HANDBOOK OF CLASS ACTIONS (ed., with Randall Thomas, Cambridge University Press, forthcoming 2021) (with Randall Thomas)

*Do Class Actions Deter Wrongdoing?* in THE CLASS ACTION EFFECT (Catherine Piché, ed., Éditions Yvon Blais, Montreal, 2018)

*Judicial Selection in Illinois* in AN ILLINOIS CONSTITUTION FOR THE TWENTY-FIRST CENTURY (Joseph E. Tabor, ed., Illinois Policy Institute, 2017)

*Civil Procedure in the Roberts Court* in BUSINESS AND THE ROBERTS COURT (Jonathan Adler, ed., Oxford University Press, 2016)

*Is the Future of Affirmative Action Race Neutral?* in A NATION OF WIDENING OPPORTUNITIES: THE CIVIL RIGHTS ACT AT 50 (Ellen Katz & Samuel Bagenstos, eds., Michigan University Press, 2016)


## ACADEMIC PRESENTATIONS

*Objector Blackmail Update: What Have the 2018 Amendments Done?*, Institute for Law and Economic Policy, Fordham Law School, New York, NY (Feb. 28, 2020)

*Keynote Debate: The Conservative Case for Class Actions*, Miami Law Class Action & Complex Litigation Forum, University of Miami School of Law, Miami, FL (Jan. 24, 2020)

*The Future of Class Actions*, National Consumer Law Center Class Action Symposium, Boston, MA (Nov. 16, 2019) (panelist)

*The Conservative Case for Class Actions,* Center for Civil Justice, NYU Law School, New York, NY (Nov.11, 2019)

*Deregulation and Private Enforcement*, Class Actions, Mass Torts, and MDLs: The Next 50 Years, Pound Institute Academic Symposium, Lewis & Clark Law School, Portland, OR (Nov. 2, 2019)

*Class Actions and Accountability in Finance,* Investors and the Rule of Law Conference, Institute for Investor Protection, Loyola University Chicago Law School, Chicago, IL (Oct. 25, 2019) (panelist)

*Incentivizing Lawyers as Teams,* University of Texas at Austin Law School, Austin, TX (Oct. 22, 2019)

*"Dueling Pianos": A Debate on the Continuing Need for Class Actions,* Twenty Third Annual National Institute on Class Actions, American Bar Association, Nashville, TN (Oct. 18, 2019) (panelist)

*A Debate on the Utility of Class Actions,* Contemporary Issues in Complex Litigation Conference, Northwestern Law School, Chicago, IL (Oct.16, 2019) (panelist)

*Litigation Funding,* Forty Seventh Annual Meeting, Intellectual Property Owners Association, Washington, DC (Sep. 26, 2019) (panelist)

*The Indian Securities Fraud Class Action: Is Class Arbitration the Answer?,* International Class Actions Conference, Vanderbilt Law School, Nashville, TN (Aug. 24, 2019)

*A New Source of Class Action Data,* Corporate Accountability Conference, Institute for Law and Economic Policy, San Juan, Puerto Rico (April 12, 2019)

*The Indian Securities Fraud Class Action: Is Class Arbitration the Answer?*, Ninth Annual Emerging Markets Finance Conference, Mumbai, India (Dec. 14, 2018)

*MDL: Uniform Rules v. Best Practices*, Miami Law Class Action & Complex Litigation Forum, University of Miami Law School, Miami, FL (Dec. 7, 2018) (panelist)

*Third Party Finance of Attorneys in Traditional and Complex Litigation*, George Washington Law School, Washington, D.C. (Nov. 2, 2018) (panelist)

*MDL at 50 - The 50th Anniversary of Multidistrict Litigation*, New York University Law School, New York, New York (Oct. 10, 2018) (panelist)

*The Discovery Tax*, Law & Economics Seminar, Harvard Law School, Cambridge, Massachusetts (Sep. 11, 2018)

*Empirical Research on Class Actions,* Civil Justice Research Initiative, University of California at Berkeley, Berkeley, California (Apr. 9, 2018)

*A Political Future for Class Actions in the United States?*, The Future of Class Actions Symposium, University of Auckland Law School, Auckland, New Zealand (Mar. 15, 2018)

4

*The Indian Class Actions: How Effective Will They Be?*, Eighth Annual Emerging Markets Finance Conference, Mumbai, India (Dec. 19, 2017)

*Hot Topics in Class Action and MDL Litigation,* University of Miami School of Law, Miami, Florida (Dec. 8, 2017) (panelist)

*Critical Issues in Complex Litigation*, Contemporary Issues in Complex Litigation, Northwestern Law School (Nov. 29, 2017) (panelist)

*The Conservative Case for Class Actions*, Consumer Class Action Symposium, National Consumer Law Center, Washington, DC (Nov. 19, 2017)

*The Conservative Case for Class Actions—A Monumental Debate*, ABA National Institute on Class Actions, Washington, DC (Oct. 26, 2017) (panelist)

*One-Way Fee Shifting after Summary Judgment*, 2017 Meeting of the Midwestern Law and Economics Association, Marquette Law School, Milwaukee, WI (Oct. 20, 2017)

*The Conservative Case for Class Actions*, Pepperdine Law School Malibu, CA (Oct. 17, 2017)

*One-Way Fee Shifting after Summary Judgment*, Vanderbilt Law Review Symposium on The Future of Discovery, Vanderbilt Law School, Nashville, TN (Oct. 13, 2017)

*The Constitution Revision Commission and Florida's Judiciary*, 2017 Annual Florida Bar Convention, Boca Raton, FL (June 22, 2017)

*Class Actions After* Spokeo v. Robins*: Supreme Court Jurisprudence, Article III Standing, and Practical Implications for the Bench and Practitioners*, Northern District of California Judicial Conference, Napa, CA (Apr. 29, 2017) (panelist)

*The Ironic History of Rule 23*, Conference on Secrecy, Institute for Law & Economic Policy, Naples, FL (Apr. 21, 2017)

*Justice Scalia and Class Actions: A Loving Critique*, University of Notre Dame Law School, South Bend, Indiana (Feb. 3, 2017)

*Should Third-Party Litigation Financing Be Permitted in Class Actions?*, Fifty Years of Class Actions—A Global Perspective, Tel Aviv University, Tel Aviv, Israel (Jan. 4, 2017)

*Hot Topics in Class Action and MDL Litigation,* University of Miami School of Law, Miami, Florida (Dec. 2, 2016) (panelist)

*The Ideological Consequences of Judicial Selection,* William J. Brennan Lecture, Oklahoma City University School of Law, Oklahoma, City, Oklahoma (Nov. 10, 2016)

*After Fifty Years, What's Class Action's Future,* ABA National Institute on Class Actions, Las Vegas, Nevada (Oct. 20, 2016) (panelist)

*Where Will Justice Scalia Rank Among the Most Influential Justices*, State University of New York at Stony Brook, Long Island, New York (Sep. 17, 2016)

*The Ironic History of Rule 23,* University of Washington Law School, Seattle, WA (July 14, 2016)

*A Respected Judiciary—Balancing Independence and Accountability*, 2016 Annual Florida Bar Convention, Orlando, FL (June 16, 2016) (panelist)

*What Will and Should Happen to Affirmative Action After Fisher v. Texas*, American Association of Law Schools Annual Meeting, New York, NY (January 7, 2016) (panelist)

*Litigation Funding: The Basics and Beyond,* NYU Center on Civil Justice, NYU Law School, New York, NY (Nov. 20, 2015) (panelist)

*Do Class Actions Offer Meaningful Compensation to Class Members, or Do They Simply Rip Off Consumers Twice?,* ABA National Institute on Class Actions, New Orleans, LA (Oct. 22, 2015) (panelist)

*Arbitration and the End of Class Actions?,* Quinnipiac-Yale Dispute Resolution Workshop, Yale Law School, New Haven, CT (Sep. 8, 2015) (panelist)

*The Next Steps for Discovery Reform: Requester Pays*, Lawyers for Civil Justice Membership Meeting, Washington, DC (May 5, 2015)

*Private Attorney General: Good or Bad?*, 17th Annual Federalist Society Faculty Conference, Washington, DC (Jan. 3, 2015)

*Liberty, Judicial Independence, and Judicial Power*, Liberty Fund Conference, Santa Fe, NM (Nov. 13-16, 2014) (participant)

*The Economics of Objecting for All the Right Reasons,* 14th Annual Consumer Class Action Symposium, Tampa, FL (Nov. 9, 2014)

*Compensation in Consumer Class Actions: Data and Reform*, Conference on The Future of Class Action Litigation: A View from the Consumer Class, NYU Law School, New York, NY (Nov. 7, 2014)

*The Future of Federal Class Actions: Can the Promise of Rule 23 Still Be Achieved?*, Northern District of California Judicial Conference, Napa, CA (Apr. 13, 2014) (panelist)

*The End of Class Actions?*, Conference on Business Litigation and Regulatory Agency Review in the Era of Roberts Court, Institute for Law & Economic Policy, Boca Raton, FL (Apr. 4, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, University of Missouri School of Law, Columbia, MO (Mar. 7, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, George Mason Law School, Arlington, VA (Mar. 6, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, Roundtable for Third-Party Funding Scholars, Washington & Lee University School of Law, Lexington, VA (Nov. 7-8, 2013)

*Is the Future of Affirmative Action Race Neutral?*, Conference on A Nation of Widening Opportunities: The Civil Rights Act at 50, University of Michigan Law School, Ann Arbor, MI (Oct. 11, 2013)

*The Mass Tort Bankruptcy: A Pre-History*, The Public Life of the Private Law: A Conference in Honor of Richard A. Nagareda, Vanderbilt Law School, Nashville, TN (Sep. 28, 2013) (panelist)

*Rights & Obligations in Alternative Litigation Financing and Fee Awards in Securities Class Actions*, Conference on the Economics of Aggregate Litigation, Institute for Law & Economic Policy, Naples, FL (Apr. 12, 2013) (panelist)

*The End of Class Actions?*, Symposium on Class Action Reform, University of Michigan Law School, Ann Arbor, MI (Mar. 16, 2013)

*Toward a More Lawyer-Centric Class Action?,* Symposium on Lawyering for Groups, Stein Center for Law & Ethics, Fordham Law School, New York, NY (Nov. 30, 2012)

*The Problem: AT & T as It Is Unfolding*, Conference on *AT & T Mobility v. Concepcion*, Cardozo Law School, New York, NY (Apr. 26, 2012) (panelist)

*Standing under the Statements and Accounts Clause,* Conference on Representation without Accountability*,* Fordham Law School Corporate Law Center, New York, NY (Jan. 23, 2012)

*The End of Class Actions?*, Washington University Law School, St. Louis, MO (Dec. 9, 2011)

*Book Preview Roundtable: Accelerating Democracy: Matching Social Governance to Technological Change*, Searle Center on Law, Regulation, and Economic Growth, Northwestern University School of Law, Chicago, IL (Sep. 15-16, 2011) (participant)

*Is Summary Judgment Unconstitutional?  Some Thoughts About Originalism*, Stanford Law School, Palo Alto, CA (Mar. 3, 2011)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, Northwestern Law School, Chicago, IL (Feb. 25, 2011)

*The New Politics of Iowa Judicial Retention Elections: Examining the 2010 Campaign and Vote,* University of Iowa Law School, Iowa City, IA (Feb. 3, 2011) (panelist)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, Washington University Law School, St. Louis, MO (Oct. 1, 2010)

Twombly *and* Iqbal *Reconsidered,* Symposium on Business Law and Regulation in the Roberts Court, Case Western Reserve Law School, Cleveland, OH (Sep. 17, 2010)

*Do Class Action Lawyers Make Too Little?*, Institute for Law & Economic Policy, Providenciales, Turks & Caicos (Apr. 23, 2010)

*Originalism and Summary Judgment*, Georgetown Law School, Washington, DC (Apr. 5, 2010)

*Theorizing Fee Awards in Class Action Litigation*, Washington University Law School, St. Louis, MO (Dec. 11, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 2009 Conference on Empirical Legal Studies, University of Southern California Law School, Los Angeles, CA (Nov. 20, 2009)

*Originalism and Summary Judgment*, Symposium on Originalism and the Jury, Ohio State Law School, Columbus, OH (Nov. 17, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 2009 Meeting of the Midwestern Law and Economics Association, University of Notre Dame Law School, South Bend, IN (Oct. 10, 2009)

*The End of Objector Blackmail?*, Stanford-Yale Junior Faculty Forum, Stanford Law School, Palo Alto, CA (May 29, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, University of Minnesota School of Law, Minneapolis, MN (Mar. 12, 2009)

*The Politics of Merit Selection*, Symposium on State Judicial Selection and Retention Systems, University of Missouri Law School, Columbia, MO (Feb. 27, 2009)

*The End of Objector Blackmail?*, Searle Center Research Symposium on the Empirical Studies of Civil Liability, Northwestern University School of Law, Chicago, IL (Oct. 9, 2008)

*Alternatives To Affirmative Action After The Michigan Civil Rights Initiative*, University of Michigan School of Law, Ann Arbor, MI (Apr. 3, 2007) (panelist)

**OTHER PUBLICATIONS**

*Memo to Mitch: Repeal the Republican Tax Increase*, THE HILL (July 17, 2020)

*The Right Way to End Qualified Immunity*, THE HILL (June 25, 2020)

*I Still Remember*, 133 HARV. L. REV. 2458 (2020)

*Proposed Reforms to Texas Judicial Selection*, 24 TEX. R. L. & POL. 307 (2020)

*The Conservative Case for Class Actions?,* NATIONAL REVIEW (Nov. 13, 2019)

*9th Circuit Split: What's the math say?*, DAILY JOURNAL (Mar. 21, 2017)

*Former clerk on Justice Antonin Scalia and his impact on the Supreme Court*, THE CONVERSATION (Feb. 24, 2016)

*Lessons from Tennessee Supreme Court Retention Election*, THE TENNESSEAN (Aug. 20, 2014)

*Public Needs Voice in Judicial Process*, THE TENNESSEAN (June 28, 2013)

*Did the Supreme Court Just Kill the Class Action?*, THE QUARTERLY JOURNAL (April 2012)

*Let General Assembly Confirm Judicial Selections*, CHATTANOOGA TIMES FREE PRESS (Feb. 19, 2012)

*"Tennessee Plan" Needs Revisions*, THE TENNESSEAN (Feb. 3, 2012)

*How Does Your State Select Its Judges?*, INSIDE ALEC 9 (March 2011) (with Stephen Ware)

*On the Merits of Merit Selection*, THE ADVOCATE 67 (Winter 2010)

*Supreme Court Case Could End Class Action Suits,* SAN FRANCISCO CHRONICLE (Nov. 7, 2010)

*Kagan is an Intellect Capable of Serving Court*, THE TENNESSEAN (Jun. 13, 2010)

*Confirmation "Kabuki" Does No Justice*, POLITICO (July 20, 2009)

*Selection by Governor may be Best Judicial Option*, THE TENNESSEAN (Apr. 27, 2009)

*Verdict on Tennessee Plan May Require a Jury*, THE MEMPHIS COMMERCIAL APPEAL (Apr. 16, 2008)

*Tennessee's Plan to Appoint Judges Takes Power Away from the Public*, THE TENNESSEAN (Mar. 14, 2008)

*Process of Picking Judges Broken*, CHATTANOOGA TIMES FREE PRESS (Feb. 27, 2008)

*Disorder in the Court*, LOS ANGELES TIMES (Jul. 11, 2007)

*Scalia's Mistake*, NATIONAL LAW JOURNAL (Apr. 24, 2006)

*GM Backs Its Bottom Line*, DETROIT FREE PRESS (Mar. 19, 2003)

*Good for GM, Bad for Racial Fairness*, LOS ANGELES TIMES (Mar. 18, 2003)

*10 Percent Fraud*, WASHINGTON TIMES (Nov. 15, 2002)

## OTHER PRESENTATIONS

*Does the Way We Choose our Judges Affect Case Outcomes?*, American Legislative Exchange Council 2018 Annual Meeting, New Orleans, Louisiana (August 10, 2018) (panelist)

*Oversight of the Structure of the Federal Courts*, Subcommittee on Oversight, Agency Action, Federal Rights and Federal Courts, United States Senate, Washington, D.C. (July 31, 2018)

*Where Will Justice Scalia Rank Among the Most Influential Justices*, The Leo Bearman, Sr. American Inn of Court, Memphis, TN (Mar. 21, 2017)

*Bringing Justice Closer to the People: Examining Ideas for Restructuring the 9th Circuit*, Subcommittee on Courts, Intellectual Property, and the Internet, United States House of Representatives, Washington, D.C. (Mar. 16, 2017)

*Supreme Court Review 2016: Current Issues and Cases Update*, Nashville Bar Association, Nashville, TN (Sep. 15, 2016) (panelist)

*A Respected Judiciary—Balancing Independence and Accountability*, Florida Bar Annual Convention, Orlando, FL (June 16, 2016) (panelist)

*Future Amendments in the Pipeline: Rule 23*, Tennessee Bar Association, Nashville, TN (Dec. 2, 2015)

*The New Business of Law: Attorney Outsourcing, Legal Service Companies, and Commercial Litigation Funding*, Tennessee Bar Association, Nashville, TN (Nov. 12, 2014)

*Hedge Funds + Lawsuits = A Good Idea?*, Vanderbilt University Alumni Association, Washington, DC (Sep. 3, 2014)

*Judicial Selection in Historical and National Perspective*, Committee on the Judiciary, Kansas Senate (Jan. 16, 2013)

*The Practice that Never Sleeps: What's Happened to, and What's Next for, Class Actions*, ABA Annual Meeting, Chicago, IL (Aug. 3, 2012) (panelist)

*Life as a Supreme Court Law Clerk and Views on the Health Care Debate*, Exchange Club, Nashville, TN (Apr. 3, 2012)

*The Tennessee Judicial Selection Process—Shaping Our Future*, Tennessee Bar Association Leadership Law Retreat, Dickson, TN (Feb. 3, 2012) (panelist)

*Reexamining the Class Action Practice*, ABA National Institute on Class Actions, New York, NY (Oct. 14, 2011) (panelist)

*Judicial Selection in Kansas*, Committee on the Judiciary, Kansas House of Representatives (Feb. 16, 2011)

*Judicial Selection and the Tennessee Constitution*, Civil Practice and Procedure Subcommittee, Tennessee House of Representatives (Mar. 24, 2009)

*What Would Happen if the Judicial Selection and Evaluation Commissions Sunset?*, Civil Practice and Procedure Subcommittee, Tennessee House of Representatives (Feb. 24, 2009)

*Judicial Selection in Tennessee*, Chattanooga Bar Association, Chattanooga, TN (Feb. 27, 2008) (panelist)

*Ethical Implications of Tennessee's Judicial Selection Process*, Tennessee Bar Association, Nashville, TN (Dec. 12, 2007)

**PROFESSIONAL ASSOCIATIONS**

Member, American Law Institute
Referee, Journal of Law, Economics and Organization
Referee, Journal of Empirical Legal Studies
Reviewer, Oxford University Press
Reviewer, Supreme Court Economic Review
Member, American Bar Association
Member, Tennessee Advisory Committee to the U.S. Commission on Civil Rights
Board of Directors, Tennessee Stonewall Bar Association
American Swiss Foundation Young Leaders' Conference, 2012
Bar Admission, District of Columbia

**COMMUNITY ACTIVITIES**

Board of Directors, Nashville Ballet, 2011-2017 & 2019-present; Board of Directors, Beacon Center, 2018-present; Nashville Talking Library for the Blind, 2008-2009

# EXHIBIT 2

<u>Documents reviewed:</u>

- Plaintiffs' Unopposed Notice of Motion and Motion for Preliminary Approval of Class Action Settlement; Memorandum of Points and Authorities in Support Thereof (document 445, filed 05/08/20)

- Facebook's Supplemental Brief in Support of Preliminary Approval of the Settlement (document 447, filed 05/08/20)

- Facebook's Second Supplemental Brief in Support of Preliminary Approval of the Settlement (document 462, filed 07/09/20)

- Plaintiffs' Supplemental Brief in Support of Preliminary Approval of a Class Action Settlement (document 465, filed 07/09/20)

- Declaration of Rafey S. Balabanian (document 465-1, filed 07/09/20)

- Transcript of Remote Zoom Video Conference Held on 06/04/20, Before the Honorable Judge James Donato (document 465-2, filed 07/09/20)

- Transcript of Videotaped Deposition of Nimesh Patel (document 465-3, filed 07/09/20)

- Declaration of Tiffany Elking (document 465-4, filed 07/09/20)

- Notice of Amended Stipulation of Class Action Settlement, including Exhibit A, thereto, Amended Stipulation of Class Action Settlement ("Settlement Agreement") (document 468, filed 07/22/20)

- Transcript of Videoconference Proceedings Held on 07/23/20, Before the Honorable Judge James Donato (document 470, filed 07/28/20)

- Order Granting Preliminary Approval of Class Action Settlement (document 474, filed 08/19/20)