# Exhibit 3

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

|  |  |  |
|---|---|---|
| IN RE:  FACEBOOK BIOMETRIC INFORMATION PRIVACY LITIGATION | : : : : | Case No. 15-CV-03747-JD |
| THIS DOCUMENT RELATES TO: | : : : | |
| ALL ACTIONS | : : : : | |

## EXPERT DECLARATION OF PROFESSOR WILLIAM B. RUBENSTEIN

1.      I am the Bruce Bromley Professor of Law at Harvard Law School and a leading

national expert on class action law and practice.  Class Counsel[1] seek a fee of $110 million,

which constitutes 20% of the original $550 million settlement.[2]  Class Counsel have retained me

---

[1] The Settlement Agreement states that "'Class Counsel' means the law firms of Edelson PC; Robbins Geller Rudman & Dowd LLP; and Labaton Sucharow LLP."  Settlement Agreement § 1.8, ECF No. 445-2.

[2] The proposed fee constitutes 16.9% of the total $650 million settlement, but Class Counsel inform me that they will seek a fee only from the initial $550 million and hence that number provides the proper basis of analysis.  I can appreciate why Class Counsel has taken this approach but I am more hesitant to ignore the additional $100 million the class will receive for three reasons: (1) Class Counsel's work to secure the first $550 million had a lot to do with why Facebook was willing to forego another $100 million, so they deserve something more than zero credit for that addition; (2) giving class counsel no credit for monetary relief achieved after a District Court expresses concern about an initial settlement proposal could create odd incentives, prompting class counsel to do anything necessary to finish the deal without incentivizing them to recover more *money* for the class; and (3) regardless of  whether you label Class Counsel's cut "20%," the class members are paying only 16.9%.  It might be best for class action law, if a bit more complex, to enable class counsel, in situations like this, to recover, say, 18% of the initial $550 million (or $99 million) and half as much, 9%, of the additional $100 million, for a total fee

1

to provide my expert opinion as to whether this request is reasonable in the context of this litigation.   As this Court has noted,[3] Ninth Circuit law authorizes this Court to utilize a percentage or lodestar approach, most courts in similar common fund cases utilize a percentage approach, the benchmark percentage award in the Ninth Circuit is 25%, the benchmark may be checked by a lodestar cross-check, and must be justified against a number of other factors (such as the risks counsel took, the results they achieved, and awards in similar cases).   After setting forth my qualifications to serve as an expert (Part I, *infra*) and assessing the scope of Class Counsel's achievement (Part II, *infra*), I employ this Court's approach to reach the following conclusions:

- *Class Counsel's requested <u>percentage</u> fits easily within the Ninth Circuit's 25% benchmark and is just above the high end of percentages courts typically award in larger fund cases* (Section III(A), *infra*).  In common fund cases, class counsel are entitled to a percentage of the fund that their efforts created for the class.  In the Ninth Circuit, 25% is the benchmark for such awards.  The requested fee here is 20% below that benchmark.  Courts tend to approve lower percentages in large fund cases, with empirical data showing a range from about 12–22%, with most cases of this magnitude somewhere between 12–18%.  Conceptualizing Class Counsel's fee as 20% puts it at the high end of these larger fund awards, while viewing it as 16.9%, *see* note 2, *supra*, places it closer to the middle of the large fund range.  Given the fact that Class Counsel are submitting their lodestar and thereby enabling the Court to "cross-check" the percentage award, the precise placement of the percentage number itself in a range of comparatives recedes in importance.

- *Class Counsel's lodestar reflects reasonable <u>billing rates</u> based on the market for attorneys in this community and a reasonable quantity of hours for the work undertaken in this matter* (Section III(B), *infra*).  For purposes of this Declaration, my research assistants compiled a database of all billing rates

---

($108 million).  This approximates the fee level Class Counsel seek, while conceptualizing it slightly differently – and importantly, it enables a conclusion that Class Counsel's fee is 16.6% of the total fund, hence enabling appropriate cross-case comparisons.

[3] *See, e.g.*, *In re Capacitors Antitrust Litig.*, No. 3:17-md-02801-JD, 2018 WL 4790575, at *2–3 (N.D. Cal. Sept. 21, 2018).

explicitly approved by courts overseeing class action settlements in the Northern District of California in 2019 (164 rates from 19 cases).  The billing rates Class Counsel employ are consistent with, albeit slightly (about 1.2%) higher than, those approved rates.  Similarly, Class Counsel's average hourly rate (or "blended billing rate") is at the higher end of the range of blended rates approved in recent Northern District cases, but not inconsistent with other approved rates.  Class Counsel's rates appropriately reflect the scale and complexity of this type of case: most cases in the comparison set were more routine wage-and-hour cases and no case in the comparison set involved a fee over $8 million.

- ***Class Counsel's lodestar reflects a reasonable <u>quantity of hours</u> for the work undertaken in this matter*** (Section III(C), *infra*).  My research assistants undertook a similar empirical evaluation of the number of hours Class Counsel billed, comparing that total to hours billed in settlements of this magnitude (roughly $400–800 million).  That analysis found that the total number of hours that all Class Counsel expended in this case is below the mean for cases of this size, supporting the conclusions that these Class Counsel were efficient in prosecuting this case and engaged in no churning or lodestar padding.  A qualitative assessment of the time spent also supports these conclusions: Class Counsel report that they devoted about 30,000 hours of time in the 5.5 years of this case, roughly 5,455 hours/year, or the equivalent of 2.5 lawyers working close to full time (2,182 hours/year) on the case throughout its duration.  In light of the complexity of the case, and the investigation, discovery, preparation for trial, and general adversarial litigation undertaken by Class Counsel, it is evident that the case could have consumed the full attention of about 2.5 attorneys for its duration.

- ***Class Counsel are entitled to a fee enhancement because of the risk the firms undertook and the results they achieved for the class – and the multiplier sought, though high, is at the level courts approve in extraordinary circumstances like those present here*** (Part III(D), *infra*).  This was an exceedingly risky case: it was not a case piggy-backing on a prior government investigation, nor the next case applying a law regularly deployed by class counsel, but a novel use of a relatively new statute, applied for the first time, to the practices of a major social networking service.  The facts involved complex biometric issues requiring technological expertise, and the law involved nuanced choice-of-law, extraterritoriality, and class certification issues.  Worse, within a year of the case's launch, the Supreme Court rendered its decision in the *Spokeo* case, so tightening standing requirements in statutory damages cases that more than 50 reported decisions immediately dismissed ongoing class actions, including cases litigated under this Illinois statute.  Similarly, in the midst of the case, the Illinois legislature considered bills that threatened to gut the class's substantive claims.  Class Counsel shouldered all of this risk while litigating against one of the largest and richest corporations in the world, with seemingly

3

bottomless coffers, yet they did so in a lean fashion without running up an enormous lodestar nor enlisting dozens of law firms to share the risk. Despite these risks, Class Counsel have secured the largest privacy settlement in American history, in raw dollars, and one of the highest ever in terms of recovery per class member. The relief is not only historic, it is available to the full class, easily claimed, and complements significant non-monetary changes in the defendant's practices as well.

2.     Having served as a fees expert in nearly 100 cases, I can testify that there are only two – interrelated – facts about this fee petition that stick out: (a) the total number of hours Class Counsel expended here is remarkably low relative to settlements of this size and hence (b) their lodestar multiplier, in the 5 range, is high.[4] Because the purpose of examining Class Counsel's lodestar is to "cross-check" the proposed percentage award and guard against an excessive fee, the resulting high multiplier implies that the Court should reduce the percentage award. Indeed, I have consistently urged courts to engage in a lodestar cross-check, believing it is the single most important backstop against excessive fees in most cases.[5] I am, nonetheless, hesitant to *automatically* conclude that a high multiplier is problematic, particularly on facts such as these. Because this high multiplier is a result of Class Counsel's low quantity of hours, it implies that the lawyers worked with admirable efficiency in producing this huge settlement. To penalize them for that efficiency by lowering the percentage award will simply incentivize class counsel in future cases to churn unnecessary work, thereby raising their hours and lodestar, and lowering the proposed multiplier. That benefits no one, particularly not the underlying class members

---

[4] Importantly, the lodestar multiplier is <u>not</u> high because of unusual billing rates.

[5] *See* 5 William B. Rubenstein, *Newberg on Class Actions* § 15:86 (5th ed. & Supp. 2020) [hereinafter *Newberg on Class Actions*]; *see also Laffitte v. Robert Half Internat. Inc.,* 1 Cal. 5th 480, 504, 376 P.3d 672, 687 (2016) ("We tend to agree with the amicus curiae brief of Professor William B. Rubenstein that these concerns [about the lodestar cross-check] are likely overstated and the benefits of having the lodestar cross-check available as a tool outweigh the problems its use could cause in individual cases.").

awaiting their recovery.  On the other hand, if the multiplier is high, it might in fact reflect an excessive fee, so I am also hesitant automatically to excuse a high multiplier on this "efficiency" rationale.  Balancing these competing concerns, I find that the presence of a high multiplier in this situation – a record settlement, produced efficiently – should not be dispositive one way or the other, but should trigger a closer analysis of some underlying facts.  Thus, in the treatise that I author (*Newberg on Class Actions*), more than five years ago, I set out a "multiplier calculator" to assist courts in broadly assessing the reasonableness of the proposed multiplier.[6]  This calculator synthesizes reported case law and, translating the approach the judiciary has taken into a point system, assigns multiplier points based on the risks counsel took and the results that they achieved.  There I state that risk factors each supporting a <u>one point increase</u> in the multiplier are: (1) unique cases, not based on rote, prior pleadings; (2) cases in which counsel themselves enforce the law and do not simply follow government enforcement actions; and (3) cases in which counsel are solely responsible for the case's costs and cannot share this risk among a larger group of firms.  As discussed below, *see* Part III(D), *infra,* all three of these factors apply here, supporting an increase from a 1 to a 4 multiplier.  On the results side, I report that the law tends to increase multipliers <u>by ½ point</u> according to factors such as: "the ease with which class members are able to receive compensation and, if decipherable, the value of that compensation compared to the value of the claim itself."[7]  Here, all class members can receive relief and they can do so with great ease, meeting the first factor; and the value of each class member's recovery here is also strong relative to the value of the underlying claim *as litigated in the aggregate*, as

---

[6] *Id.* at § 15:87.

[7] *Id.*

5

explained in ¶ 19(a), *infra*.  These results therefore back the additional point in my multiplier, suggesting that my 2015 "calculator" supports a multiplier in the 5 range.  Thus, although the requested multiplier here is high, I am comforted by the fact that [1] the single driver of that height is Class Counsel's efficiency and [2] the principles I set forth in the *Newberg* treatise some years ago independently support a multiplier in the range proposed.  Put simply, it is surely the rare settlement that justifies a lodestar multiplier in the 5 range, but, just as surely, this case is that rare case.

## I.
## BACKGROUND AND QUALIFICATIONS[8]

3.      I am the Bruce Bromley Professor of Law at Harvard Law School.  I graduated from Yale College, *magna cum laude*, in 1982 and from Harvard Law School, *magna cum laude*, in 1986.  I clerked for the Hon. Stanley Sporkin in the U.S. District Court for the District of Columbia following my graduation from law school.  Before joining the Harvard faculty as a tenured professor in 2007, I was a law professor at the UCLA School of Law for a decade, and an adjunct faculty member at Harvard, Stanford, and Yale Law Schools while a litigator in private practice during the preceding decade.  I am admitted to practice law in the Commonwealth of Massachusetts, the State of California, the Commonwealth of Pennsylvania (inactive), the District of Columbia (inactive), the U.S. Supreme Court, six U.S. Courts of Appeals, and four U.S. District Courts.

4.      My principal area of scholarship is complex civil litigation, with a special emphasis on class action law.  I am the author, co-author, or editor of five books and more than a dozen scholarly articles, as well as many shorter publications (a fuller bibliography appears in

---

[8] My full c.v. is attached as Exhibit A.

my appended c.v.).  Much of this work concerns various aspects of class action law.  Since 2008, I have been the sole author of the leading national treatise on class action law, *Newberg on Class Actions*, and I have re-written the entire 10-volume treatise from scratch.  In 2015, I wrote and published a 600-page volume (volume 5) of the Treatise on attorney's fees, costs, and incentive awards; this is the most sustained scholarly treatment of class action attorney's fees and has been cited in numerous federal court fee decisions.  For five years (2007–2011), I published a regular column entitled "Expert's Corner" in the publication *Class Action Attorney Fee Digest*.  My work has been excerpted in casebooks on complex litigation, as noted on my c.v.

5.      My expertise in complex litigation has been recognized by judges, scholars, and lawyers in private practice throughout the country for whom I regularly provide consulting advice and educational training programs.  For each of the past ten years, the Judicial Panel on Multidistrict Litigation (JPML) has invited me to give a presentation on the current state of class action law at the annual MDL Transferee Judges Conference, and I have often spoken on the topic of attorney's fees to the MDL judges.  The Federal Judicial Center invited me to participate as a panelist (on the topic of class action settlement approval) at its March 2018 judicial workshop celebrating the 50th anniversary of the JPML, *Managing Multidistrict and Other Complex Litigation Workshop*.  The Ninth Circuit invited me to moderate a panel on class action law at the 2015 Ninth Circuit/Federal Judicial Center Mid-Winter Workshop.  The American Law Institute selected me to serve as an Adviser on a Restatement-like project developing the *Principles of the Law of Aggregate Litigation*.  In 2007, I was the co-chair of the Class Action Subcommittee of the Mass Torts Committee of the ABA's Litigation Section.  I am on the

Advisory Board of the publication *Class Action Law Monitor*.  I have often presented continuing legal education programs on class action law at law firms and conferences.

6.    My teaching focuses on procedure and complex litigation.  I regularly teach the basic civil procedure course to first-year law students, and I have taught a variety of advanced courses on complex litigation, remedies, and federal litigation.  I have received honors for my teaching activities, including: the Albert M. Sacks-Paul A. Freund Award for Teaching Excellence, as the best teacher at Harvard Law School during the 2011–2012 school year; the Rutter Award for Excellence in Teaching, as the best teacher at UCLA School of Law during the 2001–2002 school year; and the John Bingham Hurlbut Award for Excellence in Teaching, as the best teacher at Stanford Law School during the 1996–1997 school year.

7.    My academic work on class action law follows a significant career as a litigator. For nearly eight years, I worked as a staff attorney and project director at the national office of the American Civil Liberties Union (ACLU) in New York City.  In those capacities, I litigated dozens of cases on behalf of plaintiffs pursuing civil rights matters in state and federal courts throughout the United States.  I also oversaw and coordinated hundreds of additional cases being litigated by ACLU affiliates and cooperating attorneys in courts around the country.  I therefore have personally initiated and pursued complex litigation, including class actions.

8.    I have been retained as an expert witness in roughly 85 cases and as an expert consultant in about another 30 cases.  These cases have been in state and federal courts throughout the United States, most have been complex class action cases, and many have been MDL proceedings.  I have been retained to testify as an expert witness on issues ranging from the propriety of class certification, to the reasonableness of settlements and fees, to the preclusive

8

effect of class action judgments.  I have been retained by counsel for plaintiffs, for defendants,

for objectors, and by courts:

- From 2018–2020, I served as an expert consultant to the Court on complex class action and fees issues in the national opioid MDL, pending in the United States District Court for the Northern District of Ohio.

- In 2017, the United States District Court for the Eastern District of Pennsylvania appointed me as an expert witness on certain attorney's fees issues in the NFL concussion litigation.  In my final report to the Court, I recommended, *inter alia*, that the Court should cap individual retainer agreements at 22%, a recommendation that the Court adopted.[9]

- In 2015, the United States Court of Appeals for the Second Circuit appointed me to argue for affirmance of a district court order that significantly reduced class counsel's fee request in a large, complex securities class action, a task I completed successfully when the Circuit summarily affirmed the decision on appeal.[10]

9.      One of the functions I can provide as an expert witness is to present empirical

evidence of class action practices from other cases.  As part of my scholarly work on class action

law, I have created and maintain a database containing data on more than 1,000 class action

lawsuits.  Specifically, my research assistants coded the data from case reports appearing in the

journal, *Class Action Attorney Fee Digest* (CAAFD).  CAAFD was published monthly from

January 2007 to September 2011 for a total of 57 issues, and reported on 1,187 unique court-

approved state and federal class actions.  For each case, a CAAFD case abstract describes the

awarding court and judge, the subject matter of the dispute, the settlement/judgment benefits, the

attorney fee and expense awards (both as requested by plaintiff's counsel and as approved by the

---

[9] *In re Nat'l Football League Players' Concussion Injury Litig.*, No. 2:12-md-02323-AB, 2018 WL 1658808, at *1 (E.D. Pa. Apr. 5, 2018) ("I adopt the conclusions of Professor Rubenstein and order that IRPAs' fees be capped at 22% plus reasonable costs.").

[10] *See In re IndyMac Mortg.-Backed Sec. Litig.*, 94 F. Supp. 3d 517 (S.D.N.Y. 2015), *aff'd sub nom. DeValerio v. Olinski*, 673 F. App'x 87 (2d Cir. 2016).

court), the case filing and attorney fee award dates, any named plaintiff awards, and miscellaneous data on case and settlement/judgment administration. In creating the database from the CAAFD reports, my research team cross-checked the accuracy of a subset of federal reports against source documents from PACER; we found only one error – an understatement of the settlement benefit value by 2% – in 726 data fields, or fewer than 0.15% of fields. I am therefore confident about the accuracy of the data in my database and use it regularly as a source for my scholarship and expert witness work.

10.    Courts have often relied on expert witness testimony in fee matters.[11]

11.    I have been retained in this case to provide an opinion concerning the issues set forth in the first paragraph, above. I am being compensated for providing this expert opinion. I was paid a flat fee in advance of rendering my opinion, so my compensation is in no way contingent upon the content of my opinion.

12.    In analyzing these issues, I have discussed the case with the counsel who retained me. I have also reviewed documents from this litigation, a list of which is attached as Exhibit B. I have also reviewed the applicable case law and scholarship on the topics of this Declaration.

---

[11] *See, e.g.*, *In re Genetically Modified Rice Litig.*, 764 F.3d 864, 872 (8th Cir. 2014); *In re Nat'l Football League Players' Concussion Injury Litig.*, No. 2:12-md-02323-AB, 2018 WL 1658808, at *4 (E.D. Pa. Apr. 5, 2018); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2017 WL 3175924, at *3 (N.D. Cal. July 21, 2017); *Aranda v. Caribbean Cruise Line, Inc.*, No. 1:12-cv-04069, 2017 WL 1369741, at *5 (N.D. Ill. Apr. 10, 2017), *aff'd sub nom. Birchmeier v. Caribbean Cruise Line, Inc.*, 896 F.3d 792 (7th Cir. 2018); *In re High-Tech Employee Antitrust Litig.*, No. 11-CV-02509-LHK, 2015 WL 5158730, at *9 (N.D. Cal. Sept. 2, 2015); *Asghari v. Volkswagen Grp. of Am., Inc.*, No. 13-CV-02529 MMM, 2015 WL 12732462, at *44 (C.D. Cal. May 29, 2015); *In re Syngenta AG MIR 162 Corn Litig.*, No. 14-md-2591-JWL, 2015 WL 2165341, at *5 (D. Kan. May 8, 2015); *Parkinson v. Hyundai Motor Am.*, 796 F. Supp. 2d 1160, 1172 (C.D. Cal. 2010); *Commonwealth Care All v. Astrazeneca Pharm. L.P.*, No. CIV.A. 05-0269 BLS 2, 2013 WL 6268236, at *2 (Mass. Super. Aug. 5, 2013).

## II.
## THE REMARKABLE SCOPE OF CLASS COUNSEL'S ACHIEVEMENT

13.     Before analyzing the reasonableness of Class Counsel's proposed fee, I found myself wanting to contextualize Class Counsel's achievement in this matter.  Why?  Put simply, my initial reaction to hearing of this settlement was astonishment at the size of the common fund. I thought it had to be the largest data privacy settlement in history.  I have followed class action privacy (often data breach) settlements with interest, particularly as my students and I helped litigate an internet privacy case against Google about a decade ago.[12]  My sense is that most of these types of settlements are far below $100 million and, because they tend to involve enormous class sizes, many are "full *cy pres*" settlements that return no money to class members directly.[13] The first task I therefore assigned my research assistants when I began assessing the reasonableness of Class Counsel's fee request was to check whether empirical evidence of privacy settlements actually supported my gut instinct that this settlement is extraordinary.

14.     I directed my research assistants to review recent (2015 to the present) privacy-related litigation in the federal courts.  Using a neutral search term in Westlaw,[14] they gathered an initial list of 680 cases.  They proceeded to review each case, screening out cases that: (1) did not involve some privacy issue (2) did not result in a finally approved class settlement or (3) did not have sufficiently granular information (*e.g.*, adequate class size estimates) available to permit

---

[12] *In re Google Buzz Privacy Litig.*, No. C 10-00672 JW, 2011 WL 7460099 (N.D. Cal. June 2, 2011) (granting final approval).

[13] For a discussion of full *cy pres* settlements, see 5 *Newberg on Class Actions* § 15:89.

[14] The specific search string used was <"final approval" & "settlement" & ("data breach" "privacy" "Stored Communications Act" "Fair Credit Reporting Act" "Telephone Consumer Protection Act" "Computer Fraud #and Abuse Act" "Health Insurance Portability #and Accountability Act") & DA(aft 12/31/2014)>, which as of October 5, 2020 returned 680 cases.

comparison.  To ensure they had not missed anything, they then checked their Westlaw results with Google searches, identifying three additional settlements not found on Westlaw.[15]  This effort yielded data set of 75 settlements at or above $5 million, from which the information in the following paragraphs is drawn.

15.     We first ranked the 20 largest privacy settlements from largest to smallest, with Table 1, below, reflecting the ranking.

---

[15] These three are: (1) *Edwards v. Hearst Commc'ns, Inc.*, No. 1:15-cv-09279 (S.D.N.Y. Apr. 24, 2019), ECF No. 314; (2) *Bull v. US Coachways, Inc.*, No. 1:14-cv-05789 (N.D. Ill. Nov. 9, 2016), ECF No. 87; and (3) *Medeiros v. HSBC Card & Retail Servs., Inc.*, No. 2:15-cv-09093 (C.D. Cal. Nov. 29, 2017), ECF No. 109.

**TABLE 1**
**LARGEST PRIVACY CLASS SETTLEMENTS SINCE 2015**
**SORTED BY SIZE OF SETTLEMENT FUND**

| # | Case | Settlement |
|---|------|-----------|
| 1 | In re Facebook Biometric Info. Privacy Litig. | $650,000,000 |
| 2 | In re Equifax Inc. Customer Data Sec. Breach Litig. | Max: $505,500,000 Min: $380,500,000 |
| 3 | In re USC Health Ctr. Litig. | $215,000,000 |
| 4 | Jabbari v. Wells Fargo & Co. | $142,000,000 |
| 5 | In re Yahoo! Inc. Customer Data Sec. Breach Litig. | $117,500,000 |
| 6 | In re Anthem, Inc. Data Breach Litig. | $115,000,000 |
| 7 | Ebarle v. Lifelock, Inc. | $80,808,000 |
| 8 | Birchmeier v. Caribbean Cruise Line, Inc. | $76,000,000 |
| 9 | In re Capital One Tel. Consumer Prot. Act Litig. | $75,455,099 |
| 10t | First Choice Fed. Credit Union v. Wendy's Co. | $50,000,000 |
| 10t | Edwards v. Hearst Commc'ns, Inc. | $50,000,000 |
| 12 | Bull v. US Coachways, Inc. | $49,932,375 |
| 13 | Hageman v. AT&T Mobility LLC | $45,000,000 |
| 14 | White v. Experian Info. Sols., Inc. | $44,150,666 |
| 15 | Wilkins v. HSBC Bank Nevada, N.A. | $39,975,000 |
| 16 | In re Easysaver Rewards Litig. | $38,000,000 |
| 17 | Hooker v. Sirius XM Radio, Inc. | $35,000,000 |
| 18 | Gehrich v. Chase Bank USA, N.A. | $34,000,000 |
| 19 | In re Premera Blue Cross Data Breach Litig. | $32,000,000 |
| 20 | In re the Home Depot, Inc. Data Breach Litig. | $28,444,056 |

16.    Table 1 shows that, in terms of raw value, this settlement is in a class of its own.

The second settlement on the list (the Equifax data breach) is deceptively close, as the vast bulk

of the settlement was allotted to credit monitoring, not direct cash payouts to class members.[16]

---

[16] This is true of several other data breach settlements on the list: for example, the $115 million valuation of the Anthem settlement is primarily attributable to credit monitoring, as the settlement set a cap of $15 million on reimbursement of out-of-pocket costs and $13 million for cash payments for class members who already had credit monitoring.  *See* Settlement Agreement at §§ 5.3, 6.4, *In re Anthem, Inc. Data Breach Litig.*, No. 5:15-md-02617 (N.D. Cal. Dec. 1, 2017), ECF No. 916-20.  Similarly, the Home Depot settlement set aside $6.5 million for credit-monitoring type services and the $13 million cash component required reasonable documentation

The third settlement on the list is less than a third the size of this settlement, and the numbers decrease rapidly thereafter: more than half of the top 20 settlements did not secure even 10% of the amount of this settlement.

17.     Raw settlement size can be deceiving if the size of the underlying class varies across the settlements.  Accordingly, we next aimed to assess settlements in terms of the amounts returned per class member, focusing on settlements with more than one million class members.[17] We did so by simply dividing the size of the common fund by the number of class members.[18] Table 2 reports the results of this comparison.[19]

---

of substantiated losses.  *See* Settlement Agreement & Release, *In re The Home Depot, Inc., Customer Data Sec. Breach Litig.*, No. 1:14-md-02583 (N.D. Ga. Mar. 7, 2016), ECF No. 181-2.

[17] We limited this comparison to cases involving classes encompassing one million or more members because recovery-per-class-member varied rather significantly depending upon the size of the class.  Nonetheless, as set forth below, *see infra* note 20, this settlement fares well per class member against the full data set.

[18] This analysis does not account for potentially different claiming rates across the cases, but that data is rarely available, *see* Nicholas M. Pace & William B. Rubenstein, *Shedding Light on Outcomes in Class Actions*, *in* CONFIDENTIALITY, TRANSPARENCY, AND THE U.S. CIVIL JUSTICE SYSTEM 20 (Joseph W. Doherty, Robert T. Reville & Laura Zakaras eds., 2012) (with Nicholas M. Pace) (describing absence of data on claiming rates), and we had no reason to believe it would vary so significantly from case to case as to significantly alter our conclusions.

[19] The class size estimate for this settlement was drawn from the Plaintiffs' Motion for Class Certification at 6, *In re Facebook Biometric Info. Privacy Litig.*, No. 3:15-cv-03747-JD (N.D. Cal. Dec. 8, 2017), ECF No. 255.

**TABLE 2**
**HIGHEST PER-CLASS-MEMBER RECOVERY**
**IN PRIVACY SETTLEMENTS WITH CLASS SIZES OF ONE MILLION**
**OR MORE (SINCE 2015)**

| # | Case | Per Member |
|---|------|------------|
| 1 | In re Facebook Biometric Info. Privacy Litig. | $93.64 |
| 2 | Birchmeier v. Caribbean Cruise Line, Inc. | $73.05 |
| 3 | Jabbari v. Wells Fargo & Co. | $52.01 |
| 4 | In re Easysaver Rewards Litig. | $29.23 |
| 5 | Snyder v. Ocwen Loan Servicing | $14.75 |
| 6 | Edwards v. Hearst Commc'ns, Inc. | $12.75 |
| 7 | Ebarle v. Lifelock, Inc. | $12.43 |
| 8 | Hashw v. Dep't Stores Nat'l Bank | $10.42 |
| 9 | In re Uber FCRA Litig. | $7.91 |
| 10 | Medeiros v. HSBC Card Servs. | $7.53 |
| 11 | Wright v. Nationstar Mortg. LLC | $5.16 |
| 12 | Bowman v. Art Van Furniture. Inc. | $5.03 |
| 13 | Lee v. Global Tel*link Corp. | $4.90 |
| 14 | Vasco v. Power Home Remodeling LLC | $4.71 |
| 15 | Charvat v. Resort Mktg. Grp., Inc. | $4.55 |
| 16 | Wilkins v. HSBC Bank Nevada, N.A. | $4.41 |
| 17 | In re Capital One Tel. Consumer Prot. Act Litig. | $4.31 |
| 18 | Duncan v. JPMorgan Chase Bank, N.A. | $4.13 |
| 19 | Markos v. Wells Fargo Bank, N.A. | $3.96 |
| 20 | In re Equifax Inc. Customer Data Sec. Breach Litig. | $3.44 |

18.     Table 2 again shows the extraordinary achievement here: compared to other large-class privacy settlements, the recovery per class member here is about 30% higher than the next closest settlement, nearly twice the size of the second closest, and more than three times the size of the third closest.[20]   Fifteen of these cases return less than $15 per member, while this settlement returns close to $100.

---

[20] As noted above, *see supra* note 17, we limited the comparison set to settlements with large class sizes, but it hardly mattered.  When we compared the per-class-member recovery here to

19.     There are two other comparatives that we considered and found inapposite, for somewhat interlocking reasons.

a.     *First*, we considered comparing the recovery per class member in this case to the potential recovery of statutory damages.  This comparison would enable a conclusion that counsel secured some specific percentage of the potential statutory relief – and we could then compare how they did to how class counsel have done in other statutory damage cases.  There were two problems with this analysis, one practical and one conceptual.  The practical problem is that assigning a set statutory damage to cases is not a straightforward task.  Statutory damages vary from statute to statute, within each statute they might vary according to degree of the wrong or the number of harms, and many cases may start with allegations under multiple statutes enabling statutory damages.  More conceptually, comparing individual recoveries in statutory damage class actions to individual statutory damage awards is an apples-to-oranges comparison.  Why?  I am not aware of any class action case in which (a) a class of significant size such as this one was certified and a case then (b) tried to a judgment awarding something akin to (full) statutory damages to each class member.  The numbers would be so staggering in such a situation, some courts (though not the Ninth Circuit)[21] have taken the position that classes cannot

---

the cases in Table 1 – representing the 20 largest privacy settlements in terms of raw value – it was still the fifth highest.  The four settlements with larger recoveries per class member all involved significantly smaller class sizes: the first three involve classes between 5,000–16,000 members, while the fourth involved a class of 143,000 members, about 2% the size of the present class.  Moreover, the numbers fell quickly in the comparison, with half of the top 20 cases returning less than $5 per class member.  When compared to our full dataset of 75 privacy settlements, this settlement falls in the top quartile and is about nine times greater than the median per-class-member recovery ($10.42).

[21] *Bateman v. American Multi-Cinema, Inc.*, 623 F.3d 708 (9th Cir. 2010).

be certified for statutory damages.[22]   A step back helps clarify why: both the class action device itself and statutory damage awards are mechanisms meant to enable litigation (so as to deter wrongdoing) in cases involving small or difficult-to-calculate harms.   The two devices are rarely combined – individuals pursuing their own cases, or small-group/class cases, might receive 100% statutory damage awards, but when a class of millions is assembled, the flat amount of the statutory damage award may no longer be the appropriate measuring stick for each class member's relief.   Again, some courts have seen that as a reason not to certify a class – finding that a class action is not a "superior" form of adjudication in these circumstances[23] – but that conclusion is unfortunate: left to individual actions, maybe a few dozen class members here would actually collect $1,000, penalizing Facebook a few thousand dollars.   The class suit is the only meaningful deterrent, and it surely hits that mark in disgorging Facebook of $650 million, but that large a collective recovery necessarily breaks down to smaller amounts per class member.   Thus the best approach to statutory damage *class actions* involving large classes, one endorsed by the Eighth Circuit, is to enable class certification but simultaneously to ensure that the total damage award is not so excessive as to violate the Due Process Clause; in the pertinent Eighth Circuit case, the District Court achieved this end by reducing a $500 statutory damage award for a class of about three million to $10, yielding a $32 million total judgment.[24]   In sum,

---

[22] The classic case is *Ratner v. Chemical Bank New York Trust Co.*, 54 F.R.D. 412 (S.D.N.Y. 1972).  For a listing of the many other cases on point, discussion and critique, see 2 *Newberg on Class Actions* § 4:83 & n.13.

[23] For a listing, see 2 *Newberg on Class Actions* § 4:83 n.13.

[24] *See Golan v. Veritas Entm't, LLC*, No. 4:14CV00069 ERW, 2017 WL 3923162 (E.D. Mo. Sept. 7, 2017), *aff'd sub nom. Golan v. FreeEats.com, Inc*., 930 F.3d 950 (8th Cir. 2019).

aiming to compare the per-class-member recovery in a class action involving a seven million member class to individual statutory damage amounts is not a pertinent mode of analysis.

b.    *Second*, the analysis from the last sub-paragraph also helps explain why comparing this settlement to settlements under Illinois's Biometric Information Privacy Act (BIPA) is not particularly enlightening.  While we focused on a comparison set of cases litigated in federal court, as this case is a BIPA case, we also reviewed a set of about 50 BIPA cases primarily litigated in state court.  We concluded that the BIPA settlements did not provide a particularly useful comparison for three reasons:  (1) most of the BIPA cases involved employees suing their employers for collecting biometric data (*e.g.*, finger scans) without their consent;[25] (b) the class sizes were therefore relatively miniscule (only one case had more than 10,000 class members and the vast bulk had fewer than 1,000); and (3) the resulting settlement funds accordingly much smaller in size than this settlement (the largest to date only about 1% the size of this fund).[26]  For the reasons outlined in the prior sub-point, these cases returned a higher recovery per class member than this case, but given our findings that the raw size of this settlement fund and of its class are both so distant from any of the BIPA settlement funds or class sizes, those per-class-member recoveries do not shed much light on the strength of Class Counsel's achievement.

---

[25] *See, e.g.*, Final Judgment & Order of Dismissal with Prejudice at ¶ 3, *Fluker v. Glanbia Performance Nutrition Inc.*, No. 2017-CH-12993 (Ill. Cir. Ct. Aug. 25, 2020) (certifying settlement class of the defendant's current and former employees who used a finger scan for timekeeping purposes); Final Judgment & Order of Dismissal with Prejudice at ¶ 3, *Lloyd v. Xanitos, Inc.*, No. 2018-CH-15351 (Ill. Cir. Ct. July 25, 2019) (similarly certifying employee class).

[26] *See Prelipceanu v. Jumio Corp.*, No. 2018-CH-15883 (Ill. Cir. Ct. July 21, 2020) (approving a $7 million settlement).

20.     In my qualitative assessment of the reasonableness of the proposed fee award, I return to analyze the results Class Counsel achieved for the class.  *See* Part III(D), *infra*.  This preliminary analysis, however, has convinced me that my gut instinct about this settlement was accurate: the sheer size of the settlement is totally unparalleled, as is its recovery per class member, especially when compared to large class settlements.  Put simply, this is a milestone class action settlement.  This review helps contextualize the analysis of the proposed fee that follows.

## III.
### THE REQUESTED FEE IS REASONABLE

21.     This Court has recently articulated the legal standard for a fee petition as follows:

> District courts in the Ninth Circuit use either the "percentage-of-the-fund" or the "lodestar" method in calculating fees in common fund settlements. Using either method, the ultimate inquiry is whether the end result is reasonable. Where there is an easily quantifiable benefit to the class—namely, the cash recovery achieved through the settlement—the percentage of the fund approach is appropriate. Indeed, the percentage-of-the-fund method is *preferred* when counsel's efforts have created a common fund for the benefit of the class. . . . Courts in the Ninth Circuit applying the "percentage of the fund" approach use a twenty-five percent benchmark. Selection of the benchmark or any other rate, however, must be supported by findings that take into account all of the circumstances of the case. The benchmark is subject to adjustment—upward or downward—based on the Court's analysis of the factors the Ninth Circuit considered in *Vizcaino*: (1) the results achieved for the class; (2) the complexity of the case and the risk of and expense to counsel of litigating it; (3) the skill, experience, and performance of counsel on both sides; (4) the contingent nature of the fee; and (5) fees awarded in comparable cases.[27]

Following this Court's approach in applying Ninth Circuit fees law, the following sections consider the reasonableness of Class Counsel's requested percentage (Part III(A), *infra*); their

---

[27] *In re Capacitors Antitrust Litig.*, No. 3:17-md-02801-JD, 2018 WL 4790575, at *2–3 (N.D. Cal. Sept. 21, 2018) (Donato, J.) (citations and internal quotation marks omitted).

proposed hourly rates (Part III(B), *infra*); their total hours (Part III(C), *infra*); and their proposed

multiplier, in quantitative and qualitative (risks and results) terms (Part III(D), *infra*).

**(A)**
***The Requested Fee is Significantly Below the Ninth Circuit's 25% Benchmark,***
***While at the High End of Percentages in Larger Fund Cases***

22.     Class Counsel seek a fee constituting 20% of the original $550 million settlement

amount.  They seek no additional fee from the extra $100 million added to the common fund

following the Court's rejection of the initial preliminary approval motion.[28]

23.     Class Counsel's requested 20% is in the appropriate range of percentage awards

generally and at the high end of the range of percentages awarded in larger fund cases like this,

as shown by several independent indicia:

- In the Ninth Circuit, 25% is the benchmark, or normal, fee.[29]

- Empirical research from one study demonstrated that, in common fund cases between 1993–2008, the mean percentage award in the Ninth Circuit was 25%[30] and in the Northern District of California specifically, 26%.[31]

- Empirical research from a second study demonstrated that, in common fund cases between 2009–2013, the mean percentage award in the Ninth Circuit was 26%[32] and in the Northern District of California specifically, also 26%.[33]

---

[28] As I explained above, *see* note 2, *supra,* it is nonetheless plausible to view Class Counsel's proposed fee as 16.9% of the $650 million total fund and, of course, that alternative framing only bolsters the conclusions I reach herein.

[29] *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047–48 (9th Cir. 2002).

[30] *See* Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical Legal Stud. 248, 260 tbl.4 (2010) [hereinafter "Eisenberg & Miller II"].

[31] *See id.* at 259 tbl.3.

[32] Theodore Eisenberg, Geoffrey Miller & Roy Germano, *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. Rev. 937, 951 tbl.3 (2017) [hereinafter "Eisenberg & Miller III"].

[33] *Id.* at 950 tbl. 2.

- Empirical research from a third study demonstrated that the mean award for all settlements in the Ninth Circuit in a two-year period (2006–2007) was 23.9%.[34]

- Empirical research shows that in 16 of the 20 largest privacy settlements over the past five years (discussed in the prior section), the mean percentage award was 25.3% and the median 23.97%.[35]

- Empirical research demonstrates that percentage awards tend to decrease as the size of the fund increases.[36]  While the effect is easily demonstrated in the aggregate,[37] pinning down percentage awards for this level of settlement is more difficult given that relatively few settlements reach this magnitude.  One study divided settlements by size into ten tranches and found that the mean award in the top tranche (settlements over $175.5 million) was 12%;[38] a later version of that study, using the same methodology, found that the mean award for the top tranche (settlements over $67.5 million) was 22.3%.[39]  A third study, using the same methodology, found that the mean award in the top tranche was 18.4% (settlements over $72.5 million).[40]  That third study then broke the top tranche into five sub-tranches, with the three middle tranches reflecting mean awards of 17.9% ($100–$250 million), 17.8% ($250–$500 million) and 12.9% ($500 million–$1 billion); while the last data point is most closely correlated with the size of this settlement, it reflects only two underlying data points.[41]

- In my own dataset (described in ¶ 9 above), there are 11 similarly sized settlements ($400–$800 million), with the average percentage award across 10 of

---

[34] Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Stud. 811, 836 tbl.9 (2010).

[35] We were not able to pin down a percentage award in three of the cases and the fourth missing case among the top 20 is this case.

[36] This is referred to as the "mega-fund" or "mega-case" concept. *See* 5 *Newberg on Class Actions* § 15:81.

[37] *See id.* Graphs 1–2.

[38] Eisenberg & Miller II, *supra* note 30, at 265 tbl.7.

[39] Eisenberg & Miller III, *supra* note 32, at 948 & fig.5.

[40] Fitzpatrick, *supra* note 34, at 839 tbl.10.

[41] *Id.* at 839 tbl.11.

these settlements being 16.0% and the percentage award in the median case of the 10 being 15.5%.[42]

24.    These data points support the conclusions that Class Counsel's requested fee of 20% of the common fund is below the Ninth Circuit benchmark, below the actual awards in Northern District and Ninth Circuit cases, below the percentages awarded in other large privacy cases, and somewhat higher than the percentages awarded in so-called mega-fund cases.

**(B)**
***The Requested Hourly Rates Are Reasonable***

25.    The *Manual for Complex Litigation* states:

> What constitutes a reasonable hourly rate varies according to geographic area and the attorney's experience, reputation, practice, qualifications, and customary charge. The rate should reflect what the attorney would normally command in the relevant marketplace.[43]

Two sets of related data demonstrate the reasonableness of the requested rates: a comparison of the rates sought to the rates approved by courts in the Northern District of California in 2019 (¶¶ 26–30, *infra*); a comparison of Class Counsel's blended lodestar to rates approved by courts in the Northern District in 2019 (¶¶ 31–32, *infra*).

26.    For purposes of this Declaration, I directed my research assistants to create a database of Northern District of California fee rates to serve as an empirical basis by which to assess the reasonableness of Class Counsel's proposed rates.  Using the Federal Judicial Center's

---

[42] I have excluded the 11th case because the percentage award was calculated against potential benefits to a class in a way that amounted to 0.2% of those potential benefits.

[43] *Manual for Complex Litigation (Fourth)*, § 14.122 (2004) (citing *Blum v. Stenson*, 465 U.S. 886, 895 (1984) ("'[R]easonable fees' . . . are to be calculated according to the prevailing market rates in the relevant community . . . ."); *Lindy Bros. Builders, Inc. of Phila. v. Am. Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 167 (3d Cir. 1973)).

database listing all civil cases terminated in a given year,[44] my research assistants identified (a) all class actions (b) terminated in the Northern District with (c) judicially approved settlements in 2019. They then reviewed the order granting approval of class counsel's fees to see if the fees included lodestar data and, if so, to see if the judge *explicitly* approved the proposed billing rates. This process yielded 19 total cases, listed in Exhibit D; no cases meeting these criteria were discarded. My team then reviewed class counsel's lodestar submissions in each of the 19 cases and found that they encompassed a total of 166 individual hourly rates, 164 of which we employ in our analysis.[45] We adjusted all these rates to August 2020 dollars using the U.S. Bureau of Labor Statistics' Producer Price Index-Office of Lawyers (PPI-OL) index.[46]

27.     Once each timekeeper's experience level had been identified and all of the dollar amounts had been set at 2020 levels, we plotted the rates on an x-y axis, with the x-axis representing the years since the timekeeper's admission to the bar and the y-axis representing the timekeeper's hourly rate. The resulting scatter plot, set forth below in Graph 1, provides a snapshot of judicially approved hourly rates in 2019 Northern District of California class actions.

---

[44] *Civil Cases Filed, Terminated, and Pending from SY 1988 to Present*, Federal Judicial Center, https://www.fjc.gov/research/idb/civil-cases-filed-terminated-and-pending-sy-1988-present.

[45] As explained below, we plot the rates according to an attorney's year of admission to the bar; for two of the 166 total rates, we were unable to verify the attorney's admission year and accordingly did not utilize the associated rates.

[46] This price database can be accessed here: https://www.bls.gov/ppi/#data. To specifically access the PPI-OL, first click on "One Screen" in the "Industry Data" row below "PPI Databases." Then select "541110 Offices of lawyers" as the industry and "541110541110 Offices of lawyers" as the product.

**GRAPH 1**
**JUDICIALLY APPROVED HOURLY RATES IN 2019 N.D. CAL. CLASS ACTIONS**



28.     I next directed my research assistants to similarly plot the rates utilized by Class

Counsel in this matter.  Class Counsel supplied us with spreadsheets containing the names of 56

professionals (non-paralegals), their year of admission to the bar, and their proposed hourly

rates.[47]  We plotted these rates onto the same type of x-y axis that we had employed for the

Northern District of California comparison set.  The resulting scatter plot, set forth below in

Graph 2, provides a snapshot of Class Counsel's proposed billing rates, with the red logarithmic

trend line sketching the trend of Class Counsel's rates across experience levels.

---

[47] Class Counsel utilize their current rates for all time spent in the litigation. The law supports
using current rates as "an appropriate adjustment for delay in payment." *Missouri v. Jenkins*,
491 U.S. 274, 283–84 (1989).

**GRAPH 2**
**CLASS COUNSEL'S PROPOSED HOURLY RATES**



29.    Finally, we aggregated the data from Graphs 1 and 2 onto a single scatter plot that indicates the judicially approved rates in the Northern District of California with blue dots and a blue logarithmic line and Class Counsel's proposed rates with red dots and a red logarithmic line. These data appear in Graph 3, below.

25

## GRAPH 3
## CLASS COUNSEL'S PROPOSED HOURLY RATES



30.    As Graph 3 demonstrates, the two logarithmic trend lines track one another somewhat closely.  For lawyers with 12 years of experience or less, Class Counsel's trend line lies below the trend line for rates in approved Northern District of California class action fee petitions.  For more senior lawyers, Class Counsel's trend line rises above the trend line for the comparison group.  Specifically, the proposed rates for 25 of Class Counsel's 56 timekeepers are below the Northern District trend line; on average, Class Counsel's trend line is 11.1% below the approved rate trend line at those 25 points.  For the 31 timekeepers whose rates are above the trend line, Class Counsel's trend line is, on average, 8.0% above the comparison trend line at those 31 points.  When the differences between the trend lines are compared at all 56 points,

Class Counsel's trend line is, on average, 1.2% above the trend line for rates approved in Northern District of California class action fee petitions.  That Class Counsel are charging rates slightly higher than the norm is not surprising: these firms are among the leading class action law firms in the United States, the lawyers who worked on this case possess years of experience, have track records of success, and can be counted among the elite of the profession generally and this area of law specifically; by contrast, the 2019 comparison set generally encompasses much smaller class actions (not one settled for more than $30 million), typically litigated by more local attorneys specializing in discrete areas like wage-and-hour cases (35% of the comparison cases are wage-and-hour cases).

31.    In addition to assessing the hourly rates of each lawyer, we also reviewed Class Counsel's blended lodestar.  The blended lodestar is calculated by taking the total lodestar and dividing it by the total number of hours worked by all of the timekeepers (partners, associates, paralegals, etc.) in the case.  The resulting number provides the cost of an average hour expended on the case.  We reviewed the blended lodestar in this matter by comparing it to the blended lodestars in the 19 cases described in the prior paragraphs.  The blended lodestar rate in the comparison cases (again adjusted to 2020 dollars) ranged from a low of $325/hour to a high of $885/hour, with a median rate of $607.  This is reflected in the Graph 4, below, with the blended lodestar in this case ($688) highlighted in red and the median rate represented by the orange horizontal bar.

**GRAPH 4**
**CLASS COUNSEL'S BLENDED LODESTAR COMPARED TO BLENDED**
**LODESTARS IN N.D. CAL. COMPARISON SET**



32.     As the Court can see, the blended rate in this case is on the higher end of the graph – about 13% above the median rate – but it is closer to the next lower grouping and median rate than it is to the two largest rates.  A higher-than-average blended lodestar is typically attributable to the fact that there are more partner hours spent on a case than associate hours, often, for example, where there is not a mound of routine document review, but a host of tricky legal questions.   That characterization fits this case in comparison to some other high-profile/large-settlement cases in which I have served as an expert, such as the Volkswagen Clean Diesel matter.  Drilling down on the data, we also found that the primary component of the higher blended rate here is that the lawyers who worked on this case simply have more experience than the lawyers who worked on the comparable cases: the average experience for lawyers in this case is 18.9 years, while the average experience for lawyers in the comparison set is 14.1 years.  When we weighted those averages based on how the work was distributed (that is, how many hours each lawyer billed), we found that the average hour in the comparison set

decreased by less than 1% (14.1 to 14.0 years), while the average hour here dropped by 16% (18.9 to 15.8). That suggests that while the lawyers in this case have more experience than the lawyers in the comparison case, the experienced partners here also delegated work appropriately.

33.    In sum, the hourly rates Class Counsel utilize are entirely consistent with the rates judges in this District explicitly approved in overseeing class action settlements in 2019, and the average, or blended, hourly rate – while above the median – appropriately reflects the level of lawyering required for a case of this magnitude.

## (C)
### *The Total Amount of Hours Billed is Reasonable*

34.    Counsel are entitled to be compensated for reasonable time spent at all points in the litigation. Courts are cautioned to avoid engaging in an "*ex post facto* determination of whether attorney hours were necessary to the relief obtained."[48] The issue "is not whether hindsight vindicates an attorney's time expenditures, but whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures."[49]

35.    I examined the hours that Class Counsel billed in two ways: *first*, by a quantitative comparison to the hours expended in similarly large cases (¶ 36, *infra*); and *second*, by a qualitative analysis of the tasks undertaken (¶ 37, *infra*).[50]

---

[48] *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992).

[49] *Id.*; *accord League of Residential Neighborhood Advocates v. City of Los Angeles,* 633 F. Supp. 2d 1119, 1133 (C.D. Cal. 2009) (noting that litigant's brief quoted language from *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992), and approving time expended).

[50] Class Counsel did not provide me – nor did I ask to see – a breakdown of each hour expended, as such a fine-grained lodestar audit is not required for purposes of the lodestar cross-check. As this Court has noted, "[T]he lodestar cross-check calculation need entail neither mathematical precision nor bean-counting. The district courts may rely on summaries submitted by the

36.   *Quantitative Assessment.*   To analyze the hours Class Counsel expended on this case, I determined that the data set of 2019 Northern District of California class action approvals was unhelpful, as none of those cases exceeded $30 million in recovery.   Those cases therefore do not helpfully address the question of how many hours it might take lawyers to achieve a $650 million settlement.   Accordingly, I directed my research assistants to gather data from our own database (*see* ¶ 9, *supra*) of the hours expended in cases with settlements of comparable size. Our database contained 11 cases with settlements sizes ranging from $400 million to $800 million; the cases with the most and fewest hours had data so out of proportion to the other nine cases we excluded them from the following analysis (had we kept them in the database, the conclusions below regarding Class Counsel's efficiency would only be bolstered).   The hours in these cases ranged from 39,347 to 309,538.   Graph 5 below shows the how the total hours in this case compare to the total hours in the set of comparably sized settlements.

---

attorneys and need not review actual billing records." *In re Capacitors Antitrust Litig.*, No. 3:14-CV-03264-JD, 2017 WL 9613950, at *6 (N.D. Cal. June 27, 2017) (Donato, J.) (quoting *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306–07 (3d Cir. 2005)); *see Goldberger v. Integrated Res., Inc.,* 209 F.3d 43, 50 (2d Cir. 2000) ("[W]here used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court.").

**GRAPH 5**
**TOTAL HOURS BILLED IN COMPARABLY SIZED CLASS SETTLEMENTS**



37.     As the Court can readily see, Class Counsel's total hours (represented by the red bar) fall at the lowest range of these comparably sized settlements. This dispels any concerns that Class Counsel padded their lodestar and suggests that they performed their duties efficiently. Indeed, the average number of hours across the nine cases was 124,733 and the median case was 70,600. In this case, Class Counsel billed 30,128 hours to produce a comparably sized settlement. That means Class Counsel produced a settlement of comparable size in about a quarter of the time of the nine-case average across the comparison group and in less than half the time of the median case in the comparison group. The cross-check not only shows that they did not pad their hours, it suggests they did the opposite: securing an enormous settlement with remarkable efficiency.

31

38.     *Qualitative Assessment.*  Class Counsel initially filed a complaint in May 2015, over five years ago.  Given the research that precedes the filing of that complaint, I estimate that the firms worked on this matter for about 5.5 years.   In that time, Class Counsel have cumulatively logged about 30,000 hours of time, or roughly 5,455 hours/year, or the equivalent of 2.5 lawyers working close to full time (2,182 hours/year)[51] on the case throughout its duration. A review of the various aspects of Class Counsel's work in this case supports the conclusion that these activities would have easily kept 2.5 lawyers busy full time for 5.5 years.  These activities included:

- Identifying and understanding the defendant's practices of collecting, storing, and using biometric information, and undertaking all the factual investigation required before filing a detailed complaint in court;

- Linking that factual investigation to the proper legal claims by researching relevant legal precedents under state and federal law;

- Screening potential clients and securing retention;

- Preparing, filing, and serving the initial complaints, ensuring compliance with the pleading standards of Rule 8 and Rule 12, as interpreted by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007);

---

[51] Roughly speaking, 2,200 hours/year may be considered as one lawyer working "full time." Data support this reference.  The National Association for Law Placement (NALP)'s most recent data available online, published in February 2012, reflect the hours billed by firms in 2009 and 2010.  *Number of Associate Hours Worked Increases at Largest Firms*, NALP (Feb. 2012), http://www.nalp.org/billable_hours_feb2012. Those data show that, for lawyers at the largest firms (700+ lawyers), about 2/3 billed more than 2,200 hours/year, and the average number of hours billed in 2010 was 2,208.  These data are a good referent in that Class Counsel litigated this case against large law firms similar to those included in the NALP study.  To compete with firms equipped with such significant expertise and resources, Class Counsel likely billed at least the number of hours they did in defending this case.

- Responding, successfully, to an initial motion to dismiss and motion for summary judgment concerning choice-of-law issues and the application of the Illinois Biometric Information Privacy Act to the software program at issue;

- Responding, successfully, to a subsequent motion to dismiss for lack of subject-matter jurisdiction based on the intervening Supreme Court decision in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016);

- Litigating several motions for summary judgment, involving issues such as Illinois's extraterritoriality doctrine, the dormant Commerce Clause, and whether the defendant's purported BIPA violations were negligent;

- Identifying, lobbying against, and help to deter proposed amendments to BIPA, including an amendment that's retroactive effect would have ended this case;

- Undertaking discovery, including taking several lengthy and technical depositions;

- Identifying these experts and working with them to produce expert reports in conjunction with the class certification motions, including taking and defending expert depositions;[52]

- Researching, drafting, filing, and serving a consolidated amended complaint;

- Researching, drafting, filing, and litigating a motion for class certification;

- Defending the class representatives' depositions in conjunction with the class certification motion;

- Arguing, successfully, the class certification motion before this Court;

- Defending, successfully, this Court's orders regarding Article III standing and class certification before the Ninth Circuit;

---

[52] The complexities and novelty of the experts' testimony in this matter is reflected in the brief Facebook filed in support of the proposed settlement. Facebook's Supplemental Brief in Support of Preliminary Approval of the Settlement, *In re Facebook Biometric Info. Privacy Litig.*, No. 3:15-cv-03747-JD (N.D. Cal. May 8, 2020), ECF No. 447. There, Facebook leads the Court through the question of whether "Facebook's facial recognition technology collects a 'scan of face geometry' under BIPA," *id.* at 4–5, and in doing so, recounts the experts' testimony in terms that require significant redactions of confidential information.

- Preparing the case for trial, including *in limine* motions, mock trials, and focus group work;

- Responding, again successfully, to several voluminous motions concerning attempts to disqualify or limit testimony of plaintiffs' expert witnesses;

- Engaging in several rounds of mediation to produce a settlement, including the 11-hour mediation with former U.S. Ambassador Jeffrey Bleich that produced an agreement in principle for the initial $550 million settlement;

- Helping to memorialize and document the settlement terms in a final settlement agreement, including releases of liability, class action notices, and claim forms;

- Shepherding the settlement agreement through a contested preliminary approval process.

39.     The range and depth of Class Counsel's efforts set forth in the prior paragraph adds important context to the low number of hours they expended on the case.  That low number, standing alone, might have suggested that they got lucky with a strong merits case and simply "mailed in" a quick settlement.  The qualitative review of Class Counsel's work demonstrates precisely the opposite: this was hard-fought litigation, prepared all the way to the brink of trial in this Court and fought in the Ninth Circuit as well.  The outcome was never inevitable, and Class Counsel should be commended not just for achieving it, but for achieving it so efficiently.

40.     In sum, the combination of the low quantity of total hours relative to other settlements of this magnitude and the qualitative review of Class Counsel's efforts easily support the conclusion that the hours expended were reasonable.  Indeed, these data, combined with the outcome, show that Class Counsel achieved a monumental settlement in an expeditious fashion. This fact becomes critical in assessing the magnitude of their lodestar multiplier, a task to which I now turn.

**(D)**
*A Lodestar Enhancement Is Appropriate and*
*the Requested Multiplier, While on the High Side, Is in the Range of Multipliers*
*Justified in the Extraordinary Circumstances Presented Here*

41.     Class Counsel's $110 million fee request constitutes a fee about 5 times higher than their lodestar.[53]

42.     Class action attorneys serve a critical social function in pursuing legal claims worth less than the cost of litigation (so-called "negative value claims"),[54] a function captured by the title "private attorneys general."[55]   Fees are what incentivize an attorney to set up an entire legal practice around the pursuit of such negative value claims.   Yet if the contingent fee attorney were paid at only her hourly rate, she would have no incentive to invest her time and money in a client's case – she would take the far less risky path of representing clients who could presently pay her on an hourly basis, as most corporate counsel are paid.

43.     The California Supreme Court has summarized the point by quoting two commentators:

> A contingent fee must be higher than a fee for the same legal services paid as they are performed.   The contingent fee compensates the lawyer not only for the legal services he renders but for the loan of those services.   The implicit interest rate on such a loan is higher because the risk of default (the loss of the case, which

---

[53]  At present, the fee is a 5.31 multiple of Class Counsel's lodestar, but Class Counsel's work will continue through the culmination of the claiming process here and may encompass appellate work if there are objectors who appear, lose, and appeal.   (This is all separate and apart from time spent on the fee petition and/or defending the fee petition here or on appeal, which would not appear in Class Counsel's lodestar in a common fund case.)   The final lodestar multiplier will be closer to 5 and my analysis proceeds on that basis, particularly as the cross-check is not meant to be an exact science.   *See supra* note 50.

[54]  For a discussion, see William B. Rubenstein, *Why Enable Litigation: A Positive Externalities Theory of the Small Claims Class Action*, 74 U.M.K.C. L. Rev. 709 (2006).

[55]  For a discussion, see William B. Rubenstein, *On What a "Private Attorney General" Is – And Why It Matters*, 57 Vand. L. Rev. 2129 (2004).

cancels the debt of the client to the lawyer) is much higher than that of conventional loans.[56]

A lawyer who both bears the risk of not being paid and provides legal services is not receiving the fair market value of his work if he is paid only for the second of these functions.  If he is paid no more, competent counsel will be reluctant to accept fee award cases.[57]

44.     The Ninth Circuit has similarly embraced the multiplied fee, noting that:

[C]ourts have routinely enhanced the lodestar to reflect the risk of non-payment in common fund cases.  This mirrors the established practice in the private legal market of rewarding attorneys for taking the risk of nonpayment by paying them a premium over their normal hourly rates for winning contingency cases.  In common fund cases, attorneys whose compensation depends on their winning the case must make up in compensation in the cases they win for the lack of compensation in the cases they lose.[58]

45.     As the lodestar cross-check has long been a part of class action fee jurisprudence, there are numerous court opinions utilizing it in assessing proposed fees.  Scholars have long studied the data from these cases and they have reported on them in a handful of oft-cited empirical studies published in the past quarter century.  The studies each survey hundreds of instances of lodestar cross-check application and cumulatively cover thousands of cases across several decades.

---

[56] *Ketchum v. Moses*, 17 P.3d 735, 742 (Cal. 2001) (quoting Richard A. Posner, *Economic Analysis of Law* 534, 567 (4th ed. 1992)) (internal quotation marks omitted).

[57] *Id.* (quoting John Leubsdorf, *The Contingency Factor in Attorney Fee Awards*, 90 Yale L.J. 473, 480 (1981)) (internal quotation marks omitted).

[58] *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002) (internal quotation marks and citations omitted).

46.     The empirical evidence that emerges from the studies is generally consistent in showing that the average percentage fee award embodies a positive lodestar multiplier.[59]   In the five studies with pertinent data, the average lodestar multiplier ranged from 1.42 to 3.89.

## TABLE 4
## EMPIRICAL DATA ON LODESTAR MULTIPLIERS IN ALL CASES

|  | YEARS STUDIED | CASES WITH MULTIPLIER DATA | AVERAGE MULTIPLIER |
|---|---|---|---|
| Rubenstein & Krishna[60] | 2006–2011 | 790 | 1.42 |
| Eisenberg, Miller & Germano[61] | 2009–2013 | 294 | 1.48 |
| Fitzpatrick[62] | 2006–2007 | 204 | 1.65 |
| Eisenberg & Miller[63] | 1993–2008 | 368 | 1.81 |
| Logan, Moore & Moshman[64] | 1973–2003 | 1,120 | 3.89 |

---

[59] Some of that consistency is explained by the fact that a number of the studies cover similar years and report on the same cases.  However, as the Court can see from the second and third columns in Table 4, the overlap across studies is relatively minimal and the results generally reinforce, not repeat, one another.

[60] 5 *Newberg on Class Actions* § 15:89 (5th ed. & Supp. 2019) (reporting on data from William B. Rubenstein & Rajat Krishna, *Class Action Fee Awards: A Comprehensive Empirical Study* (draft on file with author)).

[61] *See* Eisenberg & Miller III, *supra* note 32, at 965 tbl. 12 (2017).

[62] *See* Fitzpatrick, *supra* note 34, at 833–34.  This average encompasses cases using both a percentage method with a lodestar cross-check and pure lodestar cases.

[63] *See* Eisenberg & Miller II, *supra* note 30, at 272 tbl.14.  This multiplier data set excludes those cases that report a multiplier of 1, but appears to include cases with multipliers both below and above 1.

[64] *See* Stuart J. Logan, Beverly C. Moore & Jack Moshman, *Attorney Fee Awards in Common Fund Class Actions*, 24 Class Action Rep. 167, 167 (2003).  This multiplier data set appears to include cases that utilized a percentage-of-the-fund method for calculating fees (without a lodestar cross-check), as well as those using a lodestar method and mixed methods.  *Id.* at 169 (table headings).

47.     What these data show is that across decades of class action practice, in thousands of cases throughout the United States, in the ***average*** case, the percentage-of-the-fund method yielded an award to class counsel of about 1.5 times their normal hourly rates.

48.     All of the empirical studies with pertinent data[65] also show that multipliers tend to rise as the size of the class's fund increases.  Thus, in Table 5, below, I present the data on average lodestar multiplier in cases with common funds of comparable size to this one.  The average multiplier in these larger fund cases across the four studies is 3.20 (the average of the four numbers listed in the last column below).

**TABLE 5**
**EMPIRICAL DATA ON MULTIPLIERS IN CASES OF COMPARABLE SIZE**

|  | DEFINITION OF TRANCHE | CASES IN TRANCHE | AVERAGE MULTIPLIER |
|---|---|---|---|
| Eisenberg, Miller & Germano[66] | $67.5 million+ | 35 | 2.72 |
| Eisenberg & Miller[67] | $175.5 million+ | 40 | 3.18 |
| Rubenstein & Krishna[68] | $44.6 million+ | 89 | 2.39 |
| Logan, Moore & Moshman[69] | $100 million+ | 64 | 4.50 |

49.     While the multiplier sought here is higher than the average multiplier in cases with similar fund sizes, it is not a complete outlier.  Case reports demonstrate that, in appropriate

[65] Professor Fitzpatrick's study, cited in Table 4, does not break down multiplier data by fund size.

[66] *See* Eisenberg & Miller III, *supra* note 32, at 967 tbl.13.

[67] *See* Eisenberg & Miller II, *supra* note 30, at 274 tbl.15.

[68] 5 *Newberg on Class Actions* § 15:89 (reporting on data from Rubenstein & Krishna, *supra* note 60).

[69] Logan, Moore & Moshman, *supra* note 64, at 167.

38

circumstances, courts have approved percentage awards embodying lodestar multipliers at or above the range sought here. Thus, this Court, citing the leading Ninth Circuit case on point, has stated that, "In the Ninth Circuit, a lodestar multiplier of around 4 times has ***frequently*** been awarded in common fund cases such as this."[70]   In the Ninth Circuit decision upon which this Court relied for the statement (*Vizcaino*), the Court established 25% as the benchmark percentage fee and approved a multiplier of 3.65, writing that this number "was within the range of multipliers applied in common fund cases"[71] and appending a list of such cases to its decision. Similarly, in Exhibit C, I provide a list of 67 cases with multipliers of 4 or greater, 44 of which are cases with multipliers of 5 or greater. This list is not meant to be either exhaustive or representative of all multipliers. Rather, it demonstrates that courts approve percentage awards that embody multipliers consistent with the multiplier sought here in appropriate circumstances.

50.     As courts have approved a fee award embodying multipliers in the 5 range in appropriate circumstances, the sole question is whether Class Counsel's work in *this* case justifies this multiplier. The Ninth Circuit offers several reasonableness factors to consider in making this assessment, "including the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment."[72]   In the

---

[70] *In re Capacitors Antitrust Litig.*, 2017 WL 9613950, at *6 (N.D. Cal. June 27, 2017) (citing *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002)) (emphasis added).

[71] *Vizcaino*, 290 F.3d at 1051; *see also Dyer v. Wells Fargo Bank, N.A.*, No. 13-CV-02858-JST, 2014 WL 5369395, at *6 (N.D. Cal. Oct. 22, 2014) ("A 2.83 multiplier falls within the Ninth Circuit's presumptively acceptable range of 1.0–4.0. Given the complexity and duration of this litigation, the results obtained for the class, and the risk counsel faced in bringing the litigation, the Court finds the 2.83 multiplier appropriate." (citation omitted)).

[72] *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011) (citation omitted); *see also In re Capacitors Antitrust Litig.*, 2017 WL 9613950, at *3–4 (N.D. Cal. June 27, 2017) (Donato, J.) (applying standard by starting with results obtained and risks taken).

following paragraphs, I sort these factors into two categories – risks and results – and consider each in turn.

51.    Nine independent factors demonstrate the riskiness of this case:[73]

- ***This case was risky because it did not piggy-back on a government enforcement action.*** Many class actions follow on the heels of government enforcement actions, such as securities class actions that follow SEC enforcement actions or antitrust cases that follow Department of Justice actions. Class counsel have a lower risk in such cases as their investigative costs may be lower, as they may be able to employ non-mutual offensive issue preclusion to establish liability without litigation,[74] and/or as the defendant has a natural incentive to settle with the government, easing the road to settlement with the class. Not this case: no government agency has pursued this set of claims, using this privacy statute, against the defendant. Class Counsel detected, investigated, theorized, and executed the entire case from scratch.[75]

- ***This case was especially risky because of its novelty.*** Many class actions are pursued by lawyers who specialize in particular areas (securities, antitrust, consumer, etc.) and can economize their practices and lower their risks by repeating efforts from one case to the next. Not this case: here Class Counsel have taken a relatively new state statute, typically used for smaller class actions involving employer/employee privacy concerns, and – for the first time – applied it to a practice of a huge national internet

---

[73] The point is not to look at Counsel's risks *ex post*, but rather to demonstrate the strength of the achievement compared to the risks *ex ante*.

[74] *See, e.g.*, *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322 (1979).

[75] As the Court is aware, Facebook has entered a separate, but marginally related, settlement with the Federal Trade Commission (FTC). I note that the FTC's complaint against Facebook, though apparently based on a 2012 agreement between the FTC and Facebook, was filed in the summer of 2019, about four years after the commencement of this suit. *See* Complaint for Civil Penalties, Injunction & Other Relief, *United States of America v. Facebook*, No. 1:19-cv-02184-TJK (D.D.C. July 24, 2019), ECF No. 1. More pertinently, as Class Counsel have noted, the core of this case is unrelated to the FTC's action, as "neither Face Recognition nor image tagging was a subject of the 2012 decree." Plaintiffs' Supplemental Brief in Support of Preliminary Approval of a Class Action Settlement at 23 n.23, *In re Facebook Biometric Info. Privacy Litig.*, No. 3:15-cv-03747-JD (N.D. Cal. July 9, 2020), ECF No. 465. Similarly, Facebook has explained that this settlement "provides prospective relief to the class that goes well beyond what is required by the FTC settlement," Facebook's Second Supplemental Brief in Support of Preliminary Approval of the Settlement at 9, ECF No. 462, and the company provided a Venn diagram showing that this case barely relates to the FTC matter, *id.* Based on this review, it seems clear to me that this lawsuit is *sui generis* and not a "piling on" to any government enforcement action.

organization.  This application had no precedent and, as the Court is aware, Class Counsel spent significant time litigating the applicability of BIPA to Facebook's specific tagging practices.  Thus, Class Counsel laid out a list of novel issues a jury would have been asked to address had this case gone to trial: "[1] Whether Plaintiffs and the Class Members provided BIPA-compliant consent . . . [2] Whether Facebook collects 'scans of face geometry' . . . [3] Whether  the photograph exclusion applied . . . [4] Whether Facebook negligently, willfully or recklessly violated the Statute . . . [and]  [5] Where the offending conduct took place . . ."[76]

- ***This case was especially risky because of its factual and legal complexity.***  All class action cases are typically more complex than the average contingent fee case – that is why the field is known as "complex litigation."  But many class actions involve straightforward enforcement of a well-worn statute.  Not this case: the novel legal issues outlined in the prior bullet point involve complex technical questions, as does comprehension of Facebook platform and practices as applied to these biometric questions.  Legally, the BIPA questions had no precedent and BIPA's application outside of Illinois raised uncharted choice-of-law and extraterritoriality concerns.

- ***The case was risky because intervening Supreme Court doctrine threatened to foreclose the plaintiffs' claims and/or capacity to proceed in the aggregate in federal court.***  Class Counsel commenced this case on May 14, 2015.  Almost precisely one year later (May 16, 2016) the Supreme Court handed down its landmark decision in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016).  As the Court is aware, the decision concerned the standing requirements for cases involving so-called statutory harms.  As I explain in the *Newberg* treatise, the Court's apparent tightening of the standing requirement led to an absolute flood of motions to dismiss statutory harm-based class actions such as this one.[77]  I report that there were "roughly 150 ***reported*** decisions addressing whether *Spokeo* require dismissal of (primarily) statutory class actions"[78] and I note that while "a majority of courts rejected such challenges . . . about 60 cases were dismissed on *Spokeo* grounds."[79]  Based on these data alone – without knowing how many cases were dismissed without being reported – there was, roughly speaking, about a 40% chance that this case, and Class Counsel's investment in it, could have been swept away on standing grounds in the wake of *Spokeo*.[80]  That

---

[76] Plaintiffs' Supplemental Brief in Support of Preliminary Approval, *supra* note 75, at 7–9.

[77] *See* 1 *Newberg on Class Actions* § 2:4.

[78] *Id.* (emphasis added).

[79] *Id.*

[80] It is plausible that Class Counsel could have re-lodged the case in state court thereafter, as state courts are not bound by Article III standing doctrine.  However, that re-lodging is speculative and, at the least, would have required Class Counsel to begin again from scratch, without the benefits of the rulings in this matter to that point.

risk was especially palpable given that courts in fact dismissed BIPA cases on *Spokeo* grounds, as this Court is aware.[81] It is extraordinarily rare that in the midst of high-profile, high-stakes litigation of this type, a single Supreme Court decision cuts so broad a path of destruction through a field of litigation.

- ***This case was especially risky because Class Counsel litigated against a large, well-funded defendant***. Facebook is one of the ten largest public companies by market capitalization, coming in at $629 billion.[82] Facebook's general and administrative costs – which include its legal costs – were roughly $10.5 billion in 2019,[83] meaning the company spent close to $30 million every single day of the year on legal costs. Class Counsel's lodestar and expenses show that they invested over $20 million of their own time and money in this case – which is impressive. Yet, by reference to its most recent level of general and administrative costs, Facebook expended that much money by sundown on January 1st of this year. Thus, while Class Counsel were litigating with their own limited resources, they were litigating against a party with relatively unlimited resources.

- ***This case was especially risky because the Illinois Legislature considered amending the very law upon which the case is based – BIPA – in the midst of the action.*** In addition to the risks of going up against a well-funded, well-connected defendant in court, Class Counsel also confronted enormous risk on another front: the Illinois Legislature. During the pendency of this action, the Legislature considered various pieces of legislation that could have ended this case.[84] If the Illinois Legislature had

---

[81] *See Patel v. Facebook Inc.*, 290 F.Supp.3d 948, 955 (N.D. Cal. 2018) (distinguishing *Spokeo*-dismissed BIPA cases on the grounds that that, in those cases, "the plaintiffs indisputably knew that their biometric data would be collected before they accepted the services offered by the businesses involved") (discussing *McCollough v. Smarte Carte, Inc.*, No. 16 C 03777, 2016 WL 4077108, at *4 (N.D. Ill. Aug. 1, 2016) ("Even without prior written consent to retain, if Smarte Carte did indeed retain the fingerprint data beyond the rental period, this Court finds it difficult to imagine, without more, how this retention could work a concrete harm."); *Santana v. Take-Two Interactive Software, Inc.*, 717 F. App'x 12, 14 (2d Cir. 2017)).

[82] PwC, *Global Top 100 Companies by Market Capitalization: Update to 30 June 2020* at 11, https://www.pwc.com/gx/en/audit-services/publications/assets/global-top-100-companies-june-2020-update.pdf.

[83] *See* Facebook, Inc., *2019 Form 10-K* at 54–55, U.S. Securities & Exchange Commission, https://www.sec.gov/ix?doc=/Archives/edgar/data/1326801/000132680120000013/fb-12312019x10k.htm (showing $10.465 billion in general and administrative expenses).

[84] Senate Bill 2134 (101st General Assembly), introduced on February 15, 2019, would have amended BIPA by removing the private right of action. It failed to get reported out of committee by March 28, 2019 and no subsequent action was taken. *See* Karen Kidd, *Lawyer: Illinois Businesses Should Take Steps to Limit BIPA Liability After Reform Legislation Fails*, Cook County Record (Apr. 30, 2019), https://cookcountyrecord.com/stories/512458013-lawyer-

passed a bill to amend BIPA – for example by removing the private right of action or statutory damages provisions – this case could have been rendered worthless. Thus, Class Counsel accepted not only the normal contingency risk of not being able to predict what a judge or jury will do, but also the heightened risk of not being able to predict whether BIPA would continue to exist.

- ***This case was especially risky because the issues and money at stake were so significant that the defendant litigated especially vigorously.*** Notwithstanding Facebook's enormous legal budget, it is not every day it settles a case for more than half a billion dollars. It surely did so in part because the risk of a trial loss was greater – and it has altered its own practices accordingly. Given the magnitude of this case, it goes without saying that the company defended it with special interest and vigor.

- ***This case was especially risky because of its high expense.*** Class Counsel report a lodestar and expenses above $20 million. This means that Class Counsel have loaned the class more than twenty million dollars – and risked losing every penny of it on the outcome of this case.

- ***Given their commitment to this highly risky case, Class Counsel were precluded from taking other, simpler, work.*** It is fair to conclude that Class Counsel's extraordinary devotion of time and resources to this novel and complex case prevented them from pursuing simpler, bread-and-butter, actions, any of which would have had a higher expectation of settlement and hence ease of recovery of a contingent fee, possibly a well-multiplied one.

52.     These nine points demonstrate what seems incontestable: Class Counsel took large risks in litigating this case from inception to judgment. Like any investor that takes large

---

illinois-businesses-should-take-steps-to-limit-bipa-liability-after-reform-legislation-fails; Susan M. Lorenc, James Shreve & Ryan Gehbauer, *BIPA Litigation Offers No Legislative Reprieve to Employers - Yet*, mondaq (June 14, 2019), https://www.mondaq.com/unitedstates/privacy-protection/815122/bipa-litigation-offers-no-legislative-reprieve-to-employers-yet. Further, a proposed-but-rejected amendment to House Bill 6074 (99th General Assembly; HB6074 was an otherwise unrelated bill concerning unclaimed property) would have jeopardized this lawsuit by (i) expressly excluding both physical and digital photographs from the definition of "biometric identifier" and (ii) defining "scan" to mean "data resulting from an ***in-person process*** whereby a part of the body is traversed by a detector or an electronic beam" (emphasis added). *See* Russell Brandom, *Someone's Trying to Gut America's Strongest Biometric Privacy Law*, The Verge (May 27, 2016, 8:27 AM EDT), https://www.theverge.com/2016/5/27/11794512/facial-recognition-law-illinois-facebook-google-snapchat.

risks, these attorneys are entitled to a return on their investment, so long as the risks they took

paid off.  I will now turn to that analysis.

      53.     At least eight components of this case's outcome speak to the results Class

Counsel obtained in this matter.

- ***Counsel obtained significant monetary relief for the class***.  Put simply, $650 million is an extraordinary sum.  As discussed in Part II, *supra*, this appears to be by far the largest privacy settlement in the last five years, if not of all time, and by far the largest per-class-member recovery of any privacy settlement involving a large class.

- ***100% of the class is eligible for relief***.  The settlement agreement explains that the class, for settlement purposes, is defined as "Facebook users located in Illinois for whom Facebook created and stored a face template after June 7, 2011 up to the date of the Preliminary Approval Order."[85]  In turn, the claim form for most class members simply requires the class member to provide the email/phone number associated with their Facebook account and to attest that they "lived in the state of Illinois for a period of at least 183 days (6 months)."  Any class member who meets these criteria eligible to file a claim for damages.[86]  Most class members similarly benefit from the significant changes Facebook will make to its policies going forward.

- ***Class members will receive cash not script***.  Class actions sometimes end in settlements that return class members little direct compensation, occasionally nothing more concrete than coupons or recoveries going exclusively to third party *cy pres* recipients.[87]  The *Manual for Complex Litigation* therefore warns federal judges overseeing class action settlements to be on the lookout for settlements "granting class members illusory nonmonetary benefits, such as discount coupons for more of defendants' products. . . ."[88]  The settlement secured in this case will

---

[85] Amended Stipulation of Class Action Settlement at 5, *In re Facebook Biometric Info. Privacy Litig.*, No. 3:15-cv-03747-JD (N.D. Cal. July 22, 2020), ECF No. 468.

[86] As is evident, class members who lived in Illinois for fewer than six months (183 days) are not eligible for monetary relief, but this provision resulted from questions about the extraterritorial application of BIPA, not some attempt to disenfranchise a portion of the class.  *See* Plaintiffs' Unopposed Notice of Motion & Motion for Preliminary Approval of Class Action Settlement; Memorandum of Points & Authorities in Support Thereof at 13–14, *In re Facebook Biometric Info. Privacy Litig.*, No. 3:15-cv-03747-JD (N.D. Cal. May 8, 2020), ECF No. 445.

[87] *See* 4 *Newberg on Class Actions* §§ 12:7–12:13 (on nonpecuniary damages).

[88] *Manual for Complex Litigation (Fourth)* § 21.61 (2004).

deliver cash compensation directly to class members, a form of recovery that speaks highly of the case's outcome.

- ***Class members will receive significant cash payments***.   Not only does this settlement provide cash payments to class members, the payments are significant: the class action notice states that class members could "potentially get an estimated $200 - $400."[89]   Indeed, even if the settlement fund ($650 million) is divided by the entire estimated class size (6,941,720) – in other words, if 100% of the class members filed claims – the gross per-class-member recovery is roughly $94.   Compared to other privacy-related settlements involving a large number of class members (as set forth in Part II, *supra*), this is a significant achievement.

- ***The claims process is straightforward***.   Class actions often end with settlements requiring class members to file claims.   The claim-filing process may often dissuade class members from making the effort, particularly in small-claim situations.   The *Manual for Complex Litigation* therefore warns federal judges overseeing class action settlements to be on the lookout for settlements "imposing such strict eligibility conditions or cumbersome claims procedures that many members will be unlikely to claim benefits. . . ."[90]   Here, the claim form could not be more straightforward: most class members need only fill in identifying information and then attest that she meets the six-month Illinois residency requirement.[91]   The ease of claiming here is reflected in the rate at which claims have been filed:  Class Counsel inform me that about 1.1 million class members – or roughly 15% of the class – have filed claims as of October 15, 2020.  In my data set of over 1,000 class action cases, *see supra* ¶ 9, I have data on claiming rates in 327 cases.  When those 327 cases are sorted into deciles by class size, the highest decile of 32 cases is for classes of 317,227 or more.  The average claiming rate in those large class cases is 4.8%.  This class is therefore claiming at a rate about 3 times higher than my data would have predicted.

- ***The relief required significant, contested adversarial litigation against strong opposition, leaving no hint of collusion.***   The defendant contested nearly every aspect of this lawsuit, often repeatedly.   A critical concern in class suits is that the class's agents might be tempted to sell out the class by agreeing to a low recovery in return for a high fee.   The *Manual for Complex Litigation* therefore warns federal judges overseeing class action settlements that "[a]ctive judicial oversight of the settlement process [is necessary to] prevent collusion between counsel for

---

[89] Class Action Settlement Notice, *In re Facebook Biometric Info. Privacy Litig.*, No. 3:15-cv-03747-JD (N.D. Cal. July 22, 2020), ECF No. 468 [Ex. C at 53].

[90] *Manual for Complex Litigation (Fourth)* § 21.61 (2004).

[91] Class Action Settlement Claims Procedure, *In re Facebook Biometric Info. Privacy Litig.*, No. 3:15-cv-03747-JD (N.D. Cal. July 22, 2020), ECF No. 468 [Ex. A at 44–48].

the class and defendant and [to] minimize the potential for unfair settlements."[92] Here, there is not a hint of collusion – this case has been nothing but adversarial since its inception, encompassing five years of hard-fought litigation. There is, therefore, no evidence whatsoever of Class Counsel selling out the Class's interest.

- ***The case contributed to significant changes in defendant's practices***. The prior points focus on the common fund Class Counsel secured for the class. It is important to acknowledge, as well, that this lawsuit has produced meaningful changes to Facebook's policies. Namely, through Class Counsel's efforts, Facebook has agreed to "turn Face Recognition off automatically" and delete existing any existing face template for class members who do not affirmatively opt in to Face Recognition.[93]

- ***Public interest***. While all class action settlements assist in the government's enforcement of the law,[94] this settlement provides an important and unique public service. Through their persistent and protected efforts, Class Counsel have helped establish legal limits in a critical and developing field – the use of technology to invade privacy. That description sounds general, but unlike the mass of data breach cases, the facts of this case are far more specific, targeted, and important: the use of biometrics is a specific area of particular and growing concern, Illinois's statute is precedent setting, and this settlement's application of it to a major national internet provider like Facebook, landmark.

54.     As explained at the outset, *see* ¶ 2, *supra*, Class Counsel's multiplier is on the high end here solely because of the efficiency with which they produced this landmark settlement. It would be perverse to penalize them for that efficiency. That conclusion is independently supported by this qualitative review. These nine risks and eight results demonstrate what seems incontestable: Class Counsel took significant risks in investing substantial capital and labor in highly adversarial litigation without the promise of any easy

---

[92] *Manual for Complex Litigation (Fourth)* § 22.923 (2004).

[93] Declaration of Gary McCoy at 10–11, *In re Facebook Biometric Info. Privacy Litig.*, No. 3:15-cv-03747-JD (N.D. Cal. July 9, 2020), ECF No. 463.

[94] *See Deposit Guar. Nat. Bank, Jackson, Miss. v. Roper,* 445 U.S. 326, 339 (1980) ("The aggregation of individual claims in the context of a classwide suit is an evolutionary response to the existence of injuries unremedied by the regulatory action of government.").

return on that investment, and Class Counsel shouldered that risk superbly, prevailing at each

critical juncture and generating an important return for the client class.

* * *

55.    I have testified that:

- The requested fee is well below the Ninth Circuit's 25% benchmark and, while at
  the high end, in the range of percentages for large fund cases;

- A lodestar cross-check supports the requested award:

  ✓ The hourly billing rates are normal;

  ✓ The hours billed are far below normal;

  ✓ The resulting multiplier, though high, is in the range of multipliers
    justified here: it is consistent with the unique risks that Class Counsel
    shouldered and the record-setting results that they achieved for the class.

In sum, it is my expert opinion that Class Counsel's $110 million fee request – which can be

conceptualized as 20% of $550 or 16.9% of $650 million – is within the range of a reasonable

award.

October 15, 2020                              William B. Rubenstein

# EXHIBIT A

`

# Professor William B. Rubenstein

Harvard Law School - AR323                                      (617) 496-7320
1545 Massachusetts Avenue                              rubenstein@law.harvard.edu
Cambridge, MA 02138

### Academic Employment

**Harvard Law School, Cambridge MA**
    Bruce Bromley Professor of Law                                    2018-present
    Sidley Austin Professor of Law                                        2011-2018
    Professor of Law                                                      2007-2011
    Bruce Bromley Visiting Professor of Law                               2006-2007
    Visiting Professor of Law                              2003-2004, 2005-2006
    Lecturer in Law                                                       1990-1996
        *Courses:*    Civil Procedure; Class Action Law; Remedies
        *Awards:*    2012 Albert M. Sacks-Paul A. Freund Award for Teaching Excellence
        *Membership:*    American Law Institute; American Bar Foundation Fellow

**UCLA School of Law, Los Angeles CA**
    Professor of Law                                                      2002-2007
    Acting Professor of Law                                               1997-2002
        *Courses:*    Civil Procedure; Complex Litigation; Remedies
        *Awards:*    2002 Rutter Award for Excellence in Teaching
                Top 20 California Lawyers Under 40, *Calif. Law Business* (2000)

**Stanford Law School, Stanford CA**
    Acting Associate Professor of Law                                     1995-1997
        *Courses:*    Civil Procedure; Federal Litigation
        *Awards:*    1997 John Bingham Hurlbut Award for Excellence in Teaching

**Yale Law School, New Haven CT**
    Lecturer in Law                                                       1994, 1995

**Benjamin N. Cardozo School of Law, New York NY**
    Visiting Professor                                                    Summer 2005

### Litigation-Related Employment

**American Civil Liberties Union, National Office, New York NY**
    Project Director and Staff Counsel                                    1987-1995
    -Litigated impact cases in federal and state courts throughout the United States.
    -Supervised a staff of attorneys at the national office, oversaw work of ACLU attorneys around the country, and coordinated work with private cooperating counsel nationwide.
    -Significant experience in complex litigation practice and procedural issues; appellate litigation; litigation coordination, planning and oversight.

**Hon. Stanley Sporkin, U.S. District Court, Washington DC**
    Law Clerk                                                             1986-87

**Public Citizen Litigation Group, Washington DC**
    Intern                                                                Summer 1985

**A-1**

EDUCATION

HARVARD LAW SCHOOL, CAMBRIDGE MA
      J.D., 1986, *magna cum laude*

YALE COLLEGE, NEW HAVEN CT
      B.A., 1982, *magna cum laude*
        Editor-in-Chief, YALE DAILY NEWS

SELECTED COMPLEX LITIGATION EXPERIENCE

*Professional Service and Highlighted Activities*

◊ *Author,* NEWBERG ON CLASS ACTIONS (sole author since 2008, sole author of entirely re-written Fifth Edition (2011-2019); sole author of NEWBERG AND RUBENSTEIN ON CLASS ACTIONS (6th ed. 2022) (forthcoming))

◊ *Speaker,* Judicial Panel on Multidistrict Litigation, Multidistrict Litigation (MDL) Transferee Judges Conference, Palm Beach, Florida (invited to present to MDL judges on recent developments in class action law and related topics (2010, 2011, 2012, 2013, 2014 (invited), 2015, 2016, 2017, 2018, 2019)

◊ *Panelist,* Federal Judicial Center, *Managing Multidistrict Litigation and Other Complex Litigation Workshop* (for federal judges) (March 15, 2018)

◊ *Amicus curiae,* authored *amicus* brief in United States Supreme Court on proper approach to *cy pres* award in class action lawsuits (*Frank v. Gaos,* 139 S. Ct. 1041 (2019))

◊ *Amicus curiae,* authored *amicus* brief in California Supreme Court on proper approach to attorney's fees in common fund cases (*Laffitte v. Robert Half Int'l Inc.,* 376 P.3d 672, 687 (Cal. 2016) (noting reliance on *amicus* brief))

◊ *Amicus curiae,* authored *amicus* brief in the United States Supreme Court filed on behalf of civil procedure and complex litigation law professors concerning the importance of the class action lawsuit (*AT&T Mobility v. Concepcion,* No. 09-893, 131 S. Ct. 1740 (2011))

◊ *Adviser,* American Law Institute, *Project on the Principles of the Law of Aggregate Litigation,* Philadelphia, Pennsylvania

◊ *Advisory Board, Class Action Law Monitor* (Strafford Publications), 2008-

◊ *Co-Chair,* ABA Litigation Section, Mass Torts Committee, Class Action Sub-Committee, 2007

◊ *Planning Committee,* American Bar Association, Annual National Institute on Class Actions Conference, 2006, 2007

◊ *"Expert's Corner"* (Monthly Column)*, Class Action Attorney Fee Digest,* 2007-2011

## *Judicial Appointments*

◊   *Meditator.*   Appointed by the United States District Court for the Southern District of New York to mediate a set of complex issues in ongoing civil rights class action (*Grottano v. City of New York*, Civ. Action No. 15-cv-9242 (RMB) (May 29, 2020))

◊   *Expert consultant.*   Retained by the United States District Court for the Northern District of Ohio, and Special Master, as an expert consultant on class certification and attorney's fees issues in complex multidistrict litigation (*National Prescription Opiate Litigation,* MDL 2804, Civ. Action No. 1:17-md-2804 (N.D. Ohio Aug. 13, 2018; June 29, 2019; March 10, 2020))

◊   *Expert witness.*   Appointed by the United States District Court for the Eastern District of Pennsylvania as an expert witness on attorney's fees in complex litigation, with result that the Court adopted recommendations (*In re National Football League Players' Concussion Injury Litigation*, 2018 WL 1658808 (E.D.Pa. April 5, 2018))

◊   *Appellate counsel.*   Appointed by the United States Court of Appeals for the Second Circuit to argue for affirmance of district court fee decision in complex securities class action, with result that the Court summarily affirmed the decision below (*In re Indymac Mortgage-Backed Securities Litigation*, 94 F.Supp.3d 517 (S.D.N.Y. 2015), *aff'd sub. nom.*, *DeValerio v. Olinski*, 673 F. App'x 87, 90 (2d Cir. 2016))

## *Expert Witness*

◊   Retained as an expert witness on attorney's fees issues (*In re Facebook Biometric Information Privacy Litigation,* Civil Action No. 3:15-cv-03747-JD (N.D. Cal. (2020))

◊   Retained as an expert witness on class action issues in complex mass tort MDL (*In re Roundup Products Liability Litigation,* Civil Action No. 3:16-md-02741-VC (N.D. Cal. (2020))

◊   Retained as an expert witness on issues regarding the Lead Plaintiff/Lead Counsel provisions of the Private Securities Litigation Reform Act of 1995 (PSLRA) (*In re Apple Inc. Securities Litigation.,* Civil Action No. 4:19-cv-02033-YGR (N.D. Cal. (2020))

◊   Submitted an expert witness declaration concerning reasonableness of attorney's fee request (*Amador v. Baca*, Civil Action No. 2:10-cv-01649 (C.D. Cal. February 9, 2020))

◊   Submitted an expert witness declaration concerning reasonableness of class action settlement (*In re: Columbia Gas Cases*, Civil Action No. 1877CV01343G (Mass. Super. Ct., Essex County, February 6, 2020))

◊   Submitted an expert witness declaration, and reply declaration, concerning reasonableness of attorney's fee request (*Hartman v. Pompeo*, Civil Action No. 1:77-cv-02019 (D.D.C. October 10, 2019; February 28, 2020))

◊   Submitted an expert witness declaration concerning reasonableness of common benefit attorney's fee

request (*In re:   Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724, 16-MD-2724 (E.D. Pa. May 15, 2019))

◊   Submitted an expert witness declaration concerning reasonableness of attorney's fee request, relied upon by court in awarding fees (*Hale v. State Farm Mut. Auto. Ins. Co*., 2018 WL 6606079 (S.D. Ill. Dec. 16, 2018))

◊   Submitted expert witness affidavit and testified at fairness hearing concerning second phase fee issues in common fund class action (*Tuttle v. New Hampshire Med. Malpractice Joint Underwriting Assoc.*, Case No. 217-2010-CV-00294 (New Hampshire Superior Court, Merrimack County (2018))

◊   Submitted expert witness report – and rebutted opposing expert – concerning class certification issues for proposed class action within a bankruptcy proceeding (*In re Think Finance,* Case No. 17-33964 (N.D. Tex. Bankrpt. 2018))

◊   Submitted expert witness declaration concerning specific fee issues raised by Court at fairness hearing and second declaration in response to report of Special Master (*In re Anthem, Inc. Data Breach Litigation,* Case No. 15-MD-02617-LHK (N.D. Cal. 2018))

◊   Submitted an expert witness declaration concerning reasonableness of attorney's fee request following plaintiffs' verdict at trial in consumer class action (*Krakauer v. Dish Network, L.L.C.,* Civil Action No. 1:14-cv-00333 (M.D.N.C. 2018))

◊   Submitted three expert witness declarations and deposed by/testified in front of Special Master in investigation concerning attorney's fee issues (*Arkansas Teacher Ret. Sys. v. State St. Bank & Trust Co.*, Civ. Action No. 1:11-cv-10230 (D. Mass. 2017-18))

◊   Retained as an expert witness on issues regarding the preclusive effect of a class action judgment on later cases (*Sanchez v. Allianz Life Insurance Co. of N. Amer.,* Case No. BC594715 (California Superior Court, Los Angeles County (2018))

◊   Retained as an expert witness and submitted report explaining meaning of the denial of a motion to dismiss in American procedure to foreign tribunals (*In re Qualcomm Antitrust Matter,* declaration submitted to tribunals in Korea and Taiwan (2017))

◊   Submitted an expert witness declaration concerning reasonableness of attorney's fee request in 3.0-liter settlement, referenced by court in awarding fees (*In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation,* 2017 WL 3175924 (N.D. Cal. July 21, 2017))

◊   Retained as an expert witness concerning impracticability of joinder in antitrust class action (*In re Celebrex (Celecoxib) Antitrust Litigation,* Civ. Action No. 2-14-cv-00361 (E.D. Va. (2017))

◊   Submitted an expert witness declaration and deposed concerning impracticability of joinder in antitrust class action (*In re Modafinil Antitrust Litigation,* Civ. Action No. 2-06-cv-01797 (E.D. Pa. (2017))

◊   Submitted an expert witness declaration concerning reasonableness of attorney's fee request in 2.0-liter settlement (*In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability*

*Litigation,* 2017 WL 1047834 (N.D. Cal., March 17, 2017))

◊   Submitted an expert witness declaration concerning reasonableness of attorney's fee request, referenced by court in awarding fees (*Aranda v. Caribbean Cruise Line, Inc.,* 2017 WL 1368741 (N.D. Ill., April 10, 2017))

◊   Submitted an expert witness declaration concerning reasonableness of attorney's fee request (*McKinney v. United States Postal Service*, Civil Action No. 1:11-cv-00631 (D.D.C. (2016))

◊   Submitted an expert witness declaration concerning reasonableness of attorney's fee request (*Johnson v. Caremark RX, LLC,* Case No. 01-CV-2003-6630, Alabama Circuit Court, Jefferson County (2016))

◊   Submitted an expert witness declaration concerning reasonableness of attorney's fee request in sealed fee mediation (2016)

◊   Submitted an expert witness declaration concerning reasonableness of attorney's fee request (*Geancopoulos v. Philip Morris USA Inc.,* Civil Action No. 98-6002-BLS1 (Mass. Superior Court, Suffolk County))

◊   Submitted an expert witness declaration concerning reasonableness of attorney's fee request in sealed fee mediation (2016)

◊   Submitted an expert witness declaration concerning reasonableness of attorney's fee request (*Gates v. United Healthcare Insurance Company,* Case No. 11 Civ. 3487 (S.D.N.Y. 2015))

◊   Retained as an expert trial witness on class action procedures and deposed prior to trial in matter that settled before trial (*Johnson v. Caremark RX, LLC,* Case No. 01-CV-2003-6630, Alabama Circuit Court, Jefferson County (2016))

◊   Submitted an expert witness declaration concerning reasonableness of attorney's fee request, referenced by court in awarding fees (*In re High-Tech Employee Antitrust Litig.*, 2015 WL 5158730 (N.D. Cal. Sept. 2, 2015))

◊   Retained as an expert witness concerning adequacy of putative class representatives in securities class action (*Medoff v. CVS Caremark Corp.,* Case No. 1:09-cv-00554 (D.R.I. (2015))

◊   Submitted an expert witness declaration concerning reasonableness of proposed class action settlement, settlement class certification, attorney's fees, and incentive awards (*Fitzgerald Farms, LLC v. Chespeake Operating, L.L.C.,* Case No. CJ-2010-38, Dist. Ct., Beaver County, Oklahoma (2015))

◊   Submitted an expert witness declaration concerning reasonableness of attorney's fee request, referenced by court in awarding fees (*Asghari v. Volkswagen Grp. of Am., Inc*., 2015 WL 12732462 (C.D. Cal. May 29, 2015))

◊   Submitted an expert witness declaration concerning propriety of severing individual cases from class action and resulting statute of repose ramifications (*In re: American   International Group, Inc. 2008*

*Securities Litigation,* 08-CV-4772-LTS-DCF (S.D.N.Y. (2015))

◊   Retained by Fortune Global 100 Corporation as an expert witness on fee matter that settled before testimony (2015)

◊   Submitted an expert witness declaration and testified at Special Master proceeding concerning reasonableness of attorney's fee allocation in sealed fee mediation (2014-2015)

◊   Submitted an expert witness declaration concerning reasonableness of attorney's fee request (*In re: Hyundai and Kia Fuel Economy Litigation,* MDL 13-02424 (C.D. Cal. (2014))

◊   Submitted an expert witness declaration concerning reasonableness of attorney's fee request (*Ammari Electronics v. Pacific Bell Directory*, Case No. RG0522096, California Superior Court, Alameda County (2014))

◊   Submitted an expert witness declaration and deposed concerning plaintiff class action practices under the Private Securities Litigation Reform Act of 1995 (PSLRA), as related to statute of limitations question (*Federal Home Loan Bank of San Francisco v. Deutsche Bank Securities, Inc.,* Case No. CGC-10-497839, California Superior Court, San Francisco County (2014))

◊   Submitted an expert witness declaration and deposed concerning plaintiff class action practices under the Private Securities Litigation Reform Act of 1995 (PSLRA), as related to statute of limitations question (*Federal Home Loan Bank of San Francisco v. Credit Suisse Securities (USA) LLC,* Case No. CGC-10-497840, California Superior Court, San Francisco County (2014))

◊   Retained as expert witness on proper level of common benefit fee in MDL (*In re Neurontin Marketing and Sales Practice Litigation,* Civil Action No. 04-10981, MDL 1629 (D. Mass. (2014))

◊   Submitted an expert witness declaration concerning Rule 23(g) selection of competing counsel, referenced by court in deciding issue (*White v. Experian Information Solutions, Inc.,* 993 F. Supp. 2d 1154 (C.D. Cal. (2014))

◊   Submitted an expert witness declaration concerning proper approach to attorney's fees under California law in a statutory fee-shifting case (*Perrin v. Nabors Well Services Co.,* Case No. 1220037974, Judicial Arbitration and Mediation Services (JAMS) (2013))

◊   Submitted an expert witness declaration concerning fairness and adequacy of proposed nationwide class action settlement (*Verdejo v. Vanguard Piping Systems,* Case No. BC448383, California Superior Court, Los Angeles County (2013))

◊   Retained as an expert witness regarding fairness, adequacy, and reasonableness of proposed nationwide consumer class action settlement  (*Herke v. Merck,* No. 2:09-cv-07218, MDL Docket No. 1657 (*In re Vioxx Products Liability Litigation*) (E. D. La. (2013))

◊   Retained as an expert witness concerning ascertainability requirement for class certification and related issues (*Henderson v. Acxiom Risk Mitigation, Inc.,* Case No. 3:12-cv-00589-REP (E.D. Va. (2013))

◊   Submitted an expert witness declaration concerning reasonableness of class action settlement and performing analysis of Anet expected value@ of settlement benefits, relied on by court in approving settlement (*In re Navistar Diesel Engine Products Liab. Litig.*, 2013 WL 10545508 (N.D. Ill. July 3, 2013))

◊   Submitted an expert witness declaration concerning reasonableness of class action settlement and attorney's fee request (*Commonwealth Care All. v. Astrazeneca Pharm. L.P.*, 2013 WL 6268236 (Mass. Super. Aug. 5, 2013))

◊   Submitted an expert witness declaration concerning propriety of preliminary settlement approval in nationwide consumer class action settlement (*Anaya v. Quicktrim, LLC,* Case No.  CIVVS 120177, California Superior Court, San Bernardino County (2012))

◊   Submitted expert witness affidavit concerning fee issues in common fund class action (*Tuttle v. New Hampshire Med. Malpractice Joint Underwriting Assoc.,* Case No. 217-2010-CV-00294, New Hampshire Superior Court, Merrimack County (2012))

◊   Submitted expert witness declaration and deposed concerning class certification issues in nationwide fraud class action, relied upon by the court in affirming class certification order (*CVS Caremark Corp. v. Lauriello,* 175 So. 3d 596, 609-10 (Ala. 2014))

◊   Submitted expert witness declaration in securities class action concerning value of proxy disclosures achieved through settlement and appropriate level for fee award (*Rational Strategies Fund v. Jhung,* Case No. BC 460783, California Superior Court, Los Angeles County (2012))

◊   Submitted an expert witness report and deposed concerning legal malpractice in the defense of a class action lawsuit (*KB Home v. K&L Gates, LLP,* Case No. BC484090, California Superior Court, Los Angeles County (2011))

◊   Retained as expert witness on choice of law issues implicated by proposed nationwide class certification (*Simon v. Metropolitan Property and Cas. Co.,* Case No. CIV-2008-1008-W (W.D. Ok. (2011))

◊   Retained, deposed, and testified in court as expert witness in fee-related dispute (*Blue, et al. v. Hill,*Case No. 3:10-CV-02269-O-BK (N.D. Tex. (2011))

◊   Retained as an expert witness in fee-related dispute (*Furth v. Furth*, Case No. C11-00071-DMR (N.D. Cal. (2011))

◊   Submitted expert witness declaration concerning interim fee application in complex environmental class action (*DeLeo v. Bouchard Transportation,* Civil Action No. PLCV2004-01166-B, Massachusetts Superior Court (2010))

◊   Retained as an expert witness on common benefit fee issues in MDL proceeding in federal court (*In re Vioxx Products Liability Litigation*, MDL Docket No. 1657 (E.D. La. (2010))

**A-7**

◇   Submitted expert witness declaration concerning fee application in securities case, referenced by court in awarding fee (*In re AMICAS, Inc. Shareholder Litigation,* 27 Mass. L. Rptr. 568 (Mass. Sup. Ct. (2010))

◇   Submitted an expert witness declaration concerning fee entitlement and enhancement in non-common fund class action settlement, relied upon by the court in awarding fees (*Parkinson v. Hyundai Motor America*, 796 F.Supp.2d 1160, 1172-74 (C.D. Cal. 2010))

◇   Submitted an expert witness declaration concerning class action fee allocation among attorneys (*Salvas v. Wal-Mart*, Civil Action No. 01-03645, Massachusetts Superior Court (2010))

◇   Submitted an expert witness declaration concerning settlement approval and fee application in wage and hour class action settlement (*Salvas v. Wal-Mart*, Civil Action No. 01-03645, Massachusetts Superior Court (2010))

◇   Submitted an expert witness declaration concerning objectors' entitlement to attorney's fees (*Rodriguez v. West Publishing Corp.,* Case No. CV-05-3222 (C.D. Cal. (2010))

◇   Submitted an expert witness declaration concerning fairness of settlement provisions and processes, relied upon by the Ninth Circuit in reversing district court's approval of class action settlement (*Radcliffe v. Experian Inform. Solutions Inc.*, 715 F.3d 1157, 1166 (9th Cir. 2013))

◇   Submitted an expert witness declaration concerning attorney's fees in class action fee dispute, relied upon by the court in deciding fee issue (*Ellis v. Toshiba America Information Systems, Inc.*, 218 Cal. App. 4th 853, 871, 160 Cal. Rptr. 3d 557, 573 (2d Dist. 2013))

◇   Submitted an expert witness declaration concerning common benefit fee in MDL proceeding in federal court (*In re Genetically Modified Rice Litigation*, MDL Docket No. 1811 (E.D. Mo. (2009))

◇   Submitted an expert witness declaration concerning settlement approval and fee application in national MDL class action proceeding (*In re Wal-Mart Wage and Hour Employment Practices Litigation*, MDL Docket No.1735 (D. Nev. (2009))

◇   Submitted an expert witness declaration concerning fee application in national MDL class action proceeding, referenced by court in awarding fees (*In re Dept. of Veterans Affairs (VA) Data Theft Litigation*, 653 F. Supp.2d 58 (D.D.C. (2009))

◇   Submitted an expert witness declaration concerning common benefit fee in mass tort MDL proceeding in federal court (*In re Kugel Mesh Products Liability Litigation*, MDL Docket No. 1842 (D. R.I. (2009))

◇   Submitted an expert witness declaration and supplemental declaration concerning common benefit fee in consolidated mass tort proceedings in state court (*In re All Kugel Mesh Individual Cases*, Master Docket No. PC-2008-9999, Superior Court, State of Rhode Island (2009))

◊    Submitted an expert witness declaration concerning fee application in wage and hour class action (*Warner v. Experian Information Solutions, Inc.*, Case No.   BC362599, California Superior Court, Los Angeles County (2009))

◊    Submitted an expert witness declaration concerning process for selecting lead counsel in complex MDL antitrust class action (*In re Rail Freight Fuel Surcharge Antitrust Litigation*, MDL Docket No. 1869 (D. D.C. (2008))

◊    Retained, deposed, and testified in court as expert witness on procedural issues in complex class action (*Hoffman v. American Express*, Case No. 2001-022881, California Superior Court, Alameda County (2008))

◊    Submitted an expert witness declaration concerning fee application in wage and hour class action (*Salsgiver v. Yahoo! Inc.*, Case No. BC367430, California Superior Court, Los Angeles County (2008))

◊    Submitted an expert witness declaration concerning fee application in wage and hour class action (*Voight v. Cisco Systems, Inc.*, Case No. 106CV075705, California Superior Court, Santa Clara County (2008))

◊    Retained and deposed as expert witness on fee issues in attorney fee dispute (*Stock v. Hafif,* Case No. KC034700, California Superior Court, Los Angeles County (2008))

◊    Submitted an expert witness declaration concerning fee application in consumer class action (*Nicholas v. Progressive Direct*, Civil Action No. 06-141-DLB (E.D. Ky. (2008))

◊    Submitted expert witness declaration concerning procedural aspects of national class action arbitration (*Johnson v. Gruma Corp.,* JAMS Arbitration No. 1220026252 (2007))

◊    Submitted expert witness declaration concerning fee application in securities case (*Drulias v. ADE Corp.,* Civil Action No. 06-11033 PBS (D. Mass. (2007))

◊    Submitted expert witness declaration concerning use of expert witness on complex litigation matters in criminal trial (*U.S. v. Gallion, et al*., No. 07-39 (E. D. Ky. (2007))

◊    Retained as expert witness on fees matters (*Heger v. Attorneys' Title Guaranty Fund, Inc.,* No. 03-L-398, Illinois Circuit Court, Lake County, IL (2007))

◊    Retained as expert witness on certification in statewide insurance class action (*Wagner v. Travelers Property Casualty of America*, No. 06CV338, Colorado District Court, Boulder County, CO (2007))

◊    Testified as expert witness concerning fee application in common fund shareholder derivative case (*In Re Tenet Health Care Corporate Derivative Litigation*, Case No. 01098905, California Superior Court, Santa Barbara Cty, CA (2006))

◊    Submitted expert witness declaration concerning fee application in common fund shareholder derivative case (*In Re Tenet Health Care Corp. Corporate Derivative Litigation*, Case No. CV-03-11

RSWL (C.D. Cal. (2006))

◊   Retained as expert witness as to certification of class action (*Canova v. Imperial Irrigation District*, Case No. L-01273, California Superior Court, Imperial Cty, CA (2005))

◊   Retained as expert witness as to certification of nationwide class action (*Enriquez v. Edward D. Jones & Co.,* Missouri Circuit Court, St. Louis, MO (2005))

◊   Submitted expert witness declaration on procedural aspects of international contract litigation filed in court in Korea (*Estate of Wakefield v. Bishop Han & Jooan Methodist Church* (2002))

◊   Submitted expert witness declaration as to contested factual matters in case involving access to a public forum (*Cimarron Alliance Foundation v. The City of Oklahoma City,* Case No. Civ. 2001-1827-C (W.D. Ok. (2002))

◊   Submitted expert witness declaration concerning reasonableness of class certification, settlement, and fees (*Baird v. Thomson Elec. Co.*, Case No. 00-L-000761, Cir. Ct., Mad. Cty, IL (2001))

*Expert Consultant*

◊   Provided expert consulting services to Harvard Law School Predatory Lending and Consumer Protection Clinic concerning complex class action issues in bankruptcy (*In re: ITT Educational Services Inc.,* Case No. 16-07207-JMC-7A (Bank. S.D. Ind. 2020))

◊   Provided expert consulting services to law firm concerning complex federal procedural and bankruptcy issues (*Homaidan v. Navient Solutions, LLC*, Adv. Proc. No. 17-1085 (Bank. E.D.N.Y 2020))

◊   Provided expert consulting services to the ACLU on multi-district litigation issues arising out of various challenges to President Trump's travel ban and related policies (*In re American Civil Liberties Union Freedom of Information Act Requests Regarding Executive Order 13769*, Case Pending No. 28, Judicial Panel on Multidistrict Litigation (2017); *Darweesh v. Trump*, Case No. 1:17-cv-00480-CBA-LB (E.D.N.Y. (2017))

◊   Provided expert consulting services to law firm regarding billing practices and fee allocation issues in nationwide class action (2016)

◊   Provided expert consulting services to law firm regarding fee allocation issues in nationwide class action (2016)

◊   Provided expert consulting services to the ACLU of Southern California on class action and procedural issues arising out of challenges to municipality's treatment of homeless persons with disabilities (*Glover v. City of Laguna Beach*, Case No. 8:15-cv-01332-AG-DFM (C.D. Cal. (2016))

◊   Retained as an expert consultant on class certification issues (*In re: Facebook, Inc., IPO Securities and Derivative Litigation*, No. 1:12-md-2389 (S.D.N.Y. 2015))

◊   Provided expert consulting services to lead class counsel on class certification issues in nationwide class action (2015)

◊   Retained by a Fortune 100 Company as an expert consultant on class certification issues

◊   Retained as an expert consultant on class action and procedure related issues (*Lange et al v. WPX Energy Rocky Mountain LLC*, Case No. 2:13-cv-00074-ABJ (D. Wy. (2013))

◊   Retained as an expert consultant on class action and procedure related issues (*Flo & Eddie, Inc., v. Sirius XM Radio, Inc.*, Case No. CV 13-5693 (C.D. Cal. (2013))

◊   Served as an expert consultant on substantive and procedural issues in challenge to legality of credit card late and over-time fees (*In Re Late Fee and Over-Limit Fee Litigation*, 528 F.Supp.2d 953 (N.D. Cal. 2007), *aff'd*, 741 F.3d 1022 (9th Cir. 2014))

◊   Retained as an expert on Class Action Fairness Act (CAFA) removal issues and successfully briefed and argued remand motion based on local controversy exception (*Trevino, et al. v. Cummins, et al.*, No. 2:13-cv-00192-JAK-MRW (C. D. Cal. (2013))

◊   Retained as an expert consultant on class action related issues by consortium of business groups (*In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico on April 20, 2010*, MDL No. 2179 (E.D. La. (2012))

◊   Provided presentation on class certification issues in nationwide medical monitoring classes (*In re: National Football League Players' Concussion Injury Litigation,* MDL No. 2323, Case No. 2:12-md-02323-AB (E.D. Pa. (2012))

◊   Retained as an expert consultant on class action related issues in mutli-state MDL consumer class action (*In re Sony Corp. SXRD Rear Projection Television Marketing, Sales Practices & Prod. Liability Litig.*, MDL No. 2102 (S.D. N.Y. (2009))

◊   Retained as an expert consultant on class action certification, manageability, and related issues in mutli-state MDL consumer class action (*In re Teflon Prod. Liability Litig.*, MDL No. 1733 (S.D. Iowa (2008))

◊   Retained as an expert consultant/co-counsel on certification, manageability, and related issues in nationwide anti-trust class action (*Brantley v. NBC Universal*, No.- CV07-06101 (C.D. Cal. (2008))

◊   Retained as an expert consultant on class action issues in complex multi-jurisdictional construction dispute (*Antenucci, et al., v. Washington Assoc. Residential Partner, LLP, et al.,* Civil No. 8-04194 (E.D. Pa. (2008))

◊   Retained as an expert consultant on complex litigation issues in multi-jurisdictional class action litigation (*McGreevey v. Montana Power Company*, No. 08-35137, U.S. Court of Appeals for the Ninth Circuit (2008))

◊   Retained as an expert consultant on class action and attorney fee issues in nationwide consumer class action (*Figueroa v. Sharper Image*, 517 F.Supp.2d 1292 (S.D. Fla. 2007))

◊   Retained as an expert consultant on attorney's fees issue in complex class action case (*Natural Gas Anti-Trust Cases Coordinated Proceedings*, D049206, California Court of Appeals, Fourth District (2007))

◊   Retained as an expert consultant on remedies and procedural matters in complex class action (*Sunscreen Cases*, JCCP No. 4352, California Superior Court, Los Angeles County (2006))

◊   Retained as an expert consultant on complex preclusion questions in petition for review to California Supreme Court (*Mooney v. Caspari,* Supreme Court of California (2006))

◊   Retained as an expert consultant on attorney fee issues in complex common fund case (*In Re DietDrugs (Phen/Fen) Products Liability Litigation* (E. D. Pa. (2006))

◊   Retained as an expert consultant on procedural matters in series of complex construction lien cases (*In re Venetian Lien Litigation*, Supreme Court of the State of Nevada (2005-2006))

◊   Served as an expert consultant on class certification issues in countywide class action (*Beauchamp v. Los Angeles Cty. Metropolitan Transp. Authority*, (C.D. Cal. 2004))

◊   Served as an expert consultant on class certification issues in state-wide class action (*Williams v. State of California*, Case No. 312-236, Cal. Superior Court, San Francisco)

◊   Served as an exert consultant on procedural aspects of complex welfare litigation (*Allen v. Anderson*, 199 F.3d 1331 (9th Cir. 1999))

*Ethics Opinions*

◊   Retained to provided expert opinion on issues of professional ethics in complex litigation matter (*In re Professional Responsibility Inquiries* (2017))

◊   Provided expert opinion on issues of professional ethics in complex litigation matter (*In re Professional Responsibility Inquiries* (2013))

◊   Provided expert opinion on issues of professional ethics in complex litigation matter (*In re Professional Responsibility Inquiries* (2011))

◊   Provided expert opinion on issues of professional ethics in implicated by nationwide class action practice (*In re Professional Responsibility Inquiries* (2010))

◊   Provided expert opinion on issues of professional ethics implicated by complex litigation matter (*In re Professional Responsibility Inquiries* (2010))

◊   Provided expert opinion on issues of professional ethics in complex litigation matter (*In re Professional*

*Responsibility Inquiries* (2007))

### Publications on Class Actions & Procedure

◊   *The Negotiation Class:  A Cooperative Approach to Class Actions Involving Large Stakeholders,* __
TEXAS L. REV. __   (forthcoming 2020) (with Francis E. McGovern)

◊   NEWBERG ON CLASS ACTIONS (sole since 2008, sole author of entirely re-written Fifth Edition
(2011-2018))

◊   *Profit for Costs*, 63 DEPAUL L. REV. 587 (2014) (with Morris A. Ratner)

◊   *Procedure and Society: An Essay for Steve Yeazell,* 61 U.C.L.A. REV. DISC. 136 (2013)

◊   *Supreme Court Round-Up – Part II*, 5 CLASS ACTION ATTORNEY FEE DIGEST 331 (September 2011)

◊   *Supreme Court Round-Up – Part I*, 5 CLASS ACTION ATTORNEY FEE DIGEST 263 (July-August 2011)

◊   *Class Action Fee Award* Procedures, 5 CLASS ACTION ATTORNEY FEE DIGEST 3 (January 2011)

◊   *Benefits of Class Action Lawsuits*, 4 CLASS ACTION ATTORNEY FEE DIGEST 423 (November 2010)

◊   *Contingent Fees for Representing the Government: Developments in California Law*, 4 CLASS ACTION
ATTORNEY FEE DIGEST 335 (September 2010)

◊   *Supreme Court Roundup*, 4 CLASS ACTION ATTORNEY FEE DIGEST 251 (July 2010)

◊   *SCOTUS Okays Performance Enhancements in Federal Fee Shifting Cases – At Least In Principle,* 4
CLASS ACTION ATTORNEY FEE DIGEST 135 (April 2010)

◊   *The Puzzling Persistence of the AMega-Fund@ Concept*, 4 CLASS ACTION ATTORNEY FEE DIGEST 39
(February 2010)

◊   *2009: Class Action Fee Awards Go Out With A Bang, Not A Whimper*, 3 CLASS ACTION ATTORNEY
FEE DIGEST 483 (December 2009)

◊   *Privatizing Government Litigation: Do Campaign Contributors Have An Inside Track?*, 3 CLASS
ACTION ATTORNEY FEE DIGEST 407   (October 2009)

◊   *Supreme Court Preview*, 3 CLASS ACTION ATTORNEY FEE DIGEST 307 (August 2009)

◊   *Supreme Court Roundup*, 3 CLASS ACTION ATTORNEY FEE DIGEST 259 (July 2009)

◊   *What We Now Know About How Lead Plaintiffs Select Lead Counsel (And Hence Who Gets Attorney's
Fees!) in Securities Cases*, 3 CLASS ACTION ATTORNEY FEE DIGEST 219 (June 2009)

◊   *Beware Of Ex Ante Incentive Award Agreements*, 3 CLASS ACTION ATTORNEY FEE DIGEST 175 (May 2009)

◊   *On What a "Common Benefit Fee" Is, Is Not, and Should Be*, 3 CLASS ACTION ATTORNEY FEE DIGEST 87 (March 2009)

◊   *2009: Emerging Issues in Class Action Fee Awards*, 3 CLASS ACTION ATTORNEY FEE DIGEST 3 (January 2009)

◊   *2008: The Year in Class Action Fee Awards*, 2 CLASS ACTION ATTORNEY FEE DIGEST 465 (December 2008)

◊   *The Largest Fee Award – Ever!*, 2 CLASS ACTION ATTORNEY FEE DIGEST 337 (September 2008)

◊   *Why Are Fee Reductions Always 50%?: On The Imprecision of Sanctions for Imprecise Fee Submissions*, 2 CLASS ACTION ATTORNEY FEE DIGEST 295 (August 2008)

◊   *Supreme Court Round-Up,* 2 CLASS ACTION ATTORNEY FEE DIGEST 257 (July 2008)

◊   *Fee-Shifting For Wrongful Removals: A Developing Trend?,* 2 CLASS ACTION ATTORNEY FEE DIGEST 177 (May 2008)

◊   *You Cut, I Choose:   (Two Recent Decisions About) Allocating Fees Among Class Counsel,* 2 CLASS ACTION ATTORNEY FEE DIGEST 137 (April 2008)

◊   *Why The Percentage Method?,* 2 CLASS ACTION ATTORNEY FEE DIGEST 93 (March 2008)

◊   *Reasonable Rates: Time To Reload The (*Laffey*) Matrix,* 2 CLASS ACTION ATTORNEY FEE DIGEST 47 (February 2008)

◊   *The "Lodestar Percentage" A New Concept For Fee Decisions?,* 2 CLASS ACTION ATTORNEY FEE DIGEST 3 (January 2008)

◊   *Class Action Practice Today: An Overview, in* ABA SECTION OF LITIGATION, CLASS ACTIONS TODAY 4 (2008)

◊   *Shedding Light on Outcomes in Class Actions*, *in* CONFIDENTIALITY, TRANSPARENCY, AND THE U.S. CIVIL JUSTICE SYSTEM 20-59 (Joseph W. Doherty, Robert T. Reville, and Laura Zakaras eds. 2008) (with Nicholas M. Pace)

◊   *Finality in Class Action Litigation: Lessons From Habeas*, 82 N.Y.U. L. REV. 791 (2007)

◊   *The American Law Institute's New Approach to Class Action Objectors' Attorney's Fees,* 1 CLASS ACTION ATTORNEY FEE DIGEST 347 (November 2007)

◊   *The American Law Institute's New Approach to Class Action Attorney's Fees,* 1 CLASS ACTION

ATTORNEY FEE DIGEST 307 (October 2007)

◊   *"The Lawyers Got More Than The Class Did!":   Is It Necessarily Problematic When Attorneys Fees Exceed Class Compensation?,* 1 CLASS ACTION ATTORNEY FEE DIGEST 233 (August 2007)

◊   *Supreme Court Round-Up,* 1 CLASS ACTION ATTORNEY FEE DIGEST 201 (July 2007)

◊   *On The Difference Between Winning and Getting Fees,* 1 CLASS ACTION ATTORNEY FEE DIGEST 163 (June 2007)

◊   *Divvying Up The Pot: Who Divides Aggregate Fee Awards, How, and How Publicly?,* 1 CLASS ACTION ATTORNEY FEE DIGEST 127 (May 2007)

◊   *On Plaintiff Incentive Payments,* 1 CLASS ACTION ATTORNEY FEE DIGEST 95 (April 2007)

◊   *Percentage of What?,* 1 CLASS ACTION ATTORNEY FEE DIGEST 63 (March 2007)

◊   *Lodestar v. Percentage: The Partial Success Wrinkle,* 1 CLASS ACTION ATTORNEY FEE DIGEST 31 (February 2007) (with Alan Hirsch)

◊   *The Fairness Hearing:   Adversarial and Regulatory Approaches*, 53 U.C.L.A. L. REV. 1435 (2006) (excerpted in THE LAW OF CLASS ACTIONS AND OTHER AGGREGATE LITIGATION 447-449 (Richard A. Nagareda ed., 2009))

◊   *Why Enable Litigation?  A Positive Externalities Theory of the Small Claims Class Action*, 74 U.M.K.C. L. REV. 709 (2006)

◊   *What a "Private Attorney General" Is – And Why It Matters*, 57 VAND. L. REV.   2129(2004) (excerpted in COMPLEX LITIGATION 63-72 (Kevin R. Johnson, Catherine A. Rogers & John Valery White eds., 2009)).

◊   *The Concept of Equality in Civil Procedure*, 23 CARDOZO L. REV. 1865 (2002) (selected for the Stanford/Yale Junior Faculty Forum, June 2001)

◊   *A Transactional Model of Adjudication*, 89 GEORGETOWN  L.J. 371 (2000)

◊   *The Myth of Superiority*, 16 CONSTITUTIONAL COMMENTARY 599 (1999)

◊   *Divided We Litigate:  Addressing Disputes Among Clients and Lawyers in Civil Rights Campaigns*, 106 YALE L. J. 1623 (1997) *(*excerpted in COMPLEX LITIGATION 120-123 (1998))

*Selected Presentations*

◊   *Opioid Litigation:   What's New and What Does it Mean for Future Litigation?,* RAND Institute for Civil Justice and RAND Kenneth R. Feinberg Center for Catastrophic Risk Management and Compensation, RAND Corporation, October 22, 2020 (forthcoming)

◊   *The Opioid Crisis:  Where Do We Go From Here?"* Clifford Symposium 2020, DePaul University College of Law, Chicago, Illinois, May 28-29, 2020)

◊   *Class Action Law Update,* MDL Transferee Judges Conference, Palm Beach, Florida, October 30, 2019

◊   *Class Action Law Update,* MDL Transferee Judges Conference, Palm Beach, Florida, October 31, 2018

◊   *Attorneys' Fees Issues,* MDL Transferee Judges Conference, Palm Beach, Florida, October 30, 2018

◊   *Panelist,* Federal Judicial Center, Managing Multidistrict Litigation and Other Complex Litigation Workshop (for federal judges) (March 15, 2018)

◊   *Class Action Update,* MDL Transferee Judges Conference, Palm Beach, Florida, November 1, 2017

◊   *Class Action Update,* MDL Transferee Judges Conference, Palm Beach, Florida, November 2, 2016

◊   *Judicial Power and its Limits in Multidistrict Litigation,* American Law Institute, Young Scholars Medal Conference, *The Future of Aggregate Litigation,* New York University School of Law, New York, New York, April 12, 2016

◊   *Class Action Update & Attorneys' Fees Issues Checklist,* MDL Transferee Judges Conference, Palm Beach, Florida, October 28, 2015

◊   *Class Action Law,* 2015 Ninth Circuit/Federal Judicial Center Mid-Winter Workshop, Tucson, Arizona, January 26, 2015

◊   *Recent Developments in Class Action Law,* MDL Transferee Judges Conference, Palm Beach, Florida, October 29, 2014

◊   *Recent Developments in Class Action Law,* MDL Transferee Judges Conference, Palm Beach, Florida, October 29, 2013

◊   *Class Action Remedies,* ABA 2013 National Institute on Class Actions, Boston, Massachusetts, October 23, 2013

◊   *The Public Life of the Private Law: The Logic and Experience of Mass Litigation – Conference in Honor of Richard Nagareda,* Vanderbilt Law School, Nashville, Tennessee, September 27-28, 2013

◊   *Brave New World: The Changing Face of Litigation and Law Firm Finance,* Clifford Symposium 2013, DePaul University College of Law, Chicago, Illinois, April 18-19, 2013

**A-16**

◊  *Twenty-First Century Litigation: Pathologies and Possibilities: A Symposium in Honor of Stephen Yeazell,* UCLA Law Review, UCLA School of Law, Los Angeles, California, January 24-25, 2013

◊  *Litigation's Mirror: The Procedural Consequences of Social Relationships,* Sidley Austin Professor of Law Chair Talk, Harvard Law School, Cambridge, Massachusetts, October 17, 2012

◊  *Alternative Litigation Funding (ALF) in the Class Action Context – Some Initial Thoughts*, Alternative Litigation Funding: A Roundtable Discussion Among Experts, George Washington University Law School, Washington, D.C., May 2, 2012

◊  *The Operation of Preclusion in Multidistrict Litigation (MDL) Cases*, Brooklyn Law School Faculty Workshop, Brooklyn, New York, April 2, 2012

◊  *The Operation of Preclusion in Multidistrict Litigation (MDL) Cases*, Loyola Law School Faculty Workshop, Los Angeles, California, February 2, 2012

◊  *Recent Developments in Class Action Law and Impact on MDL Cases,* MDL Transferee Judges Conference, Palm Beach, Florida, November 2, 2011

◊  *Recent Developments in Class Action Law,* MDL Transferee Judges Conference, Palm Beach, Florida, October 26, 2010

◊  *A General Theory of the Class Suit*, University of Houston Law Center Colloquium, Houston, Texas, February 3, 2010

◊  *Unpacking The "Rigorous Analysis" Standard,* ALI-ABA 12th Annual National Institute on Class Actions, New York, New York, November 7, 2008

◊  *The Public Role in Private Law Enforcement: Visions from CAFA*, University of California (Boalt Hall) School of Law Civil Justice Workshop, Berkeley, California, February 28, 2008

◊  *The Public Role in Private Law Enforcement: Visions from CAFA*, University of Pennsylvania Law Review Symposium, Philadelphia, Pennsylvania, Dec. 1, 2007

◊  *Current CAFA Consequences: Has Class Action Practice Changed?,* ALI-ABA 11th Annual National Institute on Class Actions, Chicago, Illinois, October 17, 2007

◊  *Using Law Professors as Expert Witnesses in Class Action Lawsuits,* ALI-ABA 10th Annual National Institute on Class Actions, San Diego, California, October 6, 2006

◊  *Three Models for Transnational Class Actions*, Globalization of Class Action Panel, International Law Association 2006 Conference, Toronto, Canada, June 6, 2006

◊  *Why Create Litigation?:  A Positive Externalities Theory of the Small Claims Class Action*, UMKC Law Review Symposium, Kansas City, Missouri, April 7, 2006

◊   *Marks, Bonds, and Labels:   Three New Proposals for Private Oversight of Class Action Settlements*, UCLA Law Review Symposium, Los Angeles, California, January 26, 2006

◊   Class Action Fairness Act, Arnold & Porter, Los Angeles, California, December 6, 2005

◊   ALI-ABA 9th Annual National Institute on Class Actions, Chicago, Illinois, September 23, 2005

◊   Class Action Fairness Act, UCLA Alumni Assoc., Los Angeles, California, September 9, 2005

◊   Class Action Fairness Act, Thelen Reid & Priest, Los Angeles, California, May 12, 2005

◊   Class Action Fairness Act, Sidley Austin, Los Angeles, California, May 10, 2005

◊   Class Action Fairness Act, Munger, Tolles & Olson, Los Angeles, California, April 28, 2005

◊   Class Action Fairness Act, Akin Gump Strauss Hauer Feld, Century City, CA, April 20, 2005

SELECTED OTHER LITIGATION EXPERIENCE

*United States Supreme Court*

◊   Served as *amicus curiae* and authored *amicus* brief on proper approach to *cy pres* award in class action lawsuits (*Frank v. Gaos*, No. 17-961, October Term 2018)

◊   Co-counsel on petition for writ of *certiorari* concerning application of the voluntary cessation doctrine to government defendants (*Rosebrock v. Hoffman*, 135 S. Ct.1893 (2015))

◊   Authored *amicus* brief filed on behalf of civil procedure and complex litigation law professors concerning the importance of the class action lawsuit (*AT&T Mobility v. Concepcion,* No. 09-893, 131 S. Ct. 1740 (2011)

◊   Co-counsel in constitutional challenge to display of Christian cross on federal land in California's Mojave preserve (*Salazar v. Buono*, 130 S. Ct. 1803 (2010))

◊   Co-authored *amicus* brief filed on behalf of constitutional law professors arguing against constitutionality of Texas criminal law (*Lawrence v. Texas*, 539 U.S. 558 (2003))

◊   Co-authored *amicus* brief on scope of *Miranda* (*Illinois v. Perkins*, 496 U.S. 292 (1990))

*Attorney's Fees*

◊   Appointed by the United States District Court for the Eastern District of Pennsylvania as an expert witness on attorney's fees in complex litigation, with result that the Court adopted recommendations (*In re National Football League Players' Concussion Injury Litigation*, 2018 WL 1658808 (E.D.Pa. April 5, 2018))

◊   Appointed by the United States Court of Appeals for the Second Circuit to argue for affirmance of district court fee decision in complex securities class action, with result that the Court summarily affirmed the decision below (*In re Indymac Mortgage-Backed Securities Litigation*, 94 F.Supp.3d 517 (S.D.N.Y. 2015), *aff'd sub. nom.*, *DeValerio v. Olinski*, 673 F. App'x 87, 90 (2d Cir. 2016)).

◊   Served as *amicus curiae* and co-authored *amicus* brief on proper approach to attorney's fees in common fund cases, relied on by the court in *Laffitte v. Robert Half Int'l Inc.*, 1 Cal. 5th 480, 504, 376 P.3d 672, 687 (2016).

### Consumer Class Action

◊   Co-counsel in challenge to antenna-related design defect in Apple's iPhone4 (*Dydyk v. Apple Inc.*, 5:10-cv-02897-HRL, U.S. Dist. Court, N.D. Cal.) (complaint filed June 30, 2010)

◊   Co-class counsel in $8.5 million nationwide class action settlement challenging privacy concerns raised by Google's Buzz social networking program (*In re Google Buzz Privacy Litigation*, 5:10-cv-00672-JW, U.S. Dist. Court, N.D. Cal.) (amended final judgment June 2, 2011)

### Disability

◊   Co-counsel in successful ADA challenge ($500,000 jury verdict) to the denial of health care in emergency room (*Howe v. Hull*, 874 F. Supp. 779, 873 F. Supp 72 (N.D. Ohio 1994))

### Employment

◊   Co-counsel in challenges to scope of family benefit programs (*Ross v. Denver Dept. of Health*, 883 P.2d 516 (Colo. App. 1994)); (*Phillips v. Wisc. Personnel Com'n*, 482 N.W.2d 121 (Wisc. 1992))

### Equal Protection

◊   Co-counsel in (state court phases of) successful challenge to constitutionality of a Colorado ballot initiative, Amendment 2 (*Evans v. Romer*, 882 P.2d 1335 (Colo. 1994))

◊   Co-counsel (and *amici*) in challenges to rules barring military service by gay people (*Able v. United States*, 44 F.3d 128 (2d Cir. 1995); *Steffan v. Perry*, 41 F.3d 677 (D.C. Cir. 1994) (*en banc*))

◊   Co-counsel in challenge to the constitutionality of the Attorney General of Georgia' firing of staff attorney (*Shahar v. Bowers*, 120 F.3d 211 (11th Cir. 1997))

### Fair Housing

◊   Co-counsel in successful Fair Housing Act case on behalf of group home (*Hogar Agua y Vida En el Desierto v. Suarez-Medina*, 36 F.3d 177 (1st Cir. 1994))

### *Family Law*

◊ Co-counsel in challenge to constitutionality of Florida law limiting adoption (*Cox v. Florida Dept. of Health and Rehab. Srvcs.*, 656 So.2d 902 (Fla. 1995))

◊ Co-authored *amicus* brief in successful challenge to Hawaii ban on same-sex marriages (*Baehr v. Lewin*, 852 P.2d 44 (Haw. 1993))

### *First Amendment*

◊ Co-counsel in successful challenge to constitutionality of Alabama law barring state funding foruniversity student groups (*GLBA v. Sessions*, 930 F.Supp. 1492 (M.D. Ala. 1996))

◊ Co-counsel in successful challenge to content restrictions on grants for AIDS education materials (*Gay Men's Health Crisis v. Sullivan*, 792 F.Supp. 278 (S.D.N.Y. 1992))

### *Landlord / Tenant*

◊ Lead counsel in successful challenge to rent control regulation (*Braschi v. Stahl Associates Co.*, 544 N.E.2d 49 (N.Y. 1989))

### *Police*

◊ Co-counsel in case challenging DEA brutality (*Anderson v. Branen*, 27 F.3d 29 (2nd Cir. 1994))

### *Racial Equality*

◊ Co-authored *amicus* brief for constitutional law professors challenging constitutionality of Proposition 209 *(Coalition for Economic Equity v. Wilson*, 110 F.3d 1431 (9th Cir. 1997))

SELECTED OTHER PUBLICATIONS
*Editorials*

◊ *Follow the Leaders*, NEW YORK TIMES, March 15, 2005

◊ *Play It Straight*, NEW YORK TIMES, October 16, 2004

◊ *Hiding Behind the Constitution*, NEW YORK TIMES, March 20, 2004

◊ *Toward More Perfect Unions,* NEW YORK TIMES, November 20, 2003 (with Brad Sears)

◊ *Don't Ask, Don't Tell, Don't Believe It*, NEW YORK TIMES, July 20, 1993

◊ *AIDS: Illness and Injustice*, WASH. POST, July 26, 1992 (with Nan D. Hunter)

BAR ADMISSIONS

◊   Massachusetts (2008)

◊   California (2004)

◊   District of Columbia (1987) (inactive)

◊   Pennsylvania (1986) (inactive)

◊   U.S. Supreme Court (1993)

◊   U.S. Court of Appeals for the First Circuit (2010)

◊   U.S. Court of Appeals for the Second Circuit (2015)

◊   U.S. Court of Appeals for the Fifth Circuit (1989)

◊   U.S. Court of Appeals for the Ninth Circuit (2004)

◊   U.S. Court of Appeals for the Eleventh Circuit (1993)

◊   U.S. Court of Appeals for the D.C. Circuit (1993)

◊   U.S. District Courts for the Central District of California (2004)

◊   U.S. District Court for the District of the District of Columbia (1989)

◊   U.S. District Court for the District of Massachusetts (2010)

◊   U.S. District Court for the Northern District of California (2010)

# EXHIBIT B

*In re Facebook Biometric Information Privacy Litigation*
Case No. 3:15-cv-03747-JD
U.S. District Court for the Northern District of California

**EXPERT REPORT OF PROFESSOR WILLIAM B. RUBENSTEIN**

EXHIBIT B
Partial List of Documents Reviewed by Professor Rubenstein
(other than case law and scholarship on the relevant issues)

A. *In re Facebook Biometric Info. Privacy Litig.*, No. 3:15-cv-03747 (N.D. Cal.)

1. Consolidated Class Action Complaint, ECF No. 40
2. Defendant Facebook, Inc.'s Motion to Dismiss: Memorandum of Points and Authorities in Support, ECF No. 69
3. Plaintiffs' Opposition to Facebook's Motion to Dismiss, ECF No. 73
4. Defendant Facebook, Inc.'s Reply in Support of Motion to Dismiss, ECF No. 76
5. Defendant Facebook, Inc.'s Pre-Hearing Brief, ECF No. 96
6. Plaintiffs' Opposition to Defendant's Motion for Summary Judgment, ECF No. 97-3
7. Order re: Motion to Dismiss and Summary Judgment, ECF No. 120
8. Defendant Facebook, Inc.'s Answer and Affirmative Defenses to Plaintiffs' Complaint, ECF No. 126
9. Defendant Facebook, Inc.'s Motion to Dismiss Under Rule 12(b)(1) and Rule 12(h)(3) for Lack of Subject Matter Jurisdiction; Memorandum of Points and Authorities in Support, ECF No. 129
10. Plaintiffs' Joint Response in Opposition to Facebook's Motion to Dismiss for Lack of Subject Matter Jurisdiction, ECF No. 138
11. Defendant Facebook, Inc.'s Reply in Support of Its Motion to Dismiss for Lack of Subject Matter Jurisdiction, ECF No. 140
12. Defendant Facebook, Inc.'s Amended Answer and Affirmative Defenses to Plaintiffs' Complaint, ECF No. 169
13. Defendant Facebook, Inc.'s Renewed Motion to Dismiss Under Rule 12(b)(1) for Lack of Subject Matter Jurisdiction, ECF No. 227
14. Plaintiffs' Response in Opposition to Facebook's Renewed Motion to Dismiss for Lack of Subject Matter Jurisdiction, ECF No. 236
15. Defendant Facebook, Inc.'s Reply in Support of Its Renewed Motion to Dismiss Under Rule 12(b)(1) for Lack of Subject Matter Jurisdiction, ECF No. 239
16. Plaintiffs' Motion for Class Certification, ECF No. 255
17. Facebook, Inc.'s Motion for Summary Judgment Based on Illinois' Extraterritoriality Doctrine and the Dormant Commerce Clause, ECF No. 257
18. Plaintiffs' Opposition to Defendant Facebook, Inc.'s Motion for Summary Judgment; and Plaintiffs' Deferral Request Under Rule 56(d), ECF No. 271-3
19. Facebook's Reply in Support of Its Motion for Summary Judgment Based on Illinois' Extraterritoriality Doctrine and the Constitution's Dormant Commerce Clause, ECF No. 278
20. Facebook's Opposition to Plaintiffs' Motion for Class Certification, ECF No. 284-1

21. Plaintiffs' Reply in Support of Motion for Class Certification, ECF No. 291-1
22. Order re Renewed Motion to Dismiss for Lack of Subject Matter Jurisdiction, ECF No. 294 [*Patel v. Facebook Inc.*, 290 F. Supp. 3d 948]
23. Facebook, Inc.'s Motion for Summary Judgment, ECF No. 299
24. Plaintiffs' Notice of Motion and Motion for Partial Summary Judgment; Memorandum of Points and Authorities in Support Thereof, ECF No. 306-1
25. Order re: Class Certification, ECF No. 333
26. Facebook's Opposition to Plaintiffs' Motion for Partial Summary Judgment, ECF No. 337
27. Plaintiffs' Opposition to Facebook, Inc.'s Motion for Summary Judgment, ECF No. 341
28. Facebook's Reply in Support of Its Motion for Summary Judgment, ECF No. 350
29. Reply in Support of Plaintiffs' Motion for Partial Summary Judgment, ECF No. 359
30. Plaintiffs' Notice of Motion and Motion for Approval of Class Notice Plan and for an Order Compelling Defendant to Cooperate in Class Notice: Memorandum of Points and Authorities in Support Thereof, ECF No. 370
31. Exhibit A, Declaration of Alan Vasquez Regarding Class Notice Plan, ECF No. 370-2
32. Order re: Summary Judgment Motions, ECF No. 372
33. Facebook, Inc.'s Motion for Summary Judgment, ECF No. 377-1
34. Defendant Facebook, Inc.'s Opposition to Plaintiffs' Motion for Approval of Class Notice Plan and for an Order Compelling Defendant to Cooperate in Class Notice, ECF No. 382
35. Reply in Support of Plaintiffs' Motion for Approval of Class Notice Plan and for an Order Compelling Defendant to Cooperate in Class Notice, ECF No. 386
36. Order re: Pre-Trial Class Notice, ECF No. 402
37. Order re: Request for Stay, ECF No. 404
38. U.S. Court of Appeals for the Ninth Circuit Order re: Petition for Permission to Appeal Under 23(f), ECF No. 406
39. U.S. Court of Appeals for the Ninth Circuit Opinion Affirming Order re: Class Certification, ECF No. 416
40. Plaintiffs' Unopposed Notice of Motion and Motion for Preliminary Approval of Class Action Settlement; Memorandum of Points and Authorities in Support Thereof, ECF No. 445
41. Declaration of Jay Edelson, ECF No. 445-1
42. Exhibit 1, Stipulation of Class Action Settlement, ECF No. 445-2
43. Exhibit 2, Transcript of Proceedings, May 21, 2018, ECF No. 445-3
44. Exhibit 3, Declaration of Jeffrey L. Bleich, ECF No. 445-4
45. [Proposed] Order Granting Motion for Preliminary Approval of Class Action Settlement, ECF No. 445-5
46. Facebook's Supplemental Brief in Support of Preliminary Approval of the Settlement, ECF No. 447
47. Declaration of Whitty Somvichian, ECF No. 447-1
48. Exhibit 1 to Somvichian Declaration, Transcript of Videotaped Deposition of Yaniv Taigman [Redacted Version of Document], ECF No. 447-2
49. Order Denying Motion for Preliminary Approval, ECF No. 456
50. Stipulated Request in Response to the Court's Minute Order, ECF No. 458

51. Transcript of Remote Zoom Video Conference, June 4, 2020, ECF No. 460
52. Facebook's Second Supplemental Brief in Support of Preliminary Approval of the Settlement, ECF No. 462
53. Declaration of Whitty Somvichian, ECF No. 462-1
54. Exhibit 1 to Somvichian Declaration, 2012 FTC LEXIS 135, ECF No. 462-2
55. Exhibit 2 to Somvichian Declaration, *U.S. v. Facebook*, Complaint for Civil Penalties, Injunction, and Other Relief, ECF No. 462-3
56. Exhibit 3 to Somvichian Declaration, *U.S. v. Facebook*, Stipulated Order for Civil Penalty, Monetary Judgment, and Injunctive Relief, ECF No. 462-4
57. Exhibit 4 to Somvichian Declaration, *Facing Facts: Best Practices for Common Uses of Facial Recognition Technologies*, ECF No. 462-5
58. Exhibit 5 to Somvichian Declaration, Excerpt from Transcript of Videotaped Deposition of Dan Barak, ECF No. 462-6
59. Exhibit 6 to Somvichian Declaration, *Lloyd v. Xanitos, Inc.*, Stipulation of Class Action Settlement, ECF No. 462-7
60. Exhibit 7 to Somvichian Declaration, *Dixon v. Washington & Jane Smith Home*, Amended Settlement Agreement and Release, ECF No. 462-8
61. Exhibit 8 to Somvichian Declaration, *Svagdis v. Alro Steel Corp.*, Settlement Agreement and Release, ECF No. 462-9
62. Exhibit 9 to Somvichian Declaration, *Zepeda v. Kimpton Hotel & Restaurant Grp., LLC*, Settlement and Release Agreement, ECF No. 462-10
63. Exhibit 10 to Somvichian Declaration, *Zhirovetskiy v. Zayo Grp., LLC*, Settlement and Release Agreement, ECF No. 462-11
64. Exhibit 11 to Somvichian Declaration, *Fluker v. Glanbia Performance Nutrition*, Stipulation of Class Action Settlement, ECF No. 462-12
65. Exhibit 12 to Somvichian Declaration, *Glynn v. eDriving, LLC*, Settlement and Release Agreement, ECF No. 462-13
66. Exhibit 13 to Somvichian Declaration, *Smith v. Pineapple Hosp. Co.*, Settlement and Release Agreement, ECF No. 462-14
67. Exhibit 14 to Somvichian Declaration, *Johnson v. Resthaven Illiana Christian Convalescent Home, Inc.*, Settlement Agreement and Release Agreement, ECF No. 462-15
68. Exhibit 15 to Somvichian Declaration, *Parker v. DaBecca Natural Foods, Inc.*, Stipulation of Class Action Settlement, ECF No. 462-16
69. Exhibit 16 to Somvichian Declaration, *Prelipceanu v. Jumio Corp.*, Settlement Agreement, ECF No. 462-17
70. Exhibit 17 to Somvichian Declaration, *Graziano v. Royal Die & Stamping LLC*, Settlement and Release Agreement, ECF No. 462-18
71. Exhibit 18 to Somvichian Declaration, *Gordon v. IFCO Sys. US, LLC*, Stipulation of Class Action Settlement, ECF No. 462-19
72. Exhibit 19 to Somvichian Declaration, *Muniz v. Workwell Techs., Inc.*, Stipulation of Class Action Settlement, ECF No. 462-20
73. Declaration of Gary McCoy, ECF No. 463
74. Exhibit A, "Making Photo Tagging Easier," ECF No. 463-1
75. Exhibit B, Facebook's Privacy Policy, ECF No. 463-2
76. Exhibit C, ECF No. 463-3

77. Exhibit D, "What is the face recognition setting on Facebook and how does it work?", ECF No. 463-4
78. Plaintiffs' Supplemental Brief in Support of Preliminary Approval of a Class Action Settlement and Request for Referral to Ambassador Jeffrey L. Bleich, ECF No. 465
79. Declaration of Rafey S. Balabanian, ECF No. 465-1
80. Exhibit 1, Excerpts of Transcript of Remote Zoom Conference, June 4, 2020, ECF No. 465-2
81. Exhibit 2, Excerpt of Transcript of Videotaped Deposition of Nimesh Patel, ECF No. 465-3
82. Exhibit 3, Declaration of Tiffany Elking, ECF No. 465-4
83. Order Granting Preliminary Approval of Class Action Settlement, ECF No. 474
84. Emergency Motion for a Temporary Restraining Order as to Levi & Korsinsky LLP, ECF No. 477
85. Declaration of Christopher L. Dore, ECF No. 477-1
86. Exhibit 1, ECF No. 477-2
87. Exhibit 2, ECF No. 477-3
88. Exhibit 3, ECF No. 477-4
89. [Proposed] Temporary Restraining Order, ECF No. 477-5
90. Levi & Korsinsky, LLP's Response to Emergency Application for a Temporary Restraining Order, ECF No. 479
91. Plaintiffs' Reply in Further Support of Emergency Motion for a Temporary Restraining Order as to Levi & Korsinsky LLP, ECF No. 480
92. Levi & Korsinsky, LLP's Sur-reply in Response to Plaintiffs' Emergency Motion for a Temporary Restraining Order, ECF No. 483-1
93. Declaration of Gregory M. Nespole, ECF No. 483-2
94. Third Joint Report Regarding Progress of Notice, ECF No. 492

**B. *Patel v. Facebook, Inc.*, No. 18-15982 (9th Cir.)**

1. Appellant's Brief, ECF No. 31-1
2. Brief of *Amici Curiae* American Civil Liberties Union, American Civil Liberties Union of Illinois, American Civil Liberties Union Foundation of Northern California, American Civil Liberties Union Foundation of Southern California, Center for Democracy & Technology, Electronic Frontier Foundation, and Illinois PIRG Education Fund, Inc., in Support of Plaintiffs-Appellees Seeking Affirmance, ECF No. 43
3. Brief of *Amicus Curiae* Electronic Privacy Information Center (EPIC) in Support of Plaintiffs-Appellees, ECF No. 46
4. Opinion Affirming Order re: Class Certification, ECF No. 85-1 [932 F.3d 1264]
5. Washington Legal Foundation's *Amicus Curiae* Brief in Support of the Petition for Rehearing *En Banc*, ECF No. 92
6. Brief of Amicus Curiae Consumer Data Industry Association in Support of Appellant Facebook's Petition for Rehearing En Banc, ECF No. 93
7. Brief of Amicus Curiae TechFreedom in Support of Petitioner's Petition for Rehearing En Banc, ECF No. 97

8.  Brief for *Amicus Curiae* Internet Association in Support of Defendant-Appellant Facebook, Inc.'s Petition for Rehearing En Banc, ECF No. 100
9.  Brief for the Chamber of Commerce of the United States as *Amicus Curiae* in Support of Appellant's Petition for Rehearing En Banc, ECF No. 101
10. Opposition of Plaintiffs-Appellees to Petition for Rehearing En Banc
11. Order Denying Petition for Rehearing En Banc, ECF No. 105

## C.  *U.S. v. Facebook*, No. 19-cv-02184 (D.D.C.)

1.  Complaint for Civil Penalties, Injunction, and Other Relief, ECF No. 1
2.  Decision and Order, 2012 FTC LEXIS 135, ECF No. 1-1
3.  Complaint, 2012 FTC LEXIS 136, ECF No. 1-2
4.  "Better Controls for Managing Your Content," ECF No. 1-3
5.  "Making It Easier to Share With Who You Want," ECF No. 1-4
6.  "Privacy Checkup Is Now Rolling Out," ECF No. 1-5
7.  Civil Cover Sheet, ECF No. 1-6

## C.  *Facebook, Inc. v. Patel*, No. 19-706 (U.S.)

1.  Petition for a Writ of Certiorari, December 2019
2.  Brief of Washington Legal Foundation as *Amicus Curiae* in Support of Petitioner, December 13, 2019
3.  Brief of Amicus Curiae Consumer Data Industry Association in Support of Petitioner, January 3, 2020
4.  Brief of *Amicus Curiae* TechFreedom in Support of Petitioner, January 3, 2020

# EXHIBIT C

*In re Facebook Biometric Information Privacy Litigation*
Case No. 3:15-cv-03747-JD
U.S. District Court for the Northern District of California

**EXPERT REPORT OF PROFESSOR WILLIAM B. RUBENSTEIN**

EXHIBIT C
List of Cases with Multipliers of 4 or More

1. *In re Merry-Go-Round Enterprises, Inc.*, 244 B.R. 327, 335-45 (Bankr. D. Md. 2000) ("Based on Fidelity's analysis which assumes a $300 blended hourly rate would be reasonable, the contingent fee requested by Snyder, Weiner, as modified, of $71.2 million would be 19.6 times the lodestar starting point….Snyder, Weiner will be awarded its requested fee in the amount of $71.2 million for professional services as special litigation counsel for the Chapter 7 Trustee.")) (bankruptcy).

2. *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, NO. CIV.A. 03-457, 2005 WL 1213926, at *18 (E.D. Pa. May 19, 2005) ("The Court further notes that the high lodestar multiplier (15.6) which results from the Court's award of attorneys' fees in this case is neutralized with respect to the reasonableness of a percentage fee award of 20% by the extraordinary support Plaintiffs have shown for counsel's request for fees.").

3. *Glendora Cmty. Redevelopment Agency v. Demeter*, 155 Cal. App. 3d 465, 479 (Ct. App. 1984) ("The contention of [appellant] is that the fee sought is more than 12 times the fee for which services at an hourly rate would have been obtained from an attorney specializing in condemnation (including $8,000 for costs on appeal). Such calculations are based upon hindsight rather than reasonable expectation.") (condemnation proceeding).

4. *In re Doral Fin. Corp. Sec. Litig.*, No. 1:05-md-01706, ECF No. 107 at 5 (S. D. N.Y. July 17, 2007) ("Lead Plaintiff's counsel's total lodestar is $1,917,094.50. A 15.25% fee represents a reasonable multiplier of 10.26. Given the public policy and judicial economy interests that support the expeditious settlement of cases...the requested fee is reasonable.").

5. *Weiss v. Mercedes-Benz*, 899 F. Supp. 1297 (D. N.J. 1995), *aff'd*, 66 F.3d 314 (3d Cir. 1995) , as reported in *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 572, 592 (D.N.J. 1997) (stating that *Weiss* court had "award[ed] fee that resulted in a multiple of 9.3 times the lodestar and an average hourly rate of $2,779.63"), *vacated on other grounds sub nom. In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998).

6. *Conley v. Sears, Roebuck & Co.*, 222 B.R. 181, 182 (D. Mass. 1998) ("If a lodestar approach were used, the actual amount of attorney's fees of class counsel calculated by multiplying the number of hours worked by the hourly billing rate totals $826,665.00,

such that the requested attorney's fees would constitute a lodestar multiplier of 8.9 percent. After hearing, and some hand-wringing, the Court concludes that the fee is not unreasonable under the common fund doctrine.") (class action within bankruptcy).

7.   *Cosgrove v. Sullivan*, 759 F. Supp. 1667, 167 n.1 (S.D.N.Y. 1991) ("Under these circumstances, we set the prevailing counsel's fee at $1,000,000.00…[t]he total 'lodestar' in this case, which represents hours worked multiplied by a reasonable hourly rate, is $114,398.00.") (8.74 multiplier).

8.   *Muchnick v. First Federal Savings & Loan Association of Philadelphia*, No. CIV.A. 86-1104, 1986 WL 10791, at *1 (E.D. Pa. Sept. 30, 1986) ("Although the lodestar in this case is approximately $30,000.00, counsel seeks an attorneys' fee of $250,000.00 . . . I conclude that the requested fee is eminently reasonable under the circumstances of this case and can be justified under the lodestar method of calculation") (8.33 multiplier).

9.   *New England Carpenters Health Benefits Fund v. First Databank, Inc.*, Civil Action No. 05-11148-PBS, 2009 WL 2408560, at *2 (D. Mass. Aug. 3, 2009) ("Balancing all the factors under the crosscheck approach, I award the amount of $70,000,000, which represents a multiplier of about 8.3 times lodestar, and about 20 percent of the common fund.").

10.  *Santos v. Camacho*, No. CIV. 04-00006, 2008 WL 8602098, at*39 (D. Guam Apr. 23, 2008) ("Based on the significant results achieved through the efforts of Class Counsel in creating the funds for settlement and in light of case law, the court should find that this factor weighs strongly in favor of granting counsel a multiplier of 8."), *aff'd Simpao v. Gov't of Guam,* 369 F. App'x 837, 840 (9th Cir. 2010).

11.  *Yuzary v. HSBC Bank USA, N.A.*, No. 12 CIV. 3693 PGG, 2013 WL 5492998, at *11 (S.D.N.Y. Oct. 2, 2013) ("Here, the lodestar sought by Class Counsel, approximately 7.6 times, falls within the range granted by courts and equals the 31.7% being sought. While this multiplier is near the higher end of the range of multipliers that courts have allowed, this should not result in penalizing plaintiffs' counsel for achieving an early settlement, particular where, as here, the settlement amount is substantial.").

12.  *Hainey v. Parrott,* No. 1:02-CV-733, 2007 WL 3308027, at *1-2 (S.D. Ohio Nov. 6, 2007) ("[C]ounsel's lodestar fee calculation is approximately $241,000…[i]n consideration of the above factors, the Court finds that an award of attorney's fees of 30% of the common fund, or $1.8 million, is appropriate in this case.") (7.47 effective multiplier).

13.  *In re Boston and Maine Corp. v. Sheehan, Phinney, Bass & Green, P.A.*, 778 F.2d 890 (1st Cir. 1985) (awarding a "final fee of $232,310" contrasted with "hourly fees of $33,110") (bankruptcy).

14.  *In re Rite Aid Corp. Sec. Litigation*, 362 F. Supp. 2d 587, 589 (E.D. Pa. 2005) ("Based

on the $31,660,328.75 proposed fee award and the $4,549,824.75 lodestar, we conclude that plaintiffs' counsel requests approval of a fee award with a 6.96 multiplier.").

15. *Steiner v. Amer. Broadcasting Co., Inc.*, 248 Fed. Appx. 780, 783 (9th Cir. 2007) ("Based on class counsel's total hours, the lodestar multiplier was approximately 6.85. Although this multiplier is higher than those in many common fund cases, it still falls well within the range of multipliers that courts have allowed.") (internal citations omitted).

16. *Ramirez v. Lovin' Oven Catering Suffolk, Inc.*, No. 11 CIV. 0520 JLC, 2012 WL 651640 (S.D.N.Y. Feb. 24, 2012) (granting fees equal to 6.8 times lodestar).

17. *Riveras v. Bilboa Rest. Corp.*, No. 17-CV-4430-LTS-BCM, 2018 WL 8967112, at *1 (S.D.N.Y. Dec. 14, 2018) (finding 6.7 multiplier reasonable in FLSA action).

18. *In re UnitedHealth Grp. Inc. PSLRA Litig.*, 643 F. Supp. 2d 1094, 1106 (D. Minn. 2009) ("Using the Court-calculated lodestar, this fee would represent a multiplier of nearly 6.5. The Court finds this multiplier appropriate").

19. *Nieman v. Duke Energy Corp.*, No. 312CV00456MOCDSC, 2015 WL 13609363, at *2 (W.D.N.C. Nov. 2, 2015) ("The amount of the settlement and the efficiency of counsel in reaching such a resolution reinforce an upward variance from a 4.5 multiplier, but not an 8.0 multiplier. Considering all of the arguments presented, the court finds that the work accomplished in this case—which was substantial—is reasonably compensated by an 18% fee when the *Johnson* factors are considered and then crosschecked.") (6.43 multiplier).

20. *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 482 (S.D.N.Y. 2013) ("Here, the lodestar sought by Class Counsel, approximately 6.3 times, falls within the range granted by courts and equals the one-third percentage being sought.  While this multiplier is near the higher end of the range of multipliers that courts have allowed, this should not result in penalizing plaintiffs' counsel for achieving an early settlement, particular where, as here, the settlement amount is substantial.").

21. *Spartanburg Reg'l Health Servs. Dist., Inc. v. Hillenbrand Indus., Inc.*, No. 7:03-cv-02141, ECF Nos. 377 (D. S.C. Aug. 15, 2006) (approving fee request noting multiplier "slightly above six"); ECF No. 338-5 (providing data showing 6.22 multiplier).

22. *Stevens v. SEI Investments Co.*, No. CV 18-4205, 2020 WL 996418, at *13 (E.D. Pa. Feb. 28, 2020) ("Class Counsel's request for $2,266,666.00 (one-third of the settlement amount) will result in Class Counsel receiving approximately 6.16 times the lodestar. Courts frequently approve attorneys' fees awards for amounts in excess of the calculated lodestar. Indeed, multiples ranging from 1 to 8 are often used in common fund cases.").

23. *Kane Cty., Utah v. United States*, 145 Fed. Cl. 15, 20 (2019) ("In order to equal one third of the total recovery, this lodestar amount must be subjected to a multiplier of approximately 6.13, which is within the range courts have approved in common fund cases.").

24. *Wenzel v. Colvin*, No. EDCV 11-0338 JEM, 2014 WL 3810247, at *4 (C.D. Cal. Aug. 1, 2014) ("The $1,000 per hour rate constitutes a multiplier of 6.06 over counsel's normal hourly rate, consistent with cases that reward excellent results.").

25. *In re Credit Default Swaps Antitrust Litig.*, No. 13MD2476 (DLC), 2016 WL 2731524, at *17 (S.D.N.Y. Apr. 26, 2016) ("The loadstar calculation submitted by Class Counsel totals over $41 million as of April 1, reflecting over 93,000 hours of work by Class Counsel. This amount is equivalent to a loadstar multiple of just over 6.").

26. *In re Cardinal Health Inc. Securities Litigations*, 528 F. Supp. 2d 752, 768 (S.D. Ohio 2007) ("From the Court's analysis of the previous factors, the Court has found that approximately 18% is a reasonable award, which would yield a lodestar multiplier of six.").

27. *In re Krispy Kreme Doughnuts, Inc. Sec. Litig.*, No. 1:04-cv-00416, ECF No. 203 (M.D. N.C. Feb. 15, 2007) (approving fee request); ECF No. 193 at 17 (stating fee request embodied multiplier of "approximately 6").

28. *In re RJR Nabisco, Inc. Securities Litigation*, No. 88 Civ. 7905(MBM), 1992 WL 210138, at *5-6 (S.D. N.Y. Aug. 14, 1992) ("[T]he requested fees total six times the value of the time spent by plaintiffs' counsel, what is referred to as the lodestar amount, which amount he says equals the total fees of all defense counsel. . . .  [T]he award of a percentage fee in common fund cases such as this is consistent with the better and increasingly prevailing view in such cases, the requested percentage lies well within the limits awarded in similar cases, plaintiffs' counsel have not taken a free ride on the efforts of a government agency and the settlement was skillfully negotiated.").

29. *Ladewig v. Arizona Dep't of Revenue*, 204 Ariz. 352, 359, 63 P.3d 1089, 1096 (Ariz. Tax Ct. 2003) ("In this case, the Court believes that in light of the lengthy delay in recovery, and the high risks assumed by counsel, that a lodestar multiplier of 6 is appropriate.").

30. *Williams v. Rohm & Haas Pension Plan*, No. 04-0078-SEB, 2010 WL 4723725 (S.D. Ind. Nov. 12, 2010), *aff'd*, 658 F.3d 629 (7th Cir. 2011) (awarding fees of $43.5 million, representing 5.85 multiplier).

31. *Athale v. Sinotech Energy Ltd.*, No. 11 CIV. 05831 (AJN), 2013 WL 11310686, at *9 (S.D.N.Y. Sept. 4, 2013) ("This amounts to a lodestar multiplier of 5.65, which although high, is not unreasonable under the particular facts of this case.").

32. *In re Charter Commc'ns, Inc., Sec. Litig.*, No. 4:02-CV-1186 CAS, 2005 WL 4045741,

at *22 (E.D. Mo. June 30, 2005) ("Here fees of 20% of the settlement yield a 5.61 multiplier, which is within the range of multipliers awarded in comparable complex cases.").

33. *Geneva Rock Prod., Inc. v. United States*, 119 Fed. Cl. 581, 595 (2015), *rev'd on other grounds*, *Longnecker Prop. v. United States*, No. 2015-5045, 2016 WL 9445914 (Fed. Cir. Nov. 14, 2016) ("In this case, an award 5.39 times the lodestar is reasonable under RCFC 23(h), given the complexity of the litigation, the diligent and skillful work by class counsel, and the pendency of the case for over six years.").

34. *Rawa v. Monsanto Co.*, No. 4:17CV01252 AGF, 2018 WL 2389040, at *9 (E.D. Mo. May 25, 2018), on appeal (noting that fee award had "corresponding lodestar multiplier of 5.3" that was "quite high compared to similar cases in this circuit" but finding it not "too high").

35. *Arrington v. Optimum Healthcare IT, LLC.*, No. CV 17-3950, 2018 WL 5631625, at *10 (E.D. Pa. Oct. 31, 2018) ("When calculated against the requested fee of $1,633,333.33, the lodestar multiplier is 5.3. . . . However, in this case, class counsel undertook significant risk to achieve a substantial settlement amount, and should not be penalized for settling the case early in the litigation. We are satisfied with the reasonableness of the requested fee and we will approve class counsel's request for $1,633,333.33 in attorneys' fees.").

36. *Davis v. J.P. Morgan Chase & Co.*, 827 F. Supp. 2d 172, 185 (W.D.N.Y. 2011) ("In this case, dividing the $14 million fee request by the lodestar figure yields a multiplier of about 5.3. A review of the case law indicates that while that figure is toward the high end of acceptable multipliers, it is not atypical for similar fee-award cases.").

37. *Merkner v. AK Steel Corp.*, No. 1:09-CV-423-TSB, 2011 WL 13202629, at *5 (S.D. Ohio Jan. 10, 2011) ("Applying the rates requested with regard to the hours reflected in the Declarations of Mr. Coleman and Ms. Wallace yields a lodestar figure of $1,699,467. In light of the $9.1 million sought, the 'lodestar multiplier' would be 5.3. This multiplier is acceptable under the facts and circumstances of this case.").

38. *Di Giacomo v. Plains All Am. Pipeline*, No. CIV.A.H-99-4137, 2001 WL 34633373, at *11 (S.D. Tex. Dec. 19, 2001) ("This court finds that 5.3 is an acceptable multiplier in light of the particular facts of this case, discussed more fully below.").

39. *Craft v. Cty. of San Bernardino*, 624 F. Supp. 2d 1113, 1123 (C.D. Cal. 2008) ("The plaintiffs' request in this case for 25% of the class fund would result in a fee of $6,375,000, which is a multiplier of approximately 5.2 times the $1.2 Million lodestar in this case. The Court has concluded that it will award Class Counsel 25% of the class fund, and addresses the reasons for doing so below.").

40. *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 347 (S.D.N.Y. 2014) (noting that, "A fee award of 25% of the fund or $11,475,000 would represent a

multiplier of 5.2 of the lodestar" and approving 25% award).

41. *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 791 (S.D. Tex. 2008) ("[T]he Court finds that the exceptional obstacles to recovery that were present here, and the remarkable success obtained by Lead Counsel's skill and experience make this a rare and exceptional case warranting the application of the requested 5.2 multiplier under a lodestar cross-check or enhancement under a lodestar analysis.") (internal quotation marks and citation omitted).

42. *Zeltser v. Merrill Lynch & Co.*, No. 13 CIV. 1531 FM, 2014 WL 4816134, at *10 (S.D.N.Y. Sept. 23, 2014) (stating that "the lodestar sought by Class Counsel, approximately 5.1 times the fees sought, falls within the range granted by courts" and approving award).

43. *Ferrick v. Spotify USA Inc.*, No. 16-CV-8412 (AJN), 2018 WL 2324076, at *10 (S.D.N.Y. May 22, 2018) (finding that fee amounting to a 5.02 multiplier would "adequately compensate Class Counsel, and it recognizes the complexity of the case, the risks involved in the litigation, the efforts of Class Counsel and the quality of representation provided, and the benefits to the class from the settlement").

44. *In re Fernald Litig.*, No. C-1-85-149, 1989 WL 267038, at *5 (S.D. Ohio Sept. 29, 1989) ("We conclude, therefore, that plaintiffs' class counsel are entitled to twenty (20%) percent of the common fund created or an equivalent multiplier of five.").

45. *Fleisher v. Phoenix Life Ins. Co.*, No. 11-CV-8405 (CM), 2015 WL 10847814, at *18 (S.D.N.Y. Sept. 9, 2015) ("Based on the requested fee ($13,500,000), class counsel's aggregate lodestar yields a 'crosscheck' multiplier of 4.87.  This is well within the range of crosscheck multipliers awarded in this circuit.").

46. *Meijer, Inc. v. 3M*, No. CIV.A. 04-5871, 2006 WL 2382718, at *24 (E.D. Pa. Aug. 14, 2006) ("[T]he Court finds that, given the facts of this case, the requested lodestar multiplier of 4.77 is acceptable and does not call for a reduction in Plaintiffs' Counsel's requested attorneys' fees award.").

47. *Cornwell v. Credit Suisse Grp.*, No. 08-CV-03758(VM), 2011 WL 13263367, at *2 (S.D.N.Y. July 20, 2011) ("Lead Plaintiffs' counsel's total lodestar is $4,049,631.50. A 27.5% fee represents a multiplier of 4.7. Given the public policy and judicial economy interests that support the expeditious settlement of cases, the requested fee is reasonable.") (citation omitted).

48. *In re Xcel Energy, Inc., Sec., Derivative & "'ERISA" Litig.*, 364 F. Supp. 2d 980, 999 (D. Minn. 2005) (approving lodestar multiplier of 4.7 for securities class action component, because "[u]nder these circumstances, the court concludes that the 25% attorney fee, when cross-checked against a lodestar multiplier of 4.7, is reasonable;" also approving lodestar multiplier of 2.16 for ERISA component).

49. *Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 371 (S.D.N.Y. 2002) ("Finally, in 'cross-checking' the percentage fee against the lodestar-multiple, it clearly appears that the modest multiplier of 4.65 is fair and reasonable.").

50. *Flores v. Express Servs., Inc.*, No. CV 14-3298, 2017 WL 1177098, at *4 (E.D. Pa. Mar. 30, 2017) ("The counsel fee request of $1,895,362.33 results in a multiplier of 4.6, that is a requested fee which is 4.6 times the lodestar amount. This multiplier is reasonable . . .").

51. *Holleran v Rita Medical Systems, Inc.*, No. RG06302394, 2007 WL 7759253 (Cal. Super. Oct. 04, 2007) ("Counsel for Plaintiffs seek fees in the total amount of $290,000, which represents a multiplier of 4.57. The agreed fees sought are substantially higher than the lodestar, but presumably reflect the contingent risk of the case to class counsel, the benefits of certainty and of limiting its own attorneys' fees to Angiodynamics, and other factors.").

52. *Gutierrez v. Wells Fargo Bank, N.A.*, No. C 07-05923 WHA, 2015 WL 2438274, at *7 & 8 n.3 (N.D. Cal. May 21, 2015) (stating that, "[c]onsidering all of the facts and circumstances, the Court, in its discretion, concludes that [one firm] deserves a multiplier of 2 and [second firm] deserves a multiplier of 5.5" and noting that net result is a total multiplier of 4.53).

53. *Municipal Authority of Town of Bloomsburg v. Commonwealth of Pennsylvania*, 527 F. Supp. 982, 1000 (M.D. Pa. 1981) ("The multiplier of 4.5 requested by Petitioners will be applied to the lodestar fee despite the facts that such a multiplier is extremely high and appears to be probably without precedent. It is warranted only because of the peculiar facts of this case.").

54. *Deloach v. Philip Morris Companies*, No. 1:00CV01235, 2003 WL 23094907, at *11 (M.D.N.C. Dec. 19, 2003) ("A multiplier of 4.45, in conjunction with an adjusted lodestar of $15,914,905.50, results in a fee award of $70,821,329.48. This figure represents a reasonable fee for the services provided by Plaintiffs' Co–Lead Counsel in this case.").

55. *Rabin v. Concord Assets Group, Inc.*, No. 89 Civ. 6130, 1991 WL 275757 (S.D. N.Y. Dec. 19, 1991) ("The requested attorneys' fees of $2,544,122.78 represents a multiplier of 4.4 to the lodestar figure based on time (which this Court finds to have been reasonably expended) and at various hourly rates (which this Court finds to be reasonable for the particular attorneys performing services).").

56. *Johnson v. Fujitsu Tech. & Bus. of Am., Inc.*, No. 16-CV-03698-NC, 2018 WL 2183253, at *7 (N.D. Cal. May 11, 2018) ("This amount requires a risk multiplier of 4.375 to reach the $3.5 million Plaintiffs seek. Though on the high end, this multiplier falls within the range of reasonableness.").

57. *Monserrate v. Tequipment, Inc.*, No. 11 CV 6090 RML, 2012 WL 5830557, at *4

(E.D.N.Y. Nov. 16, 2012) ("In sum, I find that a fee award of $465,000 which provides a 4.34 multiplier of the reduced lodestar and constitutes fifteen percent of the $3,100,000.00 Settlement Fund, is a fair and reasonable fee under *Goldberger* and related cases and should adequately compensate class counsel for its time and effort, for the risk it faced in this case, and for the high quality of its representation. Moreover, that reduced fee award will allow additional monies to be distributed to class members.").

58.   *Buccellato v. AT & T Operations, Inc.*, No. C10-00463-LHK, 2011 WL 3348055, at *2 (N.D. Cal. Jun. 30, 2011) ("The resulting multiplier of 4.3 is reasonable in light of the time and labor required, the difficulty of the issues involved, the requisite legal skill and experience necessary, the excellent and quick results.").

59.   *In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 135 (D.N.J. 2002) ("Even assuming a value of one dollar per share, the 4.3 lodestar multiplier would be proper in this case.").

60.   *Demaria v. Horizon Healthcare Servs., Inc.*, No. 2:11-CV-07298 (WJM), 2016 WL 6089713, at *5 (D.N.J. Oct. 18, 2016) ("Although a lodestar multiplier of 4.3 is large, it is not unreasonable.").

61.   *In re VeriFone Holdings, Inc. Sec. Litig.*, No. C-07-6140 EMC, 2014 WL 12646027, at *2 (N.D. Cal. Feb. 18, 2014) ("[A]lthough the lodestar cross-check though reveals a high multiplier—4.3 compared to the Ninth Circuit's observation that over 80% of multipliers fall between 1.0 and 4.0—other courts have awarded multipliers in excess of 4.0, and the Court finds that the multiplier here is acceptable in light of the very substantial risks involved and Lead Plaintiff's risk and extensive work on the case.").

62.   *Shannon v. Hidalgo County Board of Comm'r*, No. 08-369 (D. N.M. June 4, 2009) (4.2 multiplier) ("Class Counsel are awarded reasonable attorneys' fees, costs and gross receipts tax in the total amount of $333,333, to be paid forthwith from the settlement fund.").

63.   *In re GSE Bonds Antitrust Litig.*, No. 19-CV-1704 (JSR), 2020 WL 3250593, at *5 (S.D.N.Y. June 16, 2020) ("A fee award of 20% of the settlement fund, or $77.3 million, thus represents a multiplier of 4.09 of this lodestar. Although on the high end, a 4.09 multiplier is within the range of what has considered reasonable by courts.").

64.   *Uschold v. NSMG Shared Servs., LLC*, No. 18-CV-01039-JSC, 2020 WL 3035776, at *16 (N.D. Cal. June 5, 2020) ("A multiplier of 4 is warranted here based on the contingent nature of the fee agreement and Mr. Benjamin's explanation at the final approval hearing that this action required the majority of his firm's resources and attention since January 2018. The high end multiplier is warranted because it would result in a percentage of recovery of 12.9% of the Gross Settlement Amount, which is below "the usual range" awarded in common fund cases.").

65. *Columbus Drywall & Insulation, Inc. v. Masco Corp.*, No. 1:04-CV-3066-JEC, 2012 WL 12540344, at *5 (N.D. Ga. Oct. 26, 2012) ("Here, the requested fee would represent a multiplier of approximately four times lodestar, which is well within the range of approved fees.").

66. *Hillson v. Kelly Servs. Inc.*, No. 2:15-CV-10803, 2017 WL 3446596, at *6 (E.D. Mich. Aug. 11, 2017) ("Here, as discussed, the risk in this case was considerable but not extraordinary. A multiplier of 4 would seem to adequately account for that risk.").

67. *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 359-60 (S.D.N.Y. 2003) ("When combined with the attorneys' fees awarded pursuant to the Citigroup Settlement, the amount sought is equivalent to a lodestar multiple of 4.0. . . . As no objection remains to the amount of costs sought by Lead Counsel, and the expenses do not appear facially unreasonable, the application for reimbursement of expenses is approved.").

# EXHIBIT D

*In re Facebook Biometric Information Privacy Litigation*
Case No. 3:15-cv-03747-JD
U.S. District Court for the Northern District of California

**EXPERT REPORT OF PROFESSOR WILLIAM B. RUBENSTEIN**

EXHIBIT D
List of Included Northern District of California Cases
Affirming Class Action Fee Awards in 2019

1.  *Strong v. C & H Sugar Co., Inc.*, No. 3:17-cv-00480 (N.D. Cal. Apr. 4, 2019), ECF No. 57.

2.  *Weeks v. Google LLC*, No. 5:18-cv-00801 (N.D. Cal. Dec. 13, 2019), ECF No. 184.

3.  *Huntsman v. Southwest Airlines*, No. 3:17-cv-03972 (N.D. Cal. Oct. 4, 2019), ECF No. 57.

4.  *Sampino v. Versace USA, Inc.*, No. 4:16-cv-07198 (N.D. Cal. Aug. 19, 2019), ECF No. 73.

5.  *Corzine v. Maytag Corp.*, No. 5:15-cv-05764 (N.D. Cal. Dec. 31, 2019), ECF No. 134.

6.  *Cryer v. Franklin Resources, Inc.*, No. 4:16-cv-04265 (N.D. Cal. Oct. 4, 2019), ECF No. 168.

7.  *Austin v. Foodliner, Inc.*, No. 4:16-cv-07185 (N.D. Cal. May 10, 2019), ECF No. 61.

8.  *Fowler v. Wells Fargo Bank, N.A.*, No. 4:17-cv-02092 (N.D. Cal. Jan. 25, 2019), ECF No. 94.

9.  *Cabiness v. Educational Financial Servs.*, No. 4:16-cv-01109 (N.D. Cal. Mar. 26, 2019), ECF No. 128.

10. *San Miguel v. HP, Inc.*, No. 5:16-cv-05820 (N.D. Cal. June 28, 2019), ECF No. 146.

11. *Terry v. Hoovestol, Inc.*, No. 4:16-cv-05183 (N.D. Cal. May 9, 2019), ECF No. 70.

12. *Giroux v. Essex Property Trust, Inc.*, No. 4:16-cv-01722 (N.D. Cal. Mar. 14, 2019), ECF No. 80.

13. *Walters v. Kimpton Hotel & Restaurant Grp.*, No. 3:16-cv-05387 (N.D. Cal. July 11, 2019), ECF No. 117.

14. *Vikram v. First Student Mgmt.*, No. 4:17-cv-04656 (N.D. Cal. Sept. 3, 2019), ECF No. 74.

15. *Cooper v. Thoratec Corp.*, No. 4:14-cv-00360 (N.D. Cal. June 25, 2019), ECF No. 137.

16. *Esomonu v. Omnicare, Inc.*, No. 4:15-cv-02003 (N.D. Cal. Feb. 8, 2019), ECF No. 102.

17. *Noroma v. Home Point Financial Corp.*, No. 4:17-cv-07205 (N.D. Cal. Nov. 6, 2019), ECF No. 64.

18. *Fitzhenry-Russell v. The Coca-Cola Co.*, No. 5:17-cv-00603 (N.D. Cal. Oct. 3, 2019), ECF No. 95.

19. *Pettit v. Procter & Gamble Co.*, No. 3:15-cv-02150 (N.D. Cal. Mar. 29, 2019), ECF No. 135.