Kendrick Jan, CA SBN 105149
Kendrick Jan, APC
402 West Broadway, Suite 1520
San Diego, CA 92101
Telephone:  (619) 607-9750
kj@jan-law.com

John J. Pentz, Esq., Mass. Bar No. 561907
19 Widow Rites Lane
Sudbury, MA 01776
Telephone: (978) 261-5725
jjpentz3@gmail.com
(*pro hac vice forthcoming*)

Counsel for Objectors Frankfother and Flanagan

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK BIOMETRIC INFORMATION PRIVACY LITIGATION | )  Master File No. 3:15-cv-3747-JD )  )  <u>CLASS ACTION</u> ) |
| ——————————————— | ) |
| This Document Relates to: ALL ACTIONS | )  OBJECTION OF CLASS MEMBERS )  DAWN FRANKFOTHER AND )  CATHY FLANAGAN TO )  PLANTIFFS' MOTION FOR FINAL )  APPROVAL OF SETTLEMENT, AND )  PLAINTIFFS' MOTION FOR )  ATTORNEYS' FEES, EXPENSE, )  AND INCENTIVE AWARDS, ) |
| ——————————————— | )  Hearing date:  Jan. 7, 2021, 10:00AM |

## <u>OBJECTION</u>

## I.  INTRODUCTION AND OBJECTION PREREQUISITES

A.      <u>Introduction</u>

In the captioned matter, class members Dawn Frankfother and Cathy Flanagan

hereby object to the PLAINTIFFS' MOTION FOR FINAL APPROVAL OF

SETTLEMENT, and PLAINTIFF'S MOTION FOR ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARDS on the following grounds:

(1)     The Motion for Final Approval of Settlement ("Settlement") proposes an unreasonable compromise of statutory damages available to class members pursuant to Illinois's Biometric Information Privacy Act ("BIPA") at 740 ILCS 14/20.

(2)     By their Motion for Attorneys' Fees, Expenses, and Incentive Awards ("Fee Motion") Class Counsel seek a common fund percentage fee of $110,000,000 out of a mega-fund settlement of $650,000,000.  The sought fee is equal to 20% of the $550 million amount originally negotiated by Class Counsel, and substantially exceeds a reasonable common fund fee in this case.

(3)     The Settlement proposes to compromise for $650 million the collective claim of class members' for statutory damages of between $10 billion and $47 billion, a compromise of between 93.5% and 98.6%.  Hrg. Transcript, ECF 460, p. 10, l. 9.  The very modest percentage recovery does not warrant a percentage fee equivalent to a 5.3 lodestar multiplier.

(4)     BIPA itself provides a fee shifting mechanism that allows for recovery of attorneys' fees.  740 ILCS 14/20.  In fee shifting cases, the fee is intended to be borne by the defendant, and the fees would ordinarily be in the amount of Class Counsel's lodestar, with a multiplier employed only in extraordinary circumstances.  Here, the class is being asked to pay the fee, and the recovery of only a very low percentage of available statutory damages does not support the use of a multiplier.

(5)   Class Counsel's lodestar calculation includes thousands of hours spent by office personnel designated as "litigation support," "summer associate," "document clerk," "client/class member relations," "paralegal," and "managing clerk."   The lodestar attributable to these office personnel totals $783,767.50, which using the sought 5.3 multiplier would itself account for "fees" of $4,153,977.75.[1]   The amount actually paid on an hourly basis by Class Counsel to these office personnel is a modest fraction of the "rate" being charged the class.[2]   The "rates" indicated in Class Counsel's lodestar calculation already have built-in multipliers, and when subjected to the requested lodestar multiplier of 5.3 would provide Class Counsel with an effective profit on the cost of these office staffers of up to 3,400%.[3]   Though inclusion of these common overhead expenses in Class Counsel's lodestar is itself objectionable, the application of a lodestar multiplier to the expenses creates an outrageous windfall to Class Counsel.

(6)   The Fee Motion seeks incentive awards for named plaintiffs, which awards have no statutory basis and are inconsistent with controlling authority established by *Trustees v. Greenough*, 105 U.S. 527 (1882) and *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116 (1885).

---

[1] This amount does not include $87,932 for a "Project Attorney" at a rate of $425/hour charged by the Robbins Geller firm.  ECF 499-4, p. 9 of 79.

[2] The hourly rates charged to Class Counsel's lodestar for their office staff range from $100 to $335.

[3] E.g.  The hourly mean wage for a paralegal in San Francisco is $34.31.  U.S. Bureau of Labor Statistics, Occupational Employment and Wages, May 2019, 23-2011 Paralegals and Legal Assistants.  *See Exhibit B*, attached.  ((($335/hr. charged - $45 burdened cost = $290/hr. profit) ÷ $45 burdened rate = 6.44 ) x 5.3 multiplier = 34.13 gross multiplier) x 100 = 3,413% profit.

B.      Class Membership/Standing

Objector Dawn Frankfother meets the definition of membership in and is a member of the certified Class in the captioned matter.  ECF 468, p. 10-11, ¶ 1.7.  She has submitted a claim in the proposed settlement and has been assigned Claim Number FBY-100018208501.  *See Exhibit A.*  As a Class Member, Dawn has standing to object to the proposed settlement, and the Fee Motion, including without limitation as to Class Counsel's sought fee and named plaintiffs' sought service awards.  Ms. Frankfother's objection applies to the entire class per FRCP Rule 23(e).

Objector Kathy Flanagan meets the definition of membership in and is a member of the certified Class in the captioned matter.  ECF 468, p. 10-11, ¶ 1.7.  She has submitted a claim in the proposed settlement and has been assigned Claim Number FBY-113777736001.  *See Exhibit A.*  As a Class Member, Cathy has standing to object to the proposed settlement, and the Fee Motion, including without limitation as to Class Counsel's sought fee and named plaintiffs' sought service awards.  Ms. Flanagan's objection applies to the entire class per FRCP Rule 23(e).

C.      Objectors' Personal Contact Information

Dawn Frankfother:   14903 W. Eagle Point Road, Polo, IL   61064; email: dfrankother@yahoo.com; telephone: (815) 716-1400.  (Note:  Dawn Frankfother should be contacted through her legal counsel.  See below.)

Cathy Flanagan:   625 Blackberry Ridge Drive, Aurora, IL 60506; email: cflanag@sbcglobal.net; telephone: (331) 301-6030.  (Note:  Cathy Flanagan should be contacted through her legal counsel.  See below.)

D.      Identification of Objectors' Counsel

Objectors are represented by attorneys Kendrick Jan and John Pentz.  Attorney Jan is licensed to practice law in the State of California and a member of the bar of the United States District Court, Northern District of California; his contact information is:  Kendrick Jan, Attorney, Kendrick Jan, APC, 402 West Broadway, Suite 1520, San Diego, California 92101; telephone: 619.231.7702.  Attorney Pentz is licensed to practice law in the State of Massachusetts and the Ninth Circuit, and is seeking admission to the United States District Court, Northern District of California, *pro hac vice* in the captioned matter; his contact information is: John Pentz, Attorney, 18 Widow Rites Lane, Sudbury, Massachusetts, 01776; telephone: 978.261.5725.  (Note:  This objection is prepared and submitted with assistance of counsel.)

E.      Notice of Intent to Appear at Fairness Hearing

Objectors Dawn Frankfother and Cathy Flanagan intend to appear through counsel at the January 7, 2021 final approval hearing ("Fairness Hearing") to provide perspective and argument in support of this objection.

F.      Objectors Do Not Intend to Call Witnesses

Objectors Dawn Frankfother and Cathy Flanagan do not intend to call witnesses at the January 7, 2021 Fairness Hearing.

## II.    ARGUMENT

**A.      The $650 million settlement represents at least a 93% discount in a case that has overcome all substantial legal defenses, and therefore is not fair, reasonable, or adequate.**

**1.      Value relative to statutory damages.**  A $650 million settlement in a case that has a potential value of between $10 billion and $47 billion – calculated based on per

class member statutory damages of between $1,000 for negligent violations and $5,000 for intentional violation of BIPA – is inadequate to satisfy the Rule 23 (e) standard.  Having survived motions to dismiss based on lack of standing and extraterritorial application, and an appeal of this Court's certification of the class, there is nothing left to do in this case but try it, with a substantial likelihood of recovery of minimum statutory damages of $10 billion, plus attorneys' fees.

Facebook seems to point to "consent" as a plausible defense to its compound statutory violation,[4] but BIPA requires more than the consent of Facebook users, it requires certain affirmative conduct by Facebook that was never performed.[5]

The compromise of statutory damages by more than 93% ought not to be approved; the proposed recovery amount is not at all proportionate to Facebook's misconduct when measured against the governing BIPA statutory standard.

The settlement must be evaluated in terms of the risks posed by a trial on the merits. Facebook knew scanning and algorithmic processing of photographs through their "Tag Suggestions" function implicated BIPA protections, had a thorough grasp of what constitutes facial geometry, was fully aware of its obligation to inform regarding collection, standards of use and retention of biometric data, and understood its obligation to obtain

---

[4] The more "technical" argument that Facebook didn't use "facial geometry" in its facial identity mapping of class members is frivolous.  Facebook would never have agreed to pay $5 billion through an FTC consent decree if there were any question about its use of facial geometry in its collection of biometric data.

[5] BIPA disallows a private entity from collecting/using "biometric information," *unless it first* informs the subject the biometric information is being collected, informs the subject of the purpose of the collection, and receives a written release from the subject.  BIPA, 740 ILCS 14/15(b).  The entity must also develop a publically available written policy "establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information."  BIPA, 740 ILCS 14/15(a).

advance consent from users.  Facebook has a market cap of over $720 billion, and dominates the world of social data and social-data exchange.  It knows more about applicable law and pending legislation than any entity on the planet, and it shouldn't be allowed to hide behind some thin veil of claimed ignorance.

Objector contends Facebook's defenses to BIPA violations warrant no more than a 50% discount of minimum statutory damages for negligent violation of BIPA.  In these circumstances, failure to garner something near the *aurea mediacritis* compels rejection of the Settlement.  Anything less cannot match the class members' interest in going to trial with a significant chance of recovering greater than 15 times the proposed settlement amount.[6]

      **2.**        **The higher per claim payout is an inverse function of inadequate notice.**

If the parties had achieved a claim rate of 90%, as urged by this Court, the average payout would be only $72.  The projected claim payout figure has more than quadrupled due to a claim rate of less than 20%.  Due to the low take rate, when considering the adequacy of the proposed settlement, the Court should focus on the amount recovered per class member, rather than the average claim payment.

      **3.**        **Settlement lacks deterrent effect.**

Facebook has committed an obvious statutory violation through their active non-consensual collection and commercial exploitation of personal biometric data.  The Illinois legislature "has said loud and clear this is meant to be an expensive violation.  The Illinois legislature set this privacy expectation and privacy right as a serious one, and they put a

---

[6] Minimum statutory damages of $10 billion for Facebook's negligent BIPA violation is greater than 15.3 times the proposed settlement amount of $650,000,000.

high price tag on it for that reason." Hrg. Transcript, ECF 460, p. 7, l. 1-5.  A recovery of only 1.4%-6.5% of available statutory damages is a dramatic "reduction from the thousand dollars that the Illinois legislature set as the baseline."  Hrg. Transcript, ECF 460, p. 6, l. 21-23.  The very low recovery-to-damages ratio, coupled with Facebook's knowing conduct and financial wherewithal, speak to both the inadequacy of the proposed settlement and the parties' clear disregard Illinois "loud and clear" intentions regarding Facebook's privacy violations.

The proposed settlement would establish a very modest precedent that neglects statutory protective enforcement standards, and would be of no real deterrent effect among Facebook and its peers.

### 4. Due Process concerns.

Finally, Facebook's voluntary $5 billion payment in the FTC action would appear to undermine any argument that a $10 billion verdict for violation of BIPA constitutes a violation of due process.  If Facebook could pay $5 billion to resolve the FTC enforcement action, it could certainly find a way to pay $5 billion to settle this lawsuit in which all significant legal questions had been resolved in favor of the Plaintiffs.

## B. Class Counsel should receive less than the average 12.9% percentage fee in megafund recoveries of $550 million or more.

### 1. Class Counsel's negotiation.

Class Counsel's work resulted in an originally proposed settlement of $550 million. Two weeks after this Court voiced its concerns over that relatively small proposed settlement amount, the parties returned with a $100 million cherry atop the single scoop $550 million settlement sundae.  Recognizing it was the Court's prompting that brought the additional $100 million to the proposed settlement, Class Counsel have not changed

their $110 million fee request – equivalent to 20% of the deficient $550 million first presented.

### 2.    The sought percentage fee is excessive.

Class Counsel ask this Court to award an excessive percentage fee for securing an unsatisfactory settlement.  The fee in this case should be governed by *In re: Wash. Pub. Power Supply Sys. Secs. Litig.*, 19 F.3d 1291 (9th Cir. 1994), another megafund case in which the Ninth Circuit upheld the district court's refusal to approve a 13.6% fee that would have represented an excessive multiplier.

> We agree with the district court that there is no necessary correlation between any particular percentage and a reasonable fee.  With a fund this large, picking a percentage without reference to all the circumstances of the case, including the size of the fund, would be like picking a number out of the air…[W]e agree with the district court that the 25 percent "benchmark" is of little assistance in a case such as this… It is not difficult to demonstrate why courts cannot rationally apply any particular percentage – whether 13.6 percent, 25 percent or any other number – in the abstract, without reference to all the circumstances of the case.

*Id*. at 1297-1298.

A $550 million class action settlement is a megafund recovery requiring that a percentage fee be *substantially* less than this Circuit's benchmark 25%.  In arriving at a reasonable fee, it must be considered that this case settled for a small fraction of the readily calculable statutory value just a year after plaintiffs scored a complete legal victory at the Ninth Circuit.  In light of the legal strength of this case after August 8, 2019, Class Counsel did a notably poor job negotiating a settlement on behalf of the class, leaving approximately

$9.4 billion[7] on the table.  For this, a percentage fee at the lower end of the megafund range for settlements above $500 million is appropriate.

Class Counsel's fee should not exceed 10%, which is just below the market rate for a settlement of this size, according to Brian Fitzpatrick.  *See An Empirical Study of Class Action Settlements and Their Fee Awards*, at p. 839 (mean percentage fee for settlements between $500 million and $1 billion is 12.9).  A 10 % fee here results in a fee of $55 million, which still represents a more than generous 2.76 multiplier of Class Counsel's $19.9 million lodestar.[8]

### 3.    The inadequate claim rate.

The Court has expressed its expectation that the claims rate would be at least 90 percent.[9]  As of November 10, only 1,311,035 claims had been received, which is only 13% of the estimated 10 million class members.  ECF 503, p. 2.  This claim rate clearly indicates the inadequacy of the notice plan assembled and put into play by Class Counsel and Facebook – the one entity in the entire world that could almost *certainly* get notice to every class member.  The inefficacy of the notice plan, as evidenced by the low take rate, is a further justification for a fee of no more than $55 million in this case.

---

[7] Objector calculates this figure based upon the $1,000 per violation statutory damages.  If the liquidated damages for intentional violations were used, the discount would be $46.5 billion.

[8] This number is the gross claimed lodestar of $20,702,829 million less $787,767 (staff expenses), which equals a $19,914,0462 million adjusted lodestar.

[9] "There is no reason, there is no reason why we ought to be settling for anything less than a 90 percent claim rate."  ECF 460, p. 32, l.1-2.

4.      **Extra-litigation efforts.**

Class Counsel state "a legislative strategy is now an integral part of prosecuting a large class action based on a statutory claim." Fee Brief, ECF 499, p. 21. Class Counsel have included in their lodestar calculations time spent to "educate legislators," "coordinate efforts by like-minded non-profit organizations," and "generally ensure that Class Members' voices were heard." This time is not properly included in a request for fees to be paid by the Rule 23(b)(3) damages class. Objectors Frankfother and Flanagan ask that the Court order that hours Class Counsel spent as legislative lobbyists and non-profit coordinators be removed from the Class Counsel's lodestar.

5.      **Trial on the merits and fee shifting.**

Class Counsel were weeks from trial on the merits of this case. Had Class Counsel prevailed at trial the fee shifting mechanism of 740 ILCS 14/20 would have imposed on Facebook the obligation to pay Class Counsel a reasonable attorneys' fee. In a fee shifting case a "reasonable fee" is measured from the perspective of the defendant. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 438 U.S. 711, 724-725 (1987). See also *Fresno County Employees' Retirement Assoc. v. Isaacson/Weaver Family Trust*, 925 F.3d 63, 70 (2d Cir. 2019). Once a common fund settlement is negotiated, however, the "reasonable fee" is calculated from plaintiff's perspective, allowing for examination of risk, contingency of fees, quality of recovery, etc. *Id.* at 71. Here, the case very recently switched from a litigation track to a settlement track, and Class Counsel ask the Court to award them fees approximately 400%-450% more than would have been awarded had they recovered a dramatically greater money judgment at trial only a few weeks later. With

settlement the risk was resolved, the contingency fee is certain and soon to be paid, and the quality of recovery is insufficient to justify the fee request.

In the 9th Circuit, "In a common-fund case, the district court "has discretion to apply either the lodestar method or the percentage-of-the-fund method in calculating a fee award." *Fischel v. Equitable Life Assurance Soc'y,* 307 F.3d 997, 1006 (9th Cir.2002). Under the former method, the district court "multiplies a reasonable number of hours by a reasonable hourly rate." *Id.* at 1006. "There is a "strong presumption" that the lodestar is a reasonable fee." *Id.* at 1007, citing *D'Emanuele v. Montgomery Ward & Co*, 904 F.2d 1379 (9th Cir. 1990).

"The district court also has discretion to adjust the lodestar upward or downward using a multiplier that reflects "a host of 'reasonableness' factors, including the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment." *In re Bluetooth Headset Prods. Liab. Litig.,* 654 F.3d 935, 941–42 (9th Cir.2011). *Stetson v Grissom*, 821 F3d 1157, 1166-67, (9th Cir. 2016). Frankforther and Flanagan ask the Court to employ the lodestar method, with the application of only a modest, if any, multiplier.

**6.    Lodestar cross check.**

Instead of a reasonable fee for their modest work, Class Counsel have requested a fee of $110 million, which represents 550% of their lodestar.

While Class Counsel argue that a lodestar cross-check is not required in this Circuit, such effort in fee analysis is strongly encouraged, and, in the very case they cite for the proposition, Judge Kleinfeld in his dissent urged the Ninth Circuit to adopt a rule requiring such cross-checks, citing the support of seven attorneys general. *See Farrell v. Bank of*

*Am. Corp. N.A.*, 2020 U.S. App. LEXIS 27980 at *18 (9th Cir. September 2, 2020) (Kleinfeld dissenting).

In light of the extremely low ratio of the settlement recovery to statutory damages, Class Counsel's willingness to close this case for a less than a fair recovery of damages, and the inexplicably low claims rate, Class Counsel do not deserve a common fund percentage fee equal to 550% of their lodestar.  Further, Class Counsel cannot demonstrate the class would be unjustly enriched by the award of a lesser – and fair – attorneys' fee. To the contrary, Class Counsel are hard pressed to justify the 2.76 multiplier represented by a $55 million fee.

**C.     The requested incentive awards are prohibited preferential payments to named plaintiffs that create a conflict between the named plaintiffs and absent class members.**

**1.      Unavailability of incentive awards.**

In their Fee Motion, Class Counsel have requested class representatives receive "incentive awards" of $7,500 each.  Class Counsel assert that incentive awards of $5,000 or less are "presumptively reasonable," and ask for a cost of living adjustment to that figure. ECF 499, p. 28.  While such awards have become common in the Ninth Circuit and elsewhere, the United States Court of Appeals for the Eleventh Circuit recently clarified that such awards are without authorization from the United States Supreme Court, and therefore are and have always been improper.  *See Johnson v. NPAS Sols. LLC*, 2020 U.S. App. LEXIS 29682 (11th Cir. Sept. 17, 2020).  As the Eleventh Circuit put it, the ubiquity of incentive awards is the product of "inertia and inattention," and "we are not at liberty to sanction a device or practice, however widespread, that is foreclosed by Supreme Court precedent."  *Id.* at *27.

The two cases that originally authorized recovery of attorneys' fees from a common fund, *Trustees v. Greenough*, 105 U.S. 527 (1882) and *Central Railroad & Banking Co. v. Pettus* (1885), prohibit recovery of any amounts by the named plaintiff himself for personal services and private expenses. *Johnson* at **21-22. These seminal cases have been ignored by modern courts when rationalizing the grant of incentive awards, whether given as a bounty for obtaining a settlement, remuneration for hours spent on litigation tasks, or compensation for reputational risk. None of these reasons, however, can justify a violation of *Greenough* or *Pettus*.

While there are Ninth Circuit decisions upholding incentive or service awards to lead class action plaintiffs, those decisions must yield to the controlling Supreme Court precedent as construed by the Eleventh Circuit in *Johnson*. Just as with the decision of the Second Circuit cited by the *Johnson* court in footnote 8 of its opinion, *id*. at *25, the decisions of the Ninth Circuit are unpersuasive because they do not grapple with *Greenough* and *Pettus*, nor do they cite to any authorization for or origin of such awards. They simply blindly imitate what other courts have done without examining whether the first court to do so had any authority for these awards that have been "created out of whole cloth." *Id*. at *27. *See also In re Dry Max Pampers Litig.*, 724 F.3d 713, 722 (6th Cir. 2013) ("To the extent that incentive awards are common, they are like dandelions on an unmowed lawn – present more by inattention than by design.").

## 2. Divorced interests.

The proposed $7,500 incentive awards are 18 times the expected claimant recovery of $400, and 104 times the average class member recovery of $72. Such payments divorce the named plaintiffs' interests from the interests of absent class members. The request for

the incentive awards represents an attempt to secure preferential payments for the named

plaintiffs, which renders the named plaintiffs conflicted and inadequate to represent the

absent class members.  Therefore, unless the requests for service awards are withdrawn,

the settlement class may not be certified for lack of adequacy, and the settlement must be

rejected on this ground alone.

### III.    CONCLUSION

For the foregoing reasons, this Court should (1) deny approval to the proposed

settlement, (2) award Class Counsel a fee of no more than $55 million, and (3) deny the

requested incentive awards to the named plaintiffs.

Respectfully submitted,
Dawn Frankfother and Cathy Flanagan
by their attorneys,

*s/ Kendrick Jan*
Kendrick Jan, APC
402 West Broadway, Suite 1520
San Diego, CA 92101
Tel: (619) 231-7702
kj@jan-law.com

John J. Pentz, Esq., *pro hac vice forthcoming*
19 Widow Rites Lane
Sudbury, MA 01776
Phone: (978) 261-5725
jjpentz3@gmail.com

## CONFIRMATION OF OBJECTORS

By their signatures below, Objectors Dawn Frankfother and Cathy Flanagan confirm their objections as set forth in the foregoing Objection to the PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT, and PLAINTIFF'S MOTION FOR ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARDS.

Date: _11 - 19 - 2020_                    Date:_____

_____                 _____
Dawn Frankfother                          Cathy Flanagan

16

<u>CONFIRMATION OF OBJECTORS</u>

By their signatures below, Objectors Dawn Frankfother and Cathy Flanagan confirm their objections as set forth in the foregoing Objection to the PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT, and PLAINTIFF'S MOTION FOR ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARDS.

Date:_____          Date:___11-19-20_____

_____               _____
Dawn Frankfother                       Cathy Flanagan

16

## **CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the foregoing was filed with the Clerk of Court using CM/ECF on November 20, 2020, and as a result has been served on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.


By: *s/ Kendrick Jan*

EXHIBIT A



**From:** donotreply@kcdlc.com
**Date:** November 19, 2020 at 8:47:57 AM CST
**To:** cflanag@sbcglobal.net
**Subject: Confirmation of receipt of your online Facebook Biometric Information Privacy Litigation class action claim**

Thank you for filing your claim online on 11/19/2020 9:47:50 AM.

Your Claim Number is: FBY-113777736001

Please retain this information in your records and use the Claim Number in any communications with KCC regarding this case.

EXHIBIT A

# EXHIBIT B

 **U.S. BUREAU OF LABOR STATISTICS**

## Occupational Employment Statistics



## Occupational Employment and Wages, May 2019
### 23-2011 Paralegals and Legal Assistants

Assist lawyers by investigating facts, preparing legal documents, or researching legal precedent. Conduct research to support a legal proceeding, to formulate a defense, or to initiate legal action. Excludes "Legal Secretaries and Administrative Assistants" (43-6012).

National estimates for this occupation
Industry profile for this occupation
Geographic profile for this occupation

**National estimates for this occupation:** Top

Employment estimate and mean wage estimates for this occupation:

| Employment (1) | Employment RSE (3) | Mean hourly wage | Mean annual wage (2) | Wage RSE (3) |
|---|---|---|---|---|
| 329,870 | 1.1 % | $26.45 | $55,020 | 0.5 % |

Percentile wage estimates for this occupation:

| Percentile | 10% | 25% | 50% (Median) | 75% | 90% |
|---|---|---|---|---|---|
| Hourly Wage | $15.46 | $18.99 | $24.87 | $31.54 | $39.66 |
| Annual Wage (2) | $32,160 | $39,500 | $51,740 | $65,610 | $82,500 |

**Industry profile for this occupation:** Top

Industries with the highest published employment and wages for this occupation are provided. For a list of all industries with employment in this occupation, see the Create Customized Tables function.

Industries with the highest levels of employment in this occupation:

| Industry | Employment (1) | Percent of industry employment | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|
| Legal Services | 254,830 | 22.24 | $25.44 | $52,910 |
| Local Government, excluding schools and hospitals (OES Designation) | 14,640 | 0.26 | $26.54 | $55,210 |
| Federal Executive Branch (OES Designation) | 13,540 | 0.67 | $33.67 | $70,040 |
| State Government, excluding schools and hospitals (OES Designation) | 10,140 | 0.47 | $23.54 | $48,970 |
| Management of Companies and Enterprises | 7,010 | 0.28 | $34.25 | $71,250 |

Industries with the highest concentration of employment in this occupation:

| Industry | Employment (1) | Percent of industry employment | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|
| Legal Services | 254,830 | 22.24 | $25.44 | $52,910 |
| Lessors of Nonfinancial Intangible Assets (except Copyrighted Works) | 180 | 0.81 | $30.68 | $63,810 |
| Other Investment Pools and Funds | 70 | 0.76 | $28.61 | $59,500 |
| Federal Executive Branch (OES Designation) | 13,540 | 0.67 | $33.67 | $70,040 |
| State Government, excluding schools and hospitals (OES Designation) | 10,140 | 0.47 | $23.54 | $48,970 |

Top paying industries for this occupation:

| Industry | Employment (1) | Percent of industry employment | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|
| Grantmaking and Giving Services | 100 | 0.07 | $43.80 | $91,110 |
| Natural Gas Distribution | 80 | 0.07 | $40.36 | $83,950 |
| Motor Vehicle and Motor Vehicle Parts and Supplies Merchant Wholesalers | 30 | 0.01 | $39.68 | $82,540 |
| Semiconductor and Other Electronic Component Manufacturing | 130 | 0.04 | $39.38 | $81,910 |
| Other Information Services | 220 | 0.07 | $38.26 | $79,580 |

**EXHIBIT B**

**Geographic profile for this occupation:** Top

States and areas with the highest published employment, location quotients, and wages for this occupation are provided. For a list of all areas with employment in this occupation, see the Create Customized Tables function.



Employment of paralegals and legal assistants, by state, May 2019

Employment
☐ 60 - 1,180   ■ 1,230 - 3,780
■ 4,370 - 6,880   ■ 7,050 - 35,040

Blank areas indicate data not available.

States with the highest employment level in this occupation:

| State | Employment (1) | Employment per thousand jobs | Location quotient (9) | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|---|
| California | 35,040 | 2.02 | 0.90 | $29.72 | $61,810 |
| Florida | 30,850 | 3.51 | 1.56 | $24.58 | $51,130 |
| New York | 29,310 | 3.08 | 1.37 | $27.92 | $58,070 |
| Texas | 27,040 | 2.18 | 0.97 | $26.17 | $54,430 |
| Illinois | 13,980 | 2.32 | 1.03 | $28.83 | $59,960 |

EXHIBIT B

## Location quotient of paralegals and legal assistants, by state, May 2019



Blank areas indicate data not available.

States with the highest concentration of jobs and location quotients in this occupation:

| State | Employment (1) | Employment per thousand jobs | Location quotient (9) | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|---|
| District of Columbia | 5,810 | 8.02 | 3.57 | $39.43 | $82,010 |
| Florida | 30,850 | 3.51 | 1.56 | $24.58 | $51,130 |
| Connecticut | 5,160 | 3.10 | 1.38 | $28.96 | $60,240 |
| New York | 29,310 | 3.08 | 1.37 | $27.92 | $58,070 |
| Delaware | 1,350 | 2.99 | 1.33 | $27.47 | $57,140 |

## Annual mean wage of paralegals and legal assistants, by state, May 2019



Blank areas indicate data not available.

EXHIBIT B

Top paying States for this occupation:

| State | Employment (1) | Employment per thousand jobs | Location quotient (9) | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|---|
| District of Columbia | 5,810 | 8.02 | 3.57 | $39.43 | $82,010 |
| Colorado | 5,290 | 1.97 | 0.88 | $29.93 | $62,250 |
| California | 35,040 | 2.02 | 0.90 | $29.72 | $61,810 |
| Massachusetts | 6,840 | 1.89 | 0.84 | $29.64 | $61,650 |
| Washington | 6,880 | 2.07 | 0.92 | $29.25 | $60,840 |



Employment of paralegals and legal assistants, by area, May 2019

Employment
□ 30 - 80    ■ 90 - 150
■ 160 - 370    ■ 380 - 29,030
Blank areas indicate data not available.

Metropolitan areas with the highest employment level in this occupation:

| Metropolitan area | Employment (1) | Employment per thousand jobs | Location quotient (9) | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|---|
| New York-Newark-Jersey City, NY-NJ-PA | 29,030 | 3.01 | 1.34 | $29.05 | $60,430 |
| Los Angeles-Long Beach-Anaheim, CA | 16,870 | 2.70 | 1.20 | $27.39 | $56,960 |
| Washington-Arlington-Alexandria, DC-VA-MD-WV | 12,550 | 3.85 | 1.76 | $33.67 | $70,030 |
| Chicago-Naperville-Elgin, IL-IN-WI | 12,180 | 2.60 | 1.16 | $29.18 | $60,690 |
| Miami-Fort Lauderdale-West Palm Beach, FL | 12,030 | 4.55 | 2.03 | $27.19 | $56,560 |
| Philadelphia-Camden-Wilmington, PA-NJ-DE-MD | 9,210 | 3.20 | 1.43 | $27.95 | $58,130 |
| Atlanta-Sandy Springs-Roswell, GA | 8,460 | 3.08 | 1.37 | $27.19 | $56,560 |
| Dallas-Fort Worth-Arlington, TX | 7,940 | 2.17 | 0.97 | $30.14 | $62,690 |
| San Francisco-Oakland-Hayward, CA | 5,810 | 2.35 | 1.05 | $34.31 | $71,360 |
| Phoenix-Mesa-Scottsdale, AZ | 5,780 | 2.73 | 1.21 | $25.30 | $52,620 |

EXHIBIT B

Location quotient of paralegals and legal assistants, by area, May 2019



Blank areas indicate data not available.

Metropolitan areas with the highest concentration of jobs and location quotients in this occupation:

| Metropolitan area | Employment (1) | Employment per thousand jobs | Location quotient (9) | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|---|
| Columbia, SC | 1,890 | 4.95 | 2.20 | $22.68 | $47,180 |
| New Bern, NC | 210 | 4.86 | 2.16 | $20.20 | $42,010 |
| Charleston, WV | 520 | 4.69 | 2.09 | $25.80 | $53,660 |
| Miami-Fort Lauderdale-West Palm Beach, FL | 12,030 | 4.55 | 2.03 | $27.19 | $56,560 |
| Tallahassee, FL | 790 | 4.51 | 2.01 | $21.72 | $45,180 |
| Hartford-West Hartford-East Hartford, CT | 2,500 | 4.27 | 1.90 | $28.71 | $59,710 |
| Tampa-St. Petersburg-Clearwater, FL | 5,510 | 4.13 | 1.84 | $23.07 | $47,980 |
| Olympia-Tumwater, WA | 450 | 3.96 | 1.76 | $26.36 | $54,820 |
| Washington-Arlington-Alexandria, DC-VA-MD-WV | 12,550 | 3.95 | 1.76 | $33.67 | $70,030 |
| New Orleans-Metairie, LA | 2,200 | 3.94 | 1.75 | $27.68 | $57,570 |

EXHIBIT B

## Annual mean wage of paralegals and legal assistants, by area, May 2019



**Annual mean wage**

☐ $27,210 - $41,390    ▨ $41,410 - $46,980
▨ $47,050 - $52,030    ■ $52,110 - $86,690

Blank areas indicate data not available.

Top paying metropolitan areas for this occupation:

| Metropolitan area | Employment (1) | Employment per thousand jobs | Location quotient (9) | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|---|
| San Jose-Sunnyvale-Santa Clara, CA | 1,650 | 1.44 | 0.64 | $41.68 | $86,690 |
| Napa, CA | 50 | 0.61 | 0.27 | $38.38 | $79,840 |
| Trenton, NJ | 580 | 2.42 | 1.08 | $34.84 | $72,480 |
| San Francisco-Oakland-Hayward, CA | 5,810 | 2.35 | 1.05 | $34.31 | $71,360 |
| Washington-Arlington-Alexandria, DC-VA-MD-WV | 12,550 | 3.95 | 1.76 | $33.67 | $70,030 |
| Santa Rosa, CA | 360 | 1.71 | 0.76 | $32.84 | $68,310 |
| San Diego-Carlsbad, CA | 2,640 | 1.76 | 0.78 | $32.26 | $67,110 |
| Bridgeport-Stamford-Norwalk, CT | 1,110 | 2.68 | 1.19 | $31.72 | $65,970 |
| Vallejo-Fairfield, CA | 80 | 0.55 | 0.25 | $31.62 | $65,780 |
| Boulder, CO | 360 | 1.93 | 0.86 | $31.48 | $65,490 |

Nonmetropolitan areas with the highest employment in this occupation:

| Nonmetropolitan area | Employment (1) | Employment per thousand jobs | Location quotient (9) | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|---|
| Kansas nonmetropolitan area | 490 | 1.23 | 0.55 | $15.05 | $31,300 |
| Piedmont North Carolina nonmetropolitan area | 430 | 1.65 | 0.74 | $17.67 | $36,760 |
| Central Kentucky nonmetropolitan area | 330 | 1.84 | 0.82 | $16.97 | $35,310 |
| Southwest Montana nonmetropolitan area | 300 | 2.18 | 0.97 | $22.39 | $46,570 |
| Southeast Coastal North Carolina nonmetropolitan area | 300 | 1.19 | 0.53 | $18.46 | $38,390 |

Nonmetropolitan areas with the highest concentration of jobs and location quotients in this occupation:

| Nonmetropolitan area | Employment (1) | Employment per thousand jobs | Location quotient (9) | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|---|
| Northeast Coastal North Carolina nonmetropolitan area | 260 | 2.79 | 1.24 | $18.56 | $38,600 |
| Connecticut nonmetropolitan | 90 | 2.68 | 1.19 | $25.84 | $53,740 |

EXHIBIT B

| | | | | | |
|---|---|---|---|---|---|
| area | | | | | |
| Northern Vermont nonmetropolitan area | 170 | 2.40 | 1.07 | $24.47 | $50,910 |
| Central New Hampshire nonmetropolitan area | 230 | 2.40 | 1.07 | $28.30 | $58,860 |
| Southwest Montana nonmetropolitan area | 300 | 2.18 | 0.97 | $22.39 | $46,570 |

Top paying nonmetropolitan areas for this occupation:

| Nonmetropolitan area | Employment (1) | Employment per thousand jobs | Location quotient (9) | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|---|
| Alaska nonmetropolitan area | 100 | 0.92 | 0.41 | $29.57 | $61,510 |
| Northwest Colorado nonmetropolitan area | 100 | 0.77 | 0.34 | $29.53 | $61,410 |
| Central New Hampshire nonmetropolitan area | 230 | 2.40 | 1.07 | $28.30 | $58,860 |
| North Coast Region of California nonmetropolitan area | 90 | 0.85 | 0.38 | $27.64 | $57,490 |
| Hawaii / Kauai nonmetropolitan area | 130 | 1.24 | 0.55 | $27.13 | $56,430 |

About May 2019 National, State, Metropolitan, and Nonmetropolitan Area Occupational Employment and Wage Estimates

These estimates are calculated with data collected from employers in all industry sectors, all metropolitan and nonmetropolitan areas, and all states and the District of Columbia. The top employment and wage figures are provided above. The complete list is available in the downloadable XLS files.

The percentile wage estimate is the value of a wage below which a certain percent of workers fall. The median wage is the 50th percentile wage estimate--50 percent of workers earn less than the median and 50 percent of workers earn more than the median. More about percentile wages.

(1) Estimates for detailed occupations do not sum to the totals because the totals include occupations not shown separately. Estimates do not include self-employed workers.

(2) Annual wages have been calculated by multiplying the hourly mean wage by a "year-round, full-time" hours figure of 2,080 hours; for those occupations where there is not an hourly wage published, the annual wage has been directly calculated from the reported survey data.

(3) The relative standard error (RSE) is a measure of the reliability of a survey statistic. The smaller the relative standard error, the more precise the estimate.

(9) The location quotient is the ratio of the area concentration of occupational employment to the national average concentration. A location quotient greater than one indicates the occupation has a higher share of employment than average, and a location quotient less than one indicates the occupation is less prevalent in the area than average.

Other OES estimates and related information:

May 2019 National Occupational Employment and Wage Estimates

May 2019 State Occupational Employment and Wage Estimates

May 2019 Metropolitan and Nonmetropolitan Area Occupational Employment and Wage Estimates

May 2019 National Industry-Specific Occupational Employment and Wage Estimates

May 2019 Occupation Profiles

Technical Notes

**Last Modified Date:** July 6, 2020

U.S. BUREAU OF LABOR STATISTICS  Division of Occupational Employment Statistics  PSB Suite 2135  2 Massachusetts Avenue NE  Washington, DC 20212-0001

Telephone:1-202-691-6569  www.bls.gov/OES  Contact OES

EXHIBIT B