ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
JOHN H. GEORGE (292332)
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
jgeorge@rgrdlaw.com

LABATON SUCHAROW LLP
MICHAEL P. CANTY (*pro hac vice*)
CORBAN S. RHODES (*pro hac vice*)
140 Broadway
New York, NY 10005
Telephone: 212/907-0700
212/818-0477 (fax)
mcanty@labaton.com
crhodes@labaton.com

EDELSON PC
JAY EDELSON (*pro hac vice*)
BENJAMIN RICHMAN (*pro hac vice*)
ALEXANDER G. TIEVSKY (*pro hac vice*)
350 North LaSalle Street, 14th Floor
Chicago, IL 60654
Telephone: 312/589-6370
312/589-6378 (fax)
jedelson@edelson.com
brichman@edelson.com
atievsky@edelson.com

*Attorneys for Plaintiffs*

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| In re FACEBOOK BIOMETRIC INFORMATION PRIVACY LITIGATION | ) ) ) |
| | ) |
| This Document Relates To: | ) ) |
| ALL ACTIONS. | ) ) ) ) |

Master File No. 3:15-cv-03747-JD

CLASS ACTION

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

1

## TABLE OF CONTENTS

2
Page

3

I.   ISSUES TO BE DECIDED ...........................................................................................1
4

II.  MEMORANDUM OF POINTS AND AUTHORITIES ..........................................1
5

III. BACKGROUND AND CASE HISTORY ..................................................................3
6

IV. TERMS OF THE SETTLEMENT .............................................................................3
7
     A.   Class Definition ................................................................................................3
8
     B.   Monetary Relief ................................................................................................3
9
     C.   Conduct Remedy ..............................................................................................4
10
     D.   Release ...............................................................................................................4
11
     E.   Attorneys' Fees & Incentive Awards ............................................................4
12

V.  NOTICE WAS SUCCESSFUL, SATISFIED DUE PROCESS, AND
13       PRODUCED A HIGH CLAIMS RATE ...................................................................5

14
     A.   The Court Approved Notice Plan was Successfully Implemented. ...................5
15
     B.   The Objections to the Sufficiency of the Notice Should be Overruled............9
16
     C.   More Than 1.5 Million Class Members Have Submitted Claims...................11
17

VI. THE SETTLEMENT MERITS FINAL APPROVAL...........................................12
18
     A.   Class Counsel and the Class Representatives Have Protected
19        the Class's Interests and Support the Settlement. ......................................13

20
     B.   The Settlement was Negotiated at Arm's Length. ............................................14
21
     C.   The Amount Offered by the Settlement Supports Final Approval. ................14
22
          i.    Projected recovery per claiming class member is unprecedented
23               for a privacy settlement. ...................................................................15

24
          ii.   The conduct remedy here provides "meaningful" relief. ....................18
25
          iii.  The risks inherent in further litigation demonstrate the
26               adequacy of the relief...............................................................19

27
          iv.   The objections to the adequacy of relief are meritless.........................20
28

Page

D.      The High Claims Rate Shows the Effectiveness of the Method
        of Distribution of Funds to the Class. ...............................................24

VII.  OBJECTIONS TO THE PROPOSED SERVICE AWARD ARE MERITLESS........27

A.      Service Awards are Permitted in Class Actions. .................................27

B.      The Proposed Service Awards are Appropriate. ...............................29

VIII.  THE OBJECTIONS TO CLASS COUNSEL'S FEE REQUEST SHOULD
        BE OVERRULED ............................................................................................30

IX.    CONCLUSION ...............................................................................................33

**TABLE OF AUTHORITIES**

Page

**U.S. Supreme Court Cases:**

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*,
     421 U.S. 240 (1975)...................................................................................32

*Eisen v. Carlisle & Jacquelin*,
     417 U.S. 156, 173 (1974).............................................................................5

*Fid. Bank & Trust Co. v. Kehoe*,
     547 U.S. 1051 (2006)...................................................................................24

*St. Louis, Iron Mountain, & S. R. Co. v. Williams*,
     251 U.S. 63 (1919)......................................................................................23

*Trustees v. Greenough*,
     105 U.S. 527 (1881)....................................................................................28

**U.S. Circuit Court of Appeals Cases:**

*Churchill Vill., L.L.C. v. Gen. Elec.*,
     361 F.3d 566 (9th Cir. 2004) ................................................................12, 27

*Hanlon v. Chrysler Corp.*,
     150 F.3d 1011 (9th Cir. 1998) ..............................................................20, 21

*In re Bluetooth Headset Prod. Liab. Litig.*,
     654 F.3d 935 (9th Cir. 2011) ...........................................................12, 13, 14

*In re Online DVD-Rental Antitrust Litig.*,
     779 F.3d 934 (9th Cir. 2015) .............................................................5, 29, 31

*In re Washington Public Power Supply System Securities Litigation*,
     19 F.3d 1291 (9th Cir. 1994) .....................................................................31

*Johnson v. NPAS Solutions, LLC*,
     975 F.3d 1244 (11th Cir. 2020) ...........................................................27, 28

*Juris v. Inamed Corp.*,
     685 F.3d 1294 (11th Cir. 2012) .................................................................5

*Lane v. Facebook, Inc.*,
     696 F.3d 811 (9th Cir. 2012) ...............................................................17, 18

Page

*Melito v. Experian Mktg. Sols., Inc.*,
    923 F.3d 85 (2d Cir. 2019)...................................................................28

*Mullins v Direct Digital LLC*,
    795 F.3d 654 (7th Cir. 2015) .................................................................5

*Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of S.F.*,
    688 F.2d 615 (9th Cir. 1982) ................................................5, 13, 16, 24

*Patel v. Facebook, Inc.*,
    932 F.3d 1264 (9th Cir. 2019) .........................................................19, 20

*Rodriguez v. West Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009) ............................................................27, 28

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) ................................................................31

*United States v. Dish Network LLC*,
    954 F.3d 970 (7th Cir. 2020) ................................................................23

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002) ..............................................................30

**U.S. District Court Cases:**

*Bailey v. Kinder Morgan GP*,
    No. 18-cv-03424, 2020 WL 5748721 (N.D. Cal. Sept. 25, 2020)...................25

*Barnes v. Fleetboston Fin. Corp.*,
    No. 01-cv-10395-NG, 2006 WL 6916834 (D. Mass. Aug. 22, 2006) .............10

*Corzine v. Whirlpool Corp.*,
    No. 15-cv-05764, 2019 WL 7372275 (N.D. Cal. Dec. 31, 2019)...................26

*Chun-Hoon v. McKee Foods Corp.*,
    716 F. Supp. 2d 848 (N.D. Cal. 2010) ...........................................27

*Cotter v. Lyft, Inc.*,
    193 F. Supp. 3d 1030 (N.D. Cal. 2016) ..........................................13

*Delgado v. MarketSource, Inc.*,
    No. 17-cv-07370, 2019 WL 4059850 (N.D. Cal. Aug. 28, 2019) ...................20

*Fraley v. Facebook, Inc.*,
    966 F. Supp. 2d 939 (N.D. Cal. 2013) ..........................................20

Page

*Hashw v. Dept. Stores Nat'l Bank*,
　　182 F. Supp. 3d 935 (D. Minn. Apr. 26, 2016)................................................................16

*Hefler v. Wells Fargo & Co.*,
　　No. 16-cv-05479-JST, 2018 WL 6619983 (N.D. Cal. Dec. 18, 2018) ....................2, 10, 30

*In re Anthem, Inc. Data Breach Litig.*,
　　327 F.R.D. 299 (N.D. Cal. 2018)..............................................................................17, 26

*In re Apple Inc. Device Performance Litigation*,
　　No. 18-md-2827 (N.D. Cal. Oct. 5, 2020) .......................................................................11

*In re Capital One Telephone Consumer Protection Act Litig.*,
　　80 F. Supp. 3d 781 (N.D. Ill. 2015) ................................................................................16

*In re Equifax, Inc. Customer Data Security Breach Litigation*,
　　No. 17-md-2800, 2020 WL 256132 (N.D. Ga.)..........................................................15, 26

*In re Google LLC Street View Elec. Commc'ns Litig.*,
　　No. 10-md-02184-CRB, 2020 WL 1288377 (N.D. Cal. Mar. 18, 2020)...................2, 3, 18

*In re LinkedIn User Privacy Litig.*,
　　309 F.R.D. 573 (N.D. Cal. 2015)...............................................................................20, 21

*In re Nexus 6P Prods. Liab. Litig.*,
　　No. 17-cv-02185, 2019 WL 6622842 (N.D. Cal. Nov. 12, 2019) .....................................26

*In re Omnivision Techs., Inc.*,
　　559 F. Supp. 2d 1036 (N.D. Cal. 2008) ......................................................................13, 14

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
　　461 F. Supp. 2d 383 (D. Md. 2006) ................................................................................10

*In re Target*,
　　No. 14-cv-2522, 2017 WL 2178306 (D. Minn.)................................................................26

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
　　No. 07-cv-1827, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013).........................................30

*In re Vizio, Inc., Consumer Privacy Litigation*,
　　No. 16-ml-02693-JLS-KES (C.D. Cal.).....................................................................16, 26

*In re Wal-Mart Wage & Hour Employment Practices Litig.*,
　　No. 06-cv-00225, 2010 WL 786513 (D. Nev. Mar. 8, 2010) ...........................................10

Page

*In re Yahoo! Inc. Customer Data Security Breach Litig.*,
    No. 16-md-02752, 2020 WL 4212811 (N.D. Cal. July 22, 2020) ..........................9, 17, 22

*Kehoe v. Fidelity Fed. Bank & Tr.*,
    No. 03-cv-80593 (S.D. Fla. Nov. 17, 2006) ....................................................16

*Moore v. Verizon Commc'ns Inc.*,
    No. 09-cv-1823 SBA, 2013 WL 4610764 (N.D. Cal. Aug. 28, 2013) ..............................9

*Nunez v. BAE Sys. San Diego Ship Repair Inc.*,
    292 F. Supp. 3d 1018 (S.D. Cal. 2017)..........................................................21

*Satchell v. Fed. Exp. Corp.*,
    Nos. 03-cv-2659-SI, 03-cv-2878-SI, 2007 WL 1114010 (N.D. Cal. Apr. 13, 2007)........14

*Schuchardt v. Law Office of Rory W. Clark*,
    314 F.R.D. 673 (N.D. Cal. 2016)................................................................14

*Sugarman v. Ducati N. Am., Inc.*,
    No. 10-cv-05246, 2012 WL 113361 (N.D. Cal. Jan. 12, 2012)..............................27

*Uschold v. NSMG Shared Servs. LLC*,
    No. 18-cv-01039, 2020 WL 3035776 (N.D. Cal. June 5, 2020)..........................13, 16, 20

*Walters v. Target Corp.*,
    No. 16-cv-1678, 2020 WL 6277436 (S.D. Cal. Oct. 26, 2020)..............................12

**State Court Cases:**

*Berlak v. Villa Scalabrini Home for the Aged, Inc.*,
    284 Ill. App. 3d 231 (1996) ...................................................................32

*Crème de la Crème*,
    No. 17 CH 1624 (Ill. Cir. Ct. Cook Cnty.) .....................................................17

*Prelipceanu v. Jumio Corp.*,
    No. 2018 CH 15883 (Ill. Cir. Ct., Cook Cnty.) ..........................................17, 18

*Sekura v. L.A. Tan Enterprises, Inc.*,
    No. 15 CH 16694 (Ill. Cir. Ct., Cook Cnty.) ..................................................17

*Young v. Alden Gardens of Waterford, LLC*,
    2015 IL App (1st) 131887....................................................................32

Page

**Rules and Statutory Provisions:**

740 ILCS 14.........................................................................................................*passim*

15 U.S.C. § 78u...................................................................................................28

18 U.S.C. § 2710................................................................................................16

Fed. R. Civ. P. 23................................................................................................*passim*

**Other Authorities:**

5 William B. Rubenstein, NEWBERG ON CLASS ACTIONS
       § 17:8 (5th ed., June 2020 update).....................................................30

Ally Marotti, *A massive Facebook privacy settlement just got bigger. Illinois users
       could split $650 million*, CHICAGO TRIBUNE (July 24, 2020), available at
       https://perma.cc/X826-MMVQ.............................................................8

*Deadline Approaches for Illinois Facebook Users to File Claim for Payouts in $650M
       Settlement*, NBC 5 CHICAGO (Nov. 6, 2020) available at
       https://perma.cc/6R4Y-FSW9..............................................................8

Federal Judicial Center, Judges' Class Action Notice & Claims Process
       Checklist & Plain Language Guide (2010) available at
       https://perma.cc/9BBX-9TNV...............................................................5

Jeff John Roberts, *Facebook adds $100 million to landmark facial recognition
       settlement payout*, FORTUNE (July 23, 2020), available at
       https://perma.cc/P7EH-NMSL..............................................................8

Lorraine Swanson, *Clock Ticking For Illinois Facebook Users To File Claims*, PATCH.COM
       (Nov. 11, 2020), available at https://perma.cc/U2RC-82PY .............................8

Natasha Singer and Mike Isaac, *Facebook to Pay $550 Million to Settle Facial
       Recognition Suit*, N.Y. TIMES (Jan. 29, 2020), available at
       https://perma.cc/X99S-743P...................................................................8

Riley O'Neil, *Illinois Facebook Users Have 2 Weeks Left To Apply For Settlement*, WROK
       1440, available at https://perma.cc/86H4-97PU ................................................8

1    TO: ALL PARTIES AND THEIR ATTORNEYS OF RECORD

2        PLEASE TAKE NOTICE that on January 7, 2021 at 10:00 a.m., or as soon thereafter as

3    they may be heard, Carlo Licata, Nimesh Patel, and Adam Pezen ("Plaintiffs") on behalf of

4    themselves and all members of the Class, hereby respectfully move this Court for an Order,

5    pursuant to Rule 23 of the Federal Rules of Civil Procedure: (i) finding the notice provided to the

6    class satisfies Rule 23 and due process; (ii) finding that the proposed settlement ("Settlement") is

7    fair, reasonable, and adequate, and granting final approval of the proposed Settlement; and (iii)

8    such other and further relief as this Court deems just and proper.

9        This Motion is supported by the following memorandum of points and authorities, the

10   Declaration of Class Counsel ("Class Counsel Decl."), which was filed in this matter at Dkt. 499-

11   1, the Amended Stipulation and Agreement of Settlement, dated July 22, 2020 ("Stipulation"),

12   which was filed in this matter at Dkt. 468, the Declaration of Lana Lucchesi, which is attached

13   hereto as Exhibit A ("Lucchesi Decl."), and the Second Expert Declaration of William

14   Rubenstein, which is attached hereto as Exhibit B ("2d Rubenstein Decl.").

15   **I.    ISSUES TO BE DECIDED**

16       1.    Whether the notice provided to the class satisfies Rule 23 and due process.

17       2.    Whether the Court should find that the proposed Settlement is fair,
               reasonable, and adequate.

18
     3.    Whether the objections of Kevin C. Williams, Dawn Frankfother, Cathy Flanagan,
19             and Kara Ross should be overruled.

20   **II.    MEMORANDUM OF POINTS AND AUTHORITIES**

21       After an initial hearing where this Court set forth its concerns with the initial settlement,

22   the parties returned with both answers to the Court's questions and several improved Settlement

23   terms. The Court then held a second hearing which included the presentation of live testimony on

24   issues of notice, the settlement's relationship to the Federal Trade Commission consent decree,

25   and the conduct remedy. After the hearing, the Court issued an order finding that "the $650

26   million that will be awarded to the Illinois class is impressive both as an absolute number and

27   relative to other class actions settlements in privacy cases." (Dkt. 474 at 5.) As the parties have

28   detailed in their bi-weekly submissions to the Court, the notice plan has been successfully

1   implemented and any issues that arose were promptly addressed. This robust notice, combined

2   with a newsworthy, historic settlement, and Class Counsel's independent efforts to ensure that

3   Class members had the information they needed has paid off: more than 1.5 million Class

4   members have submitted claims for payment from the Settlement Fund, around 22% of the

5   Class. By contrast, only 107 individuals have opted out, representing a little more than 0.01% of

6   the Class. Assuming that Class Counsel's fee request is approved in full (Dkt. 499), and based

7   upon projections from Gilardi & Co. for the cost of administering the Settlement, claiming Class

8   members stand to recover approximately $342, right in line with Class Counsel's projections at

9   preliminary approval. A claims rate of around 22% is a remarkable figure in consumer class

10  actions generally, particularly for classes of this size, and exceeds claims rates in the handful of

11  other consumer settlements under the Biometric Information Privacy Act, 740 ILCS 14

12  ("BIPA"). By contrast, the Settlement has drawn just three objections—one from an apparently

13  conflicted *pro se* felon; another from "John Pentz, a[] serial meritless objector[]," *Hefler v. Wells*

14  *Fargo & Co.*, No. 16-cv-05479-JST, 2018 WL 6619983, at *16 n.19 (N.D. Cal. Dec. 18, 2018)

15  (Tigar, J.) (rejecting nearly identical objections made by Pentz); and finally one that has already

16  been withdrawn in large part based on the objector's renewed understanding of the historic

17  nature of the Settlement. None of these objections raise a single issue not already considered by

18  the Court or raised by the parties.

19          Given the substantial relief, both monetary and non-monetary, provided by the

20  Settlement, perhaps none of this should have been much of a surprise. The Settlement, which

21  was reached only after "fierce [litigation] for over five years, with no legal pebble left unturned,"

22  (Dkt. 474 at 2), months of negotiations with former U.S. Ambassador Jeffrey L. Bleich, and the

23  critical guidance of this Court, is an exemplar in the privacy space. Indeed, the substantial

24  monetary relief provided here stands in stark contrast to many recent privacy settlements against

25  large technology companies. In March of this year, for instance, Judge Breyer of this District

26  approved, over the objections of both class members and a state attorney general, a *cy pres*-only

27  settlement in a case alleging that Google had invaded certain statutorily guaranteed privacy

28  rights. *In re Google LLC Street View Elec. Commc'ns Litig.*, No. 10-md-02184-CRB, 2020 WL

1288377, at *11-14 (N.D. Cal. Mar. 18, 2020). And just this November, Judge Alsup granted

preliminary approval to a class-action settlement against Facebook that surrendered claims

relating to data-security in exchange only for injunctive relief. *Adkins v. Facebook, Inc.*, No. 18-

cv-05982-WHA, Dkt. 314 (N.D. Cal. Nov. 15, 2020).

The Settlement here, by contrast, provides Class members not only with meaningful

injunctive relief, but with monetary relief that is unprecedented in consumer class action privacy

settlements of this size. As the Court previously found, the Settlement, reached after an

adversarial class certification decision affirmed on appeal, is "the product of serious, informed,

and noncollusive negotiations." (Dkt. 474 at 4.) The claims process has demonstrated that the

Class is extremely satisfied with those efforts. The Court should therefore grant final approval to

the Settlement.

## III.     BACKGROUND AND CASE HISTORY

The Court is deeply familiar with the procedural history of this case, which has been set

forth in several published decisions. That history is also laid out in detail in Plaintiffs' Motion for

Attorneys' Fees, Expenses, and Incentive Awards (Dkts. 499, 499-1), as well as in the parties'

submissions in support of preliminary approval. In accordance with this District's *Procedural

Guidance for Class Action Settlements* Plaintiffs incorporate by reference, but do not repeat, that

history here.

## IV.     TERMS OF THE SETTLEMENT

Although the Court has already closely examined all aspects of the Settlement, the key

terms are summarized below for the Court's convenience:

**A.     Class Definition**: All individuals located in Illinois for whom Facebook stored a

face template after June 7, 2011. (Stipulation ¶ 1.7.) This is the same class the Court certified,

(Dkt. 333), but includes approved exclusions for judicial staff and other interested persons. (Dkt.

474, at 4-5.)

**B.     Monetary Relief**: The Settlement creates a $650 million fund from which each

class member who submits an approved claim shall be entitled to a *pro rata* share, after

deducting administrative expenses, any fee award to Class Counsel, and any incentive payments

1    to the Class Representatives. No portion of the Settlement Fund will revert to Facebook. Class

2    members shall be paid by check or electronic payment, at their election. Any checks not cashed

3    within ninety (90) days will either be redistributed to claiming Class members, or, if the amount

4    is nominal, donated to the American Civil Liberties Union of Illinois, which the court

5    preliminary approved as *cy pres* recipient. (Stipulation ¶¶ 2.1-2.4, 2.6.; Dkt. 474 at 7.) Class

6    members are expected to receive approximately $342.

7        **C.    Conduct Remedy:** Facebook will turn Face Recognition settings for Class

8    members to "off" and will delete existing face templates for Class members who do not

9    affirmatively set their Face Recognition setting to "on" within 180 days of the Settlement's

10   effective date. Before Class members turn their Face Recognition settings to "on," Facebook will

11   disclose, in a separate document that complies with BIPA, how it uses Face Recognition. Taking

12   no action means Face Recognition will remain "off" for that Class member and any

13   corresponding face template stored by Facebook will be deleted. Facebook will also delete face

14   templates of Class members who have been inactive on the platform for three years. Class

15   members who have manually turned Face Recognition on or who joined after September 3, 2019

16   (the date on which Facebook implemented these practices for new users) are excepted. This

17   relief is separate and apart from and not duplicative of Facebook's obligations under the July

18   2019 FTC consent decree.

19       **D.    Release**: In exchange for the settlement relief detailed above, Facebook will

20   receive from the Class a release that is narrowly tailored to the claims related to the use of facial

21   recognition technology on users located in Illinois. The release covers claims that were actually

22   litigated in this action and was revised, based on the Court's concerns, to expressly exclude as

23   Released Parties, "any entities . . . that did not use the Tag Suggestions feature such as

24   Instagram, Inc., WhatsApp Inc., and Oculus VR Inc." (Stipulation ¶ 1.26.)

25       **E.    Attorneys' Fees & Incentive Awards:** Class Counsel has separately moved for

26   reasonable attorneys' fees and in incentive awards for the Class Representatives (Dkt. 499),

27   which was promptly posted on the Settlement website. (Lucchesi Decl. ¶ 17.) As the Court

28   recognized, the Settlement doesn't contain a "clear sailing" agreement. (Dkt. 474 at 5.)

1   **V.      NOTICE WAS SUCCESSFUL, SATISFIED DUE PROCESS, AND PRODUCED A**
2   **HIGH CLAIMS RATE**

3   **A.      The Court-Approved Notice Plan was Successfully Implemented.**

4           Prior to granting final approval to this Settlement, the Court must consider whether the

5   Class members received "the best notice that is practicable under the circumstances, including

6   individual notice to all members who can be identified through reasonable effort." Fed. R. Civ.

7   P. 23(c)(2)(B); *accord Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974). "The class must

8   be notified of a proposed settlement in a manner that does not systematically leave any group

9   without notice." *Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of S.F.*, 688 F.2d 615,

10  624 (9th Cir. 1982) (citation omitted). Rule 23 requires "the best notice that is practicable under

11  the circumstances." Fed. R. Civ. P. 23(c)(2)(B). "The rule does not insist on actual notice to all

12  class members in all cases." *Mullins v Direct Digital LLC*, 795 F.3d 654, 665 (7th Cir. 2015); *see*

13  *also Juris v. Inamed Corp.*, 685 F.3d 1294, 1321 (11th Cir. 2012) (noting that "even in Rule

14  23(b)(3) class actions, due process does not require that class members actually receive notice"

15  and collecting cases). Although what constitutes the "best notice practicable" is case-specific, the

16  Federal Judicial Center has noted that a notice campaign that reaches 70% of a class is often

17  reasonable. Federal Judicial Center, Judges' Class Action Notice & Claims Process Checklist &

18  Plain Language Guide, at 3 (2010), available at https://perma.cc/9BBX-9TNV. The Notice must

19  also accurately describe the Settlement. *See* Fed. R. Civ. P. 23(e)(1)(A); *In re Online DVD-*

20  *Rental Antitrust Litig.*, 779 F.3d 934, 946 (9th Cir. 2015). Along with the Court, Plaintiffs sought

21  through the notice "to achieve a high claims rate and payout to class members . . . [and] establish

22  best practices for online notice." (Dkt. 474 at 7.)

23          As the Court and Class Counsel recognized after the Class was certified, reaching a class

24  composed of entirely online users alleging online privacy violations was going to require

25  primarily online notice. Over Facebook's objections at that stage, the Court-ordered certification

26  notice was to be directed to the class via Class members' Facebook newsfeed channel, via jewel

27  notices, direct email notice, and a web page dedicated to the lawsuit. (*See* Dkts. 402, 474.) The

28  Settlement notice includes all these methods plus a second round of email notice, a targeted

1   internet banner ad campaign, print publication, and required CAFA notice to government

2   officials. But the right methods are only part of a successful notice campaign: the notice also

3   needs to effectively alert class members to their rights and get them to exercise those rights. Per

4   the Court's instructions, after the first preliminary approval hearing, the parties, with the

5   assistance of Facebook's media team and an outside email notice designer, reworded and

6   redesigned the entire notice program to make it eye-catching and easily understandable. The

7   parties and the settlement administrator also made sure that the claim form is easy to understand

8   and complete—most Class members could file a claim in less than two minutes. The Court

9   approved the methods and the retooled notice language finding that "together they constitute the

10  best practicable notice to individual class members under the circumstances of this case." (Dkt.

11  474 at 6.)

12          As the parties have informed the Court through their bi-monthly status reports, the notice

13  plan has been successfully completed, any hiccups have been identified and remedied, and the

14  resultant claims rate is among the highest of any consumer class action (and the highest of a class

15  of this size). The two methods of direct notice each reached most of the Class. First, as Facebook

16  has previously explained, it "has complied with this Court's order and provided the approved

17  Newsfeed and jewel notice to the class by the September 23 notice date." (Dkt. 492.) And as

18  Facebook representative Gary McCoy testified at the second preliminary approval hearing, this

19  was the best and common method by which Facebook would normally seek to communicate

20  important information to its user base. As of the Claims Deadline, the separately filed declaration

21  of Jake Webb states that the Jewel and Newsfeed notices created approximately 9.1 million

22  unique impressions, with 30.47% of those recipients engaging with the notice.

23          The Settlement Administrator (Gilardi & Co.) also successfully implemented several

24  additional forms of notice. For direct notice, Gilardi was tasked with sending emails to each

25  email address associated with a person on the Class List. It turns out, for some of the records in

26  the Class List, the data contained multiple distinct email addresses associated with the same

27  record such that there were 15,372,906 emails associated with 12,340,049 accounts. (Lucchesi

28  Decl. ¶ 7.) Gilardi sent the email notice to each of these addresses because the Parties believed

that providing Class members notice to the email address they actually monitor far outweighed the minimal downside of sending duplicate emails to Class members who actively use multiple addresses. Gilardi also determined that 2,608,319 of the emails provided were no longer valid address (*i.e.*, out-of-date school or work accounts that are no longer serviced). (*Id.*) For the first round, at least 10,295,502 emails were successfully delivered to at least one of the email addresses associated with an account. (*Id.* ¶ 9.)

As the parties reported, Class Counsel discovered through communications with Class members that approximately 5.7 million emails associated with a Gmail address were routed to users' spam folders. (Dkt. 492 ¶ 11.) Class Counsel reached out to outside and inside counsel for Google and was able to coordinate a follow up email to those Gmail users of which 99.9% were successfully delivered and no issues were reported of those emails being routed to spam. (Lucchesis Decl. ¶ 11.)

A follow-up email "reminder" campaign was initiated during the first week of November as the Claims Deadline was approaching with notices being sent to 12,888,208 emails. 9,956,299 of those emails were successfully delivered. (*Id.* ¶¶ 12-13.) Ultimately, of the 34,036,599 total emails that were sent, 25,336,835 (74.4%) were successfully delivered. Delivery of at least one email was successful to 11,326,353 of the 12,340,049 accounts on the Class List that was associated with an email (91.8%). (*Id.* ¶ 14.)

In an effort to reach Class members who may not have received the Facebook-provided notice or Gilardi's multiple emails, two forms of publication notice were provided: print ads in the September 23 editions of the *Chicago Tribune* and *Chicago Sun Times* and a Google Display Network internet banner ad campaign that ran from September 23 to October 23. (*Id.* ¶ 15.)[1] The Google campaign generated 27,907,627 impressions running banner ads on high-quality sites typically visited by the target audience of Illinois Facebook users over 18 and Illinois residents aged 25-54 generally. (*Id.* ¶ 16.) This exceeded the goal of 27.1 million impressions.

---

[1]   As previously reported, Class Counsel paid for the short-form notice to be published in *The Pantagraph* and *The Southern Illinoisan*, two daily regional newspapers whose readership is not generally covered by the *Chicago Sun-Times* or the *Chicago Tribune*. (Dkt. 501.)

1    In addition, the Settlement received significant press attention, much of it very favorable.

2  Many articles highlighted the changes made to the Settlement in light of the Court's concerns

3  about the initial agreement reached between the parties. And many articles likewise praised the

4  ultimate benefits provided under the Settlement. For instance, an article on *Fortune*'s website

5  noted that "The case represents one of the biggest payouts for privacy violations to date, and

6  contrasts sharply with other settlements such as that for the notorious data breach at Equifax—

7  for which victims are expected to receive almost nothing."[2] An article in the *New York Times*

8  similarly noted that the Settlement here "dwarfs" the *Equifax* settlement.[3] Other articles touted

9  the Settlement's expected benefits, essentially serving as free publicity for the Settlement.[4]

10  Articles such as that featured in the *Chicago Tribune* undoubtedly helped spread the word about

11  the Settlement.[5] And local news articles throughout the state that encouraged Illinoisans to

12  submit claims also served as timely reminders that the time to file a claim was running out.[6]

13    The Settlement was also the subject of a virtual town hall meeting by supportive Illinois

14  legislators on November 16, 2020. Representatives Ann Williams, Greg Harris, Yoni Pizer,

15  Lindsay LaPointe, and Will Guzzardi, and Senator Robert Martwick discussed BIPA and its

16  importance, as well as the Settlement. Representative Williams called the Settlement "historic"

17  and noted that it would "result in a substantial amount of money for Illinois Facebook users," an

18

19

_____

20  [2]   Jeff John Roberts, *Facebook adds $100 million to landmark facial recognition settlement payout*, FORTUNE (July 23, 2020), available at https://perma.cc/P7EH-NMSL.

21
22  [3]   Natasha Singer and Mike Isaac, *Facebook to Pay $550 Million to Settle Facial Recognition Suit*, N.Y. TIMES (Jan. 29, 2020), available at https://perma.cc/X99S-743P.

23  [4]   *Deadline Approaches for Illinois Facebook Users to File Claim for Payouts in $650M Settlement*, NBC 5 CHICAGO (Nov. 6, 2020) available at https://perma.cc/6R4Y-FSW9.

24  [5]   Ally Marotti, *A massive Facebook privacy settlement just got bigger. Illinois users could split $650 million*, CHICAGO TRIBUNE (July 24, 2020), available at https://perma.cc/X826-
25  MMVQ.

26  [6]   *See, e.g.*, Lorraine Swanson, *Clock Ticking For Illinois Facebook Users To File Claims*, PATCH.COM (Nov. 11, 2020), available at https://perma.cc/U2RC-82PY; Riley O'Neil, *Illinois*
27  *Facebook Users Have 2 Weeks Left To Apply For Settlement*, WROK 1440, available at https://perma.cc/86H4-97PU.
28

1    amount she later termed "unheard of." A lawyer at Edelson PC was on hand to provide attendees

2    information on how they could submit a claim, and to answer any questions.

3         Finally, Class Counsel also worked directly with several Class members in an attempt to

4    help them with any questions they had about membership in the class or filing claims. Class

5    Counsel responded to hundreds of inquiries from Class members about the Settlement and claims

6    process. In addition, lawyers at Edelson PC also responded to requests from members of the

7    Class who are incarcerated to ensure that those individuals had the materials they needed to

8    submit claims. Class Counsel was also required to protect the Class from opportunists who

9    through misleading advertising sought to solicit class member opt-outs (Dkts. 477; 494; 496 ¶ 6)

10   or have Class members assign their claims in exchange for a 20% cut of the payments.

11        Ultimately, all of this notice and press coverage resulted in over 6.2 million visits to the

12   Settlement website. (Lucchesi Decl. ¶ 17.) And as explained below, over 1.5 million Class

13   members have submitted claims. (*Id.* ¶ 19.) To achieve these impressive notice results, Gilardi

14   has incurred $1,828,009.89 in costs, which should be approved by the Court. (*Id.* ¶ 22.)

15        **B.    The Objections to the Sufficiency of Notice Should be Overruled.**

16        Two of the three objections, the joint objection on behalf of Dawn Frankforther and

17   Cathy Flanagan and Kara Ross (who has since withdrawn her objection on this point), raise

18   concerns with the notice plan but develop no argument that notice failed to comply with Due

19   Process.[7] Objector Ross, for instance, claims to know personally (but does not identify) several

20

21   [7]   The objection of Kara Ross, which was drafted and submitted with the assistance of counsel
     who is also her husband, is facially deficient. First, it does not comply Fed. R. Civ. P.
22   23(e)(5)(A), because it does not state whether it is being filed individually or on behalf of some
     group of class members. Second, it fails to provide several pieces of information required of the
23   objectors as listed in the notice approved by the Court, including: an address, email or telephone
     number associated with her Facebook account, an explanation of why she believes she is a class
24   member, and any citation to legal authority. While Class Counsel address the substance of Ms.
     Ross's objection, the Court can nevertheless overrule it on these grounds alone. *In re Yahoo! Inc.*
25   *Customer Data Security Breach Litig.*, No. 16-md-02752, 2020 WL 4212811, at *14 (N.D. Cal.
     July 22, 2020) ("The Court need not consider . . . noncompliant objections."); *Moore v. Verizon*
26   *Commc'ns Inc.*, No. 09-cv-1823 SBA, 2013 WL 4610764, at *12 (N.D. Cal. Aug. 28, 2013)
     (overruling objections "for failing to comply with the procedural requirements for objecting to
27   the Settlement.").

28

1    members of the Class who supposedly did not receive individual notice, and asks the Court to

2    require Class Counsel to "disclose its method of identifying class members." (Dkt. 506-1 at 2.)

3    But Class Counsel already has informed the Court of how the Class List was constructed—that

4    only Facebook users in Illinois for more than 6 months with a template are Class members—and

5    the Court found that construction to comport with its earlier rulings and with Due Process. (Dkt.

6    474 at 4-7.) When this was conveyed to Ms. Ross's counsel, he immediately withdrew the

7    objection on this point. Moreover, as discussed above, due process requires "the best notice

8    practicable . . . under the circumstances of this case." (Dkt. 474 at 6.) So even if Ms. Ross was

9    correct about her withdrawn objection, it does not require that each and every class member

10   receive individual notice.[8]

11        Objectors Frankfother and Flanagan contend that the notice plan here was inadequate, but

12   they develop no evidence or argument along those lines. (Dkt. 504 at 7, 10.)[9] In fact, Objectors'

13

14   _____

15   [8]   Objector Ross has also withdrawn her objection that the requirement that a class member's opt out request be personally signed is unduly burdensome after Class Counsel and Facebook agreed to not contest her counsel (husband)'s opting out of 17 other family members on his word

16   that they had agreed. Regardless, requiring a signature is a standard requirement (it prevents opt outs from being filed without the class member's knowledge), and Class Counsel are unaware of any class members who attempted to opt out but were thwarted by the signature requirement.

17   Moreover, Class Counsel was willing to, and did, work with Ross's counsel on the issues she raises, and could have done so before the objection was filed with the Court had they been

18   advised of Ross's concerns before the objection was filed. Counsel nevertheless addresses the issues she raises.

19

20   [9]   Frankfother and Flanagan are represented by John J. Pentz, a well-known serial objector. *See Hefler*, 2018 WL 6619983, at *16 (discussing Pentz's history as a "serial meritless objector"); *In*

21   *re Wal-Mart Wage & Hour Employment Practices Litig.*, No. 06-cv-00225, 2010 WL 786513, at *1 (D. Nev. Mar. 8, 2010) (noting Pentz's "documented history of filing notices of appeal from

22   orders approving other class action settlements, and thereafter dismissing said appeals when they and their clients were compensated by the settling class or counsel for the settling class"); *In re*

23   *Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F. Supp. 2d 383, 386 (D. Md. 2006) ("Pentz is a professional and generally unsuccessful objector"). As a serial meritless objector, Pentz "mak[es]

24   a living simply by filing frivolous appeals and thereby slowing down the execution of

25   settlements." *Barnes v. Fleetboston Fin. Corp.*, No. 01-cv-10395-NG, 2006 WL 6916834, at *1

26   (D. Mass. Aug. 22, 2006). These objections and subsequent appeals produce no benefit to the class, but do allow the objector (or their counsel) to extort Class Counsel for tens of thousands of

27   dollars, if not more. *See id.* at *2 (discussing case in which Pentz filed, on his wife's behalf, a

28

1    only "evidence" of inadequate notice appears to be what they consider to be a low claims rate.

2    As discussed both above and below, and putting aside that these Objectors fail to meet their

3    burden to substantiate their objection, the claims rate here, around 22%, is anything but low and

4    is squarely within the projected range provided to the Court (as required by the Northern District

5    Guidelines) during the preliminary approval process. (Dkt. 445 at 11-12.) Given the hard

6    evidence that nearly the entire Class received individual notice more than once, and the fact that

7    the claims rate here surpasses most if not all consumer privacy settlements, there is no basis to

8    find that notice failed to satisfy Due Process.

9          **C.      More Than 1.5 Million Class Members Have Submitted Claims.**

10         Given the breadth of the notice plan and the amount of publicity this Settlement has

11    received, it should come as no surprise that the Class's reaction has been overwhelmingly

12    favorable. Back in July this Court noted that this Settlement presents an "opportunity to move the

13    marker" in terms of class member participation in a consumer class-action settlement. (7/23/20

14    Tr. at 31:11-16.) The parties heeded that advice and, at the suggestion of a behavioral scientist,

15    subtly altered the claim flow to encourage more Class members to file claims. (Dkt. 476 at 1-2.)

16    These efforts, combined with the robust notice plan, have paid off: well more than 1.5 million

17    Class members have submitted claims for payment from the Settlement Fund, around 22% of the

18    Class. By contrast, only 109 individuals have opted out, representing less than 0.02% of the

19    Class. Assuming *arguendo* that Counsel's fee request is approved in full (Dkt. 499), and based

20    upon projections from Gilardi for the cost of administering the Settlement, claiming Class

21    _____

22    frivolous objection and subsequent appeal from the objection's denial, for $100,000 but no
      improvements for the class).

23         Pentz's co-counsel in this action, Kendrick Jan, is well on his way to earning a reputation
      among the federal courts for repeatedly wasting judicial resources. As it turns out, he has

24    appeared as co-counsel to Pentz before. Indeed, the two lawyers filed an objection to the
      settlement reached in *In re Apple Inc. Device Performance Litigation*, that is practically identical

25    to the objection they lodge here. *See* Objection, *In re Apple Inc. Device Performance Litig.*, No.
      18-md-2827, Dkt. 512 (N.D. Cal. Oct. 5, 2020). Indeed, it appears that Mr. Jan got admitted to

26    the roll of attorneys of this Court on September 30 of this year precisely so that he could sponsor

27    the *pro hac vice* admission of Mr. Pentz in the *Apple Device* case and in this case. The objection
      in *Apple Device*, moreover, was submitted on behalf of Sarah Feldman, who is related to John

28    Pentz, and Hondo Jan, who is presumably related to Kendrick Jan.

1  members stand to recover $342, right in line with Counsel's projections at preliminary approval.

2  As explained further below, this claim rate dwarfs what is typical in any consumer class action.

3  **VI.      THE SETTLEMENT MERITS FINAL APPROVAL**

4              To approve the settlement of a certified class as fair, reasonable, and adequate, Rule 23(e)

5  requires Court to consider "whether (A) the class representatives and class counsel have

6  adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief

7  provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and

8  appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including

9  the method of processing class-member claims; (iii) the terms of any proposed award of

10 attorney's fees, including timing of payment; and (iv) any agreement required to be identified

11 under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other."

12 These factors largely encompass those identified by the Ninth Circuit for evaluating approval of

13 a class settlement. *See In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir.

14 2011) (quoting *Churchill Vill., L.L.C. v. Gen. Elec.,* 361 F.3d 566, 575 (9th Cir. 2004)).[10] Any

15 relevant additional factors identified by the Ninth Circuit are often reviewed alongside those

16 identified by Rule 23. *See, e.g.*, *Walters v. Target Corp.*, No. 16-cv-1678, 2020 WL 6277436, at

17 *5 (S.D. Cal. Oct. 26, 2020).

18             The Court has already given the Settlement here a hard look, initially denying

19 preliminary approval, based on concerns about the relief afforded to Class members under the

20 agreement, the scope of the release, potential overlap with the 2019 FTC Consent Decree, the

21 manner of notice, and the dry, legalistic language used in both the notice and claim form. (Dkt.

22 456.) The Court gave the revised Settlement similarly close scrutiny, determining that

23 amendments to the Settlement, including greater monetary relief, and revisions to the language

24 of the release and to the substance of the notice documents, had sufficiently addressed its

---

[10]  The *Churchill* factors are: (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement.

1    concerns. (Dkt. 474 at 1.) The Court also heard the testimony and asked questions of a Facebook

2    witness (Gary McCoy) as to how the Settlement's conduct remedy is not redundant of the

3    company's agreement with the government. (*Id.* at 6.) Further developments, specifically the

4    overwhelmingly positive reaction of the Class and minimal objections of little substance,

5    confirm the Court's intuitions about the fairness, reasonableness, and adequacy of the revised

6    Settlement. *See Cotter v. Lyft, Inc.*, 193 F. Supp. 3d 1030, 1036-37 (N.D. Cal. 2016) (when

7    district court conducts a "rigorous inquiry" at preliminary approval stage and "identif[ies] any

8    flaws" in a settlement and "allows the parties to decide how to respond to those flaws," final

9    approval should focus on potential flaws identified by objectors or exposed by "further factual

10   development"); *see also Uschold v. NSMG Shared Servs. LLC*, No. 18-cv-01039, 2020 WL

11   3035776, at *9 (N.D. Cal. June 5, 2020) (adhering to preliminary analysis about settlement value

12   because "there is nothing in the final approval materials that changes the Court's analysis on that

13   score"). Class Counsel examines the fairness factors identified in Rule 23(e) and by the Ninth

14   Circuit below, mindful that objections require a "reasoned response." *Officers for Justice*, 688

15   F.2d at 624.

16
     A.       **Class Counsel and the Class Representatives Have Protected the Class's**
17            **Interests and Support the Settlement.**

18            As the Court found at the class certification stage and again at preliminary approval,

19   Class Counsel and class representatives Nimish Patel, Adam Pezen, and Carlo Licata have

20   adequately represented the class throughout the five years they fiercely litigated this case. (Dkt.

21   474.) As discussed above, this zealous representation has continued during the notice and claims

22   process where Class Counsel have spoken with hundreds of Class members, watched for and

23   resolved issues with the email notice, and identified misleading communications being provided

24   that necessitated the filing of a TRO. (Dkt. 499-1 ¶¶ 133-38.) The Court should confirm that

25   finding here.

26            Class Counsel's support of the Settlement can be considered and also favors approval. *In*

27   *re Bluetooth*, 654 F.3d at 946. It is well-established that "the recommendations of plaintiffs'

28   counsel should be given a presumption of reasonableness." *In re Omnivision Techs., Inc.*, 559 F.

1   Supp. 2d 1036, 1043 (N.D. Cal. 2008) (quotations omitted). Here, Class Counsel have extensive

2   experience litigating consumer class actions, including in the privacy space. It is their considered

3   judgment that the Settlement represents an outstanding result for the Certified Class. (Dkt. 499-1

4   ¶ 122.) "Given Class Counsel's extensive experience in this field, and their assertion that the

5   settlement is fair, adequate, and reasonable, this factor supports final approval of the Settlement

6   Agreement." *Schuchardt v. Law Office of Rory W. Clark*, 314 F.R.D. 673, 685 (N.D. Cal. 2016).

7   It is notable as well that lawyers at Cooley LLP, including an attorney with deep experience in

8   this area, recommend approval of the Settlement.

9           **B.      The Settlement was Negotiated at Arm's Length.**

10          This Court has already concluded "that the proposed settlement was the product of

11  serious, informed and noncollusive negotiations" and lacked a clear sailing agreement. (Dkt.

12  474.) That conclusion remains correct. The parties attempted to resolve this dispute through

13  mediation three separate times at different stages of the proceedings, reaching a settlement only

14  after Facebook's *en banc* petition to the Ninth Circuit had been denied. (Dkt. 499-1 ¶¶ 109-112.)

15  And during the final attempt at resolution, even after reaching an agreement in principle, the

16  parties repeatedly had to engage with Ambassador Bleich to resolve differences that arose

17  between them as to the open terms. (*Id.* at 113-18.) *See Satchell v. Fed. Exp. Corp.*, Nos. 03-cv-

18  2659-SI, 03-cv-2878-SI, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007) ("The assistance of

19  an experienced mediator in the settlement process confirms that the settlement is non-

20  collusive."). Nor does the Settlement suffer from any of the warning signs that the Ninth Circuit

21  has instructed district courts to watch out for. *See In re Bluetooth*, 654 F.3d at 946-47

22  (identifying "clear sailing" arrangements and reversionary funds may suggest the presence of

23  collusion or bad faith).

24          **C.      The Amount Offered by the Settlement Supports Final Approval.**

25          Next, the relief afforded to absent Class members by the Settlement here is extraordinary.

26  As explained below, both the monetary and non-monetary relief available to Class members

27  under the Settlement go beyond what has been offered by any comparator settlement. This factor

28

NOTICE OF MOTION AND MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION
FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT - 3:15-cv-03747-JD          - 14 -

1  weighs heavily in favor of final approval of the Settlement, especially in light of the costs and

2  risk of a trial and further appeals.

3                    **i.    Projected recovery per claiming class member is unprecedented for a**
                          **privacy settlement.**

4

5            The monetary relief awarded to claiming Class members remains unprecedented. As

6  Professor Rubenstein lays out, the size of the Settlement here amounts to the largest privacy

7  settlement on record, and when compared to the size of the Class, provides substantially more

8  relief than any documented privacy settlement. (Dkt. 499-3, Tables 1 & 2.) Indeed, the top line

9  figure ($650 million) outpaces every other privacy settlement by at least $144.5 million. But the

10 runner-up here, the settlement in *In re Equifax, Inc. Customer Data Security Breach Litigation*,

11 No. 17-md-2800, 2020 WL 256132 (N.D. Ga.), compensated a class of around 147 million

12 Americans, or about 21 times larger than the Class here. Other large privacy settlements provide

13 even more lopsided comparisons. As Professor Rubenstein shows, on a gross per class member

14 basis, the Settlement here is easily record-breaking. Indeed, as he explains, of the 20 largest

15 privacy settlements since 2014, "fifteen of these cases return less than $15 per member, while

16 this Settlement returns close to $100." (Dkt. 499-3 ¶ 18.) Quite simply, there can be no doubt

17 that the relief secured here is more than adequate.

18           Moreover, the awards to claiming Class members further show that the relief provided by

19 the Settlement is fair to the absent Class. Class Counsel estimates that claiming Class members

20 will receive around $342, an amount that is unheard of in a class action privacy settlement.

21 Given that Class members stood to recover $1,000[11] only if successful in a trial that was rife with

22 significant risks, this figure represents only a modest discount for the Class, consistent with the

23 risks that lay ahead at trial and on appeal, as well as the potential delay in resolving further

24 adversarial proceedings.

25

26

27 [11]   As previously explained to the Court, plaintiffs did not believe the evidence was likely to
       support an award of $5,000 per class member. (Dkt. 465 at 4-6.)

28

1    Such a gentle discount is rare in class action privacy settlements where statutory damages

2    are available. For example, large class actions under the Telephone Consumer Protection Act,

3    which provides for $500 in statutory damages, typically settle for less than $40 per person. *See*,

4    *e.g.*, *In re Capital One Telephone Consumer Protection Act Litig.*, 80 F. Supp. 3d 781, 787 (N.D.

5    Ill. 2015) (providing $34.60 to each claiming class member); *Hashw v. Dept. Stores Nat'l Bank*,

6    182 F. Supp. 3d 935, 940, 944-45 (D. Minn. Apr. 26, 2016) (approving settlement providing

7    class members who received over 100 calls in violation of the TCPA a single $33.20 payment).

8    Many other statutory class actions result in similar recoveries. A large privacy case under the

9    Drivers' Privacy Protection Act provided for a $50 million cash settlement fund that afforded

10   approximately 600,000 class members $160 of the $2,500 they might have been entitled to after

11   trial. *Kehoe v. Fidelity Fed. Bank & Tr.*, No. 03-cv-80593, Dkt. 215 at 7 (S.D. Fla. Nov. 17,

12   2006). And in *In re Vizio, Inc., Consumer Privacy Litigation*, No. 16-ml-02693-JLS-KES (C.D.

13   Cal.), the plaintiffs alleged that Vizio, through its smart TVs, collected an individual's viewing

14   history and transmitted that information, along with personally identifiable information, to third

15   parties in violation of the Video Privacy Protection Act, 18 U.S.C. § 2710, which allows for

16   recovery by aggrieved individuals of $2,500, *id.* § 2710(c)(1)-(2). From the resulting $17 million

17   settlement, claiming class members received about $18 per Vizio television purchased. *See In re*

18   *Vizio*, Dkt. 347-1 at 2. These cases are consistent with precedent from this district, which has

19   approved settlements embodying similar discounts across a range of subject matter. *See, e.g.*,

20   *Uschold*, 2020 WL 3035776, at *9 (concluding that a 12% recovery for class members was fair);

21   *see also Officers for Justice*, 688 F.2d at 628 ("It is well-settled law that a cash settlement

22   amounting to only a fraction of the potential recovery will not per se render the settlement

23   inadequate or unfair.").

24   The relief available to claiming Class members also dwarfs the relief available to class

25   members in all privacy class actions of remotely comparable size. For instance, when compared

26   to *Equifax* on numbers alone, this Settlement provides over 27 times more value per Class

27   member—$94.20 in cash compared to $3.44 of restricted benefits. In order to be comparable in

28   terms of dollars available per class member, the *Equifax* settlement would have had to have

NOTICE OF MOTION AND MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION
FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT - 3:15-cv-03747-JD          - 16 -

1   created $13 billion all-cash, non-reversionary fund. The same is true for other large privacy

2   settlements. *See, e.g.*, *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 324 (N.D. Cal.

3   2018) (explaining that only $13 million of the $115 million fund was available for cash

4   payments, with the rest being reserved to purchase credit monitoring services); *In re Yahoo! Inc.*,

5   2020 WL 4212811,*22 (cash relief made available to class members with existing credit

6   monitoring, out-of-pocket losses, and who paid Yahoo! for premium services).

7          The individual class member recovery here also far outstrips other consumer BIPA

8   settlements. In *Prelipceanu v. Jumio Corp.*, No. 2018 CH 15883 (Ill. Cir. Ct., Cook Cnty.), class

9   counsel provided no estimate of the recovery available to claiming class members or a follow-up

10  report, but Class Counsel understands the final check amount was $262. In another consumer

11  BIPA action, *Sekura v. L.A. Tan Enterprises, Inc.*, No. 15 CH 16694 (Ill. Cir. Ct., Cook Cnty.),

12  class members received around $170. And in a third consumer BIPA settlement, *Carroll v.

13  Crème de la Crème*, No. 17 CH 1624 (Ill. Cir. Ct. Cook Cnty.), class members received no

14  monetary relief, and were offered only credit monitoring.[12]

15         The substantial monetary relief also is remarkable in light of the fact that many privacy

16  class actions settle for mere *cy pres* relief, or other non-monetary relief, like the settlement in

17  *Crème de la Crème*, which provided only credit monitoring for class members. In fact, Judge

18  Alsup of this district recently preliminarily approved a class-action settlement in *Adkins v.

19  Facebook, Inc.*, a case arising from a hack of Facebook, that included only injunctive relief. *See*

20  Order Granting Preliminary Settlement Approval, *Adkins*, No. 18-cv-05982 WHA, Dkt. 314.

21  Indeed, class-action settlements providing no monetary benefit to the settlement class are fairly

22  common in cases against Facebook, and other so-called "tech giants." *See, e.g.*, *Lane v.

23

24  _____

    [12] As set forth in Plaintiffs' Motion for Preliminary Approval, there have been several BIPA
25  lawsuits by employees against their employer, many of which have settled for more than $1,000
    per class member. (Dkt. 445 at 17 n.8.) As Professor Rubenstein noted, these settlements are a
26  poor gauge for this one, principally because they involve small classes (the settlements are
    typically for no more than the cost of defense) and many of the legal landmines that would be
27  faced by the Class here at trial (including issues relating to extraterritoriality and how to classify
    the data collected) are not at issue in these cases. (*See* Dkt. 499-3 ¶ 19(b).)
28

1    *Facebook, Inc.*, 696 F.3d 811, 820–22 (9th Cir. 2012); *In re Google LLC Street View*, 2020 WL

2    1288377, at *11-14 (approving *cy pres* only settlement despite availability of statutory damages).

3          In other words, the per class member recovery here in a case of this size is peerless.

4    Whether viewed through the lens of BIPA specifically, of other massive privacy settlements, of

5    other settlements where statutory damages were available, or of settlements against large

6    technology companies, class member recovery here is extraordinary. This is particularly so in

7    light of the very real risk of nonpayment presented by the impending trial, as the Court has

8    outlined in previous orders. (Dkt. 474 at 5; Dkt. 404 at 3.)

9          **ii.**    **The conduct remedy here provides "meaningful" relief.**

10         First, as the Court previously found, the conduct remedy agreed to by the parties provides

11   "meaningful" relief to Class members. (Dkt. 474 at 6.) This continues to be true. In general

12   terms, the Settlement requires Facebook to turn off Face Recognition and then delete the

13   biometric data it collected about Class members unless such Class members provide their

14   informed consent to turn it back on and for Facebook to continue to retain that data. Class

15   Counsel is aware of no BIPA settlement offering any more significant non-monetary relief. And

16   consumer settlements frequently offer less relief. In the settlement of the *Prelipceanu* action

17   referenced above, which received final approval on July 21, 2020 (after Plaintiffs had submitted

18   their preliminary approval papers), the defendant agreed only to "obtain through commercially

19   reasonable methods BIPA-compliant consent," along with several other pledges to follow the

20   law. The settlement includes no way of determining what is "commercially reasonable," and no

21   pledge to turn off or delete data unless consent is obtained. By contrast, here, the Settlement

22   requires Facebook to turn Face Recognition off and obtain consent with clear language and to

23   delete data if a Class member does not consent or is inactive for several years.

24         One objector, Kevin C. Williams, appears to take issue with the conduct relief here,

25   arguing generally that Facebook users should demand "more privacy [and] more protection . . .

26   based on the wrongs perpetrated on Facebook on its users." (Dkt. 497 at 2.) But this suit, under a

27   single state's law regarding a specific type of privacy violation, is not the vehicle to make

28   sweeping changes to Facebook's governance model or change what the Illinois General

1    Assembly requires of those who collect biometrics. Given the context of this lawsuit, the non-

2    monetary relief provided by the Settlement is outstanding.

3
                    **iii.    The risks inherent in further litigation demonstrate the adequacy of**
4                           **the relief.**

5            As the Court has observed, the Settlement was reached on the eve of trial. (Dkt. 474 at 2.)

6    In fact, trial preparations had begun in earnest in 2018. Class Counsel spent a week with Rodney

7    Jew, an experienced trial consultant formulating a trial strategy, and the parties had exchanged

8    proposed motions *in limine*. (*See* Dkt. 499-1 ¶¶ 83-86.) Those preparations were temporarily put

9    on hold by Facebook's interlocutory appeal of this Court's class certification order. While that

10   appeal ultimately put to rest one of Facebook's principal contentions in this litigation, *i.e.*, that

11   class members lacked standing to sue (*see Patel v. Facebook, Inc.*, 932 F.3d 1264, 1275 (9th Cir.

12   2019)), numerous critical factual disputes remained for trial. For instance, the Ninth Circuit's

13   order left the door open for Facebook to pursue argument's about extraterritoriality, and basic

14   liability disputes "about whether Facebook's facial recognition technology collects a 'scan of

15   face geometry' as required under BIPA, and whether Facebook had a good-faith reason for

16   acting as it did with respect to Illinois users" remained for the jury to resolve. (Dkt. 474 at 5; *see*

17   *id.* at 4-5 (noting that these "specific disputes of fact . . . the jury's resolution of which was

18   uncertain . . . could have had far-reaching impacts on Facebook's liability").) There have been no

19   developments (such as new binding precedent from Illinois courts) which could upset the Court's

20   earlier findings in this regard. Further, in addition to the uncertainty of a trial, even if Plaintiffs

21   prevailed before the jury, a second lengthy and complex appeal was in the offing, challenging

22   not just the Court's trial orders, but also certain earlier decisions, such as the Court's resolution

23   of Facebook's choice-of-law argument, and Facebook's invocation of the "photograph"

24   exception, as well as a constitutional challenge to the size of any ultimate verdict. (See Dkt. 445-

25   1 ¶ 8.) A lengthy appeal (and possible remand) also would have left open the door for perhaps

26

27

28

1   the greatest risk to recovery that the Class was facing: an amendment to the BIPA which might

2   have gutted the Class's claims.[13]

3          All of this provides ample reason to settle now, securing immediate and meaningful

4   relief, rather than risk trial and subsequent appeal at a chance for a larger payout, particularly

5   given that the larger payout is by no means guaranteed even if the Class prevails on the merits, as

6   any verdict could be reduced on account of Due Process. *See, e.g.*, *Uschold*, 2020 WL 3035776,

7   at *9 ("The challenges Plaintiffs would face should this case move forward instead of settling, in

8   contrast to the finality and speed of recovery under the parties' agreement, weighs in favor of

9   approving the settlement."). Particularly given the relief provided by the Settlement (discussed

10  below), the strength of the Plaintiffs case, balanced against the risks inherent at trial, and

11  presented by lengthy and complex appeals here, supports final approval of the Settlement. *See*

12  *Delgado v. MarketSource, Inc.*, No. 17-cv-07370, 2019 WL 4059850, at *5 (N.D. Cal. Aug. 28,

13  2019) (finding that "both sides had a well-developed sense of the risks and benefits of continued

14  litigation" which "weighs in favor of approval").

15              **iv.    The objections to the adequacy of relief are meritless.**

16         Despite the facial reasonableness of the relief and the Court's determination at

17  preliminary approval that the $650 million fund was an "impressive result," all three objections

18  raise concerns about the size of the Settlement Fund. These objections should be overruled. As

19  the Ninth Circuit observed in *Hanlon*, "settlement is the offspring of compromise; the question

20  . . . is not whether the final product could be prettier, smarter or snazzier, but whether it is fair,

21  adequate and free from collusion." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir.

22  1998); *see also Fraley v. Facebook, Inc.*, 966 F. Supp. 2d 939, 948 (N.D. Cal. 2013) (finding that

23  objections seeking more relief did not show that settlement was unfair or inadequate). In arguing

24  that the relief afforded by the Settlement is inadequate, the objectors "bear the burden of proving

25  any assertions they raise challenging the reasonableness of a class action settlement." *In re*

26

27  ---
    [13]   It is also worth noting that the Ninth Circuit's opinion raised the possibility that the jury's
28  findings on extraterritoriality might be a basis to decertify the class. *See Patel*, 932 F.3d at 1276.

1    *LinkedIn User Privacy Litig.*, 309 F.R.D. 573, 592 (N.D. Cal. 2015). The objectors fail to meet

2    this burden.

3           Objector Williams generally contends that the Settlement is too small because Facebook

4    could afford to pay more. (Dkt. 497 at 2.) But this argument, which is not developed at all,

5    ignores the substantial nature of the relief actually secured.[14] This Settlement is record-breaking

6    when it comes to monetary relief made available in a consumer settlement. Williams's

7    unsubstantiated assertion "is insufficient to rebut the Parties' evidence and argument that the

8    settlement was negotiated at arms' length between experienced counsel and a respected mediator

9    who actually evaluated the case." *Nunez v. BAE Sys. San Diego Ship Repair Inc.*, 292 F. Supp.

10   3d 1018, 1042 (S.D. Cal. 2017).

11          Objector Ross appears to believe that the case should have settled for no less than $5,000

12   per class member, or, in other words, full relief after a finding of willfulness. (Dkt. 506-1 at 1-2.)

13   Ross argues that Facebook acted willfully by "caus[ing] class members' private activities and

14   whereabouts to become known to violent ex-husbands, to stalkers, as well as to jealous and

15   spiteful in-laws and acquaintances." (*Id.* at 1.) Such wild accusations, signed by counsel, have

16   nothing do with the facial recognition claims under BIPA at issue here. Beyond these claims

17   Ross's contention that the parties should have settled for more just won't do. *See Hanlon*, 150

18   F.3d at 1027; *Nunez*, 292 F. Supp. 3d at 1042

19          Objectors Frankfother and Flanagan spill the most ink on their opposition to the amount

20   offered in Settlement, ultimately arguing that the case should have settled for no less than $5

21   billion. But this objection, too, misses the mark.

22          In laying out their objection, Frankfother and Flanagan say nothing that wasn't already

23   considered by the Court at preliminary approval. Indeed, their central point—that the Settlement

24   Fund is not big enough—was central to the Court's earlier refusal to grant preliminary approval

25

---

26   [14]   Williams also may have an ulterior motive for objecting: As a result of a conviction for money
     laundering in 2013, he is under an obligation to pay restitution of nearly $1.9 million, against
27   which he must put up the proceeds of any judgment. *See* Judgment, *United States v. Williams*, No.
     4:13-cr-40019-JPG, Dkt. 40 (S.D. Ill. Nov. 15, 2013).
28

to the Settlement. (Dkt. 456 at 1.) In light of those and other concerns the parties returned to the

negotiating table, and produced, as the Court knows, a revised Settlement that increased the

Settlement Fund to $650 million. (Stipulation ¶ 1.30) The Court found that this addition

"substantially allay[ed]" its concerns and was "an impressive result." (Dkt. 474 at 5.) The gist of

Frankfother and Flanagan's objection is that the Court was wrong, and that only a $5 billion

settlement would have been sufficient. For the reasons stated above, Objectors do not have the

better of this argument. The relief available to claiming Class members here is extraordinary, and

the size of the Settlement Fund fairly reflects the type of compromises that are the very essence

of settlement. *See In re Yahoo! Inc.*, 2020 WL 4212811, at *14 (rejecting objections to the

amount of monetary relief available for "fail[ing] to adequately take into account the risks and

delays" that would face the class).

  In disagreeing with the Court's earlier findings, Frankfother and Flanagan proceed from

at least two false or misleading premises. First, they suggest that the class is 10 million

individuals. (Dkt. 504 at 6-7.) That is incorrect, as the parties explained at class certification, and

again at preliminary approval. (*See, e.g.*, Dkt. 255 at 6.)

  Second, they assert that "all significant legal questions had been resolved in favor of the

Plaintiffs." (Dkt. 504 at 8.) This is, at best, highly misleading. As this Court has found,

significant factual questions remained open for the jury to resolve. (Dkt. 474 at 5.) The objectors

attempt to downplay these very real trial risks by arguing, for instance, that Facebook's argument

about the type of data it collects is "frivolous." (Dkt. 504 at 6 n.4.) That statement lacks any basis

in the record developed in this case. In fact, on this issue specifically the parties had marshaled

competing expert testimony which this Court concluded created a genuine issue of fact for trial.

(Dkt. 372 at 2-6.) Indeed, the Court found that on this issue the parties "unleash volleys of

competing evidence." (*id.* at 5.) Facebook's position was well-supported by evidence and

certainly was not "frivolous." Indeed, the objectors' support for the idea that this position is

frivolous is the FTC's recent settlement with Facebook, but this merely confirms that they have

no idea what they are talking about. (See Dkt. 504 at 6 n.4 ("Facebook would never have agreed

to pay $5 billion through an FTC consent decree if there were any question about its use of facial

1   geometry in its collection of biometric data.").) The FTC settlement had almost nothing to do

2   with Facebook's face scanning practices (it was instead focused on privacy failures highlighted

3   by the Cambridge Analytica scandal), and even the small slice of the settlement concerning Tag

4   Suggestions had nothing to do with whether Facebook was collecting a certain type of biometric

5   data or complying with BIPA.

6          Frankfother and Flanagan do acknowledge one legal issue that remains open: a reduction

7   of any verdict under Due Process. But objectors give short shrift to this potential argument, again

8   relying on their mistaken understanding of Facebook's settlement with the FTC. Objectors

9   contend that "Facebook's voluntary $5 billion payment in the FTC action would appear to

10  undermine any argument that a $10 billion verdict for violation of BIPA constitutes a violation

11  of due process." (*id.* at 8.) Again, the FTC settlement was concerned with a far broader range of

12  conduct, including failure to abide by an earlier settlement with the FTC. In any event, the

13  argument is legally mistaken. Frankforther and Flanagan appear to believe that Facebook's

14  ability to pay is either the sole or principal basis for a reduction of an award under Due Process.

15  But that is wrong. *See United States v. Dish Network LLC*, 954 F.3d 970, 980 (7th Cir. 2020)

16  ("Normally the legal system bases civil damages and penalties on harm done, not on the depth of

17  the wrongdoer's pocket."). The relevant Due Process Clause asks whether the verdict is "so

18  severe and oppressive as to be wholly disproportioned *to the offense* or obviously unreasonable."

19  *St. Louis, Iron Mountain, & S. R. Co. v. Williams*, 251 U.S. 63, 67 (1919) (emphasis added). The

20  FTC settlement is therefore obviously not a reasonable guidepost here, because it says next to

21  nothing about the types of harms alleged here. Moreover, the FTC settlement was national in

22  scope, as opposed to the single-state class at issue here. If the instant Settlement were

23  nationalized, to make the comparison with the FTC settlement more straightforward, it would

24  amount to over $17 billion. In other words, if the FTC settlement shows anything, it shows that

25  the relief secured here is outstanding.

26          Based on these misunderstandings, the objectors argue that any settlement here should

27  have been at least $5 billion. But aside from the misunderstandings already laid out above, "the

28  very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest

1    hopes." *Officers for Justice*, 688 F.2d at 624 (quotations omitted). This Court has already found

2    that the Class faced significant risks at trial which could have left them with nothing. (Dkt. 474

3    at 5.) Class Counsel appropriately took those risks into account when deciding to settle, and to

4    settle for less than full relief. Frankfother and Flanagan omit *any* discussion of the many other

5    landmines that lay ahead for the Class. As the Class Representatives discussed in detail in their

6    preliminary approval papers, even if they prevailed at trial, a second appeal loomed, at which

7    Facebook would have the opportunity to contest certain of the Court's earlier rulings, and at

8    which Facebook's contentions about extraterritoriality could again be raised. (See Dkt. 445 at

9    20-21, 23; Dkt. 465 at 3-16.) There also existed the possibility that Facebook might successfully

10   petition the Supreme Court for certiorari, further delaying payment to the Class. *See Fid. Bank &*

11   *Trust Co. v. Kehoe*, 547 U.S. 1051 (2006) (Scalia, J., concurring in the denial of certiorari)

12   ("This enormous potential liability . . . is a strong factor in deciding whether to grant

13   certiorari."). Class Counsel was certainly entitled to account for these risks and the potential for

14   serious delay in determining what constitutes a reasonable settlement for the Class.

15        Even then, beyond the demand for a $5 billion settlement fund, it is hard to see exactly

16   what the objectors' issue with the Settlement is. The objectors acknowledge that a 50% discount

17   would be appropriate. (Dkt. 504 at 7.) As it happens, claiming Class members stand to recover

18   around $342, which amounts to nearly half the relief the objectors demand. When one adjusts for

19   the objectors' misunderstandings, and accounts for the risks they ignore, the relief available to

20   claiming Class members is right in line with what the objectors ask for.

21        **D.    The High Claims Rate Shows the Effectiveness of the Method of Distribution**
             **of Funds to the Class.**

22

23        Rule 23(e)(2) further directs the Court to consider whether the relief is adequate in light

24   of "the effectiveness of [the] proposed method of distributing relief to the class." The Committee

25   Notes explain that this factor is intended to direct the parties' attention to the claims process,

26   which should not be "unduly demanding" but which should "deter or defeat unjustified claims."

27   The high claims rate in this action is clear evidence that the claims process was easily navigable

28   for members of the Class. Indeed, the on-line claim process was exceptionally simple to use,

1    allowing most Class members to submit claims in less than two minutes and without the need to

2    hunt down any extraneous information—the only information that most Class members needed

3    to submit a claim was their contact information, the email or phone number they used to sign up

4    with Facebook, and how they wanted to receive their payment. Individuals who were not on the

5    Class List prepared by Facebook also were permitted to submit claims so long as they provided

6    their address in Illinois during the class period and a statement that they uploaded a picture of

7    their face. All told, only about 164,000 individuals of the over 1.5 million claimants took this

8    latter route. Of those, only around 15,000 claims did not provide sufficient information.

9            As for distribution, the claim form asked claiming Class members how they would like to

10   be paid from the Settlement Fund. Consistent with the nature of the case, Class members were

11   permitted to select from several online options, or to receive a traditional paper check. These

12   options were selected to maximize convenience to Class members. Again, there have been no

13   objections to this manner of distributing relief, which is substantially effective.

14           Finally, the overwhelmingly positive reaction of the Class favors final approval.

15   Approximately 22% of the Class has submitted claims for payment from the Settlement. This is

16   an enormous number, particularly in light of the size of the Class, and persuasive evidence that

17   the Class believes the Settlement provides valuable relief. *See Bailey v. Kinder Morgan GP*, No.

18   18-cv-03424, 2020 WL 5748721, at *6 (N.D. Cal. Sept. 25, 2020) ("The absence of a large

19   number of objections to a proposed class action settlement raises a strong presumption that the

20   terms of a proposed class settlement action are favorable to the class members.") (quotations

21   omitted). As Professor Rubenstein's declaration explains, the typical claims rate for a class of

22   this size is around 5%. The claims rate here is *at least* four times higher than the historical norm,

23   and potentially more like sixteen times the average claims rate for a class of this size. (2d

24   Rubenstein Decl. ¶ 5.) The claims rate here also outperforms historical norms even when

25   considering the amount of relief offered by the Settlement. As Professor Rubenstein explains,

26   historical claims rates for settlements offering this much relief per class member are only about

27   40% to 50% of the claims rate here. Or, in other words, the claims rate here is at least two to

28   two-and-a-half times the rate historical data should be expected here. (*Id.* ¶ 6.)

1    Professor Rubenstein's data covers class action settlements in all types of cases. (*Id.* ¶ 2.)

2  The claims rate here also compares favorably to rates in similar types of cases. For instance, the

3  claims rate here also easily outpaces other consumer BIPA settlements. The claims rate in *Jumio*

4  is not known, but it is believed to be around 8%. The claims rate in *Sekura* was around 12%.

5  When taking into account the fact that the Class here was much larger than in those actions, it is

6  clear that the claims rate here is truly a cut above. *See In re Nexus 6P Prods. Liab. Litig.*, No. 17-

7  cv-02185, 2019 WL 6622842, at *7 (N.D. Cal. Nov. 12, 2019) (deeming an 18% claims rate to

8  be "substantial").

9    And again, extending this comparison to other privacy cases involving large classes or

10  the potential for large statutory damage awards only confirms that class member participation

11  weighs overwhelmingly in favor of settlement approval. For instance, in *In re Equifax*, which

12  received publicity from several national news outlets and prominent national political figures, the

13  claims rate was just slightly over 10%. *See* 2020 WL 256132, at *4. Other large data breach

14  settlements featured even less class member participation. *See In re Target*, No. 14-cv-2522,

15  2017 WL 2178306, at *1-2 (D. Minn.) (225,000 claims in class of over 100 million); *In re*

16  *Anthem*, 327 F.R.D. at 321 (1.8% claims rate). Statutory damages cases are similar. For instance,

17  in the *Vizio* action, the claims rate was around 4%. *See In re Vizio*, No. No. 16-ml-02693, Dkt.

18  337 at 9. And in cases under Michigan's Preservation of Personal Privacy Act, where a potential

19  $5,000 statutory damages award was settled on a classwide basis, claims rates tended to range

20  from 11% in *Coulter-Owens v. Rodale*, No. 14-cv-12688-RHC-RSW (E.D. Mich.), to 16% in

21  *Raden v. Martha Stewart Living Omnimedia, Inc.*, No. 16-cv-12808 (E.D. Mich.).

22    Not only is the claims rate here high, but only a small number of Class members (109)

23  opted out of the Settlement. This represents less than 0.02% of the Class. There are also just

24  three objections to the Settlement. Courts in this district have found that a class's reaction to a

25  settlement was positive despite much higher opt-out and objection rates. *See, e.g.*, *Corzine v.*

26  *Whirlpool Corp.*, No. 15-cv-05764, 2019 WL 7372275, at *6 (N.D. Cal. Dec. 31, 2019) (finding

27  that 18 objections and 199 opt outs from a class of around 1 million reflected the class's

28  "favorable view" of the settlement); *In re Nexus 6P*, 2019 WL 6622842, at *10 (31 opt outs in

1    class of 511,000 "confirms that the settlement is fair and reasonable"); *Sugarman v. Ducati N.*

2    *Am., Inc.*, No. 10-cv-05246, 2012 WL 113361, at *3 (N.D. Cal. Jan. 12, 2012) (finding a

3    "positive response" from the class when the court received 28 objections and 42 opt outs from a

4    class of less than 39,000); *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 852 (N.D.

5    Cal. 2010) (in case where nearly 5% of class opted out, finding that "the absence of a negative

6    reaction" from the class "strongly supports settlement"); *see also Rodriguez v. West Publ'g*

7    *Corp.*, 563 F.3d 948, 967 (9th Cir. 2009) (concluding that the district court "had discretion to

8    find a favorable reaction" when 54 of 376,301 class members objected to settlement); *Churchill*

9    *Village*, 361 F.3d at 577 (affirming approval of class-action settlement where 45 of 90,000 class

10   members objected). That only three meritless objections have been filed speaks volumes to the

11   Settlement's fairness, reasonableness, and adequacy. Moreover, several Illinois legislators also

12   signaled support for the Settlement by holding a town hall near the end of the claims period at

13   which the Settlement was discussed and attendees' questions were answered. In sum, the

14   overwhelmingly favorable reaction of the Class weighs heavily in favor of final approval.

15   **VII.    OBJECTIONS TO THE PROPOSED SERVICE AWARDS ARE MERITLESS**

16           Objectors Frankfother and Flanagan argue that the proposed $7,500 service awards to the

17   named plaintiffs are either not allowed as a matter of equity, or so high that they demonstrate that

18   the named plaintiffs are not adequately representing the Class. (Dkt. 504 at 13-15.) On this point,

19   not only are Frankfother and Flanagan alone in making this argument, but Objector Williams

20   appears to believe that the Class Representatives should actually receive *more* for their service to

21   the Class. (Dkt. 497 at 2.) In any event, the arguments of Frankfother and Flanagan go nowhere.

22           **A.      Service Awards are Permitted in Class Actions.**

23           First, relying on a recent Eleventh Circuit opinion, *Johnson v. NPAS Solutions, LLC*, 975

24   F.3d 1244 (11th Cir. 2020), Objectors contend that all incentive awards are barred under

25   equitable principles. (Dkt. 504 at 13-14.) As they acknowledge, however, there is ample Ninth

26   Circuit authority upholding service awards. *See Rodriguez*, 563 F.3d at 958 (noting that

27   "incentive awards are fairly typical in class action cases" and "are discretionary"). Regardless of

28

1    what the Eleventh Circuit has held,[15] this Ninth Circuit precedent is binding here. More, the

2    Second Circuit has rejected precisely the same arguments that were accepted in *Johnson*. *See*

3    *Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 96 (2d Cir. 2019). Frankfother and Flanagan

4    suggest that because *Johnson* interprets Supreme Court authority that it somehow supersedes

5    binding Ninth Circuit authority, but that is wrong.

6         In any event, *Johnson* is unpersuasive. *Johnson* relied principally on *Trustees v.*

7    *Greenough*, a nineteenth-century Supreme Court decision concluding that a representative

8    plaintiff could not recover an award for "personal services and private expenses" incurred while

9    litigating on behalf of a class of bondholders. 105 U.S. 527, 537 (1881). *Johnson* concludes that

10   service awards are akin to the award for "personal services and private expenses" decried in

11   *Greenough*. 975 F.3d at 1258-59. But *Johnson*'s analogy to *Greenough* is strained. The plaintiff

12   in *Greenough*, Vose, sought an award of "$2,500 a year for ten years of personal services" plus

13   interest of $9,625, as well as another $15,003.35 for "railroad fares and hotel bills." 105 U.S. at

14   530. Adjusted to 2020 dollars, Vose asked for a salary of around $66,000/year for litigating the

15   case, as well as expenses of around $400,000, amounting to a total award of around $1.3 million.

16   This preposterous request simply cannot be analogized in good faith to service awards of just a

17   few thousand dollars. The representatives here do not seek a salary, or for reimbursement of

18   hundreds of thousands of dollars of expenses. Instead, they seek an award for reasons the Ninth

19   Circuit has recognized as legitimate: "for work done on behalf of the class, to make up for

20   financial or reputational risk undertaken in bringing the action, and . . . to recognize their

21   willingness to act as a private attorney general." *Rodriguez*, 563 F.3d at 958-59. The Eleventh

22   Circuit's analysis simply misses the mark.

23        Moreover, it would appear that Congress or the Rules Committee has recognized the

24   legitimacy of service awards. For instance, Congress has specifically outlawed them in federal

25   private securities litigation. *See* 15 U.S.C. § 78u-4(a)(2)(A)(vi). It would make no sense for

26

27   ────────────────
     [15]  A petition for rehearing *en banc* is pending in *Johnson* and no mandate has issued. *See*
     Plaintiff-Appellee Charles T. Johnson's Petition for Rehearing En Banc, *Johnson v. NPAS Sols.,*
28   *LLC*, No. 18-12344 (11th Cir. Oct. 22, 2020).

1  Congress to have taken this step if it thought that incentive awards were impermissible as a

2  general matter.

3        And recent amendments to Fed. R. Civ. P. 23 also cover the awarding of service awards.

4  Rule 23(e)(2)(D) now requires district courts to ensure that a class action settlement "treats class

5  members equitably relative to each other." This provision easily covers service awards. Such

6  awards are made by virtue of a settlement agreement, so a court would need to ensure that this

7  proposed additional allocation of funds to a class representative is sufficiently justified that the

8  settlement "treats class members equitably relative to each other." Indeed, the crux of

9  Frankfother and Flanagan's argument with respect to the size of the proposed incentive award is

10  that it is inequitable.

11        In sum, the Court should reject Frankfother and Flanagan's argument that service awards

12  are unavailable.

13       **B.**      **The Proposed Service Awards are Appropriate.**

14        With respect to the size of the award, Frankfother and Flanagan's arguments again fail.

15  Frankfother and Flanagan suggest that the size of the award divorces the interests of the

16  representatives from those of the Class. (Dkt. 504 at 14.) The argument is not well developed,

17  but Frankfother and Flanagan appear to believe that the Class Representatives sold out the Class

18  in order to obtain a modest service award.

19        There is no evidence or authority to support this argument. As to the law, the Ninth

20  Circuit rejected a nearly identical argument in *In re Online DVD-Rental*, holding that because the

21  awards were left to the discretion of the district court they did not "create an impermissible

22  conflict between class members and their representatives." 779 F.3d at 943. As to the facts, the

23  record is clear that the Class Representatives have selflessly served the Class at every turn, and

24  were preparing to offer trial testimony before the Ninth Circuit accepted Facebook's

25  interlocutory appeal, and then again before the case settled. (Dkts. 499-7, 499-8, 499-9.) The

26  behavior is inconsistent with the idea that they sold out the Class for a few thousand dollars. The

27  idea that the Plaintiffs have inadequately represented the Class is further belied by the

28  outstanding Settlement here. Moreover, Objectors' argument makes no sense: the proposed

1    $7,500 service award is on the low side. *See* 5 William B. Rubenstein, Newberg on Class

2    Actions § 17:8 (5th ed., June 2020 update). The Class Representatives easily could have

3    obtained the same award by settling earlier in the case or for a smaller amount.

4

5    **VIII.    THE OBJECTIONS TO CLASS COUNSEL'S FEE REQUEST SHOULD BE OVERRULED**

6          Two of the objections argue that Class Counsel's fee request of 20% of the initial $550

7    million settlement, or 16.9% of the final Settlement, is excessive. These objections should

8    likewise be overruled.

9          Objectors Frankfother and Flanagan contend that because this is a so-called "megafund"

10   case, Counsel's fee should be "substantially less" than the Ninth Circuit's 25% benchmark. (Dkt.

11   504 at 9.) Of course, Counsel's fee request *is* substantially less than the Circuit benchmark. *Cf.*

12   *Hefler*, 2018 WL 6619983, at *13 (finding an award of 20% of a $480 million fund to be

13   reasonable). As *Hefler* noted, the "median" award "in cases with large settlements over $100

14   million," is 19% to 22.3%. *Id.* Class Counsel's fee request is right in line with these previous

15   awards.

16         In any event, Frankfother's and Flanagan's argument ignores critical Ninth Circuit case

17   law as well as virtually all of the authority and experts reports in Plaintiff's petition for fees.

18   First, it bears noting that the Ninth Circuit acknowledged the 25% figure as a benchmark in a

19   megafund case. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002). *Vizcaino*

20   itself makes clear that the Ninth Circuit has "*not* adopt[ed]" a categorical rule that the percentage

21   of an award must "decrease[] as the amount of the fund increases." *Id.* at 1047 (emphasis added).

22   Instead, the question in any case, megafund or no, is whether the proposed award "is proper and

23   fair in light of the amount and quality of the work done by the attorneys." *In re TFT-LCD (Flat*

24   *Panel) Antitrust Litig.*, No. 07-cv-1827, 2013 WL 1365900, at *8 (N.D. Cal. Apr. 3, 2013)

25

26

27

28

1    (awarding 28.6% of $1.08 billion fund and rejecting objectors' argument to "reduce the award or

2    use a sliding scale model . . . to avoid a windfall for the attorneys").[16]

3            Frankfother and Flanagan argue that the most relevant precedent for this Court in

4    awarding fees is *In re Washington Public Power Supply System Securities Litigation*, 19 F.3d

5    1291 (9th Cir. 1994). But the lesson of *WPPSS* is simply that a district court must consider "all

6    the circumstances of the case" when settling on a reasonable fee. *Id.* at 1297-98. That holding is

7    consistent with other Ninth Circuit precedent establishing that "mechanical" application of any

8    fee calculation method may be an abuse of discretion. *In re Online DVD-Rental*, 779 F.3d at 949.

9    Class Counsel does not ask for a mechanical fee calculation, but instead advocates for a specific

10   fee based on the circumstances of this case. (Dkt. 499.) Beyond that basic teaching, *WPPSS* does

11   not set forth a rule specific to so-called megafunds.

12           Next, Frankfother's and Flanagan's remaining argument is that Class Counsel's fee

13   award should be based on a lodestar analysis, rather than a percentage-of-the-fund analysis. (Dkt.

14   504 at 11-13.) Class Counsel's fee petition and accompanying declaration of Professor

15   Fitzpatrick discuss in depth why the percentage-of-the-fund method should prevail here, and will

16   not repeat those arguments. Frankfother and Flanagan do raise one point worth discussing,

17   however: Objectors appear to contend that a lodestar analysis is preferable because it would have

18   been required had the case gone to trial, so to use a percentage analysis here gives Class Counsel

19   a windfall. (Dkt 504 at 11-12.)

20           But Frankfother's and Flanagan's legal premise is incorrect. It is true that BIPA contains

21   a fee-shifting provision. But a fee shifting provision does not limit a court's equitable power to

22   award fees from a common fund. *See Staton v. Boeing Co.*, 327 F.3d 938, 968 (9th Cir. 2003).

23   As the Supreme Court has held, fee shifting statutes do not "interfer[e] with the historic power of

24   equity to permit the trustee of a fund or property, or a party preserving or recovering a fund for

25   the benefit of others in addition to himself, to recover his costs, including his attorneys' fees,

26

27   ---
     [16]   Objector Ross suggests that Class Counsel's fee request should be denied because, Ross says,
     there is no "binding precedent" approving a fee request like Class Counsel's. (Dkt. 506-1 at 3.) As
28   the foregoing shows, that is incorrect.

1    from the fund or property itself or directly from the other parties enjoying the benefit." *Alyeska*

2    *Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 257 (1975). Thus, it is simply not true that

3    this was necessarily a "fee shifting" case before it settled. In any event, under Illinois law, the

4    existence of a statutory fee-shifting provision is not intended to curtail a court's ability to

5    compensate counsel or to foreclose consideration of a percentage-based contingent fee. *See*

6    *Young v. Alden Gardens of Waterford, LLC*, 2015 IL App (1st) 131887, ¶ 100; *Berlak v. Villa*

7    *Scalabrini Home for the Aged, Inc.*, 284 Ill. App. 3d 231, 241 (1996).

8          Frankfother and Flanagan raise some other arguments, questioning the inclusion some of

9    the hours in Class Counsel's lodestar calculation and the total multiplier. These assertions can be

10   dealt with quickly as they wholly ignore the evidence submitted in support of the fee award. As

11   to the multiplier, as Professor Rubenstein opined, Class Counsel worked extremely efficiently to

12   achieve the result here, and the success achieved by Class Counsel amply supports the requested

13   multiplier of 5.31.[17] (*See* Dkt. 499-3 ¶¶ 25-54.) Frankfother's and Flanagan's argument that the

14   Court should exclude all hours related to Class Counsel's legislative efforts to protect BIPA from

15   being amended in ways that would have resulted in the class receiving nothing ignores the

16   realities of modern litigation. (*See* Dkt. 499 at 15.) The defense of a novel large statutory class

17   action today includes a budget for legislative efforts to change the law and escape liability; Class

18   Counsel must meet those actions which are a component of what encompasses their obligations

19   in litigating such a case. Frankfother and Flanagan also claim that any lodestar calculation should

20   exclude all hours attributable to Class Counsel's paralegals and other litigation support team

21   members (or at a minimum it is their hourly wages that should be charged). But the inclusion of

22   time from people involved in such necessary parts of litigation is routine and the rates charged

23   are in-line with what comparable firms on the defense side charge their clients.

24

25

26   _____

     [17]   It bears noting that Frankfother's and Flanagan's argument is inconsistent with the recent

27   actions of their counsel, serial objector John Pentz. In *Eubank v. Pella Corp.*, No. 06-cv-4481,
     2019 WL 1227832, at *8 (N.D. Ill. Mar. 15, 2019), Mr. Pentz recently sought an award of at least

28   $400,000 on a lodestar of $48,000.

1    **IX.    CONCLUSION**

2           In sum, the Settlement at issue merits final approval. The Class's case is strong, but finely

3    poised in light of several critical fact disputes that would need to be presented to a jury, and, as

4    Counsel averred at preliminary approval, the very real risk of an adverse legislative change that

5    might wipe out any successful jury verdict. The size of the Settlement reflects this reality: the

6    Settlement provides claiming Class members more relief than any settlement of comparable size

7    or similar subject matter. And Class members have made their voices heard, submitting claims at

8    extraordinarily high rates, while only a handful of Class members opt out or object. All of this

9    points in one direction: the Court should grant Plaintiffs' Motion for Final Approval.

10

11    DATED: December 3, 2020                    Respectfully submitted,

12

13                                               /s/ Jay Edelson

14                                               EDELSON PC
                                                 JAY EDELSON*
                                                 BENJAMIN RICHMAN*
15                                               ALEXANDER G. TIEVSKY*
                                                 350 North LaSalle Street, 14th Floor
16                                               Chicago, IL 60654
                                                 Telephone: 312/589-6370
17                                               312/589-6378 (fax)

18                                               EDELSON PC
                                                 RAFEY BALABANIAN
19                                               J. AARON LAWSON
                                                 LILY HOUGH
20                                               123 Townsend Street, Suite 100
                                                 San Francisco, CA 94107
21                                               Telephone: 415/212-9300
                                                 415/373-9435 (fax)

22

23                                               ROBBINS GELLER RUDMAN
                                                   & DOWD LLP
                                                 PAUL J. GELLER
24                                               STUART A. DAVIDSON
                                                 CHRISTOPHER C. GOLD
25                                               120 East Palmetto Park Road, Suite 500
                                                 Boca Raton, FL 33432
26                                               Telephone: 561/750-3000
                                                 561/750-3364 (fax)
27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBBINS GELLER RUDMAN
  & DOWD LLP
PATRICK J. COUGHLIN
ELLEN GUSIKOFF STEWART
LUCAS F. OLTS
RANDI D. BANDMAN
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS
JOHN H. GEORGE
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)

LABATON SUCHAROW LLP
MICHAEL P. CANTY*
CORBAN S. RHODES*
140 Broadway
New York, NY 10005
Telephone: 212/907-0700
212/818-0477 (fax)


*Attorneys for Plaintiffs*

\* *appearance pro hac vice*

1

## <u>CERTIFICATE OF SERVICE</u>

2        I hereby certify that on December 3, 2020, I served the above and foregoing Notice of

3  Motion and Memorandum of Law in Support of Plaintiffs' Motion for Final Approval of a Class

4  Action Settlement by causing true and accurate copies of such paper to be filed with the Court's

5  CM/ECF system, which will send e-mail notification of such filing to counsel for all parties.

6  Although they are not parties, I have also caused a copy of the foregoing to be emailed to

7  Objectors Kara Ross (through her counsel) and Kevin C. Williams, at the email addresses they

8  provided on their objections.

9                              <u>s/ Jay Edelson</u>

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28