1

ROBBINS GELLER RUDMAN
   & DOWD LLP
SHAWN A. WILLIAMS (213113)
JOHN H. GEORGE (292332)
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
jgeorge@rgrdlaw.com

LABATON SUCHAROW LLP
MICHAEL P. CANTY (*pro hac vice*)
CORBAN S. RHODES (*pro hac vice*)
140 Broadway
New York, NY 10005
Telephone: 212/907-0700
212/818-0477 (fax)
mcanty@labaton.com
crhodes@labaton.com

EDELSON PC
JAY EDELSON (*pro hac vice*)
BENJAMIN RICHMAN (*pro hac vice*)
ALEXANDER G. TIEVSKY (*pro hac vice*)
350 North LaSalle Street, 14th Floor
Chicago, IL 60654
Telephone: 312/589-6370
312/589-6378 (fax)
jedelson@edelson.com
brichman@edelson.com
atievsky@edelson.com

*Attorneys for Plaintiffs*

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| In re FACEBOOK BIOMETRIC INFORMATION PRIVACY LITIGATION | ) ) ) ) |
| This Document Relates To:<br><br>ALL ACTIONS. | ) ) ) ) ) ) |

Master File No. 3:15-cv-03747-JD

CLASS ACTION

PLAINTIFFS' NOTICE OF MOTION AND AMENDED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

# TABLE OF CONTENTS

Page

I.    ISSUES TO BE DECIDED ...................................................................................1

II.   MEMORANDUM OF POINTS AND AUTHORITIES .....................................1

III.  BACKGROUND AND CASE HISTORY ...........................................................2

IV.   NOTICE SATISFIED DUE PROCESS AND PRODUCED A HIGH CLAIMS RATE ..2

     A.    The Court Approved Notice Plan was Successfully Implemented. ..................2

     B.    The Objections to the Sufficiency of the Notice Should be Overruled............6

     C.    More Than 1.5 Million Class Members Have Submitted Claims....................8

V.    THE SETTLEMENT MERITS FINAL APPROVAL ........................................8

     A.    Class Counsel and the Class Representatives Have Protected
         the Class's Interests and Support the Settlement. ...........................................9

     B.    The Settlement was Negotiated at Arm's Length. ...........................................10

     C.    The Amount Offered by the Settlement Supports Final Approval. ................10

         i.    Projected recovery per claiming class member is unprecedented
            for a privacy settlement. ....................................................................11

         ii.   The conduct remedy here provides "meaningful" relief. ....................13

         iii.  The risks inherent in further litigation demonstrate the
            adequacy of the relief............................................................................14

         iv.   The objections to the adequacy of relief are meritless........................15

     D.    The High Claims Rate Shows the Effectiveness of the Method
         of Distribution of Funds to the Class. .............................................................19

VI.   OBJECTIONS TO THE PROPOSED SERVICE AWARD ARE MERITLESS .........21

     A.    Service Awards are Permitted in Class Actions...............................................21

     B.    The Proposed Service Awards are Appropriate. ..............................................23

VII.  THE OBJECTIONS TO CLASS COUNSEL'S FEE REQUEST SHOULD
        BE OVERRULED ...................................................................................................23

1

Page

2

3
IX.   CONCLUSION.............................................................................................................25

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2

Page

3

**U.S. Supreme Court Cases:**

4

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*,

5

      421 U.S. 240 (1975)....................................................................................25

6

*Eisen v. Carlisle & Jacquelin*,

      417 U.S. 156, 173 (1974)..............................................................................3

7

*Fid. Bank & Trust Co. v. Kehoe*,

8

      547 U.S. 1051 (2006)...................................................................................19

9

*St. Louis, Iron Mountain, & S. R. Co. v. Williams*,

10

      251 U.S. 63 (1919)......................................................................................18

11

*Trustees v. Greenough*,

12

      105 U.S. 527 (1881)....................................................................................22

13

**U.S. Circuit Court of Appeals Cases:**

14

*Churchill Vill., L.L.C. v. Gen. Elec.*,

      361 F.3d 566 (9th Cir. 2004) ...................................................................8, 21

15

*Hanlon v. Chrysler Corp.*,

16

      150 F.3d 1011 (9th Cir. 1998) ...............................................................15, 16

17

*In re Bluetooth Headset Prod. Liab. Litig.*,

18

      654 F.3d 935 (9th Cir. 2011) .....................................................................8, 10

19

*In re Online DVD-Rental Antitrust Litig.*,

      779 F.3d 934 (9th Cir. 2015) ...............................................................3, 23, 24

20

*In re Washington Public Power Supply System Securities Litigation*,

21

      19 F.3d 1291 (9th Cir. 1994) ........................................................................24

22

*Johnson v. NPAS Solutions, LLC*,

23

      975 F.3d 1244 (11th Cir. 2020) .................................................................21, 22

24

*Juris v. Inamed Corp.*,

25

      685 F.3d 1294 (11th Cir. 2012) ......................................................................3

26

*Lane v. Facebook, Inc.*,

27

      696 F.3d 811 (9th Cir. 2012) .........................................................................13

28

Page

*Melito v. Experian Mktg. Sols., Inc.*,
    923 F.3d 85 (2d Cir. 2019)......................................................................................22

*Mullins v Direct Digital LLC*,
    795 F.3d 654 (7th Cir. 2015) ....................................................................................3

*Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of S.F.*,
    688 F.2d 615 (9th Cir. 1982) ...................................................................3, 9, 12, 18

*Patel v. Facebook, Inc.*,
    932 F.3d 1264 (9th Cir. 2019) .................................................................................14

*Rodriguez v. West Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009) ..............................................................................21, 22

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) ...................................................................................25

*United States v. Dish Network LLC*,
    954 F.3d 970 (7th Cir. 2020) ...................................................................................18

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002) .................................................................................24

**U.S. District Court Cases:**

*Bailey v. Kinder Morgan GP*,
    No. 18-cv-03424, 2020 WL 5748721 (N.D. Cal. Sept. 25, 2020)...................................20

*Corzine v. Whirlpool Corp.*,
    No. 15-cv-05764, 2019 WL 7372275 (N.D. Cal. Dec. 31, 2019)....................................21

*Cotter v. Lyft, Inc.*,
    193 F. Supp. 3d 1030 (N.D. Cal. 2016) .....................................................................9

*Delgado v. MarketSource, Inc.*,
    No. 17-cv-07370, 2019 WL 4059850 (N.D. Cal. Aug. 28, 2019) ....................................15

*Fraley v. Facebook, Inc.*,
    966 F. Supp. 2d 939 (N.D. Cal. 2013) ......................................................................15

*Hashw v. Dept. Stores Nat'l Bank*,
    182 F. Supp. 3d 935 (D. Minn. Apr. 26, 2016)............................................................11

*Hefler v. Wells Fargo & Co.*,
    No. 16-cv-05479-JST, 2018 WL 6619983 (N.D. Cal. Dec. 18, 2018)..........................2, 23

NOTICE OF MOTION AND MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION
FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT - 3:15-cv-03747-JD
4848-1892-4213.v1

- iv -

**Page**

*In re Anthem, Inc. Data Breach Litig.*,
  327 F.R.D. 299 (N.D. Cal. 2018)................................................................12, 20

*In re Apple Inc. Device Performance Litigation*,
  No. 18-md-2827 (N.D. Cal. Oct. 5, 2020) ...............................................................7

*In re Capital One Telephone Consumer Protection Act Litig.*,
  80 F. Supp. 3d 781 (N.D. Ill. 2015) ...................................................................11

*In re Equifax, Inc. Customer Data Security Breach Litigation*,
  No. 17-md-2800, 2020 WL 256132 (N.D. Ga.)........................................5, 11, 12

*In re Google LLC Street View Elec. Commc'ns Litig.*,
  No. 10-md-02184-CRB, 2020 WL 1288377 (N.D. Cal. Mar. 18, 2020)......................2, 13

*In re LinkedIn User Privacy Litig.*,
  309 F.R.D. 573 (N.D. Cal. 2015) .......................................................................16

*In re Nexus 6P Prods. Liab. Litig.*,
  No. 17-cv-02185, 2019 WL 6622842 (N.D. Cal. Nov. 12, 2019) ..............................20, 21

*In re Target*,
  No. 14-cv-2522, 2017 WL 2178306 (D. Minn.)........................................................20

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  No. 07-cv-1827, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013)........................................24

*In re Vizio, Inc., Consumer Privacy Litigation*,
  No. 16-ml-02693-JLS-KES (C.D. Cal.)................................................................12, 20

*In re Yahoo! Inc. Customer Data Security Breach Litig.*,
  No. 16-md-02752, 2020 WL 4212811 (N.D. Cal. July 22, 2020) ..........................6, 12, 17

*Kehoe v. Fidelity Fed. Bank & Tr.*,
  No. 03-cv-80593 (S.D. Fla. Nov. 17, 2006) ...........................................................12

*Moore v. Verizon Commc'ns Inc.*,
  No. 09-cv-1823 SBA, 2013 WL 4610764 (N.D. Cal. Aug. 28, 2013) ..............................6

*Nunez v. BAE Sys. San Diego Ship Repair Inc.*,
  292 F. Supp. 3d 1018 (S.D. Cal. 2017)....................................................................16

*Satchell v. Fed. Exp. Corp.*,
  Nos. 03-cv-2659-SI, 03-cv-2878-SI, 2007 WL 1114010 (N.D. Cal. Apr. 13, 2007)........10

**Page**

*Schuchardt v. Law Office of Rory W. Clark*,
  314 F.R.D. 673 (N.D. Cal. 2016) ...................................................................10

*Sugarman v. Ducati N. Am., Inc.*,
  No. 10-cv-05246, 2012 WL 113361 (N.D. Cal. Jan. 12, 2012)..........................21

*Uschold v. NSMG Shared Servs. LLC*,
  No. 18-cv-01039, 2020 WL 3035776 (N.D. Cal. June 5, 2020)...........................9, 12, 15

*Walters v. Target Corp.*,
  No. 16-cv-1678, 2020 WL 6277436 (S.D. Cal. Oct. 26, 2020)..........................9

**State Court Cases:**

*Berlak v. Villa Scalabrini Home for the Aged, Inc.*,
  284 Ill. App. 3d 231 (1996) .........................................................................25

*Crème de la Crème*,
  No. 17 CH 1624 (Ill. Cir. Ct. Cook Cnty.) ....................................................13

*Prelipceanu v. Jumio Corp.*,
  No. 2018 CH 15883 (Ill. Cir. Ct., Cook Cnty.) ............................................12, 20

*Sekura v. L.A. Tan Enterprises, Inc.*,
  No. 15 CH 16694 (Ill. Cir. Ct., Cook Cnty.) ...............................................12, 20

*Young v. Alden Gardens of Waterford, LLC*,
  2015 IL App (1st) 131887.............................................................................25

**Rules and Statutory Provisions:**

740 ILCS 14 ................................................................................... *passim*

15 U.S.C. § 78u .............................................................................22

18 U.S.C. § 2710............................................................................12

Fed. R. Civ. P. 23 .......................................................................... *passim*

**Other Authorities:**

5 William B. Rubenstein, NEWBERG ON CLASS ACTIONS
  § 17:8 (5th ed., June 2020 update).................................................................23

**Page**

1

2   Ally Marotti, *A massive Facebook privacy settlement just got bigger. Illinois users
        could split $650 million*, CHICAGO TRIBUNE (July 24, 2020), available at
3       https://perma.cc/X826-MMVQ ......................................................................5

4   *Deadline Approaches for Illinois Facebook Users to File Claim for Payouts in $650M
        Settlement*, NBC 5 CHICAGO (Nov. 6, 2020) available at
5       https://perma.cc/6R4Y-FSW9 .......................................................................5

6

7   Federal Judicial Center, Judges' Class Action Notice & Claims Process
        Checklist & Plain Language Guide (2010) available at
8       https://perma.cc/9BBX-9TNV .......................................................................3

9   Jeff John Roberts, *Facebook adds $100 million to landmark facial recognition
        settlement payout*, FORTUNE (July 23, 2020), available at
10      https://perma.cc/P7EH-NMSL.......................................................................5

11  Lorraine Swanson, *Clock Ticking For Illinois Facebook Users To File Claims*, PATCH.COM
        (Nov. 11, 2020), available at https://perma.cc/U2RC-82PY ...............................5
12

13  Natasha Singer and Mike Isaac, *Facebook to Pay $550 Million to Settle Facial
        Recognition Suit*, N.Y. TIMES (Jan. 29, 2020), available at
14      https://perma.cc/X99S-743P .........................................................................5

15  Riley O'Neil, *Illinois Facebook Users Have 2 Weeks Left To Apply For Settlement*, WROK
        1440, available at https://perma.cc/86H4-97PU ..................................................6
16

17

18

19

20

21

22

23

24

25

26

27

28

PLEASE TAKE NOTICE that on January 7, 2021 at 10:00 a.m., Carlo Licata, Nimesh Patel, and Adam Pezen ("Plaintiffs") will move this Court for an Order granting final approval to the class action settlement. (Dkt. 468) This Motion is supported by the following memorandum, the Declaration of Class Counsel (dkt. 499-1), the Declaration of Lana Lucchesi (Exhibit A), and the Second Expert Declaration of William Rubenstein (Exhibit B).

## I.    ISSUES TO BE DECIDED

1.    Whether the notice provided to the class satisfies Rule 23 and due process.

2.    Whether the proposed Settlement is fair, reasonable, and adequate.

3.    Whether the objections should be overruled.

## II.    MEMORANDUM OF POINTS AND AUTHORITIES

After an initial hearing where this Court set forth its concerns with the initial settlement, the parties returned with both answers to the Court's questions and several improved Settlement terms. The Court then held a second hearing which included the presentation of live testimony on issues of notice, the settlement's relationship to the FTC consent decree, and the conduct remedy. Afterward, the Court found that "the $650 million that will be awarded to the Illinois class is impressive both as an absolute number and relative to other class actions settlements in privacy cases." (Dkt. 474 at 5.) As evidenced in the bi-weekly submissions, the notice plan has been successfully implemented and any issues that arose were promptly addressed. This robust notice, combined with a newsworthy, historic settlement, and Class Counsel's independent efforts to ensure that Class members had the information they needed has paid off: more than 1.5 million Class members have submitted claims, around 22% of the Class. By contrast, only 107 individuals have opted out (0.01% of the Class). If Class Counsel's fee request is approved in full, and including administration costs, claiming Class members will recover approximately $342, right in line with Class Counsel's projections at preliminary approval. A claims rate of around 22% is a remarkable figure in consumer class actions generally, particularly for classes of this size, and exceeds claims rates in the handful of other consumer settlements under the Biometric Information Privacy Act ("BIPA"). By contrast, the Settlement has drawn just three objections that repeat issues already raised by the Court or the parties—one from an apparently conflicted

1    *pro se* felon; another from "John Pentz, a[] serial meritless objector[]," *Hefler v. Wells Fargo &*

2    *Co.*, No. 16-cv-05479-JST, 2018 WL 6619983, at *16 n.19 (N.D. Cal. Dec. 18, 2018) (Tigar, J.)

3    (rejecting nearly identical objections made by Pentz); and one that has already been withdrawn in

4    large part based on the objector's renewed understanding of the Settlement.

5            Given the Settlement's substantial relief, perhaps none of this should have been much of a

6    surprise. The Settlement, which was reached only after "fierce [litigation] for over five years, with

7    no legal pebble left unturned," (Dkt. 474 at 2), months of negotiations with former Ambassador

8    Jeffrey L. Bleich, and the critical guidance of this Court, is an exemplar in the privacy space.

9    Indeed, the substantial monetary relief provided here stands in stark contrast to many recent

10   privacy settlements against large technology companies. For instance, Judge Breyer recently

11   approved a *cy pres*-only settlement in a case alleging that Google had invaded certain statutorily

12   guaranteed privacy rights. *In re Google LLC Street View Elec. Commc'ns Litig.*, No. 10-md-

13   02184-CRB, 2020 WL 1288377, at *11-14 (N.D. Cal. Mar. 18, 2020). And just this November,

14   Judge Alsup granted preliminary approval to a class-action settlement against Facebook that

15   surrendered data-security claims in exchange only for injunctive relief. *Adkins v. Facebook, Inc.*,

16   No. 18-cv-05982-WHA, Dkt. 314 (N.D. Cal. Nov. 15, 2020).

17           As the Court previously found, the Settlement, reached after an adversarial class

18   certification decision affirmed on appeal, is "the product of serious, informed, and noncollusive

19   negotiations." (Dkt. 474 at 4.) The claims process has demonstrated that the Class is extremely

20   satisfied with those efforts. The Court should therefore grant final approval to the Settlement.

21   **III.    BACKGROUND AND CASE HISTORY**

22           The Court is deeply familiar with the procedural history of this case and the settlement

23   terms. In accordance with the *Procedural Guidance for Class Action Settlements* Plaintiffs

24   incorporate by reference, but do not repeat, that history or the terms here. (Dkts. 499, 499-1),

25   **IV.    NOTICE SATISFIED DUE PROCESS AND PRODUCED A HIGH CLAIMS RATE**

26           **A.    The Court-Approved Notice Plan was Successfully Implemented.**

27           Granting final approval requires the Court consider whether the Class received "the best

28   notice that is practicable under the circumstances, including individual notice to all members who

1   can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *accord Eisen v. Carlisle*

2   *& Jacquelin*, 417 U.S. 156, 173 (1974). "The class must be notified of a proposed settlement in a

3   manner that does not systematically leave any group without notice." *Officers for Justice v. Civil*

4   *Serv. Comm'n of City & Cnty. of S.F.*, 688 F.2d 615, 624 (9th Cir. 1982) (citation omitted). "The

5   rule does not insist on actual notice to all class members in all cases." *Mullins v Direct Digital*

6   *LLC*, 795 F.3d 654, 665 (7th Cir. 2015); *see also Juris v. Inamed Corp.*, 685 F.3d 1294, 1321

7   (11th Cir. 2012) (noting that "even in Rule 23(b)(3) class actions, due process does not require

8   that class members actually receive notice" and collecting cases). Although what constitutes the

9   "best notice practicable" is case-specific, a notice campaign that reaches 70% of a class is often

10  reasonable. Federal Judicial Center, Judges' Class Action Notice & Claims Process Checklist &

11  Plain Language Guide, at 3 (2010). The Notice must also accurately describe the Settlement. *See*

12  Fed. R. Civ. P. 23(e)(1)(A); *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 946 (9th Cir.

13  2015). Along with the Court, Plaintiffs sought through the notice "to achieve a high claims rate

14  and payout to class members . . . [and] establish best practices for online notice." (Dkt. 474 at 7.)

15         As the Court and Class Counsel recognized after the Class was certified, reaching a class

16  composed of entirely online users alleging online privacy violations was going to require

17  primarily online notice. Over Facebook's objections at that stage, the Court-ordered certification

18  notice was to be directed to the class via Class members' Facebook newsfeed channel, via jewel

19  notices, direct email notice, and a web page dedicated to the lawsuit. (*See* Dkts. 402, 474.) The

20  Settlement notice includes all these methods plus a second round of emails, targeted internet

21  banner ads, print publication, and required CAFA notice to government officials. But the right

22  methods are only part of a successful notice campaign: the notice also needs to effectively alert

23  class members to their rights and get them to exercise those rights. Per the Court's instructions,

24  after the first preliminary approval hearing, the parties, with the assistance of Facebook's media

25  team and an email designer, reworded and redesigned the entire notice program to make it eye-

26  catching and easily understandable. The parties also ensured that the claim form is easy to

27  understand and so Class members could file a claim in less than two minutes. The Court approved

28  the methods and the retooled notice finding that "together they constitute the best practicable

1   notice to individual class members under the circumstances of this case." (Dkt. 474 at 6.)

2        As set out in the bi-weekly status reports, the notice plan has been successfully completed,

3   any hiccups have been identified and remedied, and the resultant claims rate is among the highest

4   of any consumer class action (and the highest of one this size). The two methods of direct notice

5   were successful. First, as Facebook has explained, it "has complied with this Court's order and

6   provided the approved Newsfeed and jewel notice to the class by the September 23 notice date."

7   (Dkt. 492.) And as Facebook representative Gary McCoy testified at the preliminary approval

8   hearing, this was the best and common method by which Facebook would seek to communicate

9   important information to its user base. As of the Claims Deadline, the separately filed declaration

10   of Jake Webb states that the Jewel and Newsfeed notices created approximately 9.1 million

11   unique impressions, with 30.47% of those recipients engaging with the notice.

12        The Settlement Administrator (Gilardi & Co.) also successfully implemented several

13   additional forms of notice. For direct notice, Gilardi sent emails to each email address associated

14   with a person on the Class List. It turns out, for some of the records in the Class List, the data

15   contained multiple distinct email addresses associated with the same record such that there were

16   15,372,906 emails associated with 12,340,049 accounts. (Lucchesi Decl. ¶ 7.) Gilardi sent the

17   email notice to each of these addresses because the Parties believed that the benefits of providing

18   Class members notice to the email address they actually monitor far outweighed the minimal

19   downside of sending duplicate emails to Class members who actively use multiple addresses.

20   Gilardi also determined that 2,608,319 of the emails provided were no longer valid address (*i.e.*,

21   out-of-date school or work accounts). (*Id.*) For the first round, 10,295,502 emails were

22   successfully delivered to at least one of the email addresses associated with an account. (*Id.* ¶ 9.)

23        As the parties reported, Class Counsel discovered from Class members that around 5.7

24   million emails associated with a Gmail address were routed to users' spam folders. (Dkt. 492

25   ¶ 11.) Class Counsel reached out to outside and inside counsel for Google and was able to

26   coordinate a follow up email to those Gmail users of which 99.9% were successfully delivered

27   and no issues were reported of those emails being routed as spam. (Lucchesis Decl. ¶ 11.)

28

1      A "reminder" campaign was initiated as the Claims Deadline was approaching with

2 notices being sent to 12,888,208 emails. 9,956,299 of those emails were successfully delivered.

3 (*Id.* ¶¶ 12-13.) Ultimately, of the 34,036,599 total emails that were sent, 25,336,835 (74.4%)

4 were successfully delivered. Delivery of at least one email was successful to 11,326,353 of the

5 12,340,049 accounts on the Class List that was associated with an email (91.8%). (*Id.* ¶ 14.)

6      In an effort to reach Class members who may not have received the Facebook-provided

7 notice or Gilardi's multiple emails, two forms of publication notice were provided: print ads in

8 the September 23 editions of the *Chicago Tribune* and *Chicago Sun Times* and a Google Display

9 Network internet banner ad campaign that ran from September 23 to October 23. (*Id.* ¶ 15.)[1] The

10 Google campaign generated 27,907,627 impressions running banner ads on high-quality sites

11 typically visited by the target audience of Illinois Facebook users over 18 and Illinois residents

12 aged 25-54 generally. (*Id.* ¶ 16.) This exceeded the goal of 27.1 million impressions.

13      In addition, the Settlement received significant favorable press attention. Many articles

14 highlighted the changes made to the Settlement in light of the Court's concerns about the initial

15 agreement. And many articles praised the ultimate benefits provided. For instance, an article on

16 *Fortune*'s website noted that "The case represents one of the biggest payouts for privacy

17 violations to date, and contrasts sharply with other settlements such as that for the notorious data

18 breach at Equifax—for which victims are expected to receive almost nothing." An article in the

19 *New York Times* similarly noted that the Settlement here "dwarfs" the *Equifax* settlement. Articles

20 such as that featured in the *Chicago Tribune* undoubtedly helped spread the word about the

21 Settlement. And local news articles throughout the state encouraged Illinoisans to submit claims.[2]

22

---

23 [1]   As previously reported, Class Counsel paid for the short-form notice to be published in *The Pantagraph* and *The Southern Illinoisan*, two daily regional newspapers. (Dkt. 501.)

24 [2]   *See* Jeff John Roberts, *Facebook adds $100 million to landmark facial recognition settlement payout*, FORTUNE (July 23, 2020), available at https://perma.cc/P7EH-NMSL Natasha Singer and

25 Mike Isaac, *Facebook to Pay $550 Million to Settle Facial Recognition Suit*, N.Y. TIMES (Jan. 29, 2020), available at https://perma.cc/X99S-743P; *Deadline Approaches for Illinois Facebook*

26 *Users to File Claim for Payouts in $650M Settlement*, NBC 5 CHICAGO (Nov. 6, 2020) available at https://perma.cc/6R4Y-FSW9; Ally Marotti, *A massive Facebook privacy settlement just got*

27 *bigger. Illinois users could split $650 million*, CHICAGO TRIBUNE (July 24, 2020), available at https://perma.cc/X826-MMVQ; Lorraine Swanson, *Clock Ticking For Illinois Facebook Users*

28

1    The Settlement was also the subject of a virtual town hall meeting by several supportive

2  Illinois legislators on November 16, 2020. Representative Ann Williams called the Settlement

3  "historic" and noted that it would "result in a substantial amount of money for Illinois Facebook

4  users," an amount she later termed "unheard of." A lawyer at Edelson PC was on hand to provide

5  attendees information on how they could submit a claim, and to answer any questions.

6    Finally, Class Counsel responded to hundreds of inquiries and worked directly with

7  several Class members to help them with any questions they had about membership in the class or

8  filing claims. In addition, Edelson PC also responded to requests from members of the Class who

9  are incarcerated providing the materials they needed to submit claims. Class Counsel was also

10  required to protect the Class from opportunists who through misleading advertising sought to

11  solicit class member opt-outs. (Dkts. 477; 494; 496 ¶ 6.)

12    Ultimately, all of this notice and press coverage resulted in over 6.2 million visits to the

13  Settlement website. (Lucchesi Decl. ¶ 17.) And as explained below, over 1.5 million Class

14  members have submitted claims. (*Id.* ¶ 19.) To achieve these impressive notice results, Gilardi has

15  incurred $1,828,009.89 in costs, which should be approved by the Court. (*Id.* ¶ 22.)

16    **B.      The Objections to the Sufficiency of Notice Should be Overruled.**

17    Two of the three objections, the joint objection on behalf of Dawn Frankforther and Cathy

18  Flanagan and Kara Ross (who has since withdrawn her objection on this point), raise undeveloped

19  concerns that the notice plan failed to comply with Due Process.[3] Objector Ross, for instance,

20

21  *To File Claims*, Patch.com (Nov. 11, 2020), available at https://perma.cc/U2RC-82PY; Riley
O'Neil, *Illinois Facebook Users Have 2 Weeks Left To Apply For Settlement*, WROK 1440,
22  available at https://perma.cc/86H4-97PU.

23  [3]    The objection of Kara Ross—prepared with the assistance of counsel who is also her
husband—is deficient. First, it does not state whether it is being filed individually or on behalf of
24  some group of class members. Fed. R. Civ. P. 23(e)(5)(A.) Second, it fails to provide information
required of the objectors as listed in the Court-approved notice, including: an address, email or
25  telephone number associated with her Facebook account, an explanation of why she believes she
is a class member, and any citation to legal authority. The Court can overrule it on these grounds
26  alone. *In re Yahoo! Inc. Customer Data Security Breach Litig.*, No. 16-md-02752, 2020 WL
4212811, at *14 (N.D. Cal. July 22, 2020) ("The Court need not consider . . . noncompliant
27  objections."); *Moore v. Verizon Commc'ns Inc.*, No. 09-cv-1823 SBA, 2013 WL 4610764, at *12

28

1  claims to know personally (but does not identify) members of the Class who supposedly did not

2  receive individual notice, and asks the Court to require Class Counsel to "disclose its method of

3  identifying class members." (Dkt. 506-1 at 2.) But Class Counsel already has informed the Court

4  of how the Class List was constructed—that only Facebook users in Illinois for more than 6

5  months with a template are Class members—and the Court found that comported with its earlier

6  rulings and with Due Process. (Dkt. 474 at 4-7.) When this was conveyed to Ms. Ross's counsel,

7  he immediately withdrew that objection. Moreover, even if Ms. Ross was correct about her

8  withdrawn objection, due process not require that every class member receive the notice.[4]

9      Objectors Frankfother and Flanagan contend that the notice plan here was inadequate, but

10  they develop no evidence or argument along those lines. (Dkt. 504 at 7, 10.)[5] In fact, the only

11  "evidence" of inadequate notice appears to be what they consider to be a low claims rate. Putting

12  aside that these objectors fail to meet their burden to substantiate their objection, the 22% claims

13  rate here is anything but low and is squarely within the projected range provided to the Court (as

14  required by the Northern District Guidelines) during the preliminary approval process. (Dkt. 445

15  at 11-12.) Given the hard evidence that nearly the entire Class received individual notice more

16  than once, there is no basis to find that notice failed to satisfy Due Process.

17

18  (N.D. Cal. Aug. 28, 2013) (overruling objections "for failing to comply with the procedural
   requirements for objecting to the Settlement.").

19

20  [4]  Objector Ross has also withdrawn her objection to the requirement that a class member's opt
   out request be personally signed after Class Counsel and Facebook agreed to not contest her

21  counsel (husband)'s opting out of 17 other family members on his word that they had agreed.
   Regardless, a signature is a standard requirement (it prevents opt outs from being filed without

22  the class member's knowledge), and no other opt outs appeared hindered by the requirement.

23  [5]  As described in Plaintiff's motion to issue discovery, Frankfother and Flanagan are
   represented by John J. Pentz, a well-known serial for-profit objector. *See* dkts. 507 & 514

24  (quoting several judicial opinions describing Pentz's objection history).

25      Pentz's co-counsel, Kendrick Jan, has appeared as co-counsel to Pentz before, filing an
   objection in *In re Apple Inc. Device Performance Litigation*, that is practically identical to the

26  objection they lodge here. *See* Objection, *In re Apple Inc. Device Performance Litig.*, No. 18-
   md-2827, Dkt. 512 (N.D. Cal. Oct. 5, 2020). Indeed, it appears that Mr. Jan got admitted to

27  practice in this Court on September 30, 2020 precisely so that he could sponsor the *pro hac vice*
   admission of Mr. Pentz in the *Apple Device* case and in this case. The objection in *Apple Device*

28  was filed for Sarah Feldman, who is related to Pentz, and Hondo Jan.

NOTICE OF MOTION AND MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION
FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT - 3:15-cv-03747-JD      - 7 -

1

### C. More Than 1.5 Million Class Members Have Submitted Claims.

2        Given the breadth of the notice plan and the amount of publicity this Settlement has

3    received, it should come as no surprise that the Class's reaction has been overwhelmingly

4    favorable. Back in July this Court noted that this Settlement presents an "opportunity to move the

5    marker" in terms of class member participation. (7/23/20 Tr. at 31:11-16.) The parties heeded that

6    advice and, at the suggestion of a behavioral scientist, subtly altered the claim flow to encourage

7    more claims. (Dkt. 476 at 1-2.) These efforts, combined with the robust notice plan, have paid off:

8    more than 1.5 million Class members have submitted claims, around 22% of the Class. By

9    contrast, only 109 individuals have opted out, representing less than 0.02% of the Class.

10   Assuming *arguendo* that Counsel's fee request is approved in full (Dkt. 499), and based upon

11   projections from Gilardi for the cost of administering the Settlement, claiming Class members

12   stand to recover around $342, in line with the projections at preliminary approval. As explained

13   further below, this claim rate dwarfs what is typical in any consumer class action.

14   ## V. THE SETTLEMENT MERITS FINAL APPROVAL

15       To approve the settlement of a certified class as fair, reasonable, and adequate, Rule 23(e)

16   requires Court to consider "whether (A) the class representatives and class counsel have

17   adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief

18   provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and

19   appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including

20   the method of processing class-member claims; (iii) the terms of any proposed award of

21   attorney's fees, including timing of payment; and (iv) any agreement required to be identified

22   under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other."

23   These factors largely encompass those identified by the Ninth Circuit for evaluating a class

24   settlement. *See In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011)

25   (quoting *Churchill Vill., L.L.C. v. Gen. Elec.,* 361 F.3d 566, 575 (9th Cir. 2004)).[6] Relevant Ninth

26

27   ────────────────────

     [6]    The *Churchill* factors are: (1) the strength of the plaintiff's case; (2) the risk, expense,

28   complexity, and likely duration of further litigation; (3) the risk of maintaining class action status

1    Circuit factors are often reviewed alongside those identified by Rule 23. *See, e.g.*, *Walters v.*

2    *Target Corp.*, No. 16-cv-1678, 2020 WL 6277436, at *5 (S.D. Cal. Oct. 26, 2020).

3           The Court has already given the Settlement here a hard look, initially denying preliminary

4    approval, based on concerns about the relief afforded to Class members under the agreement, the

5    scope of the release, potential overlap with the 2019 FTC Consent Decree, the manner of notice,

6    and the dry, legalistic language used in both the notice and claim form. (Dkt. 456.) The Court

7    gave the revised Settlement similarly close scrutiny, determining that amendments to the

8    Settlement, including greater monetary relief, and revisions to the language of the release and to

9    the substance of the notice documents, had sufficiently addressed its concerns. (Dkt. 474 at 1.)

10   The Court also heard the testimony and asked questions of a Facebook witness (Gary McCoy) as

11   to how the Settlement's conduct remedy is not redundant with the company's agreement with the

12   government. (*Id.* at 6.) Further developments, specifically the overwhelmingly positive reaction of

13   the Class and minimal objections of little substance, confirm the Court's preliminary findings. *See*

14   *Cotter v. Lyft, Inc.*, 193 F. Supp. 3d 1030, 1036-37 (N.D. Cal. 2016) (when district court conducts

15   a "rigorous inquiry" at preliminary approval stage and "identif[ies] any flaws" in a settlement and

16   "allows the parties to decide how to respond to those flaws," final approval should focus on

17   potential flaws identified by objectors or exposed by "further factual development"); *see also*

18   *Uschold v. NSMG Shared Servs. LLC*, No. 18-cv-01039, 2020 WL 3035776, at *9 (N.D. Cal.

19   June 5, 2020) (adhering to preliminary analysis about settlement value because "there is nothing

20   in the final approval materials that changes the Court's analysis on that score"). Class Counsel

21   examines the fairness factors identified in Rule 23(e) and by the Ninth Circuit below, mindful that

22   objections require a "reasoned response." *Officers for Justice*, 688 F.2d at 624.

23          **A.      Class Counsel and the Class Representatives Have Protected the Class's
                      Interests and Support the Settlement.**

24          As the Court has previously found, Class Counsel and the class representatives have

25   adequately represented the class throughout the five years they fiercely litigated this case. (Dkt.

26

27   ───────────────
     throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed
28   and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a
     governmental participant; and (8) the reaction of the class members of the proposed settlement.

1   474.) This zealous representation has continued during the notice and claims process where Class

2   Counsel have spoken with hundreds of Class members, watched for and resolved issues with the

3   email notice, and identified misleading communications being provided that necessitated the

4   filing of a TRO. (Dkt. 499-1 ¶¶ 133-38.) The Court should confirm that finding.

5           Class Counsel's support of the Settlement can be considered and also favors approval. *In*

6   *re Bluetooth*, 654 F.3d at 946. Here, Class Counsel have extensive experience litigating consumer

7   class actions, including in the privacy space. It is their considered judgment that the Settlement

8   represents an outstanding result for the Certified Class. (Dkt. 499-1 ¶ 122.) "Given Class

9   Counsel's extensive experience in this field, and their assertion that the settlement is fair,

10  adequate, and reasonable, this factor supports final approval of the Settlement Agreement."

11  *Schuchardt v. Law Office of Rory W. Clark*, 314 F.R.D. 673, 685 (N.D. Cal. 2016). It is also

12  notable that experienced lawyers at Cooley LLP recommend approval of the Settlement.

13          **B.      The Settlement was Negotiated at Arm's Length.**

14          This Court has already found "that the proposed settlement was the product of serious,

15  informed and noncollusive negotiations" and lacked a clear sailing agreement. (Dkt. 474.) That

16  conclusion remains correct. The parties mediated three separate times at different stages of the

17  proceedings, reaching a settlement only after Facebook's *en banc* petition to the Ninth Circuit had

18  been denied. (Dkt. 499-1 ¶¶ 109-112.) And during the final attempt at resolution, even after

19  reaching an agreement in principle, the parties repeatedly had to engage with Ambassador Bleich

20  to resolve differences that arose between them as to the open terms. (*Id.* at 113-18.) *See Satchell*

21  *v. Fed. Exp. Corp.*, Nos. 03-cv-2659-SI, 03-cv-2878-SI, 2007 WL 1114010, at *4 (N.D. Cal. Apr.

22  13, 2007) ("The assistance of an experienced mediator in the settlement process confirms that the

23  settlement is non-collusive."). Nor does the Settlement suffer from any of the warning signs that

24  the Ninth Circuit has instructed district courts to watch out for. *See In re Bluetooth*, 654 F.3d at

25  946-47 (identifying "clear sailing" arrangements and reversionary funds may suggest the presence

26  of collusion or bad faith).

27          **C.      The Amount Offered by the Settlement Supports Final Approval.**

28          Next, the relief afforded to Class members by the Settlement here is extraordinary. As

NOTICE OF MOTION AND MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION
FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT - 3:15-cv-03747-JD          - 10 -

explained below, the relief available to Class members under the Settlement go beyond what has been offered by any comparator settlement. This factor weighs heavily in favor of final approval of the Settlement, especially in light of the costs and risk of a trial and further appeals.

        **i.**      **Projected recovery is unprecedented for a privacy settlement.**

The monetary relief awarded to claiming Class members remains unprecedented. As Professor Rubenstein lays out, the size of the Settlement here is the largest privacy settlement on record, and when compared to the size of the Class, provides substantially more relief than any privacy settlement. (Dkt. 499-3, Tables 1 & 2.) Indeed, the $650 million recovery outpaces every other privacy settlement by at least $144.5 million. But the runner-up, the settlement in *In re Equifax, Inc. Customer Data Security Breach Litigation*, No. 17-md-2800, 2020 WL 256132 (N.D. Ga.), compensated a class of around 147 million Americans, or about 21 times larger than the Class here. Other large privacy settlements provide even more lopsided comparisons. As Professor Rubenstein shows, on a gross per class member basis, the Settlement here is easily record-breaking. Indeed, of the 20 largest privacy settlements since 2014, "fifteen of these cases return less than $15 per member, while this Settlement returns close to $100." (Dkt. 499-3 ¶ 18.)

Moreover, the awards to claiming Class members further show that the relief provided by the Settlement is fair. Class members will receive around $342, an amount that is unheard of in a class action privacy settlement. Given that Class members stood to recover $1,000 only if successful in a trial that was rife with significant risks, this figure represents a modest discount for the Class, consistent with  the potential delay and risks that lay ahead at trial and on appeal.

Such a gentle discount is rare in class action privacy settlements where statutory damages are available. For example, large class actions under the Telephone Consumer Protection Act, which provides for $500 in statutory damages, typically settle for less than $40 per person. *See, e.g.*, *In re Capital One Telephone Consumer Protection Act Litig.*, 80 F. Supp. 3d 781, 787 (N.D. Ill. 2015) (providing $34.60 to each claiming class member); *Hashw v. Dept. Stores Nat'l Bank*, 182 F. Supp. 3d 935, 940, 944-45 (D. Minn. Apr. 26, 2016) (providing class members who received over 100 calls in violation of the TCPA a single $33.20 payment). Many other statutory class actions result in similar recoveries. A large privacy case under the Drivers' Privacy

1    Protection Act provided for a $50 million cash settlement fund that afforded about 600,000 class

2    members $160 of the $2,500 they might have been entitled to after trial. *Kehoe v. Fidelity Fed.*

3    *Bank & Tr.*, No. 03-cv-80593, Dkt. 215 at 7 (S.D. Fla. Nov. 17, 2006)*.* And in *In re Vizio, Inc.,*

4    *Consumer Privacy Litigation*, No. 16-ml-02693-JLS-KES (C.D. Cal.), the plaintiffs alleged that

5    defendant's smart TVs collected viewing history and transmitted that data, along with personally

6    identifiable information, to third parties in violation of the Video Privacy Protection Act, 18

7    U.S.C. § 2710, which allows for recovery of $2,500, *id.* § 2710(c)(1)-(2). From the resulting $17

8    million settlement, claiming class members received about $18 per television purchased. *See In re*

9    *Vizio*, Dkt. 347-1 at 2. These cases are consistent with decision from this district, which has

10   approved settlements embodying similar discounts across a range of subject matter. *See, e.g.*,

11   *Uschold*, 2020 WL 3035776, at *9 (approving a 12% recovery); *see also Officers for Justice*, 688

12   F.2d at 628 ("It is well-settled law that a cash settlement amounting to only a fraction of the

13   potential recovery will not per se render the settlement inadequate or unfair.").

14       The relief available to claiming Class members also dwarfs the relief available to class

15   members in all privacy class actions of remotely comparable size. For instance, when compared

16   to *Equifax* on numbers alone, this Settlement provides over 27 times more value per Class

17   member—$94.20 in cash compared to $3.44 of restricted benefits. In order to be comparable in

18   terms of dollars available per class member, the *Equifax* settlement would have had to have

19   created $13 billion all-cash, non-reversionary fund. The same is true for other large privacy

20   settlements. *See, e.g.*, *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 324 (N.D. Cal.

21   2018) (explaining that only $13 million of the $115 million fund was available for cash payments,

22   with the rest being reserved to purchase credit monitoring services); *In re Yahoo! Inc.*, 2020 WL

23   4212811, at *22 (cash relief made available to class members with existing credit monitoring,

24   out-of-pocket losses, and who paid for premium services).

25       The individual class member recovery here also far outstrips other consumer BIPA

26   settlements. In *Prelipceanu v. Jumio Corp.*, No. 2018 CH 15883 (Ill. Cir. Ct., Cook Cnty.), the

27   final check amount was $262. In another consumer BIPA action, *Sekura v. L.A. Tan Enterprises,*

28   *Inc.*, No. 15 CH 16694 (Ill. Cir. Ct., Cook Cnty.), class members received around $170. And in a

1  third consumer BIPA settlement, *Carroll v. Crème de la Crème*, No. 17 CH 1624 (Ill. Cir. Ct.

2  Cook Cnty.), class members received only credit monitoring.[7]

3     The substantial monetary relief also is remarkable in light of the fact that many privacy

4  class actions settle for mere *cy pres* relief, or other non-monetary relief, like the settlement in

5  *Crème de la Crème*, which provided only credit monitoring for class members. In fact, Judge

6  Alsup of this district recently preliminarily approved a class-action settlement in *Adkins v.*

7  *Facebook, Inc.*, a case arising from a hack of Facebook, that included only injunctive relief. *See*

8  Order Granting Preliminary Settlement Approval, *Adkins*, No. 18-cv-05982 WHA, Dkt. 314.

9  Indeed, class-action settlements providing no monetary benefit to the settlement class are fairly

10  common in cases against Facebook, and other so-called "tech giants." *See, e.g.*, *Lane v.*

11  *Facebook, Inc.*, 696 F.3d 811, 820–22 (9th Cir. 2012); *In re Google LLC Street View*, 2020 WL

12  1288377, at *11-14 (approving *cy pres* only settlement despite availability of statutory damages).

13     In other words, the per class member recovery here in a case of this size is peerless.

14  Whether viewed through the lens of BIPA specifically, of other massive privacy settlements, of

15  other settlements where statutory damages were available, or of settlements against large

16  technology companies, class member recovery here is extraordinary. This is particularly so in

17  light of the very real risk of nonpayment presented by the impending trial, as the Court has

18  outlined in previous orders. (Dkt. 474 at 5; Dkt. 404 at 3.)

19      **ii.**  **The conduct remedy here provides "meaningful" relief.**

20     First, as the Court previously found, the conduct remedy agreed to by the parties provides

21  "meaningful" relief to Class members. (Dkt. 474 at 6.) This remains true. The Settlement requires

22  Facebook to turn off Face Recognition and then delete the biometric data it collected about Class

23  members unless they provide informed consent to turn it back on and for Facebook to continue to

24  retain that data. No BIPA settlement offers any more significant non-monetary relief. And

25

26    ―――――――――――――

 [7] As previously noted, several BIPA lawsuits by employees against their employer have settled

27  for more than $1,000 per class member. (Dkt. 445 at 17 n.8.) Professor Rubenstein finds these
settlements are a poor comparison because they involve small classes (settlements are typically

28  for the cost of defense) and involve legal issues not present here. (*See* Dkt. 499-3 ¶ 19(b).)

1  consumer settlements frequently offer less relief. In the settlement of the *Prelipceanu* action

2  referenced above, which received final approval after Plaintiffs had submitted their preliminary

3  approval papers, the defendant agreed only to "obtain through commercially reasonable methods

4  BIPA-compliant consent," along with pledges to follow the law. It's unclear what "commercially

5  reasonable" means and the no pledge to turn off or delete data unless consent is obtained. By

6  contrast, here, Facebook will turn Face Recognition off and obtain consent with clear language

7  and delete data if a Class member does not consent or is inactive for several years.

8       One objector, Kevin C. Williams, appears to take issue with the conduct relief here,

9  arguing generally that Facebook users should demand "more privacy [and] more protection . . .

10  based on the wrongs perpetrated on Facebook on its users." (Dkt. 497 at 2.) But this suit, under a

11  single state's law regarding a specific type of privacy violation, is not the vehicle to make

12  sweeping changes to Facebook's governance model or change what the Illinois General Assembly

13  requires of those who collect biometrics. Given the context of this lawsuit, the non-monetary

14  relief provided by the Settlement is outstanding.

15          **iii.    The risks in further litigation demonstrate the adequacy of the relief.**

16       As the Court has observed, the Settlement was reached on the eve of trial. (Dkt. 474 at 2.)

17  In fact, trial preparations had begun in earnest in 2018. Class Counsel spent a week with Rodney

18  Jew, an experienced trial consultant formulating a trial strategy, and the parties had exchanged

19  proposed motions *in limine*. (*See* Dkt. 499-1 ¶¶ 83-86.) Those preparations were temporarily put

20  on hold by Facebook's interlocutory appeal of this Court's class certification order. While that

21  appeal ultimately put to rest one of Facebook's principal contentions, i.e., that class members

22  lacked standing to sue (*see Patel v. Facebook, Inc.*, 932 F.3d 1264, 1275 (9th Cir. 2019)),

23  numerous critical factual disputes remained for trial. For instance, the Ninth Circuit's order left

24  the door open for Facebook to pursue arguments about extraterritoriality, and basic liability

25  disputes "about whether Facebook's facial recognition technology collects a 'scan of face

26  geometry' as required under BIPA, and whether Facebook had a good-faith reason for acting as it

27  did with respect to Illinois users" remained for the jury to resolve. (Dkt. 474 at 5; *see id.* at 4-5

28  (noting that these "specific disputes of fact . . . the jury's resolution of which was uncertain . . .

could have had far-reaching impacts on Facebook's liability").) There have been no developments (such as new binding precedent from Illinois courts) which could upset the Court's earlier findings in this regard. Further, in addition to the uncertainty of a trial, even if Plaintiffs prevailed before the jury, a second lengthy and complex appeal was in the offing, challenging not just the Court's trial orders, but also certain earlier decisions, such as the Court's resolution of Facebook's choice-of-law argument, and Facebook's invocation of the "photograph" exception, as well as a constitutional challenge to the size of any ultimate verdict. (See Dkt. 445-1 ¶ 8.) A lengthy appeal (and possible remand) also would have left open the door for perhaps the greatest risk to recovery that the Class was facing: an amendment to the BIPA which might have gutted the Class's claims.

All of this provides ample reason to settle now rather than risk trial and subsequent appeal at a chance for a larger payout, particularly given that the larger payout is by no means guaranteed even if the Class prevails on the merits, as any verdict could be reduced on account of Due Process. *See, e.g.*, *Uschold*, 2020 WL 3035776, at *9 ("The challenges Plaintiffs would face should this case move forward instead of settling, in contrast to the finality and speed of recovery under the parties' agreement, weighs in favor of approving the settlement."). Particularly given the relief provided by the Settlement, the strength of the Plaintiffs case, balanced against the risks inherent at trial, and presented by lengthy and complex appeals here, supports final approval of the Settlement. *See Delgado v. MarketSource, Inc.*, No. 17-cv-07370, 2019 WL 4059850, at *5 (N.D. Cal. Aug. 28, 2019) (finding that "both sides had a well-developed sense of the risks and benefits of continued litigation" which "weighs in favor of approval").

### iv.   The objections to the adequacy of relief are meritless.

Despite the facial reasonableness of the relief and the Court's determination at preliminary approval that the $650 million fund was an "impressive result," all three objections raise concerns with the size of the Settlement Fund. These objections should be overruled. As the Ninth Circuit observed in *Hanlon*, "settlement is the offspring of compromise; the question   . . .  is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998); *see also Fraley v. Facebook, Inc.*, 966 F. Supp. 2d 939, 948 (N.D. Cal. 2013) (finding that objections seeking

1    more relief did not show that settlement was unfair or inadequate). In arguing that the Settlement

2    relief is inadequate, the objectors "bear the burden of proving any assertions they raise

3    challenging the reasonableness of a class action settlement." *In re LinkedIn User Privacy Litig.*,

4    309 F.R.D. 573, 592 (N.D. Cal. 2015). The objectors fail to meet this burden.

5        Objector Williams claims that the Settlement is too small because Facebook could afford

6    to pay more. (Dkt. 497 at 2.) But this undeveloped argument ignores the substantial nature of the

7    relief actually secured.[8] This Settlement is record-breaking when it comes to monetary relief

8    made available in a consumer settlement. Williams's unsubstantiated assertion "is insufficient to

9    rebut the Parties' evidence and argument that the settlement was negotiated at arms' length

10   between experienced counsel and a respected mediator who actually evaluated the case." *Nunez v.*

11   *BAE Sys. San Diego Ship Repair Inc.*, 292 F. Supp. 3d 1018, 1042 (S.D. Cal. 2017).

12       Objector Ross appears to believe that the case should have settled for no less than $5,000

13   per class member, or, in other words, full relief after a finding of willfulness. (Dkt. 506-1 at 1-2.)

14   Ross argues that Facebook acted willfully by "caus[ing] class members' private activities and

15   whereabouts to become known to violent ex-husbands, to stalkers, as well as to jealous and

16   spiteful in-laws and acquaintances." (*Id.* at 1.) Such wild accusations, signed by counsel, have

17   nothing do with the facial recognition claims under BIPA at issue here. Beyond these claims

18   Ross's contention that the parties should have settled for more just won't do. *See Hanlon*, 150

19   F.3d at 1027; *Nunez*, 292 F. Supp. 3d at 1042

20       Objectors Frankfother and Flanagan spill the most ink on their opposition to the amount

21   offered in Settlement, ultimately arguing that the case should have settled for no less than $5

22   billion. Indeed, their central point—that the Settlement Fund is not big enough—was central to

23   the Court's earlier refusal to grant preliminary approval to the Settlement. (Dkt. 456 at 1.) In light

24   of those and other concerns the parties returned to the negotiating table, and produced a revised

25

26   _____

27   [8]   Williams also may have an ulterior motive for objecting: As a result of a conviction for money
     laundering, he owes restitution of nearly $1.9 million including the proceeds of any judgment. *See*

28   Judgment, *United States v. Williams*, No. 4:13-cr-40019-JPG, Dkt. 40 (S.D. Ill. Nov. 15, 2013).

1   Settlement that increased the Settlement Fund to $650 million. (Stipulation ¶ 1.30) The Court

2   found that this addition "substantially allay[ed]" its concerns and was "an impressive result."

3   (Dkt. 474 at 5.) The gist of Frankfother and Flanagan's objection is that the Court was wrong, and

4   that only a $5 billion settlement would have been sufficient. But the relief available to claiming

5   Class members here is extraordinary, and the size of the Settlement Fund fairly reflects the type of

6   compromises that are the very essence of settlement. *See In re Yahoo! Inc.*, 2020 WL 4212811, at

7   *14 (rejecting objections to the amount of monetary relief available for "fail[ing] to adequately

8   take into account the risks and delays" that would face the class).

9          In disagreeing with the Court's earlier findings, Frankfother and Flanagan proceed from

10   two false or misleading premises. First, they say that the class is 10 million individuals. (Dkt. 504

11   at 6-7.) That is incorrect, it's about 7 million as has been repeatedly explained. (*See, e.g.*, Dkt. 255

12   at 6.)  Second, they assert that "all significant legal questions had been resolved in favor of the

13   Plaintiffs." (Dkt. 504 at 8.) This is, at best, highly misleading. As this Court has found, significant

14   factual questions remained open for the jury to resolve. (Dkt. 474 at 5.) The objectors attempt to

15   downplay these very real trial risks by arguing that Facebook's argument about the type of data it

16   collects is "frivolous." (Dkt. 504 at 6 n.4.) That statement lacks any basis in the record. In fact, on

17   this issue specifically the parties had marshaled competing expert testimony which this Court

18   concluded created a genuine issue of fact for trial. (Dkt. 372 at 2-6 (noting the parties "unleash

19   volleys of competing evidence.") Facebook's position was well-supported by evidence and

20   certainly was not "frivolous." Indeed, the objectors' support for the idea that this position is

21   frivolous is the FTC's recent settlement with Facebook, but this merely confirms that they have

22   no idea what they are talking about. (See Dkt. 504 at 6 n.4 ("Facebook would never have agreed

23   to pay $5 billion through an FTC consent decree if there were any question about its use of facial

24   geometry in its collection of biometric data.").) The FTC settlement had almost nothing to do with

25   Facebook's face scanning practices (it was focused on privacy failures highlighted by the

26   Cambridge Analytica scandal), and even the small slice concerning Tag Suggestions had nothing

27   to do with whether Facebook was complying with BIPA.

28

1     Frankfother and Flanagan also contend that "Facebook's voluntary $5 billion payment in

2     the FTC action would appear to undermine any argument that a $10 billion verdict for violation of

3     BIPA constitutes a violation of due process." (*id.* at 8.) Again, the FTC settlement was concerned

4     with a far broader range of conduct, including failure to abide by an earlier settlement with the

5     FTC. In any event, the argument is legally mistaken. Frankfother and Flanagan appear to believe

6     that Facebook's ability to pay is either the sole or principal basis for a reduction of an award

7     under Due Process. But that is wrong. *See United States v. Dish Network LLC*, 954 F.3d 970, 980

8     (7th Cir. 2020) ("Normally the legal system bases civil damages and penalties on harm done, not

9     on the depth of the wrongdoer's pocket."). The Due Process Clause asks whether the verdict is

10    "so severe and oppressive as to be wholly disproportioned *to the offense* or obviously

11    unreasonable." *St. Louis, Iron Mountain, & S. R. Co. v. Williams*, 251 U.S. 63, 67 (1919)

12    (emphasis added). The FTC settlement is therefore not a reasonable guidepost here, because it

13    says little about the types of harms alleged. Moreover, the FTC settlement was national in scope,

14    as opposed to the single-state class here. If the instant Settlement were national, to make the

15    comparison with the FTC settlement more straightforward, it would amount to over $17 billion.

16    In other words, if the FTC settlement shows anything, it shows that the relief here is outstanding.

17    Based on these misunderstandings, the objectors argue that any settlement here should

18    have been at least $5 billion. But aside from the misunderstandings already laid out above, "the

19    very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest

20    hopes." *Officers for Justice*, 688 F.2d at 624 (quotations omitted). This Court has already found

21    that the Class faced significant risks at trial which could have left them with nothing. (Dkt. 474 at

22    5.) Class Counsel appropriately took those risks into account when deciding to settle, and to settle

23    for less than full relief. Frankfother and Flanagan omit *any* discussion of the many other

24    landmines that lay ahead for the Class. As discussed in detail at preliminary approval papers, even

25    plaintiffs prevailed at trial, a second appeal loomed, at which Facebook would have the

26    opportunity to contest certain of the Court's earlier rulings including its contentions about

27    extraterritoriality. (See Dkt. 445 at 20-21, 23; Dkt. 465 at 3-16.) There also existed the possibility

28    that Facebook might successfully petition the Supreme Court for certiorari, further delaying

1   payment to the Class. *See Fid. Bank & Trust Co. v. Kehoe*, 547 U.S. 1051 (2006) (Scalia, J.,

2   concurring in the denial of certiorari) ("This enormous potential liability . . . is a strong factor in

3   deciding whether to grant certiorari."). Class Counsel was entitled to account for these risks and

4   the potential for delay in determining what constitutes a reasonable settlement for the Class.

5         Even then, beyond the demand for a $5 billion settlement fund, it is hard to see exactly

6   what the objectors' issue with the Settlement is. The objectors acknowledge that a 50% discount

7   would be appropriate. (Dkt. 504 at 7.) As it happens, claiming Class members stand to recover

8   around $342, which amounts to nearly half the relief the objectors demand. When one adjusts for

9   the objectors' misunderstandings, and accounts for the risks they ignore, the relief available to

10  claiming Class members is right in line with what the objectors ask for.

11        **D.     The High Claims Show the Effective Distribution of Funds to the Class.**

12        Rule 23(e)(2) directs the Court to consider whether the relief is adequate in light of "the

13  effectiveness of [the] proposed method of distributing relief to the class." The Committee Notes

14  explain that this factor concerns the claims process, which should not be "unduly demanding" but

15  which should "deter or defeat unjustified claims." The high claims rate in this action is clear

16  evidence that the claims process was easily navigated. Indeed, the on-line claim process was

17  exceptionally simple to use, allowing most Class members to submit claims in less than two

18  minutes and without the need to hunt down any extraneous information—the only information

19  that most Class members needed was their contact information, the email or phone number they

20  used to sign up with Facebook, and how they wanted to receive their payment. Individuals not on

21  the Class List also were permitted to submit claims so long as they provided their address in

22  Illinois during the class period and a statement that they uploaded a picture of their face. All told,

23  only about 164,000 individuals of the over 1.5 million claimants took this latter route. Of those,

24  only around 15,000 claims did not provide sufficient information.

25        As for distribution, the claim form asked Class members how they would like to be paid

26  from the Settlement Fund. Class members could choose from several online options, or to receive

27  a paper check. These options were selected to maximize convenience to Class members. Again,

28  there have been no objections to this manner of distributing relief, which is substantially effective.

1    Finally, the overwhelmingly positive reaction of the Class favors final approval.

2  Approximately 22% of the Class has submitted claims. This is an enormous number, particularly

3  in light of the size of the Class, and persuasive evidence that the Class believes the Settlement

4  provides valuable relief. *See Bailey v. Kinder Morgan GP*, No. 18-cv-03424, 2020 WL 5748721,

5  at *6 (N.D. Cal. Sept. 25, 2020) ("The absence of a large number of objections to a proposed class

6  action settlement raises a strong presumption that the terms of a proposed class settlement action

7  are favorable to the class members.") (quotations omitted). As Professor Rubenstein explains, the

8  typical claims rate for a class of this size is around 5%. The claims rate here is *at least* four times

9  higher, and sixteen times the average claims rate for a class of this size. (2d Rubenstein Decl. ¶ 5.)

10  The claims rate here also outperforms historical norms even when considering the amount of

11  relief offered by the Settlement. As Professor Rubenstein explains, the claims rate here is about

12  two to two-and-a-half times the historical claims rates for settlements offering this much relief per

13  class member. (*Id.* ¶ 6.)

14    The claims rate here also compares favorably to rates in similar cases. For instance, the

15  claims rate here outpaces other consumer BIPA settlements. The claims rate in *Jumio* is not

16  known, but it is believed to be around 8%. The claims rate in *Sekura* was around 12%. When

17  taking into account that the Class here was much larger than in those actions, it is clear that the

18  claims rate here is truly a cut above. *See In re Nexus 6P Prods. Liab. Litig.*, No. 17-cv-02185,

19  2019 WL 6622842, at *7 (N.D. Cal. Nov. 12, 2019) (deeming an 18% claims rate "substantial").

20    And again, extending this comparison to other privacy cases involving large classes or the

21  potential for large statutory damage awards only confirms that class member participation weighs

22  overwhelmingly in favor of settlement approval. For instance, in *In re Equifax*, which received

23  publicity from several national news outlets and prominent national political figures, the claims

24  rate was just slightly over 10%. *See* 2020 WL 256132, at *4. Other large data breach settlements

25  featured even less class member participation. *See In re Target*, No. 14-cv-2522, 2017 WL

26  2178306, at *1-2 (D. Minn.) (225,000 claims in class of over 100 million); *In re Anthem*, 327

27  F.R.D. at 321 (1.8% claims rate). Statutory damages cases are similar. For instance, in the *Vizio*

28  action, the claims rate was around 4%. *See In re Vizio*, No. No. 16-ml-02693, Dkt. 337 at 9. And

1   in cases under Michigan's Preservation of Personal Privacy Act, where a potential $5,000

2   statutory damages award was settled on a classwide basis, claims rates tended to range from 11%

3   in *Coulter-Owens v. Rodale*, No. 14-cv-12688-RHC-RSW (E.D. Mich.), to 16% in *Raden v.*

4   *Martha Stewart Living Omnimedia, Inc.*, No. 16-cv-12808 (E.D. Mich.).

5       Not only is the claims rate here high, but only 109 Class members opted out (0.02% of

6   the Class) and there are just three objections to the Settlement. Courts in this district have found

7   that a class's reaction to a settlement was positive despite much higher opt-out and objection

8   rates. *See, e.g.*, *Corzine v. Whirlpool Corp.*, No. 15-cv-05764, 2019 WL 7372275, at *6 (N.D.

9   Cal. Dec. 31, 2019) (finding that 18 objections and 199 opt outs from a class of around 1 million

10  reflected the class's "favorable view" of the settlement); *In re Nexus 6P*, 2019 WL 6622842, at

11  *10 (31 opt outs in class of 511,000 "confirms that the settlement is fair and reasonable");

12  *Sugarman v. Ducati N. Am., Inc.*, No. 10-cv-05246, 2012 WL 113361, at *3 (N.D. Cal. Jan. 12,

13  2012) (finding a "positive response" from the class when the court received 28 objections and 42

14  opt outs from a class of less than 39,000); *see also Rodriguez v. West Publ'g Corp.*, 563 F.3d 948,

15  967 (9th Cir. 2009) (concluding that the district court "had discretion to find a favorable reaction"

16  when 54 of 376,301 class members objected to settlement); *Churchill Village*, 361 F.3d at 577

17  (affirming approval of class-action settlement where 45 of 90,000 class members objected). That

18  only three meritless objections have been filed speaks volumes to the Settlement's fairness.

19  **VI.    OBJECTIONS TO THE PROPOSED SERVICE AWARDS ARE MERITLESS**

20      Objectors Frankfother and Flanagan argue that the proposed $7,500 service awards to the

21  named plaintiffs are either not allowed as a matter of equity, or so high that they demonstrate

22  inadequate representation of the Class. (Dkt. 504 at 13-15.) On this point, Objector Williams

23  appears to believe that the Class Representatives should actually receive *more* for their service to

24  the Class. (Dkt. 497 at 2.) In any event, Frankfother and Flanagan's argument goes nowhere.

25      **A.    Service Awards are Permitted in Class Actions.**

26      First, relying on a recent Eleventh Circuit opinion, *Johnson v. NPAS Solutions, LLC*, 975

27  F.3d 1244 (11th Cir. 2020), Objectors contend that all incentive awards are barred under equitable

28  principles. (Dkt. 504 at 13-14.) As they acknowledge, however, there is ample Ninth Circuit

authority upholding service awards. *See Rodriguez*, 563 F.3d at 958 (noting that "incentive awards are fairly typical in class action cases" and "are discretionary"). Regardless of what the Eleventh Circuit has held, this Ninth Circuit precedent is binding here. Moreover, the Second Circuit has rejected precisely the same arguments that were accepted in *Johnson*. *See Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 96 (2d Cir. 2019).

In any event, *Johnson* is unpersuasive. *Johnson* relied principally on *Trustees v. Greenough*, a nineteenth-century Supreme Court decision concluding that a representative plaintiff could not recover an award for "personal services and private expenses" incurred while litigating on behalf of a class of bondholders. 105 U.S. 527, 537 (1881). *Johnson* concludes that service awards are akin to the award for "personal services and private expenses" decried in *Greenough*. 975 F.3d at 1258-59. But *Johnson*'s analogy to *Greenough* is strained. The plaintiff in *Greenough*, Vose, sought an award of "$2,500 a year for ten years of personal services" plus interest of $9,625, as well as another $15,003.35 for "railroad fares and hotel bills." 105 U.S. at 530. Adjusted to 2020 dollars, Vose asked for a salary of around $66,000/year for litigating the case, as well as expenses of around $400,000, amounting to a total award of around $1.3 million. This preposterous request simply cannot be analogized in good faith to service awards of just a few thousand dollars. The representatives here do not seek a salary, or for reimbursement of hundreds of thousands of dollars of expenses. Instead, they seek an award for reasons the Ninth Circuit has recognized as legitimate: "for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and . . . to recognize their willingness to act as a private attorney general." *Rodriguez*, 563 F.3d at 958-59.

Moreover, Congress or the Rules Committee have recognized the legitimacy of service awards. For instance, Congress has specifically outlawed them in federal private securities litigation. *See* 15 U.S.C. § 78u-4(a)(2)(A)(vi). It would make no sense for Congress to have taken this step if it thought that incentive awards were impermissible as a general matter.

And recent amendments to Rule 23 also cover the awarding of service awards. Rule 23(e)(2)(D) now requires district courts to ensure that a class action settlement "treats class members equitably relative to each other." This provision easily covers service awards. Such

1   awards are made by virtue of a settlement, so a court would need to ensure that this proposed

2   additional allocation of funds to a class representative is sufficiently justified that the settlement

3   "treats class members equitably relative to each other." Indeed, the crux of Frankfother and

4   Flanagan's argument with respect to the size of the award is that it is inequitable.

5         **B.     The Proposed Service Awards are Appropriate.**

6         With respect to the size of the award, Frankfother and Flanagan's arguments again fail.

7   They suggest that the size of the award divorces the interests of the representatives from those of

8   the Class. (Dkt. 504 at 14.) The argument is not well developed, but Frankfother and Flanagan

9   claim that the Class Representatives sold out the Class to obtain a modest service award.

10         There is no evidence or authority to support this argument. As to the law, the Ninth Circuit

11   rejected a nearly identical argument in *In re Online DVD-Rental*, holding that because the awards

12   were left to the discretion of the district court they did not "create an impermissible conflict

13   between class members and their representatives." 779 F.3d at 943. As to the facts, the record is

14   clear that the Class Representatives have selflessly served the Class at every turn, and were

15   preparing to offer trial testimony before the interlocutory appeal, and then again before the case

16   settled. (Dkts. 499-7, 499-8, 499-9.) The behavior is inconsistent with the idea that they sold out

17   the Class for a few thousand dollars. Moreover, Objectors' argument makes no sense: the

18   proposed $7,500 service award is on the low side. *See* 5 William B. Rubenstein, NEWBERG ON

19   CLASS ACTIONS § 17:8 (5th ed., June 2020 update). The Class Representatives easily could have

20   obtained the same award by settling earlier in the case or for a smaller amount.

21   **VII.    OBJECTIONS TO THE FEE REQUEST SHOULD BE OVERRULED**

22         Two objections argue that Class Counsel's fee request of 20% of the initial $550 million

23   settlement, or 16.9% of the final Settlement, is excessive. These objections should be overruled.

24         Objectors Frankfother and Flanagan contend that because this is a so-called "megafund"

25   case, Counsel's fee should be "substantially less" than the Ninth Circuit's 25% benchmark. (Dkt.

26   504 at 9.) Of course, Counsel's fee request *is* substantially less than the Circuit benchmark. *Cf.*

27   *Hefler*, 2018 WL 6619983, at *13 (finding an award of 20% of a $480 million fund to be

28   reasonable). As *Hefler* noted, the "median" award "in cases with large settlements over $100

1    million," is 19% to 22.3%. *Id.* Class Counsel's fee request is right in line with these awards.

2          In any event, Frankfother's and Flanagan's argument ignores critical Ninth Circuit case

3    law as well as virtually all of the authority and experts reports in Plaintiff's petition for fees. First,

4    the Ninth Circuit has acknowledged the 25% figure as a benchmark in a megafund case. *See*

5    *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002). *Vizcaino* itself makes clear that

6    the Ninth Circuit has "*not* adopt[ed]" a categorical rule that the percentage of an award must

7    "decrease[] as the amount of the fund increases." *Id.* at 1047 (emphasis added). Instead, the

8    question in any case, megafund or no, is whether the proposed award "is proper and fair in light

9    of the amount and quality of the work done by the attorneys." *In re TFT-LCD (Flat Panel)*

10   *Antitrust Litig.*, No. 07-cv-1827, 2013 WL 1365900, at *8 (N.D. Cal. Apr. 3, 2013) (awarding

11   28.6% of $1.08 billion fund and rejecting objectors' argument to "reduce the award or use a

12   sliding scale model . . . to avoid a windfall for the attorneys").

13         Frankfother and Flanagan argue that *In re Washington Public Power Supply System*

14   *Securities Litigation*, 19 F.3d 1291 (9th Cir. 1994), controls here. But the lesson of *WPPSS* is

15   simply that a district court must consider "all the circumstances of the case" when settling on a

16   reasonable fee. *Id.* at 1297-98. That's consistent with other Ninth Circuit precedent establishing

17   that "mechanical" application of any fee calculation method may be an abuse of discretion. *In re*

18   *Online DVD-Rental*, 779 F.3d at 949. Class Counsel does not ask for a mechanical fee

19   calculation, but a specific fee based on the circumstances of this case. (Dkt. 499.) Beyond that

20   basic teaching, *WPPSS* does not set forth a rule specific to so-called megafunds.

21         Next, Frankfother's and Flanagan argue that the fee award should be based on a lodestar,

22   rather than a percentage-of-the-fund analysis. (Dkt. 504 at 11-13.) Class Counsel's fee petition

23   and accompanying declaration of Professor Fitzpatrick discuss in depth why the percentage-of-

24   the-fund method should prevail here. Frankfother and Flanagan do raise one point worth

25   discussing, however: Objectors contend that a lodestar analysis is preferable because it would

26   have been required had the case gone to trial, so to use a percentage analysis here gives Class

27   Counsel a windfall. (Dkt 504 at 11-12.) But Frankfother's and Flanagan's legal premise is

28   incorrect. It is true that BIPA contains a fee-shifting provision. But a fee shifting provision does

1  not limit a court's equitable power to award fees from a common fund. *See Staton v. Boeing Co.*,

2  327 F.3d 938, 968 (9th Cir. 2003). As the Supreme Court has held, fee shifting statutes do not

3  "interfer[e] with the historic power of equity to permit the trustee of a fund or property, or a party

4  preserving or recovering a fund for the benefit of others in addition to himself, to recover his

5  costs, including his attorneys' fees, from the fund or property itself or directly from the other

6  parties enjoying the benefit." *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 257

7  (1975). And, under Illinois law, the existence of a statutory fee-shifting provision is not intended

8  to curtail a court's ability to compensate counsel or to foreclose consideration of a percentage-

9  based contingent fee. *See Young v. Alden Gardens of Waterford, LLC*, 2015 IL App (1st) 131887,

10  ¶ 100; *Berlak v. Villa Scalabrini Home for the Aged, Inc.*, 284 Ill. App. 3d 231, 241 (1996). Thus,

11  it is simply not true that this was necessarily a "fee shifting" case before it settled.

12        Frankfother and Flanagan raise some other arguments, questioning the inclusion some of

13  the hours in Class Counsel's lodestar calculation and the total multiplier. These assertions can be

14  dealt with quickly as they wholly ignore the evidence submitted in support of the fee award. As to

15  the multiplier, as Professor Rubenstein opined, Class Counsel worked extremely efficiently to

16  achieve the result here, and the success achieved amply supports the requested multiplier of 5.31.

17  (*See* Dkt. 499-3 ¶¶ 25-54.) Frankfother's and Flanagan's argument that the Court should exclude

18  all hours related to Class Counsel's legislative efforts to protect BIPA from being gutted by

19  amendment ignores the realities of modern litigation. (*See* Dkt. 499 at 15.) Defending a novel

20  large statutory class action today includes a budget for legislative efforts to change the law and

21  escape liability; Class Counsel must meet those actions which as part of their obligations in

22  litigating such a case. Frankfother and Flanagan also claim that any lodestar calculation should

23  exclude all hours attributable to Class Counsel's paralegals and other litigation support team

24  members (or at a minimum it is their hourly wages that should be charged). But the inclusion of

25  time from those involved in such necessary parts of litigation is routine and the rates charged are

26  in-line with what comparable defense firms charge their clients.

27  **IX.   CONCLUSION**

28        The Court should grant final approval to the Settlement and overrule the objections.

1

2    DATED: December 14, 2020            Respectfully submitted,

3

4                                 /s/ Jay Edelson

5                                 EDELSON PC
                                     JAY EDELSON*

6                                 BENJAMIN RICHMAN*
                                 ALEXANDER G. TIEVSKY*

7                                 350 North LaSalle Street, 14th Floor
                                 Chicago, IL 60654

8                                 Telephone: 312/589-6370
                                 312/589-6378 (fax)

9                                 EDELSON PC
                                 RAFEY BALABANIAN

10                               J. AARON LAWSON
                                 LILY HOUGH

11                                 123 Townsend Street, Suite 100
                                 San Francisco, CA 94107

12                                 Telephone: 415/212-9300
                                 415/373-9435 (fax)

13                               ROBBINS GELLER RUDMAN

14                                   & DOWD LLP
                                 PAUL J. GELLER

15                               STUART A. DAVIDSON
                                 CHRISTOPHER C. GOLD

16                               120 East Palmetto Park Road, Suite 500
                                 Boca Raton, FL 33432

17                               Telephone: 561/750-3000
                                 561/750-3364 (fax)

18

19                               ROBBINS GELLER RUDMAN
                                 & DOWD LLP

20                               PATRICK J. COUGHLIN
                                 ELLEN GUSIKOFF STEWART

21                               LUCAS F. OLTS
                                 RANDI D. BANDMAN

22                               655 West Broadway, Suite 1900
                                 San Diego, CA 92101

23                               Telephone: 619/231-1058
                                 619/231-7423 (fax)

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS
JOHN H. GEORGE
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)

LABATON SUCHAROW LLP
MICHAEL P. CANTY*
CORBAN S. RHODES*
140 Broadway
New York, NY 10005
Telephone: 212/907-0700
212/818-0477 (fax)


*Attorneys for Plaintiffs*

\* *appearance pro hac vice*

1

## <u>CERTIFICATE OF SERVICE</u>

2

      I hereby certify that on December 14, 2020, I served the above and foregoing Notice of

3

Amended Motion and Memorandum of Law in Support of Plaintiffs' Motion for Final Approval

4

of a Class Action Settlement by causing true and accurate copies of such paper to be filed with

5

the Court's CM/ECF system, which will send e-mail notification of such filing to counsel for all

6

parties. Although they are not parties, I have also caused a copy of the foregoing to be emailed

7

to Objectors Kara Ross (through her counsel) and Kevin C. Williams, at the email addresses

8

they provided on their objections.

9

                             <u>s/ Jay Edelson</u>

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28