Kendrick Jan, SBN 105149
Kendrick Jan, APC
402 West Broadway, Suite 1520
San Diego, CA 92101
Telephone:  (619) 607-9750
kj@jan-law.com

John J. Pentz, Esq., Mass. Bar No. 561907
19 Widow Rites Lane
Sudbury, MA 01776
Telephone: (978) 261-5725
jjpentz3@gmail.com
(*pro hac vice pending*)

Counsel for Objectors Frankfother and Flanagan

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK BIOMETRIC INFORMATION PRIVACY LITIGATION _____ This Document Relates to: ALL ACTIONS _____ | ) ) ) ) ) ) ) ) ) ) ) ) |

Master File No. 3:15-cv-3747-JD

CLASS ACTION

OBJECTORS' OPPOSITION TO
PLAINTIFFS' MOTION FOR
FINAL APPROVAL OF
CLASS ACTION SETTLEMENT

      Objectors Dawn Frankfother and Cathy Flanagan ("Objectors") hereby oppose

Plaintiffs' Motion for Final Approval of Class Action Settlement ("Final Approval

Motion") filed on December 14, 2020.[1]

---

[1] Pursuant to the docket, responses to the Final Approval Motion are due by December 28, 2020.

## INTRODUCTION

Plaintiffs grossly understate Class size. This serves to artificially inflate both the percentage of recovery and the claims rate.  Further, the proposed settlement fails to satisfy the governing Seventh Circuit quantitative standard for adequacy of a proposed settlement, and Plaintiffs' Final Approval Motion must therefore be denied.  As well, Seventh Circuit law applies to the reasonableness of Class Counsel's attorney's fees.

## ARGUMENT

**1.     Class Counsel misrepresents the Class size.**

In their Final Approval Motion, Class Counsel make three conflicting representations regarding Class size, and these conflict with earlier Class size representations, [2] of which the estimates of 9.4 and 12.3 million seem the most reliable.[3] At the June 4, 2020 hearing, Class Counsel represented to the Court that maximum damages were $47 billion; this figure is the product of $5,000 maximum statutory damages multiplied by 9.4 million Class members.  Class Counsel provides no explanation for how the class size dropped by 2.6 million in six months.  As well, the latest declaration from the Claims Administrator states that over 15.3 million emails were sent to 12.34 million distinct accounts, and that almost 10.3 million of these were successfully delivered.  These

---

[2] See ECF 517, p.9, l. 20-21 ("more than 1.5 million Class members have submitted claims, around 22% of the Class" yielding a denominator of approximately 6.8 million), p. 25, l. 11 ("it's about 7 million"), p. 12, l. 16 and p. 13, l. 5, ("12,340,049 accounts"), and ECF 460, p. 10, l. 7-9 (maximum possible recovery of "$47 billion," which would require 9.4 million Class members).

[3] The only exact numbers provided by Class Counsel are the "12,340,049 accounts" and the "[maximum recovery of] $47 billion."  Assuming the number of accounts reflects the number of Class Members and $47 billion is calculated using a maximum of $5,000 per member, the accurate number of Class Members is between 9.4-12.34 million.

figures are clearly inconsistent with a Class size of only 6.8 million.[4]  Having obtained preliminary approval based upon a representation that the Class size is at least 9.4 million, Plantiffs are estopped from arguing for a lower number now.

One need only look to Plaintiffs' Motion for Class Certification to see that the Class size must be vastly greater than 6.8 million members.  In that motion, Plaintiffs cite to data showing that Facebook had 6.9 million Illinois subscribers in 2011.  That number has only grown over the past nine years, as Facebook use has continued to surge in general terms, with hundreds of thousands of Illinoisans having turned 18 and become eligible to open accounts, and approximately 2 million people having moved to Illinois since 2011.  See September 25, 2019 Chicago Tribune Article (*There's a lot of talk about an "Illinois exodus"*) attached as Exhibit A.

Considering the likely class size of 12.3 million,[5] the 1.5 million claims represent a claims rate of 12%, not 22%.[6]  Regardless, Objectors believe the difference between a

---

[4] Plaintiffs go so far as to accuse the Objectors of misleading the Court with "false" premises, when Objectors are simply using figures Plaintiffs previously presented to the Court.

[5] Some Facebook accounts are shared (e.g. a wife and husband, a parent and child, etc.), and because BIPA does not limit its provisions to primary account holders, 740 ILCS 14/20 ("Any person aggrieved by a violation of this Act shall have a right of action…".), more than one individual per account might be regarded as an aggrieved person under BIPA. This would substantially increase the number of Class members, and further reduce the actual claim rate.

[6] In his Second Expert Declaration, Professor Rubenstein describes "Notably, even at the class members' likely recovery here of $200-$400, the 22% claims rate is still nearly twice the 12.2%/12.9 rates associated with recoveries at that level."  ECF 511-2, p. 8.  If, however, the Class size is equivalent to the 12.34 million Facebook accounts twice referenced by Class Counsel, the claims rate is slightly less than the cited rates for the $200-$400 recovery range.

12% and 22% claims rate is insignificant in a case in which this Court encouraged the parties to aspire to a claims rate of over 90%.

**2.      The proposed settlement is not fair and reasonable.**

In considering the reasonableness of the proposed settlement, knowledge of Class size is fundamental, not merely academic.  Under Seventh Circuit law, which governs this matter filed in Illinois and removed to the Northern District of Illinois – *see Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964) (transferee federal courts are bound to apply the law that the transferor court would have applied) – a court must engage in a mathematical comparison of a proposed settlement to the expected recovery from continued litigation before approving a settlement.

In Illinois, a judge must "quantify the net expected value of continued litigation to the class, since a settlement for less than that value would not be adequate.  Determining that value would require estimating the range of possible outcomes and ascribing a probability to each point on the range."  *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 284-285 (7th Cir. 2002).

> Some arbitrary figures will indicate the nature of the analysis that we are envisaging.  Suppose a high recovery were estimated at $5 billion, medium at $200 million, low at $10 million.  Suppose the midpoint of the percentage estimates for the probability of victory at trial was .5 percent for the high, 20 percent for the medium, and 30 percent for the low… Then the net expected value of the litigation, before discounting, would be $68 million… [O]ur point is that the judge made no effort to translate his intuitions about the strength of the plaintiffs' case, the range of possible damages, and the likely duration of the litigation if it was not settled now into numbers that would permit a responsible evaluation of the reasonableness of the settlement.

*Id*. at 285.

Considering the foregoing, ascertaining Class size with some precision is clearly necessary.  In order to perform the required evaluation of the proposed settlement, this Court must first determine what the maximum and minimum aggregate damages are, and, in this statutory damages case, that is an arithmetic exercise involving the number of class members and the maximum and minimum statutory damages.  Class Counsel have already informed the Court the maximum recovery in this case is $47 billion, which establishes a minimum recovery of $9.4 billion.

The Court must then determine a reasonable percentage of likelihood the Class will prevail at trial for each level of damages and multiply recoverable damages by that percentage.  The sum of those products establishes an acceptable floor for settlement of Class claims.

At the high end, Class Counsel have expressed concern about evidence suggesting Facebook might be able to prove its BIPA violations were made without knowledge of their illegality.  In consideration of these defenses, Objectors assign a probability of only 1% that Plaintiffs would prevail at trial on the issue of Facebook's scienter, yielding a case value for this outcome of $470 million.

At the low end of recovery, the statutory damages total $9.4 billion.  While Facebook retains some defenses to even these negligence claims, a conservative estimate of Plaintiffs' chances of prevailing on their BIPA negligence claims is 15%.  This means, according to the *Reynolds* formula, this case has a settlement value of at least $1.41 billion on the low end of recovery, for a total litigation value of $1.88 billion (($47,000,000,000

x 0.01) + ($9,400,000,000 x 0.15) = $1,880,000,000).[7]   According to Seventh Circuit standards, unless Facebook is willing to pay at least $1.88 billion to settle this matter, the value of continued litigation outweighs the value of an early settlement.

The potential damages in this case are so great that even a very modest likelihood of recovery at trial demands a settlement substantially greater than the one Facebook and Class Counsel present for this Court's approval.   Objectors believe the percentage likelihood of prevailing at trial exceeds the 15% discussed above, but even that number illustrates the proposed settlement is 33% of what it should reasonably be.   If the real probability of recovering $9.4 billion at trial is closer to 50%, then a settlement must be closer to $5 billion to pass muster under governing Seventh Circuit law.[8]

3.     **Class Counsel's Fee Request Is Governed by the Law of the Seventh Circuit, not the Ninth Circuit, and a Market Rate Fee is Close to 10%.**

As a transferee district under 28 U.S.C. §1404(a), this Court is bound to apply the law of the transferor court, in this case the law of the Seventh Circuit.   *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964) (transferee federal courts are bound to apply the law that the transferor court would

---

[7] If the Class size were only 7 million members, the *Reynolds* calculation yields a litigation value of $1,400,000,000 ((7,000,000 x $5,000 x 0.01) + (7,000,000 x $1,000 x 0.15) = $1,400,000).   Even using Class Counsel's unrealistic Class size number, the proposed settlement is still too little.

[8] Objectors acknowledge, as in their earlier Objection, that a verdict in the amount of $9.4 billion may have to be adjusted under the principles outlined in *Parker v. Time Warner Entm't Co. LP*, 331 F.3d 13, 22 (2nd Cir. 2003), but that reduction would be to a number that is commensurate with Facebook's wrongdoing and not punitive in nature.   The due process objection is not a defense, it is simply a requirement that a court reduce a verdict to the largest number that is no longer punitive.   Objectors do not believe a court would reduce an eventual verdict to a number less than $5 billion, in light of the clear intent of the Illinois legislature in enacting BIPA, as well as the $5 billion settlement recently secured by the FTC.

have applied); *Muldoon v. Tropitone Furniture Co.*, 1 F.3d 964 (9th Cir. 1993) (following *Van Dusen* and applying Illinois law to case pending in the Central District of California).

In Illinois, Class Counsel are limited to a market rate attorney's fee, which the Seventh Circuit sets by determining what the parties would have agreed to before the case was filed, including through consideration of actual fee agreements negotiated in similar cases. *See In re Synthroid Mktg. Litig.*, 264 F.3d 712, 720 (7th Cir. 2001) (courts should look to fee agreements in securities suits where large investors have hired counsel up front). In *Synthroid*, the Seventh Circuit ultimately dictated a declining fee scale to apply in that $88 million settlement, and expressly capped fees at 15% for all recoveries over $46 million. *See In re Synthroid Mktg. Litig.*, 325 F. 3d 974, 980 (7th Cir. 2003). It can be reasonably assumed, had the recovery in *Synthroid* been substantially greater, the marginal fee rate set by the Seventh Circuit would have continued to decline, to, for example, 10% of amounts over $100 million, and 5% of amounts over $500 million.

For a settlement of the size here proposed, the best evidence of the market rate fee – *i.e.* the fee that would have been negotiated by sophisticated parties before the case was filed – is the actual fee agreement entered into by the Mississippi Public Employee Retirement System ("MPERS") cited in *Bernstein v. Bernstein Litowitz Berger & Grossman LLP*, 2016 U.S. Dist. LEXIS 35385 (SDNY Jan. 12, 2016); SDNY No. 1:14-cv-06867, Document 30-9. *A* copy of the Bernstein Litowitz Retainer Agreement with the State of Mississippi containing a graduated megafund fee scale is attached hereto as *Exhibit B*. While the MPERS/Bernstein agreement incorporates a higher fee scale for a case that has proceeded to more advanced stages of litigation, it also incorporates a declining fee scale for higher bands of recovery. For example, on amounts recovered between $200 million and $500 million, in a case that is ready for trial like this one, the MPERS/Bernstein retainer calls for a fee of 8%. In the instant case, application of the MPERS/Bernstein fee schedule would produce a total fee of $57.5 million, based on the $550 million for which Class

Counsel take credit, almost exactly the 10.45% market rate found in the Fitzpatrick fee study.  This fee agreement disproves Fitzpatrick's assertion that most fee agreements have a graduated fee scale that goes up as the amount of the recovery goes up.  Both the MPERS agreement, and the Seventh Circuit, require the opposite – the percentage fee must decline as the amount of recovery goes up.

## **<u>CONCLUSION</u>**

For the foregoing reasons, this Court should deny approval to the Final Approval Motion and any fee request of more than the market rate of 10% of $550 million.

Respectfully submitted,
Dawn Frankfother and Cathy Flanagan
by their attorneys,

*<u>s/ Kendrick Jan</u>*
Kendrick Jan, APC
402 West Broadway, Suite 1520
San Diego, CA 92101
Tel: (619) 231-7702
kj@jan-law.com

John J. Pentz, Esq., *pro hac vice pending*
19 Widow Rites Lane
Sudbury, MA 01776
Phone: (978) 261-5725
jjpentz3@gmail.com

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was filed with the Clerk of Court using CM/ECF on December 17, 2020, and as a result has been served on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.


By: _s/ Kendrick Jan_

EXHIBIT A

There's a lot of talk about an 'Illinois exodus.' We took a closer look at the reality behind the chatter.

ADVERTISEMENT

NEWS

# There's a lot of talk about an 'Illinois exodus.' We took a closer look at the reality behind the chatter.

FEEDBACK

By CECILIA REYES and PATRICK M. O'CONNELL
CHICAGO TRIBUNE  |  SEP 25, 2019

  

EXHIBIT A



FEEDBACK

Armani Martin outside her father's home in the East Chatham neighborhood on Saturday, Aug. 31, 2019. (Camille Fine / Chicago Tribune)

Perhaps you've seen the memes, the ones that poke fun at Illinois and encourage thoughts of moving away. In one, a marijuana plant appears alongside the message, "Illinois: We'll keep you as high as our taxes."

An "Escaping Illinois" Facebook group has more than 39,000 followers. One man even wrote a song called "Goodbye Illinois," lamenting the state's taxes and political corruption and expressing his desire to leave.

ADVERTISEMENT

EXHIBIT A

12/16/2020 These Rockford jokes about Illinois residents who took a closer look at the really bad population trends of... - Chicago Tribune

Case: 1:15-cv-08347-JD Document 518 Filed 12/17/20 Page 13 of 42



ADVERTISEMENT

FEEDBACK

Memes, however, can't capture the complexity of population trends for an entire state or region.

The state has been struggling to keep residents for decades, with more people leaving than arriving since at least 1970. But it's only in the last few years that the state's population and that of **its largest and most important economic engine, Chicago, have slipped**.

During that time, the gap between the number of people leaving the state and those arriving has widened. Those losses were formerly offset by gains from international migration and births, but these numbers have also decreased recently. As a result, the overall state population began to fall in 2014.

[Chicago slips in population but is still third-largest city in U.S. — for now »](#)

Other neighboring Midwestern states — Wisconsin, Iowa, Indiana, Michigan, Missouri — also have had a difficult time both keeping existing residents and

EXHIBIT A

attracting new ones. But all of those states have experienced population growth for most of this decade, though the numbers are small. Not Illinois.

ADVERTISEMENT



FEEDBACK

To better understand the trend, the Tribune gathered and analyzed years of census data, interviewed demographers and spoke with people who have decided to move. Here is some of what we discovered.

## More people are moving out. Fewer are moving in.

For decades, more people have left Illinois than have moved into the state. And that gap, which demographers call net migration, is getting worse.

In 2018, the state had an estimated net migration loss of 6.5 people for every 1,000 residents, according to the most recent census data. Five years earlier, the net loss was about 3 people per 1,000 residents.

The latest number puts Illinois 49th out of the nation's 50 states on net migration loss. Only Alaska had a worse rate, with a loss of 11 people per 1,000 residents.

EXHIBIT A

# ILLINOIS NOT KEEPING UP WITH ITS NEIGHBORS

Illinois has long had a negative net migration rate, meaning that in a given year more residents moved out than moved in. Other nearby states have had positive net migration in recent years. Illinois' numbers are similar to New York.

SECTIONS    ONLY $1 FOR 4 MONTHS  SALE ENDS 1/4    LOG IN

WATCH LIVE: GOV. PRITZKER GIVES COVID-19 UPDATE



Indiana: +1.9
Wisconsin: +1.2
Iowa: +0.9
Missouri: +0.9
Michigan: +0.5

New York: -5.6
**Illinois: -6.5**

FEEDBACK

Source: U.S. Census Bureau American Community Survey estimates
(Kyle Bentle / Chicago Tribune)

Interestingly, if you look only at the rate of people leaving one state for another, Illinois doesn't particularly stand out. Illinois ranked No. 21 — near the middle of the pack — on the rate of domestic out-migration in 2017, the most recent year for which those estimates are available.

Where Illinois really lags, the data shows, is in attracting new residents. In 2017, Illinois' rate of in-migration was third-to-last nationally, even when factoring in people who moved to Illinois from other countries.

EXHIBIT A

Census data shows that since 2013, in-migration has been decreasing in Illinois with out-migration mostly rising.

In 2017, an estimated 266,000 people reported they had moved to Illinois in the last year, which is 9% fewer than the 292,000 estimated arrivals in 2013. The number of people who arrived from other states rather than from abroad declined even more steeply, from more than 223,000 to about 195,000.

## MORE PEOPLE MOVING OUT, FEWER MOVING IN



Note: Numbers do not include people moving from foreign countries, Puerto Rico or other U.S. island territories.
Source: U.S. Census Bureau American Community Survey estimates
(Kyle Bentle / Chicago Tribune)

Combine migration losses **with an aging population**, declining birth rates and stagnated international migration, and the result is decreased population.

In 2014, Illinois' overall population decreased for the first time in nearly two decades, and it has continued to fall since, amounting to a 0.8% decrease from 2010 levels or a loss of 99,682 people.

EXHIBIT A

12/16/2020                    These leavers met an Illinois census trend: took a closer look at the reality behind the matter. - Chicago Tribune

Case: 1:15-cv-08847-JD    Document 518    Filed: 12/17/20    Page 17 of 42

ADVERTISEMENT

**Population decline is also happening in more parts of the state**. From 1990 to 2000, 68 of Illinois' 102 counties gained population. But so far this decade, only nine counties, including Kane, Will and DuPage in the Chicago area, have added residents.

Of about 339,000 people who reported moving from Illinois to another state in 2017 — roughly 3% of the state's population — most had been living in Cook County or one of its suburban counties. That makes sense, given that these areas are more populous than other parts of the state.

But counties with the highest rates of migration to other states tended to be in other parts of Illinois.

[Chicago area drops population for fourth straight year, census data show; Cook, DuPage and Lake counties also decline »](#)

Along the Mississippi River in western Illinois, Hancock County had a loss of about 47 people per 1,000 residents, one of the highest rates in the state, according to the latest census estimates. Other counties with high loss rates include Jackson County, which is home to Carbondale, and Jersey County, north of St. Louis.

Cook County, by comparison, had an estimated 26 people per 1,000 residents leave the state.

EXHIBIT A

FEEDBACK

When the Tribune looked at the demographics of people who moved out of state from the Chicago area — Cook, DuPage, Kane, Lake, McHenry and Will counties — it found the income and racial breakdowns for this group generally mirrored the patterns of the overall population in the area. Most of the movers made $50,000 or less in income, and most were white non-Hispanic, according to census survey data collected from 2013 to 2017.

Those who left the area were more likely to be young; the largest group, 28%, were in their 20s when they moved away. Census data shows that people of this age have the highest moving rate nationally.

People moving from the region to neighboring states tended to earn a bit less and have fewer years of schooling than those who moved farther away, the data shows. Those moving to non-neighboring states also skewed a bit older.

Of the black residents who moved out of Cook County, 85% stayed in Illinois, compared with 77% of white residents leaving Cook.

## The destination? Often, it's Indiana.

For more than a decade, the top destination for Illinoisans leaving the state has been Indiana, except for a couple of years when Wisconsin came out ahead.

In 2017, Indiana drew nearly 9% of the Illinois residents who moved out of state. Florida, California, Wisconsin and Texas were among the top destinations as well.

### NEW RESIDENTS, DEPARTING RESIDENTS

For people leaving Illinois, Midwestern and Southern states are common destinations. Please note: These numbers are estimates, and for states with small migration numbers, such as the Dakotas, the margin of error can be large.

**Migration to and from Illinois between 2016 and 2017**

*People moved to Illinois from...*

EXHIBIT A

FEEDBACK

These 5 stats on Illinois' census reveal a closer look at a drearily familiar heritage loss of of



**People moved from Illinois to...**

**FEEDBACK**

| State | Moved from | Moved to |
|---|---|---|
| Indiana | 16,998 | 29,526 |
| Wisconsin | 12,274 | 26,963 |
| Missouri | 16,147 | 22,767 |
| Michigan | 10,793 | 13,913 |
| Iowa | 8,837 | 12,997 |
| Ohio | 6,736 | 9,676 |

EXHIBIT A

| | | |
|---|---|---|
| Ohio | 6,756 | 9,676 |
| Minnesota | 5,286 | 7,297 |
| Kansas | 1,212 | 2,840 |
| Nebraska | 2,290 | 1,615 |
| North Dakota | 576 | 302 |
| South Dakota | 686 | 177 |

Note: Numbers do not include people moving from foreign countries,
Puerto Rico or other U.S. island territories.
Source: U.S. Census Bureau American Community Survey estimates
(Kyle Bentle / Chicago Tribune)

Indiana was an especially strong magnet for black Illinoisans. The Tribune's analysis of census data found black Illinois residents who moved out of state in recent years were twice as likely to end up in Indiana than white residents who left the state.

Speros Batistatos, president and CEO of the South Shore Convention and Visitors Authority in Indiana, said people moving into northwest Indiana tend to fall into two buckets: young couples with children under 5 — who like to move into a new school district before their kids begin kindergarten — and empty nesters.

"I just think that people are looking at value and the amount of money and time they can save and also the quality of life," Batistatos said. When you factor in property taxes, income taxes, cheaper gasoline and other fees, "All of a sudden, you're talking real money."

Carla Thacker moved across the border from Chicago to northwest Indiana over Memorial Day weekend. Thacker, deputy director of guest services at the Museum of Science and Industry, said she and her partner, Liz Villalobos, were looking for a bigger place with a yard, room for a garden and off-street parking.

EXHIBIT A

FEEDBACK

Case: 3:15-cv-08747-JD Document 518 Filed 12/17/20 Page 21 of 42

ADVERTISEMENT

FEEDBACK

EXHIBIT A

Liz Villalobos, left, and Carla Thacker hang out on the back deck of their Munster, Indiana, home following work on Wednesday, Aug. 7, 2019. The couple previously lived in Chicago's Pilsen neighborhood. (Chris Sweda / Chicago Tribune)

And with Villalobos' family already in Munster, Indiana, the destination was basically a no-brainer.

ADVERTISEMENT

FEEDBACK

"It would have been great to be able to buy a home in Chicago, but that was just financially impossible," said Thacker, 34. Their former coach house in Pilsen cost about $1,700 a month, she said, and while they are paying slightly more now, they are getting significantly more room and property for their money.

Batistatos said that despite the state border, people moving into northwest Indiana are still part of Chicagoland: same television stations, same time zone, similar commuting times, same sports teams and access to cultural amenities.

Census data on commuter flows indicates that roughly a fourth of all employed people who live in Lake County, Indiana, work in Illinois. So even though people like Thacker may be trading driver's licenses and voting places, they often remain connected to Chicago.

Incidentally, though Lake County is often portrayed as a beneficiary of Illinois' woes, the county has actually been losing population recently as well. The decreases are small, but Lake has been shrinking since 2010.

EXHIBIT A

And although about twice as many people moved from Illinois to Indiana in 2017 than the other way around, the percentage of Indiana residents who left for Illinois is about the same as the percentage of Illinois residents who moved to Indiana — 0.25% and 0.23%, respectively.

After only a few weeks in Indiana, Thacker said the move had been everything that she hoped. The couple already had a new network of friends and were enjoying the spaciousness of their three-bedroom, 2.5-bathroom ranch house, which has a two-car garage, a deck and a yard.

Although Thacker's commute to the museum has tripled compared with the trip from Pilsen, the trade-offs are worth it, she said. Plus, most of the time the traffic along her route from Indiana is moving, an upgrade from the gridlock she sometimes endured in Chicago.

FEEDBACK

"It's the best," Thacker said of her new home. Toward the end of their time in the city, Thacker said she found herself thinking, as she searched for street parking: "This is the last straw. I can't do it anymore."

EXHIBIT A

FEEDBACK

Carla Thacker, left, and Liz Villalobos in front of their home in Munster, Indiana, on Wednesday, Aug. 7, 2019. "It's the best," Thacker said. (Chris Sweda / Chicago Tribune)

## Black Chicago has been losing population.

Like Illinois, Chicago has lost population in the past few years, shrinking by about 20,200 residents since 2015.

But the city's black population has shrunk much more. Over the same time period, Chicago had a loss of about 35,600 black residents. Meanwhile, the number of white, Asian and Latino residents all grew.

EXHIBIT A

This means that Chicago's population losses are more intense in predominantly black parts of the city. Englewood and its surrounding neighborhoods have been particularly hard hit, with a loss of more than 56,400 residents combined since 2010, census data shows.

Although it's not clear whether migration alone is driving this loss, it is a factor. The trend is often described as "reverse migration," as black residents begin to return to Southern states decades after their ancestors flocked to northern destinations during the Great Migration.

Born and raised in Chicago, growing up mostly in Woodlawn, Armani Martin said she and her peers began to feel a sense of hopelessness as they grew older. That feeling ultimately pushed her to start her adult life elsewhere.

When preparing for college, Martin looked for options outside of Chicago. She said she chose Atlanta because there would be opportunities for young black women, and after starting at Clark Atlanta University she decided to stay.

"Living here is living without stress," said Martin, 25.

Martin left school during her junior year to work in the news industry, then started a music video production company. She bought a house at 22 and recently moved to Los Angeles after seven years in Georgia.

And yet, Martin says Chicago still feels like home and she would like to come back.

"I don't want to start a family anywhere else but Chicago," she said, "but until things change, I don't want to be one of those mothers crying on the news because my son was just murdered because the government of Illinois won't get their stuff together."

Census estimates from 2013 to 2017 indicate that the Atlanta metro area was the second most popular urban destination among black residents who left Illinois. (Oddly, the Chicago metro area is at the top of the list, because the census considers some bits of Indiana and Wisconsin to be part of the Chicago region.)

EXHIBIT A

12/16/2020 These 5 black families talk about Illinois exodus. We took a closer look at the really big migration out of Chicago Tribune

Case: 3:15-cv-08747-JD Document 518 Filed 12/17/20 Page 26 of 42

FEEDBACK

Armani Martin plays with family dog Cannan in her father's home in the East Chatham neighborhood Saturday, Aug. 31, 2019. (Camille Fine / Chicago Tribune)

The next biggest draws for black residents were the St. Louis, Indianapolis and Houston metro areas.

For white people who moved out of Illinois, the Chicago metro area came second after St. Louis, followed by Phoenix, Minneapolis and Denver.

Some parts of Cook County **have seen growth in their black population**. According to census survey data from 2013 through 2017, the largest increases in Cook County were seen in south suburban Matteson and a five-block stretch of

EXHIBIT A

Chicago in the Woodlawn neighborhood just west of the Metra tracks. In both areas, black residents made up at least 89% of the population.

[Chicago-area counties grow older and less white, new census data shows »](#)

## Why do people move away? Lots of reasons.

Illinois' reputation as a "high tax state" tends to have a life of its own online. "So glad I got away from that awful state when I did," one woman posted.

One Illinois meme features the characters from the movie "Office Space" gathered in a field to batter a copy machine. The characters represent gas, property and income taxes, and the copier is Illinois residents.

Homer Glen resident Bob Raudys even wrote a song titled "Goodbye Illinois." It's posted online.

"Well, they're taxing this and they're taxing that, pretty soon there ain't nothin' left," Raudys sings as he strums a guitar. "Pension fund is so well run, worst in the nation: well done! I'd really like to stay, but I just can't pay and pay."

Raudys, who grew up in Chicago and now runs his own printing and marketing company, said he recorded the song last fall, right after receiving his property tax bill. He said he pays $9,300 per year and he's bracing for more in the future. "There's no relief!" he said.

"I swear to God, it feels like I'm living in a socialist state," said Raudys, 59. He said he and his wife have been shopping for properties across the border in Indiana. "We've made up our minds. We're going."

Are taxes the main reason people are leaving Illinois? Census data can't answer that exact question, though it does provide some clues.

EXHIBIT A

FEEDBACK

ADVERTISEMENT

The Census Bureau conducts a survey every month that includes questions about why a person changed residences in the previous year. The survey offers a range of possible answers, from foreclosure/eviction to change of climate to "wanted better neighborhood/less crime."

FEEDBACK

Taxes is not on the list of possible answers, though experts said the "wanted cheaper housing" category might capture people concerned about high taxes.

Since 2008, the most common reason for moving cited by people who left Illinois was a new job or job transfer, which accounted for nearly one in three moves. That was also the top reason given by people who moved out of any state in the nation.

In second and third place both for Illinois and the U.S. were two grab-bag answers: "other family reason" and "other housing reason."

Christine Percheski, an associate professor of sociology at Northwestern University who studies changes in U.S. family life and has analyzed census reports, surveys and other demographic research, said some people certainly move because of taxes or crime rates.

But the biggest reasons people usually give for moving, Percheski said, are jobs (or shorter commutes), schools and to be closer to family. People also seek out available housing that fits their needs, she said, whether that is more space for a growing family, a smaller place because children are grown, or a more affordable option.

EXHIBIT A

"Population decline for a city as big as Chicago or a county as large as Cook County is probably not driven by small changes in taxes or crime rates," Percheski said.

Some demographers say people who move farther away from the Midwest often leave for different reasons than those who relocate nearby.

"Most of the people are coming here for employment opportunities," said Texas state demographer Lloyd Potter, who examined data on Texas residents who said they had been living in a different state a year earlier.

He said people who moved in from other states tended to be more likely than other residents of Texas to be employed and to have higher levels of educational attainment and higher levels of income. Texas "seems to be attracting a higher skilled, higher-paying type" of job seeker, Potter said.

FEEDBACK

EXHIBIT A

12/16/2020 These 5 left, or are about Illinois residents who took a closer look at leaving behind our state. - Chicago Tribune

Case: 1:15-cv-08347-JD Document 518 Filed 12/17/20 Page 30 of 42

FEEDBACK

Bob Raudys, who wrote a song titled "Goodbye Illinois," performs at Montrose Beach in Chicago on Wednesday Aug. 14, 2019. (Armando L. Sanchez / Chicago Tribune)

Marisa Wilson grew up in the South Deering neighborhood on Chicago's Far South Side, left to attend college at the University of Notre Dame, then returned to the city to start her career. But in 2014, with her two sons growing older, she decided it was time for a change.

Wilson, her husband and their boys, ages 12 and 10, moved from Hyde Park to Indiana in 2014, just as their youngest son was preparing to enter kindergarten.

EXHIBIT A

The move surprised even Wilson — "I never thought I'd end up living anywhere else" — but a confluence of factors made it the correct decision for her family.

"In a way, I feel like it's a familiar story," Wilson said. "We started thinking about our family's lifestyle and it just made a whole lot more sense to move out to the suburbs."

The deciding factor when considering where to move, Wilson said, was the schools. While living in the city, Wilson's sons were attending different schools, each several miles away from their home.

Now the boys attend school a few minutes away. Running errands is easier and faster, Wilson said. And the family has more space: a quad-level ranch with a backyard in Munster.

"I tell people we spent $3,000 more but got three times the amount of space (a four-bedroom home vs. a three-bedroom condo)," said Wilson, 49, who works at the Indiana University Northwest campus in Gary.

Wilson said that while the primary motivating factor for her move was the schools situation, "the state of Illinois finances" didn't help matters.

Her husband especially worried about the path the state was on, and Wilson said the state's budget impasse and financial situation could be felt in the quality of public schools and funding for Chicago Public Schools.

"That was definitely a factor," Wilson said. "The overall cost of living is cheaper here. There's a significant difference. ... We just felt like it wasn't going to get any better."

*This story was featured in our Daywatch newsletter.* **[Sign up here to start your day with our top stories.](#)**

*This story was featured in our smart speaker briefing.* **[Here's how to listen on your device.](#)**

EXHIBIT A

*creyes@chicagotribune.com*

*poconnell@chicagotribune.com*

---

## Cecilia Reyes

  

Cecilia Reyes is a reporter who uses data to uncover systemic abuses and bolster investigations. She's written about racial disparities in the pricing and waste of drinking water around Chicago, and is interested in housing and criminal justice. Born and raised in Mexico City, Reyes also worked as a fellow at ProPublica in New York.



## Patrick M. O'Connell

  

Patrick M. O'Connell is a Chicago Tribune reporter who covers a wide array of topics. A native of Des Plaines, he was a member of the team that earned honors for "The Water Drain" series and he covered the Cubs' 2016 World Series run. When not doing laundry for his family, he enjoys softball, hiking, trivia nights, craft beer and karaoke.

## 6 Outrageous Credit Cards If You Have Good Credit

**NERDWALLET** | SPONSORED

## If You Can Qualify for Any Credit Card, These Are the Top 6

**NERDWALLET** | SPONSORED

## Shop Now: The Best Selling Bombas Pack Is Here!

**BOMBAS SOCKS** | SPONSORED

Getting this Treasure is impossible! Prove us wrong

EXHIBIT A



Start saving for their college dreams with a 529 account

THE U. FUND MA 529 PLAN | SPONSORED

 **CHICAGO TRIBUNE**

Chance the Rapper and family decamp to suburban mansion while keeping Streeterville condo

 **CHICAGO TRIBUNE**

Englewood couple tortured to death a disabled man who paid them to help him, prosecutors say

By ROSEMARY SOBOL

**S** SUN SENTINEL

# COVID-19 data whistleblower could face up to 5 years in prison if charged with cybercrime

## Discover the advantages of a 529 account

THE U. FUND MA 529 PLAN | SPONSORED

# Throw Away Your Old Mask. Upgrade To The Only Mask With Over 6,500 Five Star Reviews Now

SPACE MASKS | SPONSORED

 **CHICAGO TRIBUNE**

Kris Bryant to the Dodgers, Nationals or Red Sox? Kyle Schwarber to the Yankees? A look at potential Chicago Cubs trade partners.

 **CHICAGO TRIBUNE**

Aurora man charged with first-degree murder

By MEGAN JONES

## You May Like

Sponsored Links by Taboola

**Michael Oher Tells A Whole Different Story About 'The Blind Side'**

Gameday News

**Remember Tiger Wood's Ex-wife? Try Not To Smile When You See Her Now**

SportPirate

**Challenge Your Brain With This Must-Play Strategy Game. No Install.**

Forge Of Empires

EXHIBIT A

**These Cars Are So Loaded It's Hard to Believe They're So Cheap**

Luxury SUVs | Search Ads

ADVERTISEMENT

**CONNECT**

   

**TRIBUNE PUBLISHING**

New York Daily News                          The Baltimore Sun

Orlando Sentinel                             Sun Sentinel of Fla.

The Morning Call of Pa.                      Hartford Courant

Daily Press of Va.                           The Virginian-Pilot

The Daily Meal                               BestReviews

**COMPANY INFO**

Careers                                      About us

Privacy Policy                               Terms of Service

Archives                                     Contact us

Coupons                                      Local print ads

Manage Web Notifications                     TAG disclosure

FAQ                                          Chicago Tribune Store

Media kit

Copyright © 2020, Chicago Tribune

EXHIBIT A

EXHIBIT B

# RETENTION AGREEMENT

**WHEREAS,** the Attorney General has determined that claims should be made against certain persons and/or legal entities which are now or have previously been known as Merck & Co., Inc. (referred to hereinafter as "Merck" or the "Company"), certain of Merck's officers, directors and control persons, (referred to collectively hereinafter as "Merck officers") and other persons and legal entities which may be discovered in due course (all prospective defendants are referred to collectively hereinafter as the "defendants"), and which have done damages to the lawful citizens of the State of Mississippi and/or are not paying lawful amounts to which the State is entitled (the "Claims") on account of, *inter alia,* making misrepresentations to investors in Merck common stock to defraud the State of Mississippi of monies owed; and

**WHEREAS,** the Attorney General has determined that the damages incurred by the State of Mississippi total in excess of $40 million, including applicable penalties, legal interest, attorneys' fees, and costs;

**WHEREAS,** the Attorney General has determined that the investigation, research, and litigation of the Claims will require the expenditure of large sums of money and require the work of numerous lawyers, paralegals, accountants, and secretaries who are familiar with the defendants and their tortious and/or otherwise wrongful actions and/or inactions, and related issues for an extended period of time; and

**WHEREAS,** the Attorney General has further determined that it is in the best interests of the State and its citizens that the State retain attorneys experienced in the prosecution of professional malpractice, tax and tort claims to pursue the Claims; and,

**WHEREAS,** the below listed Law Firm is experienced in securities litigation and has

EXHIBIT B

consented to represent the State of Mississippi, in association with the Attorney General, respecting the Claims and pursuant to the terms and conditions hereof.

**IT IS, ACCORDINGLY, AGREED** as follows:

1. The Office of the Attorney General hereby retains Bernstein Litowitz Berger & Grossmann LLP ("Law Firm"), and its principal members, Douglas McKeige and John P. Coffey, are hereby designated as Special Assistant Attorneys General to investigate, research and file the Claims in any appropriate Court or Courts or before any appropriate governmental agency.

2. The Attorney General does not relinquish his constitutional or statutory authority or responsibility through this Retention Agreement. The Attorney General has the sole authority to settle this litigation on behalf of the State of Mississippi and its citizens. The Law Firm shall consult with the Attorney General and obtain his approval on all material matters pertinent to these Claims and any litigation arising therefrom, and the Attorney General shall cooperate with the Law Firm and use his best efforts to secure the cooperation of other State agencies. Prior to initiating inquiries or demands to any persons or entities, the Attorney General and the Firm will agree upon entities to be contacted and/or claims to be pursued; the Firm will thereafter be entitled to its reasonable fees and expenses, as provided below, on any recovery from such agreed-upon entity or claims, discovered as a consequence of the Firm's inquiry/demand. The Attorney General is not required, however, to assign any members of his staff to pursue the Claims, but may from time to time afford staff and other support services as the Attorney General deems appropriate. The Attorney General shall designate a member(s) of his staff to monitor these Claims, and the Law Firm shall keep the Attorney General and his designated staff member(s) fully informed on all matters pertaining to the Claims.

3. The Attorney General and the Law Firm both recognize that the claims present

EXHIBIT B

numerous factual and legal obstacles, and that no assurance of success on the Claims has or can be made.

4.    The Attorney General shall maintain responsibility for the public distribution of information concerning this matter. All press inquiries shall be referred to the Attorney General for comment and response.

5.    Notwithstanding the potential difficulties, the Law Firm has agreed to represent the State, and the Attorney General hereby agrees that the Law Firm will be compensated for its efforts at the lessor amount agreed upon any of the joint lead plaintiffs, that ordered by the Court, or that agreed upon after the trial or settlement proceeds for the class, or the following basis:

A. Fee Agreements:

*Exhibit A* - Retention Agreement - Matter Settled Prior to Initiation of Litigation

*Exhibit B* - Retention Agreement -Matter Resolved After Initiation of Litigation

B.    All reasonable and necessary costs of litigation including, but not limited to, court costs, travel, witness fees, consultants, accounting, and expert fees and expenses, as shall be approved by the Attorney General, shall initially be borne entirely by the Law Firm, but shall be reimbursed from any gross recoveries from the pursuit of such claims on a case-by-case basis;

C.    The Law Firm shall receive no compensation or reimbursement other than set out above. In the event that no recovery is realized, the Law Firm shall receive no compensation or reimbursement.

6.    With the approval of the Attorney General, the Law Firm may associate other attorneys

Page 3 of 4

EXHIBIT B

at its own expense and at no cost to the State of Mississippi. Notwithstanding such association of other attorneys, this Retention Agreement is non-assignable and non-transferable, nor are the Law Firm=s commitments delegable without the express, written approval of the Attorney General.

DATED this _12th_ day of _November_, 2005.

ATTORNEY GENERAL OF
THE STATE OF MISSISSIPPI

By: _Jim Hood_ BY: Gm
Jim Hood, Attorney General

BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP

By: _Douglas McKeige_
Douglas McKeige

EXHIBIT B

**Attachment A**
**(Retention Agreement)**
**(Matter Settled Prior to Initiation of Litigation) \***

The following shall be the structured contingent fee schedule:

For Sums Up to $25,000,000.00:

    15%; then in addition;

For those sums between $25,000,000.00 and $75,000,000.00:

    13%; then in addition;

For those sums between $75,000,000.00 to $200,000,000.00:

    7%; then in addition;

For those sums between $200,000,000.00 to $500,000,000.00:

    4%; then in addition;

For all those sums greater than $500,000,000.00:

    2%; then in addition;

For all those sums greater than $1,000,000,000.00:

    1%

\* Due diligence and good faith must be exercised to settle this matter prior to filing a complaint, or before any significant discovery initiated.

EXHIBIT B

**Attachment B**
**(Retention Agreement)**
**(Matter Resolved After Initiation of Litigation)**

The following shall be the structured contingent fee schedule:

For Sums Up to $25,000,000.00:

       After filing complaint before discovery completed:       17%
       After filing complaint after discovery complete awaiting trial:  20%
       After commencement of trial:       25%

       then in addition;

For those sums between $25,000,000.00 and $75,000,000.00:

       After filing complaint before discovery completed:       15%
       After filing complaint after discovery complete awaiting trial:  18%
       After commencement of trial:       21%

       then in addition;

For those sums between $75,000,000.00 to $200,000,000.00:

       After filing complaint before discovery completed:       10%
       After filing complaint after discovery complete awaiting trial:  14%
       After commencement of trial:       18%

       then in addition;

For those sums between $200,000,000.00 to $500,000,000.00:

       After filing complaint before discovery completed:       6%
       After filing complaint after discovery complete awaiting trial:  8%
       After commencement of trial:       10%

       then in addition;

For all those sums greater than $500,000,000.00:

       After filing complaint before discovery completed:       3%
       After filing complaint after discovery complete awaiting trial:  4%
       After commencement of trial:       5%

EXHIBIT B

then in addition;

For all those sums greater than $1,000,000,000.00:

    After filing complaint before discovery completed:      2%
    After filing complaint after discovery complete awaiting trial:   3%
    After commencement of trial:      4%

EXHIBIT B