Pages 1 - 72

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JAMES DONATO, JUDGE

IN RE FACEBOOK BIOMETRIC            )
INFORMATION PRIVACY LITIGATION      )
_____   )  NO. 15-CV-03747-JD

San Francisco, California
Thursday, January 14, 2021

**<u>TRANSCRIPT OF PROCEEDINGS</u>**

**<u>APPEARANCES</u>**: (By Zoom Webinar)

**For Plaintiffs**:            ROBBINS GELLER RUDMAN & DOWD LLP
                              120 East Palmetto Park Road
                              Suite 500
                              Boca Raton, Florida  33432
                     BY:  **PAUL J. GELLER, ESQ.**


**For Defendant Facebook, Inc**:
                              COOLEY LLP
                              101 California Street
                              Fifth Floor
                              San Francisco, California  94111
                     BY:  **MICHAEL G. RHODES, ESQ.**


**For Objector Kara Ross**:
                              **PAUL CAMARENA, ESQ.**
                              500 South Clinton Street
                              Suite 132
                              Chicago, Illinois  60607



Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
                    Official Reporter, U.S. District Court


        (Appearances continued, next page)

**APPEARANCES, CONTINUED**:

**For Objectors Flanagan and Frankfother:**
                    KENDRICK JAN, APC
                    402 West Broadway
                    Suite 1520
                    San Diego, California  92101
          **BY:  KENDRICK M. JAN, ESQ.**

                    **JOHN JACOB PENTZ, ESQ.**
                    19 Widow Rites Lane
                    Sudbury, Massachusetts  01776


**Also Present:**
                    **PROF. WILLIAM RUBENSTEIN**

| | |
|---|---|
| 1 | <u>**Thursday - January 14, 2021**</u>                              <u>**2:04 p.m.**</u> |
| 2 | <u>**P R O C E E D I N G S**</u> |
| 3 | **THE CLERK:** Calling Civil 15-3747, In Re Facebook |
| 4 | Biometric Information Privacy Litigation.  Counsel for the |
| 5 | plaintiff? |
| 6 | **MR. GELLER:** Good afternoon, Your Honor.  Paul Geller |
| 7 | for the plaintiff class. |
| 8 | **THE CLERK:** Counsel for the defense, Michael Rhodes? |
| 9 | **MR. RHODES:** Good afternoon, Your Honor.  Michael |
| 10 | Rhodes of Cooley on behalf of the defendant Facebook. |
| 11 | **THE CLERK:** Kendrick Jan for the objector? |
| 12 | You need to unmute. |
| 13 | **MR. JAN:** Yes.  Good afternoon, Your Honor.  Kendrick |
| 14 | Jan for objectors Flanagan and Frankfother. |
| 15 | **THE COURT:** Speak up just -- you need to raise the |
| 16 | volume, counsel. |
| 17 | **MR. JAN:** Yes.  Thank Your Honor. |
| 18 | Kendrick Jan for objectors Frankfother and Flanagan.  And |
| 19 | I'm joined by co-counsel John Pentz.  How's that volume? |
| 20 | **MR. PENTZ:** Good afternoon, Your Honor.  John Pentz |
| 21 | for the same objectors. |
| 22 | **THE CLERK:** And Paul Camarena? |
| 23 | **MR. CAMARENA:** Good afternoon, Your Honor.  My name |
| 24 | is Paul Camarena.  I'm counsel for objector Kara Ross. |
| 25 | **THE COURT:** Okay.  Mr. Geller?  A lot of briefing.  I |

1    have all the papers.  Got everything you submitted.  But, why

2    don't you hit the highlights for me, and we'll take it from

3    there.

4              **MR. GELLER:**  Thanks, Your Honor.

5        I just -- I would like to say -- I would be remiss if I

6    didn't say that also participating here, watching although

7    they're not speaking, my co-counsel for the Edelson law firm in

8    Chicago and Labaton in New York.

9        We're really, really proud to be here this afternoon.

10   It's hopefully the end of what has been an almost six-year

11   journey.  And we're here with what you know to be the largest

12   privacy settlement in history.

13       Professor Rubenstein from Harvard who put in a declaration

14   at Docket 499-3 uses words like "Astonishing, extraordinary,

15   totally unparalleled," and calls it "a milestone class action."

16   But -- those are great adjectives.  But I think you lose

17   something unless you put this in perspective.

18       There's lots of other privacy class actions.  Recently you

19   had *Anthem*, you had *Yahoo!*, and you had *Equifax*, all of which

20   claimed to be the largest privacy class action at the time that

21   they were settled.  None of them come remotely close to this

22   recovery for class members.  Those classes were enormous.  In

23   *Anthem*, the class was 80 million.  And in *Yahoo!* and *Equifax*,

24   the classes are 150 million or more.  Yet the amount of money

25   recovered for the class in all of those cases is dwarfed by the

1   amount that we recovered for the 7 million members of our

2   class.

3        And Your Honor, another difference, and putting this in

4   context -- and you know this as well as we do -- this has been

5   really hard-fought.  And we couldn't follow a path that others

6   had followed, because this was the very first case under this

7   Illinois statute.

8        There's not been -- at the time that Carlo --

9        **THE COURT:**  Well, I might say, the first case that a

10  court allowed to go forward.  I'd put it that way.

11       **MR. GELLER:**  That's correct.

12       **THE COURT:**  There have been others that got summarily

13  dismissed.

14       **MR. GELLER:**  Summarily dismissed.

15       **THE COURT:**  Here, it went forward.

16       **MR. GELLER:**  I think it's a great point, because when

17  you look at those other cases that we compare our case to,

18  those were all large MDLs.  There were huge headlines.  There

19  were government investigations.  People were lining up to

20  represent clients in those cases.  Courtrooms were packed,

21  arguing for leadership.

22       Here, all we had before us was unsuccessful cases.  So we

23  had this sort of uncharted path.  We had to make the path.  We

24  had to make the road.  And we did that.  And --

25       **THE COURT:**  That is -- my recollection is -- and it

 1   might be slightly faulty because it has been a long six years.

 2   But my recollections is being told by Mr. Rhodes' prior

 3   counsel, predecessors:  Well, look, no case has withstood a

 4   motion to dismiss.  No case has withstood Article III

 5   challenge.

 6          **MR. GELLER:**  That's correct, Your Honor.

 7          **THE COURT:**  We certainly broke the ice there.

 8          **MR. GELLER:**  It started when they transferred us from

 9   the Northern District of Illinois to Your Honor's court, the

10   Northern District of California.  So here we were fighting

11   Facebook, you know, a tech giant, in a high-tech case that

12   nobody had ever won before.  And we -- we ran the gauntlet.

13       They threw -- they challenged Article III standing.  They

14   -- choice of law.  Extra-territoriality.  The servers aren't in

15   Illinois.  They deposed our clients not once, but twice.  They

16   moved for summary judgment.  They opposed class certification.

17   And when Your Honor granted it, they appealed it to the Ninth

18   Circuit.

19       And not only did we have Mr. Rhodes' firm, Cooley, a

20   phenomenal firm on the other side, Mayer Brown, another top

21   firm on the other side, but when it came to appellate issues,

22   they went and hired, you know, the former Acting Solicitor

23   General of the United States.  So we had some tough opponents.

24   And Your Honor, I said that we ran the gauntlet, because they

25   threw everything with us.

1          But we didn't only run the gauntlet; we ran the table.  We

2     beat them at every turn.  And that's why we're here with this

3     incredibly successful settlement that we're really, really

4     proud of.  Because --

5          **THE COURT:**  Well, let's go down to some of the

6      earmarks of that success for the class.  What are they

7      getting; how is that benefiting them.

8          And then I have a couple of followup questions about the

9     risks and other things.

10          **MR. GELLER:**  Sure.  So it's a $650 million

11      assignment.  And what's really important is it's

12      non-reversionary.  Meaning that no matter what Your Honor does

13      with fees, expenses, incentive awards, administrative costs,

14      Facebook is being disgorged of $650 million if this settlement

15      is approved.  They're parting with $650 million.

16          This is not a case like these other privacy cases where

17     there's going to be *cy pres* awards, or where some money reverts

18     back to the defendant, or where we're valuing it based on, you

19     know, credit monitoring or these other sort of

20     smoke-and-mirrors type of benefits.  This is cash.  And we had

21     a robust claims rate.  That was very important to the Court,

22     and it was very important to us.

23          And Professor Rubenstein has the largest database of class

24     settlements that exists.  And he was able to predict, based on

25     the amount of money recovered and the size of the class, that

1   the claims right here would be roughly, he predicted,

2   4 percent.  And if you look at *Yahoo!*, and you look at *Equifax*

3   and you look at *Anthem*, he's right.  Those are generally 3,

4   4 percent.

5        Judge Davila has a case right now.  It's not a privacy

6   case, but it's a case against Apple.  Their class is enormous.

7   They have a 3 percent take rate.  So I think we have almost as

8   many claimants here.

9             **THE COURT:**  Well, on that point, listen.  I've

10   administered now scores of settlements.  And as you know, in

11   the Northern District, we get an accounting at the end of the

12   case.

13             **MR. GELLER:**  Right.

14             **THE COURT:**  And so I -- I see that data.

15        I do know from my own personal experience and just from

16   being very immersed in the case law, it is a rare day that you

17   crack 5 percent.  It's more common to have a claims rate of 1

18   to 2 percent, even when -- even when the incentives look

19   attractive.

20             **MR. GELLER:**  That's right.

21             **THE COURT:**  And so this is -- this is something we

22   discussed.  I told you I wanted to make this a world-class --

23   a model and example of what a good claims rate could be.

24        You know, I think a 22 percent rate is actually pretty

25   phenomenal.  You know, of course, I wish everybody had done it,

1   but I can't -- you know, you can't make the horse drink water.

2   I mean, you can only do what you can do.  But the upside of

3   that is it will just be prorated per client, right?

4            MR. GELLER:  That's correct.

5            THE COURT:  So the money will go in larger amounts to

6    the -- what, was it 1.5 million people, approximately, who

7    submitted claims?

8            MR. GELLER:  Closer to 1.6.

9            THE COURT:  1.6 million.  And it also, I think, is

10    important to me that this is money that's coming directly out

11    of Facebook's own pocket.

12       In other words, this is not a case -- which is typical for

13    what I have in the consumer space -- where, you know, someone,

14    some poor consumer has put out $500 on a purchase, and then,

15    you know, something goes wrong.  And then they litigate, and

16    they get back a hundred of that.  They're still out of pocket

17    $400.

18       This is money that is coming directly from Facebook's own

19    pocket and bottom line.  It's not -- you know, you use the word

20    "disgorgement."  I know you weren't being technical about that,

21    but in fact, I think it's actually quite different.  Just the

22    -- the violations here did not extract a penny from the pockets

23    of the victims.

24       But this is real money that Facebook is paying to

25    compensate them for the tangible privacy harms that they

1   suffered.  So, I actually think that is significant, as well.

2          **MR. GELLER:**  I agree with Your Honor.  And we're

3    very, very proud of that 22 percent.

4        I was talking to Mr. Rhodes a few days ago.  And it's the

5   highest -- I don't want to put words in his mouth.  It's the

6   highest claims rate he's ever seen in this type of case.  And

7   he defends quite a lot of these.  And in --

8          **THE COURT:**  Is that right, Mr. Rhodes?

9          **MR. RHODES:**  Good afternoon, Your Honor.

10       Yeah, it's -- I think the Court is very well-schooled in

11  both the background that led to the Northern District

12  guidelines going into effect at the end of 2018, and the

13  concern that we all had in the space where it's very difficult

14  to get people to submit claims.

15       I mean, just go through some of the data with me,

16  Your Honor.  I mean, the -- what's interesting to me is that if

17  you look at the declarations that were submitted, fully

18  30 percent of the class interacted with the -- the online

19  impression that was in the feed.  Just that data, itself, is

20  pretty surprising.

21       You know, we took your observations to heart.  We went

22  back and redid the notices in more plain English.  We actually

23  did -- Paul and I -- Mr. Geller, pardon me, and I actually did

24  consult with Professor Raley (Phonetic).  We tried to come up

25  with ways to make people actually have to do something.

1    And whether you take the largest possible class size, the

2    take rate is 16.7 percent, the -- the kind of -- our estimate

3    of what it really was is 22-point-something percent.

4    1.6 million claims of a, you know, fairly small class, by

5    comparison.

6    And, you know, I would argue that given how many people

7    saw the ad, the success of getting 90-plus percent of the

8    communication to the email and not have it bounce back, and the

9    multiple rounds of communication, the fact that you have

10   1.6 million people -- and now they're going to get topped up a

11   bit in terms of the pro rata distribution -- that's okay.

12   Those are the people, presumably, who felt the most aggrieved

13   and wanted to participate.  And they will get participation.

14   And now they'll get participation, frankly, at fairly credible

15   numbers, you know, relative to a lot of these other deals.

16   And I would make the point -- and the Court knows this --

17   it's not about perfection.  Right?  We're just trying to do a

18   better job than we have historically done in these kinds of

19   cases.

20   As you know, I've spent you know 30-plus years doing this

21   kind of cases.  This is, by far, the best result I've seen, in

22   terms of participating, in percentage terms, in a class-action

23   settlement.  And so --

24            THE COURT:  Well, the good news for me is that I now

25    have the tool I've been looking for to tell people in my next

1    case:  You need to meet 22 percent.  So that's the new

2    benchmark.  Single digits are in the rear-view mirror.  We've

3    got a new standard, and we know it can be done, and we're

4    going to make it happen.

5         Let me talk with both of you, because I do want to hear

6    from Mr. Rhodes as well.

7         But Mr. Geller, one of the things I want to get a better

8    sense on, if we don't settle, if this doesn't go forward, tell

9    me about the risks that you think the plaintiffs face.  I know

10   this is always counter-intuitive to ask people to talk about

11   the weaknesses in their case, but I do want both of you do

12   that.

13        It's not really the weakness, it's -- you know, we can be

14   straight-up about -- the only reason you're here, because there

15   are two sides to every question.  So, you tell me what it is

16   that you think the most serious issues were.

17        And, listen.  I've lived with this for a long time.  I

18   know there are issues about server location; there are issue

19   about whether scanning a paper photograph is clearly

20   contemplated by the Illinois statute.

21        But just -- just build on those for me, and anything else

22   you would like to add.

23            **MR. GELLER:**  Yeah.  So we -- we -- you know, we were

24    confident; we were ready to go to trial.  We had prepared

25    witness lists, trial lists, motions in limine.  Proposed jury

 1    instructions.  But, there were risks.  And they were

 2    significant.

 3         And the five risks that I would focus on, number one, the

 4    statute precludes facial -- use of facial geometry to capture

 5    an image.

 6         And Facebook says, and they swore in deposition, they do

 7    not use geometry.  We had experts that said they do.  They say

 8    that they use a wholistic data-based machine learning approach.

 9    They don't necessarily use the angles (Indicating) and the

10    distance between eyes and nose and chin, which is geometry.

11         And, that's a game-over risk.  If the jury believes their

12    expert that it's not geometry, it's something else, then we

13    lose.  The statute doesn't apply.

14         The photo exception.  I mean, this is one where -- you

15    know, I've asked my kids, I've asked laypeople:  When you

16    upload a photo to Facebook, you know, and it's used for their

17    tag feature, is that a photograph, or is that some other group

18    of data?

19         And, I almost don't want to say the answer in front of the

20    Court and Mr. Rhodes.  But the statute has an exception for a

21    photograph.  So it's -- if the information is derived from a

22    photograph, then it's not barred.

23         So we had to -- we would have had to convince a jury that

24    this data that comes from, you know, an image that's taken by

25    an iPhone, let's say, and then uploaded is not actually a

1   photograph.  A photograph is something that goes into a frame,

2   and sits on your mantel.  That's a tough argument.

3        Number three -- and you mentioned this briefly -- Facebook

4   had an argument and that argument still existed in this case

5   that the servers that are used in this facial-recognition

6   software do note reside in Illinois.  And so that if there was

7   a violation of the statute, it occurred outside of Illinois.

8   And that was a real risk that we were concerned about.

9        Another risk, Your Honor, is that this tag feature on

10  Facebook is ubiquitous across users.  And it's popular.  And

11  it's voluntary, in the sense that people knowingly upload

12  photos to Facebook.  And one of the class representatives

13  testified in his deposition that he loved the feature, and will

14  continue using it, notwithstanding this lawsuit.  You know,

15  juries are unpredictable.  And that was a risk.

16       And then, and then, I also want to mention the legislative

17  risk.  Because that was in usual in this case.  The moment

18  Your Honor ruled in our favor, there was an onslaught in

19  Illinois to try and change the statute retroactively.  And we

20  earlier had submitted a declaration from a lobbyist in Illinois

21  that talked about dozens of efforts to gut the statute, to

22  eliminate the private right of action, to make it clear that

23  the photo exception includes digital photos.

24       And so the entire time that we're litigating this case,

25  we're looking over our shoulders because they're trying -- and

1    when I say that, I mean big tech companies -- including one

2    that's a defendant here -- are trying to get the legislation

3    changed.

4            **THE COURT:**  Oh, I do remember hearing that.  Okay,

5     thank you.

6         Mr. Rhodes, your colleague has given a very eloquent,

7    candid assessment.  I have no doubt he thinks he would have

8    beaten all that at trial, but I'd like to hear from the defense

9    side what your version of the risks were.

10           **MR. RHODES:**  Yeah, let me build on that a little bit,

11    if I can, Your Honor.

12        Let's take the issue of facial geometry.  And of course,

13    you'll recall your orders that you teed that issue up as

14    quintessentially a fact question for the jury.  I believe it

15    was your summary-judgment ruling where you noted the parties'

16    warring experts on this very point.

17        And as Mr. Geller alluded to, Facebook's system actually

18    doesn't use geometry.  We were very much prepared to take that

19    issue to the jury.

20        And to just give you an example, in connection -- when I

21    was retained to be the trial counsel in the case, one of the

22    things -- we did a lot of experimentation to see how you could

23    show a jury to make this point, because the math and the

24    science gets to be pretty complex, and requires an erudition

25    that, you know, I don't have, for sure.  One thing we did was

 1   we took two examples of photographs.

 2        So let's take -- so if you look at the screen, Your Honor,

 3   you can see images of us.  The system is really measuring pixel

 4   intensity values, and then doing a lot of mathematical

 5   devolution from it.

 6        So we took a picture, let's say, of myself.  And rather

 7   than in color, we changed the shading it of it a lot, a lot of

 8   the light intensity, so that the pixel intensity values would

 9   change.  And we would run it through the system, compared to

10   the color photograph.  And a lot of times the system wouldn't

11   recognize it.  The argument being it's clearly doing something

12   other than geometry, because the geometry has not changed.

13   Simply the intensity, the granularity, the color palette of the

14   photograph has.

15        Then on the other side of that coin, we ran tests where we

16   took geometry, and we used some other people on our team, and

17   let's say we put my nose sort of off kilter, really made the

18   mouth wide, put the eyes -- you know, so it looks like a

19   Picasso painting (Indicating).  We would run that through.  And

20   there were instances where the same picture as my normal

21   picture would be recognized.

22        And so there's an example of the kinds of evidence that we

23   would have adduced at trial to show whatever the system is

24   doing underneath the hood, it is not involved with facial

25   geometry.

1         The other thing I will give to you --

2              **THE COURT:**  Let's talk a little bit about the risks

3    to Facebook.

4              **MR. RHODES:**  I'm happy to do that.

5         The risks were obvious.  Right?  We believe that we acted

6    reasonably.  The statute, as you recall, has this tiered

7    approach.  If you act reasonably, it's zero per violation.  If

8    you acted negligent, it's one --  1,000 per something.  And if

9    it's willful or intentional, it's 5,000.  The sheer numbers

10   were daunting.  Right?  The sheer numbers.

11        So I could make fantastic arguments at trial; the jury

12   might disagree with me.  What happens if we have a gigantic

13   statutory-damages award?  There's due process considerations.

14   The Court may have one view; I would have a different idea.

15        So obviously --

16             **THE COURT:**  Just to put a finer point on it, there

17   was a genuine risk in Facebook's view that you could be found

18   to have willfully engaged in a violation.

19             **MR. RHODES:**  I always thought it was really that

20   negligence was the more problematic level.  But, sure.  I

21   mean, you know, you and I both have been around the block.

22   I've tried a lot of cases.  And unlike a lot of lawyers who

23   say they've never lost cases, I have lost cases.  And I know

24   what that looks like.  You may give a perfect case, and the

25   jury disagrees.

1      So, yes.  If that was the outcome, we're talking about

2   billions and billions of dollars.  I mean, $650 million by any

3   stretch of the imagination is a tremendous sum of money.  It's

4   not something that Facebook wants to do.  But we're also

5   rational intelligent people, trying to manage a very

6   significant risk.

7      And I will say that when I got the case, the case was

8   mature.  Right?  It was literally weeks from trial.  We had

9   expected you to set us on a very aggressive trial schedule,

10  because that's what you said would transpire before the case

11  went up to the Ninth Circuit.

12     So in that sense, the parties, Mr. Geller and I when we're

13  negotiating this framework with our mediator -- there's not a

14  lot of mystery left between the parties in that sense.  That's

15  one of the things that allows you to get real here, and try to

16  find the right answer.

17     And then, the last thing I will say, Your Honor, is early

18  on in the process of alluding to a settlement with you, we

19  heard you.  We took your feedback for a better part of four or

20  five months and tried to, you know, build that in to the deal

21  as it evolved, in terms of more money, different forms of

22  notice, different structures of claims forms and all of those

23  things.

24     But, yes.  There was tremendous risk on both sides,

25  frankly.  Because the plaintiffs have been in this case for --

1   I don't know, five years, litigated it all the way up to the

2   Appellate Court and back.  We're on the eve of trial.  We're

3   facing a potentially catastrophic award of statutory damages.

4   And, and no one really knows what the perimeter of due process

5   is in this context.  We think it's there, we know it's a

6   perimeter, but, but what does that reduction look like at the

7   end of the day?

8            THE COURT:  Let me ask you this.  Didn't Facebook

9    also make some -- what I'll just call conduct changes, as

10   well?

11           MR. RHODES:  Yes.

12           THE COURT:  Say a little bit about that.

13           MR. RHODES:  Yeah.  I mean, you'll recall from the

14   last hearing that one of the things we tried to address early

15   on is to say:  Look, we will change the flow.  New users have

16   to go through an affirmative opt-in consent paradigm.  The

17   existing users are being transformed into that flow.  If you

18   don't do anything for three years, you know, the templates are

19   all deleted.  So, yes.  I'm not going to bother to, you know,

20   recite what's in the agreement, because there's quite a bit

21   there.

22        But if you think about solving the underlying problem,

23   it's not one of those cases where defendant says:  Okay, here's

24   a pot of money, but I get to continue to do the challenged

25   practice because the Court hasn't issued its final

1  adjudication.

2      That's not what happened here.  The practice did, in fact,

3  change.  And now it is an opt-in consent flow.

4          **THE COURT:**  Okay.  All right.

5      Mr. Geller, anything else you want -- I'm going to turn to

6  the objectors now, but is there anything else you want to add

7  before we do that?

8      You'll both have a chance to respond after we hear from

9  them.  But before I get that dialogue started, is there

10  anything else you'd like to highlight?

11          **MR. GELLER:**  No.  As long as we get a chance to

12  respond, then I'd like to hear from them.

13          **THE COURT:**  Okay.  All right.  Let's see.

14      Mister -- how about Mr. Jan?  Do you want to kick it off?

15          **MR. JAN:**  Certainly, Your Honor.  I'm not sure if I

16  need to continue to hold this down, or I can be unmuted at

17  your end.

18          **THE COURT:**  You have to turn -- yeah.  Turn your mic

19  on.

20          **MR. JAN:**  I'm holding my space bar down.  So, that's

21  okay.

22      A couple of things, Your Honor.  Just slight

23  administrative issues.  With the permission and indulgence of

24  the Court, I'm going to respond the settlement issues.

25  Mr. Pentz will respond to the fee issues.

1          **THE COURT:**  Yeah.

2          **MR. JAN:**  A tiny bit of housekeeping, as well.  I've

3     been laboring with COVID for about 15 days, I've been in bed

4     for 22 hours a day, until about Monday of this week.  So if

5     I'm a little sloppy, forgive me.

6          **THE COURT:**  Okay.

7          **MR. JAN:**  I'll invite any interruption.  And if I

8     lack clarity, please, you know, stop me and I'll try and

9     reset.

10          In fact, today, I've done something unusual.  I've kind of

11     prepared some notes for the discussion.  So I may be reading,

12     some, and I apologize if it seems like I'm not paying direct

13     attention to the Court.

14          **THE COURT:**  That's okay.  Go ahead.

15          **MR. JAN:**  Let me start by saying Mr. Geller's firm,

16     Mr. Rhodes' firm, these are fantastic firms with highly,

17     highly competent counsel.  We recognize that this is a very

18     large number.  I think that some of the comments regarding

19     BIPA in Illinois and this being kind of first of many -- it

20     may have been initiated at the outset.

21          But, I know that in Mr. Edelson's response to our

22     supplemental comments given once the actual motion -- or final

23     motion for settlement approval is made, he responded with one,

24     two, three, four, five, six, seven, eight, nine BIPA cases that

25     have actually been settled, one of which was his.  His comments

1   related mostly to fees in BIPA matters in Illinois.  We don't

2   discount the reality of the fees or the percentages that he

3   describes there.  Mr. Pentz will make further comment on that.

4        But this is not a -- just, any longer, a unique case if

5   you're talking purely about BIPA resolutions.  However, I grant

6   you, this is a very large case.

7        But the size of the case here, in other words, the

8   settlement, the size of the proposed settlement, is all

9   relative.  These guys have taken on a leviathan challenge of

10  pursuing a statutory claim for a very large group of people.

11       Now, that very large group of people is one of the

12  fundamental issues in this case.  It's not genuinely clear to

13  objectors exactly what number of class members there are.  We

14  have Facebook, in their supplemental brief in support of the

15  preliminary approval of the settlement, which is ECF 447, at

16  Page 16 describing (As read):

17            "As plaintiffs note, the estimated number of people

18            on the Class Notice list with a face template is

19            approximately 9.4 million."

20       So both plaintiffs and Facebook have adopted that

21  $9.4 million number.  That's one of their two anchors.  They

22  seem to have set two anchors, one at 9.4.

23       Now, Mr. Rhodes -- forgive me, Mr. Rhodes -- Facebook, in

24  a -- in a footnote on Page 17 of that same brief, describe that

25  they had provided to plaintiffs' counsel a variety of data and

associate analysis that support an alternative estimate in the
range of 6.9 million.  So I would say that Facebook's anchored
range is 6.9 to 9.4.  They apparently have adopted or have at
least referenced both of those numbers.

Now plaintiffs' counsel started out early on in this
matter describing that the number was at least 7.1 million,
pursuant to some 2011 statistic.  And then later, jumped to and
seem to persistently use the 9.4 million class member number.
And then, following the conditional settlement of this case,
they have seemingly -- and I'm -- this sounds nasty and it's
not meant to be -- seemingly but also conveniently to improvise
a number backward to approximately 7.1 or 7.2 million.

Now, all I know is -- and because my finger is on my space
bar I can't pull up, necessarily, the document I would like to
share with the Court, but I'd be happy to make that effort if
it would help.  However, we know this.  We know that in 2011
when that 7.1 million class size estimate statistic was
provided and was referenced by plaintiffs, that Facebook usage
in North America -- that is, the United States and Canada --
was about 123, 124 million people.  We also know that in Q3 of
2020, Facebook usage in North America -- that is, the United
States Canada -- is now at about 253 or 254 -- that's Q3,
2020 -- 253 or 254 million people.  So it is, in our view,
highly unlikely that we had a static number from the outside of
this case that comported with its 7.1 statistic provided as of

1  2011 and as current as of the conclusion of the settlement

2  class period.

3       So whether it's 6.9 or 7.1 or 9.4, we regard -- although

4  we are of all the folks sitting here those with the least

5  information, and therefore, probably the least able to

6  competently estimate, estimate the real number of class

7  members.  But, we would expect that it is somewhere between the

8  7.1 of 2011, especially given the substantial growth of

9  Facebook in general terms, and the 9.4 million number posited

10 historically throughout this case, including both by plaintiffs

11 and by Facebook.

12      Now, the reason -- forgive me.  I'm going to go on a

13 coughing fit, I believe.

14           **THE COURT:**  That's fine.  Have some water.

15      (A pause in the proceedings)

16           **MR. JAN:**  Forgive me, Your Honor.

17           **THE COURT:**  That's fine.  Go ahead.

18           **MR. JAN:**  The reason that the number of class members

19  is significant -- and I am -- I'm -- I don't want to sit here

20  and necessarily nickel-and-dime the Court with regard to the

21  efficacy of notice.  I think it's something we should discuss,

22  because I've heard numbers today -- even though the number

23  that was given was 22 percent, there was actually a range,

24  depending on the actual class size, of between 16.7 and

25  22 percent.

1       Irrespective of what the actual number is, I know that if

2  there is one group that could get what the Court originally

3  suggested would have been appropriate -- that is, a very, very

4  high claims rate -- or, at the very least -- as you described,

5  you can't necessarily, you know, make the horse drink the

6  water -- at least get the notice out.  And I think these guys

7  did a -- a significantly better job than in most cases of

8  actually getting notice out.  And so I want to be cautious

9  about arguing that point too zealously.

10      However, the number of case- -- forgive me -- of class

11 members is significant because it directly -- it's directly

12 tied to the need for a finding of reasonableness of the

13 settlement in dollar terms.  Because whether you're using --

14 forgive me.  If we go back to 1968, and *Protective* -- in

15 *Protective*, it's the Supreme Court, at 390 U.S. 414 --

16          **THE COURT:**  Well, tell you what, I know the point.

17  But let's just focus on the nuts and bolts here.

18          **MR. JAN:**  All right, then, forgive me.

19          **THE COURT:**  Actually more helpful to me, Mr. Jan, in

20  our circuit there are eight factors.  They're called the

21  Churchill factors.  That's really the lens through which I

22  look at all this.

23      So why don't you see if you can kind of phrase your

24 concerns in light of those factors, and that might be a better

25 way for us to go further.

1          **MR. JAN:**  All right.  Well, let me say this.

2      Before we get to -- and I realize the Churchill factors

3  have been around some time, and I know that many circuits have

4  developed their own filters for review or pattern for review.

5  And I appreciate that.

6      But in 2018 -- and I'm reading from Professor Rubenstein's

7  comments.  And if I'm getting too wordy, forgive me. (As read)

8              "In 2018, Congress codified in 23(e)(2) a list of

9              four concerns the advisory committee labeled the

10             primary procedural considerations and substantive

11             qualities that should always matter to the decision

12             whether to approve the proposal."

13     And -- forgive me.

14             "Before the rule arrives at the articulation of

15             sub-factors, its general directive asks whether the

16             class relief is adequate."

17     Now, ultimately whether you're using the Reynolds -- the

18  very simple Reynolds analysis, which is if you take -- and I

19  heard you discussing with counsel just a few minutes ago, risk.

20  Ultimately, before you do anything else, you say:  Well, gee,

21  what's the risk of going forward?

22     Now, the Reynolds analysis, this very simple equation, is

23  you take your gross available recovery which we know is,

24  multiplied, billions of dollars, whether it's -- it doesn't

25  matter what number we use, if we use -- let's use an $8 million

or $9 million -- or 9 million-member class.  You know, it's --
then 8 billion is the exposure for the negligence cause.  And
then five times that for the knowing, reckless, or intentional
cause.  And then you attach to that gross potential recovery a
likelihood of recovery.  And you have right there a very
simple:  Is this a reasonable settlement?

Now, that is before, of course, you get to things like:
Well, cost of delay, the due process issue as referenced by
Mr. Rhodes.

But in this case, I don't think that what objectors are
proposing or suggesting is practical.  It really exposes the
case to the due-process challenge.  Especially in view of
Facebook being one of the largest market cap, and -- you know,
one of the companies with the most significant -- I apologize,
I was checking my mute -- cash flows in the world.  Not just
here locally, or not just in, you know, in northern California,
but in the world.

And so I think the due-process issue, while it's a
significant concern, and I appreciate Mr. Rhodes' description
of it, I think that that relates not so much to -- it doesn't
-- it doesn't play a realistic part in --

**THE COURT:**  Let me ask you this.  What is your
analysis or what is the objectors' analysis of the pros or
cons of the idea that Facebook did or did not scan face
geometry?  I didn't see that in any of your papers.  It's a

1    major risk factor for trial.

2            **MR. JAN:**  Yes --

3            **THE COURT:**  Mr. Pentz can kind of fill it in, but

4    what did you do to analyze that, and what conclusions did you

5    reach?

6            **MR. JAN:**  Well, I would tell you that the phrase

7    "Facial geometry," there are two things.  Actually, one was

8    referenced by Mr. Geller, one was referenced by Mr. Rhodes.

9            One is the exacting relationship or juxtaposition of

10   facial features (Indicating).  And they regard that as

11   fundamental to facial geometry.  Mr. Rhodes described some

12   pixillation issues.  But everything is an extraction or an

13   extension of a relationship.  Whether it's of pixels, or it's

14   of features.

15           I feel that -- you know, obviously, my client is a

16   plaintiff.  My client, you know, clings to Mr. Geller's

17   position, and the position of Mr. Geller's experts.

18           Do I think that there is not some significant risk, as

19   described by both Mr. Rhodes and by Mr. Geller, in the

20   positions of both distinct parties?  Absolutely, there is a

21   significant risk.  Including at this very basic factual level.

22           And I would tell you this, Your Honor.  If anyone knows

23   about this stuff, it's not necessarily me.  I'm not an expert.

24   But I cling to the plaintiffs' experts in this regard.  And I

25   think that suggesting that -- and I don't want to get into

1  finger-pointing, because I don't think it's practical at this

2  point.

3      But suggesting that there is not some geometry behind what

4  it is that is being -- some algorithmic approach to a

5  juxtaposition of pixels or features and that that is not use of

6  facial geometry is not the best position.

7      I think the best position that is clearly plaintiffs'

8  position, that it is in fact a form of facial geometry in

9  violation of BIPA.

10      Now, if you want to talk about the digital image versus

11  photograph, the paper photograph, I think there's a clear

12  distinction there.  I don't think -- you know, I think, as you

13  described -- and I'm not tried to use your words against you.

14  But as you described at the preliminary hearing, you know, the

15  use of these images for commercial gain by Facebook -- and I

16  know there was some comment that this -- you know, they're not

17  really disgorging monies taken from individual class members.

18  And I appreciate that they are not.  However, it's the

19  commercial gain or commercial exploitation of this biometric

20  information that is what's protected.  And I think that that

21  was also a part of -- and forgive me that I'm not that

22  well-versed of what has been going on in the law and motion of

23  this case, which, by the way, has been hard-fought and very

24  impressive.

25          THE COURT:  What was the objectors' analysis of the

1    photo exception that's in BIPA that --

2              MR. JAN:  That's my point, Your Honor.  The --

3              THE COURT:  I'm not sure I heard you.  Just tell me

4    what the analysis is.  Yeah.

5              MR. JAN:  The analysis is simply -- now, if you're

6    talking about risk, the analysis is that a paper photograph is

7    a distinct item.  I don't know that it means a paper

8    photograph that has been digitized.  I don't know if it means

9    an originally-digital collection of data.  I don't know.  I'm

10   afraid that I haven't studied the backdrop of BIPA in that

11   regard.

12       But I believe that there is a very real distinction

13   between the use of a paper photograph and the digitization of

14   that paper photograph, and those items that are originally

15   digital.  So, I believe that there are -- there are three

16   different issues you actually have to address in considering

17   that risk.

18             THE COURT:  Let me ask you about the location of the

19   servers point.  What is the -- what have the objectors done to

20   analyze the pros and cons of the fact issues around the server

21   location?

22             MR. JAN:  Your Honor, what's interesting here is

23   plaintiffs are in Illinois.  And it doesn't matter if Facebook

24   keeps their servers in Sunnyvale or if they keep their servers

25   in Tampa, or they keep their servers in Patagonia.  The fact

1   is they have a relationship with Facebook users in Illinois.

2   And it is the Facebook users in Illinois, using their local

3   statutory protections in connection with that relationship,

4   that Illinois-based or Illinois-driven relationship.

5        So I think the location of the servers, especially in

6   today's world -- you know, if I were to sit in Missouri and

7   say:  Gee, I'm playing with Judge Donato's emails, and you

8   bring suit against me in San Francisco, and I say:  Well, gee,

9   Judge, I'm sitting over here in St. Louis.  I'm not; I'm

10  sitting in San Diego.  But if I -- I'm sitting in St. Louis,

11  and this is not a problem for us here in St. Louis.  Does that

12  fly?  No.  Certainly, it does not.

13       And so I think hiding -- I know that this went from

14  Illinois up to the local Federal District Court there, and then

15  it kind of shot across the country.  I think that a lot of

16  these members would be saying:  Why in the world are we talking

17  about what's going on in California, as, you know, affecting

18  what has happened to us by local statutory violations of our

19  biometric information rights, here?

20       You know, I realize that there may be other issues that

21  are contractual issues that relate to jurisdiction and so

22  forth.  But the location of a server, in my view, these days,

23  is a somewhat artificial notion.

24           **THE COURT:**  And what about the Facebook risk of

25  walking out with what are essentially enhanced penalties for

1    willfulness?

2          **MR. JAN:**  Forgive me.  Could you repeat that

3    question, sir?

4          **THE COURT:**  Yes.  Facebook's concern and risk -- the

5    risk that Facebook was potentially threatened with, and that

6    is, walking out with what would in effect be enhanced

7    penalties for willfulness.  What was the analysis of the

8    objectors --

9          **MR. JAN:**  Well, I appreciate what Mr. Rhodes said,

10   because I think it was one of the most honest comments I've

11   heard in defense of a position.  When -- now, he's been

12   practicing some years.  I've been practicing for coming up on

13   40.  And I realize that sometimes you win, and sometimes you

14   lose.  And you have to appreciate that there is always some

15   risk.

16     And he said -- I'm going to pull it up, because I felt it

17   was that frank -- he was managing a very significant risk.

18   Tremendous risks on both sides.

19     Now, if you want to talk about the -- let's set aside the

20   negligence standard for a moment, and let's just talk about the

21   $5,000 knowing or reckless or intentional misconduct.  And the

22   prospect of them being found exposed on that.  Now, I

23   acknowledge, Your Honor, that I've done my analysis using the

24   very simplified Reynolds calculation.  Just the basic, you

25   know, A times B equals C, multiplied by risk.

1    And, listen.  Mr. Rhodes is one of the best trial

2  attorneys around.  His firm is renowned.  But I will tell you,

3  if he -- if he were to come in and say:  Look, we don't have at

4  least a one or two-percent risk on that -- that larger knowing

5  5,000-per-person statutory damage, I think that would be an

6  impractical thing for him to say, and I don't think he would

7  say it.  He said today, there was a tremendous risk on the part

8  of both parties.

9    So in our analysis, we didn't use -- we did not use a high

10 number in analyzing the risk to which -- I'm sorry --

11         **THE COURT:**  Look.  You know, I'll give you an

12 analogy.  There's a famous equation called the Drake equation.

13         **MR. JAN:**  I'm sorry?

14         **THE COURT:**  Can you turn your volume up?  Because I

15 can't keep repeating everything.

16    There is a famous he occasion called the Drake equation --

17         **MR. JAN:**  Yes.  Forgive me.

18         **THE COURT:**  -- which is used to estimate the number

19 of alien civilization in the universe.  And it looks neat.

20 It's got variables, and it's a formula, and you multiply

21 everything out.  And the problem with the Drake equation is

22 it's meaningless unless you populate the variables in an

23 accurate and responsible way, and we can't do that.

24    And so trotting out formulas and saying:  Well, there are

25 9 million people, and they theoretically might have gotten

1    $5,000 each, I mean, that's fine, that gives you some

2    benchmark.  But the real benchmarks are:  Are these people

3    going to prevail at trial?  Are they going to get a verdict

4    back that awards even a fraction of what they're going to ask

5    for?  These are answerable questions.

6         And, you know, what I've been fishing for here -- I don't

7    think very successfully -- is a real nuts-and-bolts analysis

8    from the objectors about -- you know, Point A.  Mr. Geller has

9    said, and I happen to agree, as I said this in my

10   summary-judgment order, there are fact issues about the use of

11   facial geometry.  I don't know one way or the other whether

12   they do it or not, but that's a fact dispute.  Facebook has

13   been adamant, as Mr. Rhodes said, as saying no.  And plaintiffs

14   say: We can do that.

15        You all haven't tilted the balance one way or the other

16   with any of your own analysis on that.  You basically said

17   just:  Yes, it's a question, but we think the plaintiffs have a

18   better view.  That's basically saying, in the Drake equation:

19   Yes, we don't really know how many alien civilization there

20   are, but we will just posit a number of a thousand.

21        I mean, it's not helpful.  It's just conjecture and

22   speculation, and I'm really looking for facts and logic.

23        So let me close this out with the objectors.  We're saving

24   attorneys' fees; that's going to be stage two.  We're just

25   getting through the substance now of the settlement terms.

1        But, any final comments, Mr. Jan?  Then I'll see if

2   Mr. Camarena has anything to add on the substance.

3        **MR. JAN:**  Yes, Your Honor.  And forgive me if I have

4    been kind of dancing around your question.

5        **THE COURT:**  Well, I'm not saying that.  But what I'm

6    interested in are concrete actualities.  Sort of the gestalt

7    of "Well, we feel like this might be the answer" is not really

8    useful.

9        **MR. JAN:**  Well, I can give you this really simple and

10   concrete perspective, Your Honor.

11       If you take 6.9 million, which is the lowest anchor

12   offered by either of the parties, okay, and you attach a

13   10 percent -- like, 10 percent -- a 10 percent likelihood that

14   they will prevail on the negligence causes, and a 1/2 of

15   1 percent likelihood that they will prevail on the wrongful

16   knowing 5,000, the greater-valued causes, then the -- the value

17   is $862,500,000.  And in my view, that is the low part of that

18   range.

19       There is -- there's no playing with the numbers.  You have

20   -- and I used the lowest anchor for their class size.

21       **THE COURT:**  Mr. Jan, this is my point.  That just

22    begs the question of success.  You're just -- you know, you're

23    just positing -- you're assuming they're going to win, and

24    you're just sort of nipping at the margins.  But it's the

25    merits that count.

1          **MR. JAN:**  Forgive me, Your Honor, I --

2          **THE COURT:**  I was hoping, because I was curious, I'm

3     actually interested in this issue, I was hoping you would have

4     a new evidentiary or factual-based discussion on why this is

5     or is not based on face geometry.  But, you know, just

6     fiddling in a kind of law and economics way with sort of

7     abstract calculations, it's not really -- I don't know, not

8     useful.

9          Anyway, Mr. Camarena, is there anything you would like to

10    add substantively on the settlement terms?

11         The only reason I'm not asking Mr. Pentz, because I think

12    he was identified as the attorneys' fees person.  But I'm not

13    meaning to foreclose him.

14         **MR. CAMARENA:**  Your Honor, there's only one point

15    that I would like to add.  When the objector saw the proposed

16    settlement, and she saw that it would yield her a couple

17    hundred dollars, comparing that to the statutory damages, she

18    asked me to object, and I did.  There's been -- and I, myself,

19    was curious about whether such a big difference between the

20    statutory damages and the -- what would ultimately be the

21    distribution to each, to each class member.

22         There's been a lot of talk about a due-process concern.

23    And class counsel had reached out to me and explained to me

24    this concern about class -- about due process with respect to

25    Facebook.  And it took me a moment to wrap my head around this,

this argument.  Because essentially what this concern is, that
Facebook has violated the law so many times and so often with
respect to so many people that they should be absolved of
having to pay the legislatively-created damages.

That would be like a defendant coming to your courtroom,
Your Honor, and saying:  I had used a firearm in furtherance of
a drug crime so often that you should absolve me of the 924
statutory mandatory minimum.

That's nonsense, Your Honor.  It's not just me who says
that's nonsense.  The last Ninth Circuit -- judge within the
Ninth Circuit who has addressed this issue has also found that
as being nonsense.

And I want to refer the Court to the opinion by Judge
Michael H. Simon out of Oregon.  The case was *Wakefield versus
Visalus*.  In that, in that particular case, the same argument
was made.  In fact, there was so much more factual support for
that argument.  Because there was another class action that
involved statutory damages.  The CEO of the defendant submitted
an affidavit saying that:  These statutory damages are
literally going to put us out of business.  We're going to file
for bankruptcy and liquidate if we have to pay this, these
statutory damages, so you shouldn't hold us to these damages.

Judge Simon wrote an opinion where he stated -- and I'm
going to quote him (As read):

                "That understanding..."

1      Meaning that position.

2              "That understanding of the limitations on damages

3              imposed by due process implies that a constitutional

4              penalty for a single violation becomes

5              unconstitutional if the defendant commits the

6              violation enough times."

7      And I think, I think that's true, and I think that the

8  class counsel overly took into this -- into consideration this

9  illusory risk, because I can't see any other reason why they

10 would have settled -- any other reason that would benefit the

11 class for why they would have settled this for essentially what

12 would be nuisance value if it were -- or less than nuisance

13 value, if they were individual suits.

14     Along those lines, the Seventh Circuit, dealing with

15 another issue where someone had claimed that damages would be

16 too high just because they've done so it often, in the case of

17 *United States versus Dish Network LLC*, which was just decided

18 this year, the Seventh Circuit said, and I'll quote (As read):

19             "Someone whose maximum penalty reaches the mesosphere

20             only because the number of violations reaches the

21             stratosphere can't complaint about the consequences

22             of its own extensive misconduct."

23     And I mention these cases, Your Honor, because to me it

24 seems that the only reason why the class counsel would have

25 accepted the settlement -- the only reason why this settlement

1    would benefit the class members is because of this risk.  But

2    this risk is really illusory.  The Ninth Circuit hasn't upheld

3    that point of view.  It's contradicted by recent opinions by

4    the Seventh Circuit.

5         So I ask the Court to consider, to consider that this risk

6    was overly valued to the extent that someone would find that it

7    leads to a fair result for the class.

8              **THE COURT:**  Okay.  Mr. Geller, Mr. Rhodes, let's do

9     some brief responses, and then we'll get to the fees issues,

10    please.

11             **MR. RHODES:**  Your Honor, let me take a shot here.

12    Let me give you a construct to think about on this -- well,

13    let me say on due process, I think they've got the factors

14    garbled.  It's basically the relationship between what the

15    underlying alleged harm was and the total amount, if there was

16    an aggregate award.  It's different if you do a claims provide

17    after a trial.  It's not the relationship to the defendant's

18    ability to pay.  I don't think anybody is advancing that

19    argument.

20         In terms of class size, I'll just respond very briefly.

21    We said in our papers and there's actually declarations in the

22    record on this point that it variously -- we could never really

23    pinpoint exactly the size of this class.  Mr. Geller and I

24    spent literally, I don't know, six months exchanging

25    information.  I gave him sworn testimony that's not in the

1   record, but I gave him data scientists from Facebook's sworn

2   testimony about how we calculated the ranges.  And you'll see

3   that in the class administrator's declaration which Your,

4   Honor, I believe is Docket 517.  And she lays out, you know,

5   that one email touched 90-plus percent of every identified

6   account that it got the notice.

7        But the one construct I wanted to leave you with, which is

8   why this is a false construct that's been advanced by the

9   objectors on this:  What is the right thing to measure.  The

10  statute sets up three possibilities.  5,000, 1,000, or zero.

11  Right?  And the way I thought about it was I put the most

12  likely scenario, if I lost in the middle point, the thousand

13  per cap, and I discounted the other two ranges.  But there was

14  actually a very credibility argument to be made that the number

15  should be zero, because Facebook acted reasonably.  And I'll

16  tell you very simply what the proffer would be on that.

17       In December of 2010, Facebook announced in advance that

18  this feature was coming.  It told its users.  It not only told

19  its users it was coming, that Tag Suggestion was coming, that

20  there was information about it being biometrically based when

21  you uploaded photographs, it told its users how you could turn

22  it off before it went live.  And then followed up with some

23  communications in the early part of Q1 of 2011.

24       The feature went live, I believe, in the first week of

25  June of 2011.  But for the better part of five or six months,

1    Facebook had been out there telling everybody in advance:  This

2    feature's coming, here's what it does; it uses biometric

3    information of some kind.  And if you don't want it to go live,

4    you can turn it off.

5         Now, the argument would have been at trial from the

6    plaintiffs: Well, you didn't get the consent right.  The

7    statute has a very particularized way you get consent.  Right.

8    The argument would have been:  Yes, you told people, and you

9    told them how to opt out.  But the way you did it, you didn't

10   get the consent.

11        We would have fought about that.  But the point of it was

12   when it came to the intent level, I would have argued to the

13   jury:  This is a company that's trying to act responsibly.

14   It's telling you in advance it's coming; it's not hiding it.

15   It's giving you a way to prevent it from ever going live.  And

16   it sends out a bunch of notices about it.  So you can argue

17   about whether the notices weren't clear, they weren't, you

18   know, conspicuous enough or whatnot.

19        So there was a real possibility, at least in my mind, that

20   we either win on the consent thing, maybe disagree, maybe the

21   jury disagrees, or we convince the jury even if we didn't get

22   the consent right, we were trying to get the consent -- there's

23   an arm about what the words of the terms.  Maybe we didn't get

24   consent right under the statute, but we tried to get consent,

25   and we gave people advance notice and way to prevent this

feature from ever going live.  Gee, maybe that was reasonable.
Maybe it wasn't negligent.  In which case you could have lost,
and the result would have been zero.

     It's just one example that the record is very complicated.
There's arguments all over the map here that we would have made
across a whole spectrum of issues.  Extra-territoriality.
Right?  That was a big issue for us.  The de novo review in the
Ninth Circuit about the photos, and all these different
exceptions.  It's a complicated matrix.

     And I would say that for somebody to come to court today,
to take a year-long negotiation that produced this
extraordinary result -- really, something we've never seen
before -- and to say:  Well, it could have been done better,
based on highly abstract notions versus not deferring to a
highly-skilled mediator working with very skilled counsel
across the vee, armed with lots of data and a very mature case,
that doesn't cut the mustard?

          **THE COURT:**  Mr. Geller?

     Oh, you've got to de-mute.

          **MR. GELLER:**  Thank you.  I think Mr. Rhodes said it
 very well.  I'll just add the following.

     Number one, for Mr. Camarena, you know, he -- the essence,
I think, of what he said is that we over-valued the due-process
concern.  Your Honor asked me for some of the risks that we
had.  I listed five.  Due process was not even one of the ones

I listed.  There were many, many concerns that we had.  The photos exception that we've discussed, the geometry that we've discussed, the legislative risk that we've discussed, the extra-territoriality that we've discussed.  Due process is also a risk.  But, I think it's unfair for him or anyone else, you know, six years later, to say that we -- to sort of armchair-quarterback and say we over-valued this one particular risk.

On Mr. Jan, I'm not quite sure I followed all of what he said.  But I know he made a lot of -- he had concerns about the class size, and used the word "conveniently" as if we -- you know, I think he said we conveniently went between 8 million and 7 million, or 9 million -- we're not doing anything for convenience.

What was important to us was to make sure that notice went to everyone that could possibly be they the class.  So we always knew that the notice was going to be broader than the actual class members.  And this was a major, major topic of discussion, major topic of data exchanged with Mr. Rhodes.  We demanded a sworn declaration.  Even if it wasn't filed in court, we wanted to see it from Facebook.  We were very, very concerned about who was in the class, and just making surely that everybody got notice.

When we negotiated this record-breaking settlement with Ambassador Bleish, it wasn't based on whether there were

 1   7 million in the class, or 7.9 million in the class, or

 2   8 million in the class.  It was getting the most money we could

 3   get, in the aggregate.  Which is what we did.

 4       So no matter what the class size actually is, this is a

 5   record-breaking settlement.  And almost 1.6 million class

 6   members made claims, and are getting roughly $350, which is

 7   significant.  And it's significant especially now, with what

 8   we're going through, what Mr. Jan is living through.

 9       And I hope that you're okay, and I'm glad that you're

10   recovering.

11           **MR. JAN:**  (Nods head)

12           **MR. GELLER:**  But, this is significant money.  And

13    I'll tell you.  The amount of people that objected or that

14    opted out, it's -- you know, .0001, 1/1,000th of 1 percent

15    opted out.  And less than that objected.

16       So the notion that Mr. Camarena says that we didn't have

17   the interests of the class at heart or we discounted things for

18   the class, it's -- you know, I should have thicker skin by now.

19   But this was a case we worked really hard on.  And we're really

20   proud of the result.

21       And, you know, I'd like Mr. Camarena and Mr. Jan to tell

22   me about the cases that they've litigated for six years.  And,

23   and maybe tried.

24       And we try more cases than most firms.  So --  we were

25   ready to try this one.  The only reason we didn't is because we

1   got a settlement that made sense.

2            THE COURT:  Okay.  All right.  Let's move on --

3        MR. JAN:  May I?

4            THE COURT:  Yes, just very briefly.

5        MR. JAN:  Yes, Your Honor.  Forgive me for being so

6    garrulous.  Two items.

7        When Mr. Geller gave his description, he said:  Look, when

8    we were discussing these matters with the mediator, we weren't

9    necessarily concerned with class size.  If you don't know what

10   class size is -- and I don't know what number they use, whether

11   they use the 6.9, the 7.1 or the 9.4., there is someone that it

12   has to establish a class size.  Because without establishing a

13   class size, you can't look at the value of the case.

14   Fundamental to even a Churchill analysis, you need to know what

15   you're talking about in terms of gross available damages.

16       This is a statutory damages case.  A times B equals C.

17   And then you attach risk to that.  It's relatively simple.  And

18   I didn't mean to say that this is nothing more than a

19   mathematical equation.  I realize there are many variables in

20   this case.

21       I think I would like to respond briefly to Mr. Rhodes'

22   comment regarding BIPA being -- requiring consent, and the

23   reasonableness of their conduct.  The fact is there are -- it

24   is an advance-written-consent-specific statute.  It's not a

25   question of reasonableness.  Did you guys get the consent or

 1   did you not; you did not.  Let's push that issue aside.

 2        Forgive me, Your Honor, if I have not been --

 3        **THE COURT:**  That's all right.  That's fine.

 4   Okay, let's jump into the fees now, Mr. Geller.

 5        **MR. JAN:**  Thank Your Honor.

 6        **THE COURT:**  This is on your side of the case, so I'll

 7   let you take the lead on that.

 8        **MR. GELLER:**  So Your Honor, originally when we

 9   presented the $550 million proposal that Your Honor had

10   concerns with, and -- and sent us back to the negotiating

11   table, we had suggested that if notice were to go out, it

12   would say that we would seek no more than 25 percent, which is

13   the benchmark, as you know, in the Ninth Circuit.

14        We came back.  And in -- in negotiating with Mr. Rhodes,

15   we got another $100 million for the class, as you know.  And

16   that was not easy.  It's not easy to get $100 million, alone,

17   from any defendant.  And to get $100 million on top of

18   $550 million that they've already agreed to pay, and they

19   thought they were done, was very, very challenging.

20        And one of the things that we decided to do is Facebook is

21   going to put in another $100 million.  Class counsels' going to

22   reduce their fee request.  So, one way -- I mean, present it

23   two ways.

24        We're asking the Court to award 20 percent of the first

25   $550 million, and zero out of the additional $100 million.  Or,

1    a blended rate of 16.9 percent.  It's significantly below the

2    25 percent benchmark in the Ninth Circuit.

3            **THE COURT:**  You know, I'm not disagreeing with any of

4    that.  But a benchmark is -- there may be some cases that say

5    -- it's really more of a guideline.

6            **MR. GELLER:**  Correct.

7            **THE COURT:**  It's not really, you know, a hard and

8    fast line.  In other words, it's not automatic.  I know you're

9    not suggesting that.  But, benchmark has the flavor of you

10   just -- you just get it.  It's a little bit different.

11        But you know what, let me just tell you my concern.  I

12   don't have any problem with the lodestar amount.  It's

13   documented; it seems fine.  The costs are actually less than I

14   would have expected in this case.  They're under a million.

15   Not by much, but they're under a million, which is not too bad.

16        But, you know, as the dollar amounts go up -- and this is,

17   as settlements go, an enormous pot -- you typically kind of

18   scale it down.  It's like, you know, when you go to your

19   broker, if you have an account over X dollars, they charge you

20   3 percent less than they charge a person who has a smaller

21   account.

22        So just looking at it this way, isn't -- now, look.  I'm

23   the first to admit there's some degree of -- it is not random,

24   but there is some degree of judgment in just picking a number.

25   I don't have any dispute with that.  It's -- it's trying to

1    figure out what's just and fair.  But, you know, maybe -- why

2    would something like 15 percent of such a large number might --

3    might be more sensible.  I mean, it's an ample reward.

4         I -- listen.  Let me just preface this.  Plaintiffs are

5    essential to our system.  We can't have cases unless people

6    bring them.  And there are, in my view, particularly in this

7    case, tremendous risks, and this was a cutting-edge case by a

8    variety of measures.  And it was well-litigated by both sides,

9    and it was no easy thing.  I know that because I wrestled with

10   most of these questions as matters of first impression on my

11   side of the table, on the judicial side.

12        And so I appreciate all of that.  And I think a reward is

13   important for the plaintiffs' bar.  That's just not a question

14   in my mind.  You do get something above and beyond your

15   lodestar.

16        But I'm wondering though, if maybe a pot this large, half

17   a billion with a B, half a billion dollars -- it's is actually

18   larger than that, but you're pegging your fees off half a

19   billion, with a B.  You know, maybe you should be looking more

20   in, say, the 15 percent range.

21        Just, what do you think about that?

22             MR. GELLER:  Well, I can tell you, you know, when I

23   read Mr. Pentz's objection to fees, he started talking about

24   the Seventh Circuit.  And I pulled a couple of cases from the

25   Seventh Circuit --

1           THE COURT:  We're in California now, so I'm really

2      not that interested.  Okay?

3           MR. GELLER:  I was just --

4           THE COURT:  We're not in Illinois, and we're not in

5      the Midwest.  You're here in the Golden State, and that's the

6      law that's going to govern the case.  So --

7           MR. GELLER:  I agree, Your Honor.  The only point I

8      was going to make is we have cases there that are much larger

9      than this, where the percentage is much larger than the ask

10     here, reflective of the work that was done and the result that

11     was achieved.

12          And we have experts here who have looked at this.  Two of

13     the greatest academics who look at fees.  And they look at it

14     from two different perspectives.  You've got Brian Fitzpatrick

15     and Bill Rubenstein.

16          And Mr. Fitzpatrick, who Mr. Pentz relies upon in his

17     objection, looks at it from a market-rate perspective.  And he

18     concluded -- I'm reading from his declaration which is at

19     Docket 499-2, that (As read):

20               "Class counsel in this case have applied for an

21               attorneys fee award of 16.9 percent.  Based on my

22               academic research, this percent is even lower than

23               the contingency-fee class members would have agreed

24               to pay in a case of this magnitude, complexity and

25               risk, had they hired counsel on their own."

1    So he supports it.

2    Professor Rubenstein, also, he was shocked at the low

3  lodestar.  And, I know Your Honor has already stated that the

4  lodestar doesn't bother you.  But, but, Professor Rubenstein

5  talks about the efficiency with which this is -- this case was

6  litigated.  And, and thinks that's important that we be

7  rewarded for that.

8    You know, when you look at other cases in the Ninth

9  Circuit, for example, *Anthem*, 56 -- or 53 law firms billed time

10 to *Anthem*.  In *Equifax*, Judge Thrash of Atlanta appointed 26

11 law firms.  In *Yahoo!,* another data breach case, over 20 firms

12 billed time.

13          THE COURT:  Who appointed 26 law firms?

14          MR. GELLER:  I'm sorry.  In *Yahoo* -- it was

15  Judge Koh -- 23 law firms submitted lodestar.  I think the

16  structure was smaller than that, but then they subbed out.

17    In *Equifax*, Judge Thrash appointed 26 law firms to

18 represent the plaintiff class, in a single-defendant case.

19    In *Anthem*, by the way, if you don't mind me taking a

20 minute, I argued to Judge Koh that she should appoint my law

21 firm, alone, or maybe with one other firm.  And she told me

22 that that was too aggressive a position.  Even though she asked

23 for a lean structure, she then appointed a structure that was

24 not lean.  And they asked for --

25          THE COURT:  Let me just jump in.  There's no doubt I

1   may have a philosophical difference with some of my colleagues

2   because I -- I go for lean and mean, as you know.

3            **MR. GELLER:**  And --

4            **THE COURT:**  Anyway, let's leave Judge Koh out of it.

5   Go ahead with --

6            **MR. GELLER:**  Okay.  But what we did here is we heard

7   you at the beginning about being lean and mean.  We didn't

8   fight over who should be lead counsel.  We worked together.

9   We worked efficiently; we worked effectively.

10           And --

11           **THE COURT:**  Listen.  Let me just cut to -- I'm with

12   you on all that.  It was well-managed.  It was -- I do not

13   allow a proliferation of firms.  And -- and you didn't ask.

14   So, I mean, we're all on the same page with that.  I don't see

15   any inefficiencies.

16           You know, 30,000 hours over six years is -- that's a lot

17   of work.  I mean, it's not -- I don't think it's that little.

18   I mean, I'm not necessarily disagreeing with your expert.  But

19   that's not a trivial amount of work.  That's 5,000 hours per

20   year; that's a lot of time.  But at the same time, it was a big

21   case.  I don't have any problem with any of that.

22           So, I really just kind of want to focus on the back end.

23   You know, right now you're asking for what would, you know,

24   effectively be, what, 110 million above and beyond your

25   out-of-pockets and, I'll just call them that -- your lodestar,

1    that's a better way of saying that.  110 million beyond your

2    lodestar.

3        And I'm not saying no; I just want to get a better sense

4    of, you know, why isn't something more like 75 or -- you know,

5    more appropriate?  I mean, that's still an enormous incentive.

6    An enormous reward I guess is one way of putting it, slightly

7    glibly, for the effort.

8        And recognize -- I don't think anybody would say getting

9    75 million above and beyond your actual fees is a small thing.

10   It's a lot of money.  And as you said, there really isn't that

11   many people to distribute it to.  It's a relatively, you know,

12   discrete team.  This is not 75 million being cut into 50

13   slices.  You know, it's you and the Edelson firm as I

14   understand it.  And that's a lot of money to divide between two

15   groups of people.

16       **MR. GELLER:**  There is a third firm.  But Your Honor,

17   my -- my point would be -- and I say this respectfully --

18       **THE COURT:**  No, listen.  You -- please.  Never say

19   "respectfully," because one, it tends to be ironic I know

20   you're not meaning it that way.  Two, we're just talking.

21   We're among friends here.

22       Just tell me why.  Why should you get 110 million?  That's

23   what I'm asking.

24       **MR. GELLER:**  Because the fact that we did it with

25   three law firms, we shouldn't be punished because we didn't do

1    it with ten law firms.  If we split it among ten law firms,

2    sure, it would be a smaller fee each.  But what that's saying

3    is that we're being cut because we were able to do this with

4    just three law firms.  And I think -- I don't think that -- I

5    think we should be, if anything, rewarded because of that.

6         And I think if you look at the -- you know the factors

7    under *Vizcaino versus Microsoft*, did we achieve exceptional

8    results?  I think the answer is unequivocally, yes.  We've set

9    the record, and we've set the record by a large margin

10   (Indicating).

11        Whether the case was risky for class counsel.  More so

12   than any other privacy case.  This was not a data-breach case

13   that everybody has a cookie-cutter form, and they cut and

14   paste, and they know what to do.  This was the first successful

15   BIPA case.

16        And I think Mr. Jan referenced other cases that Edelson

17   has done and others have done.  Of course, of course, because

18   of what we've done here, they're citing to Your Honor's

19   rulings, they're citing to our work, they're borrowing our

20   briefs.  So this has now become an area for class action

21   lawyers, but it wasn't, before this case.

22        Whether we -- whether class counsels' performance

23   generated benefits beyond the cash settlement fund.  Yes.

24   We've talked about that.  Substantial conduct remedy.

25        The market rate.  Nobody better on that Brian Fitzpatrick

1    to talk about the market rate.  He says the 16.9 ask is below

2    market.

3         And of course --

4            **THE COURT:**  Can I just ask a quick question?  I know

5    I didn't ask for this, and I'm not trying to catch you off

6    guard here.

7         But, I mean, are either one of your experts available

8    right now?  Are they on tap in any way?

9            **MR. GELLER:**  I wish they were.

10           **THE COURT:**  I didn't ask because I didn't think we

11   needed it, but -- and I have their declarations, which are

12   quite good.

13        But I was just wondering.  Are either of them on?

14           **MR. GELLER:**  I don't know if they're watching out of

15   curiosity, but we did not --

16           **THE COURT:**  All right.

17           **MR. GELLER:**  -- ask to have them available.

18           **THE COURT:**  All right.

19        Okay.  Mr. Rhodes, before I get to Mr. Pentz, it's not

20   really -- I'll invite to you add any thoughts.  Not really your

21   issue.  But if you don't have any, that's fine as well.

22           **MR. RHODES:**  I will repeat the Court's statement.

23   It's really not my issue.

24           **THE COURT:**  Okay.  All right.

25        Mr. Pentz.

1          **MR. PENTZ:**  Thank you, Your Honor.

2          Well, let me start off by saying that I think we may have

3     overstated or the parties generally may have overstated the

4     difference between Ninth Circuit law and Seventh Circuit law,

5     both on settlement approval and on the area of fees.  Because

6     even though the Seventh Circuit, you know, clearly is known for

7     looking at the market rate, the Ninth Circuit has recently

8     moved that way in the case *In Re Optical Disk Drive*, 959 F.3d,

9     922 decided this week --

10          **THE COURT:**  Yes, I -- I have that case in my hand, as

11    we speak.

12          **MR. PENTZ:**  Yeah.  In that case, there was an actual

13    fee agreement entered into by Hagens, Berman that produced a

14    12 percent fee in that $124 million settlement.  And it was

15    exactly identical to the Bernstein Litowitz fee agreement that

16    we appended to our opposition whereby, you know, for

17    increasing ranges of recovery there would be a lower

18    percentage fee awarded -- the same formula that --

19          **THE COURT:**  I'm with you on that, and I appreciate

20    you sticking with the Ninth Circuit.  Because that's really

21    all that matters.

22          **MR. PENTZ:**  Yeah.  Well, I mean, that --

23          **THE COURT:**  But there's no -- that doesn't really --

24    I mean, look.  I told Mr. Geller, you know a benchmark, is not

25    a guarantee.  That is true, but there's also no requirement

1    that there be a sliding scale.  There's nothing in the case

2    law that says once you get X dollars, you can't request more

3    than Y percentage.

4        So, I mean, what's wrong -- I mean, look.  This is a

5    ground-breaking  I'll just tell you, I'll give you my

6    perspective.  It's no secret, because I said this earlier on

7    the record.  This is a groundbreaking settlement in a novel

8    area that took a lot of effort to get to, both substantively,

9    and in terms of professional good will between warring opposing

10   parties.

11       What is wrong with, you know, either a blended rate of

12   about 17 percent, or 20 percent of the original settlement?  I

13   mean, they're are both well within the outer boundary of what

14   our circuit has said is acceptable.  And, why shouldn't I just

15   go with that?

16           **MR. PENTZ:**  Well, I believe that the real market rate

17   is reflected in *In Re: Optical Disk Drive*, and the Bernstein

18   Litowitz case where they represented the State of Mississippi.

19   I think for a settlement of this size, 15 percent is not the

20   market rate.  That wasn't even the market rate in *Optical Disk*

21   *Drive* which was 124 million.  I think what we've recommended

22   is a fee of $50 million, which represents a two and a half

23   multiplier.  So we're not saying that class counsel shouldn't

24   get rewarded.  We're certainly not saying they should take

25   their lodestar here.  Absolutely not.

We're saying they should take the same fee that larger firms who negotiate competitive fee agreements with sophisticated clients are willing to take in their cases.  And I -- you know, I don't know whether they would say that case was easier or had less risk than this one, but I doubt it.

I think if you look at the fee agreements that we know about, and that's another one -- Bernstein Litowitz is the first, this one, Hagens, Berman and *Optical Disk Drive* is another -- I think it reveals that the market rate is a lot closer to the 12 percent that we found and that was actually found in, I believe, Fitzpatrick's study for settlements in the range that we're talking, which is above $500 million.

And indeed, in *Optical Disk Drive*, the Ninth Circuit said that the starting point in megafund cases should be -- you know, the fee percentage in a fee agreement, not the 25 percent, which they said was of little assistance in megafund cases.

The other thing is that class counsel conceded that Illinois law applies here.  And, and that is correct.  That the law of the state from which the case was transferred is the one that applies.  But Illinois law also recognizes the megafund problem.

In the case cited by class counsel where I think -- I think it's the lead case by which the -- Illinois adopted the percentage of the fund method, they say (As read):

 1              "For example, awarding a percentage of the common

 2              fund and attorneys' fees keeps a windfall on

 3              plaintiffs' counsel when the damages awarded are

 4              high, but the costs and length of the litigation were

 5              comparatively slight."

 6       Now, here, the length was not slight, but the cost in

 7  terms of fees and expenses was relatively low.  Class counsel

 8  says:  Don't penalize us for that.  But if you give them a

 9  two-and-a-half multiplier, you're not penalizing them because

10  the time they didn't spend on this case presumably they were

11  able to spend on other cases, and make other fees.  So applying

12  a consistent multiplier in every case does not punish class

13  counsel.  If they were able to keep the fees to a minimum, then

14  presumably they had, you know, time to spend on other cases,

15  and make fees there.

16       And one of the reasons why the lodestar may be low here is

17  because they didn't really reach the point where they were

18  doing massive document review discovery, because that's where

19  class counsel really run up their lodestar.

20       The --

21            **THE COURT:**  Let's pause on that.

22       So Mr. Geller, what are your reactions to that?

23            **MR. GELLER:**  Well, his last statement, he just

24   doesn't-- he doesn't even know the case that he's objecting

25   to.  Discovery closed; we were literally on the brink of

1    trial.  So there was not, as -- as Your Honor held previously,

2    there was not pebble left unturned.

3      I will say this.  Mr. Pentz likes to object.  And I'm a

4   big fan of the objection ability in class actions.  I think

5   it's really, really important.  And Mr. Pentz is about as good

6   at it as anybody.

7      You know, just as -- interesting.  Ted Frank is another

8   person who objects to a lot of cases.  And he has sort of a

9   doctrinal view of class actions.  He tweeted how good this case

10   was.  So the prediction was that Ted Frank didn't object here

11   because he actually looks at cases, and doesn't object if it's

12   a really good case.  But the prediction was that Mr. Pentz

13   would object, because he just looks at the size of the case.

14   And if it's a big case with a big fee, he is going to object.

15      He's objecting right now to the Apple case before

16   Judge Davila.  He was on Zoom just a couple weeks ago.  I

17   watched him.  And here's what he said in *Apple,* why the fee's

18   too high.  He said (As read):

19        "This case..."

20     Meaning Apple.

21        "...settled just a little over two years after it was

22        filed.  And whether due to poor notice or an overly

23        burdensome claims process, very few class members

24        have filed claims.  As a consequence, the settlement

25        fund does not warrant anything close to a

1          28.3 percent fee."

2     Which was what was asked.

3          "Instead, class counsel warrant a fee at or below

4          17.8 percent."

5     So he's using the factors a low claims rate and the case

6     settled in two years to say the fee should only be 17.8.

7          Here, we're asking for less than that.  16.9.  The case is

8     almost six years old.  The original case was filed in April of

9     2015.  The claims rate is the best claims rate that any of us

10    have seen in a consumer case.  It's the exact --

11          **MR. RHODES:**  Your Honor, I'm horrified to do this,

12    but I just got notice that we can get one of the experts on

13    for you.

14          **THE COURT:**  I just promoted -- that's Zoom talk, not

15    me.  I just promoted Mr. Rubenstein to panelist.

16          **MR. RHODES:**  Okay.  I didn't want to interrupt the

17    flow, and I apologize for doing that.  But I wanted to let you

18    know.

19          **THE COURT:**  Oh, no, okay.  As host, I see and hear

20    all.

21     Okay.  Go ahead, Mr. Geller.

22          **MR. GELLER:**  So I think it's -- you know, it's

23    whatever fits the bill in the particular case.  So in *Apple* he

24    wanted to talk about the claims rate being important and he

25    didn't like it, and the length of time was important because

1    he didn't like it.

2        But here, how about the six years that we spent,

3    Mr. Pentz?  How about the fact that the claims rate is

4    historic?

5            **THE COURT:**  Let's direct everything to the Judge;

6     we're talking to me, not to each other.

7        But let me talk to Professor Rubenstein.  So you heard --

8    I hope you heard Mr. Pentz's -- I'll call it kind of a market

9    pricing theory.

10       Do you have any reactions to that?

11           **PROF. RUBENSTEIN:**  Your Honor, as you're aware, the

12    Ninth Circuit tends -- in your local rules, tends not to focus

13    so much on a market rate, although it's an acceptable way of

14    doing it.  It's the way the Seventh Circuit requires you to do

15    it.

16       I feel like Your Honor put your finger right on the key

17    issue here, which is the bonus that they're getting in the

18    case, and is it a reasonable bonus.  Particularly, as

19    Your Honor said, the lodestar all seems fine.  So it just

20    isolates that question.

21       And as I put forth in my declaration, Your Honor, I do

22    think in this case it's warranted.  This is really an

23    exceptional case, in my experience.  And I would not testify to

24    a multiplier at this height if I did not think it was.  And I

25    rarely testify --

1          **THE COURT:**  Why is that?  I know I have your

2     declaration, but just so we're all on the same page here --

3     you can gloss it.  But just tell me why you think that is the

4     case.

5          **PROF. RUBENSTEIN:**  The main reason, Your Honor, is

6     that, you know, so many of the big cases with these numbers

7     are piggyback cases.  You take a case like the *VW* case or the

8     *Gulf Oil* spill, the NFL concussion case.  A lot of these

9     cases, you know there's going to be a settlement.  And so the

10    lawyers do a lot of work, and they deserve their recovery, and

11    they should probably get a bonus.  But everyone knows going

12    in, the *VW* case is going to settle, Gulf Oil spill's going to

13    settle, the NFL concussion case is probably going to settle.

14         Here, you have an enormous settlement in a case that was

15    incredibly risky, and there was no template for.  These lawyers

16    made it up.  This is not a copycat case.  It was not a

17    settlement -- I wouldn't have predicted this case would settle,

18    and I certainly would not have predicted it would settle at

19    this level (Indicating), Your Honor.  So it stuck out to me.

20    When they called me originally and they said they'd settled the

21    data privacy case for $600 million or $550 million, I thought:

22    All these cases settle for $10 million.  I've never seen

23    anything like this before.

24         So I think they deserve an enormous amount of credit for

25    the creativity they showed in using the Illinois statute in a

1    completely new way, in taking the risk of doing this, and

2    litigating against probably the largest company in the United

3    States.  And, you know, Mr. Rhodes's firm is very skilled, and

4    they had to go up against tough opposition.  And Your Honor

5    knows far better than I do how difficult the issues in the case

6    were.

7         So, it's really an exceptional case.  I've looked at

8    hundreds of these things.  I've been an expert in hundreds of

9    these things.  And this one is really -- in my opinion, it's a

10   very special settlement for this reason.

11        **THE COURT:**  Mr. Pentz?  What's wrong with that?  That

12   makes sense to me.  Why is that -- why shouldn't we just go

13   with that perspective?

14        **MR. PENTZ:**  Well, I don't disagree with anything that

15   Professor Rubenstein just said.  I think the question is the

16   one that you posited before -- earlier:  What, what level of

17   bonus over lodestar is reasonable here?

18        There's no question that this case lasted longer than

19   *Apple,* for example, the iPhone case.  You know, that it was

20   riskier.  And that it took longer to get to settlement mode.

21   But still, you know, a multiplier of three is extremely -- you

22   know, a pretty generous multiplier.  It comports with the

23   market rate.

24        And I just -- I want to just say this with respect to, you

25   know, where this case was filed.  I know that, you know, on

federal issues, you know, the Northern District of California

will apply Ninth Circuit law.  And a fee request is arguably a

federal issue under 23(h).

But, this case was filed in Illinois state court, where it

was going to be governed, if it had stayed there, by Seventh

Circuit law.  I mean, it's pretty certain that it was going to

be removed by Facebook.  So, you know, the Seventh Circuit says

you should negotiate a fee agreement up front.  *Ex ante*.

That's what Judge Easterbrook said in *Synthroid*.  And he said

because the parties had failed to do so or the judge had failed

to require that, now, the Court was required to reconstruct the

fee agreement that the parties would have entered into and

negotiated at the outset of the case.

And I think because this case was filed in Illinois, even

though it was then fortuitously transferred to your court, you

know, class counsel --

THE COURT:  I don't know -- "fortuitously" is not the

riot world.  Transferred there pursuant to contracture

provisions between Facebook and --

MR. PENTZ:  Choice of venue.

THE COURT:  Look.  This was not just a case wandering

around the country looking for a home.  This case came here,

and it was opposed, and it was a matter of a transfer motion

and a choice-of-law motion.  It's here because of the

relationship between Facebook and its users.

1     So --

2          **MR. RHODES:**  Your Honor, may I --

3          **THE COURT:**  -- this is not really an accident;

4     California law applies.  And also, it is pretty well

5     established that in cases where actions are transferred, it's

6     the law of the transferree court that governs.

7          Anyway, go ahead, Mr. Rhodes.

8          **MR. RHODES:**  I just wanted to make one point,

9     Your Honor.  And it's a point that -- it's  subtle point, but

10    I want to make it.  And it's probably odd for somebody who's

11    had many, many cases against this group of lawyers across the

12    vee over the last 20 years.

13         But, one of the reasons we're where we are today is

14    because of the willingness of very experienced counsel --

15    Mr. Edelson, Mr. Geller, Mr. Balbanian and others -- to be able

16    to negotiate with me and my team in a way where we were able to

17    look honestly collectively at the issues.  And I know that may

18    not be an important factor for setting the fee, and it's -- far

19    be it from me to say what fee counsel should get.

20         But I think they ought to be at least applauded for being

21    able to have a very difficult, months-long, often daily

22    engagement with our mediator for the better part of the first

23    six months of last year in a way that I found to be very

24    professional.  We disagreed about a lot.  We always tend to

25    disagree about a lot.  But there was a skill level, just in the

1 negotiation, itself.  And that seemed to have gotten missed

2 here.  We're just looking at these percentage.

3     But, but, you know, lawyers shouldn't be punished when

4 they're very, very skilled because they don't put a lot of --

5 they don't put excess time in it.

6     And that was really the point I wanted to make Your Honor.

7         **THE COURT:**  Listen, yeah.  As Professor Rubenstein

8 said, these are different issues.  Okay?  Lodestar is not

9 constraining my assessment of what has been referred to as the

10 bonus or the reward, or whatever else you want to say.  The

11 money on top of the lodestar.

12     Okay.  Any final comments from anyone?

13     Mr. Geller, I'll let you have the final word on your side.

14         **MR. GELLER:**  The only thing I would say is to the

15 extent that Mr. Pentz keeps on talking about the Seventh

16 Circuit -- and I know that Your Honor doesn't want to hear

17 about it -- I have a case where I got a 25 --

18         **THE COURT:**  If I may, it's not that I don't want to

19 hear about it; it is that it's just really legally irrelevant.

20         **MR. GELLER:**  Okay.  Then --

21         **THE COURT:**  I have nothing against the Seventh

22 Circuit.  I'm sure it's a delightful place to be.  But we're

23 in the Ninth Circuit, and that's the law that governs.

24     And if you need a case cite for that, you should see

25 *Newton v. Thomason*, 22 F.3d 445, Ninth Circuit, 1994.

1     So, please.

2          **MR. GELLER:**  Yes.

3          **THE COURT:**  I don't want you to walk away thinking

4     I've got some problem with the Seventh Circuit.  I don't; I

5     don't care one way or the other.  That's one way of putting

6     it.

7     Okay.  Go ahead.

8          **MR. GELLER:**  So, again, I stand behind what we have

9     in our brief and Professor Rubenstein's declaration, and

10    Professor Fitzpatrick's declaration, all of which support the

11    16.9 request as being actually very reasonable here, in light

12    of not just the grand number that we recovered, but all of the

13    other factors taken into consideration.

14         **THE COURT:**  All right.  Processor Rubenstein, any

15    final thoughts?

16         **PROF. RUBENSTEIN:**  Just one quick response to

17    something Mr. Pentz said, Your Honor.  He mentioned a

18    two-and-a-half multiplier as a general -- generous bonus.  And

19    I just want to add that that kind of multiplier is standard in

20    the types of cases I was talking about.  And I think this case

21    warrants the type of multiplier we're talking about, that

22    they're asking for.

23    And I worry a little bit because I've seen it in other

24    cases that if you knocked them down, all they're going to do in

25    the future cases is do a lot of discovery they don't need to do

1    to run their lodestar up (Indicating) and their multiplier down

2    (Indicating).

3                    **THE COURT:**  A perverse-incentives problem.

4                    **PROF. RUBENSTEIN:**  Yes.  Thank you, Your Honor.

5                    **THE COURT:**  Okay.  All right.  Mr. Pentz?

6                    **MR. PENTZ:**  Yes, Your Honor.

7         Well, I mean, even though the transfer to California was

8    dictated by the choice of venue in the user agreements, the

9    fact that this case was filed in Illinois where class

10   counsel -- I don't think Professor Rubenstein would dispute

11   that if this case had remained there, a competitive fee

12   agreement probably would have produced a fee of 10 percent.

13   And that would not be, you know, considered punitive in any way

14   by the Illinois courts.

15                   **THE COURT:**  How would we know that?  I mean, this is

16    all speculative.  Who knows what could have happened.  It

17    could have been that Mr. Geller said:  Listen, this case is --

18    -- I've got a 5 percent chance of recovery here.  So you're

19    going to have to pay 95 percent on the back end.

20        I'm just guessing -- I mean, who knows?  We can't have --

21   do you know what this is like?  This is like those

22   *Georgia-Pacific* factors in patent cases where you're supposed

23   to have a hypothetical negotiation between two companies who

24   hate each other, and have sued each other, and you're supposed

25   to come up:  Oh, well, okay, now we -- now we order a royalty

1    or a license fee,  let's pretend they actually liked each other

2    and really wanted to share the technology, and here are 18,000

3    factors you have to take into account.

4         This is basically the same thing.  I mean, who knows what

5    Edelson, Geller and company would have negotiated with -- now

6    I've forgotten names of the plaintiffs.  But, the individual

7    named plaintiffs.  I mean, I just -- I can't say, nor can you.

8    It could have been 10 percent, it could have been 30 percent,

9    it could have been anywhere in between.  I mean, who knows.

10        But it's all really water under the bridge in a sense,

11   because you're not in Illinois anymore; you're in

12   San Francisco.

13            **MR. PENTZ:**  But my point is:  Why should a change in

14    venue affect such a huge difference in the amount of

15    attorneys' fees that the class members are going to have to

16    pay?

17            **THE COURT:**  Well, because the case I just read to you

18    has the following quote in it.

19            **MR. PENTZ:**  No --

20            **THE COURT:**  Quote:

21            "A transferree court applies the law of the circuit

22            in which it sits."

23        That's why.

24            **MR. PENTZ:**  No, I understand that.  But there's not

25    supposed to be such a thing as federal common law.  And so if

1   that result becomes too divergent, I believe there's a

2   statement in that case that the Supreme Court would have to

3   weigh in, and balance the playing field if they grow too far

4   apart.

5           **THE COURT:**  That's an issue for another day.  We're

6   not --

7           **MR. PENTZ:**  Right.  I don't think they're that far

8   apart.  I think the Ninth Circuit incorporated the market rate

9   agreement, at least in *Fiber Optics*.  So --

10          **THE COURT:**  All right.  Okay, everyone.  I will have

11  this out when I can.  And business has been very brisk the

12  last couple of months, so it may be a couple of weeks.  But

13  otherwise, I'll have it out.

14      No matter what happens, please keep in mind our Northern

15  District guidelines have a final accounting which I'm very

16  interested in getting.  It's really a key part of our tracking

17  how settlements wrap up.  This is a -- a very unique and

18  interesting settlement, so I want to make sure -- and this is

19  going to fall on you, Mr. Geller, mostly, I think, with some

20  help from Mr. Rhodes -- make sure that final accounting is

21  good.

22      I would actually like -- I'm not going to order this,

23  although I reserve the possibility of ordering it.  I would

24  like to hear more -- I know we've talked about it at some

25  length, but it would be useful for me and I think my colleagues

1  to hear more about the details of the notice process.  Sounds

2  like you two shared some information that maybe I didn't

3  necessarily see.  That's fine.  I'm not faulting you for that.

4      But I was intrigued by Mr. Rhodes' reference to some kind

5  of a -- sounded like a 90 percent test, with some kind of an

6  email or some kind of notice, and somebody figured out

7  90 percent of prospective class members would have seen it.  So

8  that's really  with one eye towards the next case, to see--

9          **MR. RHODES:**  Your Honor, that's actually in the

10  record at -- I believe, Document 517, if you're curious.

11          **THE COURT:**  All right.  If we have the time and if

12  we're so inclined, we may just set a half hour, as part of the

13  final accounting, should we get to that point, and just kind

14  of talk about these issues and see what we can do.

15      I mean, by any stretch -- and I'm not making any

16  statements now about class size or anything else.  But, you

17  know, any double-digit recovery is a fine recovery in a class

18  case.  It just doesn't happen very often.  So if we're up to

19  22 percent, if it's -- if that is the number that ends up

20  sticking, that's a pretty good day in class settlement history.

21      Okay.  Yes, Mr. Jan.  One closing comment, and then we're

22  adjourning.

23          **MR. JAN:**  I don't know that I can lend much more to

24  my request that simply we examine the settlement not in terms

25  of its very impressive numbers, in terms of gross dollars, but

1    rather, in terms of the -- the real -- the settlement value

2    versus the potential value, and that analysis which is done,

3    wherever you are.  Whether you're in the Seventh or you're in

4    the Ninth or you're looking at Churchill or you're looking at

5    *Lusk v. Five Guys* that cites Professor Rubenstein.

6         Says (As read):

7              "The primary way a court determines whether a

8              settlement's value is sufficient is by making a rough

9              estimate of what the class would have received had it

10             prevailed at trial, and then discounting that value

11             by the risks that the class would face in securing

12             that outcome."

13        So I hope I've expressed that meaningfully.  I have ranges

14   that I think are practical.  If the Court would like further

15   briefing on that, I'm happy to submit it.  If not, I appreciate

16   your great courtesy in hearing me today.  And I'm sorry if I've

17   been too long-winded.

18             **THE COURT:**  Okay.  Good luck on your recovery.

19        Okay, thanks, everyone.  Appreciate your coming in.

20             **MR. GELLER:**  Thank you, Your Honor.

21        (Proceedings concluded)

22

23

24

25

**CERTIFICATE OF REPORTER**

I, BELLE BALL, Official Reporter for the United States

Court, Northern District of California, hereby certify that the

foregoing is a correct transcript from the record of

proceedings in the above-entitled matter.


_____
/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Monday, January 18, 2021