# Exhibit 2

1   ROBBINS GELLER RUDMAN
      & DOWD LLP
2   SHAWN A. WILLIAMS (213113)
    JOHN H. GEORGE (292332)
3   One Montgomery Street, Suite 1800
    San Francisco, CA 94104
4   Telephone: 415/288-4545
    415/288-4534 (fax)
5   shawnw@rgrdlaw.com
    jgeorge@rgrdlaw.com
6                                                     EDELSON PC
    LABATON SUCHAROW LLP                              JAY EDELSON (*pro hac vice*)
7   MICHAEL P. CANTY (*pro hac vice*)                 BENJAMIN RICHMAN (*pro hac vice*)
    CORBAN S. RHODES (*pro hac vice*)                 ALEXANDER G. TIEVSKY (*pro hac vice*)
8   140 Broadway                                      350 North LaSalle Street, 14th Floor
    New York, NY 10005                                Chicago, IL 60654
9   Telephone: 212/907-0700                           Telephone: 312/589-6370
    212/818-0477 (fax)                                312/589-6378 (fax)
10  mcanty@labaton.com                                jedelson@edelson.com
    crhodes@labaton.com                               brichman@edelson.com
11                                                    atievsky@edelson.com

12  Attorneys for Plaintiffs

13  [Additional counsel appear on signature page.]

14                     UNITED STATES DISTRICT COURT

15                    NORTHERN DISTRICT OF CALIFORNIA

16                        SAN FRANCISCO DIVISION

17  In re FACEBOOK BIOMETRIC          )   Master File No. 3:15-cv-03747-JD
    INFORMATION PRIVACY LITIGATION    )
18  _____  )   CLASS ACTION
                                      )
19  This Document Relates To:         )   PLAINTIFFS' SUPPLEMENTAL BRIEF IN
                                      )   SUPPORT OF PRELIMINARY APPROVAL
20      ALL ACTIONS.                  )   OF A CLASS ACTION SETTLEMENT (*SEE*
                                      )   DKT. 456.) AND REQUEST FOR
21  _____  )   REFERRAL TO AMBASSADOR JEFFREY
                                          L. BLEICH

22

23

24

25

26

27

28

## <u>TABLE OF CONTENTS</u>

I.   <u>AMENDMENTS TO THE PROPOSED SETTLEMENT AGREEMENT</u> ..................1

    **A.  Amendments to the Settlement, Notice Documents, and Plan for Dissemination Addressing the Court's Questions and Concerns Regarding Certain Terms of the Settlement Agreement** ................................1

        1.  <u>Court's Concerns regarding the Releasing Parties</u> ...............................2
        2.  <u>Court's Concerns regarding the Released Parties</u> ...............................2
        3.  <u>Court's Concerns regarding the Released Claims</u> ...............................2
        4.  <u>Further Explanation Concerning the Class List</u> .................................2
        5.  <u>Court's Concerns regarding the Prospective Relief</u> .............................3
        6.  <u>Court's Concerns regarding the Form of Notice and Plan for Dissemination</u> .........................................................................3

II.   <u>THE BASIS FOR ACCEPTING THE MONETARY RELIEF TO THE CLASS</u> .....3

    **A.  The Monetary Relief to the Class is Fair, Reasonable, and Adequate in Light of the Risks That Lay Ahead** ................................3

        1.  *Plaintiffs Believe that Recovering Enhanced Damages of $5,000 per Violation is Exceedingly Unlikely in Light of the Available Evidence of Facebook's Wrongdoing* ..........................................................4

        2.  *Notwithstanding Plaintiffs' Confidence in the Merits of the Case, Trial Would Have Presented at Least Five Potentially Dispositive Factual Issues to Resolve* ...............................................................6

           **(i.)  Whether Plaintiffs and the Class Members provided BIPA-compliant consent** ................................7
           **(ii.)  Whether Facebook collects "scans of face geometry"** ................................7
           **(iii.) Whether the photograph exclusion applied** ........................8
           **(iv.) Whether Facebook negligently, willfully or recklessly violated the Statute** ................................8
           **(v.)  Where the offending conduct took place (*i.e.*, whether Illinois extraterritoriality doctrine could ultimately preclude recovery, to the extent Facebook is able to prove that the alleged violations occurred outside Illinois** ................................8

        3.  *Plaintiffs Believe the Potential of a Retroactive Amendment to the BIPA That Nullifies Plaintiffs and the Class' Claims is a Real Possibility* ..........................................................9

        4.  *Plaintiffs Believe the Post-Trial Risks, Once Appeals Ensue, Are*

*Substantial and Could Result in Less or No Recovery at All* .....................12

    5.  *A Claims Process After Trial Means Plaintiffs' and the Class'*
        *Statutory Damage Award Would Be Heavily Litigated, Leading*
         *to Significant Delays and Potentially Depressing Claims Rates*
        .........................................................................
        15

**B. The Monetary Relief to the Class Far Surpasses Every Other Class
Action Settlement Involving Privacy Violations and Statutory Damages
and Some Anecdotal Evidence is the Praise the Settlement Has
Received Thus Far** .........................................................................17

    1.  *There Are No Serious Comps to the Monetary Component of the
Settlement* ...............................................................................17

    2.  *The Public Reaction to the Proposed Settlement Was Universally
Positive* ...................................................................................20

**III.    THE PROSPECTIVE RELIEF REQUIRES CONSIDERABLY MORE OF
FACEBOOK THAN THE 2019 FTC ORDER** .........................................22

1

2

## <u>TABLE OF AUTHORITIES</u>

3

**United States Supreme Court Cases:**

4

*Bank Markazi v. Peterson*,
    136 S. Ct. 1310 (2016) ...............................................................................................................10

5

*Fid. Fed. Bank & Tr. v. Kehoe*,
    547 U.S. 1051 (2006) ................................................................................................................15

6

7

*Plaut v. Spendthrift Farms, Inc.*,
    514 U.S. 211 (1995) ..................................................................................................................10

8

**United States Circuit Court of Appeals Cases:**

9

*Briseno v. Conagra Foods, Inc.*,
    844 F.3d 1121 (9th Cir. 2017) ..................................................................................................15

10

*Churchill Vill., LLC v. Gen. Elec.*,
    361 F.3d 566 (9th Cir. 2004) ....................................................................................................20

11

12

*Golan v. Freeeats.com, Inc.*,
    930 F.3d 950 (8th Cir. 2019) ....................................................................................................13

13

*In re Google Referrer Header Privacy Litig.*,
    869 F.3d 737 (9th Cir. 2017) ....................................................................................................18

14

15

*Lane v. Facebook, Inc.*,
    696 F.3d 811 (9th Cir. 2012) ....................................................................................................18

16

*Murray v. GMAC Mortg. Co.*,
    434 F.3d 948 (7th Cir. 2006) ....................................................................................................12

17

18

*Parker v. Time Warner Entm't, L.P.*,
    331 F.3d 13 (2d Cir. 2003) .......................................................................................................13

19

*Six Mexican Workers v. Ariz. Citrus Growers*,
    904 F.2d 1301 (9th Cir. 1990) ..................................................................................................16

20

21

*United States v. DISH Network, LLC*,
    954 F.3d 970, 979-80 (7th Cir. 2020) ......................................................................................13

22

*Perez v. Rash Curtis Associates*,
    No.  20-15946 (9th Cir.) ...........................................................................................................14

23

24

**United States District Court Cases:**

25

*Fraley v. Facebook, Inc.*,
    966 F. Supp. 2d 939 (N.D. Cal. 2013) .....................................................................................19

26

27

28

iv

*Hashw v. Dept. Stores Nat'l Bank*,
    182 F. Supp. 3d 935 (D. Minn. Apr. 26, 2016)............................................................18

*In re Capital One Telephone Consumer Protection Act Litig.*,
    80 F. Supp. 3d 781 (N.D. Ill. 2015) ..........................................................................18

*In re Equifax Data Breach Litig.*,
    No. 117-md-2800-TWT (M.D. Ga. Jan. 13, 2020) .......................................................17

*In re Google Buzz Privacy Litig.*,
    No. 10-cv-672, 2011 WL 7460099 (N.D. Cal. June 2, 2011)........................................18

*In re Netflix Privacy Litig.*,
    No. 11-cv-00379, 2013 WL 1120801 (N.D. Cal. Mar. 18, 2013) ..................................18

*In re Vizio, Inc., Consumer Privacy Litigation*,
    No. 16-ml-02693-JLS-KES (C.D. Cal.)    .....................................................18

*Kehoe v. Fidelity Fed. Bank & Tr.*,
    No. 03-80593-CIV-HURLEY/LYNCH (S.D. Fla.)..........................................................19

*Kinder v. Meredith Corp.*,
    No. 1:14-cv-11284 (E.D. Mich.)...............................................................................19

*Maryland v. Universal Elections, Inc.*,
    862 F. Supp. 2d 457 (D. Md. 2012) .........................................................................13

*Moeller v. Am. Media, Inc.*,
    235 F. Supp. 3d 868 (E.D. Mich. 2017)...............................................................10, 19

*Texas v. Am. Blastfax, Inc.*,
    164 F. Supp. 2d 892 (W.D. Tex. 2001).....................................................................13

*United States v. Facebook, Inc.*,
    No. 19-cv-2184 (D.D.C. July 24, 2019) .................................................................22, 23

**Illinois Supreme Court Cases:**

*Barthel v. Ill. Cent. Gulf R. Co.*,
    384 N.E.2d 323 (Ill. 1978)........................................................................................4

*Perry v. Dep't of Fin. & Prof'l Reg.*,
    106 N.E.3d 1016 (Ill. 2018) ....................................................................................10

**Illinois Circuit Court Cases:**

*Carroll v. Crème de la Crème, Inc.*,
    2017 CH 01624 (Ill. Cir. Ct.)..................................................................................19

*Edmond v. DPI Specialty Foods*,
    2018 CH 09573 (Ill. Cir. Ct.)..................................................................................19

*Lloyd v. Xanitos*,
    2018 CH 15351 (Ill. Cir. Ct.)..................................................................................19

*Sekura v. L.A. Tan Enters., Inc.*,
        No. 2015 CH 16694 (Ill. Cir. Ct.) ..................................................................19

*Watts v. Aurora Chicago Lakeshore Hosp. LLC*,
        2017 CH 12756 (Ill. Cir. Ct.) .......................................................................19

**Statutory Authority:**

18 U.S.C. § 2710 ..................................................................................................18

47 U.S.C. § 227 ....................................................................................................13

740 ILCS 14/20 ......................................................................................................4

**Miscellaneous Authority:**

Blaine Evanson, *Due Process in Statutory Damages*,
        3 GEO. J. L. & PUB. POL'Y 601 (2005) .........................................................14

Colleen P. Murphy, *Reviewing Congressionally Created Remedies for Excessiveness*,
        73 OHIO ST. L.J. 651 (2012)...........................................................................14

Sheila B. Scheurman, *Due Process Forgotten: The Problem of Statutory
Damages and Class Actions*, 74 MO. L. REV. 103 (2009) ....................................14

William B. Rubenstein, 4 NEWBERG ON CLASS ACTIONS
        § 13:58 (5th ed.)..............................................................................................20

1    This supplemental submission, and the accompanying proposed amendments to the

2    Stipulation of Class Action Settlement and exhibits attached thereto (the "Settlement

3    Agreement" or "Settlement"), address the questions and concerns the Court raised at the June 4,

4    2020, hearing on Plaintiffs' motion for preliminary approval of the Settlement reached in this

5    case. It also requests a brief referral to Ambassador Jeffrey L. Bleich (ret.) for continued

6    mediation in an effort to finalize enhancements to the proposed Settlement before the Court

7    decides whether to grant preliminary approval.

8    Section I lists and discusses the Parties' amendments to the proposed Settlement

9    Agreement, including the criteria for compiling the Class List, the scope and substance of the

10   Release, and the form of the notice documents and enhanced plan for dissemination.

11   Section II provides further evidence and context regarding the record-breaking monetary

12   recovery achieved on behalf of the Class, why this Court's preliminary approval is warranted in

13   light of the risks that lay ahead in both the litigation and with respect to state and federal

14   legislative efforts that could retroactively nullify the Class's claims, and how the settlement here

15   is a landmark result that far surpasses every other class action settlement where privacy and

16   statutory damages are at issue.

17   Lastly, Section III provides further explanation about the conduct remedy under the

18   Settlement Agreement, how it materially differs from, and goes much farther than, the relief

19   obtained by the FTC in its settlements with Facebook, and how it brings Facebook in full

20   compliance with BIPA, not only on a going forward basis, but also retroactively with respect to

21   finally obtaining the informed consent of the Class Members to collect and store their biometric

22   information.

23   **I.      AMENDMENTS TO THE PROPOSED SETTLEMENT AGREEMENT**

24        **A.      Amendments to the Settlement, Notice Documents, and Plan for
                    Dissemination Addressing the Court's Questions and Concerns Regarding
25                  Certain Terms of the Settlement Agreement**

26   Plaintiffs address the questions the Court raised with respect to certain terms of the

27   Settlement Agreement. In addressing each of the questions and concerns the Court raised, the

28

Parties have agreed, among other things, to make the following amendments to the Settlement Agreement:[1]

1. <u>Court's Concerns regarding the Releasing Parties</u>: The Court made clear that it would not approve any release that goes beyond one provided by Facebook users, pointing out that the word "people" had the potential of broadening the release to non-users. (*See* Transcript of June 4 Hearing ["6/4 Tr."], attached as Exhibit 1 to the Declaration of Rafey Balabanian [Balabanian Decl.], at 24:25-25:6.)

   <u>Proposed Amendments to the Releasing Parties</u>: The Parties have agreed to the removal of the word "people," replacing it with the term "Facebook users," thus assuring that the Class is limited to Facebook users.

2. <u>Court's Concerns regarding the Released Parties</u>: The Court made clear that it would not approve any release of Facebook's corporate affiliates, such as Instagram, Oculus, etc. (6/4 Tr. at 26:24-27:12.)

   <u>Proposed Amendments to the Released Parties</u>: The list of "Released Parties" no longer includes any Facebook, Inc. applications apart from Facebook itself, such as Instagram, WhatsApp, and Oculus.

3. <u>Court's Concerns regarding the Released Claims</u>: The Court made clear that it would not approve any release that reached beyond the scope of the claims that were litigated in the case. (6/4 Tr. at 25:10-18.)

   <u>Proposed Amendments to the Released Claims</u>: The Parties have deleted the "catchall" language so that the release can be read to apply only to the BIPA claims at issue in this case and any related claims that depend on the violation of BIPA or the use of face recognition technology alleged in this action.

4. <u>Further Explanation Concerning the Class List</u>: The Court raised questions as to why the Class excludes users under the age of eighteen. (6/4 Tr. at 16:5-11.)

   <u>Proposed Amendments to the Criteria for Compiling the Class List</u>: The Parties have not removed the limiting criteria of excluding users who self-identify as under the age of eighteen from the Class List. Facebook has substantiated that it does not create templates for users who self-identify as under the age of eighteen during their Facebook membership. Facebook requires all users to provide a birth date when creating an account but does not verify this information. Thus, an individual under 18 years of age could provide a false birthdate, and thereby have a template created. But that individual is already on the Class List, because the parties are using the birthdate information provided by users to compile the Class List. Expanding the Class List to include users who self-identify as under the

---

[1] There are two exceptions: First, the Class List will continue to not to include individuals who self-identified as under the age of 18 for the entire period of their Facebook membership during the Class Period. Second, the parties have retained the limit on Prospective Relief to users who signed up for Facebook prior to September 3, 2019. Instead, Plaintiffs here attempt to explain the rationale for these positions which, as the Court noted, they failed to do in their initial preliminary approval submission.

1    age of eighteen would not target any extra class members and could lead
     to the filing of fraudulent claims.

2

5.   Court's Concerns regarding the Prospective Relief: The Court raised questions as
3    to why the conduct remedy cuts off as of September 3, 2019. (6/4 Tr. at 16:14-
     16.)

4

          Further Explanation Concerning Prospective Relief: The reason for a
5         September 2019 temporal limitation is because that is the date Facebook
          changed its user interface relating to the collection and storage of face
6         templates, and implemented a sign-up flow that affirmatively informs
          users of their ability to turn off facial recognition. Because those who
7         signed up after September 2019 have already expressed their informed
          written consent as to whether to have their face templates collected and
8         stored by Facebook, Plaintiffs did not want the Settlement to interfere with
          their stated preferences by requiring them to undertake the same process
9         again. For users who signed up prior to September 3, 2019, however,
          Plaintiffs believe that they were never offered, and thus have not provided,
10        BIPA-compliant consent, and thus, the conduct remedy finally achieves
          that for them.

11

6.   Court's Concerns regarding the Form of Notice and Plan for Dissemination: The
12   Court raised concerns about the form of the notice documents—specifically the
     language of the long-form and email notices, including that they lacked clarity
13   and contained too much legalese—and the plan for dissemination and how to
     ensure the notice garners the attention of the Class Members. (6/4 Tr. at 31:17-
14   22.)

15        Proposed Amendments to the Form of Notice and Plan for Dissemination:
          The Parties understand the Court's observations about the language of the
16        notice documents, and have redrafted them so that they use easy-to-
          understand language, which does its best to drive a high claims rate, while
17        still including what is required under Rule 23 and the N.D. Cal.
          Guidelines. Heeding the Court's admonitions, the Notice plan has been
18        expanded to include digital advertising, including 27.1 million impressions
          targeting Illinois Facebook Users and Illinois Adults 25-54 years of age
19        via the Google Display Network who may not receive the direct notice.

20        Having agreed to make the foregoing amendments, the Parties have attempted to meet

21   each of the specific concerns the Court raised at the preliminary approval hearing as to the form

22   of the Settlement Agreement. Plaintiffs are hopeful the Court shares that view, and they continue

23   to discuss further amendments to the settlement, including, with the Court's blessing, the

24   assistance of Ambassador Jeffrey L. Bleich (ret.).

25   **II.   THE BASIS FOR ACCEPTING THE MONETARY RELIEF TO THE CLASS**

26        **A.   The Monetary Relief to the Class is Fair, Reasonable, and Adequate in Light
               of the Risks That Lay Ahead**

27

28

1    The Court probed Plaintiffs about the monetary relief achieved on behalf of the Class and

2    whether it was justified in light of BIPA's set award of statutory damages. *See* 740 ILCS 14/20.

3    The Court specifically expressed concern regarding whether the amount per claimant—expected

4    to be in the projected range of $150 - $300—is fair, reasonable and adequate. While the parties

5    seek referral to Ambassador Bleich and Class Counsel continue efforts to enhance the Settlement

6    including the overall amount of the Settlement (which would increase the projected range per

7    claimant), Plaintiffs take this opportunity to explain their valuation of the case and their informed

8    belief that the result achieved on behalf of the Class is substantial and within the range of

9    approval.

10          1.   *Plaintiffs Believe that Recovering Enhanced Damages of $5,000 per Violation is*
                 *Exceedingly Unlikely in Light of the Available Evidence of Facebook's*
11               *Wrongdoing*

12    While Plaintiffs are confident in their ability to prove that Facebook acted negligently in

13    violating the BIPA (though not without acknowledging material trial risk, as described *infra* at

14    § II(A)(2)(i)-(iii), they are far less confident in proving the Company acted willfully or

15    recklessly. Plaintiffs foresaw several hurdles to obtaining enhanced damages.

16          First, the issue of when enhanced damages are available under the BIPA is one of first

17    impression. No Illinois court has authoritatively construed the distinction between negligent

18    violations and intentional or reckless ones, whether in the context of a BIPA violation or in other

19    statutes with similar right-of-action provisions. The Parties' summary judgment papers framed

20    the two sides of the debate.

21          Facebook argued that the relevant question is whether its belief that it was not collecting

22    information protected by the statute was "objectively reasonable." Facebook's rule derived from

23    Illinois law holding that when a claim of negligence is based upon compliance with a statute, a

24    jury can consider whether the defendant's conduct was "reasonable under the circumstances."

25    *See, e.g.*, *Barthel v. Ill. Cent. Gulf R. Co.*, 384 N.E.2d 323, 326 (Ill. 1978). As a corollary, under

26    Facebook's view, to obtain enhanced damages, Plaintiffs would be required to show that

27    Facebook subjectively believed that the BIPA prohibited its conduct, or that it appreciated the

28

risk that it might and chose to forge ahead anyway. Here, the evidence strongly favored Facebook.

For instance, and as discussed at the hearing on preliminary approval, Facebook specifically lobbied the Australian government to adopt the definition of biometric information contained within the BIPA, and specifically its exclusion of "photographs," a decision that is inexplicable if the company believed that the statute applied to Tag Suggestions. (6/4 Tr. at 9:6-22; Dkt. 299, at 18; Dkt. 299, Sherman Decl., Ex. 12, FBBIPA_00040772.) Facebook thus certainly had at its disposal the argument that it carefully examined compliance with the BIPA, but nevertheless concluded, in what the jury could reasonably find was in apparent good faith, that Illinois law did not apply to technology like Tag Suggestions.

Plaintiffs, by contrast, focused on whether Facebook's conduct was volitional, that is, whether Facebook understood that it was, in fact, collecting biometric information and intended to collect it. Plaintiffs relied on evidence showing that Facebook was aware that the information behind the Tag Suggestions tool was "normally referred to" as biometric data (*see* Dkt. 372, at 5), though as Plaintiffs' submissions demonstrated, even Plaintiffs did not believe those facts established as a matter of law that Facebook had intentionally violated BIPA. (Dkt. 307, at 19.) The Court already acknowledged that, at least for damages at the $5,000 level, this was a live dispute. (Dkt. 372, at 9. ("The Court will not rule out at this stage the possibility that a reasonable mistake of law might foreclose damages at the $5,000 level of exposure.").) Had the case not settled and had Plaintiffs been successful in proving an intentional violation, despite evidence to the contrary, the parties would have litigated that issue not just before this Court, but also in appellate courts.

Second, the debate over whether Facebook should be held liable for an intentional or reckless violation of the BIPA would have encompassed evidence that Facebook was mistaken about whether it had obtained consent. Facebook has repeatedly pointed to evidence regarding disclosures made during the roll out of Tag Suggestions, which, for instance, disclosed the use of "face recognition software." (Dkt. 299, at 8.) In response, Plaintiffs would point to emails in which Facebook employees or agents suggested downplaying the biometric nature of the

1   information used because those words "tend[] to scare people off." (Dkt. 307, Ex. 1.) While this

2   evidence does not paint Facebook in a sympathetic light, the repeated public announcements of

3   the product before it was brought to market does not, as Facebook's counsel pointed out at the

4   preliminary fairness hearing, lend support to the notion that Facebook "was acting recklessly or

5   willfully in the context of it attempting to tell its users about the feature." (6/4 Tr. 18:16-18.)

6          Further, when the issue of consent is at play, it changes the risk paradigm in another

7   fundamental way because it opens the door to testimony from the named Plaintiffs—who were

8   found by the Court to have assented to Facebook's Terms of Use—that they actually liked the

9   Tagging feature. Indeed, Facebook would undoubtedly point to the deposition testimony of Class

10  Representative Patel, who not only said the feature was "nice" but also admitted to its continued

11  use even after finding out that he could opt out. (See Exhibit 2 to Balabanian Decl., Excerpts

12  from the Deposition of Nimesh Patel, at 133.). Using Plaintiffs' testimony, Facebook was sure to

13  paint the picture for the jury that the Tagging feature was popular among its users. In short, it

14  would have been challenging to impanel a jury that was not familiar with Facebook and how

15  Tagging worked, and that very well could have resulted in a jury verdict that Facebook should

16  not be held liable for violating Plaintiffs' and the Class' privacy rights under BIPA.

17              2.   *Notwithstanding Plaintiffs' Confidence in the Merits of the Case, Trial Would
18                   Have Presented at Least Five Potentially Dispositive Factual Issues to Resolve*

19          Plaintiffs have always believed, and continue to believe, in the strength of this case on the

20  merits, and feel confident that the evidence would support a finding at trial that Facebook's Tag

    Suggestions feature violated the BIPA. At the same time, Plaintiffs were mindful of the Court's
21
    May 14, 2018 Order denying the Parties' respective summary judgment motions (Dkt. 372),
22
    noting that there were a "multitude of fact disputes that bar judgment as a matter of law for either
23
    side," and noting especially that this was "particularly true for plaintiffs' motion, which
24
    effectively asks for entry of judgment in their favor on a record that they concede is often
25
    unsettled." *Id.*, at 1. As such, Plaintiffs had to carefully weigh not simply amorphous trial risk in
26
    general, but the risk associated with each of the factual disputes that were ripe for adjudication in
27
    this case, any one of which could have been dispositive in Facebook's favor.
28

PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION FOR PRELIMINARY
APPROVAL OF CLASS ACTION SETTLEMENT - 3:15-cv-03747-JD                                    - 6 -

Specifically, the jury would have been charged with deciding at least the following five factual disputes:

**(i) Whether Plaintiffs and the Class Members provided BIPA-compliant consent**

Plaintiffs maintain that the language Facebook used in its terms of service prior to 2019 fell significantly short of what is required in order to satisfy BIPA's "informed written consent" standard, which is why Plaintiffs fought strenuously even after the monetary terms were agreed-in-principle to ensure that the settlement included prospective relief that would remedy that error. However, Plaintiffs must also recognize that there was nevertheless some disclosure of the Tag Suggestions feature, and the fact that many individuals, including some of the Plaintiffs, continue to use and enjoy the feature even with the understanding that their biometric identifiers are being collected. Since this question would have been left to a jury, there is a real risk that a California jury would decide that Illinoisans should have understood well enough what information Facebook is collecting, or at least that there are individualized issues of fact presented by this question.

**(ii) Whether Facebook collects "scans of face geometry"**

While Plaintiffs submit that Facebook's position that it's facial recognition algorithm does not utilize "scan[s] of face geometry" is contradicted by the evidence, it is also true that this term is not further defined by the statute, making this issue a classic "battle of the experts" on a highly complex and technical topic that combines facial recognition, computer vision and algorithmic machine learning concepts about which Facebook has fiercely argued.  Indeed, the Court in its Summary Judgment Order called this a "quintessential dispute of fact for the jury to decide" and went on to describe some of the "volleys of [] competing [fact and expert] evidence" on both sides. (Dkt. 372, at 4.) Even with the most astute and attentive jury, the risk that Facebook's highly-credentialed expert might sway the jury, or even create enough confusion to

win the day, was something Plaintiffs had to consider in light of the fact that an adverse factual

finding by a jury would result in an outright verdict in favor of Facebook.

### (iii) Whether the photograph exclusion applied

While the Court rightly rejected Facebook's photograph exception at the motion to

dismiss stage, it also permitted Facebook to explore this issue at trial, allowing that "[i]f facts

adduced at trial provide a good-faith basis for further discussion" on the photo exception

argument Facebook could then re-raise the issue. (Dkt. 372, at 7.) Given Facebook's dogged

pursuit of this defense throughout the case, there is no doubt it would have pursued it vigorously

at trial, and therefore, this was another risk that Plaintiffs had to factor into their decision.

### (iv) Whether Facebook negligently, willfully or recklessly violated the Statute

As discussed above, while Plaintiffs are confident they could have proven a negligent

violation at trial, certainly a reasonable jury could have found otherwise. And, as for proving

willfulness or recklessness, this remained highly uncertain as described above.

### (v) Where the offending conduct took place (*i.e.*, whether Illinois extraterritoriality doctrine could ultimately preclude recovery, to the extent Facebook is able to prove that the alleged violations occurred outside Illinois)

Another issue that Plaintiffs would have to contend with at trial concerns the location of

the alleged conduct, which bears on the application of Illinois' extraterritoriality doctrine.

Facebook had uncontroverted evidence that much of the activity associated with the violation

occurred on Facebook's servers outside of Illinois. Given that the architecture of Facebook's

platform is among the most complicated in the world, and the paucity of Illinois cases addressing

this issue in the digital age, Plaintiffs had to further consider the impact of such evidence both at

the trial and appellate level.

In sum, while Plaintiffs could present powerful evidence of Facebook's basic failure to

comply with the BIPA's requirements, which would at least permit the class to recover $1,000 at

1  trial, Plaintiffs also had to weigh the specific trial risks presented by this case following summary

2  judgment.

3         3. *Plaintiffs Believe the Potential of a Retroactive Amendment to the BIPA*
          *That Nullifies Plaintiffs and the Class' Claims is a Real Possibility*
4

5         It goes without saying that the longer the case was on appeal, the less valuable any

6  statutory damage award is. An additional risk in this case is that the lengthy delays inherent in an

7  appeal of a large statutory judgment would provide ample opportunity for lobbyists to pursue a

8  retroactive amendment of the BIPA that would wipe out any verdict entirely. Given the time

9  value of money, a settlement and certain and immediate payment of approximately half a billion

10 dollars now is especially valuable when compared to an uncertain payment (and risk of no

11 payment) many years into the future.

12        Special interests have been hard at work attempting to amend the BIPA since this case

13 was first filed. These yearly efforts have grown increasingly vigorous over time, and Plaintiffs

14 believe the legislative threat to this case, especially, is quite real. Although, as the Court said,

15 "the Illinois legislature has said loud and clear that this is meant to be an expensive violation"

16 (6/4 Tr. at 7:1-2), legislators in subsequent General Assemblies have expressed concern over

17 precisely that issue. A billion dollar statutory damage award would likely spell the end of the

18 BIPA, or at least the retroactive vitiating of its private right of action.

19        Plaintiffs respectfully submit that had they been offered an aggregate of $20 million, $50

20 million, or even $100 million to settle the case; the risk of no recovery due to retroactive

21 legislative action might have been one that was worth taking. But Plaintiffs here obtained a

22 significant sum—over half a billion dollars. So while it is true that the Illinois legislature placed

23 a high price tag on BIPA violations, through diligence in litigation, the Plaintiffs here exacted a

24 high price to pay from Facebook. The opportunity to collect a $550 million settlement, the

25 largest privacy payment ever, which equates to real money in the hands of Class Members,

26 rendered the risk of recovering nothing too high of a gamble.

27        This risk is not bombast. The Illinois legislature could amend the BIPA retroactively at

28 any time, including after trial and while the case was on appeal, so that even a judgment in favor

of the Class would result in class members getting nothing. *See, e.g.*, *Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1325 (2016) ("Congress may indeed direct courts to apply newly enacted, outcome-altering legislation in pending civil cases."); *Plaut v. Spendthrift Farms, Inc.*, 514 U.S. 211, 226 (1995) ("When a new law makes clear that it is retroactive, an appellate court must apply that law in reviewing judgments still on appeal that were rendered before the law was enacted, and must alter the outcome accordingly."); *Perry v. Dep't of Fin. & Prof'l Reg.*, 106 N.E.3d 1016, 1026 (Ill. 2018) ("If the legislature has clearly indicated the temporal reach [of a statute], then such temporal reach must be given effect unless to do so would be constitutionally prohibited.").

Amendment of a state-wide privacy law after favorable consumer settlements is not unprecedented. Indeed, a Michigan law, the Preservation of Personal Privacy Act, which seeks to protect consumers in the privacy of their video viewing, reading and audio preferences, was amended to remove the $5,000 statutory damage provision (in the absence of actual damages) after about a half-dozen lawsuits settled for sums in the $10 - $20 million range. While the amendment was not deemed by the courts to have retroactive effect, that didn't stop those arguments by special interest groups and litigants alike. *See, e.g.*, *Moeller v. Am. Media, Inc.*, 235 F. Supp. 3d 868, 873-75 (E.D. Mich. 2017). The potential verdict here would likely have been orders of magnitude larger, and would have given special interests a powerful argument that amendment (and *retroactive* amendment) was necessary. It would not have been in the best interests of the Class to forge ahead without a sober assessment of the potential consequences a massive verdict would bring.

As far as how close this reality has actually come in Illinois, the answer is extremely close. Class Counsel knows from first-hand experience defending the BIPA for the last five years that the Statute has, at times, been in grave danger. (*See* Declaration of Tiffany Elking ["Elking Decl."], attached as Exhibit 3 to the Balabanian Decl., ¶ 3.) As just one example, just twenty days after this Court ruled on Facebook's first Motion to Dismiss, a proposed amendment was introduced in the Illinois General Assembly that sought to retroactively amend the law to preclude its application to uploaded digital images regardless of the information collected or the

1    process of its extraction (the seminal issue Facebook had just lost in its Motion to

2    Dismiss). *See* Illinois HB 6074 (2016). The language was drafted by an industry consortium that

3    included Facebook. (Elking Decl. ¶¶ 12-13.) The Bill was introduced on a Thursday evening,

4    going into the last days of regular session over Memorial Day weekend. (Elking Decl. ¶ 4.)

5    Hoping to sneak it through the General Assembly, the Bill sponsor used a technical, procedural

6    loophole—referred to locally as "hijacking a bill"—to bypass certain notice requirements to have

7    the Bill heard on short order and without having the language public for the amount of time

8    typically required. (Elking Decl. ¶ 7.)

9         To the average person, the Bill appeared to be legislation regarding "unclaimed property"

10   (the original title for the hijacked bill). (Elking Decl. ¶ 5.) Because the Bill didn't appear on its

11   face to be controversial and it was introduced over a holiday weekend, it almost went unnoticed.

12   (Elking Decl. ¶¶ 7-8.) Class Counsel engaged dozens of advocates—from the ACLU to the

13   Georgetown Center on Law and Privacy to Unions and organizations advocating for the rights of

14   survivors of sexual abuse. (Elking Decl. ¶ 9.) Within 24 hours, Class Counsel, together with all

15   of these interest groups, collectively descended on the Capitol, prepared witnesses and

16   testimony, and alerted the media, which resulted in international attention to the industry's 11th

17   hour attempts to change the law. (Elking Decl. ¶ 9.) The unanticipated attention caused the Bill

18   Sponsor (Senator Terry Link) to pull the Bill (meaning it would not be heard that weekend).

19   (Elking Decl. ¶ 10.) Since session was ending after that weekend, it meant BIPA was safe for the

20   time being—at least until the next session. (Elking Decl. ¶ 10.)

21        With each passing year, the attempts to eviscerate BIPA get more significant and the

22   likelihood of that actually happening, become ever more real, partly because of the explosion of

23   BIPA lawsuits. (Elking Decl. ¶ 22.) There are now over 300 BIPA class actions that have been

24   filed – the vast majority of which have been brought against local Illinois employers. A number

25   of other suits were brought[2] against retailers who are important in Illinois. This has meant that

26

27   _____
     [2] Many of these were then promptly dismissed, giving the clear impression that the respective
28   plaintiffs had filed suits without having properly investigated the case.

1   the tech lobby has been able to join with other groups – retailers and employers – to form a

2   broader coalition. (Elking Decl. ¶¶ 16, 21, 23.)

3          As a corollary to that, with each passing year, industry has been able to secure

4   increasingly senior sponsors, meaning rank-and-file legislators will be more likely to follow their

5   lead and support the bills they introduce. (Elking Decl. ¶ 21.) And, this year alone, six bills have

6   been introduced that, if passed, would effectively gut the law's private-enforcement scheme. *See*

7   Illinois HB 5374 (2020); SB 3593 (2020); SB 3591 (2020); SB 2134 (2019). (See Elking Decl.

8   ¶ 20.)

9          And while the threat of state-level legislative change was more acute, there also exists the

10  possibility for an adverse legislative change at the federal level. This past year, Senator Roger

11  Wicker circulated a draft privacy bill that would have covered how companies like Facebook

12  treat biometric information, would have explicitly pre-empted state laws, and would have

13  omitted a private right of action. *See* David Shepardson & Diane Bartz, *Republican privacy bill*

14  *would set U.S. rules, pre-empt California: Senator*, Reuters (Dec. 2, 2019, 2:03 p.m.), *available*

15  *at* https://www.reuters.com/article/us-usa-privacy-congress/republican-privacy-bill-would-set-

16  us-rules-pre-empt-california-senator-idUSKBN1Y62EO. The federal legislative threat is,

17  admittedly, more remote, but it is certainly present, and factored into Class Counsel's thinking

18  about the fairness of the instant settlement.

19              4.   *Plaintiffs Believe the Post-Trial Risks, Once Appeals Ensue, Are*
                    *Substantial and Could Result in Less or No Recovery at All*

20

21         The risks that Plaintiffs and the Class face do not end when the jury returns a verdict.

22  Plaintiffs are mindful of the fact that in class-certification briefing, we explicitly argued that

23  Facebook's concerns about a substantial verdict could be accommodated through a post-trial

24  damages reduction, an argument this Court adopted in its order granting certification. (Dkt. 292,

25  at 10-11; Dkt. 333, at 15.)[3] If the Court were to uphold the jury's verdict and enter judgment on

26

27  _____

    [3]    In fact, the courts of appeals have issued similar rulings, suggesting, at the very least, that
28  courts at least consider it a live possibility that due process permits a post-trial damages
    reduction even when the applicable damages are set by statute. *See, e.g., Murray v. GMAC*

1    the amount awarded, the trial verdict would need to be defended on appeal, which while not

2    itself remarkable, poses the added (and guaranteed) risk of an appeal of the Court's initial

3    choice-of-law determination, Facebook's contention that BIPA's "photograph exception" applies

4    to its conduct, Facebook's contention that recovery here would violate either the Dormant

5    Commerce Clause or Illinois's extraterritoriality doctrine, as well as any issues raised by the

6    trial, including, for instance, Facebook's *Daubert* motions. (See Dkt. 445, at 19-22; Dkt. 447, at

7    4-7.) For many of these issues, appellate review would be *de novo* and an appellate ruling

8    adverse to the Class would preclude recovery entirely.

9         The biggest risk on appeal may be the one posed by a multi-billion aggregate statutory

10   damage award. Given the size of the Class, such an appeal would have presented Facebook with

11   a powerful opportunity to present its argument that a verdict of several billion dollars was so

12   disproportionate to the conduct here that it violates due process. Plaintiffs appreciate the Court's

13   point that "the Illinois legislature has set the benchmarks" and it isn't the job of the courts to

14   second guess that determination. (6/4 Tr. at 10:22-25.) But recent decisions out of the Circuit

15   courts have gone the other way on this issue. In *Golan v. Freeeats.com, Inc.*, 930 F.3d 950, 963

16   (8th Cir. 2019), a case brought under the Telephone Consumer Protection Act, 47 U.S.C. § 227

17   (the "TCPA"), the Eighth Circuit affirmed a 98% reduction on due process grounds. The jury

18   verdict of $1.6 billion was reduced to $32 million. (*Golan* is potentially of particular significance

19   here because one stated reason for the reduction was that the defendant "plausibly believed" it

20   was not violating the statute because it thought it had consent. *See id.* at 962-63.)[4] And, in *United*

21   *States v. DISH Network, LLC*, 954 F.3d 970, 979-80 (7th Cir. 2020), the Seventh Circuit, while

22   vacating the district court's reduction of the statutory damage award from $8.1 billion to $81

23

24   *Mortg. Co.*, 434 F.3d 948, 954 (7th Cir. 2006); *Parker v. Time Warner Entm't, L.P.*, 331 F.3d 13,
     22 (2d Cir. 2003).

25   [4]    In addition, courts have reduced awards to governments in civil enforcement actions on due
26   process grounds. *Maryland v. Universal Elections, Inc.*, 862 F. Supp. 2d 457, 466 (D. Md. 2012);
     *Texas v. Am. Blastfax, Inc.*, 164 F. Supp. 2d 892, 900 (W.D. Tex. 2001). Although the due
27   process principles are arguably different in the civil enforcement context, the awards in these
     cases were, pre-reduction, based on the aggregation of civil penalties set at the same level as the
28   statutory damages available in private actions under the same law.

PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION FOR PRELIMINARY
APPROVAL OF CLASS ACTION SETTLEMENT - 3:15-cv-03747-JD                                    - 13 -

1   million, did so not because it disagreed with the reduction on due process grounds, but because

2   the district court—by focusing on the amount the defendant was able to pay and not the relative

3   harm inflicted—undertook the wrong analysis.

4          This issue has also been the subject of abundant scholarship, much of which favors some

5   kind of proportionality review, potentially setting the stage for an extension of current due

6   process standards to the context of an enormous class verdict. *See, e.g.*, Colleen P. Murphy,

7   *Reviewing Congressionally Created Remedies for Excessiveness*, 73 OHIO ST. L.J. 651, 714-21

8   (2012) (arguing that, although "it should be rare" that a legislatively created remedy is deemed

9   excessive, the possibility exists and an award is especially likely to be problematic when

10  multiple statutory awards are aggregated); Sheila B. Scheurman, *Due Process Forgotten: The*

11  *Problem of Statutory Damages and Class Actions*, 74 MO. L. REV. 103, 132-46 (2009) (arguing

12  that "due process requires a thorough independent review of statutory damages awards"); Blaine

13  Evanson, *Due Process in Statutory Damages*, 3 GEO. J. L. & PUB. POL'Y 601, 638 (2005)

14  (arguing that "substantial deference" is due a legislature's determination about the appropriate

15  sanction for a statutory violation, but that "due process rights against arbitrary and excessive

16  awards should apply in any context, including statutory damages").

17         Thus, at best, Plaintiffs would be able to create a circuit-split with a favorable Ninth

18  Circuit opinion. And, although Plaintiffs agree with the Court that an appeal to the Supreme

19  Court is of the most remote of possibilities, were either the Ninth Circuit or the Supreme Court

20  of a mind to apply the Supreme Court's due process precedents to a statutory damages award,

21  there is unlikely to be a better vehicle than this case.[5] Indeed, there are indications that current

22  members of the Supreme Court are unlikely to allow a billion (or even multi hundred-million)

23  dollar statutory damage award to stand in a case involving not an unwitting biometric scan by

24

25

26

---

27  [5] The issue also is before the Ninth Circuit in appeal number 20-15946, *Perez v. Rash Curtis Associates*, but, as with this case, the excessiveness question is one of several raised by the appellant, and may be mooted by the Ninth Circuit's resolution of other issues.

28

PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION FOR PRELIMINARY
APPROVAL OF CLASS ACTION SETTLEMENT - 3:15-cv-03747-JD                                          - 14 -

1  Facebook, but Facebook's most utilized and popular features that relies on its own users to

2  voluntarily upload photos.[6]

3        There are a range of possible outcomes on appeal, and even a range of outcomes when it

4  comes to the length of an appeal. A denial of certiorari by the Supreme Court would undoubtedly

5  make the time of an appeal far shorter. Facebook could also win as a matter of law on appeal

6  (eliminating the Class's recovery altogether) or could win an issue that forces a new trial, which

7  the Class could then lose based on the risks outlined above.

8            *5.  A Claims Process After Trial Means Plaintiffs' and the Class' Statutory
              Damage Award Would Be Heavily Litigated, Leading to Significant
9            Delays and Potentially Depressing Claims Rates*

10       In terms of determining whether the overall settlement amount is reasonable, in addition

11  to the reasons stated in our opening brief, Plaintiffs believe several other factors to be of

12  particular significance. First, even after a verdict, a claims process would have been unavoidable.

13  As Facebook's counsel noted at the preliminary fairness hearing, Facebook has neither home

14  addresses nor bank account information for Class Members. (6/4 Tr. at 33:1-4.) Because

15  Facebook does not track the physical addresses of its users—coupled with the imprecision of its

16  "predicted home location" tool for determining residency—Class Members would ultimately

17  need to come forward to present evidence of their location in Illinois. And, consistent with due

18  process, Facebook would have been entitled to challenge that evidence. *See Briseno v. Conagra*

19  *Foods, Inc.*, 844 F.3d 1121, 1131 (9th Cir. 2017) ("Defendants will have similar opportunities to

20  individually challenge the claims of absent class members if and when they file claims for

21  damages."). Particularly given the improvements to the notice plan and documents this Court

22  ordered, Class Counsel are quite optimistic about potential claims rates. But experience shows

23  that it is highly unlikely that every, or even the majority, of Class Members would submit a

24  claim. *See id.* at 1130.

25

26  [6]   Indeed, Justice Alito has indicated that, in class actions seeking large statutory damage
      awards, "enormous potential liability is a strong factor in deciding whether to grant certiorari."
27  *Fid. Fed. Bank & Tr. v. Kehoe*, 547 U.S. 1051 (2006) (Scalia & Alito, J.J., *concurring in the*
      *denial of certiorari*).

28

1    Claims rates aside, though, proving-up each class member's claim would undoubtedly

2    take time and cost substantial money. One major benefit that the settlement provides is that,

3    while Facebook may still challenge claims, it has far less incentive to do so with a fixed amount

4    of money made available to the Class. In a post-verdict world, however, Facebook would have

5    had significant incentive to challenge claims, in an effort to have the residue of any classwide

6    verdict revert to its own pockets. Its ability to do so is unsettled, at best, as the law on this front is

7    not especially clear.

8    In the only Ninth Circuit decision dealing directly with this particular issue, the panel

9    divided. Two judges suggested in dicta that if a statute's purpose is deterrence than it would be

10    improper for unclaimed judgment funds to revert to the defendant. *See Six Mexican Workers v.*

11    *Ariz. Citrus Growers*, 904 F.2d 1301, 1309 (9th Cir. 1990). But the third judge took issue with

12    that approach. *Id.* at 1312-13 (Fernandez, J., concurring) ("Here it is said that a judge can use a

13    liquidated damage provision to mulct the defendants for an enormous sum of money. Then, if the

14    judge cannot find plaintiffs to give it to, he can do good by distributing that money to someone

15    who has no claim whatever upon it. In my opinion, that is fundamentally wrong."). *But see*

16    *Briseno*, 844 F.3d at 1130 n.8 (rejecting concerns regarding fraudulent class action claims by

17    noting that, in all likelihood, fraudulent claims would merely dilute a *cy pres* fund). Regardless,

18    this would have added yet another layer of complexity to an appeal that already features a litany

19    of complex issues. So not only does this open issue provide Facebook incentive to vigorously

20    challenge claims in a post-verdict claims process, but had Facebook won this issue on appeal, the

21    total recovery against Facebook would likely have been limited by the number of claims

22    submitted, regardless of what the judgment amount ultimately ended up being.

23    Plaintiffs respectively submit that the discount they are taking on what the class

24    theoretically stood to recover at trial is justified because, in no small part, it carries with it certain

25    non-monetary benefits, not least of which is a simple and streamlined claim process (that has

26    since been improved in light of the Court's stated concerns) that is as close to simply cutting and

27    sending checks (or directly depositing funds) as the parties could get. Some sort of claim process

28    is an inevitability in this case, but had that process come after trial the parties would have

1    expended resources litigating both what that process would look like and what to do with any

2    unclaimed funds. The Settlement is far preferable: the claims process is streamlined and no part

3    of the Settlement will revert to Facebook.

4        **B.    The Monetary Relief to the Class Far Surpasses Every Other Class Action
             Settlement Involving Privacy Violations and Statutory Damages and Some
5            Anecdotal Evidence is the Praise the Settlement Has Received Thus Far**

6            *1.    There Are No Serious Comps to the Monetary Component of the
                   Settlement*

7
         It is worth noting, in part because this District's guidelines on class action settlements
8
     require it, that the relief obtained under this Settlement far surpasses the relief obtained in other
9
     class action settlements where privacy and statutory damages were at issue. In terms of overall
10
     settlement value, the previous largest privacy settlement on record where cash was made
11
     available, was the consumer lawsuit against Equifax following its data breach exposing the
12
     information of 147 million class members. And, although that settlement was valued at $380
13
     million, much of that value came in the form of credit monitoring, and only $31 million was
14
     actually made available to claiming class members, who, if affirmed by appeal, would eventually
15
     receive essentially nominal relief.[7] Before *Equifax*, the largest privacy settlements were reached
16
     in the pending $117.5 million settlement in *In re Yahoo! Data Breach Litigation* for 194 million
17
     individuals in the US and Israel, and before that, the $195 million settlement in *In re Home*
18
     *Depot Data Breach Litigation* involving one million individuals, and before that, the $115
19
     million settlement in *In re Anthem Data Breach Litigation* that covered 79 million individuals. In
20
     each of those cases—where claims for statutory damages were also at issue—the main form of
21
     relief was non-cash in the form of credit monitoring, and the classes included tens of millions
22
     more individuals.
23
         In the TCPA context, which is a privacy statute that provides for $500 in statutory
24
     damages and has given rise to the most class action settlements, the largest settlement was
25

26   ────────────────────
     [7] Although the settlement was touted as providing $125 to each claiming class member, at the
27   time of final approval in that case, approximately 11,700,000 class members had filed claims,
     meaning they would be receiving about $2.64, not $125. *See* Final Approval Order, at 10, ECF
28   No. 956, *In re Equifax Data Breach Litig.*, No. 117-md-2800-TWT (M.D. Ga. Jan. 13, 2020).

1    reached in *Aranda v. Caribbean Cruise Lines, et al*. There, the plaintiffs recovered a common

2    fund of $76 million for a class of more than one million individuals, with claiming class

3    members receiving approximately $300. Before that, the largest settlement was for $75 million

4    reached in *In re Capital One Telephone Consumer Protection Act Litig*., 80 F. Supp. 3d 781, 787

5    (N.D. Ill. 2015), which provided $34.60 to each claiming class member. And that figure is

6    typically around what TCPA cases settle for. *See, e.g.*, *Hashw v. Dept. Stores Nat'l Bank*, 182 F.

7    Supp. 3d 935, 940, 944-45 (D. Minn. Apr. 26, 2016) (approving settlement providing class

8    members who received over 100 calls in violation of the TCPA a single $33.20 payment).`1

9        In the context of the federal Video Privacy Protection Act, 18 U.S.C. § 2710 (the

10   "VPPA"), which provides for $2,500 in statutory damages, there was a recent settlement *In re

11   Vizio, Inc., Consumer Privacy Litigation*, No. 16-ml-02693-JLS-KES (C.D. Cal.). There, the

12   plaintiffs alleged that Vizio, through its smart TVs, collected an individual's viewing history and

13   transmitted that information, along with personally identifiable information, to third parties in

14   violation of the VPPA. From the resulting $17 million settlement, claiming class members

15   received between $13 and $31 per Vizio television purchased. Before Vizio, settlements under

16   the VPPA almost uniformly took the form of *cy pres* relief. See, e.g., *In re Google Referrer

17   Header Privacy Litig*., 869 F.3d 737 (9th Cir. 2017) (affirming approval of an $8.5 million cy

18   pres settlement, where the 129 million class members stood to recover $1,000 each in statutory

19   damages), vacated on other grounds sub nom., *Frank v. Gaos*, 139 S. Ct. 1041 (2019); *Lane v.

20   Facebook, Inc*., 696 F.3d 811 (9th Cir. 2012) (affirming approval of a $9.5 million cy pres

21   settlement where some of the 3.6 million class members stood to recover $2,500 each in

22   statutory damages).[8]

23

24

25   [8] *See also, e.g.*, *In re Netflix Privacy Litig*., No. 11-cv- 00379, 2013 WL 1120801 (N.D. Cal.

26   Mar. 18, 2013)(approving a $9 million cy pres settlement where the 62 million class members
     stood to recover $2,500 each in statutory damages); *In re Google Buzz Privacy Litig*., No. 10-cv-

27   672, 2011 WL 7460099, Dkt. 61 (N.D. Cal. June 2, 2011) (approving an $8.5 million cy pres
     settlement where the 37 million class members stood to recover $1,000 each in statutory

28   damages).

1    And, Michigan's VRPA, which mirrors the VPPA, except it—until a recent

2 amendment—allowed for recovery of $5,000 in statutory damages, has seen several class

3 settlements with common funds in the $10 - $20 million range, with claiming class members

4 recovering between $32.40, *Kinder v. Meredith Corp.*, No. 1:14-cv-11284 (E.D. Mich.), and

5 $105.03, *Moeller v. Am. Media, Inc.*, No. 5:16-cv-1167-JEL-EAS (E.D. Mich.). Such recoveries

6 are anything but the exception to the rule,[9] and that also goes for cases against Facebook.

7    In *Fraley v. Facebook, Inc.*, a class sued Facebook for using their likenesses without

8 consent in "Sponsored Stories," allegedly in violation of the laws of several states, at least one of

9 which authorized statutory damages of $750. In the resulting settlement, claiming class members

10 got $15. *See* 966 F. Supp. 2d 939, 943-44 (N.D. Cal. 2013).

11    For the Court's convenience the above cases are summarized in chart form within the

12 Balabanian Declaration.

13    Ultimately, as one privacy settlement after another should make clear, there are no

14 comparables to this Settlement.[10] It is in a league of its own.[11]

15

16 [9] Of course, here have been a few outliers, like the large privacy settlement involving claims
   under the Drivers' Privacy Protection Act from 15 years ago, which established a $50 million
17 common fund for approximately 600,000 class members, with claiming class members
   recovering approximately $160 of the $2,500 in statutory damages they may have been entitled
18 to. *Kehoe v. Fidelity Fed. Bank & Tr.*, No. 03-80593-CIV-HURLEY/LYNCH (S.D. Fla.).

19 [10] There have been very few consumer BIPA settlements, and in the only other one that has
   received the final approval by the court presiding over it, claiming class members received $125.
20 *See Sekura v. L.A. Tan Enters., Inc.*, No. 2015 CH 16694 (Ill. Cir. Ct.). There have also been a
   few consumer settlements brought by employees against their employers in Illinois State courts
21 involving biometric timeclocks. Some—like other privacy settlements referenced in this brief—
   have been for zero cash and provided only non-cash relief in the form of credit monitoring. *E.g.*,
22 *Carroll v. Crème de la Crème, Inc.*, 2017 CH 01624 (Ill. Cir. Ct.). While several recent
   employment settlements have settled for $1,000 or more per person, in each case, the class size
23 ranged from a few hundred to a few thousand individuals for whom the defendants in those cases
   readily had U.S. Mail addresses. *See e.g.*, *Edmond v. DPI Specialty Foods*, 2018 CH 09573 (Ill.
24 Cir. Ct.) (fund constituting $1,000 per person with direct checks); *Watts v. Aurora Chicago
   Lakeshore Hosp. LLC*, 2017 CH 12756 (Ill. Cir. Ct.) (fund constituting $1,000 per person with
25 direct checks); *Lloyd v. Xanitos*, 2018 CH 15351 (Ill. Cir. Ct.) (fund constituting $1,300 per
   person with direct checks)

26 [11] The closest comparison to the instant settlement is Facebook's recent $5b settlement with the
   FTC. However, that was a ***nationwide*** settlement that released a host of privacy violations. After
27 adjusting for population and putting aside that the Class is releasing a narrow set of claims, this
   settlement would be valued at $14.4b, or close to three times the FTC settlement.
28

1           *2. The Public Reaction to the Proposed Settlement Was Universally Positive*

2           Public reaction to the terms of a class action settlement are often presented at the final

3      approval stage, as the parties are able to describe the number of opt outs and the quality and

4      quantity of any objections. *See Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 577 (9th Cir.

5      2004); William B. Rubenstein, 4 NEWBERG ON CLASS ACTIONS § 13:58 (5th ed.). At this

6      preliminary stage, however, the Court has the rare opportunity to consider public reaction, which

7      has universally hailed the proposed $550 million cash settlement as a watershed moment for

8      consumer privacy rights.

9           On January 29, 2020, Facebook disclosed the proposed $550 million settlement in its

10     Form 10-K SEC filing,[12] which quickly elicited wide-ranging reactions exalting the result.

11     Matthew Kugler, a professor at Northwestern University's Pritzker School of Law, declared the

12     settlement historic.[13] Illinois State Representative Ann Williams proclaimed "the settlement is

13     going to mean real money for Illinois consumers based on Facebook's disregard of our law and

14     biometric technology."[14] And the Illinois Public Interest Research Group noted the settlement

15     was not only a "victory for Illinoisans whose privacy rights were violated" but also for the

16     "Biometric Information Privacy Act."[15]

17          Even Ted Frank—the Director of the Hamilton Lincoln Law Institute and the Center for

18     Class Action Fairness—lauded the settlement. Frank has been described by Adam Liptak of the

19     New York Times as "the leading critic of abusive class action settlements," and by the American

20     Lawyer Litigation Daily as "the indefatigable scourge of underwhelming class action

21

22          [12]   Facebook, Inc., Annual Report (Form 10-K) (Jan. 29, 2020).

23          [13]   Ally Marotti, *Facebook may pay Illinois users a couple of hundred dollars each in $550*
24     *million privacy settlement*, Chicago Tribune (Jan. 30, 2020),
       https://www.chicagotribune.com/business/ct-biz-facebook-class-action-settlement-20200130-
25     mpp7vvpgvzeehfj4gbvzlwp3yy-story.html.

26          [14]   Fox 32 Chicago, *Facebook to pay $550 million to Illinois users to settle lawsuit*,
       https://www.fox32chicago.com/video/649965 (Jan. 30, 2020).

27          [15]   Illinois Public Interest Research Group (@IllinoisPIRG), Twitter (Jan. 29, 2020, 7:00 PM),
28     https://twitter.com/IllinoisPIRG/status/1222670937566466048

1   settlements."[16] Here, however, Frank tweeted to his nearly thirteen thousand followers, "Oh,

2   look, it is possible to bring a privacy class action and win real money for the class if it's done by

3   attorneys who are putting class interests first."[17]

4          Similar sentiments were echoed by legal, technology, and financial media outlets.

5   Bloomberg reported the settlement was a "huge win for consumers,"[18] and Reuters announced

6   that the class recovery "rested on two things: the Illinois statute and the class counsel's

7   determination to enforce it."[19]

8          Even before the Court's requested improvements to the proposed settlement, it was

9   widely praised by academia, politicians, media outlets, analysts, and consumer advocacy groups

10  primarily because of its sheer magnitude. It is the "largest-ever [proposed] cash settlement

11  resolving a privacy-related issue,"[20] and "dwarf[ed] the $380.5 million that [Equifax] agreed . . .

12  to pay to settle a class-action case over a 2017 consumer data breach."[21] Indeed, prior to

13  Facebook's settlement announcement, Bloomberg's litigation analysts predicted the case was

14  likely to settle in the "$300 to $600 million" range.[22] Thus, the settlement before the Court is on

15  the high end of Bloomberg's predicted range.

16

17  [16]   Hamilton Lincoln Law Institute, https://hlli.org/ted-frank/

18  [17]   Ted Frank (@tedfrank), Twitter (Jan 30, 2020, 7:46 AM),
    https://twitter.com/tedfrank/status/1222863692280152067

19
    [18]   Bloomberg Markets, *Facebook Settles Biometric Privacy Case for $550 Million*,
20  https://www.bloomberg.com/news/videos/2020-01-30/facebook-settles-biometric-privacy-case-
    for-550-million-video (Jan. 29, 2020).

21  [19]   Alison Frankel, *Does Facebook's $550 Million Settlement Change the Privacy Class Action
22  Game?*, Reuters (Jan. 30, 2020), https://www.reuters.com/article/us-otc-facebook/does-
    facebooks-550-million-settlement-change-the-privacy-class-action-game-idUSKBN1ZT33O.

23  [20]   David McCann, *Facebook Settlement May Trigger More Privacy Laws*, CFO (Feb. 11,
24  2020), https://www.cfo.com/legal/2020/02/facebook-settlement-may-trigger-more-privacy-laws/

25  [21]   Natasha Singer, *Facebook to Pay $550 Million to Settle Facial Recognition Suit*, New York
    Times (Jan. 29, 2020) https://www.nytimes.com/2020/01/29/technology/facebook-privacy-
26  lawsuit-earnings.html#:~:text=Facebook%20said%20on%20Wednesday%20that,social
    %20network's%20data%2Dmining%20practices.

27  [22]   Matthew Schettenhelm, *Facebook Sued for Photo Scans*, Bloomberg Intelligence (Jan. 23,
28  2020).

PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION FOR PRELIMINARY
APPROVAL OF CLASS ACTION SETTLEMENT - 3:15-cv-03747-JD                            - 21 -

1           Typically, no objective indicators exist to gauge class members reactions to a proposed

2    settlement at the preliminary approval stage. But in this case, the consistent public reaction

3    indicates the class will react favorably, and further demonstrates the result—even against the

4    backdrop of the potential statutory damages available—is significant and far exceeds the relief

5    obtained in every other privacy settlement.

6    **III.   THE PROSPECTIVE RELIEF REQUIRES CONSIDERABLY MORE OF**
     **FACEBOOK THAN THE 2019 FTC ORDER**

7           A large portion of the Parties' negotiations centered on the prospective relief that Class

8    Members would receive. Although several different approaches were drafted and discussed, the

9    common thread was Plaintiffs' requirement—best articulated by this Court and adopted by the

10   Illinois Supreme Court—that any settlement needed to affirmatively inform class members of

11   their "right to say no" to the collection of their biometric information. Here, the Settlement

12   Agreement provides that and more, and does so in a way that requires more of Facebook than the

13   recent FTC settlement.

14          The recent consent decree reached between Facebook and the FTC includes a narrow

15   provision regarding facial recognition. The trouble, from the FTC's perspective, occurred when

16   Facebook began migrating users from the older Tag Suggestions tool to its new Face

17   Recognition tool. Although Facebook pushed alerts regarding this migration to its users, those

18   alerts did not reach all Facebook users. For those users who did not see the alerts, Facebook left

19   the Tag Suggestions tool active. Yet Facebook updated its privacy policies as though every user

20   had the Face Recognition tool active on their account. Thus, for a small subset of users,

21   Facebook's disclosures about Face Recognition were incorrect, and therefore misleading. *See*

22   Complaint, ¶¶ 144-154, *United States v. Facebook, Inc.*, No. 19-cv-2184, ECF No. 1 (D.D.C.

23   July 24, 2019). The 2019 FTC consent decree requires Facebook to provide that subset with a

24   standalone disclosure regarding the new Face Recognition tool, and to delete any templates for

25   users who do not affirmatively opt in to using the new tool within 90 days. *See* Decision and

26

27

28

1  Order, at 8, *United States v. Facebook, Inc.*, No. 19-cv-2184, ECF. No. 2-1 (D.D.C. July 24,

2  2019).[23]

3        The conduct remedy here is both far broader and targets the Class. Even for those who

4  already received notices the FTC did not deem to be misleading, the Settlement requires

5  Facebook to affirmatively take Illinois users through a new Face Recognition sign-up flow,

6  informing them in a separate document how Facebook uses photos and its facial-recognition

7  software. [24] Class Members will have Face Recognition turned "on" only if they affirmatively

8  elect to do so. (Stipulation ¶ 2.9.) Any existing facial-recognition data will be deleted unless the

9  user elects to continue using the tool (and users who have been inactive for at least three years

10  will have their template data delated). Many (if not all) of these individuals had been migrated to

11  the Face Recognition tool automatically under Facebook's older practices, *i.e.*, without written

12  consent under Plaintiffs' theory of the case.

13        We firmly believe this conduct remedy is fair, reasonable, and adequate. Plaintiffs'

14  principal concerns with Facebook's prior practices were: (1) automatic enrollment in Tag

15  Suggestions; and (2) language that obscured the role biometrics were playing in Tag

16  Suggestions. (See Dkt. 307, at 15-18.) As our previous filings make clear, Plaintiffs and Class

17  Counsel firmly believe that the "informed and written consent" required by the statute could only

18  be obtained if Facebook disclosed how Tag Suggestions/Face Recognition operates, and obtained

19  affirmative consent from users. The stipulated conduct remedy does both of those things.

20

21

22  [23]  The Court rightly noted that the FTC and the district court in *Facebook* had concerns about
   the company's compliance with the 2012 decree. But those concerns did not relate to the Face
23  Recognition tools on the Facebook platform—neither Face Recognition nor image tagging was a
   subject of the 2012 decree.

24  [24]  By virtue of the FTC consent decree, Facebook in September 2019 altered the sign-up
25  process for Face Recognition for *new* Facebook users in a way that required affirmative consent
   to use of the tool. Facebook also took steps to obtain affirmative consent from certain affected
26  users. The forward-looking relief in the Settlement does not apply to these users, who have
   already been given an affirmative opportunity to say no to the use of Face Recognition on their
27  uploaded images. We determined that shuttling these users through a second sign-up process was
   likely to be more confusing than helpful. These users are, however, still part of the Class, and
28  still entitled to make a claim for payment from the Settlement Fund.

1    This goes beyond what is required by the law, as well. Rather than include a general

2  exhortation in the Settlement that Facebook should "implement practice changes that bring its

3  facial recognition technology in compliance with BIPA," the parties negotiated specific steps

4  that Facebook must take to remedy it's alleged past misconduct. Neither a standalone disclosure

5  nor the deletion of data are strictly required by the BIPA, but we believe both steps are necessary

6  to truly vindicate the privacy rights of the certified Class.

7    It is for these reasons, in addition to those articulated in the initial briefs in support of the

8  Settlement, that Plaintiffs and Class Counsel considered the settlement reached here to be

9  exceptional given the risks associated with continued litigation and inevitable extended delay

10  that would result, measured against the likely recovery for Class Members under the Settlement.

11  Nevertheless, as stated at the outset of this brief, Plaintiffs also respectfully request a brief

12  referral to Ambassador Jeffrey L. Bleich (ret.) for continued mediation in an effort to finalize

13  enhancements to the proposed Settlement before the Court decides whether to grant preliminary

14  approval.

15

16  DATED: July 9, 2020                              Respectfully submitted,

17                                                   EDELSON PC
                                                     RAFEY S. BALABANIAN
18                                                   J. AARON LAWSON
                                                     LILY HOUGH
19

20                                                       s/ Rafey Balabanian

21                                                   [ATTORNEY SIGNATURE]

22                                                   123 Townsend Street, Suite 100
                                                     San Francisco, CA 94107
23                                                   Telephone: 415/212-9300
                                                     415/373-9435 (fax)
24
                                                     JAY EDELSON*
25                                                   RYAN D. ANDREWS*
                                                     BENJAMIN RICHMAN*
26                                                   ALEXANDER G. TIEVSKY*
                                                     350 North LaSalle Street, 14th Floor
27                                                   Chicago, IL 60654
                                                     Telephone: 312/589-6370
28                                                   312/589-6378 (fax)

1

2      ROBBINS GELLER RUDMAN
          & DOWD LLP
3      PAUL J. GELLER
       STUART A. DAVIDSON
4      CHRISTOPHER C. GOLD
       120 East Palmetto Park Road, Suite 500
5      Boca Raton, FL 33432
       Telephone: 561/750-3000
6      561/750-3364 (fax)

7      ROBBINS GELLER RUDMAN
          & DOWD LLP
8      PATRICK J. COUGHLIN
       ELLEN GUSIKOFF STEWART
9      LUCAS F. OLTS
       RANDI D. BANDMAN
10     655 West Broadway, Suite 1900
       San Diego, CA 92101
11     Telephone: 619/231-1058
       619/231-7423 (fax)
12

13     ROBBINS GELLER RUDMAN
          & DOWD LLP
14     SHAWN A. WILLIAMS
       JOHN H. GEORGE
15     Post Montgomery Center
       One Montgomery Street, Suite 1800
16     San Francisco, CA 94104
       Telephone: 415/288-4545
17     415/288-4534 (fax)

18     LABATON SUCHAROW LLP
       MICHAEL P. CANTY*
19     CORBAN S. RHODES*
       140 Broadway
20     New York, NY 10005
       Telephone: 212/907-0700
21     212/818-0477 (fax)

22

23     Attorneys for Plaintiffs

24     * = appearance *pro hac vice*

25

26

27

28

PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION FOR PRELIMINARY
APPROVAL OF CLASS ACTION SETTLEMENT - 3:15-cv-03747-JD                    - 25 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 9, 2020, I served the above and foregoing Supplemental Brief in Support of Preliminary Approval and Request for Referral by causing true and accurate copies of such paper to be filed with the Court's CM/ECF system, which will send e-mail notification of such filing to counsel for all parties.

<u>s/</u> Rafey Balabanian